NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-1067

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

MARIN AUDUBON SOCIETY, et al.,
*Petitioners,*

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents.*

_____

**OPENING BRIEF OF PETITIONERS**

Peter T. Jenkins
D.C. Bar No. 477229
Paula Dinerstein
D.C. Bar No. 333971
Public Employees for Environmental
  Responsibility
962 Wayne Ave., No. 610
Silver Spring, MD 20910
202-265-4189
pjenkins@peer.org
pdinerstein@peer.org
Attorneys for Petitioners

July 18, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.      Parties and Amici.** The parties to this matter are: <u>Petitioners</u> - Marin

Audubon Society; Watershed Alliance of Marin; Public Employees for

Environmental Responsibility (PEER); and Laura Chariton. <u>Respondents</u> - U.S.

Department of Transportation, Federal Aviation Administration; and U.S.

Department of the Interior, National Park Service. There currently are no

intervenors or amici. There were no proceedings in the District Court, thus no other

parties appeared there.

**B.      Ruling Under Review**. The ruling under review is the unnumbered final

order of the Respondents, issuing the Record of Decision approving the Air Tour

Management Plan for Golden Gate National Recreation Area, Muir Woods

National Monument, San Francisco Maritime National Historical Park, and Point

Reyes National Seashore, dated January 10, 2023, released on January 17, 2023. It

was not published in the Federal Register. Petitioners filed a copy of the final order

with their Petition for Review on March 13, 2003.

**C.      Related Cases**. *In Re Public Employees for Environmental Responsibility*

(Writ of Mandamus), Case No. 19-1044, U.S. Court of Appeals for the DC Circuit,

Opinion, Document #1840825, and Per Curiam Order granting the Writ of

Mandamus, Document #1840824, dated May 1, 2020, reported at 957 F.3d 267

(D.C. Cir. 2020). A Per Curium Order of July 7, 2023, Document # 2006865,

i

denying Petitioners' Third Motion to Enforce Order Granting Petition for

Mandamus therein without prejudice, points directly to the present case as related.


Respectfully submitted,

 /s/ Peter T. Jenkins
Peter T. Jenkins, Attorney for Petitioners

## CORPORATE DISCLOSURE STATEMENT

Petitioners file this Disclosure Statement required by Circuit Rule 26.1:

Marin Audubon Society is a non-profit, tax-exempt corporation headquartered in Mill Valley, California. Its purpose is to conserve and restore natural ecosystems in Marin County, focusing on birds, other wildlife, and their habitats, for the benefit of humanity and the Earth's biological diversity. Marin Audubon Society has no parent companies and no publicly owned company has a 10% or greater ownership interest in it.

Watershed Alliance of Marin is a 501(c)(3) nonprofit, tax-exempt corporation headquartered in Mill Valley, California. The Alliance's purposes include protecting the streams, watersheds, and wildlife of Marin County. Watershed Alliance of Marin has no parent companies and no publicly owned company has a 10% or greater ownership interest in it.

PEER is a non-profit, tax-exempt corporation incorporated in the District of Columbia. Its purposes include educating employees of resource management and environmental protection agencies nationwide, and the public, about environmental ethics and to assist those who speak out on behalf of environmental ethics. PEER has no parent companies and no publicly owned company has a 10% or greater ownership interest in it.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............. i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF CONTENTS ................................................................ iv

TABLE OF AUTHORITIES .......................................................... vi

GLOSSARY ............................................................................x

JURISDICTIONAL STATEMENT ..................................................1

STATEMENT OF ISSUES ...........................................................1

STATEMENT OF THE CASE .......................................................3

SUMMARY OF ARGUMENT .......................................................7

STANDING ............................................................................9

I.    AIR TOURS' ENVIRONMENTAL IMPACTS AND HARM TO THE
      PETITIONERS. ...............................................................11

II.   PETITIONERS HAVE SHOWN REDRESSABLE INJURIES FAIRLY
      TRACEABLE TO THE CHALLENGED ACTIONS. ........................13

ARGUMENT ..........................................................................14

I.    STANDARD OF REVIEW .....................................................14

II.   THE CATEGORICAL EXCLUSION FROM NEPA COMPLIANCE FOR
      THE SF AREA ATMP VIOLATED NPATMA. ...............................15

      A.    Violation of NPATMA's plain language. ..........................15

      B.    Violation of NPATMA's purpose and structure. ..................20

III.    INVOCATION OF THE CATEGORICAL EXCLUSION WAS
INCONSISTENT, ARBITRARY, AND CAPRICIOUS. ....................................24

IV.    THE AGENCIES' CATEGORICAL EXCLUSION VIOLATED NEPA
BECAUSE "EXTRAORDINARY CIRCUMSTANCES" EXISTED. ................31

V.    THE APPROPRIATE REMEDY IS TO PROHIBIT FURTHER AIR
TOURS OR REMAND AND RETAIN JURISDICTION. ..................................37

CONCLUSION ..................................................................................................40

CERTIFICATE OF COMPLIANCE ......................................................................42

APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*AHA v. Azar*, No. 18-cv-2084, 2019 U.S. Dist. LEXIS 114658 (D.D.C. July 10,

    2019) ................................................................................................39

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851 (9th Cir. 1999) ..........21

*Andrus v. Sierra Club*, 442 U.S. 347 (1979)...........................................................17

*Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89 (D.D.C. 2006) ....31

*Baltimore Gas and Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87

    (1983) ................................................................................................22

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003)...............................................19

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ....................................17

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012 (10th

    Cir. 2002) ..........................................................................................31

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001)...................................................39

*Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013) ......................9

*Delaware v. Pennsylvania*, 2021 U.S. LEXIS 6295 (July 23, 2021)........................18

*Diné Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209 JB/SCY, 2015

    U.S. Dist. LEXIS 109986 (D.N.M. Aug. 14, 2015)..............................17

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143 (1985) ................................ 21, 30

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167 (2000) ...................................................................................................................9

*Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270 (D.C. Cir. 1988) .........15

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ..........................10

*In re Pub. Emps. for Envt'l Responsibility*, 957 F3d 267 (D.D.C 2020).......... 23, 39

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) .............................................................22

*Loving v. IRS*, 917 F. Supp. 2d 67 (D.D.C. 2013)....................................................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)..........................................9, 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .30

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017) .........................................................18

*NRDC v. EPA*, 755 F.3d 1010 (D.C. Cir. 2014) .......................................................9

*Pub. Emps. for Env't Responsibility v. Nat'l Park Serv*., 605 F. Supp. 3d 28 (D.D.C. 2022) ..................................................................................................................22

*Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of Interior*, 832 F. Supp. 2d 5 (D.D.C. 2011)..................................................................................................13

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,* 547 U.S. 47 (2006)....................9

*Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17 (D.D.C. 2013)...............................31

*Shays v. Fed. Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005) ..............................13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021) ...........................................................................................................37

*United States v. Rodgers*, 461 U.S. 677 (1983) ........................................................19

*United States v. Vonn*, 535 U.S. 55, 65 (2002)........................................................19

*W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803 (9th Cir. 1980) ......................................37

