NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-1067

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

MARIN AUDUBON SOCIETY, et al.,
*Petitioners,*

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents.*

---

On Petition for Review of an Order by the
Federal Aviation Administration and National Park Service

---

**BRIEF FOR FEDERAL RESPONDENTS**

---

TODD KIM
*Assistant Attorney General*

Of Counsel:

PATRICIA DEEM
*Attorney*
Office of the Chief Counsel
Federal Aviation Administration

SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

ROBERT P. STOCKMAN
JUSTIN D. HEMINGER
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.      Parties and Amici**

All parties appearing in this Court are listed in the Opening Brief for Petitioners Marin Audubon Society, et al. (Environmental Groups).

**B.      Rulings Under Review**

Environmental Groups seek review of the January 10, 2023 Record of Decision for the Air Tour Management Plan for four National Parks, Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore.

**C.      Related Cases**

This case has not previously been before this Court or any other court. Environmental Groups' Opening Brief correctly identifies a related case in which several Petitioner organizations obtained a writ of mandamus from this Court, *In re Public Employees for Environmental Responsibility*, No. 19-1044 (D.C. Cir.).

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES ...............................................................i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ........................................................... v

GLOSSARY ............................................................................. xiv

INTRODUCTION.......................................................................... 1

STATEMENT OF JURISDICTION................................................. 4

STATEMENT OF THE ISSUES.................................................... 5

PERTINENT STATUTES AND REGULATIONS ................................ 5

STATEMENT OF THE CASE ........................................................ 6

    A.    Legal background................................................... 6

        1.    The National Parks Air Tour Management
            Act....................................................... 6

        2.    The National Environmental Policy Act ....................... 9

    B.    Factual background ............................................... 12

        1.    The Bay Area Parks.................................... 12

        2.    Development of the Air Tour Management
            Plan ...................................................... 14

    C.    The Agencies' environmental review for the Plan............... 18

SUMMARY OF ARGUMENT ...................................................... 20

STANDARD OF REVIEW............................................................ 22

ARGUMENT .......................................................................23

I.     The Air Tour Management Act does not eliminate the
       Agencies' discretion to rely on a NEPA categorical
       exclusion ................................................................23

       A.    The Agencies followed the normal process to
             comply with NEPA ............................................24

       B.    The Act's plain text neither mandates a
             particular level of NEPA review nor forbids the
             Agencies from applying a categorical exclusion ..................27

             1.    The Act only requires the Agencies to "each
                   sign the environmental decision document
                   required by" NEPA .......................................27

             2.    The Act has a non-exhaustive list of
                   documents that does not restrict the
                   Agencies' path to NEPA compliance ............................30

       C.    The Act's structure and purpose reinforce the
             Agencies' discretion to apply a categorical
             exclusion ......................................................39

II.    The Agencies complied with NEPA ..............................43

       A.    The Agencies reasonably applied a categorical
             exclusion to the Air Tour Management Plan ......................44

       B.    The Agencies chose a proper baseline for the
             NEPA analysis ..................................................51

       C.    No extraordinary circumstances are present that
             would require more environmental analysis ......................55

             1.    The Plan has no significant impacts on the
                   Bay Area Parks' natural resources ............................56

2. The Plan has no environmental effects that are highly controversial ................................................ 61

3. The Plan has no significant cumulative environmental effects on birds .................................... 63

III. Neither vacatur nor injunctive relief is warranted ...................... 67

CONCLUSION ........................................................................ 71

CERTIFICATE OF COMPLIANCE ........................................ 72

ADDENDUM ............................................................................ 1

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993)......................................................... 67

*American Wild Horse Campaign v. Bernhardt,*
   963 F.3d 1001 (9th Cir. 2020) ....................................................... 61

*Anglers Conservation Network v. Pritzker,*
   809 F.3d 664 (D.C. Cir. 2016).......................................................... 31

*Azar v. Allina Health Servs.,*
   139 S. Ct. 1804 (2019) .................................................................... 29

*Bicycle Trails Council v. Babbitt,*
   82 F.3d 1445 (9th Cir. 1996) .......................................................... 64

*Biodiversity Conservation Alliance v. U.S. Forest Serv.,*
   765 F.3d 1264 (10th Cir. 2014) ...................................................... 52

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ........................................................................ 35

*BP Am. Prod. Co. v. Burton,*
   549 U.S. 84 (2006) .................................................................... 28, 29

*Burgess v. United States,*
   553 U.S. 124 (2008) ........................................................................ 33

*Bush v. United States,*
   802 F.3d 680 (5th Cir. 2015) .......................................................... 31

*CBD v. Salazar,*
   706 F.3d 1085 (9th Cir. 2013) ................................................... 46, 47

*Chevron U.S.A. v. Echazabal,*
   536 U.S. 73 (2002) .................................................................... 34, 35

*Chickasaw Nation v. United States,*
    534 U.S. 84 (2001) ........................................................ 33

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ................................ 23, 56

*Communities Against Runway Expansion, Inc. v. FAA,*
    355 F.3d 678 (D.C. Cir. 2004) ....................................... 22

*Conservation Law Foundation v. FERC,*
    216 F.3d 41 (D.C. Cir. 2000) .................................. 53, 54

*Ctr. for Biological Diversity v. Salazar,*
    706 F.3d 1085 (9th Cir. 2013) ...................................... 26

*Defenders of Wildlife v. Jewell,*
    815 F.3d 1 (D.C. Cir. 2016) .......................................... 23

*Earth Island Institute v. Muldoon,*
    -- F.4th --, 2023 WL 5921619 (9th Cir. Sept. 12, 2023) ................ 47

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................... 48

*Indep. U.S. Tanker Owners Committee v. Dole,*
    809 F.2d 847 (D.C. Cir. 1987) ...................................... 68

*Jones v. Am. Postal Workers Union,*
    192 F.3d 417 (4th Cir. 1999) ....................................... 34

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ...................................................... 69

*Morgan Drexen, Inc. v. CFPB,*
    785 F.3d 684 (D.C. Cir. 2015) ...................................... 69

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*
    *Co.,*
    463 U.S. 29 (1983) ................................................. 23, 55

*Mountain Communities for Fire Safety v. Elliott,*
    25 F.4th 667 (9th Cir. 2022) ........................................... 44

*Nat'l Trust for Historic Pres. in U.S. v. Dole,*
    828 F.2d 776 (D.C. Cir. 1987) ...................................... 44

*NLRB v. SW Gen., Inc.,*
    580 U.S. 288 (2017) ...................................................... 33

*North Carolina v. EPA,*
    550 F.3d 1176 (D.C. Cir. 2008) .................................... 70

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n,*
    896 F.3d 520 (D.C. Cir. 2018) ...................................... 67

*PEER v. Hopper,*
    827 F.3d 1077 (D.C. Cir. 2016) .................................... 68

*In re PEER,*
    957 F.3d 267 (D.C. Cir. 2020) ........................................ 9

*Puerto Rico Mar. Shipping Auth. v. ICC,*
    645 F.2d 1102 (D.C. Cir. 1981) .................................... 33

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ........................................................ 9

*Sauk Prairie Conservation Alliance v. U.S. Dep't of Interior,*
    944 F.3d 664 (7th Cir. 2019) ................................... 47, 61

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,*
    985 F.3d 1032 (D.C. Cir. 2021) .................................... 62

*Theodore Roosevelt Conservation Partnership v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) ...................................... 55

*United Keetoowah Band of Cherokee Indians in Oklahoma v.*
    *FCC,* 933 F.3d 728 (D.C. Cir. 2019) ....................... 24, 25

*United States v. Hawley,*
    919 F.3d 252 (4th Cir. 2019) ........................................ 34

*United States v. Herrera,*
    974 F.3d 1040 (9th Cir. 2020) ..................................... 34

*U.S. Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004) ...................................................... 9

*U.S. Telecom Ass'n v. FCC,*
    825 F.3d 674 (D.C. Cir. 2016) ................................... 65

*Utah Envtl. Congress v. Bosworth,*
    443 F.3d 732 (10th Cir. 2006) ................................... 46

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) ..................................... 9

*Wisconsin v. EPA,*
    938 F.3d 303 (D.C. Cir. 2019) ................................... 70

*XO Energy MA, LP v. FERC,*
    77 F.4th 710 (D.C. Cir. 2023) ................................... 68

## Statutes

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) .................................................. 22

16 U.S.C. § 6514(b) ........................................................ 36, 39

National Environmental Policy Act
    42 U.S.C. § 4321 ........................................................... 9

    42 U.S.C. § 4332 ................................... 27, 28, 30, 31

    42 U.S.C. § 4332(2) ................................................... 36

42 U.S.C. § 10155(c) ..................................................... 35

42 U.S.C. § 10161(c)(1) ............................................. 35

42 U.S.C. § 10165(d) ................................................ 35

42 U.S.C. § 10197(a) ................................................ 35

42 U.S.C. § 10197(g) ................................................ 35

43 U.S.C. § 1904(d) ................................................. 35

National Parks Air Tour Management Act
    49 U.S.C. § 40128 ................................................... 6

    49 U.S.C. § 40128(a)(1)(B) ................................... 7, 62

    49 U.S.C. § 40128(a)(2)(B)-(E) .............................. 39

    49 U.S.C. § 40128(a)(2)(E)-(F) .............................. 39

    49 U.S.C. § 40128(a)(2)(B) ...................................... 7

    49 U.S.C. § 40128(a)(3)(B) ..................................... 39

    49 U.S.C. § 40128(a)(4) ......................................... 39

    49 U.S.C. § 40128(a)(5)(A) ...................................... 8

    49 U.S.C. § 40128(a)(5)(B) ..................................... 39

    49 U.S.C. § 40128(a)(5)(C)(i) ................................. 39

    49 U.S.C. § 40128(a)(5)(D) ...................................... 8

    49 U.S.C. § 40128(b)(1)(A) ................................. 7, 39

    49 U.S.C. § 40128(b)(1)(B) ............................... 40, 41

    49 U.S.C. § 40128(b)(2) .................. 7, 20, 28, 30, 31, 32, 39

49 U.S.C. § 40128(b)(3)...................................................................... 32

49 U.S.C. § 40128(b)(3)(F)............................................................... 38

49 U.S.C. § 40128(b)(4)...................................................................... 39

49 U.S.C. § 40128(b)(5)........................................................................ 4

49 U.S.C. § 40128(b)(6)...................................................................... 39

49 U.S.C. § 40128(b)(7)........................................................................ 8

49 U.S.C. § 40128(b)(7)(A)-(C)....................................................... 39

49 U.S.C. § 40128(b)(7)(A)............................................................... 32

49 U.S.C. § 40128(b)(7)(B)............................................................... 32

49 U.S.C. § 40128(b)(7)(D)(i)(I)-(II)............................................... 39

49 U.S.C. § 40128(c)........................................................................... 45

49 U.S.C. § 40128(c)(1).................................................. 8, 32, 39, 52

49 U.S.C. § 40128(c)(2)........................................................................ 8

49 U.S.C. § 40128(c)(2)(A)(i)-(ii)................................................... 53

49 U.S.C. § 40128(c)(2)(B)............................................................... 39

49 U.S.C. § 40128(c)(2)(D)............................................................... 32

49 U.S.C. § 40128(c)(2)(E)......................................................... 52, 68

49 U.S.C. § 40128(c)(2)(I)(ii)-(iii).................................................. 39

49 U.S.C. § 40128(c)(3)(A)............................................................... 39

49 U.S.C. § 40128(c)(3)(A)(ii)-(iii) .................................................... 39

49 U.S.C. § 40128(d)(1)-(2) ............................................................ 39

Federal Aviation Act of 1958
49 U.S.C. § 46110(a) .................................................................. 4

49 U.S.C. § 46110(d) ................................................................ 49

National Park Service Organic Act of 1916
54 U.S.C. § 100101 ................................................................ 60

Pub. L. No. 100-91, § 1(b), 101 Stat. 674 (1987) ........................................ 6

Pub. L. No. 106-181, § 802, 114 Stat. 61 (2000) ................................... 6, 40

FAA Modernization and Reform Act of 2012
Pub. L. No. 112-95, § 501, 126 Stat. 11 (2012) ................................ 8

Fiscal Responsibility Act of 2023
Pub. L. No. 118-5, § 321, 137 Stat. 10 (2023) ............................ 9, 10

## Court Rule

Fed. R. App. P. 26(a)(1)(C) ........................................................ 4