### Statutes

5 U.S.C. § 706(2)(A)................................................................................30

42 U.S.C. § 4321 ......................................................................................2

42 U.S.C. § 4332 ....................................................................................22

49 U.S.C. § 40128(a)(2)(D) ......................................................................3

49 U.S.C. § 40128(a)(2)(E)........................................................................3

49 U.S.C. § 40128(b) ..............................................................................18

49 U.S.C. § 40128(b)(1)(B)....................................................................3, 20

49 U.S.C. § 40128(b)(3). ..........................................................................3

49 U.S.C. § 40128(c) ................................................................................4

49 U.S.C. § 40128(b)(1)(A) ......................................................................3

49 U.S.C. § 40128(b)(2) ....................................................................... passim

49 U.S.C. § 40128(b)(3)(A) ....................................................................21

49 U.S.C. § 40128(b)(5) ............................................................................1

49 U.S.C. § 46110(a)................................................................................1

**Other Authorities**

70 Fed. Reg. 36456 (June 23, 2005) ........................................................27

72 Fed. Reg. 6802 (Feb. 13, 2007) .....................................................4, 24

76 Fed. Reg. 45,312 (July 28, 2011) .......................................................26

85 Fed. Reg. 55060 (September 3, 2020) ..............................................18

88 Fed. Reg. 37270, 37270-37271 (June 7, 2023).....................................7

H. Rpt. 106-167 (1999) ...........................................................................20

**Regulations**

40 C.F.R. § 1505.2 ...................................................................................16

40 C.F.R. § 1505.2(b) ..............................................................................16

40 C.F.R. § 1508.4 ...................................................................................16

40 C.F.R. § 1508.10 ........................................................................... 17, 18

43 C.F.R. § 46.215 .......................................................................... 2, 8, 31, 32

# GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **AR** | Administrative Record |
| **ATMP** | Air Tour Management Plan |
| **CEQ** | Council on Environmental Quality |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **FAA** | Federal Aviation Administration |
| **MAS** | Marin Audubon Society |
| **NEPA** | National Environmental Policy Act |
| **NPATMA** | National Parks Air Tours Management Act |
| **NPS** | National Park Service |
| **PEER** | Public Employees for Environmental Responsibility |
| **SF** | San Francisco, California |
| **WAM** | Watershed Alliance of Marin |

## JURISDICTIONAL STATEMENT

The basis for the Court's jurisdiction is that Petitioners filed a Petition for Review, challenging the final order of the Respondents U.S. Department of Transportation, Federal Aviation Administration (FAA), and U.S. Department of the Interior, National Park Service (NPS) (collectively, "the Agencies"), that issued a Record of Decision approving the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore ("SF area ATMP"), dated January 10, 2023, issued on January 17, 2023. The Petition for Review was filed pursuant to 49 U.S.C. § 40128(b)(5), which provides that newly-issued ATMPs are subject to judicial review, and 49 U.S.C. § 46110(a), which allows review in this Court.

The Petition was filed on Monday, March 13, 2023. That was within 60 days of the issuance of the SF area ATMP, in compliance with 49 U.S.C. § 46110(a), which allows up to 60 days for filing such petitions for review.

Based on the above, the D.C. Circuit Court of Appeals has jurisdiction.

## STATEMENT OF ISSUES

1. By relying on a categorical exclusion, did the Agencies violate the National Parks Air Tour Management Act of 2000 (NPATMA, 49 U.S.C. § 40128(b)(2))

1

when that law explicitly requires full National Environmental Policy Act

(NEPA; 42 U.S.C. § 4321, et seq.) compliance in the form of an Environmental

Assessment (EA) or Environmental Impact Statement (EIS) before they could

approve the SF area ATMP?[1]

2. Did the Agencies' reliance on the categorical exclusion for the subject ATMP

   violate NPATMA, NEPA, and applicable regulations because they utilized past-

   allowed air tour levels, which never had been previously assessed by either the

   FAA or NPS under NEPA, as their assessment "baseline" to justify invoking the

   categorical exclusion?

3. Did the Agencies violate NEPA and its implementing regulations when they

   failed to conduct the required "hard look" by preparing an EA or EIS, failed to

   consider any alternatives to their Proposed Action, and failed to take public

   comment on a draft EA or EIS; and when their analysis of the Proposed Action

   was inadequate on key impacts of noise, human disturbance, and wildlife

   disturbance?

4. Did the Agencies violate NEPA and its implementing regulations by failing to

   determine that "extraordinary circumstances" under 43 C.F.R. § 46.215 applied

---

[1] Note the appended compilation of cited statute sections and regulations per
Circuit Rule 28(a)(5).

to disqualify the novel, sweepingly impactful, and highly controversial SF area
ATMP from approval under a categorical exclusion?

## STATEMENT OF THE CASE

The NPATMA required vendors who wished to conduct commercial air tours
over certain National Parks to first obtain a permit from the FAA. 49 U.S.C. §
40128. It provides that the FAA, "in cooperation with" the NPS, "shall establish an
air tour management plan . . . whenever a person applies for authority to conduct a
commercial air tour operation." 49 U.S.C. § 40128(b)(1)(A). The FAA may not
grant operating authority to any applicant before completion and implementation
of an ATMP. *Id.* § 40128(a)(2)(D). The FAA is to "make every effort" to act on
applications for operating authority and issue a decision not later than 24 months
after the application is received. 49 U.S.C. § 40128(a)(2)(E).

ATMPs are intended to mitigate or prevent any significant adverse impacts
of commercial air tours on the natural and cultural resources and visitor experience
at parks and adjacent tribal lands. 49 U.S.C. § 40128(b)(1)(B). To achieve this
goal, ATMPs may prohibit commercial air tours over a National Park in whole or
in part; establish routes, allowed altitudes, time of day restrictions, restrictions for
particular events, and maximum number of flights per unit of time; and provide for
mitigation of noise, visual and other impacts. 49 U.S.C. § 40128(b)(3). Preparation
of an ATMP requires review under NEPA. 49 U.S.C. § 40128(b)(2).

3

NPATMA also provides for the grant of Interim Operating Authority by the FAA Administrator to operators pending development of an ATMP and terminating 180 days after the establishment of an ATMP. 49 U.S.C. § 40128(c). The FAA has described Congress's creation of Interim Operating Authority for existing tour operators over National Parks as intended solely to bridge the gap while ATMPs are being developed.

> Congress set up the IOA process as a way of ensuring that those commercial air tour operators conducting commercial air tours over national parks at the time of Act's enactment would not be put out of business while the FAA, in cooperation with NPS, analyzed the environmental impact of the air tours on the national park unit and developed an ATMP. The IOA then ends 180 days after the ATMP is adopted.
>         . . . .
> IOA was designed as a temporary solution to allow operators already conducting air tours at the time of the enactment of the Act to continue to operate pending completion of the ATMP, or new entrants to begin operation to ensure competition.

*Notice of Final Opinion on the Transferability of Interim Operating Authority under the National Parks Air Tour Management Act*, 72 Fed. Reg. 6802, 6803 (Feb. 13, 2007).

After the passage of NPATMA in 2000, the FAA granted Interim Operating Authority to numerous air tour operators, but as of 2019, had not completed any ATMPs. In February 2019, PEER (a Petitioner here) and the Hawaii Island Coalition Malama Pono filed a Petition for a Writ of Mandamus in this Court,

4

alleging unreasonable delay in establishing ATMPs decades beyond the two years targeted in the statute. On May 1, 2020, this Court granted the Writ and ordered the Agencies to produce a plan that would bring all parks covered by NPATMA into compliance within two years.[2]

Then, earlier this year, the Agencies issued a joint decision on January 10, 2023, approving the SF area ATMP, which covered four separate but linked National Park units: the Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore. Administrative Record (AR) 0000001. The ATMP authorized 2,548 commercial airplane and helicopter flights per year over these parks, which are now ongoing. AR 0001833. The Agencies issued the SF area ATMP based on a categorical exclusion under NEPA. AR 0000024-025.