## Federal Regulations

40 C.F.R. § 1500.4(a) ................................................................ 11

40 C.F.R. § 1501.3 ............................................................ 10, 24

40 C.F.R. § 1501.3(a) .............................................................. 26

40 C.F.R. § 1501.3(a)(2) ........................................................... 10

40 C.F.R. § 1501.3(a)(3) ........................................................... 10

40 C.F.R. § 1501.4 ................................................................ 10

40 C.F.R. § 1501.4(a) ................................................................... 10, 11, 36

40 C.F.R. § 1501.4(b) ....................................................................... 11, 36

40 C.F.R. § 1501.4(b)(2) ......................................................................... 11

40 C.F.R. § 1501.4(e) ............................................................................. 36

40 C.F.R. § 1501.5 ................................................................................. 10

40 C.F.R. § 1501.6 ........................................................................... 10, 36

40 C.F.R. § 1505.2(b) ............................................................................. 37

40 C.F.R. § 1506.3(d) ....................................................................... 12, 44

40 C.F.R. § 1506.13 ................................................................................. 9

40 C.F.R. § 1507.3(e) ............................................................................. 11

40 C.F.R. § 1508.10 (1978) ................................................................... 29

40 C.F.R. § 1508.13 (1978) ................................................................... 37

43 C.F.R. § 46.215 .......................................................................... 12, 56

43 C.F.R. § 46.215(b) ................................................... 56, 57, 58, 60, 61

43 C.F.R. § 46.215(c) ............................................................................. 61

43 C.F.R. § 46.215(f) ............................................................................. 63

43 Fed. Reg. 55,978 (Nov. 29, 1978) .................................................... 9

48 Fed. Reg. 34,263 (July 28, 1983) .................................................... 11

49 Fed. Reg. 9,273 (Mar. 12, 1984) ..................................................... 12

70 Fed. Reg. 36,456 (June 23, 2005) ............................................. 14, 45

72 Fed. Reg. 6,802 (Feb. 13, 2007) ........................................................ 48

76 Fed. Reg. 45,312 (July 28, 2011) ...................................................... 48

85 Fed. Reg. 55,060 (Sept. 3, 2020) .................................................. 48, 49

87 Fed. Reg. 23,453 (May 20, 2022) ........................................................ 9

88 Fed. Reg. 37,270 (June 7, 2023) ...................................................... 60

## Legislative History

H.R. Rep. No. 106-167(I) (1999) ............................................... 6, 7, 41, 42

S. Rep. No. 106-9 (1999) ........................................................................ 42

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ........................................ 31, 34

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FAA | Federal Aviation Administration |
| NEPA | National Environmental Policy Act |

# INTRODUCTION

National parks are one of America's treasures. Every year, millions visit them on foot or by car. And some choose to experience them by air. An air tour may provide a memorable perspective on a park. Yet left unchecked, air tours could diminish the experience of those visiting the park on the ground and adversely impact the park's natural and cultural resources. Complicating matters further, two federal agencies have intersecting responsibilities over these activities—the National Park Service oversees our Nation's parks, while the Federal Aviation Administration (FAA) ensures safe and efficient air travel.

In 2000, Congress passed the National Parks Air Tour Management Act (the Act) to balance these interests and define the Agencies' roles. The Act requires the Park Service and the FAA to cooperate in preparing plans to manage air tours over national parks. Recognizing each Agency has a distinct mission and area of expertise, Congress crafted provisions that spell out each Agency's roles and responsibilities. The Act directs the Agencies to develop air tour management plans that mitigate or prevent any significant adverse

impacts from air tours on the parks. Within that broad objective, Congress gave the Agencies discretion to establish plans that reflect each park's distinct characteristics. Congress also directed the FAA to grant operators interim operating authority to continue conducting air tours over parks at existing levels until a plan could be established.

In January 2023, the Agencies issued the Air Tour Management Plan for four national parks in the San Francisco Bay Area. Those parks (the Bay Area Parks) are Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore. The Plan resulted from the Agencies' cooperation, input from the public and stakeholders, review of safety concerns, consideration of each Park's qualities, and the Agencies' review of environmental impacts under the Act, the National Environmental Policy Act (NEPA), and other statutes.

The Plan implements the existing condition of 2,548 air tours over two Parks (Golden Gate and San Francisco Maritime), 143 tours over Point Reyes, and *none* over Muir Woods. For the Parks where air tours *are* permitted, the Plan imposes many conditions and restrictions to mitigate their impacts—the times they can fly, the specific routes and

altitudes they must take, even the types of aircraft that operators may use. The Plan also requires operators to install and use flight monitoring equipment and to submit tracking data to the Agencies so they can monitor and enforce the Plan. And the Plan allows the Agencies to employ adaptive measures if any unexpected adverse impacts arise. With these targeted mitigation measures in place, the Agencies concluded that the Plan would cause no significant environmental impacts, and they complied with NEPA by applying a categorical exclusion to the Plan.

Petitioners (Environmental Groups) challenge the Plan. Their primary objection is that the Agencies applied a categorical exclusion, rather than preparing a more detailed environmental assessment or environmental impact statement. But the Agencies' discretionary decision on the proper path to NEPA compliance accords with the Act's plain text, structure, and purpose. And the Agencies fully documented their NEPA analysis in the record. Because the Plan is both lawful and rational, the Court should deny the petition for review.

## STATEMENT OF JURISDICTION

This Court has exclusive subject-matter jurisdiction to review FAA orders. 49 U.S.C. § 46110(a); *see also* 49 U.S.C. § 40128(b)(5) (confirming that an air tour management plan is subject to judicial review). The challenged Record of Decision approving the Air Tour Management Plan is an FAA order. AR001, AR025-026.

The Agencies issued the Record of Decision on January 10, 2023, AR026, and Environmental Groups timely petitioned for review 62 days later, on Monday, March 13, 2023. *See* 49 U.S.C. § 46110(a) (petition "must be filed not later than 60 days after the order is issued"); *but see* Fed. R. App. P. 26(a)(1)(C) (for "any statute that does not specify a method of computing time," when the last day is a weekend, the period continues to run until the next weekday).

Environmental Groups have shown associational standing based on future aesthetic injuries to at least one member of a Petitioner organization. Br. 9-14; Petitioners' Standing Declarations, ECF No. 2008810 (July 20, 2023).

# STATEMENT OF THE ISSUES

1.      Did the Agencies lawfully apply a NEPA categorical exclusion to the Air Tour Management Plan, rather than preparing an environmental assessment or environmental impact statement, when the Air Tour Management Act's plain text, structure, and purpose confirm that Congress intended to preserve the Agencies' ordinary discretion to choose the proper path for NEPA compliance?

2.      Did the Agencies comply with NEPA before approving the Air Tour Management Plan, when they (a) concluded that the Plan fell within a categorical exclusion, (b) selected a proper baseline for the environmental review, and (c) found that no extraordinary circumstances precluded application of the categorical exclusion?

3.      What is the appropriate equitable remedy if more environmental review is required, when (a) the *Allied-Signal* factors show that vacating the Plan would be unnecessary and cause disruptive consequences, and (b) Environmental Groups have failed to meet the heavy burden to justify the injunctive relief they seek?

# PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are in the Addendum.

## STATEMENT OF THE CASE

### A.    Legal background

####       1.    The National Parks Air Tour Management Act

Air tours have flown over national parks for many decades. In 1987, Congress directed the Park Service to study air tours over national parks, and the Service submitted its report to Congress in 1994. Pub. L. No. 100-91, § 1(b) (1987). In 1997, the Agencies established the National Parks Overflights Working Group to develop a plan for flight restrictions over national parks. H.R. Rep. No. 106-167(I), at 92 (1999). This advisory group included general aviation, commercial air tour, environmental, and Native American representatives. Pub. L. No. 106-181, § 802, 114 Stat. 61, 186 (2000) (Congress' findings).

In 2000, Congress passed the National Parks Air Tour Management Act, 49 U.S.C. § 40128. H.R. Rep. No. 106-167(I), at 92. The Act reflected the Overflights Working Group's recommendations and consensus work product. Pub. L. No. 106-181, § 802, 114 Stat. at 186. Because each National Park System unit has distinct characteristics and will be affected differently by air tours, the Act

"merely sets out a standard framework of principles to apply to all units." H.R. Rep. No. 106-167(I), at 93.

The Act directed the Agencies to establish air tour management plans (abbreviated ATMPs) for all national parks and tribal lands where air tour operators seek to fly. 49 U.S.C. § 40128(b)(1)(A). The Act's primary objective is to "develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." *Id*. § 40128(a)(1)(B).

Acknowledging that the Agencies' cooperation "may be a difficult venture," H.R. Rep. No. 106-167(I), at 93, Congress took pains to outline each Agency's roles throughout the statute. *See, e.g.*, 49 U.S.C. § 40128(a)(2)(B). To ensure the Agencies agreed on both the air tour management plan and its environmental impacts, Congress required the Agencies to "each sign the environmental decision document required by [NEPA] which may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan." *Id*. § 40128(b)(2).

To maintain the status quo until the Agencies could prepare air tour management plans, Congress required FAA to grant "interim operating authority" to existing air tour operators. 49 U.S.C. § 40128(c)(1). Congress fixed a process and formula for FAA to calculate the interim operating authority it was required to issue. *Id*. § 40128(c)(2).

The Agencies struggled to complete plans. Responding to these challenges, Congress amended the Act in 2012. FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 501, 126 Stat. 11, 100-03 (2012). Among other changes, Congress: (1) exempted parks with 50 or fewer flights from the requirement to prepare a plan; (2) required air tour operators to annually report to the Agencies the number of air tours they flew; and (3) allowed the Agencies to enter into voluntary agreements with operators at a park rather than developing an air tour management plan. 49 U.S.C. §§ 40128(a)(5)(A), (a)(5)(D), (b)(7).

Still, the Agencies did not complete plans and only completed voluntary agreements for a few parks. In 2020, this Court issued a mandamus order requiring the Agencies set a schedule to timely bring twenty-three parks into compliance with the Act (including three of the

four Bay Area Parks), either by issuing an air tour management plan or by entering into voluntary agreements with all operators at a park. *See In re PEER*, 957 F.3d 267 (D.C. Cir. 2020).

## 2.    The National Environmental Policy Act

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., is designed to inform and improve decision-making by federal agencies. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA's requirements are procedural. They do not "mandate particular results" but simply prescribe the necessary process. *U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756 (2004) (cleaned up). NEPA does not "require agencies to elevate environmental concerns over other appropriate considerations." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013) (cleaned up).

Federal agencies generally follow the Council on Environmental Quality's NEPA-implementing regulations.[1] Under those regulations,

---

[1] The Council issued regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978). Then the Council published a new rule, effective September 14, 2020, 40 C.F.R. § 1506.13, which was amended in May 2022. *See* 87 Fed. Reg. 23,453 (May 20, 2022). Unless otherwise noted, all citations in this brief are to the regulations in effect as of January 2023, when the Agencies issued the Plan. In June 2023, Congress amended NEPA in the Fiscal Responsibility Act of 2023, Pub.

NEPA compliance may take three forms. 40 C.F.R. § 1501.3. First, if a

project is "likely to have significant effects," the agency must prepare a

comprehensive Environmental Impact Statement (EIS). *Id*.

§ 1501.3(a)(3). Second, if an action's significance is uncertain, the

agency may prepare an environmental assessment (EA), *see id*.

§§ 1501.3(a)(2), 1501.5, before deciding to either prepare an EIS or issue

a finding of no significant impact. *Id*. § 1501.6. Third, the agency need

not prepare an EA or an EIS where the proposed action falls within a

"categorical exclusion" established in the agency's NEPA procedures.

*See id*. § 1501.4.

The Council's current NEPA regulations—under which the

Agencies analyzed the Plan—define categorical exclusions as

"categories of actions that normally do not have a significant effect on

the human environment, and therefore do not require preparation of an

environmental assessment or environmental impact statement." 40

C.F.R. § 1501.4(a). If an agency determines that a categorical exclusion

applies, it must evaluate the action for "extraordinary circumstances" in

---

L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023), but this brief addresses
the Agencies' compliance with NEPA as it existed when the Agencies
took the challenged action.

which a normally excluded action may have a significant effect. *Id*.

§ 1501.4(b). If an extraordinary circumstance is present, the agency

may still categorically exclude the proposed action if it determines that

there are "circumstances that lessen the impacts" or "other conditions

sufficient to avoid significant effects." *Id*. § 1501.4(b)(2).

Categorical exclusions allow agencies to focus their environmental

review efforts on major actions that may significantly affect the

environment, NEPA's primary aim. *See* 48 Fed. Reg. 34,263, 34,264-65

(July 28, 1983); *see also* 40 C.F.R. § 1500.4(a) (noting that categorical

exclusions can reduce excessive paperwork). Categorical exclusions are

essential to the NEPA framework, and  the Council's regulations direct

all agencies to establish "[s]pecific criteria and identification of those

typical classes of action" that normally do not require an EIS or an EA.

40 C.F.R. § 1507.3(e).

Federal agencies must adopt their own process for identifying and

applying categorical exclusions. *Id*. The categorical exclusions available

to the Park Service are identified in its NEPA Handbook. AR3416.