---

[2] *In Re Public Employees for Environmental Responsibility* (Writ of Mandamus), Case No. 19-1044, U.S. Court of Appeals for the DC Circuit, Opinion, Document #1840825, and Per Curiam Order granting the Writ of Mandamus, Document #1840824, dated May 1, 2020, reported at 957 F.3d 267 (D.C. Cir. 2020). On March 10, 2023, Petitioners in that case filed their Third Motion to Enforce Order Granting Petition for Mandamus. Document #1989723. The NPATMA and NEPA arguments in that Motion, while less extensive and detailed there, overlap with the arguments in this Opening Brief. The Per Curiam Order of July 7, 2023, document # 2006865, denied that Third Motion to Enforce without prejudice while pointing directly to the pending issues in the present case.

The Petitioners Marin Audubon Society, Watershed Alliance of Marin, and Laura Chariton had timely filed comments in response to the public comment period on the ATMP opened by the NPS. AR 0003136-137 and 0003268-269. Their comments stated the procedural and substantive deficiencies in the decision process and how those deficiencies, as well as the air tours themselves, negatively impacted them. Because the agencies did not later correct those deficiencies, the Petitioners timely sought judicial review.

Both the Petitioners and the Agencies recognize that the Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore are outstanding areas. AR 0001830-832 (overview in ATMP). They allow for a wide array of outdoor recreation, provide wildlife viewing opportunities, and conserve open space and other natural and cultural resources that are virtually unique nationally for their proximity to a huge metropolitan area. Collectively, they provide habitat for over 1,300 plant and animal species, including at least 37 threatened and endangered species. *Id.* The NPS has formally nominated the Golden Gate National Recreation Area and Point Reyes National Seashore for

6

inclusion on the United Nations World Heritage List of national and cultural sites of global significance.[3]

## SUMMARY OF ARGUMENT

The NPATMA, 49 U.S.C. § 40128(b)(2), expressly requires full NEPA compliance in the form of an EA or EIS before the Agencies could approve the SF area ATMP. Yet, they issued it based on a categorical exclusion under NEPA. This violated § 40128(b)(2) because the plain language of that section calls for an EA or EIS for a new ATMP. This is reinforced by reviewing long-accepted NEPA terminology in the statute as well as the definitions in the Council on Environmental Quality's (CEQ) NEPA-implementing regulations, 40 C.F.R. Parts 1500–1508. Further, the legislative history and structure of NPATMA make clear that the only reasonable reading of § 40128(b)(2) is that either an EA or an EIS is required.

By relying on the categorical exclusion, the Agencies failed to conduct a comprehensive analysis of how air tours were affecting the Park resources and other visitors, failed to consider reasonable alternatives to their Proposed Action, and also denied the Petitioners and the public at large a vital opportunity to comment on a draft EA or EIS for the Agencies' proposed SF area ATMP.

---

[3] *U.S. Nominations to the World Heritage List; 21-Day Notice of Opportunity for Public Comment*, 88 Fed. Reg. 37270-37271 (June 7, 2023).

Even assuming, *arguendo,* that no NPATMA violation occurred, the Agencies nevertheless violated NEPA by relying on the categorical exclusion. First, the particular categorical exclusion relied upon cannot be used here. It applies to "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." NPS NEPA Handbook 3.3 Al (516 DM 12). AR 0000148. The agencies claimed the "approved action" was the existing Interim Operating Authority, and specifically the average number of flights conducted under that authority between 2017 and 2019. *Id*. However, the statutory scheme does not permit Interim Operating authority to be considered an "approved action" that an ATMP would change or amend. Interim Operating Authority was approved in NPATMA only as a temporary measure until ATMPs could be developed with full environmental review, after which it would expire.

Further, the Agencies inexplicably relied on the flawed baseline of Interim Operating Authority as the basis for their categorical exclusion determination after previously determining several years earlier that a full EA <u>was</u> necessary for the SF area ATMP. Also, by not preparing an EA, they treated the San Francisco area Parks inconsistently compared to how they treated other Park units nationally for which EAs were required.  Additionally, they violated Department of the Interior regulation 43 C.F.R. § 46.215 on categorical exclusions because they arbitrarily and capriciously ignored substantial evidence of at least three "extraordinary

8

circumstances," which mandated preparation of an EA or EIS rather than relying on a categorical exclusion.

## STANDING

The Petitioners bear the burden of proving the three requirements of constitutional standing: (1) an actual or imminent concrete and particularized injury; (2) a causal connection between the injury and conduct alleged; and (3) a likelihood that a favorable decision would redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Petitioners Marin Audubon Society (MAS), Watershed Alliance of Marin (WAM), and PEER claim representational standing on behalf of their members. Accordingly, each group must demonstrate that: "[1] its members would otherwise have standing to sue in their own right, [2] the interests it seeks to protect are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members." *NRDC v. EPA*, 755 F.3d 1010, 1016 (D. C. Cir. 2014) (quoting *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013). The injury inquiry focuses on injury to the claimant, not injury to the environment. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000). The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,* 547 U.S. 47, 52 n.2, (2006).

9

 Declarations are attached by the following officers and members of the associations: Barbara Salzman (MAS), Nik Bertulis (WAM), and Timothy Whitehouse (PEER).[4] The interests that MAS, WAM, and PEER seek to protect through this litigation are clearly germane to their organizational purposes. MAS seeks "to conserve and restore natural ecosystems in Marin County [where Point Reyes National Seashore and parts of Golden Gate National Recreation Area are located], focusing on birds, other wildlife, and their habitats, for the benefit of humanity and the Earth's biological diversity." Salzman Decl., ¶ 2. Petitioner WAM aims at "protecting the streams, watersheds, and wildlife of Marin County." Bertulis Decl., ¶ 2. And PEER's fundamental goal, working in conjunction with government personnel in environment-connected public agencies, is the "responsible management of America's public resources, including National Parks and other public lands." Whitehouse Decl., ¶ 2.

Neither the claims in this action nor the relief requested require the participation of individual members of the organizations. The claims are not specific to any individual members and the relief sought would address the members' injuries without the necessity of any individualized relief. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) ("If . . . the

---

[4] Petitioners' Standing Declarations were filed previously, on April 13, 2023, with their Docketing Statement, document # 1994642.

10

association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured") (citation omitted).

Additionally, Laura Chariton has standing as an individual Petitioner, per her appended declaration. She seeks to protect the San Francisco area National Parks from environment hazards from air tour overflights and the perils they pose to her enjoyment and use of those Parks.

The MAS, WAM, and Laura Chariton commented in opposition in response to the public comment period opened by the FAA and NPS on their proposed ATMP. AR 0003136-137 and 0003268-269. Salzman Decl., ¶ 7; Bertulis Decl., ¶ 6; Chariton Decl., ¶ 6.[5]

## I. AIR TOURS' ENVIRONMENTAL IMPACTS AND HARM TO THE PETITIONERS.

The "injury in fact" requirement involves injury that is "concrete and particularized" and "actual or imminent." *Lujan,* 504 U.S. at 560. Here, Petitioners' declarations are replete with particularized examples of actual injuries to their interests from air tours allowed by the SF area ATMP, several of which are excerpted below:

Salzman Decl. (MAS), referring to the Bay Area National Park units:

---

[5] Petitioner PEER did not participate in the administrative proceeding.

11

- ¶ 5. "Overflights threaten these national, iconic lands. From my own experience, I know that overflights cause loud noise and disturb the quiet. I come to these spaces for peace and quiet. I am personally harmed by overflights and cannot enjoy these areas like I used to.
- ¶ 6. Additionally, I have observed how overflights impact wildlife. I have seen birds getting flushed away by the noise of overflights. From my experience with local ecosystems, I believe overflights will also impact seabird nesting and marine mammals."