Here, the Park Service relied on a categorical exclusion for "[c]hanges or

amendments to an approved action when such changes would cause no

or only minimal environmental impacts." AR008 (NEPA Handbook, Categorical Exclusion 3.3 A1); AR3416; *see also* 49 Fed. Reg. 9,273, 9,276 (Mar. 12, 1984) (providing public notice and comment on Categorical Exclusion 3.3 A1); AR148-152; 40 C.F.R. § 1507.3(a) (determining that existing categorical exclusions comply with current NEPA regulations). And the Park Service also adhered to Interior's NEPA regulations by considering whether "extraordinary circumstances" were present so that an otherwise-excluded action requires more environmental review. 43 C.F.R. § 46.215.

The Council's regulations also allow one federal agency to adopt another agency's determination that a categorical exclusion applies. 40 C.F.R. § 1506.3(d). Here, FAA adopted the Park Service's determination that a categorical exclusion applied. AR158-198.

## B. Factual background

### 1. The Bay Area Parks

The four Bay Area Parks are Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore. Each Park has a distinct history and characteristics. AR030-31.

For example, Golden Gate National Recreation Area is an 80,000-acre collection of park sites, many in urban San Francisco, along with tidal and submerged lands. AR030. The Park has many outstanding cultural and natural features, including Alcatraz Island, the one-time maximum-security federal prison that is now a popular tourist destination. AR030. The Park's cultural assets chronicle centuries of history—California Indian culture, the Spanish empire's frontier, the California Gold Rush, and World War II. AR030. Golden Gate's purpose is to offer national park experiences to a large and diverse urban population while preserving and interpreting the outstanding natural, historic, scenic, and recreational values of the park lands. AR031.

By contrast, Muir Woods National Monument is a 558-acre monument that preserves one of the last ancient redwood forests in the Bay Area. AR031. Some redwoods are nearly 1,000 years old and grow more than 250 feet tall. AR031. Muir Woods' purpose is to preserve the primeval character and ecological integrity of the old-growth redwood forest for scientific values and inspiration. AR031.

## 2. Development of the Air Tour Management Plan

Before Congress passed the Air Tour Management Act in 2000, two air tour operators conducted air tours over the Bay Area Parks. Thus, FAA followed the Act's requirements by granting those operators interim operating authority to conduct up to 5,090 flights per year over each Park until the Agencies completed air tour management plans. AR148; *see also* 70 Fed. Reg. 36,456, 36,456-58 (June 23, 2005).

In 2010, the Agencies began a planning process for the Bay Area Parks but paused it when Congress amended the Act in 2012. AR002-003. After this Court granted mandamus in 2020, the Agencies formally terminated that stale process and began anew. AR003.

The Agencies agreed to prepare one combined air tour management plan for all four Bay Area Parks. AR004. This made sense because the Parks are in proximity, with shared borders, the same two operators conducted air tours over three Parks (no operator was conducting tours over Muir Woods), and the operators' routes overflew multiple Parks. AR004. Although this Court had recognized that Muir Woods was exempt from mandamus because it had no air tours, the

Park Service decided to protect the Park's resources and visitor experience with a plan. AR003.

The Agencies began by identifying the existing condition of air tours over the Parks. Though two operators held interim operating authority for a combined total of 5,090 air tours each year over each Park, this did not reflect the actual tours flown. AR004. Thus, the Agencies decided to use a three-year average of operator-reported air tours to identify the existing condition. AR004. The Agencies selected 2017, 2018, and 2019 because those years reflected recent air tour conditions, represented reliable operator reporting of air tours, accounted for variations across multiple years, and excluded atypical data from 2020, a pandemic year. AR004-005.

Based on this methodology, the Agencies found that the operators conducted an annual average of 2,548 air tours over Golden Gate and San Francisco Maritime, mostly helicopter tours. AR004-005. Of the air tours by plane, 143 also flew over Point Reyes. AR005. No air tours flew over Muir Woods. AR005. FAA also gathered data from the operators on current routes and operating conditions, including the altitudes at which tours were conducted. AR005.

Noise is among the most prominent impacts from air tours, and the Agencies studied that impact closely. The Agencies used the air tour data from operators to model noise impacts on the Parks. AR006. They analyzed the data with FAA's standard noise modeling tool, a software program that models aircraft performance in space and time to estimate fuel consumption, emissions, noise, and air quality. AR006. The Agencies reviewed the modeling results and acoustic monitoring data to evaluate environmental impacts from air tours and develop a draft air tour management plan. AR006.

The Park Service took the lead in identifying the proposed action. The Park Service assembled an interdisciplinary team of subject matter experts from its Natural Sounds and Night Skies Division, Environmental Quality Division, and Regional Office. AR006. Key staff from the four Parks also participated, including experts in biology, park planning, cultural resources, and natural resources. AR006. The interdisciplinary team considered the existing routes and operations, impacts on the Parks' noise sensitive resources and visitor experience, the Parks' existing and natural acoustic environment, and potential mitigation or protective measures for the draft plan. AR006.

The interdisciplinary team identified minimum altitudes to protect the Parks' resources and adjusted the operator-provided routes to avoid sensitive areas, such as nesting sites and areas occupied by marine mammals. AR006, AR016-017. And the Park Service included other measures to mitigate or avoid environmental impacts, including time of day restrictions for all air tours. AR006. Then FAA reviewed the Park Service's proposed action for aviation safety concerns. AR006.

During this time, the Agencies also did a preliminary environmental analysis to identify the appropriate NEPA pathway for the plan. AR006. The Agencies also initiated consultation under Section 106 of the National Historic Preservation Act, including tribal consultation, and began analyzing potential effects on listed species and critical habitat to comply with the Endangered Species Act. AR006.

In October 2021, the Agencies published a draft air tour management plan in the Federal Register for public comment and held a public meeting regarding the draft, as required by the Act. AR006, AR3086-3121. During the meeting, the Agencies explained that they anticipated complying with NEPA by applying a categorical exclusion. AR3116. The Agencies also conducted additional outreach to consulting

parties in the Section 106 process. AR010. Based on public comments, the Agencies modified the draft plan. AR011-014.

## C. The Agencies' environmental review for the Plan

The record shows the Agencies did a robust environmental review that met their statutory obligations. AR057-198, AR758-773.

The Park Service analyzed the environmental impacts from air tours in an environmental screening form for each Park. AR057-138. The Park Service found that the Plan fell within a categorical exclusion. AR139-151. In applying the categorical exclusion, the Park Service found that (1) FAA's grant of interim operating authority to operators as required by the Act was an "approved action" because it was Congressionally mandated, (2) the Plan reflected "changes or amendments" to that approved action, and (3) the changes from implementing the Plan would result in no or only minimal environmental impacts. AR148-151. The Park Service also found no extraordinary circumstances that would require more environmental review. AR152-156. And the Park Service found that the Plan would not impair park resources and values. AR828-858.

FAA adopted the Park Service's categorical exclusion determination. AR159-163. FAA found no extraordinary circumstances existed that are identified in FAA's order implementing NEPA. AR161-170. The Agencies also prepared analyses compliant with Section 4(f) of the Department of Transportation Act, AR171-198, the National Historic Preservation Act, AR774-798, and the Coastal Zone Management Act, AR875-913. Finally, the Agencies determined that the Plan would have no effect on threatened or endangered species or critical habitat under the Endangered Species Act. AR758-773.

In January 2023, the Agencies signed the Record of Decision, AR001-027, and issued the final Air Tour Management Plan, AR028-056. The Plan authorizes a similar number of annual air tours as operators were flying in recent years—2,548 air tours over Golden Gate and San Francisco Maritime. AR004-007. Of that total, the Plan allows up to 143 air tours that also would fly over Point Reyes. AR007. It allows no air tours to fly over Muir Woods. AR007. The Plan imposes many conditions to mitigate potential environmental impacts from the air tours. AR007-008.

Environmental Groups' petition for review followed.

**SUMMARY OF ARGUMENT**

1.    The Agencies complied with the Air Tour Management Act. Under NEPA, the Agencies ordinarily have discretion to choose the proper path for environmental review, which includes a categorical exclusion when one applies. Environmental Groups claim that the Act overrides NEPA by requiring the Agencies to prepare either an EA or an EIS. But the Act's plain language, structure, and purpose preserve ordinary NEPA discretion.

The key provision on which Environmental Groups rely (the Signature Provision) does not help them. That Provision merely requires the Agencies to "each sign" (1) the "environmental decision document" required by NEPA, and (2) the "record of decision for the air tour management plan." 49 U.S.C. § 40128(b)(2). The Agencies satisfied this requirement.

The Signature Provision identifies examples of environmental decision documents, and categorical exclusions are not on that list, but the list is non-exhaustive because it is prefaced by the phrase "which may include." *Id*. Environmental Groups seek to cram this list into the rigid "EA-or-EIS" box they built, but the textual pieces simply do not fit.

Congress' purpose in enacting the Signature Provision was not to cabin the Agencies' NEPA discretion but to ensure they agreed on the environmental analysis and the plan. The Agencies' interpretation fulfills that purpose.

2. The Agencies complied with NEPA.

a. The Agencies rationally applied a categorical exclusion to the Plan for the Bay Area Parks. The exclusion applies to "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." AR008. The "approved action" is the interim operating authority that Congress required FAA to grant existing operators. And the Agencies did a detailed environmental analysis showing that the Plan makes changes or amendments to that approved action that cause no or minimal environmental impacts. AR001-027, AR057-198, AR758-798, AR875-913.

b. The Agencies chose a proper baseline for their environmental review. In the Act, Congress set the status quo when it required FAA to grant operators interim operating authority, and the Agencies properly accounted for Congress' choice when they chose a baseline reflecting the existing conditions in the Parks.

c.      No extraordinary circumstances exist. The Agencies studied and documented their conclusions that: (1) the Plan would cause no significant environmental effects to a relevant resource; (2) no environmental effects were highly controversial; and (3) there were no significant cumulative effects on bird species. On these highly technical issues, the Court should defer to the Agencies' expert judgment.

3.      If remand were necessary, the *Allied-Signal* factors weigh against vacatur. First, the Agencies prepared a solid environmental analysis and can correct any errors by doing more analysis. Second, vacatur would cause disruptive consequences by eliminating the Plan's benefits. Environmental Groups' alternative request for an injunction is unsupported.

## STANDARD OF REVIEW

Neither the National Parks Air Tour Management Act nor NEPA provides an express cause of action, so this Court reviews the Agencies' compliance with those laws under the Administrative Procedure Act (APA)'s arbitrary and capricious standard, 5 U.S.C. § 706(2)(A). *See, e.g.*, *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004).

Arbitrary and capricious review of an agency's decisions is "highly deferential and presumes agency action to be valid." *Defenders of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016). The standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But the agency must "examine the relevant data and articulate a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *Id.* (cleaned up). Courts afford an "extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (cleaned up).

## ARGUMENT

### I. The Air Tour Management Act does not eliminate the Agencies' discretion to rely on a NEPA categorical exclusion.

NEPA vests agencies with discretion to choose the proper path to compliance, including when applicable, a categorical exclusion. Environmental Groups contend that Congress eliminated that discretion in Section 40128(b)(2) of the Air Tour Management Act (the

Signature Provision). Br. 15-20. But the Signature Provision's plain language does not define a specific path for NEPA compliance that the Agencies must pursue; it contemplates that the general NEPA rules will apply. Likewise, the Act's structure and purpose confirm that Congress did not dictate the specific level of NEPA review that is required. Because the Act does not prohibit the use of categorical exclusions, the Agencies complied with the Act when they applied a categorical exclusion.

### A. The Agencies followed the normal process to comply with NEPA.

NEPA has three levels of review. Depending on the circumstances, an agency may apply a categorical exclusion, prepare an EA, or develop an EIS. 40 C.F.R. § 1501.3. If the agency finds that a categorical exclusion applies and that no extraordinary circumstances exist, then the agency may conclude its NEPA process without preparing an EA or EIS. *See United Keetoowah Band of Cherokee Indians in Oklahoma v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) (recognizing categorical exclusions as one type of NEPA review).

That is what happened here. Before approving the Air Tour Management Plan for the Parks, the Agencies complied with NEPA.

First, the Agencies thoroughly analyzed the Plan's potential environmental impacts on natural and cultural resources and the visitor experience at each of the four Parks. AR057-198. Based on that analysis, the Agencies then concluded that the Park Service's categorical exclusion applied to the Plan and that no extraordinary circumstances existed. AR057-138 (Park Service's environmental screening forms for each Park); AR139-157 (Park Service's categorical exclusion documentation); AR158-198 (FAA's categorical exclusion adoption). Thus, the Agencies chose to comply with NEPA through a categorical exclusion. AR8-9. And the Agencies documented that decision in the Record of Decision, which senior officials from each Agency signed. AR25-26.