Bertulis Decl. (WAM), with similar observations to Salzman's, but adding:

- ¶ 4 "From my own experience, I know that overflights cause loud noise and disturb the quiet…We are personally harmed by overflights and cannot enjoy these areas as we used to.
- ¶ 5 We have often seen songbirds rely on quiet to make alarm calls when there is a predator present such as a hawk or an eagle. Their ability to warn others is impaired by the loud noise of the overflights."

Whitehouse Decl. (PEER):

- ¶ 4 "Overflights threaten our national, iconic lands. Overflights cause loud noise and disturb the peace and quiet, interfering with visitors' enjoyment and disturbing wildlife. This impacts both myself and PEER's supporters."

Chariton Decl.:

- ¶ 4 "I come to these spaces for peace, quiet, observation and meditation. The loud noises from overflights trigger my PTSD from childhood and cause me great anxiety.
- ¶ 5 From my experience with local ecosystems and witnessing air tour impacts on wildlife, I believe overflights will also impact the migration and nesting seasons of hawks and eagles and flush out birds such as Band-Tailed Pigeons (in decline) and impact rare Tule Elk at Pt. Reyes."

In short, no doubt exists that the Petitioners adequately expressed actual and imminent harms resulting from the FAA and NPS's underlying proceedings that approved the SF area ATMP and the ongoing air tours and objected to the same.

## II.    PETITIONERS HAVE SHOWN REDRESSABLE INJURIES FAIRLY TRACEABLE TO THE CHALLENGED ACTIONS.

To show standing, "[c]ausation 'demands a causal connection between the injury and the conduct complained of' or, in other words, 'the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of Interior*, 832 F. Supp. 2d 5, 18 (D.D.C. 2011) (quoting *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 83 (D.C. Cir. 2005)). Plainly, there was no independent third-party actor between the FAA and NPS and the injuries to Petitioners that were caused by the Agencies' defective ATMP and their compliance failures under NPATMA and NEPA for it. Each Petitioners' standing declaration highlighted specific harms to them from those compliance failures: Salzman Decl., ¶¶ 8-10; Bertulis Decl., ¶¶ 7-8, 10; Whitehouse Decl., ¶¶ 7-9; Chariton Decl., ¶¶ 7-9.

Therefore, the injuries are fairly traceable to the Agencies' actions. Further, the requested relief, *infra*, of either revoking all the air tour approvals immediately or, alternatively, remanding the ATMP to the Agencies with an order compelling them to prepare at least a full EA and open a new public involvement process

13

under NEPA, followed by issuing a new ATMP, would redress the harms described above caused by the Agencies. In short, the harms here are redressable.

## ARGUMENT

### I.    STANDARD OF REVIEW

Courts consider NEPA-based challenges, lacking a separate private right of action, under the APA's standard of review. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010). Thus, the APA's familiar standard of "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" applies. 5 U.S.C. § 706(2)(A). An agency's decision to invoke a categorical exclusion under NEPA is reviewed under that standard. *Nat'l Tr. for Historic Pres. in U.S. v. Dole*, 828 F.2d 776, 781, 264 U.S. App. D.C. 196 (D.C. Cir. 1987).

Regarding the NPATMA issue here, in determining whether an agency's interpretation of an applicable statute is not in accordance with law, courts follow a familiar two-step process:

> First, we ask whether the intent of Congress is clear. *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984). If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. We determine the plain meaning of a statute by examining, at least in the first instance, the "particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 281 (1988). Second, if Congress has not "spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, we ask whether the agency's construction of the statute is "permissible," *id.* at 843, i.e.,

14

"rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123 (1987).

*Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 274 (D.C. Cir. 1988).

## II.  THE CATEGORICAL EXCLUSION FROM NEPA COMPLIANCE FOR THE SF AREA ATMP VIOLATED NPATMA.

### A. Violation of NPATMA's plain language.

This case is primarily about statutory interpretation. The Agencies violated NPATMA when they decided to approve the SF area ATMP based on a categorical exclusion under NEPA. This is first and foremost evidenced by the statute's plain language:

> ENVIRONMENTAL DETERMINATION. In establishing an air tour management plan under this subsection, the Administrator [of FAA] and the Director [of NPS] shall each sign the *environmental decision document* required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) which *may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision* for the air tour management plan.

49 U.S.C. § 40128(b)(2) (emphasis added). The NPATMA thus specifically directed that an ATMP approval decision must be accompanied by an "environmental decision document" consisting of an EA (which may accompany a finding of no significant impact) or an EIS (accompanied by a record of decision). Categorical exclusions are not among the environmental decision documents that

§ 40128(b)(2) set out for new ATMPs.[6] There would be no purpose for the statute to specify the allowed ("may include") environmental documents to go with an ATMP if other pathways, such as categorical exclusions, also were allowed.[7]

Furthermore, a categorical exclusion does not directly or indirectly equate to an "environmental decision document required by section 102 of [NEPA] (42 U.S.C. 4332)," as is mandated by NPATMA, 49 U.S.C. § 40128(b)(2). "If the

---

[6] "Categorical exclusion" is defined in the NEPA implementing regulations issued by the CEQ as: "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4. The regulations cited in connection with statutory interpretation of NPATMA are those that were in effect at the time of its passage in 2000.

[7] The Agencies may claim their action here fits into the language of NPATMA because they labeled their decision to adopt the ATMP based on a categorical exclusion as a "record of decision." AR 0000001, 0000024-025; 0000140-157. However, the actual NPATMA language is "an environmental impact statement and the record of decision," 49 USC § 40128(b)(2), meaning the record of decision for an EIS. Not only does NPATMA link the two terms; the then-current NEPA-implementing regulations defined a "record of decision" as linked to an EIS. The CEQ regulation defining the term is entitled: "Record of decision in cases requiring environmental impact statements." 40 C.F.R. § 1505.2. The required content of a "record of decision" also indicates that one cannot be based on a categorical exclusion. Under 40 C.F.R. § 1505.2(b), a "record of decision" must: "Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable." There is of course, no consideration of alternatives with a categorical exclusion. In other words, a record of decision is linked to a full EIS, as § 40128(b)(2) makes clear.

16

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984).

"Categorical exclusion" and "environmental decision document" are never used together in NEPA or its implementing regulations nor in any case law Petitioners have found. Further, the NPS's own NEPA Handbook 3.3 A1 (516 DM 12), which was cited in its categorical exclusion here, AR 000148, and adopted by the FAA, AR 000163, does not describe a categorical exclusion as an environmental decision document. To further nail this issue down, a regulatory definition existed for the term "environmental decision document" used in § 40128(b)(2). The CEQ's NEPA regulation at 40 C.F.R. § 1508.10 provided: [8]

> 'Environmental document' includes the documents specified in §1508.9, (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent.)

The CEQ definition does not include categorical exclusions. "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979); *see Diné Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209 JB/SCY, 2015 U.S. Dist. LEXIS 109986, at *129 (D.N.M. Aug. 14, 2015),

---

[8] Citations to the CEQ regulations are to the regulations that were in effect at the time of NPATMA's enactment in 2000 and until 2020 when they were revised. The terminology in the statutory provision in NPATMA should be interpreted based on the regulations in effect at the time.

17

*aff'd* 839 F.3d 1276 (10th Cir. 2016) ("There are four 'environmental documents' under NEPA: (i) EISs; (ii) EAs; (iii) FONSIs; and (iv) notices of intent.").  Thus, the requirement for an environmental decision document stated in 49 U.S.C. § 40128(b) excludes categorical exclusions.[9] Creative language by the Agencies cannot detour around the statute's limits.