Throughout their brief, Environmental Groups suggest that use of a categorical exclusion is suspect and "amount[s] to the exclusion of NEPA review." Br. 21. Not so. As this Court has recognized, the Council on Environmental Quality explained that categorical exclusions "are not exemptions or waivers of NEPA review; they are simply one type of NEPA review." *United Keetoowah*, 933 F.3d at 735 (quoting the Council's *Handbook*).

"Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013). The Council's current regulations direct agencies to assess the "appropriate level of NEPA review" and identify categorical exclusions as one of three levels. 40 C.F.R. § 1501.3(a). And the Agencies reasonably applied one of those levels of NEPA review. *See* Argument Point II.

In short, the Agencies adhered to NEPA's standard process and the governing regulations. So unless the Air Tour Management Act prohibited the Agencies from following that process, the Agencies' application of the categorical exclusion should be upheld. Neither the Act's text (Argument Point I.B.), nor its structure and purpose (Argument Point I.C.) evince Congress' intent to override the normal NEPA process.

**B.   The Act's plain text neither mandates a particular level of NEPA review nor forbids the Agencies from applying a categorical exclusion.**

The Air Tour Management Act plainly allows the Agencies to comply with NEPA through regular procedures, including a categorical exclusion when applicable. The Act's plain language does not prohibit the Agencies from applying a categorical exclusion, nor mandate that the Agencies prepare a particular NEPA document. Environmental Groups' contrary argument (Br. 15-20) relies on an inaccurate reading of the Act's text and misapplication of canons of statutory construction.

**1.   The Act only requires the Agencies to "each sign the environmental decision document required by" NEPA.**

Environmental Groups rely on a single provision in the Act (the Signature Provision) for their argument that the Act forbids use of categorical exclusions. That provision provides:

> **Environmental determination.** In establishing an air tour management plan under this subsection, the Administrator and the Director shall each sign the environmental decision document required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) which may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan.

49 U.S.C. § 40128(b)(2).

On its face, the Signature Provision does *not* require the Agencies to prepare a specific NEPA document. Rather, the Provision directs the FAA Administrator and the Park Service Director to "each sign" (1) the "environmental decision document required" by NEPA Section 4332, and (2) "the record of decision for the air tour management plan." *Id*. (emphasis added). In other words, the most natural reading of the Provision (adopted by the Agencies, AR25-26) is that Congress directed the Agency heads to each sign both the environmental decision document and the record of decision for the Plan.

The precise language supports this natural reading. The term "environmental decision document" is undefined in the Air Tour Management Act or in NEPA. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). On that front, the Signature Provision's text "is quite clear." *Id*. An "environmental decision document required by" NEPA Section 4332 encompasses *any* decision document that complies with NEPA Section 4332. Fulfilling that requirement, the Agencies prepared multiple

documents reflecting their decision that the NEPA categorical exclusion applied. AR057-198.

The Environmental Groups acknowledge that Congress did not define "environmental decision document." Br. 17. In fact, the term appears nowhere else in the United States Code—nor is it a common term among reported federal court decisions. Yet the Environmental Groups suggest (Br. 17) that Congress' use of that term incorporates a contemporaneous regulatory definition by the Council. But those regulations defined "environmental document," not "environmental *decision* document." *Cf.* 40 C.F.R. § 1508.10 (1978) (defining "environmental document"). Given Congress' awareness of the existing NEPA regulations, its choice of language in the Act that differs from the defined regulatory terms should be given meaning. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) (Congress intended a new meaning when it used the novel phrase "substantive legal standards" instead of the term of art "substantive rule"). And the correct way to do so is by giving the term its ordinary meaning. *BP Am. Prod.*, 549 U.S. at 91.

The Act's reference to NEPA itself supports this ordinary meaning. Congress directed the Agency heads to each sign "the environmental decision document *required by*" Section 4332 of NEPA. 49 U.S.C. § 40128(b)(2) (emphasis added). Section 4332 is the core provision of NEPA that directs agencies to study and disclose the environmental impacts of major federal actions. 42 U.S.C. § 4332. And under longstanding Council and judicial interpretations, an agency can meet its requirements under Section 4332 by preparing an EIS, an EA, or a categorical exclusion. Here again, Congress' reference to Section 4332 is best understood to preserve the Agencies' discretion to determine *which* document satisfies NEPA's requirements for a particular air tour management plan, but to require both Agencies to sign it.

> **2.    The Act has a non-exhaustive list of documents that does not restrict the Agencies' path to NEPA compliance.**

The Signature Provision gives several examples of what the "environmental decision document" may be, but the Provision's plain text reveals these examples are not exhaustive or restrictive.

The way Congress introduced the list is critical to its meaning. The Agency heads "shall each sign the environmental decision document required by" Section 4332 of NEPA "which *may include* a finding of no significant impact, an environmental assessment, or an environmental impact statement." 49 U.S.C. § 40128(b)(2) (emphasis added). Environmental Groups erroneously interpret this phrase to require the Agencies to prepare either an EA or EIS. Br. 15-16. But the plain language contradicts that reading. Congress prefaced the list with the phrase "which may include"—a signal that the next items are "merely exemplary and not exhaustive." *Bush v. United States*, 802 F.3d 680, 689 (5th Cir. 2015) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 133 (2012)).

*First*, when Congress uses "may," it usually does so in a permissive sense, while the use of the term "shall" may be mandatory. *See, e.g.*, *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016). Though courts sometimes read a "may" to mean "must" or "shall," when the statutory provision includes both mandatory and permissive language "it is a fair inference that the writers intended the ordinary distinction." *Id*. That inference applies here because the

Signature Provision includes both "shall" and "may." 49 U.S.C.

§ 40128(b)(2). Congress employed mandatory language to require that

the Agency heads "*shall* each sign the environmental decision

document," and permissive language to give examples of what that

document "*may* include." *Id*. (emphasis added).

This same distinction between "shall" and "may" appears in other

provisions of the Act. For example, the next provision after the

Signature Provision lists the mandatory contents of an air tour

management plan using the term "shall" while identifying other items

that "may" be included in a plan. 49 U.S.C. § 40128(b)(3). Likewise,

Section 40128(c) provides that the FAA Administrator "*shall* grant

interim operating authority," *id*. § 40128(c)(1) (emphasis added), but

then provides that interim operating authority "*may* be revoked by the

Administrator for cause," *id*. § 40128(c)(2)(D) (emphasis added). *See also*

*id*. §§ 40128(b)(7)(A), (B) (providing that the Agencies "may enter into a

voluntary agreement" but that a voluntary agreement "shall address"

specific issues "and may" include certain provisions). When Congress

has so clearly distinguished between mandatory and permissive

language, that distinction should be given its ordinary meaning.

*Second*, Congress' use of "include" or "including" ordinarily signals that the following list is "illustrative, not exclusive." *Puerto Rico Mar. Shipping Auth. v. ICC*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981). And the "word 'includes' is usually a term of enlargement, and not of limitation." *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (cleaned up); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) (the term "including" "emphasizes the fact that that which is within is meant simply to be illustrative").

The use of "include" in the Signature Provision fits comfortably within the word's normal meaning. An "environmental decision document" could be an EA; it could be a Finding of No Significant Impact; it could be an EIS. But those are not the only options that the Agencies may choose to comply with NEPA.

*Third*, Environmental Groups invoke the interpretive canon *expressio unius est exclusio alterius*—that "expressing one item of [an] associated group or series excludes another left unmentioned." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (cleaned up). But the "force of any negative implication" in a statute "depends on context." *Id*. at 302 (cleaned up). The negative implication canon "applies only when

circumstances support[] a sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 80 (2002) (cleaned up).

One exception to that canon is the "presumption of nonexclusive 'include.'" *United States v. Herrera*, 974 F.3d 1040, 1048 (9th Cir. 2020) (quoting Scalia & Garner, *Reading Law* 132). Under this presumption, the word "*include* does not ordinarily introduce an exhaustive list." *Id.* (cleaned up). So the negative implication canon is generally *not* applied when the list is introduced by "including," which signifies that the items that come after are illustrative, not exhaustive. *See, e.g.*, *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019) (rejecting negative implication when statute used "including"); *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 426 (4th Cir. 1999) ("When 'include' is utilized in a statute, it is generally improper to conclude that entities not specifically enumerated are excluded.").

So here. By beginning with "may include," the Signature Provision tells the reader that the list of NEPA documents is nonexclusive and illustrative. "Far from supporting" Environmental Groups' position (Br. 19-20), "the expansive phrasing of 'may include' points directly away

from the sort of exclusive specification" they claim. *Chevron*, 536 U.S. at 80.

"When interpreting a statute," courts also "examine related provisions in other parts of the U.S. Code." *Boumediene v. Bush*, 553 U.S. 723, 776 (2008). When the Act was passed in 2000, Congress had passed many laws that required an agency to prepare one of the two specific NEPA documents that Environmental Groups mistakenly insist the Signature Provision requires—an EA or an EIS.[2] And shortly after passing the Air Tour Management Act, Congress enacted a provision that—unlike the Signature Provision—clearly requires the agency to prepare either an EA or EIS: "The Secretary shall prepare an environmental assessment or an environmental impact statement pursuant to section 102(2) of the National Environmental Policy Act of

---

[2] *See, e.g.*, 42 U.S.C. § 10155(c) (1998) ("The Secretary shall prepare" an EA); *id*. § 10161(c)(1) (1998) (same); 42 U.S.C. § 10165(d) (1998) (same); *id*. § 10197(a) (1998) (same); *id*. § 10197(g) (1998) ("The Secretary shall prepare" an EIS); 43 U.S.C. § 1904(d) (1998) (Secretary "shall cause to have prepared an environmental assessment record" and project "may be constructed unless the Secretary determines that the project will have a significant impact on the quality of human environment, necessitating an environmental impact statement"); 42 U.S.C. § 10155(c) (1998) (an agency action "shall be considered to be a major Federal action requiring preparation of an environmental impact statement").

1969 (42 U.S.C. 4332(2)) for each authorized hazardous fuel reduction project." 16 U.S.C. § 6514(b) (2003). Because Congress generally employs clear and specific language to override an agency's ordinary discretion under NEPA, its choice of open-ended language in the Signature Provision should be given a different, permissive meaning.

*Fourth*, the list that follows "may include" does not read logically as a set of discrete, limited options from which the Agencies may select. Put differently, the listed documents are not disjunctive, mutually exclusive types of NEPA review. For example, a finding of no significant impact is not a separate level of NEPA review but is one possible *outcome* of an EA. *See* 40 C.F.R. § 1501.6 ("An agency shall prepare a finding of no significant impact if the agency determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action will not have significant effects."); *see also* 40 C.F.R. § 1501.4(e) (1998). It is also possible for an agency to prepare an EA and then develop an EIS based on a finding of significant impacts, or to simply prepare an EIS by itself. *See* 40 C.F.R. §§ 1501.4(a), (b). Thus, it does not make sense to read the list as purely

disjunctive, as would be natural if the "may include" were read as limiting.

Seeking to avoid this tension, Environmental Groups lump the documents into two categories: (1) an EA that may come with a finding of no significant impact, and (2) an "environmental impact statement" with "the record of decision." Br. 15. This binary grouping is artificial. The Signature Provision lists "finding of no significant impact," "environmental assessment," and "environmental impact statement" as three alternatives in the same list. And these documents have distinct functions. A "finding of no significant impact" is a document prepared *because of* an EA. 40 C.F.R. § 1508.13 (1978) (a "finding of no significant impact" "shall include the environmental assessment or a summary of it").

Nor does it make sense to group "environmental impact statement" with "record of decision," as Environmental Groups propose. Br. 15. Nobody denies that when an agency prepares an EIS, it also will prepare a record of decision. *See* Br. 16 n.7 (quoting 40 C.F.R. § 1505.2(b)). But an agency also may prepare a record of decision after an environmental assessment or a categorical exclusion.

The more natural reading of the Signature Provision's last phrase—"and the record of decision for the air tour management plan"—is that this describes the record of decision *for* the plan that is distinct from the non-exhaustive list of environmental decision documents. That interpretation is confirmed later in the Act by the requirement that the Agencies "justify and document" the need for measures taken in an air tour management plan "and include such justifications in *the record of decision*." 49 U.S.C. § 40128(b)(3)(F) (emphasis added). Thus, Congress intended the Agencies to prepare a record of decision, even if they did not prepare an EIS—indeed, even the Environmental Groups acknowledge that the Agencies can rely on an EA, not an EIS. Returning to the best reading of the Signature Provision, the Agencies must each sign the environmental decision document and the record of decision.

In sum, the Act's plain text does not override the Agencies' discretion to apply a NEPA categorical exclusion. Congress could have done this in one of two ways, either by explicitly prohibiting the Agencies from relying on a categorical exclusion or, as it has done in

other statutes, by requiring the Agencies to prepare an EA or EIS. *See, e.g.*, 16 U.S.C. § 6514(b). But the plain text does neither.