Further, attempting to read the dissimilar categorical exclusion into the list set out in § 40128(b)(2) would violate the *expressio unius est exclusio alterius* canon of statutory construction, that expression of one thing implies the exclusion of others, *Delaware v. Pennsylvania*, 2021 U.S. LEXIS 6295 at *101 (July 23, 2021), or that "expressing one item of an associated group or series excludes another left unmentioned." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 290 (2017).

---

[9] Note also that in 2020 the FAA and NPS formally terminated their earlier 2011 attempt to prepare the SF area ATMP, via a Federal Register notice. AR 0000002-003. *Notice of Termination of Previously Initiated Processes for Air Tour Management Plans and Associated Environmental Documents and Notice of Intent to Complete Air Tour Management Plans at 23 National Park Units*, 85 Fed. Reg. 55060, 55060-55061 (September 3, 2020). The Notice, which directly applied to the SF area Park units at issue, i.e., Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore, stated at p. 55060: "termination of these processes will allow the agencies to start anew with the development of ATMPs and associated **environmental documents** at these and other parks." (emphasis added). This reinforces that the agencies previously concluded that no categorical exclusion applied and had indicated to the public concerned about the SF area ATMP that they would be preparing a future EA, with a finding of no significant impact, or EIS, per the 40 C.F.R. § 1508.10 definition of "environmental document" and accepted NEPA parlance.

While the language "may include" in § 40128(b)(2) is not a limiting clause by itself, the category of "environmental decision documents" defined in NEPA and the CEQ regulations is narrow and, as such, Congress's exclusion of categorical exclusions from the list in NPATMA should be read as prescriptive.[10] The list of possible NEPA outcomes in § 40128(b)(2) are "members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55 (2002)).

Interpreting "may include" as giving only limited discretion after earlier language in § 40128(b)(2) narrowed the universe of possible outcomes fits within common statutory interpretations of "may." In *United States v. Rodgers*, 461 U.S. 677, 706 (1983), the Supreme Court said:

> The word "may,' when used in a statute, usually implies some degree of discretion. This common-sense principle of statutory construction is by no means invariable, however, see *Mason v. Fearson*, 9 How. 248, 258-260 (1850); see generally *United States ex rel. Siegel v.*

---

[10] While perhaps obvious here, another canon of statutory interpretation applies when reading the more recent NPATMA in relation to the older and more general NEPA: "When statutes intersect, the specific statutes …. trump the general. 'That is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.' *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 S. Ct. 2065, 2071, 182 L. Ed. 2d 967 (2012) (internal quotation marks omitted); *see also Brown & Williamson Tobacco*, 529 U.S. at 133 ('the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand')." *Loving v. IRS*, 917 F. Supp. 2d 67, 77 (D.D.C. 2013).

>*Thoman*, 156 U.S. 353, 359-360 (1895), and cases cited, and can be
>defeated by indications of legislative intent to the contrary or by
>obvious inferences from the structure and purpose of the statute.

The language, structure, and purpose of NPATMA all cabin the Agencies'

discretion here. An imaginary analogy: a law firm's clerk is directed, for the annual

holiday party: "You shall invite, at your discretion, one of the three most senior

members of the Supreme Court, which *may include* Chief Justice Roberts, or

Justices Thomas or Alito." If the clerk then invited Justice Jackson, his or her

future at the firm could be in doubt.

## B. Violation of NPATMA's purpose and structure.

Apart from its plain language, NPATMA's purpose and structure provide

very strong reasons as to why an EA or EIS were required in this case. The impetus

for the statute's adoption in 2000 was that air tours had been flying low in National

Parks airspace for many years before then without any environmental review and

damage to resources and visitor experience occurred as a result. As the House

Committee Report stated, the legislation responded to "an increase in complaints

by park users that the serenity and quiet of national parks is being destroyed." H.

Rpt. 106-167 at 93 (1999). The Act effected a radical change – requiring

comprehensive environmental review to inform ATMPs that would "mitigate or

prevent" "significant adverse impacts … upon the natural and cultural resources,

visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B).

20

The future ATMPs would do so through measures that could include prohibiting commercial air tours altogether; restricting air tours to designated routes, altitudes, and times of day; limiting numbers of flights and intrusions on tribal lands; and mitigation of noise, visual and other impacts. *Id.* § 40128(b)(3)(A) and (B). The idea that a new ATMP could be pre-determined to have minimal environmental impacts, as occurred here, without full analysis under NEPA, was anathema to NPATMA's purpose and perpetuates the "significant adverse impacts" it was promulgated to correct.

The Agencies' invocation of the categorical exclusion for the SF area ATMP amounted to the exclusion of NEPA review. *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir. 1999). That decision was particularly inapt in the context of NPATMA's major purpose, again which was to remedy the situation of incessant air tours occurring with no public comment, environmental analysis, consideration of alternatives, or mitigation. As stated in *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (1985):

> The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. *Jones v. D.C. Redevelopment Land Agency*, 162 U.S. App. D.C. 366, 499 F.2d 502, 513 (D.C.Cir.1974), *cert. denied*, 423 U.S. 937, 96 S. Ct. 299, 46 L. Ed. 2d 271 (1975).

The NPS and FAA claimed the SF area ATMP would not make things *worse* than under the existing purported "approved action." AR 0000008-009. The

21

Agencies thus attempt to justify <u>never</u> formally assessing or mitigating the environmental impacts of the existing flights – exactly what NPATMA (and NEPA) was enacted to require. If this Court were to accept this ruse, the result would be the Agencies' now 20-plus years of non-compliance with NPATMA and NEPA would be rendered permanent.

The current SF area ATMP does add some restrictions that did not exist under the prior Interim Operating Authority regarding routes, altitudes, and times of day for flights. However, the categorical exclusion process invoked for this ATMP was a far cry from the "hard look" review required under NEPA, 42 U.S.C. § 4332, that should not only assess the environmental impacts from the existing level of ongoing flights, but should also give equal analytical consideration to alternatives to the existing level of flights and allow for multi-agency and public participation in that impact assessment process. *See Baltimore Gas and Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 100 (1983); *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21 (1976).[11]

---

[11] Petitioner PEER had a similar situation arise regarding the NPS's failed NEPA compliance in a recent case in the U.S. District Court for the District of Columbia. *Pub. Emps. for Env't Responsibility v. Nat'l Park Serv.*, 605 F. Supp. 3d 28 (D.D.C. 2022). The NPS had allowed electronic bicycles (or "e-bikes") into the National Parks based on a similar categorical exclusion as here, that is, without preparing either an EA or an EIS for the decision by which the NPS approved e-bikes. So, as here, the agency was confronted by mechanized uses that posed impacts to other Park users and wildlife. To

The NPS and FAA here claimed they could use the prior level of flights permitted under Interim Operating Authority as their assessment baseline because the grant of that authority "was a non-discretionary action directed by Congress." AR 0000008. This argument mercilessly twists NPATMA, which provided for Interim Operating Authority in order that air tour vendors would not go out of business while ATMPs were being prepared with the needed detailed environmental documents. 49 U.S.C. § 40128(b)(2). Congress did not legislate Interim Operating Authority to enshrine the *status quo*, but rather to create a bridge to full environmental review for ATMPs – a bridge that as this Court found in *In re Public Employees* was only intended to last two years from NPATMA's enactment in 2000, "We fully expect that the agencies will make every effort to produce a plan that will enable them to complete the task within two years, as Congress directed." *In re Pub. Emps. for Envt'l Responsibility*, 957 F3d 267, 276 (D.D.C 2020).