## C. The Act's structure and purpose reinforce the Agencies' discretion to apply a categorical exclusion.

On top of the plain language, the Act's structure and purpose confirm the Agencies retained their ordinary discretion under NEPA.

*First*, Congress took great pains to define each Agency's role in the Act. Many provisions illustrate this. Congress assigned some tasks to the "[FAA] Administrator, in cooperation with the [Park Service] Director." *See* 49 U.S.C. §§ 40128(a)(2)(B)-(E), 40128(b)(1)(A), 40128(b)(6), 40128(c)(3)(A). It assigned other tasks to "the Administrator and the Director." *See id.* §§ 40128(a)(3)(B), 40128(a)(5)(C)(i), 40128(b)(2), 40128(b)(4), 40128(b)(7)(A)-(C), 40128(c)(2)(B), 40128(d)(1)-(2). And it assigned still other tasks to one agency or the other. *See id.* §§ 40128(a)(2)(E)-(F), 40128(a)(4), 40128(a)(5)(B), 40128(b)(7)(D)(i)(I)-(II), 40128(c)(1), 40128(c)(2)(I)(ii)-(iii), 40128(c)(3)(A)(ii)-(iii).

Congress did this for a sound reason. It knew that the Act would require two federal agencies with different policy goals and priorities to

work together to reach a reasonable and balanced result for air tours over national parks. *See* Pub. L. No. 106-181, § 802, 114 Stat. at 186 (congressional findings describing FAA's and the Park Service's responsibilities). To achieve a balanced result, Congress needed to ensure that the Agencies collaborated and agreed on both the NEPA review and the air tour management plan.

The Signature Provision embodies that intent. Congress specified that the "Administrator and the Director shall each sign" the environmental decision document and the record of decision. 49 U.S.C. § 40128(b)(2). And the Agencies followed the Provision when they prepared the environmental decision documents and record of decision at the Bay Area Parks. AR001-198.

*Second*, as its title foretells, the Air Tour Management Act centers on air tour management plans. Environmental Groups misread the Act when they suggest that NEPA is central to the Act's goals. Br. 20 (citing 49 U.S.C. § 40128(b)(1)(B)). The provision they rely on is *not* about NEPA at all—it defines the Act's primary objective for "any air tour management plan." 49 U.S.C. § 40128(b)(1)(B). That objective is for the

Agencies to develop plans that "*mitigate* or *prevent* the significant

adverse impacts, *if any*," of air tours. *Id.* (emphasis added).

As to compliance with the Act, Environmental Groups

inaccurately assert (Br. 22) that the Agencies failed to "formally assess[]

or mitigat[e]" the impacts of existing flights. The record shows that the

Agencies did assess and mitigate those impacts in developing the Plan.

AR007-008, AR014-020. The Agencies fully complied with Act's

substantive duties in general and Section 40128(b)(1)(B) in particular,

and Environmental Groups develop no argument to the contrary.

*Finally*, the legislative history corroborates the Agencies'

interpretation of the Signature Provision. Environmental Groups quote

a snippet from the House Committee Report referencing the Act's

background. Br. 20 (quoting H.R. Rep. 106-167(I), at 93). But more

relevant parts of the Report confirm the Signature Provision's meaning.

The House Committee identified the Provision's purpose as

requiring both Agencies to sign the NEPA document, not to dictate

what level of environmental review is required. The House Committee

explained: "This bill adds an additional requirement to existing

environmental requirements in that it *requires both agencies, FAA and*

*NPS, to sign the environmental review document.* This is *not* a current requirement under NEPA and *is intended to ensure that NPS and FAA agree on the ATMP [air tour management plan].*" H.R. Rep. 106-167(I), at 95-96 (emphasis added). The House Committee also explained that the air tour management plan "process must also comply with regulations promulgated under the National Environmental Policy Act that determine the parameters of an environmental review." *Id.* at 95.

The Senate Committee advanced a similar explanation. That Committee explained: "In developing an ATMP [air tour management plan], the FAA and the NPS would conduct the *environmental analysis provided for by the National Environmental Policy Act of 1969 (NEPA).*" S. Rep. No. 106-9, at 46 (1999) (emphasis added). Then the Senate Committee clarified that the Signature Provision required the Agencies to sign the NEPA document: "Both the FAA Administrator and the NPS Director *would have to sign the environmental decision document for each park* before proceeding with development of the ATMP. *If either agency fails to sign or refuses to sign*, the ATMP will be considered premature and not in force." *Id.* at 46 (emphasis added); *see also id.* at 44 ("The FAA and the NPS jointly conduct the ATMP process, and each

agency must sign the required environmental and decision documents."). Thus, the legislative history supports the Agencies' interpretation of the Signature Provision.

In sum, the Agencies acted consistent with the Air Tour Management Act's plain language, structure, and purpose when they applied a NEPA categorical exclusion.

## II. The Agencies complied with NEPA.

The Agencies complied with NEPA before finalizing the Air Tour Management Plan. First, they rationally found that the Plan fell within an applicable categorical exclusion. The Plan fits comfortably within the exclusion because it makes "[c]hanges" to an "approved action" (FAA's grant of interim authorization of air tours as required by the Act), and the Agencies confirmed that the changes "will cause no or only minimal environmental impact." AR008, AR148-152. Second, the Agencies selected a proper baseline and fully evaluated and disclosed the Plan's potential environmental impacts. Third, the Agencies reasonably determined that the Plan did not implicate any extraordinary circumstances that triggered more NEPA review.

### A. The Agencies reasonably applied a categorical exclusion to the Air Tour Management Plan.

This Court reviews the Agencies' decision to invoke a categorical exclusion under the APA's arbitrary and capricious standard. *See Nat'l Trust for Historic Pres. in U.S. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987). In other words, the Court asks whether the Agencies "reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion." *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 680 (9th Cir. 2022) (cleaned up). The Park Service reasonably determined that the Plan fell within the scope of its categorical exclusion, and FAA reasonably adopted that determination. *See* 40 C.F.R. § 1506.3(d). Environmental Groups' passing objection (Br. 25) lacks merit and is thin enough to constitute forfeiture.

The categorical exclusion is a good fit with the circumstances. AR008-009. It applies to "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." AR008 (Park Service NEPA Handbook, Categorical Exclusion 3.3 A1). As the Park Service explained, the "approved action" is FAA's grant of interim operating authority. AR148, AR8, AR2712-2717. In the Act, Congress directed FAA to grant interim

operating authority to air tour operators that applied. *See* 49 U.S.C. § 40128(c). And FAA did so at the Bay Area Parks, authorizing two operators to conduct up to 5,090 flights per year over each Park. AR148; *see also* 70 Fed. Reg. at 36,458.

Next, the Agencies made *changes* to that approved action in the Plan. AR007-008. In other words, the Agencies took the existing routes and altitudes that operators flew under interim operating authority and made changes in the Plan to mitigate and avoid potential environmental impacts from those authorized air tours. AR149-151. Among those changes, the Agencies reduced the number of authorized annual tours from 5,090 to 2,548 (which is equivalent to the recent annual average of such tours), imposed minimum altitudes on tours, restricted the times that tours could take place, and identified minimum distances that tours had to maintain from sensitive resources, all of which mitigated the impacts of existing air tours on natural and cultural resources and visitor experiences. AR007-008, AR014-020.

Finally, the Park Service analyzed the changes in the Plan and found that they "would result in no or only minimal environmental

impacts." AR151, AR020-021. In fact, the Park Service found the Plan would benefit the Parks' resources and values when compared to current conditions. AR151, AR020-021. That finding makes sense because the Agencies designed the Plan to "improve resource protections and visitor experience." AR151. And FAA reasonably adopted the Park Service's categorical exclusion and found no extraordinary circumstances. AR158-198.

In the end, both Agencies fully documented why the categorical exclusion applied. AR057-198. And each Agency found that the Plan would cause no significant environmental impacts at the four Bay Area Parks. AR020-021. As the Agencies explained, the Parks' resources and values impacted by air tours "will continue to exist in a condition that will allow the American people to have present and future opportunities to enjoy them." AR021.

Stepping back, when a categorical exclusion applies, it "promotes efficiency" in the "NEPA review process while avoiding unnecessary analysis." *Utah Envtl. Congress v. Bosworth*, 443 F.3d 732, 742 (10th Cir. 2006). In the "abbreviated categorical exclusion process" designed to streamline procedures and reduce paperwork and delay, *CBD v.*

*Salazar*, 706 F.3d 1085, 1096-98 (9th Cir. 2013), the Agencies' documentation is more than adequate to show that using the categorical exclusion was not arbitrary or capricious. Indeed, both the Ninth and Seventh Circuits have upheld the Park Service's application of a similar categorical exclusion with relatively succinct explanations, so long as there is enough analysis—as there is here (AR57-198)—to show that the "minimal environmental impact" determination was not arbitrary. *See Earth Island Institute v. Muldoon*, -- F.4th --, 2023 WL 5921619, at *7-10 (9th Cir. Sept. 12, 2023); *Sauk Prairie Conservation Alliance v. U.S. Dep't of Interior*, 944 F.3d 664, 676-77 (7th Cir. 2019). This Court should defer to the Agencies' reasonable choice to apply a categorical exclusion to the Plan for the Bay Area Parks.

In a single paragraph, Environmental Groups assert that the categorical exclusion does not apply. Br. 25. That argument is conclusory enough to constitute forfeiture. In any event, it is incorrect for the reasons just explained.

Environmental Groups raise two more arguments that lack merit. *First*, they contend that the Agencies found that an EA was necessary to comply with the Act and then changed position without explanation.

Br. 18 n.9, 24-25, 26-27. But these statements merely show that the Agencies planned to comply with NEPA, not that they interpreted the Act to require a specific level of NEPA review. *See, e.g.*, 72 Fed. Reg. 6802, 6803 (Feb. 13, 2007) (noting that the Act's interim operating authority allowed air tour to continue while the Agencies "analyzed the environmental impact of the air tours"). Environmental Groups highlight (Br. 25) the Agencies' announcement that "[i]n compliance with [NEPA] and FAA Order 1050.1E, an Environmental Assessment (EA) is being prepared." 76 Fed. Reg. 45,312, 45,312 (July 28, 2011). None of this amounts to a definitive policy position that bound the Agencies to offer "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Besides, the Agencies gave "good reasons" for what they did. *Id.* In 2020, the Agencies notified the public that they had terminated and restarted the processes under the Act and NEPA at several parks, including the Bay Area Parks. 85 Fed. Reg. 55,060, 55,060-61 (Sept. 3, 2020). Eight years had passed since the Agencies had ceased work on those processes, so the Agencies decided to "start anew" in developing plans and "associated environmental documents at these and other

48

parks." *Id.*; AR002-004. Because the Agencies began an entirely new process, they did not arbitrarily "revers[e] course" when they applied a categorical exclusion at the Bay Area Parks. *Cf.* Br. 30.

When the Agencies announced the new process, they stated that "in accordance" with the Act, they would "hold at least one public meeting, publish the [air tour management plan] in the Federal Register, *comply with NEPA*, and invite Tribes to participate as cooperating agencies, as appropriate." 85 Fed. Reg. at 55,061 (emphasis added). Promising to comply with NEPA is *not* the same as committing to a specific level of environmental review—a distinction overlooked by Environmental Groups.

*Second*, Environmental Groups claim it was arbitrary for the Agencies to apply a categorical exclusion for the Bay Area Parks, while preparing EAs for other parks. Br. 29; *see* AR2695-2722. They failed to present this objection to the Agencies, so the issue is forfeit. *See* 49 U.S.C. § 46110(d) (court may consider objection to an FAA order "only if the objection was made in the proceeding" or if "there was a reasonable ground for not making the objection in the proceeding").

If not forfeit, the argument lacks merit. Neither NEPA nor the APA requires the Agencies to do a cookie-cutter environmental review at each park. *Cf.* Br. 30. Nor is it the case, as Environmental Groups suggest (Br. 29-30), that the *number* of air tours is the sole factor for assessing potential environmental impacts. The *routes*, *altitudes*, and *aircraft types* are important too. And the Agencies must consider each park's specific natural and cultural resources. Likewise, a park's acoustic environment matters—for example, whether it is an urban soundscape or remote wilderness. Environmental Groups fail to show that the Agencies must prepare an EA for *every* park just because they are presently preparing EAs for *some* parks.

These same principles refute Environmental Groups' strained comparison between the Bay Area Parks and Badlands National Park, where the Agencies are preparing an EA. Br. 29-30. Relying on extra-record evidence, Br. 29 n.17, Environmental Groups point to the lower number of existing air tours at Badlands (1,425) to suggest that the Agencies should have prepared an EA for the Bay Area Parks. Br. 29-30 & n.17. But number of air tours is an empty statistic because in the final Plan for the Parks, the Agencies are allowing *no* air tours at Muir

Woods, only 143 plane tours per year at Point Reyes, and 2,548 tours per year at Golden Gate and San Francisco Maritime—two Parks with settings unlike Badlands. AR033.