---

justify its similar determination not to prepare an environmental document, the NPS relied on the claim that there were no significant impacts caused by its rulemaking above and beyond the "baseline" of impacts already allowed under a prior categorical exclusion determination. *Id.* at 60-61. Judge Rudolph Contreras ruled: "the interaction between these two Categorical Exclusions allowed NPS to avoid taking the requisite hard look required by NEPA." *Id.* at 63. He then remanded the e-bikes approval back to the NPS directing it to conduct full NEPA compliance. *Id.* at 62. That outcome is comparable to the relief Petitioners seek in this case. Also relevant was Judge Contreras' observation that categorical exclusions do not amount to NEPA analysis *per se,* rather they act to "excuse NEPA analysis." *Id.* at 57.

23

The FAA itself, in an earlier regulatory notice, clearly recognized Congress's intent that the Agencies must conduct full impact analysis before adopting new ATMPs:

> Congress set up the IOA [interim operating authority] process as a way of ensuring that those commercial air tour operators conducting commercial air tours over national parks at the time of Act's enactment would not be put out of business while the FAA, in cooperation with NPS, *analyzed the environmental impact of the air tours* on the national park unit and developed an ATMP. The IOA then ends 180 days after the ATMP is adopted.

*Notice of Final Opinion on the Transferability of Interim Operating Authority under the National Parks Air Tour Management Act*, 72 Fed. Reg. 6802, 6803 (Feb. 13, 2007) (emphasis added).

To summarize, § 40128 (b)(2) of NPATMA directed the preparation of an EIS or EA for new ATMPs. Neither the language nor the Congressional purpose of the statute fit with the NPS and FAA's invocation of a categorical exclusion instead, as occurred here. The SF area ATMP improperly locked in the prior "baseline" of air tour levels over the four National Park units in the San Francisco Bay area with no prior "environmental decision document" as defined under NEPA and called for in § 40128(b)(2). By not preparing an EA or EIS, the Agencies violated both of those statutes.

## III. INVOCATION OF THE CATEGORICAL EXCLUSION WAS INCONSISTENT, ARBITRARY, AND CAPRICIOUS.

The Agencies' stated justification for the categorical exclusion per their Record of Decision relies on the Department of the Interior Manual at 516 DM 12.5 A(l), reproduced in the NPS NEPA Handbook as "categorical exclusion 3.3.A.I." It applies to "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." AR 0000008. Invocation of that categorical exclusion was a violation of NEPA first because it does not apply here. The SF area ATMP is not a change to an "approved action," because Interim Operating Authority was only given by Congress as a temporary measure, to expire when ATMPs were issued. As argued, above, the ATMPs were intended to replace that temporary authority with fully NEPA-compliant plans adopted after assessing the adverse effects of the existing flights.

Further, the categorical exclusion here was an arbitrary determination because in 2011 the same Agencies determined they did need to prepare an EA rather than invoke a categorical exclusion for their planned ATMP on the continuing air tour overflights in the San Francisco area, which as of that time had been allowed based on Interim Operating Authority for roughly ten years since NPATMA was adopted in 2000. AR 0000002.[12] The Agencies' Federal Register

---

[12] AR 0000002 states (emphasis added): "In 2011, the FAA published a notice of the agencies' intent to prepare an **environmental assessment** for that ATMP. *Notice of Intent to Prepare an Environmental Assessment, Notice of Public Meetings, and Notice to Request Public Scoping Comments for the*

notice then, for what was essentially the same planning process at issue now, stated: "In compliance with the National Environmental Policy Act of 1969 (NEPA) and FAA Order 1050.1E, an Environmental Assessment (EA) is being prepared."[13] They scheduled public meetings to take input on scoping the EA, but then later terminated that process.[14]

The Agencies, with no clear reason apart from expediency, reversed course as far as NEPA compliance in 2020-2021 when they invoked a categorical exclusion for basically the same proposed action. To determine the allowable air tour levels for their baseline they simply queried the air tour operators in the region asking for their estimated number of flights for 2017 through 2019.[15] In a form of "bootstrapping," they labelled those air tours, which previously they had

---

*Air Tour Management Plan Program at Golden Gate National Recreation Area, San Francisco Maritime National Historical Park and Point Reyes National Seashore*, 76 Fed. Reg. 45,312 (July 28, 2011).

[13] *Id.*

[14] See full information on this termination in note 9, *supra*.

[15] AR 0003057 and 0003060 are letters from FAA to air tour vendors SeaPlane Adventures and SF Helicopters; those query letters were stated to be in response to this Court's order in the nationwide NPATMA litigation by PEER and the Hawaii Coalition Malama Pono. The FAA then compiled the vendors' self-reported numbers, averaged them, and labeled the result the baseline that justified the categorical exclusion because the future air tour levels would be set under the ATMP so as not to exceed the averaged numbers. AR 0001842 (Final ATMP); AR 0000151(NPS Appendix C - Categorical Exclusion Documentation Form).

26

determined required an EA, as the now "approved action" baseline beyond which

their proposed ATMP would "cause no or only minimal environmental impacts."

However, neither the reliability of the baseline estimates provided by the

tour operators nor, critically, the environmental impacts of those baseline air tour

levels, were ever assessed by independent monitoring or verification or in a prior

NEPA analysis.[16] There were no key new facts in 2020 that justified the shift from

the commitment to formal NEPA compliance in 2011 to exclusion of the same nine

years later. Some of the numbers provided by the Agencies when comparing flight

levels from 2012 to the 2017-2019 "baseline" numbers by the NPS's own

admission are not accurate. The NPS states in its Categorical Exclusion

Documentation Form: "Reporting data from 2013 and 2014 are considered

incomplete as reporting protocols were not fully in place at that time and likely do

not reflect actual flights." AR 0000148. However, if one disregards that 2013 and

2014 data in Tables 2, 3, and 4 in the Documentation Form, AR 0000150-151, and

just compares the 2015-2016 data to the 2017-2019 data, the trend of increasing

---

[16] The reason no prior NEPA compliance occurred for the initial Interim
Operating Authorities created under NPATMA, including for the San
Francisco area Parks, was explained in the 2005 *Notice of Interim Operating
Authority Granted to Commercial Air Tour Operators Over National Parks
and Tribal Lands Within or Abutting National Parks*, 70 Fed. Reg. 36456,
36456-36458 (June 23, 2005); AR 0003359-0003361, 0003360, n. 1. The
FAA then interpreted the short statutory deadline for issuing Interim
Operating Authorities as making NEPA compliance for them "impossible."

actual flight levels over time is strong. Except for the 2015 levels for helicopter overflights over the Golden Gate National Recreation Area/San Francisco Maritime National Historical Park (top entry line of Table 2), all of the other entries in Tables 2, 3, and 4 that compare those two periods show marked increases in flights over time.

Thus, the effect of the Agencies' ten-plus years of additional delay after they first began the SF area ATMP process was to <u>increase</u> the overall numbers of actual flights that they then claimed as their baseline in 2020-2021. If anything, the ongoing environmental impacts from the air tours, such as the disturbance of local wildlife populations, became potentially more significant as the flight numbers increased and impacts accumulated. *See* AR 0000069, NPS Environmental Screen Form, acknowledging the existence of ongoing "temporary disturbances to wildlife." Again, it was arbitrary and capricious to shift the NEPA determination from an EA to a categorical exclusion when the flights numbers and impacts had increased in the interim. Yet, that shift, relying on the higher baseline flight numbers, meant that for every impact category they screened – from noise to wildlife disturbance and all other categories in between - the Agencies determined there would be no significant impacts caused by the new ATMP flight numbers because they were not higher than the baseline numbers. AR 0000024 (Record of Decision); AR 0000057-138 (Appendix B - Environmental Screening Form).