In all events, the Agencies explained why they anticipated applying a categorical exclusion at some parks in response to this Court's order in the mandamus case. AR2699-2721. Along those lines, the Agencies have selected the proper NEPA pathway to fit each park's circumstances, including the Bay Area Parks. At bottom, the Agencies thoroughly studied and disclosed the potential environmental impacts from air tours over the Bay Area Parks—all that NEPA requires.

## B. The Agencies chose a proper baseline for the NEPA analysis.

The Agencies chose a sound baseline for their environmental analysis that reflects the existing conditions at the Bay Area Parks—the number of air tours flown on average in recent years. Contrary to Environmental Groups' claims (Br. 23, 26-27), this baseline accords with NEPA, the Air Tour Management Act, and the record.

*First*, the Agencies had to identify the baseline against which to measure potential environmental impacts. The baseline for a NEPA analysis is the "known impacts of maintaining the status quo."

*Biodiversity Conservation Alliance v. U.S. Forest Serv.*, 765 F.3d 1264, 1269 (10th Cir. 2014). The Agencies identified the baseline as the impacts on park resources from existing air tours over the four Parks, in the absence of an air tour management plan—the status quo. AR058-059, AR081-082, AR106-107, AR126, AR148-152. Under the existing conditions, two operators flew air tours over three Parks under interim operating authority. AR004-005; AR148-152. The operators flew no tours over Muir Woods, so the Agencies set the baseline for that Park as the impacts from *no* air tours. AR151. The Agencies' choice accords with NEPA, which sets the baseline as the "current level of activity." *Biodiversity Conservation Alliance*, 765 F.3d at 1269 (cleaned up).

*Second*, Environmental Groups contend (Br. 23) that using existing conditions as the baseline "mercilessly twists" the Air Tour Management Act, but that contention is belied by the Act's text and structure. Congress set the status quo in the Act by directing FAA to grant interim operating authority to an "existing commercial air tour operator" and by specifying that authority terminates only *after* a plan is established. 49 U.S.C. §§ 40128(c)(1), (c)(2)(E); AR023-24. Congress even prescribed the formula that FAA had to use to determine how

many air tours were authorized. 49 U.S.C. § 40128(c)(2)(A)(i)-(ii).

Because air tour operators were flying over the Bay Area Parks before

the Act was passed, FAA complied with Congress' directions by issuing

those operators authority for 5,090 air tours over each Park. AR148.

Elsewhere, Environmental Groups acknowledge this reality.

When requesting extraordinary injunctive relief, they note that if the

Court vacated the Plan, the "*status quo* to which air tours would revert

would be a largely unregulated system of Interim Operating Authority."

Br. 37. Because interim operating authority is the status quo—as

Environmental Groups concede—the Agencies reasonably and

conservatively chose as the baseline the then-existing conditions under

which operators conducted air tours at the Bay Area Parks.

This Court addressed a similar baseline in *Conservation Law

Foundation v. FERC*, 216 F.3d 41 (D.C. Cir. 2000). Petitioners

challenged the Federal Energy Regulatory Commission's decision to

relicense a hydroelectric dam. *Id*. at 44-45. To comply with NEPA, the

Commission chose a baseline of "existing conditions" that reflected the

dam's existence and operation under its existing license. *Id*. at 45-46.

This Court affirmed that choice because the Federal Power Act gave the

Commission "leeway to conduct its comparative assessments using existing conditions as a baseline." *Id*. at 46.

The same here. In the Act, Congress directed FAA to grant interim operating authority to air tour operators. This defined the *legal* status quo for operations until the air tour management plans were in place. But the Agencies also recognized that the operators only flew about *half* the authorized air tours in an average year. AR150-151. Given the legal and factual status quo, the Agencies reasonably used the existing conditions as a baseline in the NEPA analysis. *Conservation Law Foundation*, 216 F.3d at 46; AR151.

*Third*, the Agencies reasonably calculated the baseline figure. They chose a three-year average of air tours over the years 2017, 2018, and 2019. AR004-005, AR148. Environmental Groups assert (Br. 26-27) this led to an arbitrary and inflated figure, but the Agencies gave sound reasons for calculating the baseline number this way. AR148-149. For one thing, the Agencies were concerned about "inconsistencies" in flight reporting data and noted earlier data was "incomplete." AR148. For another, the three-year average from 2017 through 2019 accounted for

both (1) "variation across years" and (2) "takes into account the most recent years prior to the COVID-19 pandemic." AR149.

This was a sensible choice based on the data. *See State Farm* 463 U.S. at 43. Though Environmental Groups object (Br. 27-28) that the baseline figure is higher than if the Agencies had used earlier years, the APA leaves these sorts of data-driven judgments to the Agencies' discretion. *See, e.g.*, *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 510-511 (D.C. Cir. 2010) (deferring to agency's choice of methodology in NEPA air quality analysis). Besides, the figure the Agencies chose (2,548 air tours) is approximately *half* the number that FAA authorized as required by the Act (5,090 air tours). AR148-151. But the Agencies reasonably declined to use that much higher figure because it did not reflect the actual air tours being conducted over the Parks and thus was not an accurate depiction of the "current condition of the human environment." AR151.

## C. No extraordinary circumstances are present that would require more environmental analysis.

Because the Agencies applied a categorical exclusion, they also evaluated whether "extraordinary circumstances" existed in which a normally excluded action may have significant environmental effects

requiring an EA or EIS. *See* 43 C.F.R. § 46.215. Each Agency concluded that the Plan did *not* implicate any extraordinary circumstances and documented that conclusion with supporting technical analysis. AR152-56, AR165-198. Environmental Groups contend (Br. 31-37) that three extraordinary circumstances exist, but the record supports the Agencies' conclusion. And because the Agencies evaluated scientific data within their technical expertise, the Court should defer to the Agencies' expert judgment. *City of Waukesha*, 320 F.3d at 247.

### 1. The Plan has no significant impacts on the Bay Area Parks' natural resources.

The Agencies considered whether extraordinary circumstances existed because the Plan would have "significant impacts" on certain natural resources and lands. 43 C.F.R. § 46.215(b). The critical question is whether the Plan has "significant impacts" on the Parks' resources, as required by the relevant definition of "extraordinary circumstances":

> Have *significant impacts* on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11190); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

43 C.F.R. § 46.215(b) (emphasis added). The Agencies found that the Plan would have no significant impacts on the Parks. AR152-153, AR015-016, AR020-021, AR165-198.

The Agencies reached this conclusion after an extensive environmental review process by an interdisciplinary team of FAA and Park Service experts, including biologists, cultural resource program managers, natural resource specialists, and NEPA specialists. AR006. The Agencies modeled the noise from existing air tours, and the Park Service's experts then reviewed that modeling, together with acoustic monitoring data. AR006, AR165-166, AR192-197, AR203-207. Then the Park Service assessed how the air tour routes and operations would affect the Bay Area Parks' noise sensitive resources, existing and natural acoustic environment, and visitor experience. AR006. To avoid impacts to sensitive resources, such as nesting shorebird colonies, the Agencies imposed minimum distances (lateral offsets) on the existing air tour routes; the Agencies also imposed other mitigation measures, including minimum altitudes for air tours. AR006, AR016.

Based on their noise modeling and technical analysis, the Agencies concluded that the Plan would have *no* significant impacts,

including from noise. AR008-009, AR152-153, AR165-166.

Environmental Groups fail to identify record evidence that calls this

conclusion into question. Br. 32-33. They generally cite the Park

Service's categorical exclusion documentation, Br. 33 (citing AR139-

157), which supports the Agencies' findings. And they selectively quote

*one* paragraph in the Park Service's environmental screening form for

Point Reyes National Seashore. Br. 33 (quoting AR089). That

paragraph recognizes that "[c]urrently *some* park visitors *may* hear

noise from commercial air tours, which may disrupt visitors or degrade

the visitor experience." AR089 (emphasis added). But the Park Service's

recognition that visitors may hear an air tour does not establish a

significant impact. And if *any* impact, however minimal, qualified as an

extraordinary circumstance, then no categorical exclusion would ever

apply to any agency action. To trigger this extraordinary circumstance,

the action must have a *significant* impact. 43 C.F.R. § 46.215(b).

The Agencies' handling of air tours at Point Reyes paints a very

different picture than Environmental Groups suggest. AR089-090; *cf.*

Br. 33. First, the Agencies imposed substantial mitigation measures on

air tours over Point Reyes. The Agencies capped the *annual* number of

air tours over Point Reyes at 143—less than one air tour every two days. AR007, AR038, AR082 (limits on tours per day), AR146. And the Agencies authorized only fixed-wing planes to fly over Point Reyes, not helicopters. AR008. Environmental Groups omit these facts, citing only the *annual limit* of 2,548 helicopter and fixed wing air tours authorized over Golden Gate and San Francisco Maritime. Br. 5.

The Park Service found these mitigation measures would benefit the visitor experience at Point Reyes and avoid significant impacts. AR087-090. The Park Service observed that (1) the low number of air tours daily and annually made it less likely that the visitor experience would be disrupted by multiple air tours; (2) on days when air tours did occur, noise levels above 52 decibels that interfered with conversational speech "will occur for *less than five minutes a day* over the Park"; and (3) the Plan restricted air tours to the hours of 12 p.m. to 5 p.m. (or 11 a.m. for operators converting to quiet technology aircraft that are authorized by the Agencies). AR088-090, AR839. The Plan's time restrictions created periods "when visitors seeking solitude may explore the Park without disruptions from commercial air tours" and "opportunities to experience the sights and sounds of wildlife." AR089-

090 (emphasis added). The Park Service reasonably concluded that the remaining, minimal impacts were not "significant" and thus were not an extraordinary circumstance as defined by the regulations. 43 C.F.R. § 46.215(b); AR152-153, AR022-023.

Rather than pointing to evidence of any significant impacts, Environmental Groups emphasize the unique character of the Bay Area Parks. Br. 32-33. They incorrectly assert that the Park Service has "formally nominated" two Parks for "special designations on the World Heritage List." Br. 32; *cf.* 88 Fed. Reg. 37,270, 37,270-71 (June 7, 2023) (soliciting comment on whether to prepare nominations). Status aside, the key question remains whether there are *significant* effects on the Parks. There are none.

The Park Service also found that the Plan complied with its 2006 Management Policies derived from the National Park Service Organic Act of 1916, 54 U.S.C. §§ 100101 *et seq*. AR827-858; AR025. The Park Service found that the Plan would not impair park resources and values at the Bay Area Parks and, in fact, would *protect* those resources and values. AR827-858, AR016-017, AR020-023, AR025.

To sum up, the Agencies rigorously analyzed potential environmental impacts and concluded that none were significant. Environmental Groups have failed to identify record evidence that undermines that conclusion. *See Sauk Prairie*, 944 F.3d at 679 (extraordinary circumstances under 43 C.F.R. § 46.215(b) did not apply when the Park Service adequately explained why the changes would not have significant environmental effects).

### 2. The Plan has no environmental effects that are highly controversial.

Environmental Groups also invoke extraordinary circumstances when the action has "highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resource." 43 C.F.R. § 46.215(c); Br. 33-35. But Environmental Groups conflate controversy with opposition.

"Mere opposition is not sufficient for a proposed action or its impacts to be considered highly controversial on environmental grounds." FAA Order 1050.1F at 5-2, ¶ 5-2.b.(10); AR3403-3404 (explanation in Park Service's NEPA Handbook); *see American Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1011 (9th Cir. 2020). A decision is "highly controversial," if a "substantial dispute exists as to

the size, nature, or *effect* of the major federal action." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1042 (D.C. Cir. 2021). "But not just any criticism renders the effects of agency action 'highly controversial.'" *Id*. "Rather, *something more* is required for a highly controversial finding besides the fact that some people may be highly agitated and be willing to go to court over the matter." *Id*. (cleaned up).

That "something more" is missing here. *Id*. Environmental Groups quote public comments opposing the Air Tour Management Plan. Br. 33-35 (AR3259-3265). These comments reflect general disagreement with the Plan but fail to show a "substantial dispute" over an environmental effect that the Agencies failed to address. *Standing Rock*, 985 F.3d at 1042.

For instance, Environmental Groups quote comments urging the Agencies to ban air tours from the Parks. Br. 34-35 (quoting AR3260). The Agencies considered a ban but decided that other, commonsense mitigation measures were enough to avoid significant environmental impacts, achieve the Act's objectives, and preserve the Parks' resources and values. AR016; *see* 49 U.S.C. § 40128(a)(1)(B) (identifying the

objective of air tour management plans); AR021. Another comment objected to the Agencies' baseline for the environmental review, Br. 35 (quoting AR3261), but the Agencies thoroughly explained why they chose the baseline. *See above* Argument Point II.B. Environmental Groups identify no environmental effect or issue that the Agencies overlooked.