28

Another indication of the arbitrary nature of the decision to invoke a categorical exclusion for the SF area ATMP is that the Agencies have or are planning to prepare EAs for several other National Parks with similar or lower levels of impacts. As indicated, the actions of the Agencies in creating the SF area ATMP were driven by this Court's May 1, 2020, order granting the Writ of Mandamus sought in *In Re Pub. Emps.*, Case No. 19-1044. The extensive "Court Orders and Joint Supplemental Report" from that case form part of the Administrative Record here. AR 0002695-722. The Agencies listed at least seven pending Park unit ATMPs in that Report for which they anticipated preparing full EAs, AR 0002719-720, and another ten units, including the SF area ATMP, for which they anticipated preparing only categorical exclusions. AR 0002717-0002718. While the explanation went to great lengths on why the Agencies were preparing categorical exclusions for the ten Parks, it included no explanation as to why at least seven other Parks would receive full EAs. There is no reasoned separation of the two groups.

One example from the Report is Badlands National Park in South Dakota., Badlands averages 1,425 flights per year and was subject to an EA.[17] However, the

---

[17] NPS News Release, *Public input sought on draft air tour management plan for Badlands National Park*, May 15, 2023, available at: https://www.nps.gov/badl/learn/news/public-input-air-management-plan-at-badlands.htm .

San Francisco area Parks were approved for almost double that - 2,548 flights per year – with no EA. This example (and there are several others) poses a lesser degree of environmental impact from the flights than the SF area ATMP. There is no reason to believe the environmental consequences of commercial air tours across Badlands are more significant or require a higher level of analysis than the same flights over the San Francisco area, which, *inter alia,* provides habitat for many sensitive species of migratory waterfowl and other birds. AR 0000084 and 0001831-832. The unexplained exclusion of the SF area ATMP from the national EA category in the Agencies' Report and their decisionmaking is yet another indication that the categorical exclusion here violates the APA stricture against "arbitrary and capricious" inconsistent decisions, 5 U.S.C. § 706(2)(A).

In sum, even apart from their violation of NPATMA's plain language discussed above, the Agencies' invoking a categorical exclusion, rather than preparing an EA, without legal or factual justification, violated NEPA. "Simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA." *Found. on Econ. Trends*, 756 F.2d at 154. Further, their reversing course from their prior commitment to prepare a full EA despite the actual overflight numbers increasing over time was inconsistent, arbitrary, and capricious, thus contrary to the APA, 5 U.S.C. § 706 (2)(A). *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) (alternative compliance method

30

by the agency "should have been addressed and adequate reasons given for its

abandonment"). A comparison with other Parks nationwide, such as Badlands

National Park, where EAs were prepared further cements this conclusion.

## IV.   THE AGENCIES' CATEGORICAL EXCLUSION VIOLATED NEPA BECAUSE "EXTRAORDINARY CIRCUMSTANCES" EXISTED.

Even assuming, *arguendo*, that a categorical exclusion for the SF area ATMP

was a legal possibility, the categorical exclusion here violated the Interior

regulation that sets out that exclusion for the Department, 43 C.F.R. § 46.215,

because of the presence of "extraordinary circumstances" that the agencies have

not accounted for. An "agency's 'decision to classify a proposed action as falling

within a particular categorical exclusion will be set aside only if a court determines

that the decision was arbitrary and capricious.'" *Back Country Horsemen of Am. v.

Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006), quoting *Citizens' Comm. to Save

Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002). However,

such a decision will not be upheld when "there is substantial evidence in the record

that an extraordinary circumstance might apply." *Safari Club Int'l v. Jewell*, 960 F.

Supp. 2d 17, 82 (D.D.C. 2013).

Here, the Administrative Record provides substantial evidence of

"extraordinary circumstances" that disallowed the invoked exclusion. Three

distinct criteria for such circumstances in the Department of the Interior's

31

regulation, 43 C.F.R. § 46.215 - "Extraordinary circumstances" apply. The

Petitioners excerpt and analyze them below:

> *(b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; **park,** recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas. (emphasis added)*

Under **extraordinary circumstance (b)**, the proposed SF area ATMP allowed the

long-ongoing impacts on the National Park units to continue despite "park" lands

being singled out for special recognition under Interior's regulation. Further, on

June 7, 2023, the NPS formally nominated the Golden Gate National Recreation

Area and Point Reyes National Seashore for special designations on the World

Heritage List maintained by the United Nations Education, Culture and Science

Organization (UNESCO).[18] This nomination is limited to places that have met the

World Heritage Convention's criteria for "preservation of natural and cultural

heritage sites of global significance." Thus, at least those two sites clearly met the

criteria in (b), above, of "unique . . . historic or cultural resources . . . and other

ecologically significant or critical areas."

---

[18] 88 Fed Reg. 37270-37271 (June 7, 2023).

Yet, the categorical exclusion analysis of extraordinary circumstances by the NPS applies no special importance or scrutiny to the impacts of repeated overflights on those two Park units that the agency itself shortly thereafter designated as of "global significance." AR 0000139-157. It ignores the NPS's own finding in its Environmental Screening Form that visitors to these units:

> …. may hear noise from commercial air tours, which may disrupt visitors or degrade the visitor experience at the Park by disturbing verbal communications and masking the sounds of nature. For example, noise from commercial air tours may disrupt visitors during interpretive and educational programs at historical sites or while hiking, camping, fishing, or participating in other activities…. Visitors in backcountry and wilderness areas often find commercial air tours more intrusive than visitors in developed and front country areas….

AR 0000089. The determination that "extraordinary circumstance (b)" does not apply is contradicted by the evidence of the foreseeable noise impacts, particularly in backcountry and wilderness areas in the Parks, and further contradicted by the NPS's own World Heritage List nomination for the Golden Gate National Recreation Area and Point Reyes National Seashore.

> *(c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources.*

Under **extraordinary circumstance (c)**, several comments in the Administrative Record point to the severe controversy regarding the lack of NEPA

compliance for SF area ATMP. These were well-summarized in the NPS-authored

document summarizing the public comments as:

> Commenters noted various shortcomings in the NEPA process including: A) the agencies have issued a proposed action for public comment without disclosing potential impacts or providing any environmental impact analysis regarding that proposed action; B) the agencies have failed to conduct public scoping or otherwise consider reasonable alternatives to the proposed action; C) the NPS has not made the case that its proposed action will effectively mitigate the adverse impacts of ongoing air tours at the Parks that have been operating virtually unregulated over the past 20 years; D) the agencies stated intention is to finalize the action (i.e., the ATMP) before actually issuing a NEPA analysis which violates NEPA procedural requirements; and E) the agencies have improperly identified NPS categorical exclusion 3.3 Al as the preliminary NEPA pathway for this draft ATMP since NPS has not conducted a NEPA review and never formally approved national park air tours in the first place

AR 0000873. The NPS did not respond to the serious, fundamental controversy

stated in those concerns. Opposition came from not just local groups, but from the

largest nationwide National Park advocacy organization, the National Parks

Conversation Association, which thoroughly criticized the Agencies' analytical

approach, including their flawed "baseline." AR 0003259-265. Some key points

(emphasis added):

- "This plan lacks a rationale for continuing air tours." AR 0003260
- "In public meetings, the FAA and NPS have said the NEPA pathway (categorical exclusion) could be reconsidered based on public comment, placing the burden squarely on the public to identify potential impacts absent site specific analysis. We ask instead that the agencies go back to the drawing board, with NPS as the lead agency with the expertise in preventing adverse impacts to park resources, to develop a suite of alternatives with site specific

34

analyses. Alternatives should include an option to reroute air tours outside park air space (no air tour alternative), and an option to decrease air tours over time." *Id.*

- "In the past, we have witnessed the NPS allow other uses from snowmobiles to personal watercraft to enter parks at low volumes then grow and have major damaging effects from increased noise to direct conflicts with park resources, wildlife, and visitor experiences. This Bay Area National Parks plan lacks detail and foresight that will likely set these parks on a detrimental course that will be difficult to reverse in the future." *Id.*

"*Delay caused by the FAA's refusal to implement the intent of Congress in creating NPATMA does not change the baseline. The baseline for any ATMP for a national park is the ambient natural sound within that park absent the proposed intrusion.*" AR 0003261.