### 3. The Plan has no significant cumulative environmental effects on birds.

The third extraordinary circumstance that Environmental Groups raise is whether the Plan has significant *cumulative* environmental effects on birds. This extraordinary circumstance addresses whether the Plan has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. § 46.215(f). Contrary to Environmental Groups' claim (Br. 35-37), the Agencies found no significant cumulative effects on birds.

*First*, Environmental Groups identify no concrete "other actions" that have a "direct relationship" to the Plan that, taken together, could give rise to significant environmental effects. Their failure to identify these other actions with an alleged direct relationship alone suffices to reject this argument. Rather, they offer vague references to air tours

"both legal and illegal" and allude to "numerous other disturbances."

Br. 36 (AR3334-3335). The Agencies may reasonably conduct their

NEPA analysis presuming that the public will comply with the law. *See,*

*e.g.*, *Bicycle Trails Council v. Babbitt*, 82 F.3d 1445, 1457 (9th Cir. 1996)

(reasoning that an agency conducting a NEPA analysis of a new

regulation "should no more assume that citizens will violate any other

law than that they will violate the regulation being promulgated"). At

any rate, the Plan requires operators to equip all aircraft with flight

monitoring technology and to submit the flight tracking data to the

Agencies in semi-annual compliance reports. AR040-041.

*Second*, Environmental Groups distort and omit the Agencies'

analysis of impacts to birds. They pluck one phrase about "temporary

disturbances to wildlife" from the Agencies' discussion of *indirect* effects

(not cumulative effects) and then criticize the Agencies for "provid[ing]

only generalities." Br. 35-36 (AR069). In context, the Agencies'

statement is about indirect effects on undeveloped lands *outside* the

Parks. AR069. And the Agencies noted that those lands will "likely

experience similar impacts to those described in other sections" of the

environmental screening form, including "temporary disturbances to wildlife." AR069.

More importantly, the Agencies addressed cumulative impacts in the form's preceding section. AR068-69. Environmental Groups say nothing about that analysis, so they have waived any challenge to it. *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 697 (D.C. Cir. 2016). In all events, the Agencies explained that they considered cumulative impacts when other foreseeable current and future activities and noise sources in the Parks were combined with air tour noise. AR068. The Agencies found that noise from air tours is a "small contribution of overall noise" in the Parks and concluded there would be no significant cumulative impacts from the Plan. AR068-069.

*Third*, the Agencies complied with NEPA and the Endangered Species Act by studying potential impacts to birds. AR758-772, AR060-062 (Golden Gate), AR083-085 (Point Reyes), AR108 (San Francisco Maritime), AR127 (Muir Woods). The Agencies included mitigation measures in the Plan requiring air tours to avoid certain areas to protect nesting seabird colonies and peregrine falcon nests. AR007, AR042, AR770-772; *compare* AR033-034 (requiring minimum altitudes

between 1,000 and 2,000 feet) *with* Br. 36 (citing comments, AR3268, that estimated planes flying at 400 feet). Based on technical advice from the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, the Agencies set minimum distance or altitude requirements to protect areas occupied by marine mammals, peregrine falcons, nesting shorebirds, and other noise sensitive species. AR011, AR022, AR042. After informal discussions with these expert wildlife agencies, the Agencies determined that, with the mitigation measures they adopted, the Plan would have no effect on threatened or endangered species or any other species of concern. AR758-722, AR021-022, AR060-061. Environmental Groups fail to acknowledge or address the Agencies' careful analysis of impacts to birds.

Environmental Groups also bring up bird strikes, citing one email from a Park Service wildlife ecologist and claiming the "risks are not adequately addressed" in the record. Br. 36 (AR3317). But the Agencies *did* address bird strikes in many places in the record. AR022, AR060-061, AR012-013. And in response to comments, the Agencies included a requirement in the Plan that air tour operators use FAA's Wildlife

Strike Database to report any bird strikes within the Plan's boundary and in their semi-annual reports. AR039, AR022, AR043-044.

In short, the Agencies studied potential impacts to bird species and prepared a cumulative impacts analysis.

## III. Neither vacatur nor injunctive relief is warranted.

Even if the Court finds that the Agencies violated the Air Tour Management Act, NEPA, or the APA, the Court should remand to the Agencies without vacating the Air Tour Management Plan.

Both *Allied-Signal* factors cut against vacatur. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). *First*, any error is not serious enough to warrant vacatur. The Agencies prepared a thorough environmental review for the Plan. AR057-198. Even if more analysis is required, Environmental Groups have offered no reason to expect that the Agencies "will be unable to correct those deficiencies" on remand. *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018).

*Second*, vacating the Plan while the Agencies conducted more environmental analysis would cause disruptive consequences. *Oglala Sioux Tribe*, 896 F.3d at 538. Although the Act provides that interim

operating authority terminated 180 days after the Agencies established the Plan, 49 U.S.C. § 40128(c)(2)(E), vacating the Plan would return the Bay Area Parks to the "status quo ante" condition under which operators hold interim operating authority to fly up to 5,090 air tours. *See, e.g.*, *Indep. U.S. Tanker Owners Committee v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) (vacating rule returned conditions to the status quo ante, before the rule took effect). Environmental Groups agree vacatur would have this effect. Br. 37. And the adverse consequences would fall on the very places and people that the Plan protects. Thus, the Court should exercise its equitable discretion by leaving the Plan in place while the Agencies conduct more NEPA analysis. *See PEER v. Hopper*, 827 F.3d 1077, 1083-84 (D.C. Cir. 2016) (vacating NEPA document but declining to vacate underlying leases or other regulatory approvals).

Environmental Groups agree vacatur is undesirable. Br. 37. Yet their proposed solution—that the Court ban all but 50 air tours per year over the Parks (Br. 37-38)—is also disruptive and unjustified. A ban would inflict economic injury on the air tour operators, which have relied on the Plan since January 2023 and are third parties not before the Court. *See XO Energy MA, LP v. FERC*, 77 F.4th 710, 719 (D.C. Cir.

2023) (declining to vacate rule in part because vacatur would "unduly disrupt" market and "market participants have relied" on the rule).

An injunction is a "drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). This Court "must determine that an injunction should issue under the traditional four-factor test," *id*. at 158, and "[f]ailing to satisfy any factor is grounds for denying relief." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 694 (D.C. Cir. 2015). Environmental Groups have failed to acknowledge, let alone satisfy, their heavy burden to obtain injunctive relief; in particular, they have not established a likelihood of irreparable harm as necessary to justify an injunction. They have forfeited that opportunity.

Besides, Environmental Groups' reasons for the Court to ban air tours miss the mark. They point to the mandamus case, where they requested the same relief. But seeking unjustified relief in two cases does not tip the scales in either one. Nor are Environmental Groups correct when they claim that, if the Court rules in their favor in this case, the Agencies will be "out of compliance" with the Court's mandamus order. Br. 38. Consistent with the Court's decision and

orders in that case, the Agencies issued the Air Tour Management Plan for the Bay Area Parks by January 31, 2023.

The Court also should decline Environmental Groups' alternative request that the Court (1) set a one-year deadline for the Agencies to prepare an EA and a new air tour management plan and (2) retain jurisdiction over this case. Br. 39-40; *see North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam) (declining invitation to "impose a definitive deadline by which EPA must correct [a Clean Air Act rule's] flaws"); *Wisconsin v. EPA*, 938 F.3d 303, 337 (D.C. Cir. 2019) (declining request to impose a six-month timeframe on remand and noting availability of a mandamus remedy). The Court can and should presume that in the event of a remand, the Agencies will act promptly to resolve the Court's concerns.

## CONCLUSION

For all these reasons, the petition for review should be denied.

Respectfully submitted,

/s/ Justin D. Heminger

TODD KIM
*Assistant Attorney General*

Of Counsel:

ROBERT P. STOCKMAN
JUSTIN D. HEMINGER
*Attorneys*

PATRICIA DEEM
*Attorney*
Office of the Chief Counsel
Federal Aviation Administration

Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044

SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

(202) 514-5442
justin.heminger@usdoj.gov

September 19, 2023
DJ 90-13-1-17046

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,979 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

# ADDENDUM

National Parks Air Tour Management Act
    43 U.S.C. § 1344 ................................................................ 1a

Council on Environmental Quality NEPA Regulations
    40 C.F.R. § 1501.3 (2022) ............................................ 16a

    40 C.F.R. § 1501.4 (2022) ............................................ 17a

U.S. Department of the Interior NEPA Regulation
    43 C.F.R. § 46.215 ....................................................... 18a

## National Parks Air Tour Management Act
### 49 U.S.C. § 40128—Overflights of national parks

**(a) In general.—**

    **(1) General requirements.**—A commercial air tour operator may not conduct commercial air tour operations over a national park or tribal lands, as defined by this section, except—

        (A) in accordance with this section;

        (B) in accordance with conditions and limitations prescribed for that operator by the Administrator; and

        (C) in accordance with any applicable air tour management plan or voluntary agreement under subsection (b)(7) for the park or tribal lands.

    **(2) Application for operating authority.—**

        **(A) Application required.**—Before commencing commercial air tour operations over a national park or tribal lands, a commercial air tour operator shall apply to the Administrator for authority to conduct the operations over the park or tribal lands.

        **(B) Competitive bidding for limited capacity parks.—** Whenever an air tour management plan limits the number of commercial air tour operations over a national park during a specified time frame, the Administrator, in cooperation with the Director, shall issue operation specifications to commercial air tour operators that conduct such operations. The operation specifications shall include such terms and conditions as the Administrator and the Director find necessary for management of commercial air tour operations over the park. The Administrator, in cooperation with the Director, shall develop an open competitive process for evaluating proposals from persons interested in providing commercial air tour operations over

the park. In making a selection from among various proposals submitted, the Administrator, in cooperation with the Director, shall consider relevant factors, including—

(i) the safety record of the person submitting the proposal or pilots employed by the person;

(ii) any quiet aircraft technology proposed to be used by the person submitting the proposal;

(iii) the experience of the person submitting the proposal with commercial air tour operations over other national parks or scenic areas;

(iv) the financial capability of the person submitting the proposal;

(v) any training programs for pilots provided by the person submitting the proposal; and

(vi) responsiveness of the person submitting the proposal to any relevant criteria developed by the National Park Service for the affected park.

**(C) Number of operations authorized.**—In determining the number of authorizations to issue to provide commercial air tour operations over a national park, the Administrator, in cooperation with the Director, shall take into consideration the provisions of the air tour management plan, the number of existing commercial air tour operators and current level of service and equipment provided by any such operators, and the financial viability of each commercial air tour operation.

**(D) Cooperation with NPS.**—Before granting an application under this paragraph, the Administrator, in cooperation with the Director, shall develop an air tour management plan in accordance with subsection (b) and implement such plan.

**(E) Time limit on response to ATMP applications.—**
The Administrator shall make every effort to act on any
application under this paragraph and issue a decision on
the application not later than 24 months after it is received
or amended.

**(F) Priority.—**In acting on applications under this
paragraph to provide commercial air tour operations over a
national park, the Administrator shall give priority to an
application under this paragraph in any case in which a
new entrant commercial air tour operator is seeking
operating authority with respect to that national park.

**(3) Exception.—**Notwithstanding paragraph (1), commercial
air tour operators may conduct commercial air tour operations
over a national park under part 91 of title 14, Code of Federal
Regulations if—

(A) such activity is permitted under part 119 of such title;

(B) the operator secures a letter of agreement from the
Administrator and the national park superintendent for
that national park describing the conditions under which
the operations will be conducted; and

(C) the total number of operations under this exception is
limited to not more than five flights in any 30-day period
over a particular park.

**(4) Special rule for safety requirements.—**Notwithstanding
subsection (c), an existing commercial air tour operator shall
apply, not later than 90 days after the date of the enactment of
this section, for operating authority under part 119, 121, or 135
of title 14, Code of Federal Regulations. A new entrant
commercial air tour operator shall apply for such authority
before conducting commercial air tour operations over a
national park or tribal lands. The Administrator shall make
every effort to act on any such application for a new entrant

and issue a decision on the application not later than 24 months after it is received or amended.

**(5) Exemption for national parks with 50 or fewer flights each year.—**

    **(A) In general.—**Notwithstanding paragraph (1), a national park that has 50 or fewer commercial air tour operations over the park each year shall be exempt from the requirements of this section, except as provided in subparagraph (B).

    **(B) Withdrawal of exemption.—**If the Director determines that an air tour management plan or voluntary agreement is necessary to protect park resources and values or park visitor use and enjoyment, the Director shall withdraw the exemption of a park under subparagraph (A).

    **(C) List of parks.—**

        **(i) In general.—**The Director and Administrator shall jointly publish a list each year of national parks that are covered by the exemption provided under this paragraph.