Plainly the Agencies' approach generated extensive opposition and controversy. It is noteworthy also in terms of "unresolved conflicts" that the NPS itself determined that: "No public comments were submitted that noted benefits of air tours." AR 0000871. Based on evidence of a high level of opposition to the air tour use and no countervailing assertions of benefits, the "extraordinary circumstance" determination should have been to seek to resolve the conflict through a detailed EA, with its official NEPA scoping and comment processes.

*f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.*

Under **extraordinary circumstance (f)**, the categorical exclusion analysis by the Agencies failed to assess the significant cumulative impact of the SF area ATMP on birds. The NPS Environmental Screening Form acknowledges

35

foreseeable "temporary disturbances to wildlife," but provides only generalities. AR 0000069. Many public comments stressed cumulative harms to birds, including numerous threatened and endangered species. *See* AR 0003136 (comment of Petitioner Marin Audubon Society highlighting the very incomplete and vague bird impact analysis); AR 0003268 (comment of Petitioner Watershed Alliance of Marin documenting potential overflight impacts on bald and golden eagles, band-tailed pigeons, cedar waxwings, ospreys, and northern spotted owls).

Mortality especially to high-flying migratory birds caused by foreseeable "bird strikes" resulting from plane and helicopter flights was brought to the Agencies' attention by the NPS's Golden Gate National Recreation Area Wildlife Ecologist, Bill Merkle. AR 0003317. Those risks are not adequately addressed in the Administrative Record. The cumulative dangers to birds (and other resources) are exacerbated by the numerous well-documented cases of past violations of air tour restrictions in terms of altitudes and locations flown. AR 0003334-335 (comment of Richardson Bay Environmental Protection Association). The overall picture is one of air tours – both legal and illegal - and numerous other disturbances that, when added together, may cause long-term population harm. Yet, only superficial analysis addresses the cumulative SF area-wide impacts to birds. Instead, the record evidence shows the NPS should have invoked "extraordinary circumstance (f)," together with the other extraordinary

36

circumstances discussed above, to shift from the categorical exclusion approach over to full NEPA compliance.

## V.    THE APPROPRIATE REMEDY IS TO PROHIBIT FURTHER AIR TOURS OR REMAND AND RETAIN JURISDICTION.

"The ordinary practice . . . is to vacate unlawful agency action, and district courts in this circuit routinely vacate agency actions taken in violation of NEPA." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citations and quotation marks omitted). However, courts also have discretion "to leave agency action in place while the decision is remanded for further explanation." *Id.* at 1051. A reviewing court may craft relief as equity requires. *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("[A] reviewing court has discretion to shape an equitable remedy.")

Under the facts here, were this Court simply to vacate the current SF area ATMP, then the *status quo* to which the management of air tours would revert would be a largely unregulated system of Interim Operating Authority 23 years after the NPATMA directed the Agencies to promptly adopt ATMPs to regulate overflights. Vacating this ATMP would allow operators to go from the 2,548 annual overflights allowed in the ATMP to the theoretical ceiling of the prior Interim Operating Authority of 5,090 annual overflights. Compare AR 0000151 to 0000148. Given the decades of delay and the unfairness to the Petitioners and the public from the Agencies' intransigence, the Petitioners here reiterate the need to

revoke all air tour approvals over the San Francisco area Parks (beyond the 50 flights per year, below which the NPATMA would not apply). This relief was requested in the national overflights case, *In Re Public Employees, supra,* a request that this Court left as a potential outcome when it denied the Third Motion to Enforce Order Granting Petition for Mandamus therein without prejudice. Case No. 19-1044, Per Curium Order of July 7, 2023, document # 2006865. The stated reason for that Order was the "challenge to the Agencies' reliance on categorical exclusions" will be decided in the present case. Deciding for Petitioners based on the arguments herein will provide a strong reason to revisit and now grant, for the SF area ATMP, the relief requested in that Third Motion to Enforce (document #1989723, filed: March 10, 2023), at p. 15, which was:

> This Court should order that no air tours beyond the 50 tours per year that are exempt from NPATMA may take place until a fully compliant ATMP, based on an environmental assessment or environmental impact statement is in place. In the alternative, the Court should hold the agencies in contempt for failing to comply with its mandamus order, and impose fines or other sanctions until compliance is achieved.

Further justification for that relief would lie in the fact that the Agencies will be even further out of compliance with their timeline for the SF area ATMP they had submitted in *In re Public Employees, supra,* which was to be fully compliant with NPATMA and NEPA by January 31, 2023, more than five months ago. AR 0002718.

38

Alternatively, a remand here could allow the Agencies one year to comply with NPATMA and NEPA in the form of a full EA, released as a draft and then a final with a public comment process in between.[19] If preparation of a full EIS becomes necessary, additional time could later be allowed for that. Then, the Agencies could adopt a new SF area ATMP based on that NEPA process.

Under this alternative, the Court should retain jurisdiction for as long as it takes to ensure the Agencies comply. *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001) ("federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime"; also citing several other examples). The discretion to retain jurisdiction on remand "is typically reserved for cases alleging unreasonable delay of agency action or failure to comply with a statutory deadline, or for cases involving a history of agency noncompliance." *AHA v. Azar*, No. 18-cv-2084, 2019 U.S. Dist. LEXIS 114658 at *5 (D.D.C. July 10, 2019). Those circumstances of unreasonable delay and failure to comply with NPATMA's deadlines are clearly present here as this Court first ruled *more than three years* ago when it issued the Writ of Mandamus and chose to retain jurisdiction in *In Re Pub. Emps. for Envt'l Responsibility*, 957 F.3d at 275-76, ("Left to their own

---

[19] See at least seven examples of EAs for other ATMPs in the "Court Orders and Joint Supplemental Report." AR 0002719.

39

devices, the agencies have failed to comply with their statutory mandate for the past nineteen years.") If the NPS and FAA fail to conform with the terms of the remand alternative, justice would then call for the Court to further exercise its discretion to vacate the ATMP entirely and revoke all authority for commercial air tours subject to NPATMA over any of the National Park units in the San Francisco area.

## CONCLUSION

For the foregoing reasons, the Petition for Review should be granted, and the ATMP dated January 10, 2023, for the Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore should be held to be in violation of NPATMA, NEPA, and the APA. Either the ATMP should be vacated and all air tours (beyond 50 flights per year) above San Francisco area Park units should be prohibited or the Court should remand the ATMP to the FAA and NPS with directions to comply with NPATMA and NEPA by issuing, at least, a draft and then final EA within one year, while the Court retains jurisdiction until they do.

Respectfully submitted,

/s/ Peter T. Jenkins
Peter T. Jenkins
D.C. Bar No. 477229
Paula Dinerstein

40

D.C. Bar No. 333971
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202-265-4189
pjenkins@peer.org
pdinerstein@peer.org

Attorneys for Petitioners

APPENDIX

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit, typeface requirements and type-style requirements of the Federal Rules of Appellate Procedure and D.C. Circuit Rules.

1. This document complies with the type-volume limitation of Fed.R.App.P 32(a)(7)(B). It contains 11,297 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman, 14 point.


/s/ Peter T. Jenkins
Peter T. Jenkins

Attorney for Petitioners

42