        **(ii) Notification of withdrawal of exemption.—** The Director shall inform the Administrator, in writing, of each determination to withdraw an exemption under subparagraph (B).

    **(D) Annual report.—**A commercial air tour operator conducting commercial air tour operations over a national park that is exempt from the requirements of this section shall submit to the Administrator and the Director a report each year that includes the number of commercial air tour operations the operator conducted during the preceding 1-year period over such park.

**(b) Air tour management plans.—**

**(1) Establishment.—**

**(A) In general.—**The Administrator, in cooperation with the Director, shall establish an air tour management plan for any national park or tribal land for which such a plan is not in effect whenever a person applies for authority to conduct a commercial air tour operation over the park. The air tour management plan shall be developed by means of a public process in accordance with paragraph (4).

**(B) Objective.—**The objective of any air tour management plan shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands.

**(C) Exception.—**An application to begin or expand commercial air tour operations at Crater Lake National Park or Great Smoky Mountains National Park may be denied without the establishment of an air tour management plan by the Director of the National Park Service if the Director determines that such operations would adversely affect park resources or visitor experiences.

**(2) Environmental determination.—**In establishing an air tour management plan under this subsection, the Administrator and the Director shall each sign the environmental decision document required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) which may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan.

**(3) Contents.**—An air tour management plan for a national park—

> (A) may prohibit commercial air tour operations over a national park in whole or in part;
>
> (B) may establish conditions for the conduct of commercial air tour operations over a national park, including commercial air tour routes, maximum or minimum altitudes, time-of-day restrictions, restrictions for particular events, maximum number of flights per unit of time, intrusions on privacy on tribal lands, and mitigation of noise, visual, or other impacts;
>
> (C) shall apply to all commercial air tour operations over a national park that are also within ½ mile outside the boundary of a national park;
>
> (D) shall include incentives (such as preferred commercial air tour routes and altitudes, relief from caps and curfews) for the adoption of quiet aircraft technology by commercial air tour operators conducting commercial air tour operations over a national park;
>
> (E) shall provide for the initial allocation of opportunities to conduct commercial air tour operations over a national park if the plan includes a limitation on the number of commercial air tour operations for any time period; and
>
> (F) shall justify and document the need for measures taken pursuant to subparagraphs (A) through (E) and include such justifications in the record of decision.

**(4) Procedure.**—In establishing an air tour management plan for a national park or tribal lands, the Administrator and the Director shall--

> (A) hold at least one public meeting with interested parties to develop the air tour management plan;

(B) publish the proposed plan in the Federal Register for notice and comment and make copies of the proposed plan available to the public;

(C) comply with the regulations set forth in sections 1501.3 and 1501.5 through 1501.8 of title 40, Code of Federal Regulations (for purposes of complying with the regulations, the Federal Aviation Administration shall be the lead agency and the National Park Service is a cooperating agency); and

(D) solicit the participation of any Indian tribe whose tribal lands are, or may be, overflown by aircraft involved in a commercial air tour operation over the park or tribal lands to which the plan applies, as a cooperating agency under the regulations referred to in subparagraph (C).

**(5) Judicial review.**—An air tour management plan developed under this subsection shall be subject to judicial review.

**(6) Amendments.**—The Administrator, in cooperation with the Director, may make amendments to an air tour management plan. Any such amendments shall be published in the Federal Register for notice and comment. A request for amendment of an air tour management plan shall be made in such form and manner as the Administrator may prescribe.

**(7) Voluntary agreements.**—

**(A) In general.**—As an alternative to an air tour management plan, the Director and the Administrator may enter into a voluntary agreement with a commercial air tour operator (including a new entrant commercial air tour operator and an operator that has interim operating authority) that has applied to conduct commercial air tour operations over a national park to manage commercial air tour operations over such national park.

**(B) Park protection.**—A voluntary agreement under this paragraph with respect to commercial air tour operations over a national park shall address the management issues necessary to protect the resources of such park and visitor use of such park without compromising aviation safety or the air traffic control system and may—

> (i) include provisions such as those described in subparagraphs (B) through (E) of paragraph (3);
>
> (ii) include provisions to ensure the stability of, and compliance with, the voluntary agreement; and
>
> (iii) provide for fees for such operations.

**(C) Public review.**—The Director and the Administrator shall provide an opportunity for public review of a proposed voluntary agreement under this paragraph and shall consult with any Indian tribe whose tribal lands are, or may be, flown over by a commercial air tour operator under a voluntary agreement under this paragraph. After such opportunity for public review and consultation, the voluntary agreement may be implemented without further administrative or environmental process beyond that described in this subsection.

**(D) Termination.**—

> **(i) In general.**—A voluntary agreement under this paragraph may be terminated at any time at the discretion of—
>
> > (I) the Director, if the Director determines that the agreement is not adequately protecting park resources or visitor experiences; or
> >
> > (II) the Administrator, if the Administrator determines that the agreement is adversely

affecting aviation safety or the national aviation system.

**(ii) Effect of termination.**—If a voluntary agreement with respect to a national park is terminated under this subparagraph, the operators shall conform to the requirements for interim operating authority under subsection (c) until an air tour management plan for the park is in effect.

**(c) Interim operating authority.**—

**(1) In general.**—Upon application for operating authority, the Administrator shall grant interim operating authority under this subsection to a commercial air tour operator for commercial air tour operations over a national park or tribal lands for which the operator is an existing commercial air tour operator.

**(2) Requirements and limitations.**—Interim operating authority granted under this subsection—

(A) shall provide annual authorization only for the greater of—

(i) the number of flights used by the operator to provide the commercial air tour operations over a national park within the 12-month period prior to the date of the enactment of this section; or

(ii) the average number of flights per 12-month period used by the operator to provide such operations within the 36-month period prior to such date of enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period;

(B) may not provide for an increase in the number of commercial air tour operations over a national park conducted during any time period by the commercial air tour operator above the number that the air tour operator was originally granted unless such an increase is agreed to by the Administrator and the Director;

(C) shall be published in the Federal Register to provide notice and opportunity for comment;

(D) may be revoked by the Administrator for cause;

(E) shall terminate 180 days after the date on which an air tour management plan is established for the park or tribal lands;

(F) shall promote protection of national park resources, visitor experiences, and tribal lands;

(G) shall promote safe commercial air tour operations;

(H) shall promote the adoption of quiet technology, as appropriate; and

(I) may allow for modifications of the interim operating authority without further environmental review beyond that described in this subsection, if—

>(i) adequate information regarding the existing and proposed operations of the operator under the interim operating authority is provided to the Administrator and the Director;

>(ii) the Administrator determines that there would be no adverse impact on aviation safety or the air traffic control system; and

>(iii) the Director agrees with the modification, based on the professional expertise of the Director regarding the

protection of the resources, values, and visitor use and enjoyment of the park.

**(3) New entrant air tour operators.**—

**(A) In general.**—The Administrator, in cooperation with the Director, may grant interim operating authority under this paragraph to an air tour operator for a national park or tribal lands for which that operator is a new entrant air tour operator without further environmental process beyond that described in this paragraph, if—

(i) adequate information on the proposed operations of the operator is provided to the Administrator and the Director by the operator making the request;

(ii) the Administrator agrees that there would be no adverse impact on aviation safety or the air traffic control system; and

(iii) the Director agrees, based on the Director's professional expertise regarding the protection of park resources and values and visitor use and enjoyment.

**(B) Safety limitation.**—The Administrator may not grant interim operating authority under subparagraph (A) if the Administrator determines that it would create a safety problem at the park or on the tribal lands, or the Director determines that it would create a noise problem at the park or on the tribal lands.

**(C) ATMP limitation.**—The Administrator may grant interim operating authority under subparagraph (A) of this paragraph only if the air tour management plan for the park or tribal lands to which the application relates has not been developed within 24 months after the date of the enactment of this section.

**(d) Commercial air tour operator reports.—**

    **(1) Report.**—Each commercial air tour operator conducting a commercial air tour operation over a national park under interim operating authority granted under subsection (c) or in accordance with an air tour management plan or voluntary agreement under subsection (b) shall submit to the Administrator and the Director a report regarding the number of commercial air tour operations over each national park that are conducted by the operator and such other information as the Administrator and Director may request in order to facilitate administering the provisions of this section.

    **(2) Report submission.**—Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Administrator and the Director shall jointly issue an initial request for reports under this subsection. The reports shall be submitted to the Administrator and the Director with a frequency and in a format prescribed by the Administrator and the Director.

**(e) Exemptions.**—This section shall not apply to—

    (1) the Grand Canyon National Park; or

    (2) tribal lands within or abutting the Grand Canyon National Park.

**(f) Lake Mead.**—This section shall not apply to any air tour operator while flying over or near the Lake Mead National Recreation Area, solely as a transportation route, to conduct an air tour over the Grand Canyon National Park. For purposes of this subsection, an air tour operator flying over the Hoover Dam in the Lake Mead National Recreation Area en route to the Grand Canyon National Park shall be deemed to be flying solely as a transportation route.

**(g) Definitions.**—In this section, the following definitions apply:

**(1) Commercial air tour operator.**—The term "commercial air tour operator" means any person who conducts a commercial air tour operation over a national park.

**(2) Existing commercial air tour operator.**—The term "existing commercial air tour operator" means a commercial air tour operator that was actively engaged in the business of providing commercial air tour operations over a national park at any time during the 12-month period ending on the date of the enactment of this section.

**(3) New entrant commercial air tour operator.**—The term "new entrant commercial air tour operator" means a commercial air tour operator that—

(A) applies for operating authority as a commercial air tour operator for a national park or tribal lands; and

(B) has not engaged in the business of providing commercial air tour operations over the national park or tribal lands in the 12-month period preceding the application.

**(4) Commercial air tour operation over a national park.**—

**(A) In general.**—The term "commercial air tour operation over a national park" means any flight, conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over a national park, within ½ mile outside the boundary of any national park (except the Grand Canyon National Park), or over tribal lands (except those within or abutting the Grand Canyon National Park), during which the aircraft flies—

(i) below a minimum altitude, determined by the Administrator in cooperation with the Director, above ground level (except solely for purposes of takeoff or

landing, or necessary for safe operation of an aircraft as determined under the rules and regulations of the Federal Aviation Administration requiring the pilot-in-command to take action to ensure the safe operation of the aircraft); or

(ii) less than 1 mile laterally from any geographic feature within the park (unless more than ½ mile outside the boundary).

**(B) Factors to consider.**—In making a determination of whether a flight is a commercial air tour operation over a national park for purposes of this section, the Administrator may consider--

(i) whether there was a holding out to the public of willingness to conduct a sightseeing flight for compensation or hire;

(ii) whether a narrative that referred to areas or points of interest on the surface below the route of the flight was provided by the person offering the flight;

(iii) the area of operation;

(iv) the frequency of flights conducted by the person offering the flight;

(v) the route of flight;

(vi) the inclusion of sightseeing flights as part of any travel arrangement package offered by the person offering the flight;

(vii) whether the flight would have been canceled based on poor visibility of the surface below the route of the flight; and

(viii) any other factors that the Administrator and the Director consider appropriate.

**(5) National park.**—The term "national park" means any unit of the National Park System.

**(6) Tribal lands.**—The term "tribal lands" means Indian country (as that term is defined in section 1151 of title 18) that is within or abutting a national park.

**(7) Administrator.**—The term "Administrator" means the Administrator of the Federal Aviation Administration.

**(8) Director.**—The term "Director" means the Director of the National Park Service.

## National Environmental Policy Act
## Council on Environmental Quality Regulations
## 40 C.F.R. § 1501.3 (2022)—Determine the appropriate level of NEPA review.

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

   (1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

   (2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

   (3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

\*\*\*

# National Environmental Policy Act
## Council on Environmental Quality Regulations
### 40 C.F.R. § 1501.4 (2022)—Categorical exclusions.

(a) For efficiency, agencies shall identify in their agency NEPA procedures (§ 1507.3(e)(2)(ii) of this chapter) categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

> (1) If an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.

> (2) If the agency cannot categorically exclude the proposed action, the agency shall prepare an environmental assessment or environmental impact statement, as appropriate.

# National Environmental Policy Act
# Department of the Interior Regulations
# 43 C.F.R. § 46.215—Categorical exclusions:
# Extraordinary circumstances

Extraordinary circumstances (see paragraph 46.205(c)) exist for individual actions within categorical exclusions that may meet any of the criteria listed in paragraphs (a) through (l) of this section. Applicability of extraordinary circumstances to categorical exclusions is determined by the Responsible Official.

(a) Have significant impacts on public health or safety.

(b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

(c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA section 102(2)(E) ].

(d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

(e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

(f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

(g) Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau.

(h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

(i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

(j) Have a disproportionately high and adverse effect on low income or minority populations (EO 12898).

(k) Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (EO 13007).

(l) Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and EO 13112).