## LIST OF REFERENCES

Anderson, G., Rapoza, A., Fleming, G., & Miller, N. (2011). Aircraft noise dose-response relations for national parks. Noise Control Engineering Journal, 59, 519. https://doi.org/10.3397/1.3622636

American National Standards Institute, Inc (1994). S1.42-2001, Design Response of Weighting Networks for Acoustical Measurements.

American National Standards Institute, Inc (2001). Design response of weighting networks for acoustical measurements. Acoustical Society of America, ANSI S1.42-2001, i-1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S1.42-2001+(R2011).pdf

American National Standards Institute, Inc. (2002). Acoustical performance criteria, design requirements, and guidelines for schools, Part 1: Permanent schools. Acoustical Society of America, ANSI/ASA S12.60-2002/Part 1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S12.60+Part+1-2010+(R2020).pdf

American National Standards Institute, Inc. (2007). Quantities and procedures for description and measurement of environmental sound — Part 5: Sound level descriptors for determination of compatible land use. Acoustical Society of America, ASA S12.9-2007/PART 5 (R2020), 1-20. https://www.techstreet.com/standards/asa-s12-9-2007-part-5-r2020?product_id=1534045

Benfield, J., Taff, B. D., Weinzimmer, D., & Newman, P. (2018). Motorized recreation sounds influence nature scene evaluations: The role of attitude moderators. Frontiers in Psychology, 9:495. https://doi.org/10.3389/fpsyg.2018.00495

Department of Interior, National Park Service (1995). Report on effects of aircraft overflights on the National Park System. Report to Congress, 1.1-10.23. https://www.nonoise.org/library/npreport/intro.htm

Federal Aviation Administration (2015). FAA Order 1050.1F, Environmental impacts: Policies and procedures. U.S. Department of Transportation, 1.1-11.4. https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf

Ferguson, L. A. (2018). Strategies for managing natural sounds for human experience and ecosystem services (Dissertation). The Pennsylvania State University The Graduate School College of Health and Human Development, 1-176. https://etda.libraries.psu.edu/files/final_submissions/17621

Gutzwiller, K. J., D'Antonio, A. L., & Monz, C. A. (2017). Wildland recreation disturbance: Broad-scale spatial analysis and management. Frontiers in Ecology and the Environment, 15(9), 517–524. https://doi.org/10.1002/fee.1631

Haas, G. E. & Timothy J. W. (1998). National parks and the American public: a national public opinion survey on the National Park System: A summary report. The Association, 1-32.

Haralabidis A.S., Dimakopoulou, K., Vigna-Taglianti, F., Giampaolo, M., Borgini, A., Dudley, M., … & Jarup, L. (2008). Acute effects of night-time noise exposure on blood pressure in populations living near airports. European Heart Journal Advance Access. https://academic.oup.com/eurheartj/article/29/5/658/440015

Kunc, H. P., McLaughlin, K. E., & Schmidt, R. (2016). Aquatic noise pollution: Implications for individuals, populations, and ecosystems. Proceedings of the Royal Society B: Biological Sciences, 283(1836), 20160839. https://doi.org/10.1098/rspb.2016.0839-

AR_0000078

**JA249**

Kunc, H. P., & Schmidt, R. (2019). The effects of anthropogenic noise on animals: A meta-analysis. Biology Letters, 15(11), 20190649. https://doi.org/10.1098/rsbl.2019.0649

Lee, C., & MacDonald, J. (2011). Golden Gate National Recreation Area: Acoustical Monitoring 2007/2008.

Mace, B. L., Corser, G. C., Zitting, L., & Denison, J. (2013). Effects of overflights on the national park experience. Journal of Environmental Psychology, 35, 30–39. https://doi.org/10.1016/j.jenvp.2013.04.001

McDonald, C. D., Baumgarten, R. M., & Iachan, R. (1995). Aircraft management studies: National Park Service Visitors Survey. National Park Service, U.S. Department of the Interior, HMMH Report No. 290940.12; NPOA Report No. 94-2. https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB95196002.xhtml

Merchan, C. I., Diaz-Balteiro, L., & Soliño, M. (2014). Noise pollution in national parks: Soundscape and economic valuation. Landscape and Urban Planning, 123, 1–9. https://doi.org/10.1016/j.landurbplan.2013.11.006

Miller, Z., Taff, B.D., & Newman, P. (2018). Visitor experiences of wilderness soundscapes in Denali National Park and Preserve. International Journal of Wilderness, 24(2). https://ijw.org/2018-visitor-experiences-of-wilderness-soundscapes/

National Park Service (2002). NPS-28: Cultural Resource Management Guideline. National Park Service, Introduction, A-F. https://www.nps.gov/parkhistory/online_books/nps28/28appena.htm

National Park Service (2006). Management Policies, 2006. https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service (1992). National Register Bulletin 38. https://www.nps.gov/subjects/nationalregister/upload/NRB38-Completeweb.pdf

Rapoza, A., Sudderth, E., & Lewis, K. (2015). The relationship between aircraft noise exposure and day-use visitor survey responses in backcountry areas of national parks. The Journal of the Acoustical Society of America, 138(4), 2090–2105. https://doi.org/10.1121/1.4929934

Richardson, C. T., & Miller, C. K. (1997). Recommendations for Protecting Raptors from Human Disturbance: A Review. Wildlife Society Bulletin (1973-2006), 25(3), 634–638. http://www.jstor.org/stable/3783512

Shannon, G., McKenna, M.F., Angeloni, L.M., Crooks, K.R., Fristrup, K.M., Brown, E., Warner, K.A., Nelson, M.D., White, C., Briggs, G., McFarland, S., & Wittemyer, G. (2016). A synthesis of two decades of research documenting the effects of noise on wildlife. Biological Reviews, 91(4) 982-1005. https://doi.org/10.1111/brv.12207

United States Census Bureau (2021). Explore census data. United States Census Bureau. https://data.census.gov/cedsci/

United States Environmental Protection Agency, Office of Noise Abatement and Control (1974). Information on levels of environmental noise requisite to protect public health and welfare with an adequate margin of safety. NPC Online Library, 550/9-74-004, 1-78. https://www.nrc.gov/docs/ML1224/ML12241A393.pdf

U.S. Fish and Wildlife Service (2006). Estimating the effects of auditory and visual disturbance to northern spotted owls and marbled murrelets in northwestern California. https://s3-us-west-1.amazonaws.com/waterfrontballparkdistrict.com/11_ReferencesintheDraftEIR-Section4-3BiologicalResources/2006-0731-USFWS-TransmittalOfGuidance.pdf

AR_0000079

**JA250**

U.S. Fish and Wildlife Service (2007). National Bald Eagle Management Guidelines. United States Department of Agriculture, 1-19.
https://www.aphis.usda.gov/plant_health/plant_pest_info/emt/downloads/EaglePrtctnGuidance.pdf

U.S. Fish and Wildlife Service (2012).  Revised Northern Spotted Owl and Marbled Murrelet Disturbance Disruption Tables.

Weinzimmer, D., Newman, P., Taff, D., Benfield, J., Lynch, E., & Bell, P. (2014). Human responses to simulated motorized noise in national parks. Leisure Sciences, 36(3), 251–267.
https://doi.org/10.1080/01490400.2014.888022

23

AR_0000080

**JA251**



**National Park Service**
**U.S. Department of the Interior**

**Point Reyes National Seashore**
**Date: January 4, 2023**

# ENVIRONMENTAL SCREENING FORM (ESF)

## PROJECT INFORMATION

**Project Title:** Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore Air Tour Management Plan

**PEPC Project Number:** 103175

**Project Type:** Categorical Exclusion

**Project Location:** San Francisco County and Marin County, California

## PROJECT DESCRIPTION

The proposed action is to implement an Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore. The "Project Description" section of the Categorical Exclusion (CE) Form for the ATMP sets out the elements of the ATMP and is incorporated herein by reference.

Considering their proximity, National Park Service (NPS) management of the parks, and current commercial air tour operations, the agencies determined that a single ATMP covering all four parks (Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore) was appropriate for future management of commercial air tours. Point Reyes National Seashore manages the north district of Golden Gate National Recreation Area under a Regional Directive for Management. Though the ATMP covers four parks, this ESF analyzes the impacts to Point Reyes National Seashore and the north district of Golden Gate National Recreation area (Park) from the implementation of the ATMP.

## RESOURCE IMPACTS TO CONSIDER

*Definition of Effects or Impacts (40 C.F.R. § 1508.1(g))*
Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include direct effects, indirect effects, and cumulative effects. Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

For the purposes of considering environmental impacts, the NPS evaluated the change to the human environment resulting from implementation of the ATMP. Consistent with Council on Environmental Quality regulations, the baseline from which to measure environmental impacts of the ATMP is the current condition of the human environment. In this case, the baseline is the current condition of Park resources and values, as impacted by 143 commercial air tours per year (existing three-year average of tours conducted on an annual basis from 2017-2019) along with other planned actions and trends. The baseline also includes the route and altitude information of

1

commercial air tours provided by the operator, as well as the timing and daily commercial air tour information from commercial air tour reports provided by the operator from 2017-2019.

*Existing Conditions of Commercial Air Tours over the Park*

Two commercial air tour operators, San Francisco Helicopters, LLC and San Francisco Seaplane Tours, Inc., hold Interim Operating Authority (IOA) to conduct a combined total of 5,090 commercial air tours over the Park each year. However, San Francisco Helicopters, LLC has not reported flying commercial air tours over the Park from 2017 to 2019. Based on the three-year average of reporting data from 2017 to 2019, San Francisco Seaplane Tours, Inc. conducts an average of 143 total commercial air tours over the Park each year.

San Francisco Seaplane Tours, Inc. conducts commercial air tours on one route over the Park using DHC-2-MKI aircraft (fixed-wing). Commercial air tours are conducted at altitudes ranging between 1,500 feet and 2,500 feet (ft.) above ground level (AGL) depending on location over the Park. Commercial air tours are typically conducted between the hours of 12:00 PM and 5:00 PM. Tours occur year-round, with tours on an average of 137 days per year based on the three-year average. For the majority of those days, San Francisco Seaplane Tours, Inc. has reported flying just one flight, though multiple flights on a single day have occasionally been reported.

*Summary of the ATMP as applied to the Park*

The ATMP limits the number of commercial air tours that the operator is authorized to conduct per year over the Park to the existing three-year average of tours conducted on an annual basis from 2017-2019 (143 annual tours). The ATMP restricts the number of commercial air tours that San Francisco Seaplane Tours, Inc. may conduct per day over the Park (up to one tour per day on Standard Days, up to two tours per day on Flex Days, and no more than five Flex Days per year). San Francisco Seaplane Tours, Inc. will be allowed to conduct commercial air tours on substantially the same route that the operator reports flying over the Park, with a modification to the lateral offsets from Ranch Core Areas. The ATMP results in no change to the minimum altitude that commercial air tours may be conducted over the Park (minimum 1,500 ft. AGL, minimum 2,000 ft. AGL over land-based wilderness, and minimum 2,500 ft. AGL over Bolinas Ridge and Inverness Ridge). Except as provided for by quiet technology incentives, the ATMP restricts the hours during which commercial air tours may be conducted over the Park, from 12:00 PM to 5:00 PM. The ATMP allows the Park to establish no-fly periods for special events or planned Park management. The ATMP requires operators to report all bird strikes that occur during commercial air tours over the Parks per FAA Advisory Circular 150/5200-32B, Reporting Wildlife Aircraft Strikes. Refer to the ATMP document for more information.

## Evaluation of the ATMP

**Table 1.** Potential Issues and Impacts to Resources

| Resource | Potential Issues & Impacts |
|---|---|
| **Agricultural** Grazing and Ranching | Approximately 28,000 acres of NPS lands managed by the Park are currently under agricultural production, including livestock grazing and ranching operations. The route over the Park authorized by the ATMP includes a 1,000 ft. lateral offset to ranch core areas and 1,500 ft. AGL over these areas. Through the establishment of documented route and flight elevation requirements reflecting this offset, the level of noise exposure will be similar or decrease compared to current conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019, and the lateral offset will provide protection to ranch core areas. Therefore, agricultural impacts are not anticipated to occur as a result of the ATMP. |
| **Air** Air Quality | The findings from the screening analysis demonstrate that implementing the ATMP will not meaningfully impact (meaning that it will have no or minimal impact) local air quality and will not have regional impacts. See *Air Quality Technical Analysis* below. |

2

| Biological Species of Special Concern or Their Habitat | Federally Listed Threatened and Endangered Species<br><br>The Park has a number of Federally designated threatened and endangered species, including listed birds and fish. Commercial air tours will have no impact on these species or their habitat due to the proposed commercial air tour route, minimum altitudes, time of day restrictions, type of aircraft, and limit on the maximum number of flights per day and per year that will be permitted under the ATMP. In addition, the ATMP requires operator to maintain 1,000 ft. lateral avoidance of nesting shorebird colonies or marine mammal haul outs. The ATMP requires minimum 1,500 ft. AGL over most portions of the Park and ½ mile buffer, minimum 2,000 ft. AGL over land-based wilderness, and minimum 2,500 ft. AGL over Bolinas Ridge and Inverness Ridge. These altitudes are also identified as protective of nesting Northern Spotted Owl as well as wilderness resources. Based on these measures, the ATMP results in no impact on listed species, and after having informal discussions with the U.S. Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS), the agencies determined the ATMP will have *No Effect* on listed species or their critical habitat.<br><br>The Section 7 analysis conducted by the agencies considered the potential effects of the ATMP on listed species and/or designated critical habitat without the consequences to those listed species by the existing commercial air tours, in accordance with 50 CFR § 402.02. Refer to the Section 7 documentation for additional information, which includes the agencies' analysis. The ATMP is expected to have no impacts or only beneficial impacts on listed species when compared to current conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019, and the route will remain substantially the same as those currently flown under existing operations.<br><br>Special Status Species and Migratory Birds<br><br>Marine mammals, including harbor seals (*Phoca vitulina*) are present within the Park.[1] While these species may be sensitive to noise, the ATMP sets the minimum altitude at 1,500 ft. AGL for commercial air tours over the outer coastal lands and waters of the Park. Refer to the Section 7 documentation for additional information, which includes the agencies' analysis. In addition, the route requirements in the ATMP ensure operators maintain 1,000 ft. lateral avoidance of marine mammal haul outs which has been shown to be protective of these species. Therefore, it has been determined that the ATMP will result in negligible and only beneficial impacts to these species from current conditions and the agencies have determined that the ATMP will have *No Effect* on marine mammals.<br><br>Bald eagles, golden eagles, and peregrine falcons are protected raptor species that are present in the Park.[2] These species are especially sensitive to low flying aircraft and their associated noise. Nesting eagles that are repeatedly disturbed by noise will abandon their nests. Additionally, raptors may collide with aircraft because of the altitude at which raptors fly. Scientific and national level guidance recommend aircraft standoff of 1,000 ft. for bald eagles (USFWS, 2007) and golden eagles to reduce noise impacts |

---

[1] Marine mammals are protected under the Marine Mammal Protection Act.
[2] Bald and golden eagles are protected under the Bald and Golden Eagle Protection Act. Peregrine falcons are protected under the Migratory Bird Treaty Act.

3

| | |
|---|---|
| | (Richardson and Miller, 1997). As raptors may be impacted by flights below 1,000 ft. AGL during nesting season and near communal roost sites based on the National Bald Eagle Management Guidelines, there will be beneficial impacts from maintaining the minimum altitude at 1,500-2,500 ft. AGL depending on location over the Park. The route requirements in the ATMP also ensure operators maintain a 1,000 ft. lateral avoidance of peregrine falcon nests which has been shown to be protective of these species. The ATMP authorizes the same number of flights on substantially the same route when compared to existing operations and maintains the same altitudes. Therefore, the ATMP is expected to have no impacts on these species when compared to current conditions. The requirement to report bird strikes, detailed above, also will allow the agencies to assess the effectiveness of these protections, and to modify them in the event that unanticipated adverse impacts are observed.<br><br>A number of other migratory birds[2] and other avian species use the Park. The ATMP ensures operators maintain 1,000 ft. lateral avoidance (through route requirements) as well as at least 1,500 ft. vertical avoidance (through altitude restrictions) of nesting shorebird colonies which is protective of these species. Information related to migratory birds are summarized more generally below under wildlife. Migratory birds will be exposed to noise at a similar or decreased level compared to what is currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019 and the route will remain substantially the same. Therefore, the ATMP is expected to have negligible or only beneficial impacts on these species when compared to current conditions. |
| **Biological**<br>Wildlife and/or Wildlife Habitat including terrestrial and aquatic species | The Park and its surroundings are home to a wide variety of wildlife. The Park contains approximately 80 species of mammals, 85 species of fish, 29 species of reptiles and amphibians, and thousands of aquatic and terrestrial invertebrate species. Nearly half the bird species of North America, 490 species, have been seen within the Park.<br><br>Noise from commercial air tours may impact wildlife in a number of ways: altered vocal behavior, breeding relocation, changes in vigilance and foraging behavior, and impacts on individual fitness and the structure of ecological communities to name a few (Shannon et al., 2015; Kunc et al., 2016; Kunc & Schmidt, 2019). Understanding the relationships between commercial air tour noise attributes (e.g., timing, intensity, duration, and location) and ecosystem responses is essential for understanding impacts to these species and developing management actions to address them (Gutzwiller et al., 2017).<br><br>Since the ATMP authorizes a maximum number of commercial air tours per year equivalent to three-year average of existing operations on substantially the same route currently used, it is anticipated that there will be little to no change to existing operating conditions and the resultant disturbances to wildlife. Furthermore, the ATMP requires the operator to continue to fly at the same altitudes that are flown under existing operations (minimum 1,500-2,500 ft. AGL, depending on location over the Park). This limits noise exposure to wildlife in the Park and will result in negligible or only beneficial impacts compared to current conditions. Many species of wildlife move, making daily maximum exposure to individual animals less likely.<br><br>Sunrise and sunset are important times of the day for wildlife, including many species of crepuscular wildlife present within the Park. Biologically important behaviors for many species occur during this time, such as the dawn chorus for songbirds, foraging, and communication. The day/time restrictions and quiet technology incentives included in |

4

| | the ATMP provide protection to wildlife that are active during sunrise and sunset, which represents an improvement to current conditions. In the event that operators request and are authorized to use the quiet technology incentive, those tours would result in the possibility of noise beginning one hour after sunrise. The impacts from these flights would be less than the noise modeled in the *Noise Technical Analysis* but could be more than when there are no flights during this time of day. |
|---|---|
| | In conclusion, while wildlife will continue to be exposed to noise, effects are expected to be insignificant and will not be widespread throughout the Park. Any disturbances will likely be temporary in nature and infrequent on both a daily and annual basis. Noise from commercial air tours will be experienced by only those wildlife under or near the designated route, leaving most wildlife in the Park unaffected. The level of noise exposure will be similar or decrease compared to current conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019 and the route will remain substantially the same. Therefore, impacts to wildlife are not significant. See also the discussion above for special status species. |
| **Coastal** <br> Coastal Resources and Coastal Zones | Portions of the planning area for the ATMP overlap with designated coastal zone areas. The agencies analyzed the ATMP's consistency with the provisions of the California Coastal Act and have found the ATMP to be consistent to the maximum extent practicable with the enforceable provisions of the Act. The California Coastal Commission concurred with this determination on November 17, 2022. Refer to the coastal zone consistency review documentation for more information. |
| **Cultural** <br> Cultural Landscapes | The NPS defines a Cultural Landscape as: a geographic area, including both cultural and natural resources and the wildlife or domestic animals therein, associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values. There are four general kinds of cultural landscape, not mutually exclusive: historic sites, historic designed landscapes, historic vernacular landscapes, and ethnographic landscapes (NPS, 2002). <br><br> An impact to a cultural landscape will occur if the project alters any of the characteristics that help make the cultural landscape eligible for listing the National Register of Historic Places (NRHP). This includes any diminishment of the cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. The potential impacts to cultural landscapes from the ATMP are limited to the continuation of visual and audible elements that diminish the integrity of the landscape setting and/or feeling. <br><br> The Park contains 28 properties documented by the NPS as cultural landscapes. The number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019, and substantially the same route will be used. On days when commercial air tours will occur, the *Noise Technical Analysis* shows that aircraft noise related to commercial air tours is predicted to be audible (exceed 35 dBA) for less than ten minutes per day. Therefore, impacts to cultural landscapes will be similar or decrease compared to impacts currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019. <br><br> The Federal Aviation Administration (FAA), in coordination with the NPS, consulted with the California State Historic Preservation Office, Federated Indians of Graton Rancheria, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including cultural landscapes. That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this |

5

| | |
|---|---|
| | finding to all consulting parties. The FAA did not receive any objections to the finding. See CE Form for further information. |
| **Cultural Ethnographic Resources** | The NPS defines Ethnographic Resources as: a site, structure, object, landscape, or natural resource feature assigned traditional legendary, religious, subsistence, or other significance in the cultural system of a group traditionally associated with it (NPS, 2002). Ethnographic resources include Traditional Cultural Properties (TCPs) (NPS, 1992).<br><br>An impact to an Ethnographic Resource will occur if the project affected those elements of the resources that make it significant to the group traditionally associated with the resource, or if the project interferes with the use of the resource by the associated groups.<br><br>The Federated Indians of Graton Rancheria, California, attach religious or cultural significance to areas within and adjacent to the Park. The Tribe has informed Park staff that there are TCPs within the Park that are significant to the Tribe. There are a number of areas throughout the Park that contain traditional natural resources significant to the Tribe such as medicine and food plants and minerals used in pigments and for ceremonial purposes.<br><br>The ATMP includes provisions that allow for the establishment of no-fly periods. These no-fly periods may be established to avoid conflicts or impacts to tribal ceremonies or similar activities, therefore no impacts on ethnographic resources are anticipated. Sacred ceremonies or other tribal activities which occur without notice to the NPS may be interrupted by noise, however, commercial air tours have no effect on tribal access.<br><br>The FAA, in coordination with the NPS, consulted with the Federated Indians of Graton Rancheria on the potential impacts of the ATMP on Ethnographic Resources, through compliance with Section 106 of the National Historic Preservation Act. That consultation led to a finding that the ATMP will have no adverse effect on historic properties, which includes Ethnographic Resources. The FAA proposed this finding to all consulting parties. The FAA did not receive any objections to the finding. |
| **Cultural Prehistoric/historic structures** | Cultural resources within the Park include a number of archaeological sites and historic structures. As noted above, impacts to these resources will occur if the project alters the characteristics of an archaeological site or historic structure that make it eligible for NRHP listing. Commercial air tours, by their nature, have the potential to impact resources for which only feeling and setting are the contributing elements. Feeling and setting have been identified as contributing elements for 82 cultural resources in the Area of Potential Effects for the Park. Refer to the Section 106 documentation for a complete list.<br><br>Commercial air tours will result in the continuation of visual and audible elements that are inconsistent with the feeling and setting for these resources. These intrusions will remain infrequent, with no more than 143 instances annually, and of limited duration. Based on the *Noise Technical Analysis*, on days when commercial air tours will occur, the noise associated with commercial air tours is predicted to be audible (exceed 35 dBA) for less than ten minutes per day. These impacts will be similar to or decrease compared to impacts currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019 on |

6

| | |
|---|---|
| | substantially the same route. Therefore, the ATMP is expected to have negligible or only beneficial impacts on cultural resources when compared to current conditions.<br><br>The FAA, in coordination with the NPS, consulted with the California State Historic Preservation Office, Federated Indians of Graton Rancheria, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including Cultural; prehistoric/historic structures. That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this finding to all consulting parties. The FAA did not receive any objections to the finding. |
| **Lightscapes**<br>Lightscapes | Under the ATMP, unless they qualify for the quiet technology incentive, commercial air tours are not permitted before 12:00 PM and after 5:00 PM. Any lights from commercial air tour aircraft are not likely to be noticeable and changes from the current condition will not occur. |
| **Other**<br>Human Health and Safety | Commercial air tours are subject to the FAA regulations for protecting individuals and property on the ground, and preventing collisions between aircraft, land or water vehicles, and airborne objects. The operator must continue to meet the FAA safety regulations. |
| **Socioeconomic**<br>Minority and low-income populations, size, migration patterns, etc. | U.S. Census data for census blocks surrounding the Park was reviewed to determine the presence of minority or low-income populations outside the Park or within ½-mile of its boundary (United States Census Bureau, 2022). Based on this review, no minority or low-income populations were identified in Marin County. Therefore, the ATMP will not have a disproportionate impact on low-income or minority populations. |
| **Socioeconomic**<br>Socioeconomic | Commercial air tours generate income for operators and potentially generate income for other ancillary visitor industry businesses. Visitors from outside the immediate area contribute to this income. Because the number of commercial air tours authorized under the ATMP is the same as the average number of flights from 2017-2019, the NPS does not expect visitor spending on commercial air tours or economic activity in the local communities to change. The competitive bidding process may redistribute the number of flights and income between individual operators in the future but is not anticipated to affect the overall average number of flights or local business activity generated by these flights. |
| **Soundscapes**<br>Acoustic Environment | Baseline acoustic conditions in the Park were measured in 2009 and 2010 (Lee and MacDonald, 2011). At the locations nearest the commercial air tour route, the existing ambient daytime sound level was reported to be 30-40 decibels (A-weighted), while the natural ambient daytime sound level was reported to be 25-35 decibels. The existing ambient condition includes all sound associated with a given environment, i.e., natural, human, and mechanical sounds, such as automobiles and aircraft. Aircraft sound measured at a sampling location may include general aviation, commercial jets, military, and air tours. The natural ambient is the sound conditions found in a study area, including all sounds of nature (i.e., wind, water, wildlife, etc.) and excluding all human and mechanical sounds. Both the existing and natural ambient conditions were considered in the resource impacts analysis. Buxton, et al. (2017) found that anthropogenic noise in protected areas is closely linked with transportation, development, and other uses. Aircraft noise was audible at all acoustic monitoring locations in the Park.<br><br>Depending on a receiver's location on the ground in relation to an aircraft flying overhead, aircraft sound can range from faint and infrequent to loud and intrusive. Impacts of aircraft noise range from masking quieter sounds of nature such as bird vocalizations to noise loud enough to interrupt conversational speech between visitors. To capture how noise may affect quieter natural sounds or conversations, the resource |

7

AR_0000087

**JA258**

| | |
|---|---|
| | impacts analysis examines the time above 35 decibels (for quieter natural sounds and impacts to natural resources) and time above 52 decibels for conversational speech disturbance and impacts to visitor experience.<br><br>Overall, noise impacts associated with commercial air tours over the Park are not expected to measurably change, since the ATMP authorizes the same number of flights per year as the average number of flights from 2017-2019 on substantially the same route, and requires commercial air tours to maintain the same altitudes flown under existing operations.<br><br>For purposes of assessing noise impacts from commercial air tours on the acoustic environment of the Park under the National Environmental Policy Act (NEPA), the FAA noise evaluation is based on Yearly[3] Day Night Average Sound Level (DNL); the cumulative noise energy exposure from aircraft over 24 hours. The DNL analysis indicates that the ATMP would not result in any noise impacts that would be "significant" or "reportable" under FAA's policy for NEPA. Refer to the *Noise Technical Analysis* below. |
| **Viewsheds**<br>Viewsheds | While studies indicate that aircraft noise in national parks can impact human perceptions of aesthetic quality of viewsheds (Weinzimmer et al. 2014; Benfield et al., 2018), given the relatively low level of flight activity associated with the commercial air tours authorized over the Park by the ATMP, the NPS does not anticipate any impacts. Further, because the level of commercial air tour activity under the ATMP will remain the same, there will be no change in the effect to visitors in this regard. Other literature for studies on impacts from commercial air tours or overflights generally on viewsheds conclude that the visual impacts of overflights are difficult to identify because visitors primarily notice aircraft because of the accompanying noise. Aircraft are transitory elements in a scene and visual impacts tend to be relatively short. The short duration and low number of flights (along with the position in the scene as viewed from most locations) make it unlikely the typical visitor will notice or be visually distracted by aircraft. The viewer's eye is often drawn to the horizon to take in a park view and aircraft at higher altitudes are less likely to be noticed. Aircraft at lower altitudes may attract visual attention but are also more likely to be screened by vegetation or topography.<br><br>Under existing operations, commercial air tours over the Park are flown on a single route, which flies in a northwesterly direction across the Park, makes a turn around the Lighthouse Visitor Center, then continues in a southeasterly direction back towards the southern end of the Park. The ATMP limits the number of commercial air tours to 143 tours per year and maintains substantially the same route as is currently flown under existing operations. Therefore, impacts to viewsheds will be similar to impacts currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019, and the route will remain substantially the same as compared to existing operations. Therefore, impacts to viewsheds would not be considered significant. |

---

[3] As required by FAA policy, the FAA typically represents yearly conditions as the Average Annual Day (AAD). However, because ATMP operations in the park occur at low operational levels per year and are highly seasonal in nature it was determined that a peak day representation of the operations would more adequately allow for disclosure of any potential impacts. A peak day has therefore been used as a conservative representation of assessment of AAD conditions.

8

| Visitor Use and Experience Recreation Resources | Commercial air tours offer a recreational experience for those who wish to view the Park from a different vantage point. Because the number of commercial air tours under the ATMP is consistent with the average number of flights from 2017-2019, there are no or minimal changes anticipated to the number of commercial air tours offered per year compared to current operations. |
| | |
| | Currently, customers on commercial air tours are not required to pay an entrance fee at the Park, nor are the commercial air tour operators required to pay a fee to the Park. |
| Visitor Use and Experience Visitor Use and Experience | The NPS allows visitor uses that are appropriate to the purpose for which the Park was established and can be sustained without causing unacceptable impacts to Park resources or values. Unacceptable impacts are impacts that, individually or cumulatively, will unreasonably interfere with Park programs or activities including interpretive programs, or the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the Park (2006 NPS Management Policies 8.2). |
| | |
| | Effects of commercial air tours on Park visitor experience have been well documented over many years. See *Report on the Effects of Aircraft Overflights on the National Park System* (Department of Interior and NPS, 1995). The primary effect of commercial air tours is the introduction of noise into the acoustic environment. Numerous studies have identified the value and importance of soundscapes as one of the motivations for visiting parks (Haas and Wakefield, 1998; McDonald et al., 1995; Merchan et al., 2014; Miller et al., 2018), including in a cross-cultural context (Miller et al., 2018). Other studies have focused specifically on the effects of aircraft on the visitor experience both in parks and protected areas, and a laboratory setting, indicating that aircraft noise negatively impacts the visitor experience (Anderson et al., 2011; Ferguson, 2018; Mace et al., 2013; Rapoza et al., 2015). |
| | |
| | Currently, some park visitors may hear noise from commercial air tours, which may disrupt visitors or degrade the visitor experience at the Park by disturbing verbal communications and masking the sounds of nature. For example, noise from commercial air tours may disrupt visitors during interpretive and educational programs at historical sites or while hiking, camping, fishing, or participating in other activities. Visitors respond differently to noise from commercial air tour overflights – noise may be more acceptable to some visitors than others. Visitors in backcountry and wilderness areas often find commercial air tours more intrusive than visitors in developed and frontcountry areas where noise from commercial air tours may not be as audible (Rapoza et al., 2015; Anderson et al., 2011). |
| | |
| | Visitor points of interest include campgrounds, coastal areas, visitor centers, and trails. Ranger-led education and interpretive programs occur across the Park. Wildlife viewing, particularly during morning hours, is a popular visitor activity. Noise disturbances to visitors from commercial air tours are not expected to measurably change under the ATMP because the ATMP authorizes the same number of commercial air tours as the existing three-year average on the same routes, and requires commercial air tours to fly at the existing altitudes reported by the operator. The limited number of commercial air tours on both a daily and annual basis will make it less likely that a visitor is disrupted by multiple commercial air tours during their visit. On days when commercial air tours will occur, noise levels above 52 dBA (which is associated with speech interference) will occur for less than five minutes a day over the Park. See *Noise Technical Analysis* below. Finally, limiting the operation of commercial air tours from |

9

| | |
|---|---|
| | 12:00 PM to 5:00 PM, or beginning at 11:00 AM for operators that have converted to quiet technology aircraft and have been authorized by the agencies, provides times when visitors seeking solitude may explore the Park without disruptions from commercial air tours, including providing visitors at the Park opportunities to experience the sights and sounds of wildlife. Collectively, these changes from existing operations will result in some improvement to the visitor experience at the Park. |
| **Wilderness**<br>Wilderness | Within the Park, the almost 33,000-acre Phillip Burton Wilderness offers an extraordinary opportunity for solitude and unconfined recreation in untrammeled terrestrial and marine environments and includes one of only two marine wilderness areas in the national park system.<br><br>Section 2(a) of the Wilderness Act states that wilderness areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character." Commercial air tours over the Park may impact the following qualities of wilderness character: opportunity for solitude, the natural quality, and other features of value (e.g., cultural resources). Aircraft that land in wilderness detract from the undeveloped quality of wilderness. Because commercial air tours do not land in wilderness or the Park, the undeveloped quality of wilderness is not considered here. As commercial air tours do not in any way manipulate or control wilderness or any resources therein, the untrammeled quality of wilderness is not considered here either.<br><br>*Keeping it Wild 2, An Updated Interagency Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System* (Landres, et al., 2015) notes that solitude includes attributes such as "separation from people and civilization, inspiration (an awakening of the senses, connection with the beauty of nature and the larger community of life), and a sense of timelessness (allowing one to let go of day-to-day obligations, go at one's own pace, and spend time reflecting). A review of research suggests that solitude encapsulates a range of experiences, including privacy, being away from civilization, inspiration, self-paced activities, and a sense of connection with times past (Borrie and Roggenbuck, 2001)." Generally, solitude improves when sights and sounds of human activity are remote. Commercial air tours can represent both a sight and sound of human activity and therefore detract from this quality of wilderness character.<br><br>Noise from commercial air tours has the potential to disrupt the opportunity for solitude in designated wilderness areas. On days when commercial air tours will occur, noise levels above 35 dBA are not predicted to exceed ten minutes in areas beneath and adjacent to the route (see Figure 1 in the *Noise Technical Analysis*). The average sound levels (Equivalent Sound Level or $LA_{eq, 12hr}$) are not anticipated to exceed 45 dB in small areas beneath the route. See *Noise Technical Analysis* below. However, as described in analyses for soundscapes, viewsheds, and visitor use and experience, because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019, and substantially the same route will be used at the existing altitudes reported by the operator, the NPS anticipates with clear enforceable routes and elevation requirements, impacts would be the same or less when compared to current conditions. Therefore, the impacts to solitude will not be significant.<br><br>Impacts on the natural quality of wilderness character are the same as those described under the natural resource categories above (biological resources) and will be limited on |

10

<table>
<tr><td></td><td>an annual basis under the ATMP. Therefore, the ATMP is not expected to result in a change in impacts to solitude over current conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019. Additionally, because the ATMP requires commercial air tours to fly at enforceable altitudes and routes identified in the ATMP which will be further protective of these natural qualities, the NPS anticipates impacts would be similar or decrease when compared to current conditions. Therefore, the impacts to natural character will not be significant.

Section 2 (c)(4) of the Wilderness Act states that wildernesses "may contain features of ecological, geological, scientific, educational, scenic, or historical value." Where present, cultural resources are part of this "unique" quality of wilderness character. Therefore, active management of wilderness cultural resources must take into account both cultural resource values and contributions to wilderness character.

Flights over sensitive cultural resources located in designated wilderness areas have the potential to impact the auditory and visual area of potential effects of both known and yet unidentified cultural resources. However, as described in analyses for cultural resources above, because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019 and requires commercial air tours to fly at the same altitudes reported by the operator and on substantially the same route, which are enforceable as identified in the ATMP, the NPS anticipates impacts would be the same or less compared to current conditions. Therefore, the impacts to other features of value within wilderness will not be significant.</td></tr>
<tr><td>Cumulative Effects</td><td>The cumulative impact analysis for the ATMP focuses on noise and viewshed impacts. Impacts to other resources, i.e., wildlife, visitor experience, ethnographic resources, wilderness, etc. all result from noise or viewshed impacts.

Many activities may contribute noise to the Park's acoustic environment. Aviation activities such as commercial air tours above 5,000 ft. AGL, and overflights by high altitude jets or private aviation regardless of altitude are not subject to regulation under the National Parks Air Tour Management Act (NPATMA). All of these aviation activities may currently contribute noise to the project area. Private and commercial overflights associated with the nearby San Francisco International Airport are commonly flown over the Park. These flights may detract from the Park's viewshed as well.

The Park's developed areas and roadways also contribute to ambient noise. Maintenance and other administrative activities may also contribute noise to the acoustic environment, but are generally temporary, irregular, and do not last more than a few hours. Intermittent construction activities may add noise to the Park's acoustic environment, though generally those occur in already developed areas where noise is generally more acceptable and expected.

The agencies have qualitatively considered the cumulative impacts of commercial air tours along with impacts from existing activities generally described above. Depending on the level of Park activities at various times of the year, the noise contribution from other sources such as road traffic and visitor use in developed areas may be substantial. There is no known future project that would significantly contribute noise impacts to the project area. Considering existing ambient noise sources and foreseeable future noise sources, the commercial air tour noise is a small contribution of overall noise. Furthermore, the ATMP establishes operating conditions to protect Park natural and</td></tr>
</table>

11

AR_0000091

JA262

|  | cultural resources, and it is unlikely it would measurably change the overall acoustic environment. Commercial air tours over Park roadways are likely to be masked by existing noise and therefore the impacts would be de minimis. Finally, the ATMP does not add new noise to the existing acoustic environment. Therefore, when considering other sources of noise in the Park that are likely to continue under the ATMP, the continuation of 143 commercial air tours will not result in a meaningful change to the overall current condition of the Park's visual or auditory landscape.

As noted above under viewsheds, visual or viewshed impacts associated with aircraft are most noticeable because of noise. As described above, the ATMP will not result in significant impacts to the acoustic environment. Additionally, there should not be significant cumulative changes to the viewshed since the number of air tours is not increasing but is consistent with the 3-year average.

Therefore, no significant cumulative environmental impacts are likely to result from the ATMP. |
|---|---|
| **Indirect Effects** | The ATMP applies to all commercial air tours over the four parks or within ½ mile outside their boundaries, that are flown below 5,000 ft. AGL. These flights takeoff and land from the Commodore Center Seaplane Base in Sausalito, CA. The Commodore Center is located approximately eight miles from the Park's ½-mile ATMP boundary. Land uses between the Commodore Center Seaplane Base and the Park's ½-mile boundary buffer primarily include developed residential areas within the greater San Francisco metropolitan area and undeveloped open space. Commercial air tours traveling to and from the Park could result in some temporary noise disturbances in these areas. Commercial air tours may fly over residential areas resulting in temporary noise disturbance to homeowners. Undeveloped lands will likely experience similar impacts to those described in other sections of this ESF, i.e., temporary disturbances to wildlife, etc. although flight altitudes may be different outside the Park's boundary resulting in potentially more adverse impacts than those occurring within the ATMP boundary. Commercial air tours that fly over Golden Gate National Recreation Area or San Francisco Maritime National Historical Park in order to reach the Park are regulated by the ATMP and therefore, the indirect effects to these areas resulting from commercial air tours over the Park are regulated and minimized. Because the number of flights authorized by the ATMP (no more than 143 tours per year) is consistent with existing conditions, these effects are expected to be insignificant.

Since the ATMP authorizes the same number of commercial air tours per year as existing operations on substantially the same route, it is unlikely that the frequency and nature of these disturbances outside of the Park and its ½-mile buffer would result in a change from current condition. Therefore, the agencies consider indirect effects of the ATMP to be negligible. However, since the ATMP cannot regulate the flight path, altitude, duration, etc. of flights beyond ½-mile boundary of the four parks included in the ATMP (the operator must comply with relevant FAA regulations), the agencies are unable to require the operator to continue to fly more than ½ mile outside of boundary of the parks in the manner in which they currently fly under existing operations or to require the operator to change any operational parameters (e.g., altitude or routes). However, the agencies are unaware of any reason the operator would deviate from their current flight paths outside the ATMP boundary since the route authorized over the Park has not substantially changed. |

12

AR_0000092

**JA263**

**Additional Technical Analysis**

## AIR QUALITY TECHNICAL ANALYSIS

Potential air quality impacts from proposed commercial air tour operations were estimated using an emissions inventory approach. Annual flight miles by aircraft type were calculated for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (GOGA-SAFR-PORE) – 68,300 flight miles. The two aircraft that fly commercial air tours are the DHC-2 Beaver Floatplane (fixed-wing) and Bell 407 (helicopter). The potential impacts of commercial air tours were analyzed jointly across all three parks.

The FAA's Aviation Environmental Design Tool (AEDT) version 3d was used to develop emission factors (pounds of emissions per mile flown) for these aircraft, which were derived from the Environmental Protection Agency's (EPA) AP-42: Compilation of Emission Factors (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974). Although the AP-42 emission factors represent the best available data, they have not been updated since the 1990s and most aircraft engines in use today are likely to be cleaner due to less-polluting fuels and improvements in engine emissions controls. Therefore, these emission rates are considered a conservative estimate of emission rates for aircraft used in commercial air tours.

The maximum emissions (tons per year) were calculated for GOGA-SAFR-PORE[4] by multiplying the total number of operations (by aircraft type), the longest routes flown by each aircraft type over the parks and the ½ mile boundary outside of the parks, and the aircraft-specific emission factor. The sum of total emissions by aircraft type represent the maximum emissions conditions for the parks. To highlight the potential impacts to ambient air quality for all criteria pollutants, GOGA-SAFR-PORE emissions results were compared with the EPA's General Conformity *de minimis* thresholds for the most stringent[5] nonattainment areas. EPA's General Conformity *de minimis* thresholds represent a surrogate for impacts to ambient air quality.

The NPS must also consider impacts to resources that are sensitive to air pollution under the NPS Organic Act mandates and the Clean Air Act (CAA). Such resources include (but are not limited to) sensitive vegetation, streams and lakes, aquatic biota and visibility. These resources are typically referred to as Air Quality Related Values (AQRVs). Parks designated Class I areas under the CAA also receive an additional measure of protection under the CAA provisions. The CAA gives the NPS an "affirmative responsibility to protect the air quality related values (including visibility) of any such lands within a Class I area."

Additionally, a portion of GOGA-SAFR-PORE and the ½ mile boundary outside GOGA-SAFR-PORE is classified as Marginal Nonattainment for ozone (2015 standard), Moderate Nonattainment for $PM_{2.5}$ (2006 standard), and Moderate Maintenance for carbon monoxide (1971 standard) and is thus subject to the General Conformity regulations. However, since emissions estimates for all pollutants in across the three parks and the ½-mile boundary outside the parks are well below the most stringent *de minimis* levels (Table 2), a General Conformity Determination is not required. Furthermore, the most stringent *de minimis* emission thresholds for federal conformity determinations are sufficiently low relative to emission thresholds the NPS will use to determine whether additional air quality analysis is necessary under a NEPA analysis. Given this, and the fact that the maximum projected emissions from overflights in GOGA-SAFR-PORE are well below these *de minimis* levels (< 1 TPY for particulate matter and sulfur dioxide, and <2 TPY for nitrogen oxides – criteria pollutants that have the most significant impact on AQRVs), it is expected that emissions from overflights in GOGA-SAFR-PORE under the ATMP will not meaningfully impact AQRVs, or local air quality, and will not have regional impacts from implementation of the ATMP in GOGA-SAFR-PORE.

---

[4] Muir Woods National Monument was not included in this analysis because the ATMP does not authorize any commercial air tours over that Park or its ½ mile boundary.
[5] The most stringent non-attainment areas (i.e., lowest *de minimis* thresholds) are categorized as "extreme" for ozone (VOCs or NOx) and "serious" for particulate matter and sulfur dioxide.

13

AR_0000093

**JA264**

**Table 2.** Comparison of the emissions inventory for proposed commercial air tours in GOGA-SAFR-PORE with *de minimis* thresholds for the most stringent nonattainment areas.

| Pollutant | *de minimis* threshold (Tons per Year) | Emissions Inventory for GOGA-SAFR-PORE (Tons per Year) |
|---|---|---|
| Carbon Monoxide | 100 | 0.221 |
| Volatile Organic Compounds | 10 | 0.008 |
| Nitrogen Oxides | 10 | 1.806 |
| Particulate Matter, diam. < 2.5 μm | 70 | 0.019 |
| Particulate Matter, diam. < 10 μm | 70 | 0.019 |
| Lead | 25 | 0.122 |
| Sulfur Oxides | 70 | 0.254 |
| Carbon Dioxide | n/a | 683.707 |

## NOISE TECHNICAL ANALYSIS

### Indicators of acoustic conditions

There are numerous ways to measure the potential impacts of noise from commercial air tours on the acoustic environment of a park, including intensity, duration, and spatial footprint of the noise. The metrics and acoustical terminology used for the ATMP are shown in Table 3.

**Table 3.** Primary metrics used for the noise analysis.

| Metric | Relevance and citation |
|---|---|
| Time Above 35 dBA [6] | The amount of time (in minutes) that aircraft sound levels are above a given threshold (i.e., 35 dBA)<br><br>In quiet settings, outdoor sound levels exceeding 35 dB degrade experience in outdoor performance venues (American National Standards Institute (ANSI), 2007); blood pressure increases in sleeping humans (Haralabidis et al., 2008); maximum background noise level inside classrooms (American National Standards Institute/Acoustical Society of America S12.60/Part 1-2010). |
| Time Above 52 dBA | The amount of time (in minutes) that aircraft sound levels are above a given threshold (i.e., 52 dBA)<br><br>This metric represents the level at which one may reasonably expect interference with Park interpretive programs. At this background sound level (52 dB), normal voice communication at five meters (two people five meters apart), or a raised voice to an audience at ten meters would result in 95% sentence intelligibility (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974). |

---

[6] dBA (A-weighted decibels): Sound is measured on a logarithmic scale relative to the reference sound pressure for atmospheric sources, 20 μPa. The logarithmic scale is a useful way to express the wide range of sound pressures perceived by the human ear. Sound levels are reported in units of decibels (dB) (ANSI S1.1-1994, American National Standard Acoustical Terminology). A-weighting is applied to sound levels in order to account for the sensitivity of the human ear (ANSI S1.42-2001, Design Response of Weighting Networks for Acoustical Measurements). To approximate human hearing sensitivity, A-weighting discounts sounds below 1 kHz and above 6 kHz.

14

AR_0000094

**JA265**

| | |
|---|---|
| Equivalent sound level, $L_{Aeq, 12 hr}$ | The logarithmic average of commercial air tour sound levels, in dBA, over a 12-hour day. The selected 12-hour period is 7 a.m. to 7 p.m. to represent typical daytime commercial air tour operating hours. |
| Day-night average sound level, $L_{dn}$ (or DNL) | The logarithmic average of sound levels, in dBA, over a 24-hour day, DNL takes into account the increased sensitivity to noise at night by including a 10 dB penalty between 10 p.m. and 7 a.m. local time.<br><br>For aviation noise analyses, the FAA (2015, Appendix. B, B-1) has determined that the cumulative noise energy exposure of individuals to noise resulting from aviation activities must be established in terms of DNL.<br><br>Note: Both $L_{Aeq, 12hr}$ and $L_{dn}$ characterize:<br><br>• Increases in both the loudness and duration of noise events<br>• The number of noise events during specific time period (12 hours for $L_{Aeq, 12hr}$ and 24-hours for $L_{dn}$)<br>If there are no nighttime events, then $L_{Aeq, 12hr}$ is arithmetically three dBA higher than $L_{dn}$.<br><br>The FAA's (2015 Exhibit 4-1) indicators of significant impacts are for an action that would increase noise by DNL 1.5 dB or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dB noise exposure level, or that will be exposed at or above the DNL 65 dB level due to a DNL 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe. |
| Maximum sound level, $L_{max}$ | The loudest sound level, in dBA, generated by the loudest event; it is event-based and is independent of the number of operations. $L_{max}$ does not provide any context of frequency, duration, or timing of exposure. |

**ATMP as related to indicators**

The potential impacts of commercial air tours were analyzed jointly across Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (the Parks). In order to provide a conservative evaluation of potential noise effects produced by commercial air tours under the ATMP, the CE analysis is based on a representation of a peak day[7] of commercial air tour activity. For the busiest year of commercial air tour activity from 2017-2019 based on the total number of commercial air tour operations and total flight miles over the Park, the 90th percentile day was identified for representation of a peak day in terms of number of operations, and then further assessed for the type of aircraft and route flown to determine if it is a reasonable representation of the commercial air tour activity over the Park. For the Park, the 90th percentile day was identified as the following:

• One flight on the Seaplane Adventures PORE – NCT route using a DHC-2-MKI aircraft
• One flight on the Seaplane Adventures GOGA – BAT route using a DHC-2-MKI aircraft

Noise contours for the following acoustic indicators were developed using the FAA's AEDT version 3d and are provided below. A noise contour presents a graphical illustration or "footprint" of the area potentially affected by the noise.

---

[7] As required by FAA policy, the FAA typically represents yearly conditions as the Average Annual Day (AAD). However, because ATMP operations in the park occur at low annual operational levels and are highly seasonal in nature, the FAA determined that a peak day representation of the operations would more adequately allow for disclosure of any potential impacts. A peak day has therefore been used as a conservative representation of assessment of AAD conditions required by FAA policy.

15

- Time above 35 dBA (minutes) – see Figure 1
- Time above 52 dBA (minutes) – see Figure 2
- Equivalent Sound Level or $L_{Aeq, 12hr}$ – see Figures 3-4
  - Equivalent sound level, $L_{Aeq, 12hr}$ Note: Contours are not presented for $L_{dn}$ (or DNL) as it is arithmetically three dBA lower than $L_{Aeq, 12hr}$ if there are no nighttime events, which is the case for the ATMP modeled at the Park.
- Maximum sound level or $L_{max}$ – see Figures 5-6

After completing noise modeling for the proposed action, a minor altitude adjustment was made for which the impacts are not represented in the *Noise Technical Analysis*. The helicopter route altitude was raised from 1,000 ft. to 1,500 ft. AGL near Alcatraz (commercial air tours directly over Alcatraz are not authorized) to reduce noise impacts on nesting seabirds. Compared to current conditions, this altitude adjustment may result in a brief increase in noise in two locations along the route due to the flight dynamics of helicopters when changing altitudes. The noise increases are expected to last for only a few minutes of the tour and would occur when the helicopter ascends to 1,500 ft. AGL and then descends back to 1,000 ft. AGL both of which occur before and after the flight passes near sensitive bird habitat at Alcatraz (refer to Figure 1 in the CE). The NPS has determined that the overall effect of this change would be beneficial for nesting seabirds and other Park resources, including visitor experience.

16



**Figure 1.** Noise contour results for Time Above 35 dBA

17



**Figure 2.** Noise contour results for Time Above 52 dBA

18

AR_0000098



**Figure 3.** Noise contour results for $L_{Aeq, 12hr}$

AR_0000099



**Figure 4.** Noise contour results for $L_{Aeq,\,12hr}$ (zoomed in)

20



**Figure 5.** Noise contour results for $L_{max}$

21

AR_0000101

**JA272**



**Figure 6.** Noise contour results for L$_{max}$ (zoomed in)

22

## LIST OF REFERENCES

American National Standards Institute, Inc (2001). Design response of weighting networks for acoustical measurements. *Acoustical Society of America*, ANSI S1.42-2001, i-1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S1.42-2001+(R2011).pdf

American National Standards Institute, Inc. (2002). Acoustical performance criteria, design requirements, and guidelines for schools, Part 1: Permanent schools. *Acoustical Society of America*, ANSI/ASA S12.60-2002/Part 1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S12.60+Part+1-2010+(R2020).pdf

American National Standards Institute, Inc (2004). Acoustical terminology. *Acoustical Society of America*, ANSI S1.1-1994 (R2004). https://webstore.ansi.org/Standards/ASA/ANSIS11994R2004

American National Standards Institute, Inc. (2007). Quantities and procedures for description and measurement of environmental sound — Part 5: Sound level descriptors for determination of compatible land use. *Acoustical Society of America*, ASA S12.9-2007/PART 5 (R2020), 1-20. https://www.techstreet.com/standards/asa-s12-9-2007-part-5-r2020?product_id=1534045

Anderson, G., Rapoza, A., Fleming, G., & Miller, N. (2011). Aircraft noise dose-response relations for national parks. *Noise Control Engineering Journal*, 59, 519. https://doi.org/10.3397/1.3622636

Benfield, J., Taff, B. D., Weinzimmer, D., & Newman, P. (2018). Motorized recreation sounds influence nature scene evaluations: The role of attitude moderators. *Frontiers in Psychology*, 9:495. https://doi.org/10.3389/fpsyg.2018.00495

Borrie, W. T., & Roggenbuck, J. W. (2001). The dynamic, emergent, and multi-phasic nature of on-site wilderness experiences. *Journal of Leisure Research*, 33(2), 202–228. https://doi.org/10.1080/00222216.2001.11949938

Buxton, R. T., McKenna, M. F., Mennitt, D., Fristrup, K., Crooks, K., Angeloni, L., & Wittemyer, G. (2017). Noise pollution is pervasive in US protected areas. *Science*, *356*(6337), 531-533.

Department of Interior and the National Park Service (1995). Report on effects of aircraft overflights on the National Park System. *Report to Congress*, 1.1-10.23. https://www.nonoise.org/library/npreport/intro.htm

Federal Aviation Administration (2015). FAA Order 1050.1F, Environmental impacts: Policies and procedures. *U.S. Department of Transportation*, 1.1-11.4. https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf

Ferguson, L. A. (2018). Strategies for managing natural sounds for human experience and ecosystem services (Dissertation). *The Pennsylvania State University The Graduate School College of Health and Human Development*, 1-176. https://etda.libraries.psu.edu/files/final_submissions/17621

Gutzwiller, K. J., D'Antonio, A. L., & Monz, C. A. (2017). Wildland recreation disturbance: Broad-scale spatial analysis and management. *Frontiers in Ecology and the Environment*, 15(9), 517–524. https://doi.org/10.1002/fee.1631

Haas, G. E. & Timothy J. W. (1998). National parks and the American public: a national public opinion survey on the National Park System: A summary report. *The Association*, 1-32.

23

Haralabidis A.S., Dimakopoulou, K., Vigna-Taglianti, F., Giampaolo, M., Borgini, A., Dudley, M., … & Jarup, L. (2008). Acute effects of night-time noise exposure on blood pressure in populations living near airports. European Heart Journal Advance Access. https://academic.oup.com/eurheartj/article/29/5/658/440015

Kunc, H. P., McLaughlin, K. E., & Schmidt, R. (2016). Aquatic noise pollution: Implications for individuals, populations, and ecosystems. *Proceedings of the Royal Society B: Biological Sciences,* 283(1836), 20160839. https://doi.org/10.1098/rspb.2016.0839-

Kunc, H. P., & Schmidt, R. (2019). The effects of anthropogenic noise on animals: A meta-analysis. *Biology Letters*, 15(11), 20190649. https://doi.org/10.1098/rsbl.2019.0649

Landres, P., Barns, C., Boutcher, S., Devine, T., Dratch, P., Lindholm, A., … & Simpson, E. (2015). Keeping it wild 2: An updated interagency strategy to monitor trends in wilderness character across the National Wilderness Preservation System. Gen. Tech. Rep. RMRS-GTR-340. *Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.* 114 p. DOI: https://doi.org/10.2737/RMRS-GTR-340

Lee C., & Macdonald, J. (2011).  Point Reyes National Seashore baseline ambient sound levels 2009 and 2010. Report No. DOT-VNTSC-FAA-16-20.

Mace, B. L., Corser, G. C., Zitting, L., & Denison, J. (2013). Effects of overflights on the national park experience. *Journal of Environmental Psychology*, 35, 30–39. https://doi.org/10.1016/j.jenvp.2013.04.001

McDonald, C. D., Baumgarten, R. M., & Iachan, R. (1995). Aircraft management studies: National Park Service Visitors Survey. *National Park Service, U.S. Department of the Interior*, HMMH Report No. 290940.12; NPOA Report No. 94-2. https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB95196002.xhtml

Merchan, C. I., Diaz-Balteiro, L., & Soliño, M. (2014). Noise pollution in national parks: Soundscape and economic valuation. *Landscape and Urban Planning*, 123, 1–9. https://doi.org/10.1016/j.landurbplan.2013.11.006

Miller, Z., Taff, B.D., & Newman, P. (2018). Visitor experiences of wilderness soundscapes in Denali National Park and Preserve. *International Journal of Wilderness*, 24(2). https://ijw.org/2018-visitor-experiences-of-wilderness-soundscapes/

National Park Service (1992).  National Register Bulletin 38. https://www.nps.gov/subjects/nationalregister/upload/NRB38-Completeweb.pdf

National Park Service (2002). NPS-28: Cultural Resource Management Guideline. *National Park Service*, Introduction, A-F. https://www.nps.gov/parkhistory/online_books/nps28/28appena.htm

Rapoza, A., Sudderth, E., & Lewis, K. (2015). The relationship between aircraft noise exposure and day-use visitor survey responses in backcountry areas of national parks. *The Journal of the Acoustical Society of America*, 138(4), 2090–2105. https://doi.org/10.1121/1.4929934

Richardson, C. T., & Miller, C. K. (1997). Recommendations for Protecting Raptors from Human Disturbance: A Review. *Wildlife Society Bulletin (1973-2006)*, 25(3), 634–638. http://www.jstor.org/stable/3783512

Shannon, G., McKenna, M.F., Angeloni, L.M., Crooks, K.R., Fristrup, K.M., Brown, E., Warner, K.A., Nelson, M.D., White, C., Briggs, G., McFarland, S., & Wittemyer, G. (2015). A synthesis of two decades of research documenting the effects of noise on wildlife. *Biological Reviews*, 91(4) 982-1005. https://doi.org/10.1111/brv.12207

24

United States Census Bureau (2022). Explore census data. *United States Census Bureau.* https://data.census.gov/cedsci/

United States Environmental Protection Agency, Office of Noise Abatement and Control (1974). Information on levels of environmental noise requisite to protect public health and welfare with an adequate margin of safety. NPC Online Library, 550/9-74-004, 1-78. https://www.nrc.gov/docs/ML1224/ML12241A393.pdf

United States Fish and Wildlife Service (2007). National Bald Eagle Management Guidelines. United States Department of Agriculture, 1-19. https://www.aphis.usda.gov/plant_health/plant_pest_info/emt/downloads/EaglePrtctnGuidance.pdf

Weinzimmer, D., Newman, P., Taff, D., Benfield, J., Lynch, E., & Bell, P. (2014). Human responses to simulated motorized noise in national parks. *Leisure Sciences*, 36(3), 251–267. https://doi.org/10.1080/01490400.2014.888022

25



**National Park Service**
**U.S. Department of the Interior**

**San Francisco Maritime National Historical Park**
**Date: January 4, 2023**

# ENVIRONMENTAL SCREENING FORM (ESF)

## PROJECT INFORMATION

**Project Title:** Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore Air Tour Management Plan

**PEPC Project Number:** 103175

**Project Type:** Categorical Exclusion

**Project Location:** San Francisco County and Marin County, California

## PROJECT DESCRIPTION

The proposed action is to implement an Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore. The "Project Description" section of the Categorical Exclusion (CE) Form for the ATMP sets out the elements of the ATMP and is incorporated herein by reference.

Considering their proximity, National Park Service (NPS) management of the parks, and current commercial air tour operations, the agencies determined that a single ATMP covering all four parks (Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore) was appropriate for future management of commercial air tours. Though the ATMP covers four parks, this ESF analyzes the impacts to San Francisco Maritime National Historical Park (Park) from the implementation of the ATMP.

## RESOURCE IMPACTS TO CONSIDER

*Definition of Effects or Impacts (40 C.F.R. § 1508.1(g))*
Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include direct effects, indirect effects, and cumulative effects. Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

For the purposes of considering environmental impacts, the NPS evaluated the change to the human environment resulting from implementation of the ATMP. Consistent with Council on Environmental Quality regulations, the baseline from which to measure environmental impacts of the ATMP is the current condition of the human environment. In this case, the baseline is the current condition of Park resources and values, as impacted by 2,548 commercial air tours per year (existing three-year average of tours conducted on an annual basis from 2017-2019) along with other planned actions and trends. The baseline also includes the route and altitude information of commercial air tours provided by the operators, as well as the timing and daily commercial air tour information from commercial air tour reports provided by the operators from 2017-2019.

1

*Existing Conditions of Commercial Air Tours over the Park*

Two commercial air tour operators, San Francisco Helicopters, LLC and San Francisco Seaplane Tours, Inc., hold Interim Operating Authority (IOA) to conduct a combined total of 5,090 commercial air tours over the Park or within ½ mile of its boundary each year. San Francisco Helicopters, LLC holds IOA for 2,900 commercial air tours over the Park each year, and San Francisco Seaplane Tours, Inc. holds IOA for 2,190 commercial air tours over the Park each year. Due to inconsistencies in commercial air tour reporting for the Park, the three-year average of reporting data from 2017-2019 for Golden Gate National Recreation Area is being used for the Park since it shares a boundary with Golden Gate National Recreation Area and commercial air tour routes that pass over Golden Gate National Recreation Area also pass over or within ½-mile of the Park. San Francisco Helicopters, LLC conducts an average of 1,280 commercial air tours over the Park each year, and San Francisco Seaplane Tours, Inc. conducts an average of 1,268 commercial air tours over the Park each year. The operators conduct commercial air tours on 11 different routes over the Park or within ½-mile of its boundary. San Francisco Helicopters, LLC conducts commercial air tours using BHT-407-407 and BHT-427-427 aircraft (helicopter aircraft) at a minimum altitude of approximately 1,000 ft. AGL. San Francisco Seaplane Tours, Inc. conducts commercial air tours using DHC-2-MKI aircraft (fixed-wing) at a minimum altitude of approximately 1,500 ft. AGL over the Park or within ½ mile of its boundary. Commercial air tours are typically conducted between the hours of 9:00 AM and 6:00 PM and occur year-round. San Francisco Seaplane Tours, Inc. also offers a sunset tour.

*Summary of the ATMP as applied to the Park*

The ATMP limits the number of commercial air tours that the operators are authorized to conduct over the Park each year to the three-year average of tours conducted on an annual basis from 2017-2019 (2,548 tours per year). The operators will be allowed to conduct commercial air tours on the existing routes and at the same altitudes that the operators currently report flying over the Park and ½ mile boundary (approximately 1,000 ft. AGL minimum altitude for helicopter aircraft, and approximately 1,500 ft. AGL altitude for fixed-wing aircraft). Except as provided for by quiet technology incentives, the ATMP restricts the hours during which commercial air tours may be conducted over the Park, beginning at 9:00 AM until 30 minutes after sunset. The ATMP allows the NPS to establish no-fly periods for special events or planned Park management. The ATMP requires operators to report all bird strikes that occur during commercial air tours over the Parks per FAA Advisory Circular 150/5200-32B, Reporting Wildlife Aircraft Strikes. Refer to the ATMP document for more information.

**Evaluation of the ATMP**

After completing noise modeling for the proposed action, a minor altitude adjustment was made for which the impacts are not represented in the *Noise Technical Analysis* below. The helicopter route altitude was raised from 1,000 ft. to 1,500 ft. AGL near Alcatraz (commercial air tours directly over Alcatraz are not authorized) to reduce noise impacts on nesting seabirds. Compared to current conditions, this altitude adjustment may result in a brief increase in noise in two locations along the route due to the flight dynamics of helicopters when changing altitudes. The noise increases are expected to last for only a few minutes of the tour and would occur when the helicopter ascends to 1,500 ft. AGL and then descends back to 1,000 ft. AGL both of which occur before and after the flight passes near sensitive bird habitat at Alcatraz (refer to Figure 1 in the CE). The NPS has determined that the overall effect of this change would be beneficial for nesting seabirds and other Park resources, including visitor experience.

**Table 1.** Potential Issues and Impacts to Resources

| Resource | Potential Issues & Impacts |
|---|---|
| **Air**<br>Air Quality | The findings from the screening analysis demonstrate that implementing the ATMP will not meaningfully impact (meaning that it will have no or minimal impact) local air quality and will not have regional impacts. See *Air Quality Technical Analysis* below. |

2

**JA278**

| | |
|---|---|
| **Biological**<br>Species of Special Concern or Their Habitat | <u>Federally Listed Threatened and Endangered Species</u><br><br>The Park contains Federally designated threatened and endangered species, including listed fish. Commercial air tours will have no impact on these species or their habitat due to the proposed commercial air tour routes, minimum altitudes, time of day restrictions, type of aircraft, and limit on the maximum number of flights per year that will be permitted under the ATMP. Based on these measures, the ATMP results in no impact on listed species, and after having informal discussions with the U.S. Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service, the agencies have determined the ATMP will have *No Effect* on listed species or their critical habitat.<br><br>The Section 7 analysis conducted by the agencies considered the potential effects of the ATMP on listed species and/or designated critical habitat without the consequences to those listed species by the existing commercial air tours, in accordance with 50 CFR § 402.02. Refer to the Section 7 documentation for additional information, which includes the agencies' analysis. The ATMP is expected to have no impacts or only beneficial impacts on listed species when compared to current conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019 and routes and altitudes will remain the same when compared with existing operations.<br><br><u>Special Status Species and Migratory Birds</u><br><br>Raptors may collide with aircraft because of the altitude at which raptors fly. The ATMP authorizes the same number of flights on the same routes and altitudes as existing operations. Therefore, the ATMP is expected to have negligible impacts on these species when compared to current conditions. The requirement to report bird strikes, detailed above, also will allow the agencies to assess the effectiveness of these protections, and to modify them in the event that unanticipated adverse impacts are observed. |
| **Biological**<br>Wildlife and/or Wildlife Habitat including terrestrial and aquatic species | The Park includes a maritime museum, a visitor center, and the Hyde Street Pier. These areas are highly developed. Some fish species, such as coho and steelhead fish are present in the areas around the pier and shoreline. Migratory birds may also be present in the area. Since the ATMP authorizes a maximum number of commercial air tours per year equivalent to the existing three-year average on the same routes and altitudes reported by the operators under existing operations, it is anticipated that there will be little to no change to existing operating conditions and the resultant disturbances to wildlife. While wildlife will continue to be exposed to noise, the level of noise exposure will be similar to existing conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019. Therefore, impacts to wildlife are not significant. See also the discussion above for special status species. |
| **Coastal**<br>Coastal Resources and Coastal Zones | Portions of the planning area for the ATMP overlap with designated coastal zone areas. The agencies analyzed the ATMP's consistency with the McAteer-Petris Act and the policies set forth in the San Francisco Bay Plan, and have found the ATMP to be consistent with them to the maximum extent practicable. The San Francisco Bay Conservation and Development Commission is presumed to concur with the agencies' determination. Refer to the coastal zone consistency review documentation for more information. |

3

AR_0000108

**JA279**

| | |
|---|---|
| **Cultural**<br>Cultural Landscapes | The NPS defines a Cultural Landscape as: a geographic area, including both cultural and natural resources and the wildlife or domestic animals therein, associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values. There are four general kinds of cultural landscapes, not mutually exclusive: historic sites, historic designed landscapes, historic vernacular landscapes, and ethnographic landscapes (NPS, 2002).<br><br>An impact to a cultural landscape will occur if the project alters any of the characteristics that help make the cultural landscape eligible for listing in the National Register of Historic Places (NRHP). This includes any diminishment of the cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. The potential impacts to cultural landscapes from the ATMP are limited to the continuation of visual and audible elements that diminish the integrity of the landscape setting and/or feeling.<br><br>The Aquatic Park is a historic district within the Area of Potential Effects that has been identified and evaluated within the context of cultural landscapes and is listed in the NRHP. The period of significance for this property dates to 1920-1945 and aircraft were part of the current visible and auditory landscape during that time. As such, authorizing commercial air tours to continue to operate as part of the undertaking will have no or minimal impact the integrity of the landscapes' setting, feeling, and association. The *Noise Technical Analysis*[1] shows that aircraft noise related to commercial air tours are predicted to be greater than 52 dBA for less than ten minutes a day. Furthermore, the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019 and the same routes and altitudes will be used. Therefore, impacts to cultural landscapes will be similar compared to impacts currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019.<br><br>The Federal Aviation Administration (FAA), in coordination with the NPS, consulted with the California State Historic Preservation Office, Native American tribes, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including cultural landscapes. That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this finding to all consulting parties. The FAA did not receive any objections to the finding. See CE Form for further information. |
| **Cultural**<br>Ethnographic Resources | The NPS defines Ethnographic Resources as: a site, structure, object, landscape, or natural resource feature assigned traditional legendary, religious, subsistence, or other significance in the cultural system of a group traditionally associated with it (NPS, 2002). Ethnographic Resources include Traditional Cultural Properties (TCPs) (NPS, 1992).<br><br>An impact to an Ethnographic Resource will occur if the project affected those elements of the resources that make it significant to the group traditionally |

---

[1] See also note preceding Table 1 regarding minor altitude adjustments not reflected in the noise modeling.

4

AR_0000109

**JA280**

| | |
|---|---|
| | associated with the resource, or if the project interferes with the use of the resource by the associated groups.<br><br>There are no known Ethnographic Resources within the Park.<br><br>The FAA, in coordination with the NPS, consulted with the California State Historic Preservation Office, Native American tribes, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including cultural landscapes. That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this finding to all consulting parties. The FAA did not receive any objections to the finding. |
| **Cultural**<br>Prehistoric/historic structures | The Park maintains the largest and most diverse collection of national historic landmark ships in the United States. As noted above, impacts to these resources will occur if the ATMP alters the characteristics of an archaeological site or historic structure that make it eligible for NRHP listing. Commercial air tours, by their nature, have the potential to impact resources for which only feeling and setting are the contributing elements. Feeling and setting have been identified as contributing elements for 82 cultural resources in the Area of Potential Effects for the Park. Refer to the Section 106 documentation for a complete list.<br><br>The visual and audible elements of commercial air tours are consistent with the dense urban feeling and setting for these resources. These intrusions will be limited to a maximum of 2,548 instances per year, and of limited duration. The *Noise Technical Analysis*[2] shows that aircraft noise related to commercial air tours are predicted to be greater than 52 dBA for less than ten minutes a day. These impacts will be similar compared to impacts currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019, and the ATMP requires operators to fly on the same routes and altitudes as existing operations. Therefore, the ATMP is expected to have negligible or only beneficial impacts on the Park's cultural resources when compared to current conditions.<br><br>The FAA, in coordination with the NPS, consulted with the California State Historic Preservation Office, Native American tribes, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including Cultural; prehistoric/historic structures. That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this finding to all consulting parties. The FAA did not receive any objections to the finding. |
| **Lightscapes**<br>Lightscapes | Under the ATMP, unless they qualify for the quiet technology incentive, commercial air tours are not permitted before 9:00 AM or 30 minutes after sunset. Any lights from commercial air tour aircraft are not likely to be noticeable and any impacts will be similar to or decrease compared to current conditions because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019. Therefore, impacts to the Park's lightscapes will not be significant. |

---

[2] See also note preceding Table 1 regarding minor altitude adjustments not reflected in the noise modeling.

AR_0000110

| Other<br>Human Health and Safety | Commercial air tours are subject to the FAA regulations for protecting individuals and property on the ground, and preventing collisions between aircraft, land or water vehicles, and airborne objects. The operators must continue to meet the FAA safety regulations. |
|---|---|
| Socioeconomic<br>Minority and low-income populations, size, migration patterns, etc. | U.S. Census data for census blocks surrounding the Park was reviewed to determine the presence of minority or low-income populations outside the Park and within ½-mile of its boundary (United States Census Bureau, 2022). Based on this review, minority populations were identified in San Francisco County. However, commercial air tours will not have a disproportionate impact on low-income or minority populations, since the noise associated with commercial air tours will occur in areas directly beneath and adjacent to the routes over the Park and will not be concentrated over low-income or minority populations. Therefore, the ATMP will not have a disproportionate impact on low-income or minority populations. |
| Socioeconomic<br>Socioeconomic | Commercial air tours generate income for operators and potentially generate income for other ancillary visitor industry businesses. Visitors from outside the immediate area contribute to this income. Because the number of commercial air tours authorized under the ATMP is the same as the average number of flights from 2017-2019, the Park does not expect visitor spending on commercial air tours or economic activity in the local communities to change. The competitive bidding process may redistribute the number of flights and income between individual operators in the future but is not anticipated to affect the overall average number of flights or local business activity generated by these flights. |
| Soundscapes<br>Acoustic Environment | Baseline acoustic conditions in the Park have not been measured but were measured nearby at Golden Gate National Recreation Area in 2007 and 2008. The existing acoustic conditions at the Park have been estimated using data from developed sites at Golden Gate National Recreation Area. Due to the urban setting of the Park, only the existing ambient conditions were considered in the resource impacts analysis. The modeled daytime existing ambient sound level without air tours was 55-60 decibels, which is typical of an urban setting (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974). The existing ambient condition includes all sound associated with a given environment, i.e., natural, human, and mechanical sounds, such as automobiles and aircraft. Aircraft sound measured at a sampling location may include general aviation, commercial jets, military, and air tours.<br><br>Depending on a receiver's location on the ground in relation to an aircraft flying overheard, aircraft sound can range from faint and infrequent to loud and intrusive. Due to the urban setting of the Park, only time above 52 decibels for conversational speech disturbance and impacts to visitor experience were considered.<br><br>Overall, noise impacts associated with commercial air tours over the Park are not expected to measurably change, since the ATMP authorizes the same number of flights per year as the average number of flights from 2017-2019 and requires commercial air tours to maintain the same routes and altitudes flown under existing operations. It should be noted that when the altitude of an aircraft is increased, the total area exposed to the noise from that aircraft may also increase depending on the surrounding terrain. Although the area exposed to noise might increase, this would not meaningfully affect the acoustic environment because of |

6

| | the attenuation of the noise from higher altitude and transient nature of the impacts. |
| --- | --- |
| | For purposes of assessing noise impacts from commercial air tours on the acoustic environment of the Park under the National Environmental Policy Act (NEPA), the FAA noise evaluation is based on Yearly[3] Day Night Average Sound Level (DNL); the cumulative noise energy exposure from aircraft over 24 hours. The DNL analysis indicates that the ATMP would not result in any noise impacts that would be "significant" or "reportable" under FAA's policy for NEPA. Refer to the *Noise Technical Analysis* below. |
| **Viewsheds**<br>Viewsheds | While studies indicate that aircraft noise in national parks can impact human perceptions of aesthetic quality of viewsheds (Weinzimmer et al., 2014; Benfield et al., 2018), because the level of commercial air tour activity under the ATMP will remain the same, there will be no change in the effect to visitors in this regard. Other literature for studies on impacts from commercial air tours or overflights generally on viewsheds conclude that the visual impacts of overflights are difficult to identify because visitors primarily notice aircraft because of the accompanying noise. Aircraft are transitory elements in a scene and visual impacts tend to be relatively short. The short duration and low number of flights (along with the position in the scene as viewed from most locations) make it unlikely the typical visitor will notice or be visually distracted by aircraft. The viewer's eye is often drawn to the horizon to take in a park view and aircraft at higher altitudes are less likely to be noticed. Aircraft at lower altitudes may attract visual attention but are also more likely to be screened by vegetation or topography.<br><br>Under existing operations, commercial air tours over the Park or outside the Park but within ½-mile of its boundary are flown on 11 different routes. The ATMP limits the number of commercial air tours per year to 2,548 tours and maintains the same routes and altitudes as are flown under existing operations. Therefore, impacts to the Park's viewsheds will be similar to impacts currently occurring because the number of authorized flights under the ATMP will be the same as the average number of flights from 2017-2019. |
| **Visitor Use and Experience**<br>Recreation Resources | Commercial air tours offer a recreational experience for those who wish to view the Park from a different vantage point. Because the number of commercial air tours under the ATMP is consistent with the average number of flights from 2017-2019, there are no or minimal changes anticipated to the number of commercial air tours offered per year compared to current operations.<br><br>Currently, customers on commercial air tours are not required to pay an entrance fee at the Park, nor are the commercial air tour operators required to pay a fee to the Park. |
| **Visitor Use and Experience**<br>Visitor Use and Experience | The NPS allows visitor uses that are appropriate to the purpose for which the Park was established and can be sustained without causing unacceptable impacts to Park resources or values. Unacceptable impacts are impacts that, individually or |

---

[3] As required by FAA policy, the FAA typically represents yearly conditions as the Average Annual Day (AAD). However, because ATMP operations in the park occur at low operational levels per year and are highly seasonal in nature it was determined that a peak day representation of the operations would more adequately allow for disclosure of any potential impacts. A peak day has therefore been used as a conservative representation of assessment of AAD conditions.

AR_0000112

<table>
<tr><td></td><td>cumulatively, will unreasonably interfere with Park programs or activities including interpretive programs, or the historic or commemorative locations within the Park (NPS 2006 Management Policies 8.2).

Effects of commercial air tours on Park visitor experience have been well documented over many years. See *Report on the Effects of Aircraft Overflights on the National Park System* (Department of Interior and the National Park Service, 1995). The primary effect of commercial air tours is the introduction of noise into the acoustic environment. Numerous studies have identified the value and importance of soundscapes as one of the motivations for visiting parks (Haas and Wakefield, 1998; McDonald et al., 1995; Merchan et al., 2014; Miller et al., 2018), including in a cross-cultural context (Miller et al., 2018). Other studies have focused specifically on the effects of aircraft on the visitor experience both in parks and protected areas, and a laboratory setting, indicating that aircraft noise negatively impacts the visitor experience (Anderson et al., 2011; Ferguson, 2018; Mace et al., 2013; Rapoza et al., 2015). Based on the results of a visitor survey that was conducted at the Park in 2017, the vast majority, 72%, reported that noise was not a problem, while another 25% reported noise was a small problem (NPS and Resource Systems Group, 2017). The results of this survey indicate that in general noise is not an issue for visitor experience at the Park.

Currently, some park visitors may hear noise from commercial air tours, which may disrupt visitors or degrade the visitor experience at the Park by disturbing verbal communications. For example, noise from commercial air tours may disrupt visitors during interpretive and educational programs at historical sites. Visitors respond differently to noise from commercial air tour overflights – noise may be more acceptable to some visitors than others (Rapoza et al., 2015; Anderson et al., 2011).

Visitor points of interest include the Park's visitor center, historic ships, ranger-led interpretive programs, Maritime Museum, beach, and the Hyde Street Pier. Noise disturbances to visitors from commercial air tours are not expected to measurably change under the ATMP because the ATMP authorizes the same number of commercial air tours per year as the average number of flights from 2017-2019 and requires commercial air tours to fly at the same altitudes and on the same routes reported by the operators. Therefore, the ATMP is not expected to result in an impact to visitor experience at the Park.</td></tr>
<tr><td>**Wilderness**<br>Wilderness</td><td>There is no wilderness located within the Park. Therefore, no impacts to Park wilderness will occur as a result of the ATMP.</td></tr>
<tr><td>**Cumulative Effects**</td><td>The cumulative impact analysis for the ATMP focuses on noise and viewshed impacts. Impacts to other resources, i.e., wildlife, visitor experience, ethnographic resources, wilderness, etc. all result from noise or viewshed impacts.

Many activities may contribute noise to the Park's acoustic environment. Aviation activities such as commercial air tours above 5,000 ft. AGL, and overflights by high altitude jets or private aviation regardless of altitude are not subject to regulation under the National Parks Air Tour Management Act (NPATMA). All of these aviation activities may currently contribute noise to the project area. Private and commercial overflights associated with the nearby San</td></tr>
</table>

8

| | |
|---|---|
| | Francisco International Airport are commonly flown over the Park. These flights may detract from the Park's viewshed as well.<br><br>The Park's developed areas, which encompass the entire Park, also contribute to ambient noise. Maintenance and other administrative activities may also contribute noise to the acoustic environment, but are generally temporary, irregular, and do not last more than a few hours. Intermittent construction activities may add noise to the Park's acoustic environment, though generally those occur in already developed areas where noise is generally more acceptable and expected. Developed areas surrounding the Park near downtown San Francisco also contribute ambient noise the Park's acoustic environment.<br><br>The agencies have qualitatively considered the cumulative impacts of commercial air tours along with impacts from existing activities generally described above. Depending on the level of Park activities at various times of the year, the noise contribution from other sources such as road traffic and visitor use in developed areas may be substantial. There is no known future project that would significantly contribute noise impacts to the project area. Considering existing ambient noise sources and foreseeably future noise sources, the commercial air tour noise is a small contribution of overall noise. Furthermore, the ATMP establishes operating conditions to protect Park natural and cultural resources, and it is unlikely it would measurably change the overall acoustic environment. Commercial air tours over Park roadways are likely to be masked by existing noise and therefore the impacts would be de minimis. Finally, the ATMP does not add new noise to the existing acoustic environment. Therefore, when considering other sources of noise in the Park that are likely to continue under the ATMP, the continuation of 2,548 commercial air tours will not result in a meaningful change to the current condition of the Park's visual or auditory landscape.<br><br>As noted above under viewsheds, visual or viewshed impacts associated with aircraft are most noticeable because of noise. As described above, the ATMP will not result in significant impacts to the acoustic environment. Additionally, there should not be significant cumulative changes to the viewshed since the number of commercial air tours is not increasing but is consistent with the 3-year average.<br><br>Therefore, no significant cumulative environmental impacts are likely to result from the ATMP. |
| **Indirect Effects** | The ATMP applies to all commercial air tours over the Park, Golden Gate National Recreation Area, Muir Woods National Monument[4], and Point Reyes National Seashore, or within ½ mile outside these parks' boundaries that are flown below 5,000 ft. AGL. These flights takeoff and land from the San Francisco International Airport and the Commodore Center heliport in Sausalito, CA. The Commodore Center is approximately six miles from the nearest point of the Park's ½-mile boundary buffer and the San Francisco International Airport is approximately 12 miles from the nearest point of the Park's ½-mile ATMP boundary. Land uses between the airports and the Park's ½-mile ATMP |

---

[4] The ATMP does not authorize any air tours over Muir Woods National Monument or its ½-mile boundary, which maintains the current level of air tour activity.

9

boundary primarily include heavily developed commercial and residential areas within the greater San Francisco metropolitan area, although some undeveloped areas associated with other protected areas of open space are also present. Commercial air tours traveling to and from the Park could result in some temporary noise disturbances in these areas. Commercial air tours may fly over residential areas resulting in temporary noise disturbance to homeowners. Undeveloped lands will likely experience similar impacts to those described in other sections of this ESF, i.e., temporary disturbances to wildlife, etc. although flight altitudes may be different more than ½ mile of the outside the Park boundary resulting in potentially more adverse impacts than those occurring within the ATMP boundary. Because the number of flights authorized by the ATMP (no more than 2,548 tours per year) is consistent with existing operations, these effects are expected to be insignificant.

Since the ATMP authorizes the same number of commercial air tours per year as existing operations on the same routes, it is unlikely that the frequency and nature of these disturbances outside of the Park and its ½-mile ATMP boundary would result in a change from current condition. Therefore, the agencies consider indirect effects of the ATMP to be negligible. However, since the ATMP cannot regulate the flight path, altitude, duration, etc. of flights more than ½-mile outside the boundaries of the four parks covered by the ATMP (the operators must comply with relevant FAA regulations), the agencies are unable to require operators to continue to fly outside of area covered by the ATMP in the manner in which they currently fly under existing operations or to require operators to change any operational parameters (e.g., altitude or routes). However, the agencies are unaware of any reason the operator would deviate from their current flight paths outside the ATMP boundary since routes have not changed.

**Additional Technical Analysis**

**AIR QUALITY TECHNICAL ANALYSIS**

Potential air quality impacts from proposed commercial air tour operations were estimated using an emissions inventory approach. Annual flight miles by aircraft type were calculated for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (GOGA-SAFR-PORE) – 68,300 flight miles. The two aircraft that fly commercial air tours are the DHC-2 Beaver Floatplane (fixed-wing) and Bell 407 (helicopter). The potential impacts of commercial air tours were analyzed jointly across all three parks.

The FAA's Aviation Environmental Design Tool (AEDT) version 3d was used to develop emission factors (pounds of emissions per mile flown) for these aircraft, which were derived from the Environmental Protection Agency's (EPA) AP-42: Compilation of Emission Factors (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974). Although the AP-42 emission factors represent the best available data, they have not been updated since the 1990s and most aircraft engines in use today are likely to be cleaner due to less-polluting fuels and improvements in engine emissions controls. Therefore, these emission rates are considered a conservative estimate of emission rates for aircraft used in commercial air tours.

10

**JA286**

The maximum emissions (tons per year) were calculated for GOGA-SAFR-PORE[5] by multiplying the total number of operations (by aircraft type), the longest routes flown by each aircraft type over the parks and the ½ mile boundary outside of the parks, and the aircraft-specific emission factor. The sum of total emissions by aircraft type represent the maximum emissions conditions for the parks. To highlight the potential impacts to ambient air quality for all criteria pollutants, GOGA-SAFR-PORE emissions results were compared with the EPA's General Conformity *de minimis* thresholds for the most stringent[6] nonattainment areas. EPA's General Conformity *de minimis* thresholds represent a surrogate for impacts to ambient air quality.

The NPS must also consider impacts to resources that are sensitive to air pollution under the NPS Organic Act mandates and the Clean Air Act (CAA). Such resources include (but are not limited to) sensitive vegetation, streams and lakes, aquatic biota and visibility. These resources are typically referred to as Air Quality Related Values (AQRVs). Parks designated Class I areas under the CAA also receive an additional measure of protection under the CAA provisions. The CAA gives the NPS an "affirmative responsibility to protect the air quality related values (including visibility) of any such lands within a Class I area."

Additionally, a portion of GOGA-SAFR-PORE and the ½ mile boundary outside GOGA-SAFR-PORE is classified as Marginal Nonattainment for ozone (2015 standard), Moderate Nonattainment for $PM_{2.5}$ (2006 standard), and Moderate Maintenance for carbon monoxide (1971 standard) and is thus subject to the General Conformity regulations. However, since emissions estimates for all pollutants in the entirety of the Parks and also in the area within the ½-mile boundary outside the parks are well below the most stringent *de minimis* levels (Table 2), a General Conformity Determination is not required. Furthermore, the most stringent *de minimis* emission thresholds for federal conformity determinations are sufficiently low relative to emission thresholds the NPS will use to determine whether additional air quality analysis is necessary under a NEPA analysis. Given this, and the fact that the maximum projected emissions from overflights in GOGA-SAFR-PORE are well below these *de minimis* levels (< 1 TPY for particulate matter and sulfur dioxide, and <2 TPY for nitrogen oxides – criteria pollutants that have the most significant impact on AQRVs), it is expected that emissions from overflights in GOGA-SAFR-PORE under the ATMP will not meaningfully impact AQRVs, or local air quality, and will not have regional impacts from implementation of the ATMP in GOGA-SAFR-PORE.

**Table 2.** Comparison of the emissions inventory for proposed commercial air tours in GOGA-SAFR-PORE with *de minimis* thresholds for the most stringent nonattainment areas.

| Pollutant | *de minimis* threshold (Tons per Year) | Emissions Inventory for GOGA-SAFR-PORE (Tons per Year) |
|---|---|---|
| Carbon Monoxide | 100 | 0.221 |
| Volatile Organic Compounds | 10 | 0.008 |
| Nitrogen Oxides | 10 | 1.806 |
| Particulate Matter, diam. < 2.5 μm | 70 | 0.019 |
| Particulate Matter, diam. < 10 μm | 70 | 0.019 |
| Lead | 25 | 0.122 |
| Sulfur Oxides | 70 | 0.254 |
| Carbon Dioxide | n/a | 683.707 |

---

[2] Muir Woods National Monument was not included in this analysis because the ATMP does not authorize any commercial air tours over that Park or its ½ mile boundary.

[3] The most stringent non-attainment areas (i.e., lowest *de minimis* thresholds) are categorized as "extreme" for ozone (VOCs or NOx) and "serious" for particulate matter and sulfur dioxide.

11

## NOISE TECHNICAL ANALYSIS

### Indicators of acoustic conditions

There are numerous ways to measure the potential impacts of noise from commercial air tours on the acoustic environment of a park, including intensity, duration, and spatial footprint of the noise. The metrics and acoustical terminology used for the ATMP are shown in Table 3.

**Table 3.** Primary metrics used for the noise analysis.

| Metric | Relevance and citation |
|---|---|
| Time Above 35 dBA [7] | The amount of time (in minutes) that aircraft sound levels are above a given threshold (i.e., 35 dBA)<br><br>In quiet settings, outdoor sound levels exceeding 35 dB degrade experience in outdoor performance venues (American National Standards Institute (ANSI), 2007); blood pressure increases in sleeping humans (Haralabidis et al., 2008); maximum background noise level inside classrooms (American National Standards Institute/Acoustical Society of America S12.60/Part 1-2010). |
| Time Above 52 dBA | The amount of time (in minutes) that aircraft sound levels are above a given threshold (i.e., 52 dBA)<br><br>This metric represents the level at which one may reasonably expect interference with Park interpretive programs. At this background sound level (52 dB), normal voice communication at five meters (two people five meters apart), or a raised voice to an audience at ten meters would result in 95% sentence intelligibility (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974). |
| Equivalent sound level, $L_{Aeq,\ 12\ hr}$ | The logarithmic average of commercial air tour sound levels, in dBA, over a 12-hour day. The selected 12-hour period is 7 a.m. to 7 p.m. to represent typical daytime commercial air tour operating hours. |
| Day-night average sound level, $L_{dn}$ (or DNL) | The logarithmic average of sound levels, in dBA, over a 24-hour day, DNL takes into account the increased sensitivity to noise at night by including a 10 dB penalty between 10 p.m. and 7 a.m. local time.<br><br>For aviation noise analyses, the FAA (2015, Appendix. B, B-1) has determined that the cumulative noise energy exposure of individuals to noise resulting from aviation activities must be established in terms of DNL.<br><br>Note: Both $L_{Aeq,\ 12hr}$ and $L_{dn}$ characterize:<br><br>• Increases in both the loudness and duration of noise events<br>• The number of noise events during specific time period (12 hours for $L_{Aeq,\ 12hr}$ and 24-hours for $L_{dn}$)<br>If there are no nighttime events, then $L_{Aeq,\ 12hr}$ is arithmetically three dBA higher than $L_{dn}$. |

---

[7] dBA (A-weighted decibels): Sound is measured on a logarithmic scale relative to the reference sound pressure for atmospheric sources, 20 µPa. The logarithmic scale is a useful way to express the wide range of sound pressures perceived by the human ear. Sound levels are reported in units of decibels (dB) (ANSI S1.1-1994, American National Standard Acoustical Terminology). A-weighting is applied to sound levels in order to account for the sensitivity of the human ear (ANSI S1.42-2001, Design Response of Weighting Networks for Acoustical Measurements). To approximate human hearing sensitivity, A-weighting discounts sounds below 1 kHz and above 6 kHz.

12

AR_0000117

**JA288**

| | The FAA's (2015 Exhibit 4-1) indicators of significant impacts are for an action that would increase noise by DNL 1.5 dB or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dB noise exposure level, or that will be exposed at or above the DNL 65 dB level due to a DNL 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe. |
|---|---|
| Maximum sound level, $L_{max}$ | The loudest sound level, in dBA, generated by the loudest event; it is event-based and is independent of the number of operations. $L_{max}$ does not provide any context of frequency, duration, or timing of exposure. |

## ATMP as related to indicators

The potential impacts of commercial air tours were analyzed jointly across Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore. In order to provide a conservative evaluation of potential noise effects produced by commercial air tours under the ATMP, the CE analysis is based on a representation of a peak day[8] of commercial air tour activity. For the busiest year of commercial air tour activity from 2017-2019 based on the total number of commercial air tour operations and total flight miles over the Parks, the 90th percentile day was identified for representation of a peak day in terms of number of operations, and then further assessed for the type of aircraft and route flown to determine if it is a reasonable representation of the commercial air tour activity over the Parks. For the Parks, the 90th percentile day was identified as the following:

- Two flights on the S.F. Helicopter Tours V1 S-C route using a BHT-407-407 aircraft
- One flight on the S.F. Helicopter Tours VG1 S-C route using a BHT-407-407 aircraft
- One flight on the S.F. Helicopter Tours V2 C-C route using a BHT-407-407 aircraft
- Two flights on the S.F. Helicopter Tours VG2 C-C route using a BHT-407-407 aircraft
- One flight on the Seaplane Adventures BAT route using a DHC-2-MKI aircraft
- Six flights on the Seaplane Adventures GGT route using a DHC-2-MKI aircraft
- One flight on the Seaplane Adventures NCT route using a DHC-2-MKI aircraft

Noise contours for the following acoustic indicators were developed using the FFAA's AEDT version 3d and are presented below. A noise contour presents a graphical illustration or "footprint" of the area potentially affected by the noise.

- Time above 35 dBA (minutes) – see Figure 1
  - Note: The utility of this metric may be limited in urban environments such as San Francisco Maritime National Historical Park and surrounding areas where the ambient sound level is generally greater than 45-50 dBA. Therefore, it is not referenced in the resource analysis.
- Time above 52 dBA (minutes) – see Figure 2
  - Note: The utility of this metric may be limited in urban environments such as San Francisco Maritime National Historical Park and surrounding areas where the ambient sound level is generally greater than 45-50 dBA.
- Equivalent Sound Level or $L_{Aeq, 12hr}$ – see Figure 3
  - Equivalent sound level or $L_{Aeq, 12hr}$ Note: Contours are not presented for $L_{dn}$ (or DNL) as it is arithmetically three dBA lower than $L_{Aeq, 12hr}$ if there are no nighttime events, which is the case for the ATMP modeled at the Park.

---

[8] As required by FAA policy, the FAA typically represents yearly conditions as the Average Annual Day (AAD). However, because ATMP operations in the park occur at low operational levels per year and are highly seasonal in nature it was determined that a peak day representation of the operations would more adequately allow for disclosure of any potential impacts. A peak day has therefore been used as a conservative representation of assessment of AAD conditions.

13

- Maximum sound level or $L_{max}$ – see Figure 4

After completing noise modeling for the proposed action, a minor altitude adjustment was made for which the impacts are not represented in the *Noise Technical Analysis*. The helicopter route altitude was raised from 1,000 ft. to 1,500 ft. AGL near Alcatraz (commercial air tours directly over Alcatraz are not authorized) to reduce noise impacts on nesting seabirds. Compared to current conditions, this altitude adjustment may result in a brief increase in noise in two locations along the route due to the flight dynamics of helicopters when changing altitudes. The noise increases are expected to last for only a few minutes of the tour and would occur when the helicopter ascends to 1,500 ft. AGL and then descends back to 1,000 ft. AGL both of which occur before and after the flight passes near sensitive bird habitat at Alcatraz (refer to Figure 1 in the CE). The NPS has determined that the overall effect of this change would be beneficial for nesting seabirds and other Park resources, including visitor experience.

14



**Figure 1.** Noise contour results for Time Above 35 dBA

15



**Figure 2.** Noise contour results for Time Above 52 dBA

16



**Figure 3.** Noise contour results for $L_{Aeq,\,12hr}$

AR_0000122

**JA293**



**Figure 4.** Noise contour results for $L_{max}$

18

AR_0000123

**JA294**

# LIST OF REFERENCES

American National Standards Institute, Inc (2001). Design response of weighting networks for acoustical measurements. *Acoustical Society of America,* ANSI S1.42-2001, i-1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S1.42-2001+(R2011).pdf

American National Standards Institute, Inc. (2002). Acoustical performance criteria, design requirements, and guidelines for schools, Part 1: Permanent schools. *Acoustical Society of America,* ANSI/ASA S12.60-2002/Part 1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S12.60+Part+1-2010+(R2020).pdf

American National Standards Institute, Inc (2004). Acoustical terminology. *Acoustical Society of America,* ANSI S1.1-1994 (R2004). https://webstore.ansi.org/Standards/ASA/ANSIS11994R2004

American National Standards Institute, Inc. (ANSI) (2007). Quantities and procedures for description and measurement of environmental sound — Part 5: Sound level descriptors for determination of compatible land use. *Acoustical Society of America,* ASA S12.9-2007/PART 5 (R2020), 1-20. https://www.techstreet.com/standards/asa-s12-9-2007-part-5-r2020?product_id=1534045

Anderson, G., Rapoza, A., Fleming, G., & Miller, N. (2011). Aircraft noise dose-response relations for national parks. *Noise Control Engineering Journal,* 59, 519. https://doi.org/10.3397/1.3622636

Benfield, J., Taff, B. D., Weinzimmer, D., & Newman, P. (2018). Motorized recreation sounds influence nature scene evaluations: The role of attitude moderators. *Frontiers in Psychology,* 9:495. https://doi.org/10.3389/fpsyg.2018.00495

Department of Interior and the National Park Service (1995). Report on effects of aircraft overflights on the National Park System. *Report to Congress,* 1.1-10.23. https://www.nonoise.org/library/npreport/intro.htm

Federal Aviation Administration (2015). FAA Order 1050.1F, Environmental impacts: Policies and procedures. *U.S. Department of Transportation,* 1.1-11.4. https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf

Ferguson, L. A. (2018). Strategies for managing natural sounds for human experience and ecosystem services (Dissertation). *The Pennsylvania State University The Graduate School College of Health and Human Development,* 1-176. https://etda.libraries.psu.edu/files/final_submissions/17621

Haas, G. E. & Timothy J. W. (1998). National parks and the American public: a national public opinion survey on the National Park System: A summary report. *The Association,* 1-32.

Haralabidis A.S., Dimakopoulou, K., Vigna-Taglianti, F., Giampaolo, M., Borgini, A., Dudley, M., … & Jarup, L. (2008). Acute effects of night-time noise exposure on blood pressure in populations living near airports. European Heart Journal Advance Access. https://academic.oup.com/eurheartj/article/29/5/658/440015

Mace, B. L., Corser, G. C., Zitting, L., & Denison, J. (2013). Effects of overflights on the national park experience. *Journal of Environmental Psychology,* 35, 30–39. https://doi.org/10.1016/j.jenvp.2013.04.001

McDonald, C. D., Baumgarten, R. M., & Iachan, R. (1995). Aircraft management studies: National Park Service Visitors Survey. *National Park Service, U.S. Department of the Interior,* HMMH Report No. 290940.12; NPOA Report No. 94-2. https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB95196002.xhtml

Merchan, C. I., Diaz-Balteiro, L., & Soliño, M. (2014). Noise pollution in national parks: Soundscape and economic valuation. *Landscape and Urban Planning,* 123, 1–9. https://doi.org/10.1016/j.landurbplan.2013.11.006

19

Miller, Z., Taff, B.D., & Newman, P. (2018). Visitor experiences of wilderness soundscapes in Denali National Park and Preserve. *International Journal of Wilderness*, 24(2). https://ijw.org/2018-visitor-experiences-of-wilderness-soundscapes/

National Park Service (1992). National Register Bulletin 38. https://www.nps.gov/subjects/nationalregister/upload/NRB38-Completeweb.pdf

National Park Service (2002). NPS-28: Cultural Resource Management Guideline. *National Park Service*, Introduction, A-F. https://www.nps.gov/parkhistory/online_books/nps28/28appena.htm

National Park Service and Resource Systems Group. (2017). San Francisco Maritime National Historical Park visitor use study. White River Junction, VT.

Rapoza, A., Sudderth, E., & Lewis, K. (2015). The relationship between aircraft noise exposure and day-use visitor survey responses in backcountry areas of national parks. *The Journal of the Acoustical Society of America*, 138(4), 2090–2105. https://doi.org/10.1121/1.4929934

United States Census Bureau (2022). Explore census data. *United States Census Bureau*. https://data.census.gov/cedsci/

United States Environmental Protection Agency, Office of Noise Abatement and Control (1974). Information on levels of environmental noise requisite to protect public health and welfare with an adequate margin of safety. NPC Online Library, 550/9-74-004, 1-78. https://www.nrc.gov/docs/ML1224/ML12241A393.pdf

Weinzimmer, D., Newman, P., Taff, D., Benfield, J., Lynch, E., & Bell, P. (2014). Human responses to simulated motorized noise in national parks. *Leisure Sciences*, 36(3), 251–267. https://doi.org/10.1080/01490400.2014.888022

AR_0000125

**JA296**



**National Park Service**
**U.S. Department of the Interior**

**Muir Woods National Monument**
**Date: January 4, 2023**

# ENVIRONMENTAL SCREENING FORM (ESF)

## PROJECT INFORMATION

**Project Title:** Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore Air Tour Management Plan

**PEPC Project Number:** 103175

**Project Type:** Categorical Exclusion

**Project Location:** San Francisco County and Marin County, California

## PROJECT DESCRIPTION

The proposed action is to implement an Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore. The "Project Description" section of the Categorical Exclusion (CE) Form for the ATMP sets out the elements of the ATMP and is incorporated herein by reference.

Considering their proximity, National Park Service (NPS) management of the parks, and current commercial air tour operations, the agencies determined that a single ATMP covering all four parks (Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore) was appropriate for future management of commercial air tours. Though the ATMP covers four parks, this ESF analyzes the impacts to Muir Woods National Monument (Park) from the implementation of the ATMP. The ATMP does not authorize any commercial air tours over the Park.

## RESOURCE IMPACTS TO CONSIDER

*Definition of Effects or Impacts (40 C.F.R. § 1508.1(g))*
Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include direct effects, indirect effects, and cumulative effects. Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

For the purposes of considering environmental impacts, the NPS evaluated the change to the human environment resulting from implementation of the ATMP. Consistent with Council on Environmental Quality regulations, the baseline from which to measure environmental impacts of the ATMP is the current condition of the human environment. In this case, the baseline is the current condition of Park resources and values, as impacted by zero commercial air tours per year (existing three-year average of tours conducted on an annual basis from 2017-2019) along with other planned actions and trends. The baseline also includes the route and altitude information of commercial air tours provided by the operators, as well as the timing and daily commercial air tour information from commercial air tour reports provided by the operators from 2017-2019.

1

*Existing Conditions of Commercial Air Tours over the Park and Summary of the ATMP as applied to the Park*

Two commercial air tour operators, San Francisco Helicopters, LLC and San Francisco Seaplane Tours, Inc., currently hold Interim Operating Authority (IOA) for a total of 5,090 flights over the Park each year. Though one of the operators had reported air tours over the Park from 2013 to 2017, the agencies determined that reporting was in error and that the operator had not conducted any air tours over the Park. The agencies have since corrected that error. No air tours have been reported over the Park from 2018 to 2021. The three-year average of air tours conducted over the Park based on reporting data from 2017-2019 is zero commercial air tours each year.[1] The ATMP does not authorize any commercial air tours over the Park which maintains the current level of air tour activity, zero tours per year, based on operator reporting.

**Evaluation of the ATMP**

**Table 1.** Potential Issues and Impacts to Resources

| Resource | Potential Issues & Impacts |
|---|---|
| **Air** <br> Air Quality | The ATMP does not authorize any commercial air tours over the Park. Therefore, the ATMP will not impact local air quality and will not have regional impacts. |
| **Biological** <br> Species of Special Concern or Their Habitat | The ATMP does not authorize any commercial air tours over the Park. Therefore, the ATMP will result in no impact to the Park's threatened and endangered species or their habitat. |
| **Biological** <br> Wildlife and/or Wildlife Habitat including terrestrial and aquatic species | The ATMP does not authorize any commercial air tours over the Park. Therefore, the ATMP will result in no impact to the Park's wildlife or their habitat. |
| **Cultural** <br> Cultural Landscapes | The NPS defines a Cultural Landscape as: a geographic area, including both cultural and natural resources and the wildlife or domestic animals therein, associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values. There are four general kinds of cultural landscapes, not mutually exclusive: historic sites, historic designed landscapes, historic vernacular landscapes, and ethnographic landscapes (NPS, 2002). <br><br> An impact to a cultural landscape will occur if the project alters any of the characteristics that help make the cultural landscape eligible for listing in the National Register of Historic Places (NRHP). This includes any diminishment of the cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. The potential impacts to cultural landscapes from the ATMP are limited to the continuation of visual and audible elements that diminish the integrity of the landscape setting and/or feeling. |

---

[1] Air tours reported for Muir Woods National Monument in 2017 were due to reporting errors by one of the operators. The NPS and the FAA worked with the operator to correctly identify the parks when reporting air tours. The operator started correctly reporting air tour activity over the Bay Area parks starting in 2018. See: https://www.nps.gov/subjects/sound/upload/NRSS_NRR_2017_Air_Tour_Report_Final508.pdf and National Park Service, Reporting Information for Commercial Air Tour Operations over Units of the National Park System, 2018 Annual Report (nps.gov)

2

AR_0000127

**JA298**

|  | The ATMP does not authorize any commercial air tours over the Park.  Therefore, no impacts on cultural landscapes are anticipated.

The Federal Aviation Administration (FAA), in coordination with the NPS, consulted with the California State Historic Preservation Office, Native American tribes, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including cultural landscapes.  That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this finding to all consulting parties.  The FAA did not receive any objections to the finding. See CE Form for further information. |
| **Cultural**<br>Ethnographic Resources | The NPS defines Ethnographic Resources as: a site, structure, object, landscape, or natural resource feature assigned traditional legendary, religious, subsistence, or other significance in the cultural system of a group traditionally associated with it (NPS, 2002).  Ethnographic resources include Traditional Cultural Properties (TCPs) (NPS, 1992).

An impact to an Ethnographic Resource will occur if the project affects those elements of the resources that make it significant to the group traditionally associated with the resource, or if the project interferes with the use of the resource by the associated groups.

The Federated Indians of Graton Rancheria, California, attach religious or cultural significance to areas within and adjacent to the Park.  Because the ATMP does not authorize any commercial air tours over the Park, no impacts on ethnographic resources are anticipated.

The FAA, in coordination with the NPS, consulted with the tribe listed above on the potential impacts of the ATMP on Ethnographic Resources, through compliance with Section 106 of the National Historic Preservation Act.  That consultation led to a finding that the ATMP will have no adverse effect on historic properties, which includes Ethnographic Resources.  The FAA proposed this finding to all consulting parties.  The FAA did not receive any objections to the finding. |
| **Cultural**<br>Prehistoric/historic structures | Cultural resources within the Park include a number of archaeological sites and historic structures.  As noted above, impacts to these resources will occur if the ATMP alters the characteristics of an archaeological site or historic structure that make it eligible for NRHP listing.  Commercial air tours, by their nature, have the potential to impact resources for which only feeling and setting are the contributing elements.  Because the ATMP does not authorize any commercial air tours over the Park, no impacts on historic properties, including prehistoric/historic structures are anticipated.

The FAA, in coordination with the NPS, consulted with the California State Historic Preservation Office, Native American tribes, and other consulting parties on the potential impacts of the ATMP on Historic Properties, including Cultural; prehistoric/historic structures.  That consultation process led to a finding that the ATMP will have no adverse effect on historic properties. The FAA proposed this finding to all consulting parties.  The FAA did not receive any objections to the finding. |
| **Lightscapes**<br>Lightscapes | Because the ATMP does not authorize any commercial air tours over the Park, no impacts on the Park's lightscapes are anticipated. |

3

| Other Human Health and Safety | Commercial air tours are subject to the FAA regulations for protecting individuals and property on the ground, and preventing collisions between aircraft, land or water vehicles, and airborne objects. The operators must continue to meet the FAA safety regulations. |
|---|---|
| Socioeconomic Minority and low-income populations, size, migration patterns, etc. | U.S. Census data (United States Census Bureau, 2021) for census blocks surrounding the Park was reviewed to determine the presence of minority or low-income populations immediately outside and within ½-mile of the Park boundary. Based on this review, no minority or low-income populations were identified in Marin County. Therefore, the ATMP will not have a disproportionate impact on low-income or minority populations. |
| Socioeconomic Socioeconomic | Commercial air tours generate income for the operator as well as other ancillary visitor industry businesses. Visitors from outside the immediate area contribute to this income. Because the number of commercial air tours authorized under the ATMP is the same as the average number of flights from 2017-2019 (zero air tours), the NPS does not expect visitor spending on commercial air tours or economic activity in the local communities to change. |
| Soundscapes Acoustic Environment | Baseline acoustic conditions in the Park were measured in 2007 and 2008 (NPS, 2013). The existing ambient daytime sound level was reported to be 25-55 decibels, while the natural ambient daytime sound level was reported to be 25-50 decibels. The existing ambient condition includes all sound associated with a given environment, i.e., natural, human, and mechanical sounds, such as automobiles and aircraft. Aircraft sound measured at a sampling location may include general aviation, commercial jets, military, and air tours. The natural ambient is the sound conditions found in a study area, including all sounds of nature (i.e., wind, water, wildlife, etc.) and excluding all human and mechanical sounds. Both the existing and natural ambient conditions were considered in the resource impacts analysis.

Depending on a receiver's location on the ground in relation to an aircraft flying overheard, aircraft sound can range from faint and infrequent to loud and intrusive. Impacts of aircraft noise range from masking quieter sounds of nature such as bird vocalizations to noise loud enough to interrupt conversational speech between visitors. To capture how noise may affect quieter natural sounds or conversations, the resource impacts analysis below examines the time above 35 decibels (for quieter natural sounds and impacts to natural resources) and time above 52 decibels for conversational speech disturbance and impacts to visitor experience.

Overall, noise impacts associated with commercial air tours are not expected to measurably change, since the ATMP, authorizes the average number of flights per year from 2017-2019 for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore and does not authorize any commercial air tours over Muir Woods National Monument. Furthermore, the ATMP requires commercial air tours maintain the same or increased altitudes flown under existing operations over the adjoining Golden Gate National Recreation Area. Therefore, the ATMP will result in minimal or only beneficial changes to the soundscape or acoustic environment at the Park compared to current conditions.

For purposes of assessing noise impacts from commercial air tours on the acoustic environment of the Park under the National Environmental Policy Act (NEPA), the |

4

|  | FAA noise evaluation is based on Yearly Day Night Average Sound Level (DNL)[2]; the cumulative noise energy exposure from aircraft over 24 hours. The DNL analysis indicates that the ATMP would not result in any noise impacts that would be "significant" or "reportable" under FAA's policy for NEPA. Refer to the *Noise Technical Analysis* below. |
|---|---|
| **Viewsheds**<br>Viewsheds | Since the ATMP does not authorize any commercial air tours over the Park which is consistent with the average number of flights from 2017-2019 (zero air tours), the NPS does not anticipate any impacts on the Park's viewsheds. |
| **Visitor Use and Experience**<br>Recreation Resources | Because the ATMP does not authorize any commercial air tours over the Park, which is consistent with the average number of flights from 2017-2019 (zero air tours), the ATMP will not impact the Park's recreation resources. |
| **Visitor Use and Experience**<br>Visitor Use and Experience | Visitor points of interest include visitor centers and trails. Since the ATMP does not authorize any commercial air tours over the Park, which is consistent with the average number of flights from 2017-2019 (zero air tours), the ATMP will not impact the Park's visitor use or visitor experience. |
| **Wilderness**<br>Wilderness | There is no wilderness present within the Park. Therefore, the ATMP will not impact wilderness in the Park. |
| **Cumulative Effects** | Many activities may contribute noise to the Park's acoustic environment. Aviation activities such as commercial air tours above 5,000 ft. AGL, and overflights by high altitude jets or private aviation regardless of altitude are not subject to regulation under the National Parks Air Tour Management Act (NPATMA). All of these aviation activities currently contribute noise to the project area. Private and commercial passenger jet overflights associated with the nearby San Francisco International Airport are commonly flown over the Park. These flights may detract from the Park's viewshed as well.<br><br>The Park's developed areas and roadways also contribute to ambient noise. Maintenance and other administrative activities may also contribute noise to the acoustic environment, but are generally temporary, irregular, and do not last more than a few hours. Intermittent construction activities may add noise to the Park's acoustic environment, though generally those occur in already developed areas where noise is generally more acceptable and expected.<br><br>The agencies have qualitatively considered the cumulative impacts of commercial air tours along with impacts from existing activities generally described above. Since the ATMP does not authorize any commercial air tours over the Park, no cumulative environmental impacts to the Park are likely to result from the ATMP. |
| **Indirect Effects** | The ATMP applies to all commercial air tours over the Park, as well as over Golden Gate National Recreation Area, Point Reyes National Seashore, and San Francisco Maritime National Historical Park that are flown below 5,000 ft. AGL and within ½ mile outside the boundary of the four parks. Since the ATMP does not authorize any commercial air tours over the Park which is consistent with the existing conditions, and the same number of commercial air tours as the three-year average on |

---

[2] As required by FAA policy, the FAA typically represents yearly conditions as the Average Annual Day (AAD). However, because ATMP operations in the park occur at low annual operational levels and are highly seasonal in nature it was determined that a peak day representation of the operations would more adequately allow for disclosure of any potential impacts. A peak day has therefore been used as a conservative representation of assessment of AAD conditions.

5

AR_0000130

**JA301**

|  | substantially the same routes at each of the three nearby parks covered by the ATMP, it is unlikely that the frequency and nature of these disturbances which occur outside of these parks or within ½ mile of their boundaries would result in a change from current condition.  Therefore, the agencies consider indirect effects of the ATMP to be negligible.  However, since the ATMP cannot regulate the flight path, altitude, duration, etc. of flights outside the ATMP boundary, the agencies are unable to require operators to fly in the manner in which they may currently fly under existing conditions, or to require operators to change any operational parameters (e.g., altitude or routes).  However, the agencies are unaware of any reason operators would deviate from their current flight paths outside the ATMP boundary since routes have not changed. |
|---|---|

## NOISE TECHNICAL ANALYSIS

### Indicators of acoustic conditions

There are numerous ways to measure the potential impacts of noise from commercial air tours on the acoustic environment of a park, including intensity, duration, and spatial footprint of the noise.  The metrics and acoustical terminology used for the ATMP are shown in Table 2.

**Table 2.**  Primary metrics used for the noise analysis.

| Metric | Relevance and citation |
|---|---|
| Time Above 35 dBA [3] | The amount of time (in minutes) that aircraft sound levels are above a given threshold (i.e., 35 dBA) <br><br> In quiet settings, outdoor sound levels exceeding 35 dB degrade experience in outdoor performance venues (American National Standards Institute [ANSI], 2007 ); blood pressure increases in sleeping humans (Haralabidis et al., 2008); maximum background noise level inside classrooms (ANSI/ASA, 2002). |
| Time Above 52 dBA | The amount of time (in minutes) that aircraft sound levels are above a given threshold (i.e., 52 dBA) <br><br> This metric represents the level at which one may reasonably expect interference with Park interpretive programs.  At this background sound level (52 dB), normal voice communication at five meters (two people five meters apart), or a raised voice to an audience at ten meters would result in 95% sentence intelligibility (Environmental Protection Agency, 1974). |
| Equivalent sound level, $L_{Aeq,\,12\,hr}$ | The logarithmic average of commercial air tour sound levels, in dBA, over a 12-hour day.  The selected 12-hour period is 7 a.m. to 7 p.m. to represent typical daytime commercial air tour operating hours. |
| Day-night average sound level, $L_{dn}$ (or DNL) | The logarithmic average of sound levels, in dBA, over a 24-hour day, DNL takes into account the increased sensitivity to noise at night by including a ten dB penalty between 10 p.m. and 7 a.m. local time. <br><br> Note: Both $L_{Aeq,\,12\,hr}$ and $L_{dn}$ characterize: |

---

[3] dBA (A-weighted decibels): Sound is measured on a logarithmic scale relative to the reference sound pressure for atmospheric sources, 20 µPa.  The logarithmic scale is a useful way to express the wide range of sound pressures perceived by the human ear.  Sound levels are reported in units of decibels (dB) (ANSI, 1994).A-weighting is applied to sound levels in order to account for the sensitivity of the human ear (ANSI, 2001).  To approximate human hearing sensitivity, A-weighting discounts sounds below 1 kHz and above 6 kHz.

6

| | |
|---|---|
| | • Increases in both the loudness and duration of noise events<br>• The number of noise events during specific time period (12 hours for $L_{Aeq, 12hr}$ and 24-hours for $L_{dn}$)<br>If there are no nighttime events, then $L_{Aeq, 12hr}$ is arithmetically three dBA higher than $L_{dn}$.<br><br>The FAA's indicators of significant impacts are for an action that would increase noise by DNL 1.5 dB or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dB noise exposure level, or that will be exposed at or above the DNL 65 dB level due to a DNL 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe (Federal Aviation Administration, 2015). |
| Maximum sound level, $L_{max}$ | The loudest sound level, in dBA, generated by the loudest event; it is event-based and is independent of the number of operations. $L_{max}$ does not provide any context of frequency, duration, or timing of exposure. |

**ATMP as related to indicators**

The potential impacts of commercial air tours were analyzed jointly across Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (the Parks). In order to provide a conservative evaluation of potential noise effects produced by commercial air tours under the ATMP, the CE analysis is based on a representation of a peak day[4] of commercial air tour activity. For the busiest year of commercial air tour activity from 2017-2019 based on the total number of commercial air tour operations and total flight miles over the Parks, the 90th percentile day was identified for representation of a peak day in terms of number of operations, and then further assessed for the type of aircraft and route flown to determine if it is a reasonable representation of the commercial air tour activity over the Parks. For the Parks, the 90th percentile day was identified as the following (note that none of these commercial air tour routes are authorized over Muir Woods National Monument or its ½-mile buffer):

- Two flights on the S.F. Helicopter Tours V1 S-C route using a BHT-407-407 aircraft
- One flight on the S.F. Helicopter Tours VG1 S-C route using a BHT-407-407 aircraft
- One flight on the S.F. Helicopter Tours V2 C-C route using a BHT-407-407 aircraft
- Two flights on the S.F. Helicopter Tours VG2 C-C route using a BHT-407-407 aircraft
- One flight on the Seaplane Adventures BAT route using a DHC-2-MKI aircraft
- Six flights on the Seaplane Adventures GGT route using a DHC-2-MKI aircraft
- One flight on the Seaplane Adventures NCT route using a DHC-2-MKI aircraft

Noise contours for the following acoustic indicators were developed using the FAA's Aviation Environmental Design Tool (AEDT) version 3d and are presented below. A noise contour presents a graphical illustration or "footprint" of the area potentially affected by the noise.

- Time above 35 dBA (minutes) – see Figure 1
- Time above 52 dBA (minutes) – see Figure 2
- Equivalent sound level, $L_{Aeq, 12hr}$ – see Figure 3
  - Note: Contours are not presented for $L_{dn}$ (or DNL) as it is arithmetically three dBA lower than $L_{Aeq, 12hr}$ if there are no nighttime events, which is the case for the ATMP modeled at Muir Woods National Monument.

---

[4] As required by FAA policy, the FAA typically represents yearly conditions as the Average Annual Day (AAD). However, because ATMP operations in the park occur at low annual operational levels and are highly seasonal in nature it was determined that a peak day representation of the operations would more adequately allow for disclosure of any potential impacts. A peak day has therefore been used as a conservative representation of assessment of AAD conditions.

7

- Maximum sound level or $L_{max}$ – see Figure 4

After completing noise modeling for the proposed action, a minor altitude adjustment was made for which the impacts are not represented in the *Noise Technical Analysis*. The helicopter route altitude was raised from 1,000 ft. to 1,500 ft. AGL near Alcatraz (commercial air tours directly over Alcatraz are not authorized) to reduce noise impacts on nesting seabirds. Compared to current conditions, this altitude adjustment may result in a brief increase in noise in two locations along the route due to the flight dynamics of helicopters when changing altitudes. The noise increases are expected to last for only a few minutes of the tour and would occur when the helicopter ascends to 1,500 ft. AGL and then descends back to 1,000 ft. AGL both of which occur before and after the flight passes near sensitive bird habitat at Alcatraz (refer to Figure 1 in the CE). The NPS has determined that the overall effect of this change would be beneficial for nesting seabirds and other Park resources, including visitor experience.

8



**Figure 1.** Noise contour results for Time Above 35 dBA

9



**Figure 2.** Noise contour results for Time Above 52 dBA

AR_0000135



**Figure 3.** Noise contour results for $L_{Aeq,\,12hr}$

AR_0000136

JA307



**Figure 4.** Noise contour results for $L_{max}$

12

## LIST OF REFERENCES

American National Standards Institute, Inc (1994). S1.42-2001, Design Response of Weighting Networks for Acoustical Measurements.

American National Standards Institute, Inc (2001). Design response of weighting networks for acoustical measurements. Acoustical Society of America, ANSI S1.42-2001, i-1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S1.42-2001+(R2011).pdf

American National Standards Institute, Inc. (2002). Acoustical performance criteria, design requirements, and guidelines for schools, Part 1: Permanent schools. Acoustical Society of America, ANSI/ASA S12.60-2002/Part 1. https://webstore.ansi.org/preview-pages/ASA/preview_ANSI+ASA+S12.60+Part+1-2010+(R2020).pdf

American National Standards Institute, Inc. (2007). Quantities and procedures for description and measurement of environmental sound — Part 5: Sound level descriptors for determination of compatible land use. Acoustical Society of America, ASA S12.9-2007/PART 5 (R2020), 1-20. https://www.techstreet.com/standards/asa-s12-9-2007-part-5-r2020?product_id=1534045

Federal Aviation Administration (2015). FAA Order 1050.1F, Environmental impacts: Policies and procedures. U.S. Department of Transportation, 1.1-11.4. https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf

Haralabidis A.S., Dimakopoulou, K., Vigna-Taglianti, F., Giampaolo, M., Borgini, A., Dudley, M., … & Jarup, L. (2008). Acute effects of night-time noise exposure on blood pressure in populations living near airports. European Heart Journal Advance Access. https://academic.oup.com/eurheartj/article/29/5/658/440015

National Park Service (2002). NPS-28: Cultural Resource Management Guideline. National Park Service, Introduction, A-F. https://www.nps.gov/parkhistory/online_books/nps28/28appena.htm

National Park Service (2013). Muir Woods National Monument Baseline Ambient Sound Levels 2009 and 2010.

United States Census Bureau (2021). Explore census data. United States Census Bureau. https://data.census.gov/cedsci/

United States Environmental Protection Agency. Information on Levels of Noise Requisite to Protect the Public Health and Welfare with an Adequate Margin of Safety, March 1974.

13

# APPENDIX G

NPS Statement of Compliance for Golden Gate
National Recreation Area,
San Francisco Maritime National Historical
Park, and Point Reyes National Seashore

APPENDIX G

NATIONAL PARK SERVICE STATEMENT OF COMPLIANCE

**San Francisco Maritime National Historical Park Air Tour Management Plan**

**Compliance with NPS Management Policies Unacceptable Impact and Non-Impairment Standard**

As described in National Park Service (NPS or Service) 2006 Management Policies, § 1.4.4, the National Park Service Organic Act prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (September 2011) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The applicable NPS guidance does not require the preparation of a non-impairment determination where a categorical exclusion (CE) is applied because impacts associated with CEs are generally so minimal, they do not have the potential to impair park resources. Nonetheless, out of an abundance of caution, the NPS has completed a non-impairment analysis for the impacts to San Francisco Maritime National Historical Park (Park) as a result of commercial air tours authorized under the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument and Point Reyes National Seashore and determined that it will not result in impairment of Park resources, or in unacceptable impacts as described in § 1.4.7.1 of the 2006 NPS Management Policies. A separate Statement of Compliance has been completed for Point Reyes National Seashore and Golden Gate National Recreation Area. Impacts to Muir Woods National Monument from commercial air tours are addressed in Golden Gate National Recreation Area Statement of Compliance.

Sections 1.4.5 and 1.4.6 of Management Policies 2006 further explain impairment. Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Section 1.4.5 goes on to state:

> An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

Section 1.4.6 of Management Policies 2006 identifies the park resources and values that are subject to the no-impairment standard. These include:

1

**JA311**

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor experience, socioeconomics, public health and safety, environmental justice, land use, Park operations, wilderness, etc., as these do not constitute impacts to Park resources and values subject to the non impairment standard under the Organic Act. *See* Management Policies § 1.4.6.

*Non-Impairment Determination for the San Francisco Maritime National Historical Park ATMP*

The purposes of San Francisco Maritime National Historical Park, along with Park significance statements and a description of the Park's fundamental resources and values, are described in the *Foundation Document Overview for San Francisco Maritime National Historical Park* (Foundation Document), 2017.

> Through preservation and interpretation of historic ships, extensive museum collections, traditional maritime skills, and its San Francisco Bay setting, San Francisco Maritime National Historical Park brings America's maritime legacy to life and promotes the understanding and enjoyment of the nation's West Coast maritime heritage (Foundation Document, page 5).

The Park's significance statements highlight resources that are unlikely to be impacted by commercial air tours. The preservation of historic ships and the maritime history collection will not be impacted by commercial air tours nor will commercial air tours alter the rich legacy of the site and seaport (*See* Foundation Document, page 6). The Park's fundamental resources and values include recreational and scenic opportunities. These resources may be impacted by commercial air tours, although the impacts are within the context of and urban audience (*See* Foundation Document, page 7).

As a basis for evaluating the potential for impairment or unacceptable impacts on Park resources, the NPS relied on the environmental analysis in the Environmental Screening Form (ESF) (Appendix B to the Record of Decision (ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), and the Section 106 documentation for the National

2

Historic Preservation Act (Appendix F to the ROD). The ESF includes analysis of impacts to air quality; biological resources including wildlife, wildlife habitat, and special status species; cultural resources including cultural landscapes, ethnographic resources, prehistoric and historic structures; soundscapes; lightscapes; wilderness; visitor experience; and viewsheds. The ESF considers both the change from current conditions as well the impact from the commercial air tours authorized under the ATMP (*See* ESF, Appendix B to the ROD).

The ATMP would result in limited impacts to the Park's natural and cultural soundscapes. Acoustic conditions in the Park have not been measured but were measured nearby at Golden Gate National Recreation Area in 2007 and 2008. The existing acoustic conditions at the Park have been estimated using data from developed sites at Golden Gate National Recreation Area. Due to the urban setting of the Park, only the existing ambient conditions were considered in the resource impacts analysis. The modeled daytime existing ambient[1] sound level without air tours was 55–60 decibels, which is typical of an urban setting (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974) in which the Park is located. To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. Noise modeling for the ATMP discloses that noise exceeding 35 decibels, a level at which natural sounds would be masked, would be present up to 125 minutes on a peak day, defined as a 90th percentile day at some locations in the Park (*See* ESF, Appendix B to the ROD). Because the Park is in an urban setting and the existing ambient exceeds 35 decibels, it is likely this noise would be masked by other noise. Modeling demonstrates that noise exceeding 52 decibels, the level at which a visitor may reasonably expect interference with Park interpretive programs, for up to 10 minutes on a peak day. Noise is not expected to exceed 85 decibels at any time. Again, much of this noise may be masked by other noise in the Park. Regardless, noise exceeding 52 decibels for only 10 minutes a day leaves the Park's natural and cultural soundscape largely unimpacted by commercial air tours and available for the enjoyment by present and future generations with limited interruptions. The Park will continue to preserve the historic resources in the Park and offer the public opportunities to learn about those with the existing soundscape.

ATMP impacts to wildlife could occur from noise generated by commercial air tours, although the Park does not have abundant habitat for species other than aquatic species. Commercial air tours do not have a known impact these species. Some birds use the area, but habitat for these species is limited and most bird species that use the Park are accustomed to noise. Therefore, noise will have very limited impacts on birds that maybe in the area. To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. As described above commercial air tours would impact the Park at levels above 35 decibels up to 125 minutes on a peak day. The minimum altitude of 1,000 ft above ground level (AGL) limits noise exposure to wildlife in the Park. Also, the NPS concluded, after discussing the impacts with the

---

[1] Noise metrics referenced in this document are discussed in detail on pages 8–9 and 14–16 of the ESF.

3

U.S. Fish and Wildlife Service, that the commercial air tours authorized by the ATMP will have no effect on threatened and endangered species in the Park[2] (Section 7 documentation, Appendix E to the ROD). In conclusion, the ATMP will not impair the Park's wildlife or its habitat because the impacts from the commercial air tours do not individually rise above 35 decibels over most of the park for more than 125 minutes on a peak day. As documented through this analysis, and in the ESF, impacts to wildlife, either individually or cumulatively, would occur on an individual level and would not affect wildlife on the population level. These impacts do not impair the functioning of the Park's wildlife within. Consistent with the no adverse effect determination, wildlife, including threatened and endangered species, will persist in the Park without a loss of integrity and visitors will continue to enjoy wildlife and their habitats.

Impacts to the Park's cultural resources would be similar in frequency, amplitude, and duration to those described above for wildlife. The analysis in the ESF evaluated the impacts from commercial air tours on ethnographic resources, cultural landscapes, and historic resources. Many of the historic resources the Park protects are inside historic ships or museum properties and will not be impacted at all by noise from commercial air tours. Acting as lead agency for the purposes of compliance with Section 106 of the National Historic Preservation Act with respect to the ATMP, the FAA concluded, in coordination with the NPS, that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The State Historic Preservation Officer concurred with that determination that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The consultation materials documented that the ATMP would not diminish the Park's cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. Additionally, the determination documented that commercial air tours do not adversely affect those elements of ethnographic resources that make them significant to traditionally associated groups, nor does the ATMP interfere with the use of ethnographic resources by these groups. Finally, the analysis documented that the ATMP does not adversely affect the feeling and setting of historic structures that make those sites and structures eligible for listing on the National Register of Historic Properties (*See* Appendices B and F to the ROD). Since there are no adverse effects on these resources and impacts on these resources are limited, these resources would maintain their integrity and purpose and therefore remain unimpaired for the enjoyment of future generations under the ATMP.

As disclosed in the ESF, the ATMP may have very limited impacts on the Park's viewshed or scenic views. The Park's scenic views are a fundamental resource. As noted in the ESF, aircraft are not typically included in viewshed analyses because they are transitory. They are most noticeable because of the noise associated with them. Because of the Park location within and near urban environments, aircraft of all types are common and expected from most viewing areas. Commercial air tours therefore likely do not detract from viewsheds within the Park. As a result, visitors will continue to be able to enjoy the Park's beautiful views unimpaired.

---

[2] No effect means there will be no consequences to listed species or critical habitat that result from the proposed action.

4

The NPS completed an air quality analysis and determined that the 2,548 commercial air tours authorized under the ATMP contributes a minimal amount of emissions to the local air quality and would not have a regional impact (*See* ESF, Air Quality Technical Analysis, Appendix B to the ROD). Because the amount of emissions is so small the ATMP does not affect the integrity of the Park's air quality, leaving it unimpaired for future enjoyment.

As demonstrated here and in the analysis referenced above, the impacts to these resources, neither individually nor cumulatively, would preclude the NPS from achieving the purpose of the Park or desired conditions for resources; and would not unreasonably interfere with Park programs or activities, another appropriate use, the overall atmosphere of peace and tranquility or the natural soundscape, or NPS concessioner or contractor operations or services. As a result, there will not be impairment of or unacceptable impacts to the Park's natural and cultural resources or visitor experience. Impacts to other resources potentially affected were considered so small and insignificant that they did not warrant a written analysis here.

The ATMP sections on adaptive management and amending the plan will allow park managers to ensure that unanticipated or unacceptable impacts do not occur and the requirement for implementing flight tracking technologies included in the ATMP will better enable the NPS to monitor and enforce the restrictions in the ATMP.

**Compliance with NPS Management Policies Regarding Appropriate Uses**

A separate written appropriate use analysis is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether commercial air tours are an appropriate use over the Park, for this ATMP the NPS has decided to briefly address the issue of appropriate use below.

NPS 2006 Management Policies § 1.5 state:

An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park."

Section 8.1.2 of Management Policies further explain:

The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated.

In determining whether a use is appropriate, the NPS evaluates:

- consistency with applicable laws, executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;

5

- total costs to the Service;
- whether the public interest will be served.

Parks may allow uses that are appropriate even if some individuals do not favor that particular use. The National Park Air Tour Management Act (NPATMA) contemplates that commercial air tours may be an acceptable use over National Park System units so long as protections are in place to protect park resources from significant impacts of such tours, if any. Therefore, commercial air tours are authorized by law, though not mandated, and generally may be appropriate where they do not result in significant impacts or cause unacceptable impacts on park resources and values.

*San Francisco Maritime National Historical Park ATMP – consistency with NPS Management Policies for Appropriate Uses*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), the unacceptable impact and non-impairment analysis above, and the language in NPATMA as a basis for finding that the ATMP's authorization of 2,548 commercial air tours over San Francisco Maritime National Historical Park is an appropriate use.

- The ATMP for San Francisco Maritime National Historical Park is consistent with applicable laws, executive orders, regulations, and policies. NPATMA specifically provides that air tours may be allowed over National Park System units where they do not result in significant impacts. Commercial air tours are not prohibited in applicable laws, regulations, or policies.
- The ATMP's authorization of 2,548 commercial air tours over the Park is consistent with the Park's existing management plans. No existing management plans preclude commercial air tours, though the Park may set different management direction in the future. Mitigations, including limiting the number of commercial air tours per year, restricting commercial air tours to the designated route, and setting minimum altitudes, limit impacts to visitor experience and other resources.
- The effects of the 2,548 commercial air tours authorized in the ATMP on Park resources was evaluated in the materials referenced above and unacceptable impact and non-impairment discussion above. The Park is in an urban environment and much of the noise from commercial air tours will be masked by other noise. As noted in the ESF, a recent visitor survey noted that noise was not a problem at the Park. The commercial air tours are short in duration and occur at decibel levels that do not rise to the level of an unacceptable impact nor impair Park resources. The NPS does not interpret § 8.1.1 to require the NPS to contemplate mitigating Park uses to the point that the use no longer has any impact or no longer can occur. Rather, this section requires the NPS to consider whether there are mitigations that can reduce impacts to Park resources and whether the impacts of those uses, after applying mitigations, result in unacceptable impacts or impairment. In this case, the NPS evaluated the impacts of 2,548 commercial air tours and included specific mitigations in the ATMP to minimize impacts to Park resources.

6

The NPS acknowledges that prohibiting commercial air tours entirely would avoid all impacts to Park resources, but the elimination of commercial air tours is not required to avoid unacceptable impacts or impairment of Park resources. The NPS believes the mitigations in the ATMP are sufficient to protect Park resources and that additional mitigations are not required because the impacts associated with the ATMP are not significant and do not result in unacceptable impacts or impairment.

- The cost to the NPS from implementing the ATMP includes yearly compiling of operator reported commercial air tours and aircraft monitoring data which is done in coordination with the Federal Aviation Administration. These activities would occur anyway, because they are required under NPATMA, regardless of whether the Park has an ATMP because commercial air tours are currently authorized under interim operating authority (IOA). This is done by the NPS's Natural Sounds and Night Skies Division which also provides noise monitoring, modeling, and planning support to parks across the country.

- While some visitors may not like commercial air tours, others appreciate the opportunity to view the Park from a commercial air tour. Commercial air tours, as contemplated in NPATMA, serve the public in this way.

Additional commercial air tours and commercial air tours on other routes may not be appropriate. However, the NPS has determined that because the ATMP authorizes 2,548 commercial air tours, and because those commercial air tours are restricted to designated routes, are relatively short in duration, and are at an acceptable altitude, the ATMP is adequately protective of Park resources and the commercial air tours it authorizes are an appropriate use of the Park at this time.

**Compliance with NPS Management Policies for Soundscape Management**

A separate written compliance analysis for Soundscape Management is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether the ATMP complies with NPS soundscape policies and guidance, the NPS has opted to briefly discuss the issue with respect to this ATMP.

Management Policies § 4.9 states, "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks." Section 5.3.1.7 similarly addresses cultural and historic resource sounds.

Section 8.4 specifically addresses overflights, including commercial air tours, which notes

Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the National Park System occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences.

7

Director's Order #47 gives further guidance for the management of natural and cultural soundscapes, requiring the consideration of both the natural and existing ambient levels.

*San Francisco Maritime National Historical Park ATMP – consistency with NPS Management Policies for Soundscape Management.*

Consistent with Management Policies § 8.4, the NPS worked constructively and collaboratively with FAA to develop the ATMP. The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), and the unacceptable impact and non-impairment analysis above as a basis for finding that the ATMP complies with the policies and guidance for management of natural and cultural soundscapes.

Consistent with Management Policies § 4.9, the ATMP eliminates some noise, or moves the Park closer to natural ambient conditions, by limiting commercial air tours to 2,548 per year, which is a reduction from the current authorized number (5,090) under IOA (*See* ATMP, Appendix A to the ROD). In addition, the ATMP limits the operation of commercial air tours to between 9:00 AM until 30 minutes after sunset, establishes designated air tour routes, increases the minimum altitude that commercial air tours may fly over the Park to no lower than 1,000 ft. AGL and includes quiet technology incentives which could further reduce noise. The commercial air tours occur along designated routes, which protects most of these areas from the intermittent, and short duration noise effects of commercial air tours.

Management Policies § 5.3.1.7 prohibits excessive noise and § 1.4.7.1 prohibits actions that unreasonably interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park." Because of the location of the Park which includes substantial noise from other sources outside the Park, a natural soundscape is highly unlikely to ever occur. As noted above, commercial air tour noise should not exceed 52 decibels for more than 10 minutes. Some mitigations have been included to reduce noise compared to current condition. Commercial air tour noise is neither excessive nor does it unreasonably interfere with the peace and tranquility of the Park, or natural or historic or commemorative locations. In conclusion, the ATMP complies with § 8.4, § 4.9, and § 5.3.1.7 of the Management Policies because the NPS has successfully collaborated with the FAA and developed an ATMP that will not result in unacceptable impacts to natural or cultural soundscapes or impairment of Park resources.

8

**References**

National Park Service. (2000). Director's Order #47: Soundscape Preservation and Noise Management. Available at https://www.nps.gov/subjects/policy/upload/DO_47_12-1-2000.pdf

National Park Service. (2006). Management Policies, 2006. Available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service. (2011). Guidance for Non-Impairment Determinations and the NPS NEPA Process. Available at https://www.nps.gov/subjects/nepa/

National Park Service. (2017). Foundation Document for San Francisco Maritime Historical Park. Available at https://www.nps.gov/safr/getinvolved/upload/SAFR_FD_SP_11_17_508-2.pdff

United States Environmental Protection Agency, Office of Noise Abatement and Control (1974). Information on levels of environmental noise requisite to protect public health and welfare with an adequate margin of safety. NPC Online Library, 550/9-74-004, 1-78. Available at https://www.nrc.gov/docs/ML1224/ML12241A393.pdf

9

APPENDIX G

NATIONAL PARK SERVICE STATEMENT OF COMPLIANCE

**Point Reyes National Seashore Air Tour Management Plan**

**Compliance with NPS Management Policies Unacceptable Impact and Non-Impairment Standard**

As described in National Park Service (NPS or Service) 2006 Management Policies, § 1.4.4, the National Park Service Organic Act prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (September 2011) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The applicable NPS guidance does not require the preparation of a non-impairment determination where a categorical exclusion (CE) is applied because impacts associated with CEs are generally so minimal, they do not have the potential to impair park resources. Nonetheless, out of an abundance of caution, the NPS has completed a non-impairment analysis for the impacts to Point Reyes National Seashore (Park) as a result of commercial air tours authorized under the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore and determined that they will not result in impairment of Park resources, or in unacceptable impacts as described in § 1.4.7.1 of the 2006 NPS Management Policies. A separate Statement of Compliance has been completed for Golden Gate National Recreation Area and San Francisco Maritime National Historic Park. The ATMP does not authorize commercial air tours over Muir Woods National Monument and therefore the NPS has not prepared a separate Statement of Compliance for that park. Impacts to Muir Woods National Monument from commercial air tours are addressed in Golden Gate National Recreation Area Statement of Compliance.

Sections 1.4.5 and 1.4.6 of Management Policies 2006 further explain impairment. Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Section 1.4.5 goes on to state:

>An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is
>
>- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
>- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
>- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

1

**JA320**

Section 1.4.6 of Management Policies 2006 identifies the park resources and values that are subject to the no-impairment standard. These include:

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor experience, socioeconomics, public health and safety, environmental justice, land use, Park operations, wilderness, etc., as these do not constitute impacts to Park resources and values subject to the non impairment standard under the Organic Act. *See* Management Policies § 1.4.6.

*Non-Impairment Determination for the Point Reyes National Seashore ATMP*

The purposes of Point Reyes National Seashore, along with Park significance statements and a description of the Park's fundamental resources and values, are described in the *Foundation Document Point Reyes National Seashore* (Foundation Document), 2020.

> Park Purpose: Established for public benefit, recreation, and inspiration, Point Reyes National Seashore preserves a rugged and wild coastal peninsula and surrounding waters, connecting native ecosystems, enduring human history, and interpretive, scientific, and educational opportunities (Foundation Document, page 5).

The Park's significance statements highlight resources that may be impacted by commercial air tours including wilderness character, wildlife, and cultural resources. The scenic coastal landscapes of the Park may also be impacted by commercial air tours (*See* Foundation Document, page 6). Additionally, a number of the Park's fundamental resources and values could be impacted by commercial air tours including the Park's diverse wildlife habitats and opportunities for inspiration (*See* Foundation Document, page 8). The analysis in this statement includes 15,000 acres of the North District of Golden Gate National Recreation Area, including all NPS lands north of Bolinas-Fairfax Road. This area of Golden Gate National Recreation Area is managed by Point Reyes National Seashore.

2

As a basis for evaluating the potential for impairment or unacceptable impacts on Park resources, the NPS relied on the environmental analysis in the Environmental Screening Form (ESF) (Appendix B to the Record of Decision (ROD)), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), and the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD). The ESF includes analysis of impacts to air quality; biological resources including wildlife, wildlife habitat, and special status species; cultural resources including cultural landscapes, ethnographic resources, prehistoric and historic structures; soundscapes; lightscapes; wilderness; visitor experience; and viewsheds. The ESF considers both the change from current conditions as well the impact from the commercial air tours authorized under the ATMP (*See* ESF, Appendix B to the ROD).

The ATMP would result in limited impacts to the Park's natural and cultural soundscapes. Acoustic conditions in the Park were measured in 2009 and 2010 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$)[1] was reported to be 30–40 decibels, while the natural ambient ($L_{nat}$) was reported to be 25–35 decibels. These metrics confirm that the natural acoustic environment at these sites experience disturbances from anthropogenic noise. Buxton, et al. (2017) found that anthropogenic noise in protected areas is closely linked with transportation, development, and other uses. To determine the severity of the effect and potential for impairment from commercial air tours, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. Noise modeling for the ATMP discloses that noise from 143 annual commercial air tours would be present at any location in the Park no more than 10 minutes on a peak day, defined as a 90th percentile day (*See* ESF, Appendix B to the ROD). Most areas of the Park would experience noise above 35 decibels, a level at which natural sounds would be masked, less than 5 minutes on a peak day. The area around the Lighthouse Visitor Center, Point Reyes Lighthouse and Sea Lion Overlook would experience noise up to 35 decibels approximately 10 minutes on a peak day. The maximum noise level is not expected to exceed 52 decibels for more than 5 minutes at any location in the Park on a peak day, the level at which a visitor may reasonably expect interference with Park interpretive programs (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). Approximately half of the Park will never experience noise at or above 52 decibels and noise from air tours will be present less than half of the days of the year. Therefore, the natural and cultural soundscapes of the Park remain unimpaired and without unacceptable impacts under the ATMP since noise impacts are limited to approximately half of the Park and noise in that area only exceeds 52 decibels for 5 minutes on a peak day and commercial air tour noise will not be present every day. Because the noise is short in duration and infrequent with the loudest noise focused near or beneath the designated routes, the Park's natural and cultural soundscape will be largely unimpacted by commercial air tours and available for the enjoyment by present and future generations.

ATMP impacts to wildlife occur from noise generated by commercial air tours. The analysis in the ESF discloses that noise would likely be heard by wildlife near the route (*See* Appendix B to the ROD). Generally, noise from commercial air tours may impact wildlife in a number of ways:

---

[1] Noise metrics referenced in this document are discussed in detail on pages 8–9 and 14–16 of the ESF.

3

altered vocal behavior, breeding relocation, changes in vigilance and foraging behavior, predator avoidance, reproductive success, and impacts on individual fitness and the structure of ecological communities to name a few (Shannon et al., 2016; Kunc et al., 2016; Kunc and Schmidt, 2019). To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. The analysis demonstrates that the 143 commercial air tours would impact the Park at levels above 35 decibels for no more than 10 minutes on a peak day. Most Park wildlife would not experience noise above 35 decibels more than 5 minutes on a peak day. The minimum altitude required along the route includes altitude protections (required 2,500 ft AGL) and setbacks for areas with sensitive wildlife. Therefore, the AGL requirements limit noise exposure to wildlife in the Park, including the Park's threatened and endangered species. The NPS concluded, after discussing the impacts with the U.S. Fish and Wildlife Service, that the commercial air tours authorized by the ATMP will have no effect on threatened and endangered species in the Park[2] (Section 7 documentation, Appendix E to the ROD). In conclusion, the ATMP will not impair the Park's wildlife or its habitat because the impacts from the commercial air tours do not individually rise above 35 decibels for more than 10 minutes on a peak day. As documented through this analysis, and in the ESF, impacts to wildlife, either individually or cumulatively, would occur on an individual level and would not affect wildlife on the population level. These impacts do not impair the functioning of the Park's unique ecosystems and the wildlife within. Consistent with the no adverse effect determination, wildlife, including threatened and endangered species, will persist in the Park without a loss of integrity and visitors will continue to enjoy wildlife and their habitats.

Impacts to the Park's cultural resources would be similar in frequency, amplitude, and duration to those described above for wildlife. The analysis in the ESF evaluated the impacts from commercial air tours on cultural landscapes, ethnographic resources, and historic resources. Because of the number and times commercial air tours occur, and the location of the routes, noise impacts to these resources will be limited. Acting as lead agency for the purposes of compliance with Section 106 of the National Historic Preservation Act with respect to the ATMP, the FAA concluded, in coordination with the NPS, that there would be no adverse effects on historic properties from the 143 commercial air tours authorized under the ATMP. The State Historic Preservation Officer concurred with that determination that there would be no adverse effects on historic properties from the 143 commercial air tours authorized under the ATMP. The consultation materials documented that the ATMP would not diminish the Park's cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. Additionally, the determination documented that commercial air tours do not adversely affect those elements of ethnographic resources that make them significant to traditionally associated groups, nor does the ATMP interfere with the use of ethnographic resources by these groups. Finally, the analysis documented that the ATMP does not adversely affect the feeling and setting of historic structures that make those sites and structures eligible for listing on the National Register of Historic Properties (*See* Appendices B and F to the ROD). Since there are no adverse effects on these resources and impacts on these resources are limited, these resources would

---

[2] No effect means there will be no consequences to listed species or critical habitat that result from the proposed action.

4

maintain their integrity and purpose and therefore remain unimpaired for the enjoyment of future generations under the ATMP.

As disclosed in the ESF, the ATMP may have very limited impacts on the Park's viewshed or scenic views. The Park's scenic views are a fundamental resource. Commercial air tours will be visible from some observation points in the Park. As noted in the ESF, aircraft are not typically included in viewshed analyses because they are transitory. They are most noticeable because of the noise associated with them. As noted above, due to the short duration of the effects as well as the limited area air tours will be present, impacts to the Park's viewshed will be limited. As a result, visitors will continue to be able to enjoy the Park's beautiful views unimpaired.

The NPS completed an air quality analysis and determined that the 143 commercial air tours authorized under the ATMP contributes a minimal amount of emissions to the local air quality and would not have a regional impact (*See* ESF, Air Quality Technical Analysis, Appendix B to the ROD). Because the amount of emissions is so small the ATMP does not affect the integrity of the Park's air quality, leaving it unimpaired for future enjoyment.

As demonstrated here and in the analysis referenced above, the impacts to these resources, neither individually nor cumulatively, would preclude the NPS from achieving the purpose of the Park or desired conditions for resources; and would not unreasonably interfere with Park programs or activities, another appropriate use, the overall atmosphere of peace and tranquility or the natural soundscape, or NPS concessioner or contractor operations or services. As a result, there will not be impairment of or unacceptable impacts to the Park's natural and cultural resources or visitor experience. Impacts to other resources potentially affected were considered so small and insignificant that they did not warrant a written analysis here.

The ATMP sections on adaptive management and amending the plan will allow park managers to ensure that unanticipated or unacceptable impacts do not occur and the requirement for implementing flight tracking technologies included in the ATMP will better enable the NPS to monitor and enforce the restrictions in the ATMP.

**Compliance with NPS Management Policies Regarding Appropriate Uses**

A separate written appropriate use analysis is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether commercial air tours are an appropriate use over the Park, for this ATMP the NPS has decided to briefly address the issue of appropriate use below.

NPS 2006 Management Policies § 1.5 state:

> An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park."

5

AR_0000841

Section 8.1.2 of Management Policies further explain:

> The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated.

In determining whether a use is appropriate, the NPS evaluates:

- consistency with applicable laws, executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;
- total costs to the Service;
- whether the public interest will be served.

Parks may allow uses that are appropriate even if some individuals do not favor that particular use. The National Park Air Tour Management Act (NPATMA) contemplates that commercial air tours may be an acceptable use over National Park System units so long as protections are in place to protect park resources from significant impacts of such tours, if any. Therefore, commercial air tours are authorized by law, though not mandated, and generally may be appropriate where they do not result in significant impacts or cause unacceptable impacts on park resources and values.

*Point Reyes National Seashore ATMP – consistency with NPS Management Policies for Appropriate Uses*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), the unacceptable impact and non-impairment analysis above, and the language in NPATMA as a basis for finding that the ATMP's authorization of 143 commercial air tours over Point Reyes National Seashore is an appropriate use.

- The ATMP for Point Reyes National Seashore is consistent with applicable laws, executive orders, regulations, and policies. NPATMA specifically provides that commercial air tours may be allowed over National Park System units where they do not result in significant impacts. Commercial air tours are not prohibited in applicable laws, regulations, or policies.
- The ATMP's authorization of 143 commercial air tours over the Park is consistent with the Park's existing management plans. No existing management plans preclude commercial air tours, though the Park may set different management direction in the future. Mitigations, including limiting the number of commercial air tours per year, restricting commercial air tours to the designated route, and setting minimum altitudes, limit impacts to visitor experience and other resources.

6

- The effects of the 143 commercial air tours authorized in the ATMP on Park resources was evaluated in the materials referenced above and unacceptable impact and non-impairment discussion above. The Park will not experience noise above 35 decibels from commercial air tours for more than 10 minutes on a peak day. Most areas will not experience noise above 35 decibels for more than 5 minutes on a peak day. Commercial air tours will not occur on at least half of the days each year. The commercial air tours are short in duration and occur at decibels levels that do not rise to the level of an unacceptable impact nor impair Park resources. The NPS does not interpret § 8.1.1 to require the NPS to contemplate mitigating Park uses to the point that the use no longer has any impact or no longer can occur. Rather, this section requires the NPS to consider whether there are mitigations that can reduce impacts to Park resources and whether the impacts of those uses, after applying mitigations, result in unacceptable impacts or impairment. In this case, the NPS evaluated the impacts of 143 commercial air tours and included specific mitigations in the ATMP to minimize impacts to Park resources. These mitigations included setbacks for wildlife, restricted hours in which tours may occur, and altitude protections for wildlife and wilderness protection. The NPS acknowledges that prohibiting commercial air tours entirely would avoid all impacts to Park resources, but the elimination of commercial air tours is not required to avoid unacceptable impacts or impairment of Park resources. The NPS believes the mitigations in the ATMP are sufficient to protect Park resources and that additional mitigations are not required because the impacts associated with the ATMP are not significant and do not result in unacceptable impacts or impairment.
- The cost to the NPS from implementing the ATMP includes yearly compiling of operator reported commercial air tours and aircraft monitoring data which is done in coordination with the Federal Aviation Administration. These activities would occur anyway, because they are required under NPATMA, regardless of whether the Park has an ATMP because commercial air tours are currently authorized under interim operating authority (IOA). This is done by the NPS's Natural Sounds and Night Skies Division which also provides noise monitoring, modeling, and planning support to parks across the country.
- While some visitors may not like commercial air tours, others appreciate the opportunity to view the Park from a commercial air tour. Commercial air tours, as contemplated in NPATMA, serve the public in this way.

Additional commercial air tours and commercial air tours on other routes may not be appropriate. However, the NPS has determined that because the ATMP authorizes 143 commercial air tours, and because those commercial air tours are restricted to designated routes, are relatively short in duration, and are at an acceptable altitude, the ATMP is adequately protective of Park resources and the commercial air tours it authorizes are an appropriate use of the Park at this time.

**Compliance with NPS Management Policies for Soundscape Management**

A separate written compliance analysis for Soundscape Management is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider

7

AR_0000843
**JA326**

whether the ATMP complies with NPS soundscape policies and guidance, the NPS has opted to briefly discuss the issue with respect to this ATMP.

Management Policies § 4.9 states, "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks." Section 5.3.1.7 similarly addresses cultural and historic resource sounds.

Section 8.4 specifically addresses overflights, including commercial air tours, which notes

> Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

> Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the National Park System occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences.

Director's Order #47 gives further guidance for the management of natural and cultural soundscapes, requiring the consideration of both the natural and existing ambient levels.

*Point Reyes National Seashore ATMP – consistency with NPS Management Policies for Soundscape Management.*

Consistent with Management Policies § 8.4, the NPS worked constructively and collaboratively with FAA to develop the ATMP. The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), and the unacceptable impact and non-impairment analysis above as a basis for finding that the ATMP complies with the policies and guidance for management of natural and cultural soundscapes.

Consistent with Management Policies § 4.9, the ATMP eliminates some noise, or moves the Park closer to natural ambient conditions, by limiting commercial air tours to 143 per year, which is a reduction from the current authorized number (5,090) under IOA (*See* ATMP, Appendix A to the ROD). In addition, the ATMP limits the hours in which commercial air tours may occur (tours may only occur between 12:00 pm and 5:00 pm), restricts commercial air tours to designated routes, requires operators fly a minimum altitude between 1,500 ft. AGL to 2,500 ft. AGL depending on location, and includes quiet technology incentives which could further reduce noise. When developing the ATMP, the NPS considered the commercial air tour routes and evaluated the potential for noise to reach the most sensitive resources in the Park, including cultural and natural resources, and areas where commercial air tours could disrupt educational and interpretive opportunities. None of the visitor centers at the Park would experience noise above 52 decibels for more than 5 minutes a day leaving most educational and interpretative programs at these sites free from interruption from commercial air tours.

8

Management Policies § 5.3.1.7 prohibits excessive noise and § 1.4.7.1 prohibits actions that unreasonably interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park." Acoustic conditions in the Park were measured in 2009 and 2010 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$) was reported to be 30–40 decibels, while the natural ambient ($L_{nat}$) was reported to be 25–35 decibels. When determining the severity of the impacts, results from the noise modeling for the ATMP were considered against both the natural soundscape and existing soundscape. In this case, there is some evidence of anthropogenic noise, including aircraft noise. As discussed above under the non-impairment discussion, the noise from commercial air tours is limited, both spatially and temporally. Therefore, the noise from commercial air tours is neither excessive nor does it unreasonably interfere with the peace and tranquility of the Park, wilderness character, or natural or historic or commemorative locations. In conclusion, the ATMP complies with § 8.4, § 4.9, and § 5.3.1.7 of the Management Policies because the NPS has successfully collaborated with the FAA and developed an ATMP that will not result in unacceptable impacts to natural or cultural soundscapes or impairment of Park resources.

**Compliance with NPS Management Policies for Wilderness Preservation and Management**

A separate written compliance analysis for Wilderness Preservation and Management is not required under NPS Management Policies. In recognition of comments suggesting that the NPS consider whether the ATMP complies with NPS wilderness policies and guidance, the NPS has elected to briefly discuss the issue with respect to this ATMP.

Management Policies for wilderness preservation and management do not specifically address commercial air tours. However, § 7.3 of Director's Order #41 notes that commercial air tours are inconsistent with preservation of wilderness character and requires the NPS to consider ways to further prevent or minimize impacts of commercial air tours on wilderness character.

The ATMP does not allow commercial air tours to take off or land within wilderness. Therefore, § 4(c) of the Wilderness Act and § 6.4 of Director's Order #41 do not apply and a minimum requirements analysis is not required. While the NPS did not complete a minimum requirements analysis, the NPS did analyze and report on the impacts of commercial air tours on wilderness character and minimized those impacts.

*Point Reyes National Seashore ATMP – consistency with NPS Management Policies for Wilderness Preservation and Management.*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the unacceptable impact and non-impairment analysis above, and soundscape management analysis above as a basis for finding that the ATMP complies with the policies and guidance for Wilderness Preservation and Management.

Point Reyes National Seashore includes the 33,000–acre Phillip Burton Wilderness. The NPS considered the impact of 143 commercial air tours on wilderness character. The ESF

9

acknowledges noise from aircraft could impact wilderness character although the analysis demonstrates that the impact is limited. The ATMP requires aircraft to fly at least 2,500 ft AGL above Bolinas Ridge and Inverness Ridge and at 1,500 ft AGL over the Point Reyes headlands area in order to limit noise to wilderness. The wilderness at Tomales Point will not experience any noise from commercial air tours. Much of the remainder of the Phillip Burton Wilderness will not experience noise above 52 decibels and where the decibel levels reach that level, it will not exceed 5 minutes. Most of the Phillip Burton Wilderness will not experience noise above 35 decibels more than 5 minutes. Because of the limited number of tours, at least half of the year there will be no noise in wilderness from commercial air tours. In conclusion, as described in detail above and in the ESF, noise from commercial air tours over wilderness will be short and at an amplitude that impacts to wilderness character will be limited. Wilderness character will remain unimpaired under the ATMP since a Park visitor will have the opportunity to hear the sounds of nature and experience the primeval character of the Park's wilderness, and the natural and cultural soundscape will remain largely unmarred by air tour noise the vast majority of time.

Consistent with Director's Order #41, § 7.3, the ATMP includes mitigations which minimize impacts to wilderness character including limiting commercial air tours to 143 per year, requiring aircraft to fly above 1,500 ft. AGL over most of the Park, and between 2,000 ft AGL and 2,500 ft. AGL over certain wilderness portions, and requiring the commercial air tours to stay on designated routes (*See* ATMP, § 5.0, Appendix A to the ROD).

10

**References**

Buxton, R. T., McKenna, M. F., Mennitt, D., Fristrup, K., Crooks, K., Angeloni, L., & Wittemyer, G. (2017). Noise pollution is pervasive in US protected areas. Science, 356 (6337), 531-533.

Kunc, H. P., McLaughlin, K. E., & Schmidt, R. (2016). Aquatic noise pollution: Implications for individuals, populations, and ecosystems. Proceedings of the Royal Society B: Biological Sciences, 283(1836), 20160839. Available at https://doi.org/10.1098/rspb.2016.0839

Kunc, H. P., & Schmidt, R. (2019). The effects of anthropogenic noise on animals: A meta-analysis. Biology Letters, 15(11), 20190649. Available at https://doi.org/10.1098/rsbl.2019.0649

Lee C., & Macdonald, J. (2011). Point Reyes National Seashore baseline ambient sound levels 2009 and 2010. Report No. DOT-VNTSC-FAA-16-20.

National Park Service. (2000). Director's Order #47: Soundscape Preservation and Noise Management. Available at https://www.nps.gov/subjects/policy/upload/DO_47_12-1-2000.pdf

National Park Service. (2006). Management Policies, 2006. Available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service. (2011). Guidance for Non-Impairment Determinations and the NPS NEPA Process. Available at https://www.nps.gov/subjects/nepa/

National Park Service. (2013). Directors Order #41. Wilderness Stewardship. Available at https://www.nps.gov/policy/DOrders/DO_41.pdf

National Park Service. (2020). Foundation Document for Point Reyes National Seashore. Available at https://www.nps.gov/pore/getinvolved/planning_foundation_document.htm

Shannon, G., McKenna, M.F., Angeloni, L.M., Crooks, K.R., Fristrup, K.M., Brown, E., Warner, K.A., Nelson, M.D., White, C., Briggs, G., McFarland, S., & Wittemyer, G. (2015). A synthesis of two decades of research documenting the effects of noise on wildlife. *Biological Reviews*, 91(4) 982-1005. Available at https://doi.org/10.1111/brv.12207

The Wilderness Act, (1964), Public Law 88-577 (16 U.S.C. §§ 1131-1136) 88th Congress, Second Session (As amended).

11

## APPENDIX G

## NATIONAL PARK SERVICE STATEMENT OF COMPLIANCE

### For Golden Gate National Recreation Area

**Compliance with NPS Management Policies Unacceptable Impact and Non-Impairment Standard**

As described in National Park Service (NPS or Service) 2006 Management Policies, § 1.4.4, the National Park Service Organic Act prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (September 2011) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The applicable NPS guidance does not require the preparation of a non-impairment determination where a categorical exclusion (CE) is applied because impacts associated with CEs are generally so minimal, they do not have the potential to impair park resources. Nonetheless, out of an abundance of caution, the NPS has completed a non-impairment analysis for the impacts to Golden Gate National Recreation Area (Park) as a result of commercial air tours authorized under the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument and Point Reyes National Seashore and determined that it will not result in impairment of Park resources, or in unacceptable impacts as described in § 1.4.7.1 of the 2006 NPS Management Policies. A separate Statement of Compliance has been completed for Point Reyes National Seashore and San Francisco Maritime National Historic Park. The ATMP does not authorize commercial air tours over Muir Woods National Monument (Muir Woods) and therefore the NPS has not prepared a separate Statement of Compliance for that park. However, the effects of commercial air tour noise on Muir Woods as a result of air tours authorized within the ATMP planning area are documented here. As noted, those effects are similar to those for adjacent areas of Golden Gate National Recreation Area (described in detail below), and therefore similarly do not result in unacceptable impacts or impairment of Park resources.

Sections 1.4.5 and 1.4.6 of Management Policies 2006 further explain impairment. Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Section 1.4.5 goes on to state:

> An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

> - necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or

1

- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

Section 1.4.6 of Management Policies 2006 identifies the park resources and values that are subject to the no-impairment standard. These include:

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor experience, socioeconomics, public health and safety, environmental justice, land use, Park operations, wilderness, etc., as these do not constitute impacts to Park resources and values subject to the non impairment standard under the Organic Act. *See* Management Policies § 1.4.6.

*Non-Impairment Determination for the Golden Gate National Recreation Area ATMP*

The purposes of Golden Gate National Recreation Area, along with Park significance statements and a description of the Park's fundamental resources and values, are described in the *Foundation Document Overview for Golden Gate National Recreation Area* (Foundation Document), 2017.

> The purpose of Golden Gate National Recreation Area is to offer national park experiences to all, including a large and diverse urban population, while preserving and interpreting the outstanding natural, historic, scenic, and recreational values of the park lands (Foundation Document, page 8).

The Park's significance statements highlight resources that may be impacted by commercial air tours including Alcatraz Island, outstanding scenic views, and historic values. Many of the fundamental resources and values will not be impacted by commercial air tours. Commercial air tours will not impact Park access and the diversity of settings. Similarly, they do not impact geologic resources, water resources, tides, currents and ocean conditions, but commercial air

2

tours may impact coastal wildlife, threatened and endangered species, and cultural resources at the Park (*See* Foundation Document, page 6-7). The analysis in this statement excludes 15,000 acres of the North District of Golden Gate National Recreation Area, including all NPS lands north of Bolinas-Fairfax Road. This area of Golden Gate National Recreation Area is managed by Point Reyes National Seashore. Thus, analysis for that area is included in the Statement of Compliance for Point Reyes National Seashore .

As a basis for evaluating the potential for impairment or unacceptable impacts on Park resources, the NPS relied on the environmental analysis in the Environmental Screening Form (ESF) (Appendix B to the Record of Decision (ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), and the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD). The ESF includes analysis of impacts to air quality; biological resources including wildlife, wildlife habitat, and special status species; cultural resources including cultural landscapes, ethnographic resources, prehistoric and historic structures; soundscapes; lightscapes; wilderness; visitor experience; and viewsheds. The ESF considers both the change from current conditions as well the impact from the commercial air tours authorized under the ATMP (*See* ESF, Appendix B to the ROD).

The ATMP would result in limited impacts to the Park's natural and cultural soundscapes. Acoustic conditions in the Park were measured in 2007 and 2008 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$)[1] was reported to be 40–55 decibels, while the natural ambient ($L_{nat}$) was reported to be 30–55 db. These metrics confirm that the natural acoustic environment at these sites sometimes experience disturbances from anthropogenic noise. Many Park areas are adjacent to urban environments where urban noise is common. To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. Noise modeling for the ATMP discloses noise exceeding 35 decibels, a level that would mask natural sounds, would not exceed 125 minutes on a peak day, defined as a 90th percentile day. However, this would only occur in a small area of the park and, as with all air tour noise, it would be intermittent throughout the day (*See* ESF, Appendix B to the ROD).

The Tennessee, Gerbode, and Rodeo Valley areas would experience noise above 35 decibels for about an hour on a peak day but would only exceed 52 decibels, the level at which a visitor may reasonably expect interference with park interpretive programs, approximately 10 minutes on a peak day. Most of this area would experience noise above 52 decibels for 5 minutes on a peak day (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). These lands are predominately natural areas within the Park (National Park Service, 2014). The short duration of noise in these areas is consistent with the uses of these lands.

Some isolated areas in San Mateo County will experience noise above 35 decibels for less than 5 minutes on a peak day but most of the areas south of Fort Funston will not experience noise

---

[1] Noise metrics referenced in this document are discussed in detail on pages 8–9 and 14–16 of the ESF.

AR_0000850

above 35 decibels from commercial air tours over the Park. No areas south of Fort Funston will experience noise that exceed 52 decibels (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD).

The lands within San Francisco City and County will experience the most noise from commercial air tours. Some of these areas will experience noise above 35 decibels for just over two hours on a peak day (125 minutes). This includes areas near the Presidio, Fort Mason, Fort Point, and Lands End. Some areas will experience noise above 52 decibels for up to 25 minutes on a peak day (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). These Park areas are not natural areas and are in or adjacent to urban environments where noise is common. Human caused sound was audible 84% during daytime hours (7 am – 7 pm) at a nearby acoustic sampling location and sound levels were above 52 decibels 75 – 95% of daytime hours (Lee & MacDonald, 2011). Existing noise from sources other than commercial air tours, such as road traffic, is likely to mask some noise from air tours in these locations. The ESF Noise Technical Analysis indicates similar decibel levels for Alcatraz. The ATMP was revised to include a setback around Alcatraz to provide protections for seabirds. Therefore, the anticipated decibel levels at Alcatraz are expected to be less than depicted in Figures 1, 2 and 4 (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD).

In summary, most of the impacted areas will experience noise at or above 35 decibels less than 20 minutes on a peak day. The maximum noise level is not expected to exceed 52 decibels for more than 25 minutes at any location in the Park on a peak day (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). Park lands within San Francisco City and County will experience the most noise. Because noise is limited in the more natural areas and noise within the more urban environments is limited to 25 minutes above 52 decibels, and much of the Park will not experience noise from commercial air tours, the natural and cultural soundscapes of the Park remain unimpaired and without unacceptable impacts under the ATMP. The Park's natural and cultural soundscape will be largely unimpacted by commercial air tours and available for the enjoyment by present and future generations with limited interruptions.

ATMP impacts to wildlife occur from noise generated by commercial air tours. The analysis in the ESF discloses that noise would likely be heard by wildlife near the route (See Appendix B to the ROD). Generally, noise from commercial air tours may impact wildlife in a number of ways: altered vocal behavior, breeding relocation, changes in vigilance and foraging behavior, predator avoidance, reproductive success, and impacts on individual fitness and the structure of ecological communities to name a few (Shannon et al., 2016; Kunc et al., 2016; Kunc and Schmidt, 2019). To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. As described above commercial air tours would impact most of the Park at levels above 35 decibels for less than 20 minutes on a peak day. The minimum altitude of 1,000 ft above ground level (AGL) limits noise exposure to wildlife in the Park, including the Park's threatened and endangered species. The ATMP includes a 1,500 ft. AGL requirement near Alcatraz for the purpose of limiting noise impacts on seabirds that use the island for roosting. The ATMP also includes a 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine

4

falcon nests and marine mammal haul outs. The NPS concluded, after discussing the impacts with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, that the commercial air tours authorized by the ATMP will have no effect on threatened and endangered species in the Park[2] (Section 7 documentation, Appendix E to the ROD). In conclusion, the ATMP will not impair the Park's wildlife or its habitat because the impacts from the commercial air tours do not individually rise above 35 decibels over most of the Park for more than 20 minutes on a peak day and not exceed 125 minutes at any location. As documented through this analysis, and in the ESF, impacts to wildlife, either individually or cumulatively, would occur on an individual level and would not affect wildlife on the population level. These impacts do not impair the functioning of the Park's unique ecosystems and the wildlife within. Consistent with the no adverse effect determination, wildlife, including threatened and endangered species, will persist in the Park without a loss of integrity and visitors will continue to enjoy wildlife and their habitats.

Impacts to the Park's cultural resources would be similar in frequency, amplitude, and duration to those described above for wildlife. The analysis in the ESF evaluated the impacts from commercial air tours on cultural landscapes, ethnographic resources, and historic resources. Because of the number and times commercial air tours occur, and the location of the routes, noise impacts to these resources will be limited. Acting as lead agency for the purposes of compliance with Section 106 of the National Historic Preservation Act with respect to the ATMP, the FAA concluded, in coordination with the NPS, that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The State Historic Preservation Officer concurred with that determination that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The consultation materials documented that the ATMP would not diminish the Park's cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. Additionally, the determination documented that commercial air tours do not adversely affect those elements of ethnographic resources that make them significant to traditionally associated groups, nor does the ATMP interfere with the use of ethnographic resources by these groups. Finally, the analysis documented that the ATMP does not adversely affect the feeling and setting of historic structures that make those sites and structures eligible for listing on the National Register of Historic Properties (*See* Appendices B and F to the ROD). Since there are no adverse effects on these resources and impacts on these resources are limited, these resources would maintain their integrity and purpose and therefore remain unimpaired for the enjoyment of future generations under the ATMP.

As disclosed in the ESF, the ATMP may have very limited impacts on the Park's viewshed or scenic views. The Park's scenic views are a fundamental resource. As noted in the ESF, aircraft are not typically included in viewshed analyses because they are transitory. They are most noticeable because of the noise associated with them. Because of the Park location within and near urban environments, aircraft of all variations are likely commonly seen and expected from most viewing areas. Commercial air tours therefore likely do not detract from viewsheds within

---

[2] No effect means there will be no consequences to listed species or critical habitat that result from the proposed action.

AR_0000852

the Park. As a result, visitors will continue to be able to enjoy the Park's beautiful views unimpaired.

The NPS completed an air quality analysis and determined that the 2,548 commercial air tours authorized under the ATMP contributes a minimal amount of emissions to the local air quality and would not have a regional impact (*See* ESF, Air Quality Technical Analysis, Appendix B to the ROD). Because the amount of emissions is so small the ATMP does not affect the integrity of the Park's air quality, leaving it unimpaired for future enjoyment.

As demonstrated here and in the analysis referenced above, the impacts to these resources, neither individually nor cumulatively, would preclude the NPS from achieving the purpose of the Park or desired conditions for resources; and would not unreasonably interfere with Park programs or activities, another appropriate use, the overall atmosphere of peace and tranquility or the natural soundscape, or NPS concessioner or contractor operations or services. As a result, there will not be impairment of or unacceptable impacts to the Park's natural and cultural resources or visitor experience. Impacts to other resources potentially affected were considered so small and insignificant that they did not warrant a written analysis here.

The ATMP sections on adaptive management and amending the plan will allow park managers to ensure that unanticipated or unacceptable impacts do not occur and the requirement for implementing flight tracking technologies included in the ATMP will better enable the NPS to monitor and enforce the restrictions in the ATMP.

*Non-Impairment Determination for the Muir Woods National Monument*

As noted above, the ATMP does not authorize commercial air tours over Muir Woods. However, some noise from commercial air tours within the ATMP planning area will affect Muir Woods. The NPS normally does not prepare non-impairment determinations for actions outside a NPS unit boundary. However, here, out of an abundance of caution, we briefly discuss the ATMP's impact on Muir Woods since establishing the ATMP is an NPS action. The impact of commercial air tours on Muir Woods would be similar to the impacts of commercial air tours on Golden Gate National Recreation Area's adjacent natural areas. Lands within Muir Woods would experience noise above 35 decibels for up to 20 minutes on a peak day. Noise would exceed 52 decibels, the level at which a visitor may reasonably expect interference with park interpretive programs, no more than 5 minutes on a peak day. The analysis above for wildlife, cultural resources, air quality, viewsheds, etc. discusses the impacts of air tour noise and would apply similarly to Muir Woods where the noise is similar in frequency, intensity and duration. Noise from commercial air tours will not result in unacceptable impacts or impairment of any resources at Muir Woods because noise will be of relatively low intensity and infrequent throughout the day.

**Compliance with NPS Management Policies Regarding Appropriate Uses**

A separate written appropriate use analysis is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether commercial air

6

tours are an appropriate use over the Park, for this ATMP the NPS has decided to briefly address the issue of appropriate use below.

NPS 2006 Management Policies § 1.5 state:

> An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park."

Section 8.1.2 of Management Policies further explain:

> The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated.

In determining whether a use is appropriate, the NPS evaluates:

- consistency with applicable laws, executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;
- total costs to the Service;
- whether the public interest will be served.

Parks may allow uses that are appropriate even if some individuals do not favor that particular use. The National Park Air Tour Management Act (NPATMA) contemplates that commercial air tours may be an acceptable use over National Park System units so long as protections are in place to protect park resources from significant impacts of such tours, if any. Therefore, commercial air tours are authorized by law, though not mandated, and generally may be appropriate where they do not result in significant impacts or cause unacceptable impacts on park resources and values.

*Golden Gate National Recreation Area ATMP – consistency with NPS Management Policies for Appropriate Uses*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), the unacceptable impact and non-impairment analysis above, and the language in NPATMA as a basis for finding that the ATMP's authorization of 2,548 commercial air tours over Golden Gate National Recreation Area is an appropriate use.

- The ATMP for Golden Gate National Recreation Area is consistent with applicable laws, executive orders, regulations, and policies. NPATMA specifically provides that air tours may be allowed over National Park System units where they do not result in significant

7

impacts. Commercial air tours are not prohibited in applicable laws, regulations, or policies.

- The ATMP's authorization of 2,548 commercial air tours over the Park is consistent with the Park's existing management plans. No existing management plans preclude commercial air tours, though the Park may set different management direction in the future. Mitigations, including limiting the number of commercial air tours per year, restricting commercial air tours to the designated route, and setting minimum altitudes, limit impacts to visitor experience and other resources.
- The effects of the 2,548 commercial air tours authorized in the ATMP on Park resources was evaluated in the materials referenced above and unacceptable impact and non-impairment discussion above. Most areas of the Park will not experience noise at or above 35 decibels from air tours for more than 20 minutes a day. Areas with the most noise will not experience noise that interrupts speech more than 25 minutes a day. The areas most affected by noise are in or near urban environments where commercial air tour noise may be masked by other noise. The commercial air tours are short in duration and occur at decibel levels that do not rise to the level of an unacceptable impact nor impair Park resources. The NPS does not interpret § 8.1.1 to require the NPS to contemplate mitigating Park uses to the point that the use no longer has any impact or no longer can occur. Rather, this section requires the NPS to consider whether there are mitigations that can reduce impacts to Park resources and whether the impacts of those uses, after applying mitigations, result in unacceptable impacts or impairment. In this case, the NPS evaluated the impacts of 2,548 commercial air tours and included specific mitigations in the ATMP to minimize impacts to Park resources. The NPS acknowledges that prohibiting commercial air tours entirely would avoid all impacts to Park resources, but the elimination of commercial air tours is not required to avoid unacceptable impacts or impairment of Park resources. The NPS believes the mitigations in the ATMP are sufficient to protect Park resources and that additional mitigations are not required because the impacts associated with the ATMP are not significant and do not result in unacceptable impacts or impairment.
- The cost to the NPS from implementing the ATMP includes yearly compiling of operator reported commercial air tours and aircraft monitoring data which is done in coordination with the Federal Aviation Administration. These activities would occur anyway, because they are required under NPATMA, regardless of whether the Park has an ATMP because commercial air tours are currently authorized under interim operating authority (IOA). This is done by the NPS's Natural Sounds and Night Skies Division which also provides noise monitoring, modeling, and planning support to parks across the country.
- While some visitors may not like commercial air tours, others appreciate the opportunity to view the Park from a commercial air tour. Commercial air tours, as contemplated in NPATMA, serve the public in this way.

Additional commercial air tours and commercial air tours on other routes may not be appropriate. However, the NPS has determined that because the ATMP authorizes 2,548 commercial air tours over the Park, and because those commercial air tours are restricted to

8

designated routes, are relatively short in duration, and are at an acceptable altitude, and no air tours are authorized over, or within ½ mile of Muir Woods, the ATMP is adequately protective of Park resources, and the resources of the adjacent Muir Woods, and the commercial air tours authorized by the ATMP are an appropriate use of the Park at this time.

**Compliance with NPS Management Policies for Soundscape Management**

A separate written compliance analysis for Soundscape Management is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether the ATMP complies with NPS soundscape policies and guidance, the NPS has opted to briefly discuss the issue with respect to this ATMP.

Management Policies § 4.9 states, "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks." Section 5.3.1.7 similarly addresses cultural and historic resource sounds.

Section 8.4 specifically addresses overflights, including commercial air tours, which notes

> Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

> Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the National Park System occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences.

Director's Order #47 gives further guidance for the management of natural and cultural soundscapes, requiring the consideration of both the natural and existing ambient levels.

*Golden Gate National Recreation Area ATMP – consistency with NPS Management Policies for Soundscape Management.*

Consistent with Management Policies § 8.4, the NPS worked constructively and collaboratively with FAA to develop the ATMP. The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), and the unacceptable impact and non-impairment analysis above as a basis for finding that the ATMP complies with the policies and guidance for management of natural and cultural soundscapes.

Consistent with Management Policies § 4.9, the ATMP eliminates some noise, or moves the Park closer to natural ambient conditions, by limiting commercial air tours to 2,548 per year, which is a reduction from the current authorized number (5,090) under IOA (*See* ATMP, Appendix A to the ROD). In addition, the ATMP limits the operation of commercial air tours to between 9:00 AM until 30 minutes after sunset, establishes designated air tour routes, establishes the minimum altitude that commercial air tours may fly over the Park to no lower than 1,000 ft. AGL for the

9

entirety of all commercial air tour routes, and includes quiet technology incentives which could further reduce noise. When developing the ATMP, the NPS considered the commercial air tour routes and evaluated the potential for noise to reach the most sensitive resources in the Park, including cultural and natural resources, and areas where commercial air tours could disrupt educational opportunities. The commercial air tours occur along designated routes, which protects most of these areas from the intermittent, and short duration noise effects of commercial air tours.

Management Policies § 5.3.1.7 prohibits excessive noise and § 1.4.7.1 prohibits actions that unreasonably interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park." Acoustic conditions in the Park were measured in 2007 and 2008 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$) was reported to be 40–55 decibels, while the natural ambient ($L_{nat}$) was reported to be 30–55 decibels. These metrics confirm that the natural acoustic environment at these sites sometimes experience disturbances from anthropogenic noise. When determining the severity of the impacts, results from the noise modeling for the ATMP were considered against both the natural soundscape and existing soundscape. As discussed above under the non-impairment discussion, the noise from commercial air tours is limited, both spatially and temporally. Therefore, the noise from commercial air tours is neither excessive nor does it unreasonably interfere with the peace and tranquility of the Park, or natural or historic or commemorative locations. In conclusion, the ATMP complies with § 8.4, § 4.9, and § 5.3.1.7 of the Management Policies because the NPS has successfully collaborated with the FAA and developed an ATMP that will not result in unacceptable impacts to natural or cultural soundscapes or impairment of park resources at Golden Gate National Recreation Area or Muir Woods National Monument.

10

**References**

Kunc, H. P., McLaughlin, K. E., & Schmidt, R. (2016). Aquatic noise pollution: Implications for individuals, populations, and ecosystems. Proceedings of the Royal Society B: Biological Sciences, 283(1836), 20160839. Available at https://doi.org/10.1098/rspb.2016.0839

Kunc, H. P., & Schmidt, R. (2019). The effects of anthropogenic noise on animals: A meta-analysis. Biology Letters, 15(11), 20190649. Available at https://doi.org/10.1098/rsbl.2019.0649

Lee, C., & MacDonald, J. (2011). Golden Gate National Recreation Area: Acoustical Monitoring 2007/2008.

National Park Service. (2000). Director's Order #47: Soundscape Preservation and Noise Management. Available at https://www.nps.gov/subjects/policy/upload/DO_47_12-1-2000.pdf

National Park Service. (2006). Management Policies, 2006. Available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service. (2011). Guidance for Non-Impairment Determinations and the NPS NEPA Process. Available at https://www.nps.gov/subjects/nepa/

National Park Service. (2014). Golden Gate National Recreation Area General Management Plan. Available at https://parkplanning.nps.gov/projectHome.cfm?parkID=303&projectID=15075

National Park Service. (2015). Foundation Document for Golden Gate National Park. Available at https://www.nps.gov/goga/learn/management/upload/GOGA_OV_2017.pdf

Shannon, G., McKenna, M.F., Angeloni, L.M., Crooks, K.R., Fristrup, K.M., Brown, E., Warner, K.A., Nelson, M.D., White, C., Briggs, G., McFarland, S., & Wittemyer, G. (2015). A synthesis of two decades of research documenting the effects of noise on wildlife. *Biological Reviews*, 91(4) 982-1005. Available at https://doi.org/10.1111/brv.12207

AR_0000858

**JA341**



Filed: 10/16/2023    Document #2022013    USCA Case #23-1067

Page 94 of 232

*Date Filed* June 10, 2005.

*Parties* Members of the International Air Transport Association.

*Subject* PTC31 SOUTH 0177 dated 6 June 2005. TC31 South Pacific Resolutions except between French Polynesia, New Caledonia, New Zealand and USA r1–r35. PTC31 SOUTH 0178 dated 6 June 2005. TC31 South Pacific Resolutions between French Polynesia, New Caledonia, New Zealand and USA r36–r51. Minutes: PTC31 SOUTH 0179 dated 9 June 2005. Tables: PTC31 SOUTH Fares 0040 dated 6 June 2005. Intended effective date: 1 October 2005.

*Docket Number* OST–2005–21516.

*Date Filed* June 10, 2005.

*Parties* Members of the International Air Transport Association.

*Subject* MAIL VOTE NUMBER S 082. RP 1720a–013 Digit Numbering System for Traffic. Documents Form Code for Virtual Multiple Purpose Document (vMPD). Intended effective date: 1 July 2005.

**Renee V. Wright,**

*Acting Program Manager, Docket Operations, Alternate Federal Register Liaison.*

[FR Doc. 05–12430 Filed 6–22–05; 8:45 am]

**BILLING CODE 4910–62–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Office of the Secretary**

**Notice of Applications for Certificates of Public Convenience and Necessity and Foreign Air Carrier Permits Filed Under Subpart B (Formerly Subpart Q) During the Week Ending June 10, 2005**

The following Applications for Certificates of Public Convenience and Necessity and Foreign Air Carrier Permits were filed under Subpart B (formerly Subpart Q) of the Department of Transportation's Procedural Regulations (*See* 14 CFR 301.201 *et seq.*). The due date for Answers, Conforming Applications, or Motions to Modify Scope are set forth below for each application. Following the Answer period DOT may process the application by expedited procedures. Such procedures may consist of the adoption of a show-cause order, a tentative order, or in appropriate cases a final order without further proceedings.

*Docket Number:* OST–2005–21445.

*Date Filed:* June 6, 2005.

*Due Date for Answers, Conforming Applications, or Motion to Modify Scope:* June 27, 2005.

*Description:* Joint Application of Atlas Air Worldwide Holdings, Inc., Atlas Air, Inc. and Polar Air Cargo, Inc., requesting the Department commence registration of "Atlas Air" as an additional trade name of Polar Air Cargo, Inc. and re-issue all certificates and exemptions held by Polar in the form of "Polar Air Cargo, Inc. d/b/a Atlas Air and d/b/a Polar Air Cargo," effective as of the consummation of the operational merger of Atlas into Polar, expected to occur in January 2006.

*Docket Number:* OST–2005–21533.

*Date Filed:* June 10, 2005.

*Due Date for Answers, Conforming Applications, or Motion To Modify Scope:* July 1, 2005.

*Description:* Application of Friendship Airways, Inc. d/b/a Yellow Air Taxi, requesting issuance of commuter air carrier authority to enable Yellow Air Taxi to engage in interstate and foreign scheduled air transportation operations utilizing small aircraft.

**Renee V. Wright,**

*Acting Program Manager, Docket Operations, Alternate Federal Register Liaison.*

[FR Doc. 05–12429 Filed 6–22–05; 8:45 am]

**BILLING CODE 4910–62–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**Notice of Interim Operating Authority Granted to Commercial Air Tour Operators Over National Parks and Tribal Lands Within or Abutting National Parks**

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Notice.

**SUMMARY:** On October 25, 2002, the Federal Aviation Administration (FAA) published the final rule for Title 14, Code of Federal Regulations (14 CFR) part 136, National Parks Air Tour Management (67 FR 65662). The rule became effective on January 23, 2003. On January 27, 2005, the FAA published a notice of opportunity for commercial air tour operators granted interim operating authority (IOA) under the National Parks Air Tour Management Act of 2000 (the Act) to review and self-correct annual authorizations (70 FR 3972), based on the responses to that notice, the FAA made some corrections to interim operating authority. The Act also requires the interim operating authority granted under the Act to be published in the **Federal Register** for notice and the opportunity for comment. This notice fulfills that statutory requirement.

**FOR FURTHER INFORMATION CONTACT:** Gene Kirkendall, Flight Standards Service, Federal Aviation Administration, 800 Independence Ave., SW., Washington, DC 20591; telephone (202) 385–4510; e-mail *Gene.Kirkendall@FAA.GOV.*

**SUPPLEMENTARY INFORMATION:** On October 25, 2002, the FAA published a final rule in 14 CFR part 136, National Parks Air Tour Management (67 FR 65662), pursuant to the mandates specified in the Act, enacted on April 5, 2000. This final rule (part 136) completed the definition of "commercial air tour operation" by establishing the altitude (5,000 feet above ground level) below which an operator flying over a national park for the purpose of sightseeing would be classified as a commercial air tour operator. The rule also codified provisions of the Act. In accordance with 14 CFR 136.7(b), before commencing commercial air tour operations over a unit of the national park system or tribal lands within or abutting a national park, a commercial air tour operator is required to apply to the Administrator for authority to conduct the operations over the park or tribal lands. Title 14 CFR 136.11(a) states that: "Upon application for operating authority, the Administrator shall grant interim operating authority under this section to a commercial air tour operator for commercial air tour operations over a national park or tribal land for which the operator is an existing commercial air tour operator." Consistent with the Act, 14 CFR 136.11(b)(3) also states that IOA granted under that section would be published in the **Federal Register** to provide notice and opportunity for comment.

Prior to issuing this notice, the FAA became aware that there may have been some errors in the number of commercial air tours initially reported and received. There are several reasons why these errors could have occurred, such as (1) Operators were not required to keep records of the number of commercial air tours conducted over national parks prior to the adoption of the Act; (2) there was a 2½ year time lapse between the passage of the Act and the effective date of the part 136 rule; and (3) there appeared to have been confusion over how to initially report information, especially for operators flying over more than one park. The FAA understood that operators should have requested and received IOA that reflects the actual number of commercial air tours that were conducted during the relevant time period set forth in the statute and the rule and that every effort should be made to standardize the counting of flights requiring IOA.

Consequently, the FAA provided an opportunity for air tour operators to

AR_0003359

Filed: 10/16/2023     Document #2022013     Page 95 of 232

USCA Case #23-1067

review and correct, if necessary, their annual authorizations. Specifically, on January 27, 2005, the FAA published "Notice of Opportunity To Self-Correct Annual Authorizations for Commercial Air Tour Operators Over National Parks and Tribal Lands Within or Abutting National Parks" (70 FR 3972). This notice informed all operators of the self-correcting process and the rules to follow in counting air tours over parks. Individual notices were also sent by first class mail to all operators who initially reported their number of annual commercial air tour operations. The deadline for completing this review and self-correction was February 21, 2005.

In response to this self-correction process, the FAA received 19 responses from commercial air tour operators. Six operators reported no change in their original reported numbers; three included national parks and/or tribal lands that were unintentionally not listed; three decreased their total annual numbers due to re-examination of their flight paths that were originally thought to penetrate a national park or tribal lands; and seven reported errors made by them or in the data entry process. Based on these responses, the FAA has issued corrected IOA.

The FAA has not confirmed the numbers reported by operators. Operators were notified that if comments are received in response to this current notice that provide substantive information that an operator does not qualify under the law as an existing operator or has erroneously reported the number of flights flown over a park or tribal lands within or abutting the park unit, the FAA may investigate and take corrective action, if necessary, to bring the operator into compliance with the law. IOA may be further amended, if necessary.

In this notice, the FAA is publishing the names of the existing operators who have applied for and received IOA, the national parks and/or tribal lands over which they fly, and the number of operations authorized for each park and/or tribal land. This information is provided so that the public has notice and an opportunity to comment, as required by the Act and 14 CFR part 136. The FAA and the National Park Service (NPS) also will consider this information in the development of Air Tour Management Plans (ATMP) for the parks, which will replace IOA.

The Act and 14 CFR part 136 limit the impacts of commercial air tour operations conducted under IOA by existing operators in several ways. IOA provides annual authorization only for the greater of: (1) The number of flights used by the operator to provide the commercial air tour operations within the 12-month period prior to the date of the Act's enactment; or (2) the average number of flights per 12-month period used by the operator to provide such operations within the 36-month period prior to the Act's enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period, 49 U.S.C. 40128(c)(2)(A); 14 CFR 136.11(b)(1). Any increase in the authorized number of operations under IOA must be agreed to by the FAA and the NPS, 49 U.S.C. 40128(c)(2)(B); 14 CFR 136.11(b)(2). The Act and part 136 also provide that IOA: (1) May be revoked by the Administrator of the FAA for cause; (2) shall terminate 180 days after the date on which an ATMP is established for the park or tribal lands; (3) shall promote protection of national park resources, visitor experiences, and tribal lands; (4) shall promote safe commercial air tour operations; (5) shall promote the adoption of quiet technology, as appropriate; and (6) shall allow for modifications of the IOA based on experience if the modification improves protection of national park resources and values and of tribal lands, 49 U.S.C. 40128(c)(2)(D)–(I); 14 CFR 136.11(b)(4)–(9).

The Act provides for IOA to allow commercial air tours to continue operating over national parks and tribal lands within or abutting a unit of the national park system pending the establishment of ATMPs. The Act requires that the FAA grant IOA to existing commercial air tour operators "[u]pon application for operating authority," 49 U.S.C. 40128(c)(1), thus allowing these operators to continue to operate without a break in service.[1] The FAA interprets the provisions in the Act requiring that IOA promote protection of national park resources, visitor experiences, and tribal lands; safe commercial air tour operations; and the adoption of quiet technology, as appropriate, to be continuing requirements of IOA rather than being

---

[1] The requirement in the Act that the FAA grant IOA "upon application for operating authority" also makes impossible compliance with the National Environmental Policy Act. See, e.g., City of New York v. Mineta, 262 F.3d 169, 178 (2nd Cir. 2001) (concluding that the provisions under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century for the U.S. Department of Transportation to decide within 60 days whether to award slot exemptions at New York's LaGuardia and John F. Kennedy International Airports triggered the exception to NEPA compliance "when a statute imposes short, mandatory deadlines on an agency, thereby rendering compliance with NEPA's [environmental impact statement] requirement impossible.")

tied to the initial granting of IOA. See 49 U.S.C. 40128(c)(2)(F)–(H).

In consultation with the NPS, and Native American tribes as appropriate, the FAA will monitor impacts of authorized commercial air tour operations on park resources, visitor experiences, and tribal lands within or abutting a unit of the national park system. Consistent with the statutory term "promote," as used in 49 U.S.C. 40128(c)(2)(F)–(H), the FAA will support appropriate voluntary measures to address specific concerns raised by the NPS, or in the case of tribal lands, Native American tribes, regarding impacts from commercial air tour operations conducted under IOA. As noted above, the Act also allows for modification of IOA based on experience if the modification improves protection of national park resources and values and of tribal lands, 49 U.S.C. 40128(c)(2)(I).

Regarding the promotion of safe commercial air tour operations, the FAA will continue to address safety issues in parks covered by IOA in a manner consistent with existing regulations.

Section 805 of the Act directs the National Parks Overflights Advisory Group (NPOAG) to provide advice, information, and recommendations to the FAA and the NPS on "commonly accepted quiet aircraft technology for use in commercial air tour operations over a national park or tribal lands, which will receive preferential treatment in a given [ATMP]" (Pub. L. 106–181, title VIII, section 805(c)(2)). Section 804 of the Act requires the FAA to designate reasonably achievable requirements necessary for aircraft to be considered as employing quiet aircraft technology for purposes relating to commercial air tour operations at the Grand Canyon. Pursuant to section 804 of the Act, the FAA issued a final rule designating quiet aircraft technology for commercial air tour aircraft in Grand Canyon National Park on March 29, 2005 (70 FR 16084). Although the Grand Canyon rule does not address the NPOAG's responsibility under section 805 of the Act, the NPOAG may consider the Grand Canyon rule in making recommendations on "commonly accepted quiet aircraft technology" for use in other national parks' ATMPs. Using the advice and recommendations of the NPOAG, the FAA and the NPS will give further consideration to the appropriate promotion of the adoption of quiet technology in IOA.

The FAA solicits comments on all aspects of this notice. Comments about the status of the IOA of a commercial air tour operator or operators, including

Filed: 10/16/2023   Document #2022013   USCA Case #23-1067   Page 96 of 232

qualifications to have status as an existing air tour operator over a unit of the national park system or tribal land or the number of flights over a national park or tribal land, should be as specific as possible and include substantive, credible information to support assertions. If comments are received that provide substantive, credible information that an operator does not qualify under the law as an existing operator or has erroneously reported the number of flights flown over a park or related tribal lands, the FAA will investigate and take corrective action, to bring the operator into compliance with the law. IOA may be further amended, if necessary. Comments should be directed to the person listed under **FOR FURTHER INFORMATION CONTACT**.

Dated: Issued in Washington, DC on June 15, 2005.

**John M. Allen,**

*Acting Director, Flight Standard Services.*

| Name | DBA | National Park/Abutting Tribal Lands | IOA auth / yr |
|---|---|---|---|
| Above It All, Inc. ..................... | Benchmark Flight Center, Hawaii Airventures, Hawaii Island Hoppers, Sporty's Academy Hawaii. | Hawaii Volcanoes National Park, HI ......................................... | 3878 |
| Adams, Bruce M ..................... | Southwest Safaris ................... | Arches National Park, UT ......................................................... | 57 |
| | | Aztec Ruins National Monument, NM .................................... | 83 |
| | | Bandelier National Monument, NM ......................................... | 126 |
| | | Big Bend National Park, TX ...................................................... | 5 |
| | | Black Canyon of The Gunnison National Park, CO ............... | 7 |
| | | Bryce Canyon National Park, UT ............................................. | 23 |
| | | Canyon De Chelly National Monument, AZ ............................. | 147 |
| | | Canyonlands National Park, UT ............................................... | 57 |
| | | Capitol Reef National Park, UT ............................................... | 57 |
| | | Capulin Volcano National Monument, NM ............................... | 13 |
| | | Carlsbad Caverns National Park, NM ...................................... | 18 |
| | | Casa Grande Ruins National Monument, AZ ........................... | 6 |
| | | Cedar Breaks National Monument, UT .................................... | 15 |
| | | Chaco Culture National Historic Park, NM ............................. | 147 |
| | | Colorado National Monument, CO ........................................... | 57 |
| | | Coronado National Memorial, AZ ............................................ | 5 |
| | | Dinosaur National Monument, CO, UT .................................... | 9 |
| | | El Malpais National Monument, NM ........................................ | 43 |
| | | El Morro National Monument, NM ........................................... | 43 |
| | | Fort Bowie National Historic Site, AZ .................................... | 5 |
| | | Fort Davis National Historic Site, TX .................................... | 5 |
| | | Fort Union National Monument, NM ........................................ | 32 |
| | | Gila Cliff Dwellings National Monument, NM ......................... | 26 |
| | | Glen Canyon National Recreation Area, AZ, UT ..................... | 123 |
| | | Great Sand Dunes National Park & Preserve, CO ................. | 16 |
| | | Guadalupe Mountains National Park, TX ................................ | 18 |
| | | Hohokam Pima National Monument, AZ .................................. | 5 |
| | | Hovenweep National Monument, UT ........................................ | 63 |
| | | Hubbell Trading Post National Historic Site, AZ .................... | 27 |
| | | Lake Mead and Parashant National Recreation Area and National Monument, AZ, NV. | 38 |
| | | Mesa Verde National Park, CO ................................................ | 63 |
| | | Montezuma Castle National Monument, AZ ............................. | 19 |
| | | Natural Bridges National Monument, UT ................................ | 29 |
| | | Navajo National Monument, AZ ............................................... | 57 |
| | | Organ Pipe Cactus National Monument, AZ ........................... | 5 |
| | | Pecos National Historic Park, NM ........................................... | 32 |
| | | Petrified Forest National Park, AZ ......................................... | 42 |
| | | Petroglyph National Monument, NM ........................................ | 45 |
| | | Pipe Spring National Monument, AZ ....................................... | 23 |
| | | Rainbow Bridge National Monument, UT ................................ | 52 |
| | | Rio Grande Wild and Scenic River, TX .................................. | 5 |
| | | Saguaro National Park, AZ ...................................................... | 5 |
| | | Salinas Pueblo Missions National Monument, NM ................. | 17 |
| | | Sunset Crater Volcano National Monument, AZ ..................... | 37 |
| | | Tumacacori National Historic Park, AZ .................................. | 5 |
| | | Tuzigoot National Monument, AZ ............................................ | 19 |
| | | Walnut Canyon National Monument, AZ .................................. | 37 |
| | | Wupatki National Monument, AZ ............................................. | 42 |
| | | Yucca House National Monument, CO ..................................... | 63 |
| | | Zion National Park, UT ............................................................ | 15 |
| Aero-Copters of Arizona, Inc ... | Bryce Canyon Airlines, Bryce Canyon Helicopters, Helivision, Canyon Airlines. | Arches National Park, UT ......................................................... | 10 |
| | | Bryce Canyon National Park, UT ............................................. | 1481 |
| | | Canyonlands National Park, UT ............................................... | 10 |
| | | Glen Canyon National Recreation Area, AZ, UT ..................... | 39 |
| | | Navajo Tribal Lands .................................................................. | 38 |
| | | Zion National Park, UT ............................................................ | 26 |
| Air Grand Canyon Inc ............. | | Arches National Park, UT ......................................................... | 8 |

AR_0003361

| Name | DBA | National Park/Abutting Tribal Lands | IOA auth / yr |
|---|---|---|---|
| | | Bryce Canyon National Park, UT ........................................ | 15 |
| | | Canyon De Chelly National Monument, AZ ....................... | 9 |
| | | Canyonlands National Park, UT ........................................ | 10 |
| | | Capitol Reef National Park, UT ........................................ | 2 |
| | | Cedar Breaks National Monument, UT ............................. | 9 |
| | | Glen Canyon National Recreation Area, AZ, UT ............... | 65 |
| | | Hovenweep National Monument, UT ................................. | 2 |
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 24 |
| | | Montezuma Castle National Monument, AZ ....................... | 5 |
| | | Natural Bridges National Monument, UT ........................... | 6 |
| | | Navajo National Monument, AZ ........................................ | 11 |
| | | Petrified Forest National Park, AZ ................................... | 4 |
| | | Pipe Spring National Monument, AZ ................................. | 3 |
| | | Rainbow Bridge National Monument, UT ........................... | 40 |
| | | Saguaro National Park, AZ .............................................. | 13 |
| | | Sunset Crater Volcano National Monument, AZ ................ | 26 |
| | | Tuzigoot National Monument, AZ ..................................... | 38 |
| | | Walnut Canyon National Monument, AZ ........................... | 11 |
| | | Wupatki National Monument, AZ ...................................... | 4 |
| | | Zion National Park, UT .................................................... | 25 |
| Alika Aviation, Inc .................. | Alexair ..................................... | Haleakala National Park, HI ............................................ | 2923 |
| American Aviation, Inc. ........... | American Air Charter, Frog Air | Arches National Park, UT ................................................ | 137 |
| | | Bryce Canyon National Park, UT ..................................... | 138 |
| | | Canyon De Chelly National Monument, AZ ....................... | 14 |
| | | Canyonlands National Park, UT ....................................... | 137 |
| | | Capitol Reef National Park, UT ........................................ | 136 |
| | | Cedar Breaks National Monument, UT ............................. | 27 |
| | | Glen Canyon National Recreation Arez, AZ, UT ............... | 462 |
| | | Golden Spike National Historic Site, UT ........................... | 11 |
| | | Grand Teton National Park, WY ....................................... | 8 |
| | | Havasupai Tribal Lands .................................................. | 14 |
| | | Hopi Tribal Lands ........................................................... | 14 |
| | | Hovenweep National Monument, UT ................................. | 27 |
| | | Hualapai Tribal Lands ..................................................... | 14 |
| | | Lake Meade and Parashant National Recreation Area and National Monument, AZ, NV. | 3 |
| | | Natural Bridges National Monument, UT ........................... | 28 |
| | | Navajo National Monument, AZ ........................................ | 14 |
| | | Navajo Tribal Lands ........................................................ | 16 |
| | | Petrified Forest National Park, AZ ................................... | 14 |
| | | Rainbow Bridge National Monument, UT ........................... | 138 |
| | | Sunset Crater Volcano National Museum, AZ ................... | 14 |
| | | Timpanogos Cave National Monument, UT ....................... | 254 |
| | | Wupatki National Monument, AZ ...................................... | 14 |
| | | Yellowstone National Park, ID, MT, WY ........................... | 8 |
| | | Zion National Park, UT .................................................... | 29 |
| Aris, Inc. ............................... | Air Maui Helicopter Tours ...... | Haleakala National Park, HI ............................................ | 3996 |
| Arrow West Aviation ............... | Redtail Aviation ...................... | Arches National Park, UT ................................................ | 57 |
| | | Canyonlands National Park, UT ....................................... | 404 |
| | | Capitol Reef National Park, UT ........................................ | 63 |
| | | Glen Canyon National Recreation Area, AZ, UT ............... | 63 |
| | | Natural Bridges National Monument, UT ........................... | 67 |
| Aviation Ventures, Inc ............ | Vision air, Vision Aviation Management LLC. | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 6756 |
| Badger Helicopters Inc ........... | | Badlands National Park and Pine Ridge Indian Reservation, SD. | 4099 |
| Bar Harbor Aviation ............... | | Acadia National Park, ME ............................................... | 2000 |
| Big Island Air, Inc. ................. | Hawaii Volcanos National Park, HI. | | 1643 |
| Black Hills Aerial Adventures, Inc. | | Mount Rushmore National Memorial, SD .......................... | 363 |
| Burrus FlightSeeing Service .... | | Cape Hatteras National Seashore, NC ............................ | 1500 |
| Call Air, Inc. .......................... | Eco air Tours—Hawaii ........... | Haleakala National Park, HI ............................................ | 104 |
| | | Hawaii Volcanos National Park, HI .................................. | 102 |
| | | Kalaupapa National Historical Park, HI ............................ | 198 |
| | | Kaloko-Honokohau National Historical Park, HI ............... | 37 |
| | | Pu'uhonua OHonaunau National Historical Park, HI ......... | 37 |
| | | Pu'uhoma O Honaunau National Historical Park, HI ......... | 88 |
| | | U S S Arizona Memorial, HI ............................................ | 198 |
| Carisch Helicopters Inc .......... | | Yellowstone National Park, ID< MT. WY .......................... | 20 |
| Classic Helicopter Corporation | | Mount Ranier National park, WA ...................................... | 32 |
| Columbia Air Services–BHB, LLC. | | Acadia National Park, ME ............................................... | 2585 |

AR_0003362
Filed: 10/16/2023    Page 97 of 232
USCA Case #23-1067    Document #2022013

JA345

Page 98 of 232

Filed: 10/16/2023

Document #2022013

USCA Case #23-1067

| Name | DBA | National Park/Abutting Tribal Lands | IOA auth / yr |
|---|---|---|---|
| Courtney Aviation, Inc ............ | Courtney Aviation ................ | Death Valley National Park, CA ........................................ | 4 |
| | | Sequoia & Kings Canyon National Parks, CA ...................... | 10 |
| | | Yosemite National Park, CA ............................................ | 100 |
| Dairy Air Inc ....................... | Outer Banks Airways ........... | Cape Hatteras National Seashore, NC ............................... | 6500 |
| English, Daniel B ................... | Mt. Lassen Aviation ............. | Lassen Volcanic National Park, CA .................................. | 89 |
| Grand Canyon Airlines, Inc ..... | Grand Canyon Airlines ......... | Arches National Park, UT .............................................. | 4 |
| | | Canyon De Chelly National Monument, AZ ......................... | 5 |
| | | Canyonlands National Park, UT ....................................... | 20 |
| | | Capitol Reef National Park, UT ....................................... | 6 |
| | | Glen Canyon National Recreation Area, AZ, UT ................... | 5429 |
| | | Lake Mead and Parashant National Recreation Area and National Monument, Az, NV. | 257 |
| | | Montezuma Castle National Monument, AZ ......................... | 156 |
| | | Navajo National Monument, AZ ....................................... | 185 |
| | | Rainbow Bridge National Monument, UT ............................ | 4472 |
| | | Sunset Crater Volcano National Monument, AZ ................... | 17 |
| | | Zion National Park, UT ................................................. | 3 |
| Great Smoky Mountain Helicopter, Inc. | Cherokee Helicopters, Delta Helicopters, M Helicopters of TN, Smokey Mountain Helicopters. | Great Smoky Mountain National Park, TN, NC/Cherokee Tribal Lands. | 120 |
| Gretzke, Robert C ................. | Wings ................................ | Big Cypress National Preseve, FL .................................... | 1260 |
| | | Big Cypress Seminole Tribal Lands, FL .............................. | 200 |
| | | Biscayne National Park, FL ............................................ | 200 |
| | | Dry Tortugas National Park, FL ....................................... | 100 |
| | | Everglades National Park, FL .......................................... | 674 |
| Hawaii Helicopters, Inc ........... | | Haleakala National Park, HI ........................................... | 5682 |
| Hawaii Volcanoes ................. | | National Park, HI ......................................................... | 141 |
| Heli USA Airways, Inc ............ | Heli USA ............................ | Bryce Canyon National Park, UT ..................................... | 6 |
| | | Death Valley National Park, CA ....................................... | 6 |
| | | Lake Mead and Parashant National Recreational Area and National Monument,AZ, NV. | 7463 |
| | | Zio National Park, UT ................................................... | |
| Helicopter Consultants of Maui, Inc. | Blue Hawaiian Helicopters ..... | Haleakala National Park, HI ........................................... | 8348 |
| | | Hawaii Volcano National Park, HI .................................... | 12413 |
| Helicopter Flight Services, Inc. | | Statute of Liberty Monument, NY .................................... | 3500 |
| Homestead Helicopters, Inc .... | | Glacier National Park, MT and Blackfeet Tribal Land ............ | 15 |
| | | Yellowstone National Park, ID,MT< WY and adjacent tribal land. | |
| Island Air, Inc. ..................... | | Mount Ranier National Park, WA ..................................... | 2 |
| | | North Cascades National Park,WA ................................... | 10 |
| | | San Juan National Historical Park, WA ............................. | 20 |
| Jamestown Flight Center ........ | | Colonial National Historical Park .................................... | 147 |
| K & S Helicopters, inc ............ | Tropical Helicopters ............ | Hawaii Volcanoes National Park, HI ................................. | 1684 |
| King Airlines Inc ................... | | Bryce Canyon National Park, UT ..................................... | 12 |
| | | Cedar Breaks National Monument, UT .............................. | 12 |
| | | Death Valley National Park, CA ....................................... | 12 |
| | | Glen Canyon National Recreation Area, AZ, UT ................... | 12 |
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 4380 |
| | | Rainbow Bridge National Monument, UT ............................ | 12 |
| | | Zion National Park, UT ................................................. | 12 |
| Kruger, James W. | Kruger Helicopter Service ...... | Blackfeet Tribal Lands ................................................... | 750 |
| | | Glacier National Park, MT ............................................. | 750 |
| Lake Chelan Air Service Inc ... | Chelan Airways ................... | Lake Chelan National Recreation Area, WA ........................ | 350 |
| | | North Cascades National Park, WA .................................. | 50 |
| Las Vegas Helicopters Inc ...... | | Bryce Canyon National Park, UT ..................................... | 12 |
| | | Death Valley National Park, CA ....................................... | 12 |
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 1376 |
| | | Zion National Park, UT ................................................. | 12 |
| Laughlin Aviation LLC ............ | | Lake Mead and Parashant National Recreation Area and National Monument, AZ, NV (Lake Mohave). | 3015 |
| Liberty Helicopters, Inc .......... | | Statue of Liberty National Monument, NY .......................... | 29432 |
| | | Governors Island National Monument, NY .......................... | 29432 |
| Makarion Air ........................ | Makarion Air ....................... | Arches National Park, UT .............................................. | 10 |
| | | Aztec Ruins National Monument, NM ............................... | 5 |
| | | Black Canyon of The Gunnison National Park, CO ............... | 1 |
| | | Bryce Canyon National Park, Bryce Canyon, UT ................. | 40 |
| | | Canyon de Chelly National Monument, AZ ......................... | 8 |
| | | Canyoulands National Park, UT ....................................... | 40 |
| | | Capitol Reef National Park, UT ....................................... | 25 |
| | | Carlsbad Caverns National Park, NM ................................ | 1 |

AR_0003363

JA346

Page 99 of 232

Filed: 10/16/2023

Document #2022013

USCA Case #23-1067

| Name | DBA | National Park/Abutting Tribal Lands | IOA auth / yr |
|------|-----|-------------------------------------|---------------|
| | | Casa Grande Ruins National Monument, AZ | 25 |
| | | Channel Islands National Park, CA | 5 |
| | | Chiricahua National Monument, AZ | 1 |
| | | Coronado National Memorial, AZ | 5 |
| | | Death Valley National Park, CA | 40 |
| | | Dinosaur National Monument, CO, UT | 2 |
| | | Glen Canyon National Recreation Area, AZ, UT | 40 |
| | | Golden Gate National Recreation Area, CA | 40 |
| | | Great Basin National Park, NV | 25 |
| | | Great Sand Dunes National Park & Preserve, CO | 3 |
| | | John Muir National Historic Site, CA | 40 |
| | | Joshua Tree National Park, CA | 25 |
| | | Sequoia & Kings Canyon National Parks, CA | 5 |
| | | Lassen Volcanic National Park, CA | 5 |
| | | Lava Beds National Monument, CA | 1 |
| | | Mesa Verde National Park, CO | 10 |
| | | Mojave National Preserve, CA | 3 |
| | | Montezuma Castle National Monument, AZ | 10 |
| | | Monument Valley Navajo Tribal Park, UT, AZ | 50 |
| | | Natural Bridges National Monument, UT | 5 |
| | | Navajo National Monument, AZ | 50 |
| | | Petrified Forest National Park, AZ | 10 |
| | | Rainbow Bridge National Monument, UT | 50 |
| | | Sagauro National Park, AZ | 10 |
| | | Salinas Pueblo Missions National Monument, NM | 1 |
| | | San Francisco Maritime National Park, CA | 40 |
| | | Santa Monica Mountains National Recreation Area, CA | 5 |
| | | Sequoia & Kings Canyon Nqtional Parks, CA | 5 |
| | | Sunset Crater Volcano National Monument, AZ | 20 |
| | | Tonto National Monument, AZ | 2 |
| | | Walnut Canyon National Monument, AZ | 5 |
| | | Yellowstone National Park, ID, MT, WY | 3 |
| | | Yucca House National Monument, CO | 1 |
| | | Zion National Park, UT | 40 |
| Manuiwa Airways, Inc | Volcano Heli-Tours, Volcano Helicopters. | Hawaii Volcanoes National Park, HI | 800 |
| Maui Island Air, Inc | Maui Air, Volcano Air Tours | Haleakala National Park, HI | 130 |
| | | Hawaii Volcanoes National Park, HI | 611 |
| Maverick Helicopters, Inc | | Arches National Park, UT | 15 |
| | | Bryce Canyon National Park, UT | 15 |
| | | Canyonlands National Park, UT | |
| | | Capitol Reef National Park, UT | 15 |
| | | Cedar Breaks National Monument, UT | 15 |
| | | Death Valley National Park, CA | 15 |
| | | Glen Canyon National Recreation Area, AZ, UT | 15 |
| | | Grand Teton National Park, WY | 15 |
| | | Havasu pai Tribal Lands | 15 |
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 9603 |
| | | Mojave National Preserve, CA | 15 |
| | | Monument Valley Navajo Tribal Park, UT, AZ | 15 |
| | | Natural Bridges National Monument, UT | 15 |
| | | Rainbow Bridge National Monument, UT | 15 |
| | | Yosemite National Park, CA | 15 |
| | | Zion National Park, UT | 15 |
| McClelland, John and Terri | S.F. Helicopter Tours | Devils Postpile National Monument, CA | 2900 |
| | | Fort Point National Historic Site, CA | 2900 |
| | | Golden Gate National Recreation Area, CA | 11600 |
| | | John Muir National Historic Site, CA | 2900 |
| | | Muir Woods National Monument, CA | 2900 |
| | | Point Reyes National Seashore, CA | 2900 |
| | | Redwood National and State Parks, CA | 2900 |
| | | Rosie the Riveter WWII Home Front National Historical Park, CA. | 2900 |
| | | San Francisco Maritime National Historical Park, CA | 2900 |
| Minuteman Aviation Inc | | Blackfeet Tribal Lands | 717 |
| | | Glacier National Park, MT | 717 |
| Mokulele Flight Service, Inc | | Hawaii Volcanoes National Park, HI | 60 |
| Montana Aircraft, Inc | Montana Aircraft Wings of Montana. | Grand Teton National Park, WY | 6 |
| | | Yellowstone National Park, ID, MT, WY | 60 |
| Montana By Air L L C | | Blackfeet Tribal Lands | 12 |
| | | Glacier National Park, MT | 12 |
| Natures Designs, Inc | Vashon Island Air | Mount Rainier National Park, WA | 74 |

**JA347**

Filed: 10/16/2023   Page 100 of 232

USCA Case #23-1067   Document #2022013

| Name | DBA | National Park/Abutting Tribal Lands | IOA auth / yr |
|---|---|---|---|
| New York Helicopter Charter, Inc. | | Statue of Liberty National Monument, NY | 2655 |
| North East Air and Sea Services LLC. | | Statue of Liberty National Monument, NY | 125 |
| Osprey Aero | | Glacier National Park, MT | 60 |
| Papillon Airways Inc | Grand Canyon Helicopters Papillon Grand Canyon Helicopters. | Arches National Park, UT | 12 |
| | | Bryce Canyon National Park, UT | 12 |
| | | Canyonlands National Park, UT | 12 |
| | | Capitol Reef National Park, UT | 5 |
| | | Death Valley National Park, CA | 12 |
| | | Glen Canyon National Recreation Area, AZ, UT | 48 |
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 11322 |
| | | Zion National Park, UT | 12 |
| Paragon Air, Inc | | Haleakala National Park, HI | 219 |
| | | Hawaii Volcanoes National Park, HI | 1019 |
| | | Kalaupapa National Historical Park, HI | 730 |
| | | U S S Arizona Memorial, HI | 18 |
| Pavco, Inc | | Mount Rainier National Park, WA | 60 |
| | | Olympic National Park, WA | 27 |
| Platt, Phil | Pelican Airways | Cape Hatteras National Seashore, NC | 170 |
| Rainbow Pacific Helicopters, Ltd. | Magnum Helicopters | Haleakala National Park, HI | 45 |
| | | Hawaii Volcanoes National Park, HI | 45 |
| | | Kalaupapa National Historical Park, HI | 45 |
| | | Kaloko-Honokohau National Historical Park, HI | 45 |
| | | Pu'uhonua O Honaunau National Historical Park, HI | 45 |
| | | Puukohola Heiau National Historic Site, HI | 45 |
| | | U S S Arizona Memorial, HI | 1500 |
| Rambo Helicopter Charter, Inc | Scenic Helicopter Tours | Great Smoky Mountain, National park, TN, NC | 1800 |
| Red Eagle Aviation, Inc | | Blackfeet Tribal Lands | 159 |
| | | Glacier National Park, MT | 159 |
| Rite Bros Aviation Inc | | Mount Rainier National Park, WA | 2 |
| | | North Cascades National Park, WA | 2 |
| | | Olympic National Park, WA | 76 |
| Rogers Helicopters Inc | Dam Helicopter Company, Inc., Hall Air Ambulance Service, Inc., ROAM, Rogers Aviation Sky Life. | Lake Mead and Parashant National Recreation Area and National Monument, AZ, NV. | 9000 |
| Rushmore Helicopters, Inc | Safari Helicopter Tours | Mount Rushmore National Memorial, SD | 5200 |
| Safari Aviation, Inc | | Hawaii Volcanoes National Park, HI | 3920 |
| Scenic Airlines, Inc | | Bryce Canyon National Park, UT | 1094 |
| | | Glen Canyon National Recreation Area, AZ, UT | 3153 |
| | | Lake Mead and Parashant National Recreation Area and National Monument, AZ, NV. | 14707 |
| | | Monument Valley Navajo Tribal Park, UT, AZ | 1303 |
| | | Rainbow Bridge National Monument, UT | 1303 |
| | | Zion National Park, UT | 547 |
| Schuman Aviation Company, Ltd. | Makani Kai Helicopters | Haleakala National Park, HI | 25 |
| | | Hawaii Volcanoes National Park, HI | 25 |
| | | Kalaupapa National Historical Park, HI | 25 |
| | | Kaloko-Honokohau National Historical Park, HI | 25 |
| | | Pu'uhonua O Honaunau National Historical Park, HI | 25 |
| | | Puukohola Heiau National Historic Site, HI | 25 |
| | | U S S Arizona Memorial, HI | 2100 |
| Selway Aviation LLC | | Glacier National Park, MT | 20 |
| Slickrock Air Guides, Inc | | Arches National Park, UT | 323 |
| | | Canyonlands National Park, UT | 323 |
| | | Glen Canyon National Recreation Area, AZ, UT | 323 |
| | | Navajo Tribal Lands | 323 |
| Spirit Mountain Aviation LLC | | Grand Teton National Park, WY | 45 |
| | | Yellowstone National Park, ID, MT, WY | 45 |
| Steve Winters d/b/a M & S Aero. | M & S Aero | Bryce Canyon National Park, UT | 326 |
| | | Glen Canyon National Recreational Area | 10 |
| | | Zion National Park, UT | 25 |
| Sundance Helicopters Inc | Helicop Tours, Helicopter Services Sundance Helicopters. | Bryce Canyon National Park, UT | 12 |
| | | Death Valley National Park, CA | 6 |

Page 101 of 232

Filed: 10/16/2023     Document #2022013

USCA Case #23-1067

| Name | DBA | National Park/Abutting Tribal Lands | IOA auth / yr |
|------|-----|-------------------------------------|---------------|
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 865 |
| | | Zion National Park, UT | 12 |
| Sunshine Helicopters, Inc | | Haleakala National Park, HI | 4853 |
| | | Hawaii Volcanoes National Park, HI | 2100 |
| | | Kalaupapa National Historical Park, HI | 1252 |
| Swanstrom, Paul N | Mountain Flying Service | Arches National Pak, UT | 50 |
| | | Canyonlands National Park, UT | 50 |
| | | Capitol Reef National Park, UT | 50 |
| | | Glen Canyon National Recreation Area, AZ, UT | 50 |
| | | Natural Bridges National Monument, UT | 50 |
| | | Navajo Tribal Lands | 50 |
| Van Air, Inc | | Voyageurs National Park, MN | 60 |
| Ventura Air Services, Inc | | Statue of Liberty National Monument, NY | 125 |
| Westwind Aviation, Inc | Westwind Air Service | Bryce Canyon National Park, UT | 130 |
| | | Glen Canyon National Recreation Area, AZ, UT | 4270 |
| | | Navajo Tribal Lands | 2664 |
| | | Rainbow Bridge National Monument, UT | 4140 |
| Wilson Aviation, LLC | | Glacier National Park, UT | 60 |
| Windrock Aviation Inc | Sky Eye Air Tours, Windrock Airlines, Windrock Aviation. | Arches National Park, UT | 2 |
| | | Bryce Canyon National Park, UT | 1 |
| | | Canyon De Chelly National Monument, AZ | 2 |
| | | Canyonlands National Park, UT | 1 |
| | | Cedar Breaks National Monument, UT | 1 |
| | | Glen Canyon National Recreation Area, AZ, UT | 12 |
| | | Lake Mead and Parashant National Recreational Area and National Monument, AZ, NV. | 5 |
| | | Montezuma Castle National Monument, AZ | 5 |
| | | Rainbow Bridge National Monument, UT | 3 |
| | | Saguaro National Park, AZ | 2 |
| | | Sunset Crater Volcano National Monument, AZ | 4 |
| | | Tuzigoot National Monument, AZ | 5 |
| | | Walnut Canyon National Monument, AZ | 1 |
| | | Zion National Park, UT | 3 |
| Wings of Wenatchee, Inc | | Lake Chelan National Recreation Area, WA | 15 |
| | | Lake Roosevelt National Recreation Area, WA | 12 |
| | | Mount Rainier National Park, WA | 3 |
| | | North Cascades National Park, WA | 10 |

[FR Doc. 05–12380 Filed 6–22–05; 8:45 am]
BILLING CODE 4910–13–M

# DEPARTMENT OF TRANSPORTATION

**Federal Railroad Administration**

**Agency Information Collection Activities**

**AGENCY:** Federal Railroad Administration, DOT.

**ACTION:** Notice of OMB approvals.

**SUMMARY:** In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) and 5 CFR 1320.5(b), this notice announces that new information collections requirements (ICRs) listed below have been approved by the Office of Management and Budget (OMB). These new ICRs pertain to 49 CFR Parts 224, 229, and 238. Additionally, FRA hereby announces that other ICRs listed below have been re-approved by the Office of Management and Budget (OMB). These ICRs pertain to Parts 220, and 244. The OMB approval numbers, titles, and

expiration dates are included herein under supplementary information.

**FOR FURTHER INFORMATION CONTACT:** Mr. Robert Brogan, Office of Planning and Evaluation Division, RRS–21, Federal Railroad Administration, 1120 Vermont Ave., NW., Mail Stop 17, Washington, DC 20590 (telephone: (202) 493–6292), or Victor Angelo, Office of Support Systems, RAD–20, Federal Railroad Administration, 1120 Vermont Ave., NW., Mail Stop 35, Washington, DC 20590 (telephone: (202) 493–6470). (These telephone numbers are not toll-free.)

**SUPPLEMENTARY INFORMATION:** The Paperwork Reduction Act of 1995 (PRA), Pub. L. 104–13, § 2, 109 Stat. 163 (1995) (codified as revised at 44 U.S.C. 3501–3520), and its implementing regulations, 5 CFR Part 1320, require Federal agencies to display OMB control numbers and inform respondents of their legal significance once OMB approval is obtained. The following new FRA information collections were approved: (1) OMB No. 2130–0560, Use of Locomotive Horns at Highway-Rail

Grade Crossings (49 CFR 222) (Final Rule). The expiration date for this collection of information is April 30, 2007. In a previous notice published on October 8, 2004 (see 69 FR 60457), FRA mistakenly listed this approval as the interim final rule. (2) OMB No. 2130–0563, Railroad Trespasser Death Study (Form FRA F 6180.117). The expiration date for this collection of information is January 31, 2008. (3) OMB No. 2130–0564, Locomotive Crashworthiness (49 CFR 229 and 238) (NPRM). The expiration date for this collection of information is May 31, 2008. (4) OMB No. 2130–0565, Safety Appliance Concern Recommendation Report; Safety Appliance Checklist Forms (Forms FRA F 6180.4(a)–(m)). The expiration date for this collection of information is May 31, 2008. (5) OMB No. 2130–0566, Reflectorization of Freight Rolling Stock (49 CFR 224) (Final Rule). The expiration date for this collection of information is April 30, 2008.

The following information collections were re-approved: (1.) OMB No. 2130–0524, Railroad Communications (49

AR_0003366

**JA349**

USCA Case #23-1067    Document #2022013    Filed: 10/16/2023    Page 102 of 232

# National Park Service
# NEPA Handbook



**2015**

AR_0003376

**JA350**

USCA Case #23-1067      Document #2022013      Filed: 10/16/2023      Page 103 of 232

AR_0003377

# ACRONYMS

| | |
|---|---|
| **ACHP** | Advisory Council on Historic Preservation |
| **CE** | categorical exclusion |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **DM** | Departmental Manual |
| **DO-12** | Director's Order 12 |
| **DO-75A** | Director's Order 75A |
| **DOI** | Department of the Interior |
| **DEIS** | draft environmental impact statement |
| **EA** | environmental assessment |
| **ECM** | environmental compliance memorandum |
| **EIS** | environmental impact statement |
| **EO** | executive order |
| **EPA** | Environmental Protection Agency |
| **EQD** | Environmental Quality Division |
| **ERM** | environmental review memorandum |
| **ESA** | Endangered Species Act |
| **ESF** | environmental screening form |
| **ESM** | environmental statement memorandum |
| **FEIS** | final environmental impact statement |
| **FONSI** | finding of no significant impact |
| **GMP** | general management plan |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NOA** | notice of availability |
| **NOI** | notice of intent to prepare an environmental impact statement |
| **NPOMA** | National Parks Omnibus Management Act of 1998 |
| **NPS** | National Park Service |
| **OEPC** | Office of Environmental Policy and Compliance (Department of the Interior) |
| **PEPC** | Planning, Environment and Public Comment |
| **REC** | regional environmental coordinator |
| **ROD** | record of decision |
| **SOF** | statement of findings |
| **USC** | United States Code |
| **WASO** | Washington Support Office (National Park Service) |

i

AR_0003378

**JA352**

ii

2015 NPS NEPA Handbook

AR_0003379

JA353

# CONTENTS

ACRONYMS ...................................................................................................................... I

HANDBOOK USER'S GUIDE ........................................................................................ 1

CHAPTER 1: INTRODUCTION TO THE NATIONAL ENVIRONMENTAL POLICY ACT ............. 5

1.1　INTRODUCTION ................................................................................................ 5
1.2　LEGAL AND POLICY OVERVIEW ..................................................................... 5

　　A.　A Procedural Act ............................................................................................ 5
　　B.　NEPA and the Council on Environmental Quality ......................................... 6
　　C.　Department of the Interior NEPA Regulations and Policies ......................... 7
　　D.　National Park Service NEPA Policies and Procedures .................................. 7

1.3　DETERMINING WHETHER NEPA APPLIES ...................................................... 9

　　A.　Actions Requiring NEPA Review ................................................................... 9
　　B.　Actions Exempt from NEPA Review ............................................................. 11
　　C.　Emergency Actions ....................................................................................... 11

1.4　NEPA FUNDAMENTALS .................................................................................. 12

　　A.　Characteristics of NEPA Review .................................................................. 12
　　B.　Timing of NEPA Review ................................................................................ 14
　　C.　Specificity and Quality of Data Needed ....................................................... 15

1.5　THE NEPA PATHWAYS ................................................................................... 16

　　A.　Categorical Exclusion for which No Documentation is Required ................... 16
　　B.　Categorical Exclusion for which Documentation is Required ........................ 17
　　C.　Environmental Assessment ........................................................................... 17
　　D.　Environmental Impact Statement .................................................................. 18
　　E.　Actions that Normally Require an Environmental Impact Statement ............. 19

1.6　CONSIDERING WHETHER A PROPOSAL HAS THE POTENTIAL FOR SIGNIFICANT
　　　IMPACTS ......................................................................................................... 19

CHAPTER 2: USING EXISTING NEPA ANALYSES ......................................................... 23

2.1　INTRODUCTION .............................................................................................. 23
2.2　MEMORANDUM TO FILE ................................................................................ 23
2.3　INCORPORATION BY REFERENCE ................................................................ 24
2.4　TIERING ........................................................................................................... 25
2.5　ADOPTING ANOTHER AGENCY'S EXISTING ENVIRONMENTAL ASSESSMENT OR
　　　ENVIRONMENTAL IMPACT STATEMENT ...................................................... 26

CHAPTER 3: CATEGORICAL EXCLUSIONS ................................................................... 29

3.1　INTRODUCTION .............................................................................................. 29
3.2　CATEGORICAL EXCLUSIONS FOR WHICH NO DOCUMENTATION IS REQUIRED ..... 30
3.3　CATEGORICAL EXCLUSIONS FOR WHICH DOCUMENTATION IS REQUIRED ............ 33
3.4　PROCESS FOR CATEGORICAL EXCLUSIONS REQUIRING DOCUMENTATION ........... 38

iii

3.5   EXTRAORDINARY CIRCUMSTANCES .................................................................. 40
3.6   USE OF CATEGORICAL EXCLUSIONS FOR ONGOING AND RECURRING ACTIONS ... 41

**CHAPTER 4: THE NEPA PROCESS FOR ENVIRONMENTAL ASSESSMENTS AND
    ENVIRONMENTAL IMPACT STATEMENTS** ......................................................43

4.1   INTRODUCTION .................................................................................................. 43
4.2   SCOPING ............................................................................................................. 43

 A.   *Identifying Purpose, Need, and Objectives* .................................................47
 B.   *Defining the Proposed Action (the Proposal)* .............................................48
 C.   *Identifying Connected and Similar Actions* ................................................49
 D.   *Identifying Environmental Issues and Impact Topics* ................................50
 E.   *Determining Whether to Retain Issues for Detailed Analysis* .....................51

4.3   ALTERNATIVES .................................................................................................. 52

 A.   *Range of Alternatives* ...................................................................................52
 B.   *The No-Action Alternative* ...........................................................................55
 C.   *The Preferred Alternative* ............................................................................56
 D.   *The Environmentally Preferable Alternative* ..............................................57
 E.   *Mitigation* .....................................................................................................58
 F.   *Adaptive Management* ..................................................................................58

4.4   DESCRIBING THE AFFECTED ENVIRONMENT ................................................. 60
4.5   IMPACT ANALYSIS ............................................................................................. 61

 A.   *Direct Impacts* ..............................................................................................62
 B.   *Indirect Impacts* ...........................................................................................62
 C.   *Cumulative Impacts* ......................................................................................62

4.6   CIRCULATING ENVIRONMENTAL ASSESSMENTS AND ENVIRONMENTAL IMPACT
      STATEMENTS, SOLICITING PUBLIC COMMENTS, AND RESPONDING TO
      COMMENTS ......................................................................................................... 64

 A.   *Circulating an Environmental Assessment and Responding to Comments* ............65
 B.   *Circulating an Environmental Impact Statement and Responding to Comments* ................66

4.7   CONCLUDING THE NEPA PROCESS AND DOCUMENTING A DECISION ...................... 67

 A.   *Environmental Assessments* ..........................................................................68
 B.   *Environmental Impact Statements* ...............................................................70

4.8   IMPLEMENTING A DECISION ............................................................................. 71

 A.   *Finding of No Significant Impact* .................................................................71
 B.   *Record of Decision* .......................................................................................71

4.9   THE DECISION FILE ........................................................................................... 71
4.10  SUPPLEMENTS TO DRAFT AND FINAL ENVIRONMENTAL IMPACT STATEMENTS .. 72
4.11  TERMINATING THE NEPA PROCESS PRIOR TO COMPLETION ...................................... 73

 A.   *Environmental Assessments* ..........................................................................73
 B.   *Environmental Impact Statements* ...............................................................73

4.12  USING CONTRACTORS ........................................................................................ 74
4.13  WORKING WITH OTHER AGENCIES AND ENTITIES ......................................... 74

 A.   *Lead Agencies* ...............................................................................................74
 B.   *Cooperating Agencies* ..................................................................................75

iv

4.14    INTEGRATING NEPA WITH OTHER ENVIRONMENTAL REVIEW AND
        CONSULTATION REQUIREMENTS ................................................................. 76

**CHAPTER 5: NPS REVIEW OF EXTERNAL ENVIRONMENTAL REVIEW DOCUMENTS** ......... 81

5.1    INTRODUCTION .................................................................................................. 81
5.2    DOI AND NPS EXTERNAL ENVIRONMENTAL REVIEW PROCESSES ............................. 81
5.3    COMMENTING ON EXTERNAL ENVIRONMENTAL REVIEW DOCUMENTS .............. 82

    A.    Scope of Comments ........................................................................................ 82
    B.    Substance of Comments .................................................................................. 82
    C.    Commenting on NEPA Documents as a Reviewing Agency ......................... 83

5.4    REVIEW OF DRAFT VS. FINAL DOCUMENTS ....................................................... 83
5.5    FORMAT OF COMMENTS FOR EXTERNAL ENVIRONMENTAL REVIEWS .................... 84

**GLOSSARY** ........................................................................................................................ 87

**APPENDIX A: ENVIRONMENTAL ASSESSMENT REQUIRED CONTENT AND ADDITIONAL
CONSIDERATIONS** ................................................................................................ 91

**APPENDIX B: ENVIRONMENTAL IMPACT STATEMENT REQUIRED CONTENT AND
RECOMMENDED FORMAT** .................................................................................. 93

AR_0003382

JA356

vi

AR_0003383

JA357

# HANDBOOK USER'S GUIDE

This handbook synthesizes the legal and policy requirements and considerations related to the National Environmental Policy Act (NEPA) (42 United States Code (USC) 4321 et seq.) and associated guidance applicable to the National Park Service (NPS). It contains the information necessary to comply with NEPA and conduct sound environmental planning.

This handbook, along with supplemental guidance that will be issued on an as-needed basis to address specific NEPA-related topics, is intended to assist you in carrying out your NEPA responsibilities. The handbook will be maintained electronically; only a limited number of hard copies will be distributed. It will be modified and reissued periodically based on changes to Council on Environmental Quality (CEQ) and Department of the Interior (DOI) regulations and guidance, as well as NPS policy. The most up-to-date version of the handbook can be accessed on the NPS policy website: http://www.nps.gov/applications/npspolicy/DOrders.cfm.

In addition to managing units of the national park system, the NPS administers programs that serve the conservation and recreation needs of the nation but are not directly related to the national park system. Examples include the Land and Water Conservation Fund Grants Program; the Rivers, Trails, and Conservation Assistance Program; and the National Heritage Areas Program. Pursuant to *Director's Order 12: Conservation Planning, Environmental Impact Analysis, and Decision-making* (DO-12), these programs may develop their own program-specific NEPA guidance. However, where other directives or guidelines appear to differ from the information in this handbook, this handbook takes precedence (DO-12, 4.2).

This handbook is intended only to improve the internal management of the National Park Service and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

**Chapter 1: Introduction to the National Environmental Policy Act** provides a general overview of several aspects of the act, including how NEPA relates to the NPS mission, the circumstances that trigger the need to comply with NEPA, the basic characteristics of a NEPA review, and the methods for documenting compliance with NEPA.

**Chapter 2: Using Existing NEPA Analyses** describes options and procedures for using existing NEPA analyses to meet a proposal's NEPA documentation and analysis requirements, either in full or in part.

**Chapter 3: Categorical Exclusions** provides information about the use of categorical exclusions to meet NEPA review requirements for certain types of NPS actions and the process for applying and documenting categorical exclusions.

2015 NPS NEPA Handbook

AR_0003384

**JA358**

**Chapter 4: The NEPA Process for Environmental Assessments and Environmental Impact Statements** describes the elements of the NEPA planning and analysis process for environmental assessments and environmental impact statements in detail.

**Chapter 5: NPS Review of External Environmental Review Documents** discusses how the National Park Service provides comments on other agencies' environmental review documents through a formal process required by DOI.

Although this handbook is intended to be comprehensive, it is not an all-inclusive, step-by-step NEPA "cookbook." Therefore, in addition to becoming familiar with this handbook, you are encouraged to pursue opportunities for NEPA training and to seek NEPA-related advice, when needed, from your regional environmental coordinator (REC) and the Environmental Planning and Compliance Branch of the Washington Support Office (WASO) Environmental Quality Division (EQD).

This handbook contains numerous references to NEPA, the CEQ NEPA regulations and *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations* (40 Questions), the DOI NEPA regulations and Departmental Manual (DM), and DO-12. The guidance provided in this handbook is derived primarily from these authorities. The nature of these authorities is discussed in Section 1.1 of this handbook. Although this handbook has been written with these authorities in mind, if a conflict should be found between the handbook and these authorities, the authorities take precedence. These authorities are cited as follows:

> NEPA – The referenced section number is in parentheses: (sec. 101(b))

> CEQ regulations – The referenced section number from 40 *Code of Federal Regulations* (CFR) Parts 1500–1508 is in parentheses: (1500.2)

> 40 Questions – The number of the question referenced is in parentheses: (Q23)

> DOI NEPA regulations – The referenced section number from 43 CFR Part 46 is in parentheses: (46.30)

> Departmental Manual – The referenced chapter from part 516 of the DM is in parentheses as 516 DM followed by the relevant chapter: (516 DM 2)

> Director's Order 12 – The referenced section number from the Director's Order is in parentheses as DO-12 followed by the relevant section: (DO-12, 4.2)

Guidance found in the DOI Office of Environmental Policy and Compliance (OEPC) Environmental Statement Memorandum (ESM) series is also incorporated throughout the handbook.

This handbook uses the pronoun "you" to address the reader. While the guidance in this handbook is intended for use by NPS personnel, it may be consulted by other

2

AR_0003385

**JA359**

agencies, tribal representatives, applicants, contractors, and members of the public who are involved with the NPS NEPA process.

The "NEPA process" refers to all measures taken in order to meet NEPA-related legal and policy requirements associated with a particular NPS action. The term "NEPA review" is used to refer to the process, analyses, and documents developed under NEPA to inform a decision. "NEPA document" generally refers to an environmental assessment (EA) or environmental impact statement (EIS), and can also refer to documentation that is prepared for a categorical exclusion (CE).

The terms "must" and "should" appear throughout this handbook. "Must" is used in association with requirements imposed on the NPS by law, regulation, or policy. "Should" is used in association with instructions that are not explicitly required by law, regulation, or policy, but are "best practices" to be followed in most cases, and are intended to help ensure that NPS NEPA practice meets both the letter and spirit of NEPA-related requirements. The same is true for references to "standard" and "recommended" NPS NEPA practices. You are encouraged to consult with your REC if you have questions about any particular requirements or instructions.

As with the CEQ regulations (1508.8), this handbook uses the terms "impact" and "effect" interchangeably. When the term "resource" or "environmental resource" is used, it should be understood to mean an element of the human environment. The human environment includes the natural and physical environment and the relationship of people with that environment (1508.14).

*The terms "must" and "should" appear throughout this handbook. "Must" is used in association with requirements imposed on the NPS by law, regulation, or policy. "Should" is used in association with instructions that are not explicitly required by law, regulation, or policy, but are "best practices" to be followed in most cases, and are intended to help ensure that NPS NEPA practice meets both the letter and spirit of NEPA-related requirements.*

AR_0003386

states that park management generally should be guided by "the highest quality science and information" and requires the NPS to use the results of scientific study when considering management decisions pertaining to national park system units (54 USC 100702, 100706).

The specificity of data needed for analysis will vary according to the nature of the action. For actions of a more programmatic or broad nature, such as development of a parkwide facilities management plan, the NEPA review and the data on which it is based may be correspondingly broad. For site-specific projects such as construction of a new picnic area or rehabilitation of a parking lot, the data on which analyses are based should be correspondingly specific.

Ultimately, you must be able to carry out a meaningful analysis of impacts based on the available data in order to support a decision to take an action. Analyses should be substantiated by information included in the decision file, and peer review should be used when appropriate. [*See Section 4.9: The Decision File; see also supplemental guidance: Compiling a Decision File for NEPA Reviews*.] If there are key uncertainties regarding the environmental effects of an action under consideration, an adaptive management approach should be used when appropriate (46.145). [*See Section 4.3 F: Adaptive Management*.]

In cases where you have no data or poor quality data, you are required to obtain additional information that is "relevant to reasonably foreseeable significant adverse impacts," if it is "essential to a reasoned choice among alternatives," and if "the overall costs of obtaining it are not exorbitant" (1502.22(a)). The costs of obtaining additional information are measured not only in money, but also in time (to complete a research study or survey, for instance).

If essential information is unavailable or if the costs of obtaining it are exorbitant, an EIS must include statements to inform the public of this lack of information and its effect on the ability of the NPS to predict environmental impacts. When information cannot be obtained, existing credible scientific evidence must be summarized and the impact predicted based on this evidence (1502.22(b)). When preparing an EA, you should take the same approach. Lack of data can be an important consideration when preparing an EA because if you do not have enough reliable data to support a finding at the conclusion of the EA process that there will be no significant adverse impacts as a result of implementing the selected action, an EIS will need to be prepared.

## 1.5    THE NEPA PATHWAYS

The NPS uses four pathways, or levels of analysis and documentation, to comply with NEPA. A brief description of each pathway is included below. More detailed information about the pathways can be found in Chapters 3 and 4.

### A.    Categorical Exclusion for which No Documentation is Required

This pathway is applicable to actions that have been found to have no potential for significant environmental impacts under ordinary circumstances and whose potential for environmental impacts of any kind is so minimal the NEPA review does

16

AR_0003399

not require formal documentation. The source of these CEs is the DOI NEPA regulations; they apply to all DOI bureaus (46.215). [*See Section 3.2: Categorical Exclusions for which No Documentation is Required.*]

### B.    Categorical Exclusion for which Documentation is Required

This pathway is applicable to actions that have been found to have no potential for individual or cumulative significant environmental impacts under ordinary circumstances, but whose potential for environmental impacts warrants some level of analysis and formal documentation. The source of these CEs is the NPS-specific chapter of the DM (516 DM 12). [*See Section 3.3: Categorical Exclusions for which Documentation is Required.*]

### C.    Environmental Assessment

This pathway is applicable to a variety of situations. Although an EA was originally envisioned as a tool for determining whether to prepare an EIS and is still used this way in some instances, in most cases the EA has become a distinct pathway. An EA is a means for documenting compliance with NEPA and assisting in the planning and decision-making process when a CE is not appropriate but an EIS is not necessary.

Any of the following indicates a need to prepare an EA:

- the proposal has no applicable CE, is not an action that normally requires preparation of an EIS, and is unlikely to result in significant adverse environmental impacts;

- the proposal has an applicable CE but may trigger an extraordinary circumstance (46.205) [*See Section 3.5: Extraordinary Circumstances.*]; or

- it is unknown whether the proposal would result in significant adverse environmental impacts (i.e., the preparation of the EA is to determine whether an EIS is necessary).

In addition to the circumstances above, an EA may be prepared when it would assist with or inform agency planning and decision-making (1501.3(b); 46.300(b)).

It is important to understand some fundamental differences between EAs and EISs in order to prevent the EA document and process from simply becoming an "EIS in disguise." An EIS is meant to be a "detailed written statement" on the environmental impacts of major actions significantly affecting the environment (1508.11). Its fundamental purpose is to promote detailed consideration and disclosure of the environmental costs and benefits of a proposal.

An EA, on the other hand, while still analytical and explanatory, is meant to be a "brief" and "concise" document at a level of detail limited to that necessary to demonstrate that the proposal would not result in significant environmental impacts (1508.9; 46.310(e)). It should be kept brief by carefully developing the scope to identify pivotal issues; focusing discussions and analysis on the relevant issues and dismissing issues that are not meaningful to the decision; discussing impacts in proportion to their importance; and using tiering and incorporation by reference techniques, when appropriate, to minimize bulk. You should strive to keep an EA to no more than 50 pages, and closer to 15 pages when you are preparing an EA for

*An EA should be kept brief by carefully developing the scope to identify pivotal issues; focusing discussions and analysis on the relevant issues and dismissing issues that are not meaningful to the decision; discussing impacts in proportion to their importance; and using tiering and incorporation by reference techniques, when appropriate, to minimize bulk*

AR_0003400

situations where you are reasonably sure there is no potential for significant adverse impacts (such as when there is an activity that has minimal impact but does not fit within any established CEs). On the other hand, an EA may be longer than 50 pages where the issues involved are controversial or very complex (assuming, of course, there is still no potential for significant adverse impacts that would trigger the need for an EIS). In all cases, the length of an EA should be sufficient to demonstrate that NPS has taken a hard look at the environmental impacts of the proposed action and any alternatives.

*[For more information, see Section 2.3: Incorporation by Reference, and Section 2.4: Tiering; see also supplemental guidance: Preparing Focused and Concise EAs, supplemental guidance: Writing Impact Analysis Sections for EAs and EISs, and CEQ guidance: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act. For information on the required content for an EA, see Appendix B: Environmental Assessment Required Content and Additional Considerations.]*

### D.    Environmental Impact Statement

This pathway is applicable to proposals that could result in significant adverse environmental impacts. An EIS is a detailed written statement required by Section 102(2)(C) of NEPA (1508.11).There are several circumstances that indicate an EIS is the appropriate NEPA pathway:

- the proposal is designated by the NPS as an action normally requiring preparation of an EIS;

- the proposal is expected to or has the potential to result in significant adverse environmental impacts;

- there is incomplete or unavailable information to the extent that a FONSI cannot be supported [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*];

- there is a high degree of controversy over the environmental impacts of a proposed action [For more information on controversy, see Section 1.6: Considering Whether a Proposal has the Potential for Significant Impacts.]; or

- an EIS is legislatively or judicially mandated.

You should strive to keep an EIS to no more than 150 pages, and for proposals of unusual scope or complexity to less than 300 pages (1502.7). As with EAs, you should carefully develop the scope to identify pivotal issues; focus discussions and analysis on the relevant issues and dismiss issues that are not meaningful to the decision; discuss impacts in proportion to their importance; and use tiering and incorporation by reference techniques, when appropriate, to minimize bulk.

*[For more information, see Section 2.3: Incorporation by Reference, and Section 2.4: Tiering; see also Writing Impact Analysis Sections for EAs and EISs, and CEQ guidance: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act. For information on the required content for an*

18

AR_0003401

**JA364**

*EIS, see Appendix B: Environmental Impact Statement Required Content and Recommended Format.]*

### E.    Actions that Normally Require an Environmental Impact Statement

The CEQ regulations require that agencies designate actions that normally require preparation of an EIS (1507.3(b)(2)(i)). For the NPS, an EIS is normally required for the following types of actions (516 DM 12):

- proposals to designate Wild and Scenic Rivers, National Trails, or Wilderness;

- GMPs for major national park system units;

- grants, including multi-year grants whose size and/or scope will result in major natural or physical changes, including interrelated social and economic changes and residential and land use changes within the project area or its immediate environs; and

- grants which foreclose other beneficial uses of mineral, agricultural, timber, water, energy, or transportation resources important to national or state welfare.

While the actions listed above normally require preparation of an EIS, an EIS is not required in every case. If you are able to document that there is no potential for significant adverse impacts as a result of implementing one of those actions, you may prepare an EA. However, if you prepare an EA for an action that normally requires an EIS, you must make the FONSI available for public review for 30 days prior to making a final determination whether to prepare an EIS and may not implement the selected action until after the 30-day period has passed (1501.4(e)(2)).

It is important to note that *NPS Management Policies 2006* require an EIS to be prepared for wilderness studies that will result in recommendations for designation, and therefore a waiver from that requirement would need to be obtained in order to prepare an EA rather than an EIS for such studies (NPS *Management Policies 2006*, 6.2.2). NPS *Management Policies 2006* also state that in most cases an EIS will be prepared for GMPs, but provide for a regional director to approve an exception to that general rule after consulting with EQD through the Associate Director, Natural Resource Stewardship and Science when: (1) scoping indicates there is no public controversy concerning environmental effects; and (2) preliminary impact analysis clearly indicates there is no potential for significant impacts from any alternative under consideration (NPS *Management Policies 2006*, 2.3.1.7).

## 1.6    CONSIDERING WHETHER A PROPOSAL HAS THE POTENTIAL FOR SIGNIFICANT IMPACTS

The concept of significance is central to NEPA reviews. If an action has the potential to result in significant adverse impacts and applying mitigation measures cannot ensure that significant adverse impacts will be avoided, an EIS must be prepared. Although evaluation of significance often relies on subjective judgment, the CEQ

*Although evaluation of significance often relies on subjective judgment, the CEQ regulations require that evaluations of significance consider both an impact's context and intensity (1508.27).*

19

AR_0003402

**JA365**

USCA Case #23-1067    Document #2022013    Filed: 10/16/2023    Page 118 of 232

regulations require that evaluations of significance consider both an impact's context and intensity (1508.27).

### Context

An impact's significance is influenced by the importance of the resource or value being impacted, the geographic location and timing, and other relevant factors that provide context for more fully understanding the severity of the impact. For example, a ground disturbance that takes place in a previously disturbed maintenance area of a park would be less likely to have a significant adverse impact than the same ground disturbance in an area containing important archeological resources.

The context in which impacts are considered should generally be specific to the area and resources being affected. For most NPS actions, this means considering impacts in the context of the affected locale, such as a national park system unit as opposed to the state, country, or world as a whole (1508.27(a)), although in many cases it is also appropriate to consider the role of a park unit in the larger landscape. The relationship of an affected resource to a park unit's purpose and significance can be an important factor when considering context.

### Intensity

Intensity refers to the severity of an impact (1508.27(b)), which may be direct, indirect, or cumulative (1508.25(c)). When evaluating intensity, the CEQ regulations require you to consider (1508.27(b)):

> *Impacts that may be both beneficial and adverse. A significant impact may exist even if the federal agency believes that on balance the effect will be beneficial.*
> This means that even in situations where beneficial impacts outweigh adverse ones, or where the ultimate environmental outcomes of an action may be beneficial, it is possible that adverse impacts associated with taking the action can be significant when considered in context and therefore trigger the need to prepare an EIS. Only those actions with the potential to cause significant adverse impacts require preparation of an EIS.

> *The degree to which the proposed action affects public health or safety.*
> For example, consider impacts related to hazardous and solid wastes, air and water quality, and their relation to public health and safety.

> *Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.*
> Most actions taken by the NPS affect park lands that protect many of the unique characteristics mentioned. This does not mean that an EIS must be prepared for every action the NPS takes. When assessing whether an impact would be significant, consider the magnitude of the impact in the context of the particular resource.

> *The degree to which the effects on the quality of the human environment are likely to be highly controversial.*

2015 NPS NEPA Handbook

AR_0003403

Controversy does not refer simply to the existence of opposition to a proposal whose effects are relatively undisputed (46.30). Rather, the term "controversial" refers to cases where a substantial dispute exists as to the nature of the environmental consequences of a proposed action. This consideration specifically references effects that are "highly controversial." While in many cases there will be some disagreement about the nature of the effects of a proposed action, the mere existence of controversy does not necessarily equate to significance. However, substantial dispute within the scientific community about the effects of a proposed action would indicate that the effects are likely to be highly controversial and therefore likely significant.

*The degree to which the potential impacts are highly uncertain or involve unique or unknown risks.*
There will often be some uncertainty about the impacts of management actions and some level of associated risk. The focus of this consideration is on high levels of uncertainty and risks that are unique or unknown, which would make it difficult or impossible to reasonably predict impacts of an action. When a high level of uncertainty over potential impacts involves an important resource or value, there is increased potential for impacts to be significant and thus require analysis in an EIS.

*The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.*
This consideration should be limited to those future considerations that are reasonably foreseeable, as defined in the DOI NEPA regulations, "...activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision" (46.30). Reasonably foreseeable future actions do not include those actions that are highly speculative or indefinite.

*Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.*
When considering whether your proposal has significant impacts, you must look at the incremental impacts of your proposal plus the impacts of other past, present, and reasonably foreseeable future actions and determine whether or not the total (i.e., cumulative) impact on a specific resource is significant, even if the impact of your proposal, by itself, may not be significant. [*See Section 4.5 C: Cumulative Impacts.*] If significant cumulative adverse impacts already exist as a result of past, present, or reasonably foreseeable actions and the incremental adverse impacts of your action will make existing impacts worse but will not take the resource past an environmental or regulatory "tipping point" (e.g., causing a violation of the National Ambient Air Quality Standards), then your action would not be considered to result in significant cumulative adverse impacts and you would not need to prepare an EIS.

*The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the*

21

2015 NPS NEPA Handbook

AR_0003404

**JA367**

*National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.*
A finding of adverse effect under the National Historic Preservation Act (NHPA) Section 106 consultation process does not necessarily trigger the need to prepare an EIS; a determination of effect is made according to different criteria than a determination regarding significance. When assessing whether an impact would be significant, consider the magnitude of the impact in the context of the particular resource.

*The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.*
A finding under the Endangered Species Act (ESA) Section 7 consultation process that an action is likely to adversely affect a listed species or designated critical habitat does not necessarily trigger the need to prepare an EIS; a determination of effect is made according to different criteria than a determination regarding significance. As with Section 106 above, you must consider the magnitude of an impact in the context of the particular resource to determine whether or not there would be a significant impact.

*Whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.*
Not every violation of environmental requirements imposed by other governmental entities constitutes a significant impact, especially when the violation is trivial or the impacts of the violation can be mitigated.

2015 NPS NEPA Handbook

AR_0003405

**JA368**

# CHAPTER 2: USING EXISTING NEPA ANALYSES

## 2.1    INTRODUCTION

This chapter describes options and procedures for using existing NEPA analyses to meet a current proposal's NEPA documentation and analysis requirements, either in full or in part. The CEQ and DOI NEPA regulations encourage the use of existing NEPA analyses to the extent possible and appropriate to reduce unnecessary analysis and paperwork (1502.20; 1502.21; 46.120). This chapter discusses several ways of doing so. Section 2.2 describes the use of the memorandum to file, which documents a determination that an existing NPS NEPA document provides complete and accurate documentation sufficient to cover a specific proposal. Section 2.3 describes the use of incorporation by reference, which can be used to reduce the amount of text included in a NEPA document and to facilitate the use of existing scientific studies and environmental reviews prepared by state and local governments. Section 2.4 discusses tiering, which is a specific type of incorporation by reference that can be used to focus the scope of a proposal and its consequent NEPA documentation and analysis. Section 2.5 discusses options and procedures for adopting an existing EA or EIS prepared by another agency to serve as NEPA documentation for an NPS action.

*The CEQ and DOI NEPA regulations encourage the use of existing NEPA analyses to the extent possible and appropriate to reduce unnecessary analysis and paperwork (1502.20; 1502.21; 46.120).*

## 2.2    MEMORANDUM TO FILE

A memorandum to file (memo to file) is used to document that a specific proposal and its impacts were adequately described and analyzed in site-specific detail in an existing NPS NEPA document, meaning that additional NEPA review is not required.

A memo to file should be used when an NPS NEPA review was previously completed for a specific proposal, but its implementation was delayed because of unavailability of funds or other reasons. For example, if your park unit completed an EA five years ago that resulted in a decision to construct new park housing but funding was not available and construction could not proceed as intended, when you receive the funding you should review the EA and FONSI to ensure that the action and its impacts are still accurately described. You would then document the adequacy of the existing NEPA review through preparation of a memo to file. A memo to file may also be used when an action is being taken that is not specifically called out in an existing NPS NEPA document, but it logically falls within the effects of substantially similar actions that have been evaluated in site-specific detail in an existing NPS NEPA document. When preparing a memo to file, you should consider whether information regarding other required consultation processes (such as ESA Section 7, NHPA Section 106, and tribal consultations) needs to be updated. If so, depending on the outcome of additional consultations, a new NEPA review may need to be initiated. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements.*]

There is no required format for a memo to file. However, it should at a minimum contain the following:

- a description of the current action;

23

AR_0003406

**JA369**

- the name and date of the existing NPS NEPA document that describes and analyzes the action;

- identification of the associated decision document;

- a statement that the existing NPS NEPA document has been reviewed and that there are no substantive differences between the current proposal and its associated environmental impacts and the proposal and impacts as described in the existing NEPA document and associated decision document;

- a reference to correspondence documenting updated consultation if other required consultation processes have been updated; and

- approval (signature) of the park superintendent or his/her designee.

When reviewing an existing NPS NEPA document to determine if it covers your current action, consider the following questions:

- Is the action as currently proposed the same or essentially the same as the action described in the existing NEPA document and associated decision document?

- Is the project location as currently proposed the same or essentially the same as that described in the existing NEPA document and associated decision document?

- Is the range of alternatives in the existing NEPA document appropriate with respect to the current action? For example, if there is a substantially different option for meeting the purpose and need of the proposal that was not available, and therefore not analyzed at the time the existing NEPA document was prepared, the answer would be "no."

- Are current resource conditions substantially the same as those described in the NEPA document and associated decision document? For example, if there is a threatened or endangered species currently present in the project area that was not listed, and therefore not analyzed at the time the existing NEPA document was prepared, the answer would be "no."

- Are the direct, indirect, and cumulative impacts associated with the action as currently proposed the same or essentially the same as those described in the existing NEPA document and associated decision document?

- Is consultation that was completed for the action covered by the earlier NEPA review (e.g., ESA Section 7 and NHPA Section 106) still adequate?

If you are able to answer "yes" to all of these questions, a memo to file would be appropriate. If you are unable to answer "yes" to all of these questions, you will likely need to complete an additional NEPA review. If you have questions regarding whether a memo to file is appropriate or whether additional consultation with other agencies is necessary, you should consult with your REC.

## 2.3    INCORPORATION BY REFERENCE

Incorporation by reference is the citation and summary of reasonably available material that addresses actions, issues, resources, or impacts that are relevant to the

2015 NPS NEPA Handbook

AR_0003407

**JA370**

actions under consideration in your NEPA review. Incorporation by reference allows such material to be briefly summarized rather than extensively repeated in the NEPA document. The purpose of incorporation by reference is to "cut down on bulk without impeding agency and public review of the action" (1502.21).

Many different types of material may be incorporated by reference, including written material of all kinds, conversations, taped public meetings or workshops, etc. Specific examples of materials that might be incorporated by reference into a NEPA document include other NEPA documents, species lists relevant to the project area, scientific studies, monitoring data, and environmental reviews prepared by state and local governments. For material to be incorporated by reference, the analysis and assumptions used in the incorporated document must be appropriate for the analysis at hand (46.135(a)). In addition, the incorporated material must be "reasonably available for inspection by potentially interested persons within the time allowed for comment" on the NEPA document (1502.21). There are many options available to make referenced material readily available, such as placing material on a park unit's website or PEPC, notifying the public that the referenced material is available at a park unit's headquarters upon request, and placing materials in local libraries or facilities accessible to the public. Material that is not or cannot be made reasonably available, such as proprietary information, may not be incorporated by reference (1502.21).

Incorporating by reference is accomplished through two steps: (1) citing the incorporated material, and (2) summarizing its content. Citation consists of identifying the material in as specific a manner as possible to inform the reader of what material is being incorporated. Summarizing the material consists of briefly describing its content and placing the material and its use in the context of your specific NEPA review. Citations of specific information or analysis from incorporated material should include pertinent page numbers or other relevant identifying information (46.135(b)). All documents incorporated by reference must be listed in a bibliography (46.135(c)) and copies of materials incorporated by reference should be included in the decision file. [*See Section 4.9: The Decision File; see also supplemental guidance: Compiling a Decision File for NEPA Reviews.*]

## 2.4    TIERING

Tiering is using the coverage of general matters in broader or programmatic NEPA documents in subsequent, more narrowly focused NEPA documents (1508.28). The purpose of tiering is to eliminate repetitive discussions across NEPA documents and focus successive NEPA processes on the particular issues ripe for decision (1502.20). The broad NEPA document to which a subsequent, more narrowly focused NEPA document is tiered may be an EA or EIS. [*See CEQ guidance: Effective Use of Programmatic NEPA Reviews.*] You should use tiering in situations when an action is proposed that, although addressed in general or program-level terms in a previous, valid NEPA document, requires additional refinement and site-specific analysis prior to implementation.

For example, suppose your park unit recently completed an EIS for a GMP and the selected action includes construction of a visitor contact station within one particular

AR_0003408

management zone. Although the analysis in the EIS is up-to-date and accurate, the EIS does not contain a site-specific analysis of the proposed visitor contact station because details, such as exact location and size, were not available at the time the EIS was prepared. In this situation, you would need to complete a site-specific NEPA review before the visitor contact station could be constructed. By tiering the subsequent site-specific NEPA review to the EIS prepared for the GMP, the scope of the subsequent NEPA review could be narrowed to address the particulars of the visitor contact station, such as where specifically to site it within the area designated in the GMP and how large it should be. This narrow scope for the site-specific NEPA review would be proper because the question of whether to build a visitor contact station has already been decided based on the earlier, broader EIS and therefore does not need to be addressed again so soon.

A NEPA document that is tiered to a previous, broader NEPA document must include a finding that environmental conditions and impacts as described in the earlier NEPA document are still valid; or if not, address any exceptions (46.140). If conditions or impacts have changed, the tiered document must explain this and provide any updated information or analysis (46.140(b)). Tiering is not appropriate when the previous, broader NEPA document is outdated because new information or changed conditions require that the original decision and analysis be revisited. Consider the example above involving the visitor contact station and the GMP. Suppose that some years pass between adoption of the GMP and the park unit's ability to proceed with the proposed visitor contact station. In the intervening years, park staff discover that there has been an unforeseen increase in visitation, making the previous visitor contact station location unsuitable because of access and parking limitations. In this instance, the decision regarding whether and where to build a visitor contact station should be revisited and tiering would not be appropriate.

Tiering is essentially a specific form of incorporation by reference. When tiering a new NEPA document to an existing one, you must state that you are tiering to another NEPA document, give a brief description of the earlier document, and state where the earlier document is available. Following the procedures for incorporation by reference, cite and summarize the relevant portions of the broader document to which the new NEPA document is tiered (1502.20; 1502.21).

*A finding of no significant impact other than those already disclosed and analyzed in the EIS to which the EA is tiered may also be called a "finding of no new significant impact" (46.140(c)).*

An EA may be prepared for a proposed action with significant effects if the EA is tiered to a broader EIS that fully analyzed those significant effects. In such a case, a FONSI could be prepared as long as any previously unanalyzed effects are not significant. A finding of no significant impact other than those already disclosed and analyzed in the EIS to which the EA is tiered may also be called a "finding of no new significant impact" (46.140(c)).

## 2.5    ADOPTING ANOTHER AGENCY'S EXISTING ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT

When available, the NPS should use existing NEPA documents and analyses to evaluate the impacts of a proposed action and any alternatives (46.120). The NPS may adopt an EA or EIS prepared by another agency or entity, including an applicant, as the basis for an NPS decision if the document meets all NEPA

26

AR_0003409

**JA372**

USCA Case #23-1067    Document #2022013    Filed: 10/16/2023    Page 125 of 232

requirements applicable to the NPS and the NPS takes full responsibility for its content. When determining whether an existing EA or EIS is sufficient for purposes of the NPS action under consideration, the NPS must consider whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects (46.120(c)).

Scoping is not required when the NPS adopts another agency's EA or EIS. However, parks and programs are expected to consult, cooperate, and coordinate with other federal, state, local, and tribal governments and other bureaus and federal agencies whenever possible (46.155). Furthermore, when adopting another agency's EA or EIS, the NPS is responsible for providing the appropriate level of public review, as discussed further below, and for completing other required consultation processes (such as ESA Section 7, NHPA Section 106, and tribal consultations). [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements.*] If you are considering adopting an existing EA or EIS, you should consult with your REC.

In the event that adoption is not appropriate because the existing document is only partially relevant or applicable to the NPS action, you should still make the best use of existing information by supplementing, tiering to, and incorporating by reference relevant or applicable portions of the existing EA or EIS in order to avoid redundancy and unnecessary paperwork (46.120(d)). [*See Section 2.3: Incorporation by Reference, and Section 2.4: Tiering.*]

### Adopting an Environmental Assessment

The NPS may adopt another federal agency's EA as the basis for a FONSI and decision on an NPS action if it covers the NPS action and the NPS independently reviews the existing EA and determines that it meets all NEPA requirements applicable to the NPS (e.g., the CEQ and DOI NEPA regulations, DO-12, etc.). You should use an interdisciplinary approach to determine the applicability and adequacy of the existing EA in relation to the NPS proposal. When appropriate, the NPS may augment an EA prepared by another federal agency to be consistent with an NPS proposed action. When doing so, the augmented EA must cite to the original EA (46.320). Prior to adopting an existing EA, the NPS must also ensure that its own public involvement requirements have been met (46.320(d)). [*See Section 4.6: Circulating Environmental Assessments and Environmental Impact Statements, Soliciting Public Comments, and Responding to Comments.*] If the NPS elects to adopt an existing EA, it must prepare and approve its own FONSI and must notify the public of the availability of a FONSI once it is signed (516 DM 1.2; 46.305(c)). [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*]

### Adopting an Environmental Impact Statement

As with EAs, the NPS may adopt another federal agency's EIS as the basis for a decision on an NPS action as long as it adequately covers the NPS action and meets all NEPA requirements applicable to the NPS (e.g., the CEQ and DOI NEPA regulations, DO-12, etc.). As with adoption of an EA, you should use an interdisciplinary approach to determine the applicability and adequacy of the existing EIS in relation to the NPS proposal. If the NPS elects to adopt an existing

AR_0003410

JA373

EIS, it must sign its own ROD and make it available to the public through appropriate notice (1506.6(b), Q30). [*See Section 4.7: Concluding the NEPA Process and Documenting a Decision.*]

The applicable procedures for adopting another agency's EIS depend on whether the NPS participated as a cooperating agency during preparation of the EIS. [*See Section 4.13 B: Cooperating Agencies.*] If the NPS participated as a cooperating agency it may adopt the EIS without recirculating the document, provided that all NPS comments and suggestions were addressed in a satisfactory manner during preparation and it meets all NEPA requirements applicable to the NPS (1506.3). In such a case, the NPS would adopt the document and issue its own ROD (Q30). If the EIS prepared by another agency does not adequately address NPS comments or does not meet NPS NEPA requirements, all or portions of the EIS may be adopted, supplemented to meet NPS requirements, and circulated as a draft EIS (DEIS) for public comment prior to issuing a final EIS and signing a ROD (1506.3; Q30).

In the event that the NPS did not participate as a cooperating agency in the preparation of the existing EIS, the NPS may adopt the final EIS as long as the NPS proposed action is substantially the same as the action addressed in the existing EIS. In this instance, the NPS would be required to recirculate the existing EIS as an NPS final EIS (FEIS) and issue its own ROD (1506.3; Q30). If the NPS did not participate as a cooperating agency and the NPS proposed action is not substantially the same as the actions analyzed in the existing EIS (i.e., if an EIS for one action is being adapted for use in a decision on another action) or requires additional information in order to meet NEPA requirements applicable to the NPS, the NPS would need to augment and recirculate the EIS that is being adopted as a DEIS, and seek public comment prior to issuing a final EIS and signing its own ROD (1506.3; Q30).

2015 NPS NEPA Handbook

AR_0003411

**JA374**

# CHAPTER 3: CATEGORICAL EXCLUSIONS

## 3.1   INTRODUCTION

A CE describes a category or type of actions that do not cumulatively or individually have the potential for significant environmental impacts (1508.4). If an action fits within a CE it is not exempt from NEPA; however, it is exempted from the requirement to prepare an EA or EIS. You are encouraged to use CEs when applicable, in order to reduce paperwork and delays associated with approvals of certain federal actions (1500.4; 1500.5).

> *If an action fits within a CE it is not exempt from NEPA; however it is exempted from the requirement to prepare an EA or EIS (1508.4)*

The NPS categorizes CEs into two types based on documentation requirements associated with the CE: (1) CEs for which no documentation is required; and (2) CEs for which documentation is required.

CEs applicable to NPS actions come from two sources:

1. The DOI NEPA regulations (46.210), which include CEs available for use by all DOI bureaus and offices.

2. The NPS chapter of the DM (516 DM 12), which includes additional CEs available specifically to the NPS.

These CEs are listed below. You may rely on the CE lists included in this handbook and cite the CEs listed below by referring to chapter 3.2 or 3.3 and the CE letter/number, for example, "CE 3.2Y" or "CE 3.3 A.4.," rather than citing to the DOI NEPA regulations or the DM.

Information regarding when a CE may be used, approval authority for CEs, and public involvement considerations is included in this section. Other sections in this chapter describe the various NPS actions that may be categorically excluded and discuss associated documentation requirements and procedures, consideration of extraordinary circumstances, and use of CEs for ongoing and recurring actions. The sections discussing these topics are:

| | |
|---|---|
| 3.2 | Categorical Exclusions for which No Documentation is Required |
| 3.3 | Categorical Exclusions for which Documentation is Required |
| 3.4 | Process for Categorical Exclusions Requiring Documentation |
| 3.5 | Extraordinary Circumstances |
| 3.6 | Use of Categorical Exclusions for Ongoing and Recurring Actions |

### *Determining Whether a Categorical Exclusion May be Used*

In order to use a CE, you must ensure a proposed action fits within the category of actions described in a specific CE. A proposed action is "the bureau activity under consideration" (46.30). The proposed action does not have to be specifically mentioned in the text of a CE, but should easily fit into the category of actions described by the CE. Many of the CEs listed below include guidance that is intended to help you understand how they should best be applied. Where the guidance provides examples of actions that would be appropriate under a specific CE, the examples are meant to be illustrative and not exclusive. If the proposed action does

29

AR_0003412

**JA375**

not fit within the category of actions described in a CE you must either modify the proposal so that it does, or prepare an EA or EIS (46.205). If multiple CEs are required to cover different elements of the proposed action that is a sign that a CE is likely not appropriate.

Once you determine that a proposed action fits within a CE, you must consider whether any of the extraordinary circumstances listed in the DOI NEPA regulations apply. [*See Section 3.5: Extraordinary Circumstances.*] If extraordinary circumstances do apply, you may not use a CE. In such circumstances you must either modify the proposal so that extraordinary circumstances no longer apply, or prepare an EA or EIS (46.205).

As long as the proposed action fits within a CE and no extraordinary circumstances apply, you should use the CE as your pathway for complying with NEPA.

### Approval of Categorical Exclusions

Authority for categorically excluding an action rests with the park unit's superintendent (DO-12, 5.4).

Prior to the approval of a CE, all other necessary consultation and coordination (such as ESA Section 7, NHPA Section 106, and tribal consultations) should be completed and related documentation should be included in the decision file. If the action under consideration triggers the need to comply with Section 106 of the NHPA, you must complete the Section 106 consultation before the CE is approved. You may implement an action that is categorically excluded immediately upon approval of the CE by the superintendent as long as all other necessary consultation and coordination requirements have been completed. [*See Section 4.14: Integrating NEPA and other Environmental Requirements.*]

### Public Involvement

Public comment is not required when using a CE. However, you may wish to seek public comment in situations where there is a high degree of public interest or uncertainty regarding potential effects of a proposed action. Public input can help identify environmental issues [*See Section 4.2 D: Identifying Environmental Issues and Impact Topics*] and provide information that will help determine whether any extraordinary circumstances exist. If you decide to seek public comment regarding the use of a CE, you generally should provide only a short period for the public to submit written comments.

Regardless of whether or not you seek public comment, when using a CE that requires documentation, you should consider notifying the public once the CE is approved by the superintendent. This can be accomplished by posting a brief notice on PEPC or your park unit or program's website, or by other means.

## 3.2    CATEGORICAL EXCLUSIONS FOR WHICH NO DOCUMENTATION IS REQUIRED

A variety of CEs exist to cover actions that typically have little or no potential for environmental impacts of any kind, let alone potential for significant adverse

AR_0003413

JA376

impacts. For such actions, documentation regarding use of a CE is generally not required. These types of actions typically have such little potential to cause environmental impacts that in many instances, NPS personnel may not even realize they are taking an action to which NEPA applies.

While the CEs in this section may be applied without any associated documentation, there may be some instances where documentation is desired for administrative purposes. In such cases, you may prepare documentation following the procedures described in Section 3.4 or document use of the CE in some other way such as a memorandum to the project file. Voluntary documentation of CEs that do not require documentation should be considered on a case-by-case basis. If documentation is prepared for a CE that does not require documentation, it should not be considered to set a precedent for the need to document the use of that same CE in the future.

Although no documentation is required for the purposes of NEPA, if the proposed action triggers the need to comply with other laws, such as the ESA or NHPA, you should develop a decision file for the CE and include the results of any studies or consultations related to other laws.

**Available CEs:**

A. Personnel actions and investigations and personnel services contracts.

B. Internal organizational changes and facility and bureau reductions and closings.

C. Routine financial transactions including such things as salaries and expenses, procurement contracts (e.g., in accordance with applicable procedures and executive orders for sustainable or green procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.

D. Departmental legal activities including, but not limited to such things as arrests, investigations, patents, claims, and legal opinions. This does not include bringing judicial or administrative civil or criminal enforcement actions which are outside the scope of NEPA in accordance with 40 CFR 1508.18(a).

E. Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects).

  *Guidance: Examples of routine and continuing maintenance and operations include trash removal, sweeping parking lots, cleaning restrooms, fixing machinery, snow removal, and small-scale building repairs and renovations.*

F. Management, formulation, allocation, transfer, and reprogramming of the department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required).

31

AR_0003414

**JA377**

G. Legislative proposals of an administrative or technical nature (including such things as changes in authorizations for appropriations and minor boundary changes and land title transactions) or having primarily economic, social, individual, or institutional effects, and comments and reports on referrals of legislative proposals.

H. Policies, directives, regulations, and guidelines that are of an administrative, financial, legal, technical, or procedural nature, or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

*Guidance: **Consider** documenting this CE if you are promulgating a **regulation**.*

I. Activities that are educational, informational, advisory, or consultative to other agencies, public and private entities, visitors, individuals, or the general public.

J. Land and boundary surveys.

K. Preparation and issuance of publications.

L. Technical assistance to other federal, state, and local agencies or the general public.

M. Routine reports required by law or regulation.

N. Issuance of individual hunting and/or fishing licenses in accordance with state and federal regulations.

O. Changes in interpretive and environmental education programs.

P. Plans, including priorities, justifications and strategies, for non-manipulative research, monitoring, inventorying, and information gathering.

*Guidance: This CE also applies to agreements between NPS offices and other federal and state agencies for plans and studies.*

Q. Authorization, funding, or approval for the preparation of statewide comprehensive outdoor recreation plans.

*Guidance: This CE applies to equivalent plans such as **comprehensive statewide historic preservation plans.***

R. Adoption or approval of surveys, studies, reports, plans, and similar documents which will result in recommendations or proposed actions which would cause no or only minimal environmental impact.

S. Sanitary facilities operation.

*Guidance: This may also include **upgrades** to equipment to incorporate new technologies.*

T. Development of standards for, and identification, nomination, certification, and determination of eligibility of properties for listing in the National Register of Historic Places and the National Historic Landmark and National Natural Landmark Programs.

32

AR_0003415

**JA378**

*Guidance: This CE also applies to biosphere reserves.*

U. Statements for management, outlines of planning requirements, and task directives for plans and studies.

*Guidance: **Statements** for management and **outlines** of planning requirements are now known as foundation stat**ements** and assessments of planning needs, respectively.*

V. Preparation of internal reports, plans, studies, and other documents containing recommendations for action which NPS develops preliminary to the process of preparing a specific Service proposal or set of alternatives for decision.

W. Documents which interpret existing mineral management regulations and policies and do not recommend action.

X. Stabilization by planting native plant species in disturbed areas.

Y. Day-to-day resource management and research activities.

## 3.3 CATEGORICAL EXCLUSIONS FOR WHICH DOCUMENTATION IS REQUIRED

A variety of CEs exist for actions that generally result in some level of environmental impact but that do not have the potential to cause significant adverse impacts under normal circumstances. For such actions, documentation is required indicating that the action fits within a CE and that no extraordinary circumstances exist. Documenting the use of a CE provides the NPS an opportunity to demonstrate why a decision to use a CE is appropriate.

Available CEs:

A. Actions Related to General Administration.

1. Changes or amendments to an approved action when such changes would cause no or only minimal environmental impact.

2. Minor boundary changes.

*Guidance: This CE applies to boundary changes that are accomplished **through** existing statutory authorities, such as including an area within a park boundary and maintaining the area as open space, or including a **historic** structure within the boundaries of a park unit and retaining that **structure**.*

3. Reissuance/renewal of permits, rights-of-way, or easements not involving new environmental impacts.

4. Conversion of existing permits to rights-of-way when such conversions do not continue or initiate unsatisfactory environmental conditions.

5. Issuances, extensions, renewals, reissuances, or minor modifications of concession contracts or permits not entailing new construction.

6. Commercial use licenses involving no construction.

33

*Guidance: Commercial use licenses are now known as commercial use authorizations.*

7. Leasing of historic properties in accordance with 36 CFR Part 18 and NPS-38.

   *Guidance: NPS-38 is now Director's Order 38: Real Property Leasing.*

8. Modifications or revisions to existing regulations or the promulgation of new regulations for NPS-administered areas, provided the modifications, revisions, or new regulations do not:

   a. increase public use to the extent of compromising the nature and character of the area or causing physical damage to it,

   b. introduce noncompatible uses that might compromise the nature and characteristics of the area or cause physical damage to it,

   c. conflict with adjacent ownerships or land uses, or

   d. cause a nuisance to adjacent owners or occupants.

   *Guidance: "Area" should be interpreted to mean NPS unit.*

9. At the direction of the NPS Responsible Official, actions where NPS has concurrence or co-approval with another bureau and the action is a categorical exclusion for that bureau.

B. **Plans, Studies, and Reports.**

1. Changes or amendments to an approved plan, when such changes would cause no or only minimal environmental impact.

2. Cultural resources maintenance guides, collection management plans, and historic furnishings reports.

   *Guidance: This CE also applies to equivalent documents related to cultural resources.*

3. Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

   *Guidance: This CE also applies to equivalent documents related to interpretation.*

4. Land protection plans which propose no significant change to existing land or visitor use.

C. **Actions Related to Development.**

1. Land acquisition within established park boundaries.

2. Land exchanges which will not lead to significant changes in the use of land.

   *Guidance: Land exchanges under this CE include transfers of jurisdiction in the District of Columbia.*

3. Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds, and trails.

4. Routine maintenance and repairs to cultural resource sites, structures, utilities, and grounds under an approved Historic Structures Preservation

2015 NPS NEPA Handbook

AR_0003417

**JA380**

Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource.

5. Installation of signs, displays, kiosks, etc.

   *Guidance: Other examples include **wayside** exhibits, small solar collectors on poles, **boundary** marking signs, and small solar or wind generator system installations on a building.*

6. Installation of navigation aids.

7. Establishment of mass transit systems not involving construction, experimental testing of mass transit systems, and changes in operation of existing systems (e.g., routes and schedule changes).

8. Replacement in kind of minor structures and facilities with little or no change in location, capacity, or appearance.

   *Guidance: Examples of minor structures and facilities include **comfort** stations, pit toilets, fences, kiosks, signs, sheds, foot logs, small trail bridges, and **campfire** circles.*

9. Repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails, etc., on existing roads.

   *Guidance: This CE also applies to road maintenance, rehabilitation, repaving, and re**construction** on existing roads within the existing road **prism**. Actions taken under this CE may also include repair or replacement of culverts, signs, surfacing of right-turn lanes at intersections in **previously** disturbed areas, seal coating a parking lot, maintenance of an existing gravel road in the same footprint, **routine** roadside brushing, routine ditching, adding gravel, grading, and other modifications.*

10. Installation of wells, comfort stations, and pit toilets in areas of existing use and in developed areas.

    *Guidance: Other examples include pump houses and vault toilets.*

11. Minor trail relocation, development of compatible trail networks on logging roads or other established routes, and trail maintenance and repair.

12. Upgrading or adding new overhead utility facilities to existing poles or replacement poles which do not change existing pole line configurations.

13. Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in significant visual intrusion and will involve no clearance of vegetation other than for placement of poles.

    *Guidance: This CE also **applies** to the installation of overhead poles and utility lines that meet the other requirements of the CE (not just the **issuan**ce of a right-of-way permit for another **entity**).*

14. Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or significant visual intrusion in an NPS-administered area.

2015 NPS NEPA Handbook

AR_0003418

**JA381**

15. Installation of underground utilities in previously disturbed areas having stable soils or in an existing utility right-of-way.

16. Landscaping and landscape maintenance in previously disturbed or developed areas.

17. Construction of fencing enclosures or boundary fencing posing no effect on wildlife migrations.

*Guidance: **Other** examples include installation or **construction** of exclosures or other inter**nal fenc**ing that may be used to control **adverse** effects of wildlife. This CE may also be used for security fencing around park buildings **or facilities**.*

18. Construction of minor structures, including small improved parking lots, in previously disturbed or developed areas.

*Guidance: Some examples of minor structures include adding a small support building such as a **pump** house or small **equipment** cache in an existing maintenance yard, bus stop (**transp**ortation) or picnic shelters, comfort **stations**, or similar **small**-scale structures; walkways, ramps, signs, or other s**mall fea**tures incidental to the use of a developed area or to improve ac**cessibility; small**-scale develo**pment** of new parking spaces adjacent to existing parking areas; addition or relocation of a small number of camping spaces in an existing ca**mpground** or picnic sites in an **existing** picnic area and **small**, compatible additions to existing buildings (such as **making** an "L" into a "T").*

19. Construction or rehabilitation in previously disturbed or developed areas, required to meet health or safety regulations, or to meet requirements for making facilities accessible for the handicapped.

D.    **Actions Related to Visitor Use.**

1. Carrying capacity analysis.

2. Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.

3. Minor changes in programs and regulations pertaining to visitor activities.

4. Issuance of permits for demonstrations, gatherings, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance.

5. Designation of trailside camping zones with no or minimal improvements.

E.    **Actions Related to Resource Management and Protection.**

1. Archeological surveys and permits involving only surface collection or small-scale test excavations.

2. Restoration of noncontroversial native species into suitable habitats within their historic range and elimination of exotic species.

3. Removal of park resident individuals of non-threatened/endangered species which pose a danger to visitors, threaten park resources, or become a

36

AR_0003419

nuisance in areas surrounding a park when such removal is included in an approved resource management plan.

*Guidance: Resource management plan should be interpreted broadly.*

4. Removal of non-historic materials and structures in order to restore natural conditions.

5. Nondestructive data collection, inventory (including field, aerial, and satellite surveying and mapping), study, research, and monitoring activities.

*Guidance: Some examples include vegetation plots and monitoring, soil surveys, species monitoring, and other nondestructive research activities that require a research permit. This CE should be used for activities that are not covered under the CE for day-to-day resource management. [See CE 3.2 Y.]*

6. Designation of environmental study areas and research natural areas.

**F.    Actions Related to Grant Programs.**

1. Proposed actions essentially the same as those listed in paragraphs A–E above.

*Guidance: This CE applies to approval of a grant by the NPS that would result in actions taken by others that are the same or similar to those listed in paragraphs A–E above.*

2. Grants for acquisition of areas that will continue in the same or lower density use with no additional disturbance to the natural setting.

3. Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical, or cultural resources of the area, or the integrity of the existing setting.

4. Grants for construction of facilities on lands acquired under a previous NPS or other federal grant provided that the development is in accord with plans submitted with the acquisition grant.

5. Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:

    a. conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants, e.g., extend use beyond daylight hours;

    b. introduce motorized recreation vehicles;

    c. introduce active recreation pursuits into a passive recreation area;

    d. increase public use or introduce noncompatible uses to the extent of compromising the nature and character of the property or causing physical damage to it; or

    e. add or alter access to the park from the surrounding area.

6. Grants for the restoration, rehabilitation, stabilization, preservation, and reconstruction (or the authorization thereof) of properties listed on or

2015 NPS NEPA Handbook

AR_0003420

**JA383**

eligible for listing on the National Register of Historic Places at their same location and provided that such actions:

    a.  will not alter the integrity of the property or its setting;

    b.  will not increase public use of the area to the extent of compromising the nature and character of the property; and

    c.  will not cause a nuisance to adjacent property owners or occupants.

**G. Actions Related to Hazardous Fuels Reduction and Post-fire Rehabilitation.** [3]

1. Post-fire rehabilitation activities not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds) to repair or improve lands unlikely to recover to a management-approved condition from wildland fire damage, or to repair or replace minor facilities damaged by fire. Such activities must comply with the following (Refer to the ESM Series for additional, required guidance.):

    a.  shall be conducted consistent with bureau and departmental procedures and applicable land and resource management plans;

    b.  shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and

    c.  shall be completed within three years following a wildland fire.

## 3.4  PROCESS FOR CATEGORICAL EXCLUSIONS REQUIRING DOCUMENTATION

*The steps described below should be accomplished through an internal scoping process that uses an interdisciplinary approach.*

This section details the process for applying and documenting CEs described in Section 3.3. The steps described below should be accomplished through an internal scoping process that uses an interdisciplinary approach.

### 1.  *Define the Proposed Action, Identify Issues, and Evaluate Associated Impacts*

The first steps in the process should be to define the proposed action, identify potential issues, and evaluate associated impacts. Be certain to consider whether there are any connected or similar actions that should be considered as part of the proposal. [*See Section 4.2 D: Identifying Environmental Issues and Impact, and Section 4.2 C: Identifying Connected and Similar Actions.*]

You should complete this step with input from subject matter experts. You may wish to use an environmental screening form (ESF), which can be generated in PEPC, to assist with identifying issues and impacts, although you are not required to do so.

---

[3] The DOI NEPA regulations include an additional CE for hazardous fuels reduction activities (43 CFR 46.210 (k)) that is not listed here. That hazardous fuels reduction CE is not available for use in areas within the jurisdiction of the U.S. Court of Appeals for the 9th Circuit Court at this time, as discussed in the preamble to the final rule (73 FR 61305 October 15, 2008). As a matter of policy, NPS does not currently use this CE.

2015 NPS NEPA Handbook

AR_0003421

**JA384**

When evaluating impacts, be sure to consider cumulative impacts in addition to direct and indirect impacts. If your evaluation of impacts indicates there is a potential for significant adverse impacts as a result of implementing the proposed action, a CE may not be used unless the proposal is modified to reduce impacts to a level below significance.

### 2. Determine Whether There is a CE That Could Apply to the Proposed Action

After defining the proposed action and determining that there is no potential for significant adverse impacts, you should review the CE list to determine whether there is a CE that applies. As stated in Section 3.1, the proposed action does not have to be specifically described, but should easily fit into the category of actions described by the CE. If you are unsure whether a CE applies, you should consult with your REC.

### 3. Determine Whether Any Extraordinary Circumstances Exist

Prior to categorically excluding an action, you must consider the extraordinary circumstances listed in the DOI NEPA regulations and determine whether any apply. [*See Section 3.5: Extraordinary Circumstances.*] If any of the extraordinary circumstances apply, you may not use a CE. In such circumstances you must either modify the proposal so that extraordinary circumstances no longer apply, or prepare an EA or EIS (46.205).

### 4. Document the Potential Impacts of the Action Covered by the CE

When using a CE that requires documentation, you must create a concise record that identifies the CE being used and which should document: (1) that the proposed action fits within the category of actions described in the CE; and (2) no extraordinary circumstances exist. [*See CEQ guidance: Final Guidance for Federal Departments and Agencies on Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act.*] The standard NPS practice is to use a Categorical Exclusion Documentation Form, which can be generated in PEPC, in order to document the required information.

In addition to the information above, if you decide to use an ESF, you should include it in the decision file. Furthermore, if the proposed action triggers the need to comply with other laws, such as the ESA or NHPA, you should include the results of any studies or consultations related to other laws in the decision file. You may also include additional documentation pertinent to the action, such as notes from internal scoping meetings, photographs or field notes documenting a site visit, and documents generated from public involvement efforts (press releases, newsletters, public comments received, etc.). [*See Section 4.9: The Decision File; see also supplemental guidance: Compiling a Decision File for NEPA Reviews.*] The documentation you prepare should be as concise as possible in order to avoid unnecessary delays and administrative burdens. However, the level of detail, length of discussions, and amount of materials you include in the decision file will vary based on the type of action involved, the potential for extraordinary circumstances to apply, and the compliance requirements of other laws.

The superintendent must provide written approval of a CE that requires documentation (typically by signing the Categorical Exclusion Documentation

2015 NPS NEPA Handbook

AR_0003422

**JA385**

Form), and other required consultation processes (such as ESA Section 7, NHPA Section 106, and tribal consultations) must be complete prior to implementing an action covered by a documentable CE. [*See Section 4.14: Integrating NEPA with Other Environmental Review and Consultation Requirements*.]

## 3.5    EXTRAORDINARY CIRCUMSTANCES

As described in Section 3.1 above, CEs apply under normal circumstances. When applying CEs, you must consider the impacts of the action in question to ensure that no extraordinary circumstances exist. If extraordinary circumstances do exist a CE may not be used and an EA or EIS must be prepared (46.205(c)). If you determine that extraordinary circumstances exist that preclude the use of a CE, you can modify the proposed action or apply mitigation so that extraordinary circumstances would no longer apply, and then use the CE. Significant impacts as referred to in the list of extraordinary circumstances below should be interpreted to mean significant adverse impacts.

The DOI NEPA regulations establish the following extraordinary circumstances and mandate that prior to categorically excluding an action, the NPS must consider whether the action would (46.215):

   a.  have significant impacts on public health or safety;

   b.  have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas;

   c.  have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources (Sec. 102(2)(E));

   d.  have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks;

   e.  establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects;

   f.  have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects;

   g.  have significant impacts on properties listed or eligible for listing in the National Register of Historic Places as determined by the bureau;

   h.  have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated critical habitat for these species;

   i.  violate a federal law, or a state, local, or tribal law or requirement imposed for the protection of the environment;

40

2015 NPS NEPA Handbook

Filed: 10/16/2023    Document #2022013    USCA Case #23-1067

j.   have a disproportionately high and adverse effect on low income or minority populations (EO 12898);

k.   limit access to and ceremonial use of Indian sacred sites on federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites (EO 13007); or

l.   contribute to the introduction, continued existence, or spread of noxious weeds or nonnative invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and EO 13112).

## 3.6    USE OF CATEGORICAL EXCLUSIONS FOR ONGOING AND RECURRING ACTIONS

Many NPS actions, especially routine activities related to park administration and maintenance, are of an ongoing or recurring nature. Some examples of these types of actions include routine maintenance and repair of non-historic structures (CE 3.3 C.4) and trail maintenance and repair (CE 3.3 C.11). Such activities, although routine, are at the same time subject to NEPA. In the case of these examples and similar actions, a CE with documentation would typically be required. However, you may avoid preparing separate CE documentation for each instance that one of these types of activities is conducted by making use of "programmatic CEs." Programmatic CEs provide NEPA documentation for multiple instances of an ongoing or recurring activity, when the activity or activities and the impacts that result, are predictable. For example, if your park unit routinely makes repairs to non-historic structures, you could develop a programmatic CE that serves as the NEPA review for routine maintenance and repairs rather than preparing CE documentation each time a repair is made.

When a CE is used in this manner, you should clearly describe the specific activities that are meant to be covered and describe any conditions that must be met for the CE to apply to a particular activity. Although a programmatic CE can be established to cover activities for some time, you should periodically review and updated the CE as necessary to ensure the documentation is still accurate and that no circumstances have changed that would warrant additional NEPA review. While in some cases an annual review may be appropriate, CEs used for ongoing and recurring actions should be reviewed every five years at a minimum, consistent with CEQ guidance regarding supplementation of EISs for ongoing programs (Q32).

You must also consider cumulative impacts and other required consultation processes when preparing and reviewing programmatic CEs. You are encouraged to consult with your REC if you have any questions about developing and using programmatic CEs.

AR_0003424



**U.S. Department
of Transportation
Federal Aviation
Administration**

Western-Pacific Region
Office of the Regional Administrator

777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245

September 23, 2020

Aaron Singer
SeaPlane Adventures
242 Redwood Hwy
Mill Valley, CA 94941

Dear Mr. Singer:

The National Parks Air Tour Management Act of 2000 as amended (NPATMA) addresses commercial air tour operations over units of the National Park System through air tour management plans (ATMPs) or voluntary agreements. Commercial air tour operators who applied for operating authority to conduct tours over a National Park System unit were granted interim operating authority (IOA) by the Federal Aviation Administration (FAA) in 2005. IOA was established as a temporary measure until an ATMP was developed for each park. Based on the level of reported air tours in 2019 for each park with IOA, ATMPs or voluntary agreements are needed at over 20 parks.

On February 14, 2019, Public Employees for Environmental Responsibility and the Hawaiʻi Coalition Malama Pono filed a petition for writ of mandamus in the U.S. Court of Appeals for the District of Columbia Circuit seeking to have the FAA and the National Park Service (NPS) (collectively, the agencies) complete air tour management plans or voluntary agreements at seven specified parks. On May 1, 2020, the Court granted the petition and ordered the FAA and the NPS to file a proposed schedule within 120 days for bringing all twenty-three eligible parks into compliance with NPATMA within two years or to provide specific, concrete reasons why it would take longer. The agencies submitted a proposed schedule to the Court on August 31, 2020.

In response to meeting the order from the court, the FAA and the NPS are commencing ATMP processes at the twenty-three parks. Since your company holds IOA for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore, you have been submitting quarterly reporting of the number of tours conducted on a daily basis, type of aircraft, and route names. In 2013, the agencies implemented the reporting requirement but did not immediately require operators to provide detailed information about specific air tour routes flown each time they submitted a report in order to lessen the burden on the operators. However, as the agencies begin development of the remaining ATMPs, collecting detailed information about routes is necessary in order to support development of the ATMP process.

As an active operator with IOA, we are requesting detailed information on your tour routes for these parks. The agencies will use this information in the ATMP development process. We

2

appreciate the route information you provided in 2016 (included for reference), however this information does not include route names that correspond to your reporting.  In order for your operations to be considered in the ATMP process, we are asking that you provide information on the routes you identified for each of these parks in your quarterly reports submitted between 2017 and 2019 as follows (please include any additional routes, not listed for this timeframe):

Golden Gate

| GGT |
| --- |
| NCT |
| BAT |

San Francisco Maritime

| BAT |
| --- |
| GGT |
| NCT |

Point Reyes

| NCT |
| --- |

- *On the 24x36 park specific map provided (see example map enclosed on how to display and label your routes):*
  - *Draw each route you fly when conducting air tour operations of that park, include arrows showing flight direction, and label with the route name per your quarterly reporting submission (as noted above).*
  - *Indicate at specific points along the route the ideal elevation (MSL or AGL).*

Please use Fed Ex to return the completed map in the enclosed return Fed Ex packaging with the pre-paid/pre-addressed label included, to Amanda Rapoza at the address below by October 7, 2020.

Amanda Rapoza, V-324
Volpe National Transportation Systems Center
55 Broadway
Cambridge, MA 02142
Email: amanda.rapoza@dot.gov

**JA389**

3

**FOR FURTHER INFORMATION CONTACT:** Should you have questions regarding this request please contact me at 424-405-7017, keith.lusk@faa.gov.

Sincerely,

Keith Lusk
Special Programs Office



U.S. Department
of Transportation
**Federal Aviation Administration**

Western-Pacific Region
Office of the Regional Administrator

777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245

September 23, 2020

Teri McClelland
SF Helicopters
875A Island Dr. #372
Alameda, CA 94502

Dear Ms. McClelland:

The National Parks Air Tour Management Act of 2000 as amended (NPATMA) addresses commercial air tour operations over units of the National Park System through air tour management plans (ATMPs) or voluntary agreements. Commercial air tour operators who applied for operating authority to conduct tours over a National Park System unit were granted interim operating authority (IOA) by the Federal Aviation Administration (FAA) in 2005. IOA was established as a temporary measure until an ATMP was developed for each park. Based on the level of reported air tours in 2019 for each park with IOA, ATMPs or voluntary agreements are needed at over 20 parks.

On February 14, 2019, Public Employees for Environmental Responsibility and the Hawaiʻi Coalition Malama Pono filed a petition for writ of mandamus in the U.S. Court of Appeals for the District of Columbia Circuit seeking to have the FAA and the National Park Service (NPS) (collectively, the agencies) complete air tour management plans or voluntary agreements at seven specified parks. On May 1, 2020, the Court granted the petition and ordered the FAA and the NPS to file a proposed schedule within 120 days for bringing all twenty-three eligible parks into compliance with NPATMA within two years or to provide specific, concrete reasons why it would take longer. The agencies submitted a proposed schedule to the Court on August 31, 2020.

In response to meeting the order from the court, the FAA and the NPS are commencing ATMP processes at the twenty-three parks. Since your company holds IOA for Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, you have been submitting quarterly reporting of the number of tours conducted on a daily basis, type of aircraft, and route names. In 2013, the agencies implemented the reporting requirement but did not immediately require operators to provide detailed information about specific air tour routes flown each time they submitted a report in order to lessen the burden on the operators. However, as the agencies begin development of the remaining ATMPs, collecting detailed information about routes is necessary in order to support development of the ATMP process.

As an active operator with IOA, we are requesting detailed information on your tour routes for these parks. The agencies will use this information in the ATMP development process. We appreciate the route information you provided in 2016 (included for reference), however this

2

information does not include route names that correspond to your reporting.  In order for your operations to be considered in the ATMP process, we are asking that you provide information on the routes you identified for each of these parks in your quarterly reports submitted between 2017 and 2019 as follows (please include any additional routes, not listed for this timeframe):

Golden Gate

| V1 |
|---|
| VG1 |
| V2 |
| VG2 |
| VG |

San Francisco Maritime

| V1 |
|---|
| VG1 |
| V2 |
| VG2 |
| VG |

- *On the 24x36 park specific map provided (see example map enclosed on how to display and label your routes):*
  - *Draw each route you fly when conducting air tour operations of that park, include arrows showing flight direction, and label with the route name per your quarterly reporting submission (as noted above).*
  - *Indicate at specific points along the route the ideal elevation (MSL or AGL).*

Please use Fed Ex to return the completed map in the enclosed return Fed Ex packaging with the pre-paid/pre-addressed label included, to Amanda Rapoza at the address below by October 7, 2020.

Amanda Rapoza, V-324
Volpe National Transportation Systems Center
55 Broadway
Cambridge, MA 02142
Email: amanda.rapoza@dot.gov

3

**FOR FURTHER INFORMATION CONTACT:** Should you have questions regarding this request please contact me at 424-405-7017, keith.lusk@faa.gov.

Sincerely,

Keith Lusk
Special Programs Office

# National Parks Air Tour Management Program



**Federal Aviation Administration**



**National Park Service**

**WELCOME – WE WILL BEGIN SHORTLY**

**October 26, 2021**



Photo Credits (clockwise from upper left): National Park Service (NPS) photo of Golden Gate National Recreation Area by Alison Taggart Barone, NPS photo of Muir Woods National Monument, NPS photo of Point Reyes National Seashore by Anela Ramos Kopshever, NPS photo of San Francisco Maritime National Historical Park.

AR_0003086

JA394

# National Parks Air Tour Management Program



**Federal Aviation Administration**



**National Park Service**

## Draft Air Tour Management Plan for:

**Golden Gate National Recreation Area,
San Francisco Maritime National Historical Park,
Point Reyes National Seashore,
and
Muir Woods National Monument**

## October 26, 2021



Photo Credits (clockwise from upper left): National Park Service (NPS) photo of Golden Gate National Recreation Area by Alison Taggart Barone, NPS photo of Muir Woods National Monument, NPS photo of Point Reyes National Seashore by Anela Ramos Kopshever, NPS photo of San Francisco Maritime National Historical Park.

AR_0003087

**JA395**

# Welcome

- Thank you for joining us today.

- Today's meeting focuses on the draft Air Tour Management Plan for four parks: Golden Gate National Recreation Area; San Francisco Maritime National Historical Park; Point Reyes National Seashore; and Muir Woods National Monument.

- We invite you to share your feedback on this draft.

- Specific instructions will be provided throughout this meeting on how to submit your questions.

- This meeting is held pursuant to the National Parks Air Tour Management Act (NPATMA) and its implementing regulations.



**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

**Federal Aviation Administration**

**National Park Service**

3

AR_0003088

**JA396**

# Presenters

- **Eric Elmore**, Senior Policy Advisor, Office of Environment and Energy, FAA

- **Vicki Ward**, Overflights Program Manager, Natural Sounds and Night Skies Division, NPS

- **Laura Joss**, Superintendent, Golden Gate National Recreation Area and Muir Woods National Monument

- **Alison Forrestel**, Chief of Natural Resources Management and Science, Golden Gate National Recreation Area and Muir Woods National Monument



AR_0003089

**JA397**

# Asking Questions

- Throughout the meeting, we invite you to share your questions. Please submit questions using the Google form posted by the FAA in the chat area of the social media platform you are using (Facebook, Twitter, or YouTube).

- Questions will be addressed at the end of the presentations as part of the Q&A portion.



AR_0003090

**JA398**

# Submitting Comments

- All written comments for the record must be submitted via the NPS Planning, Environment and Public Comment (PEPC) site or sent to the mailing addresses listed on the PEPC site.

- These written comments become part of the official record.

- Please note that written comments must be submitted on or before November 15, 2021.

AR_0003091

**JA399**

# Format of Meeting

- This meeting will be 90 minutes long.

- We will adjourn at 6:00 PM Pacific Time.

- In the event questions are addressed before this end time, we will continue to hold the meeting until this identified end time to allow for any additional questions that might come in.



AR_0003092

**JA400**

# National Parks Air Tour Management Program



**Federal Aviation Administration**



**National Park Service**

## Overview of the National Parks Air Tour Management Act (NPATMA) and Air Tour Management Plans (ATMP)



## October 26, 2021

Photo Credits (clockwise from upper left): National Park Service (NPS) photo of Golden Gate National Recreation Area by Alison Taggart Barone, NPS photo of Muir Woods National Monument, NPS photo of Point Reyes National Seashore by Anela Ramos Kopshever, NPS photo of San Francisco Maritime National Historical Park.

AR_0003093

**JA401**

# NPATMA Overview

- Requires the FAA, in cooperation with the NPS, to develop an ATMP for those parks and Tribal lands where operators have applied to conduct commercial air tours

- Act applies to commercial air tours:

    - Within ½ mile of park

    - Over Tribal lands within or abutting a park

    - Below 5,000 feet altitude above ground level (AGL)



**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**     **Federal Aviation Administration**     **National Park Service**     9

AR_0003094

**JA402**

# NPATMA Overview

- Does not apply to general aviation, commercial airline, or military flights

- Does not apply to Alaska parks, Grand Canyon National Park, or Rocky Mountain National Park

- Parks with 50 or fewer reported flights per year are exempt from developing an ATMP, unless this exemption is withdrawn by NPS

- If abutting Tribal lands are or may be overflown, Tribes must be invited as cooperating agencies for National Environmental Policy Act (NEPA) compliance

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument



**Federal Aviation Administration**     **National Park Service**     10

AR_0003095

**JA403**

# NPATMA Overview

- Commercial air tour operators apply for FAA Operating Authority in order to operate over National Park System units and abutting Tribal lands

- Commercial air tour operators fall into two categories:

  o Existing commercial air tour operator

  o New entrant commercial air tour operator



AR_0003096

**JA404**

# Air Tour Management Plans

The objective of any ATMP is to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, resulting from commercial air tour operations upon natural and cultural resources, visitor experiences, and Tribal lands.



AR_0003097

**JA405**

# Air Tour Management Plans

An ATMP:

A. May prohibit commercial air tour operations in whole or in part

B. May establish conditions for the conduct of air tour operations including routes, altitudes, time-of-day restrictions, restrictions for particular events, maximum number of flights, etc.

C. Shall apply to all commercial air tour operations within ½ mile outside the boundary of a national park

D. Shall include incentives for the adoption of quiet aircraft technology

E. Shall provide for the allocation of opportunities to conduct air tours when the ATMP limits the number of operations

F. Shall justify and document the need for measures taken pursuant to items (A) through (E), above, and include such justifications in the record of decision

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

 **Federal Aviation Administration**

 **National Park Service**

13

AR_0003098

**JA406**

# ATMP Parks

**24 Parks**
- Mount Rainier National Park (WA)
- Olympic National Park (WA)
- Point Reyes National Seashore (CA)
- San Francisco Maritime National Historical Park (CA)
- Golden Gate National Recreation Area (CA)
- Muir Woods National Monument (CA)
- Death Valley National Park (CA/NV)
- Glacier National Park (MT)
- Bryce Canyon National Park (UT)

- Canyonlands National Park (UT)
- Rainbow Bridge National Monument (UT)
- Natural Bridges National Monument (UT)
- Glen Canyon National Recreation Area (UT)
- Arches National Park (UT)
- Canyon de Chelly National Monument (AZ)
- Lake Mead National Recreation Area (NV/AZ)
- Bandelier National Monument (NM)
- Mount Rushmore National Memorial (SD)
- Badlands National Park (SD)

- Great Smoky Mountains National Park (NC/TN)
- National Parks of New York Harbor (NY)
- Everglades National Park (FL)
- Haleakala National Park (HI)
- Hawai'i Volcanoes National Park (HI)

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**



**Federal Aviation Administration**



**National Park Service**

14

AR_0003099

**JA407**

# ATMP Development

- For each ATMP, the agencies will:
  1. Publish the proposed ATMP in the Federal Register;
  2. Hold at least one public meeting;
  3. Comply with the National Environmental Policy Act (NEPA), and other legal requirements; and,
  4. Invite Tribes to participate as cooperating agencies for NEPA compliance in cases where Tribal lands are, or may be, overflown.

- The purpose of today's meeting is to review the components of the draft ATMP.

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**        **Federal Aviation Administration**    **National Park Service**    **15**

AR_0003100

**JA408**

# National Parks Air Tour Management Program



**Federal Aviation Administration**



**National Park Service**

## Draft Air Tour Management Plan for:

## Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

## October 26, 2021



Photo Credits (clockwise from upper left): National Park Service (NPS) photo of Golden Gate National Recreation Area by Alison Taggart Barone, NPS photo of Muir Woods National Monument, NPS photo of Point Reyes National Seashore by Anela Ramos Kopshever, NPS photo of San Francisco Maritime National Historical Park.

# Golden Gate National Recreation Area: Park Overview & Resources

- 80,000 acres of land, including sites within urban San Francisco and offshore tidal and submerged lands.

- Variety of cultural and natural features for visitors to enjoy, including Golden Gate Bridge, Alcatraz Island, and Crissy Field.

- The park protects 19 separate ecosystems and numerous watersheds, including more than 1,250 plant and animal species.



Photo Credit: NPS

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

 **Federal Aviation Administration**

**National Park Service**

17

AR_0003102

**JA410**

# San Francisco Maritime National Historical Park: Park Overview & Resources

- Promotes the understanding and enjoyment of the nation's West Coast maritime heritage.

- The 50-acre park maintains the largest and most diverse collection of national historic landmark ships in the United States, featuring historic vessels, maritime structures, and exhibits.



Photo Credit: NPS

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

 **Federal Aviation Administration**

 **National Park Service**

**18**

AR_0003103

**JA411**

# Muir Woods National Monument: Park Overview & Resources

- The 558-acre monument preserves one of the last remaining ancient redwood forests in the Bay Area, including 380 different plants and animals.

- More than 1 million visitors per year come to enjoy the park, which houses redwoods that are nearly 1,000 years old and more than 250 feet tall.



Photo Credit: NPS



**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

**Federal Aviation Administration**



**National Park Service**

19

AR_0003104

JA412

# Point Reyes National Seashore: Park Overview & Resources

- Encompasses more than 71,000 acres of beaches, coastal cliffs and headlands, marine terraces, coastal uplands, and forests and includes all tide and submerged lands to 0.25 miles offshore.

- Includes two no-take state marine reserves, three special closure areas, and three state marine conservation areas, as well as two ranching historic districts.

- The almost 33,000-acre Phillip Burton Wilderness includes one of only two marine wilderness areas in the national park system.



Photo Credit: NPS Photo by Anela Ramos Kopshever

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

 **Federal Aviation Administration**

 **National Park Service**

20

AR_0003105

**JA413**



Petaluma
Novato
Alcatraz Island
San Francisco Maritime National Historical Park
0 0.75 1.5 Miles
Bear Valley Visitor Center
Kenneth C Patrick Visitor Center
Philip Burton Wilderness
Inverness Ridge (elevation 1,180')
Bolinas Ridge (elevation 2,070')
San Rafael
Pinole
Hercules
Martinez
Concord
Richmond
Lighthouse Visitor Center
Muir Woods Visitor Center
Mill Valley
Walnut Creek
Alcatraz Island
Berkeley
Marin Headlands Visitor Center
San Francisco Maritime Visitor Center
Oakland
Golden Gate Bridge Pavillion
San Francisco
Golden Gate NRA Headquarters
Land's End Lookout Visitor Center
San Leandro
Presidio Visitor Center
South San Francisco
Hayward
Airport
Heliport and Seaplane Base
Visitor Center
State Park
Wilderness Area
San Francisco Maritime Park Unit Boundary
Muir Woods Park Unit Boundary
Point Reyes Park Unit Boundary
Golden Gate Park Unit Boundary
1/2 Mile Park Unit Boundary Buffer
N
San Mateo
Redwood City
Palo Alto
0 5 10 Miles

# Existing Air Tour Conditions at the Parks

- Two air tour operators currently hold Interim Operating Authority (IOA) for a total of 5,090 flights each year for each park.

- Annual number of commercial air tours at the parks is limited by the IOA.

- There are no designated parameters on route, time-of-day, or altitude restrictions; no procedures to establish no-fly periods; and no training or education requirements.

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

**Federal Aviation Administration**



**National Park Service**

22

AR_0003107

**JA415**

# Existing Air Tour Conditions at the Parks

| Park | Three-Year Average (2017-2019) |
|------|-------------------------------|
| Golden Gate National Recreation Area | 2,548 flights per year |
| San Francisco Maritime National Historical Park | 2,548 flights per year |
| Point Reyes National Seashore | 143 flights per year |
| Muir Woods National Monument | 0 flights per year |

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

 **Federal Aviation Administration**

 **National Park Service**

23

# Draft ATMP for the Parks

| Category | Existing Air Tour Conditions | Draft ATMP |
|---|---|---|
| Number of Air Tours Authorized Per Year | IOA: 5,090 at each of the 4 park units.<br>Three Year Average (2017-2019):<br>▪ Golden Gate National Recreation Area: 2,548 flights per year<br>▪ San Francisco Maritime National Historical Park: 2,548 flights per year<br>▪ Point Reyes National Seashore: 143 flights per year<br>▪ Muir Woods National Monument: 0 flights per year | 2,548 (of these, 143 commercial air tours may fly over Point Reyes National Seashore, and none are authorized to fly over Muir Woods National Monument) |
| Altitudes | No restrictions, reported altitude currently ranging between 800 feet and 2,500 feet AGL | No lower than 1,500 to 2,500 ft AGL for fixed-wing aircraft, and no lower than 1,000 to 1,500 ft AGL for helicopters, depending on location over the Parks |
| Aircraft Types | No restrictions | Fixed wing and helicopters at Golden Gate National Recreation Area and San Francisco Maritime National Historical Park. Only fixed wing at Point Reyes National Seashore. |

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

 **Federal Aviation Administration**

 **National Park Service**

24

AR_0003109

**JA417**

# Draft ATMP for the Parks

| Category | Existing Air Tour Conditions | Draft ATMP |
|---|---|---|
| Time-of-Day Restrictions | No restrictions, may occur at any time | From 9:00 AM until 30 minutes after sunset for tours of Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, and from 12:00 PM to 5:00 PM for tours of Point Reyes National Seashore |
| Day-of-Week Restrictions | No restrictions, may occur on any day of the week | The NPS can establish temporary no-fly periods for special events or planned park management. |
| Required Reporting and Additional Requirements | Semi-annual reporting requirement; no additional requirements | <ul><li>Restrictions for particular events</li><li>Restrictions for number of daily air tours</li><li>Semi-annual reporting requirement</li><li>Operator training when made available by NPS</li><li>Option for annual meeting</li><li>Specified in-flight communications frequency</li></ul> |

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

 **Federal Aviation Administration**

 **National Park Service**

25

AR_0003110

**JA418**

# Proposed Air Tour Routes
*All Parks, all routes*







**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

**Federal Aviation Administration**

**National Park Service**

26

AR_0003111

**JA419**

# Proposed Air Tour Routes

*Helicopter routes*

Notes:
1. Dashed lines represent the portion of the route outside of the 1/2 mile Park Unit Boundary Buffer.
2. Arrows on routes indicate direction of flight.
3. The routes will be flown at a minimum AGL of 1,000 ft. over Golden Gate and San Francisco Maritime.
4. All commercial tours maintain at least 1,000 ft lateral avoidance of Alcatraz Island.

# Proposed Air Tour Routes

*Seaplane routes at Golden Gate National Recreation Area and San Francisco National Maritime Park*



 

**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

**Federal Aviation Administration**

**National Park Service**

28

# Proposed Air Tour Routes
## *Seaplane route at Point Reyes National Seashore*





**Federal Aviation Administration**



**National Park Service**

AR_0003114

**JA422**

# Justification for Measures Taken

- **Northern Spotted Owls**: Condition that in certain locations the commercial air tours fly no lower than 1,500 feet AGL is consistent with avoidance recommendations for spotted owls.

- **Wilderness**: Condition that commercial air tours fly no lower than 2,000 feet AGL over land-based wilderness is intended to protect wilderness character and visitor experience.

- **Seabirds and Marine Mammals:** Condition that commercial air tours fly at least 1,000 feet laterally from Alcatraz Island and from known seabird colonies, peregrine falcon nests, and marine mammal haul outs are intended to protect wildlife.

- **Muir Woods:** No air tours currently occur. The ATMP would continue existing conditions and no air tours would be authorized.

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

**Federal Aviation Administration**

**National Park Service**

30

AR_0003115

**JA423**

# National Environmental Policy Act

- The FAA and the NPS are complying with the National Environmental Policy Act (NEPA) in development of the draft ATMP.

- NEPA requires that the agencies:
  - Consider the human and natural environment that could be affected by their action (ATMP).
  - Determine the appropriate level of NEPA review.
  - Prepare associated environmental review documents.

- At this time, the FAA and the NPS have conducted an initial impact analysis and are considering developing the ATMP under an NPS Categorical Exclusion.

- The agencies will consider public comments on the ATMP, information obtained during consultations, and fully assess the environmental impacts before making a final decision on the appropriate level of environmental review.

AR_0003116

JA424

# Section 106 of the National Historic Preservation Act

- The FAA and the NPS are complying with Section 106 of the National Historic Preservation Act in development of the draft ATMP.

- Section 106 includes the requirement that the agencies:

  - Define the Undertaking and Identify Consulting Parties

  - Determine the Area of Potential Effects and Identify Historic Properties

  - Assess Effects to Historic Properties

  - Resolve Adverse Effects, if Any, to Historic Properties

- The FAA and the NPS have initiated consultation with the relevant SHPO, Tribes, and Consulting Parties.



AR_0003117

**JA425**

# Section 7 of the Endangered Species Act

- The FAA and the NPS are complying with Section 7 of the Endangered Species Act (ESA) in development of the draft ATMP.

- Section 7 includes the requirement that the agencies:

  – Ensure their actions do not jeopardize the existence of any species listed under ESA or result in the destruction or adverse modification of designated critical habitat.

- The FAA and the NPS have completed a preliminary assessment and do not anticipate impacts to listed species or designated critical habitat.

---

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

 **Federal Aviation Administration**

 **National Park Service**

33

AR_0003118

**JA426**

# Public Review of the Draft ATMP

- The FAA and the NPS invite comments from the public, agencies, Tribes, and other interested parties on the draft ATMP.

- Comments must be received on or before November 15, 2021.

- Submit your comments:

  – Online: https://parkplanning.nps.gov/BayAreaATMP

  – Via Mail:

    National Park Service
    Natural Sounds & Night Skies Division
    Bay Area ATMP
    1201 Oakridge Dr., Suite 100
    Fort Collins, CO 80525

 

AR_0003119

**JA427**

# Next Steps

- Following the end of the public comment period, the FAA and the NPS will:

    - Review the comments and use these to inform the final ATMP.

    - Continue to coordinate and complete Tribal, Section 106, and Section 7 consultations.

    - Conclude the NEPA process by signing a decision document.

- Upon the completion of the public comment period, consultations, Section 106 and NEPA processes, the ATMP will be finalized. The final ATMP will be available on the FAA and the NPS websites.

- Once the final ATMP is in place, the FAA will update Operations Specifications for each air tour operator.



**Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument**

**Federal Aviation Administration**

**National Park Service**

35

# Questions and Comments

- **During the meeting**, please submit questions using the Google form posted by the FAA in the chat area of the social media platform you are using (Facebook, Twitter, or YouTube).

- **After the meeting**, please submit your comments for the record on or before November 15, 2021, at:

  - Online: https://parkplanning.nps.gov/BayAreaATMP

  - Via Mail:

    National Park Service
    Natural Sounds & Night Skies Division
    San Francisco Bay Area ATMP
    1201 Oakridge Dr., Suite 100
    Fort Collins, CO 80525

---

Draft ATMP for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Point Reyes National Seashore, and Muir Woods National Monument

 **Federal Aviation Administration**

 **National Park Service**

36

AR_0003121

**JA429**

unforeseen and temporary operator limitations. Additionally, industry marketing trends change and NPS needs to respect that dynamic, as visitors alter their destinations according to those trends.

Finally, the National Parks should be available for all visitors to see. Limiting flights over the park unfairly limits the elderly, very young, handicapped, and others to experience the park. Limiting flights over the Parks is discriminating to those who might not have the time, resources, or physical ability to see the park any other way.

The National Park Service simply cannot go behind closed doors to do this independently. I strongly urge you to consult with the NPOAG on the development of the ATMPs.

| | |
|---|---|
| Correspondence ID: | 102Project:103175Document:115991 |
| Email: | jerry@littlefluffyclouds.com |
| Outside Organization: | Little Fluffy Clouds LLC Unaffiliated Individual |
| Received: | Nov,07 2021 16:26:48 |
| Correspondence Type: | Web Form |

Correspondence:    I hope I'm not too late to say that I think in light of reducing unnecessary carbon output it is almost frivolous to consider allowing tourist flights over our National Parks. Emissions, noise, wildlife and bird disturbance are among the objections that come immediately to mind.

Our National Parks are sanctuaries for wildlife and birds, and places of calm, beauty and grandeur for people. They should not be subject to this constant and relentless pulse towards a revenue stream at any cost.

The NPS should be set in the role of stewardship and not deviate from that master plan. The NPS must set an example for others to follow.

I hope you will reconsider and fight hard to prevent such an intrusion from occurring.

Sincerely,
Jerry van de Beek
Little Fluffy Clouds LLC

| | |
|---|---|
| Correspondence ID: | 103Project:103175Document:115991 |
| Email: | |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,07 2021 17:48:39 |
| Correspondence Type: | Web Form |

Correspondence:    Commercial air tours are unnecessary.

Visitors come to West Marin for a sense of peace, quiet and viewing wildlife. The beauty of this region is it offers a quiet escape from the hustle and bustle of city life.
Tourism supports local businesses, their dollars benefit the County and help pay for our emergency services.

Flights are counter intuitive when considering the larger picture.
Thank you for your consideration.

| | |
|---|---|
| Correspondence ID: | 104Project:103175Document:115991 |
| Email: | sfcc@goldengateaudubon.org |
| Outside Organization: | Golden Gate Audubon Society Unaffiliated Individual(Official Rep.) |
| Received: | Nov,08 2021 14:41:19 |
| Correspondence Type: | Web Form |

Correspondence:    These comments are submitted by the Golden Gate Audubon Society (GGAS) on behalf of its approximately 10,000 members and supporters in the San Francisco Bay Area, many of whom use and enjoy our National

Filed: 10/16/2023     Page 183 of 232

USCA Case #23-1067     Document #2022013

Parks and are concerned about the protection of natural resources, visitor experience and National Park values. Our members frequently enjoy the local National Park lands for the study of birds and other wildlife and for the pure enjoyment of nature. Many of our members also enjoy the educational and volunteer stewardship opportunities the Parks have to offer.

In the spirit of advocating for the best possible protection of natural resources and visitor experience, we support the notion of prohibiting any air tour routes from entering or crossing over National Park areas. Given the climate challenges facing humanity, air tourism within our National Parks is an excessive use of energy and a frivolous output of carbon into our atmosphere. In addition, air tourism represents a daunting example of elitism, with the wealthy few hovering over and looking down upon the common majority.

That being said, we appreciate the opportunity to comment on the Bay Area Draft Air Tour Management Plan (Draft ATMP). After reviewing the draft and attending the public meeting on October 26th we have the following questions and comments.

Natural Resource Protection

Lateral Avoidance - The Draft ATMP (lines 161 - 165) states, All commercial tours will fly no lower than 2,000 ft AGL over land-based wilderness and maintain at least 1,000 ft lateral avoidance of Alcatraz Island and 1,000 ft lateral avoidance of nesting shorebird colonies, peregrine falcon nests or marine mammal haul outs...
The Draft ATMP (lines 274-276) states, Studies of aircraft disturbance to both Brandts cormorants and common murres support a 1,000 ft AGL buffer to prevent flushing, with greater distance to prevent all forms of disturbance.
The Draft ATMP (lines 297-299) states, The vertical and lateral avoidance of the Core Ranch Area B and other Core Ranch Areas at Point Reyes National Seashore are intended to limit sound impacts and minimize disturbances to permitted dairy ranch operations and associated residential uses. The lateral avoidance referred to here being 2,000 ft.

Why is the lateral avoidance 2,000 ft for dairy ranches, but only 1,000 ft for nesting birds and marine mammals? The lateral avoidance should provide consistent and adequate protection from disturbance to natural resources and to visitor experience.

Studies support a 1,000 ft buffer to prevent flushing, with greater distance to prevent all forms of disturbance. The ATMP should provide for the prevention of all forms of disturbance, not merely the prevention of flushing. A 2,000 ft lateral avoidance requirement for all ATMP applications may serve to prevent all forms of disturbance to sensitive habitat areas and would achieve consistent protection of resources and visitor experience.

How will pilots know where nesting bird colonies, falcon nests, or marine mammal haul outs are? The ATMP should include provisions by which sensitive habitat sites can be sufficiently identified so pilots clearly understand where these sensitive locations are.

Golden Gate Channel - Hundreds of birds cross the Golden Gate Channel each day during spring and fall migration. The ATMP does not consider the potential impacts to raptors and other birds that cross the Golden Gate Channel between Marin and San Francisco Counties. Potential impacts to migrating birds should be addressed and safeguarded by the ATMP.

According to BirdNote (birdnote.org), Birds usually fly relatively low. Most of the year, they stay under 500 feet. During migration, though, birds gain altitude, and many species fly at 2,000 to 5,000 feet or higher, using prevailing winds to assist them.

During spring and fall migration, birds are regularly observed flying at high altitudes, 1,000 ft., while crossing the Golden Gate Channel. Air tour routes over the Golden Gate Channel and elsewhere throughout the Park should be at sufficient altitudes to avoid any chance of impacting migrating birds.

Visitor Experience/Soundscapes

Altitudes - Many people visit the Park to experience nature and to seek quietude with the expectation of a soundscape that buffers the noise of the surrounding urban areas. To facilitate a Park experience that is quieter than the surrounding urban areas the minimum AGL altitude should be higher in the Park than in the surrounding urban areas.

AR_0003225

The Federal Aviation Regulation (FAR) Part 91.119 indicates that the minimum cruising altitude over urban areas is 1,000 feet above ground level (AGL). The Draft ATMP indicates that the minimum altitude for helicopters will be 1,000 ft AGL. By setting the minimum AGL altitude at 1,000 ft above Park lands, the Draft ATMP offers park visitors no better experience than they get in surrounding urban neighborhoods.

The Draft ATMP also indicates (lines 293-295) that an altitude of 2,500 ft AGL &will improve preservation of& visitor experiences on the ground by reducing the intensity of air tour noise to visitors on the ground.

The route maps provided in the Draft ATMP indicate that helicopters will frequently fly over much of the Presidio. Considering that Hawk Hill is 923 ft tall and the Golden Gate Bridge towers are 746 ft tall (and the Salesforce Tower is 1,070 ft tall), helicopters flying at 1,000 ft will be obvious and apparent to park visitors on the ground. In order to preserve visitor experiences on the ground the ATMP should require air tours to fly higher than the 1,000 ft minimum required over urban areas.

Routes - The Draft ATMP indicates that helicopter flights will regularly fly directly over the Presidio. Helicopters are loud machines that dominate the surrounding soundscape in all directions. Currently, helicopters flying directly over the Presidio are, quite often, obvious and apparent, and noticeably impact Park visitor experience on the ground.

Routes should be designed to view the Park from its margins, to minimize traversal of interior Park areas and to maintain altitudes such that they will not easily draw the attention of Park visitors on the ground. Crossings of the Park should be done at the narrowest parts of the Park where practicable.

Time of day - - Many visitors enjoy wildlife viewing opportunities within the Park. The hours from sunrise until mid-day, and from the later afternoon through sunset, offer the best opportunities for most wildlife viewing.

The Draft ATMP (lines 300-306) states, Sunrise and sunset are important times of the day for&visitor use and experience&Wildlife viewing is often conducted during this time of day&Day/time restrictions have been included in this ATMP to create quiet periods of the day&These restrictions&allow for opportunities for visitors to enjoy natural sounds& Most organized wildlife viewing field trips occur between 7am and 12pm. It is not uncommon for individuals or impromptu groups to start before sunrise or to enjoy the Park in the evening hours before sunset. During the months when migration occurs, hawk watching from the Marin Headlands, coastal areas of the Presidio, and other areas of the Park may occur beyond noon and well into the afternoon hours.

In order to create quiet periods of the day during which noise from commercial air tours would not impede wildlife behaviors and also allow opportunities for visitors to enjoy natural sounds, all air tours should be restricted to the hours of 12PM to 5PM. While restricting air tour hours to 12PM to 5PM would not eliminate all potential for negative impact to visitor experience, it may be an acceptable compromise.

Days of week - The Draft ATMP does not consider the potential for designating some days of the week as no-fly days. Having some days of the week where air tour flights are not permitted may serve to enhance and ensure a better quality of visitor park experience.

Precautionary Principle

Along with the provisions for Adaptive Management (Sec 8.0) and Amendment (Sec 9.0), the ATMP should also include the Precautionary Principle, in which lack of full scientific certainty shall not be used as a reason for postponing cost-effective measures to prevent environmental degradation.

Administration Costs

The Draft ATMP does not address the cost of administering the ATMP. Administration of the ATMP should not put a financial burden on the NPS and should provide for adequate funding to cover all NPS administrative expenses.

Conclusion

While we would prefer a plan that allows no air tour flights over Park areas, we applaud the Park Service and the FAA for moving forward to better protect natural resources and Park visitor experience. We hope that our questions and comments are useful toward shaping a workable and effective plan. We look forward to continuing our participation in Park planning issues, and our membership looks forward to enjoying our National Parks and benefiting from the values that they uphold.

Sincerely,

Glenn Phillips
Executive Director

| Correspondence ID: | 105Project:103175Document:115991 |
|---|---|
| Email: | stacysheard@gmail.com |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov.09 2021 11:10:53 |
| Correspondence Type: | Web Form |

Correspondence:    Thank you for the opportunity to comment on the proposed Air Tour Management Plans for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (Parks).

I have serious concerns with the development process of the Air Tour Management Plans (ATMP) by the National Park Service (NPS) and the Federal Aviation Administration (FAA). NPS and the FAA have ignored The National Parks Overflight Advisory Group (NPOAG), a rulemaking committee put in place by congress to provide advice, information, and recommendations to the agencies in the implementation of the National Parks Air Tour Management Act of 2000.

NPOAG guidance is critical to the safety and economic stability of the air tour industry. Excluding NPOAG in the ATMP process is negligent and violates the NPOAG Order.

NPS does not have the expertise to redesign the airspace over these parks. Without the expertise and safety input from the NPOAG, serious safety concerns will arise as the NPS moves, compresses, combines and shifts flight routes and altitudes that have been in place for years.

I also have serious concerns with the economic impact these plans will have on helicopter air tour companies. The NPS has failed to reach out to the operators to enquire what economic impacts might arise implementing a management plan that restricts overflights. Operators are already suffering economically post COVID-19, loosing over 80% of their businesses due to the shutdown of international travel. Further restrictions will cripple an already fragile industry trying to rebuild.

The Bay Area ATMP authorizes 2,548 commercial air tours per year. Of these, 143 commercial air tours may fly over Point Reyes National Seashore, however helicopter air tours are no longer authorized over this park. No commercial air tours are authorized over Muir Woods National Monument. Currently the two operators in the area are authorized to fly a combined total of 5,090 commercial air tours per year. This plan eliminates helicopter tours over two parks and uses the average from 2017-2019 reported commercial air tours to establish a new, much lowered number of authorized flights.

The draft plans' flight allocation numbers do not take into consideration fluctuations in the market and fluctuations in unforeseen and temporary operator limitations. Additionally, industry marketing trends change and NPS needs to respect that dynamic, as visitors alter their destinations according to those trends.

Finally, the National Parks should be available for all visitors to see. Limiting flights over the park unfairly limits the elderly, very young, handicapped, and others to experience the park. Limiting flights over the Parks is discriminating to those who might not have the time, resources, or physical ability to see the park any other way.

The National Park Service simply cannot go behind closed doors to do this independently. I strongly urge you to consult with the NPOAG on the development of the ATMPs.



# Marin Audubon Society

P.O. Box 599  |  Mill Valley, CA 94942-0599  |  marinaudubon.org

November 14, 2021

National Park Service
Natural Sounds and Night Skies Division
San Francisco Bay Area ATMP
12012 Oakridge Drive, Suite 100
Fort Collins, CO 80525

Re:  Air Tour Management Plan – San Francisco Bay Area

Dear Sirs/Madams:

Thank you for providing the opportunity to comment on this important Plan.  As we understand, this draft Plan applies to all commercial air tours over parks the four. The Plan reports quite a high number of tours 2,548 air tours (143 over Pt. Reyes)over authorized annually significant natural resource areas of the Golden Gate National Recreation Area, Pt. Reyes National Seashore and Muir Wood National Monument, and SF Maritime Historical Park.  That high number of trips could be causing significant impacts to the natural resources of the parks and that is the focus of our comments.  We read that the intent of the Plan is to mitigate or prevent significant adverse impacts, and to protect wildlife and their habitats however, as discussed below, the Plan does not adequately address avoidance. We recommend that the Plan be revised to provide sufficient data and analysis that demonstrate significant impacts will be avoided with proposed restrictions.

The Plan needs to provide more than short lists of species with a few discussions.  Endangered, special status, migratory and resident species that  are in the path of existing and potential flight patterns s]should be identified and described in more detail. For GGNRA 13 different ecosystems, 37 threatened and endangered species, only two endangered seabirds and one falcon are listed.  For Pt Reyes seven ecosystems are listed, but there are certainly more,  28 threatened and endangered species, 490 species of birds and marine mammal. The Plan should identify and discuss the different ecosystems, the avian and mammal species that depend on these habitats as well as the life cycle functions the species depend on the habitat for, e.g. nesting, refueling stop over during migration, overwintering.  In addition, some habitats need to be protected because their sensitivity.  These include  wilderness, aquatic habitats – bluffs wetlands, lagoons, and coastal beaches and

The plan reports flight restrictions: Fixed wing aircraft can fly no lower than 1500 to 2,500 depending on location; helicopters can fly no lower than. 1000-1500 and hours are limited to 9

AR_0003136

**JA434**

Filed: 10/16/2023    Page 187 of 232    Document #2022013    USCA Case #23-1067

am to 30 minutes after sunset. The critical question is whether these heights are actually sufficient to protect the important wildlife of GGNRA, Pt. Reyes National Seashore.

While information is provided about certain species (e.g. Brandt's cormorants nesting on cliffs), harbor seal haul outs), this information is vague. There needs to be more specific and organized data and analysis provided that shows that the sensitive resources are adequately protected by the flight height limits and that the species are adequately protected during the time they are occupying the specific habitats for critical life functions. Have there been tests demonstrating the following are adequately protected:  marine mammals and pups on beaches, nesting seabirds nesting on cliffs, Northern Spotted Owl nesting on the tops of Redwood trees, other raptors nesting  waterfowl rafting on pond waters or seabirds resting on the ocean, and shorebirds foraging on beaches during migration and winter, or even birds in flight, are not disturbed,  flying away or simply. stopping from the activity (e.g. sleeping, foraging) they are engaged in.

In addition to analyzing the effectiveness of height limits as mitigation for noise impacts,  the Plan needs to address other measures to protect the species.  In particular, closing specific locations at certain times to flyovers in order to avoid noise impacts during  nesting and other time periods when wildlife is engaged in activities during which they are particularly sensitive to disturbance.

Thank you for responding to our recommendations.

Sincerely,

Barbara Salzman, Co-chair
Conservation Committee

Correspondence:    This past weekend, Bald Eagles were sited in the area of Panoramic Ave, near the Muir Woods National Park, Redwood, Lagunitas and other Marin creeks where very rare, threatened and endangered salmon are spawning. The restored presence of the Bald Eagles indicate that the natural system is being restored with this year's incredible rains.

This natural system is being harmed by commercial tourist plane fly overs. These must be prohibited from flying over the Panoramic Ridge, over the Mt. Tam watershed lands and certainly over GGNRA and NPS lands. These commercial flights have been banned in other National Parks because of the disturbance they create. We need a similar ban to protect the wild, protected, biodiverse and taxpayer funded special areas of Mt Tam.

Please act swiftly to ban these disruptive flyovers. The privelage of the few should NOT be allowed to harm nature that we ALL rely on for life, survival and spiritual renewal.

| Correspondence ID: | 122Project:103175Document:115991 |
|---|---|
| Email: | |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,13 2021 13:52:13 |
| Correspondence Type: | Web Form |

Correspondence:    If the objective of this current ATMP is "to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tours on natural and cultural resources, visitor experiences, and tribal lands," then an important element has yet to be fully considered. The Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore areas are surrounded by densely populated residential areas that feel the direct negative effects of the 1280 annual (2560 takeoffs and landings) helicopter flights allowed. A reduction in the total number of flights is the only acceptable solution to the intrusive impacts we currently experience. The NPS has an obligation to consider the population that shares this beautiful geography. Please seriously consider a significant reduction in the number of helicopter flights over these parks.

| Correspondence ID: | 123Project:103175Document:115991 |
|---|---|
| Email: | stevetwt@earthlink.net |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,13 2021 15:54:20 |
| Correspondence Type: | Web Form |

Correspondence:    The National Park Service helicopter rules over the GGNRA, San Francisco Maritime Park, Point Reyes and Muir Woods serves tour operators and a few thousand tourists to the detriment of hundreds-of-thousands of southern Marin residents. Obviously the daily lives of tens-of-thousands of residents is of no consequence to the NPS and associated government agencies. When the government says it is comming to help - don't believe it. The government does not know how to help -it only knows how to make make more jobs and accomplish nothing positive..

| Correspondence ID: | 124Project:103175Document:115991 |
|---|---|
| Email: | solomonprogressive@gmail.com |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,14 2021 03:34:31 |
| Correspondence Type: | Web Form |

Correspondence:    Low-flying commercial tour flights over the Point Reyes National Seashore are inappropriate. I have lived in Inverness for more than 20 years very near the National Seashore, and I believe that altitude restrictions and strict limits on frequency of flights are long overdue. In fact, an outright ban seems preferable if the aspirational priorities of the National Park Service are to be implemented.

| Correspondence ID: | 125Project:103175Document:115991 |
|---|---|
| Email: | gbatmuirb@aol.com |
| Outside Organization: | Save Our Seashore Unaffiliated Individual(Official Rep.) |
| Received: | Nov,14 2021 15:37:22 |
| Correspondence Type: | Web Form |

Correspondence:    Save Our Seashore

A 501(c)(3) Charitable Organization (EIN 94-3221625)
Founded in 1993 to Protect Marin County's
Ocean, Coasts, Estuaries, Watersheds and Creeks

40 Sunnyside Dr, Inverness CA 94956 gbatmuirb@aol.com 415-663-1881

November 15, 2021

Craig Kenkel, Superintendent, Point Reyes National Seashore (PRNS)
1 Bear Valley Road, Point Reyes Station, CA 94956

Subject: Comments on the National Park Service (NPS) Air Tour Management Plan (ATMP)

Dear Superintendent Kenkel:

Unfortunately, the process for the National Park Service's (NPS) Air Tour Management Plan (ATMP) makes clear that NPS nationally has subverted the National Environmental Policy Act (NEPA) to reach the predetermined outcome of ratifying air tours as they currently exist.

The adverse impacts of aircraft overflight noise on park resources and visitor experience have been extensively documented. Yet the ATMP process provides
1) No analysis of baseline conditions,
2) No analysis of potential impacts from air tours and
3) No consideration of reasonable alternatives (different flight plans; no air tours).

Thus, the ATMP planning undermines the credibility and legitimacy of NPS's planning process.

Comments specific to Point Reyes National Seashore (PRNS):

1) No Analysis of Baseline Conditions:

As we said in our 8/19/11 comments on the prior PRNS ATMP: A NEPA Environmental Assessment (EA) should include measurements of aircraft noise sufficient to provide a statistically valid environmental baseline and incorporate the 2002 decision of the U.S. Circuit Court of Appeals in the case of United States Air Tour Association v. FAA, 298F.3d997, which held that ATMPs must also consider impacts from non-tour aircraft.

Including impacts from non-tour aircraft is particularly important for PRNS since it is close to a major metropolitan area and is already subject to significant aircraft noise. It is quite possible that reasonable "quotas" for aircraft noise over PRNS are already being met or exceeded by non-tour aircraft in which case no tour flights should be permitted under 5,000 feet Above Ground Level (AGL).

2) No Analysis of Potential Impacts from Air Tours:

Sound Impacts Must be Reasonable for both Park Visitors and Wildlife. The A-weighted decibel scale measure impacts to humans. We therefore urge that the ATMP EA adopt A-weighted soundscape limits to limit impacts to park visitors.

Further, the PRNS coastline includes many breeding and nesting sites for vulnerable wildlife species. The soundscape for wildlife includes many sounds humans cannot hear, so, to limit impacts to park wildlife, the EA should include studies to determine which species may be sensitive to typical aircraft noise frequencies, volumes and durations.

3) No Consideration of Reasonable Alternatives (different flight plans; no air tours).

The FAA recommends that pilots fly at least 2,000 feet AGL over national parks. Yet the PRNS ATMP proposes some flight segments at 1500 feet AGL despite the requirements of the Organic Act ("when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant"). The current air tour operator complains (Point Reyes Light 9/3/21) that a 1500 feet AGL is a "reasonable compromise," but the FAA's 2,000-foot minimum is already a compromise.

Further, some sensitive areas (Point Reyes Headlands) have shoreline cliffs as high as 600 feet, consequently a plane flying lateral to these cliffs at 1500 feet AGL would have impacts comparable to a flight at 900 feet AGL.

The current air tour operator also complains that the new ATMP proposal calls for his planes to dangerously alternate between 1500 feet and 2000 feet AGL segments, which danger would be eliminated and the ride made smoother by a consistent 2000-foot AGL limit. We therefore urge that PRNS ATMP maintain at least the FAA's minimum of 2,000 feet AGL.

Further, the proposed ATMP flight plan calls for a flight segment (#4 to #5 on the map of the proposed seaplane route at PRNS) that crosses the ridgeline but over the Phillip Burton Wilderness. This is unacceptable and unnecessary when views of the ridgeline can be provided by crossing south of Stinson Beach to avoid both the Wilderness area and Bolinas Lagoon.

Further still, the proposed ATMP flight plan calls for a flight segment (#6 to #7, returning via #8) that crosses PRNS near the B Ranch dairy complex. PRNS dairies have enough on their plates with required environmental improvements. One hundred forty-three overflights when cows are supposed to be contentedly milked is unacceptable and unnecessary when views of 10-Mile Beach can be provided by coming around the Point Reyes Headlands from #6 to #8 and turning around at #7 to return via #8).

In sum, Save Our Seashore calls for an Environmental Assessment that conforms to NEPA and in the absence of which also calls for the PRNS ATMP flight plans and minimum altitudes to be adjusted as noted above.

Thank you for the opportunity to comment.

Gordon Bennett, SOS President

| | |
|---|---|
| Correspondence ID: | 126Project:103175Document:115991 |
| Email: | sonjajeananderson@gmail.com |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,14 2021 20:19:57 |
| Correspondence Type: | Web Form |
| Correspondence: | National Parks, |

The air tours over the Park in Pt Reyes should be ended. the noise and air pollution is disturbing to wildlife.

It is unfortunate to enable a company to make a profit to disturb the life that the NPS is mandated to protect.
End air tours now. No aircraft should be allowed below 5,000 feet.

Sould you ignore safety to animals, birds and marine life.; please take 50% of the fee for the parks to support the parks.

Thank you for considering these comments to the draft plan.

Sincerely,
Sonja Anderson. US Citizen

| | |
|---|---|
| Correspondence ID: | 127Project:103175Document:115991 |
| Email: | RICK.ERNENWEIN@GMAIL.COM |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,14 2021 22:14:30 |

AR_0003250

**JA438**

This insufficient ATMP does not protect the outstanding qualities of these four parks that are intended to be preserved within our National Park System.

| Correspondence ID: | 134Project:103175Document:115991 |
| --- | --- |
| Email: | dhingson@imfowest.com |
| Outside Organization: | Sierra Club - member of its National Recreation Issues Tean Unaffiliated Individual |
| Received: | Nov,15 2021 15:29:50 |
| Correspondence Type: | Web Form |
| Correspondence: | I have tracked the NPATMA law since 2000; and a member of the NPOAG since about 2012 |

My comments address Muir Woods NM with which I have extensive field experience with NPS as employee on summer and as contacted employer the summer before that.

This beautiful serene redwoods grove did not deserve some air tour/sea plane company all too casually claiming IOA of 5090 annual tours over it and nearby park units. The FAA embarrassed itself by not checking that IOA out, and hopefully after 20 years arranged for voluntary surrender of that IOA.

The ROD should detail the events that led finally to that IOA surrender, disclose what if any scrutiny was given or not to the operators application twenty years ago, and intervening, efforts to confirm the 5090 air tours operator-claimed , or whatever the actual number plausible to claim, and all efforts/events to withdraw IOA over the years.

The ROD should list all of the many noise and visitor experience studies at MUWO, what was learned about acoustics of the park vs visitor noise intrusions from high and low.

Finally, the ROD and environmental documentation should include full text of the March 4, 2021 letter from NPS to FAA asking for withdrawal of the Standard Categorical Exemption; as that will doubtless expound upon many reasons NPS took its specially enhanced preservationist stance re its integrity and natural soundscape.

I strongly support a no flights alternative over MUWO- let the silent primeval ancient forest reign unimpaired by helicopter ðŸš□ noisemakers.

Interfering corrupting motor noise of tour aircraft.must resisted by keeping that mode of transport on ground, used for industrial or emergency needs only, partly because we desperately need to keep carbon in the ground by forbidding spewing of GHG over or around MUWO by irresponsible flying aka "littering" of the atmosphere with still more CO2!

| Correspondence ID: | 135Project:103175Document:115991 |
| --- | --- |
| Email: | ndesai@npca.org |
| Outside Organization: | National Parks Conservation Association Unaffiliated Individual |
| Received: | Nov,15 2021 17:10:35 |
| Correspondence Type: | Web Form |
| Correspondence: | November 15, 2021 |

National Park Service
Natural Sounds and Night Skies Division
San Francisco Bay Area ATMP
1201 Oakridge Dr., Suite 100
Fort Collins, CO 80525

Re: NPCA comments on Draft ATMP for Bay Area National Parks

We are writing to comment on the Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (Bay Area National Parks) draft air tour management plan. Since 1919, the National Parks Conservation Association (NPCA) has been the leading voice of the American people in protecting and enhancing our National Park System.â€ On behalf of ourâ€¯nearlyâ€¯1.6â€¯million members and supporters

nationwide,†̄ we ask you to†̄ consider our views and concerns on this draft air tour management plan (ATMP). We want to express our strong recommendation to eliminate impacts from air tours at Bay Area National Parks, including the development of an alternative that eliminates air tours from these parks.

This plan lacks a rationale for continuing air tours. In fact, the National Parks Air Tour Management Act of 2000 (P.L. 106-181) states, "The objective of any air tour management plan shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." The plan does not include any park-specific data or information to judge "adverse impacts" to resources, visitor experience, and tribal lands. Yet, it allows "new entrants" to be "granted operating authority under this ATMP...within 90 days of the publication of an amended ATMP or of the effective date of ATMP changes implemented through the adaptive management process." We believe this draft plan lacks information to justify any air tours or potential future increase of air tours. This plan appears to be an attempt to shoehorn a minimal amount of air tours in the parks only to allow future air tours without any baseline acoustic information or identification of natural and cultural resources affected by air tours and their harm to visitor and tribal experiences.

In public meetings, the FAA and NPS have said the NEPA pathway (categorical exclusion) could be reconsidered based on public comment, placing the burden squarely on the public to identify potential impacts absent site specific analysis and scientific data as well as information from Tribal and US Fish and Wildlife Service consultation. We ask instead that the agencies go back to the drawing board, with NPS as the lead agency with the expertise in preventing adverse impacts to park resources, to develop a suite of alternatives with site specific analyses. Alternatives should include an option to reroute air tours outside park air space (no air tour alternative), and an option to decrease air tours over time.

In the past, we have witnessed the NPS allow other uses from snowmobiles to personal watercraft to enter parks at low volumes then grow and have major damaging effects from increased noise to direct conflicts with park resources, wildlife, and visitor experiences. This Bay Area National Parks plan lacks detail and foresight that will likely set these parks on a detrimental course that will be difficult to reverse in the future.

Organic Act of 1916

The National Park Service Organic Act of 1916 sets forth the agency's central mission "to conserve the scenery and the natural and historic objects and the wild life [in national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. In the General Authorities Act, Congress "reaffirm[ed], declare[d], and direct[ed] that the promotion and regulation of the various areas of the National Park System ... shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all of the people of the United States." Id. § 1a-1. Congress further provided that "[t]he authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established." Id. Air tour management must comply with these laws and other laws as well as the enabling legislation for each park unit. This draft air tour plan fails to account for the resources and values intended to be protected, how those resources and values may be impacted by the number and conditions set out for future air tours and puts the burden on the public to identify adverse impacts.

Determination of Baseline

This draft plan improperly uses the existing number of flights permitted under Interim Operating Authority (IOA) as the baseline for determining the appropriateness or impacts from proposed air tours. Congress created the National Parks Air Tour Management Act (NPATMA) to address the problem of existing air tours over national parks, not to enshrine them. If existing number of air tours over national parks was not a major problem in 2000, Congress would have had no reason or purpose to create NPATMA. IOA was created as a temporary, permissive use of air space that was otherwise set "off-limits" to commercial air tours by NPATMA pending a properly-completed air tour management plan signed by both the FAA and the NPS. The FAA repeatedly refused NPS requests for verification of the operator-submitted numbers used to establish IOA. Operational disagreement between the two agencies has extended that temporary period for two decades, but Congress stated clearly in the report language accompanying the Act how this basic difference was to be resolved within a cooperative process:

AR_0003260

**JA441**

Filed: 10/16/2023    Page 194 of 232

USCA Case #23-1067    Document #2022013

Senate Report 106-109: "The Committee further intends that the FAA retains its role as the sole manager of America's airspace, and its responsibility to ensure a safe and efficient air transport system, and that the NPS retains its responsibility and authority to protect park resources and values, and visitor experiences… The NPS determines potential impacts to the park and visitor opportunities."

Under NPATMA, the purpose of an ATMP is to terminate IOA, not to extend it. Upon the creation of an ATMP, IOA ceases to exist. Accordingly, it is not an approved action nor a justification for allowing continuing air tours over a national park. NPATMA also states that an ATMP "may prohibit commercial air tour operations over a national park in whole or in part". The use of IOA-permitted flights as a baseline determination without evidence or analysis frustrates the letter of the law and the intent of Congress in the creation of NPATMA.

A decision to approve any number or type of air tours over any national park must be a data-driven determination made solely by applying the high standards of the Organic Act to the protection of that park's cultural, natural and wildlife resources, and maintenance of the unique human experience that each park is mandated to provide and to protect. Delay caused by the FAA's refusal to implement the intent of Congress in creating NPATMA does not change the baseline. The baseline for any ATMP for a national park is the ambient natural sound within that park absent the proposed intrusion. The use of the IOA-permitted existing number of flights in this draft plan has, by definition, no basis in analysis nor consideration of the effects of air tours on park resources and visitors' experience.

In the past, we have witnessed the NPS allow other uses, from snowmobiles to personal watercraft, to enter parks at low volumes then grow and have major damaging effects ranging from increased noise to direct conflicts with park resources, wildlife, and visitor experiences. Approval of this draft plan, with its complete lack the detail and foresight, would likely set this national park on a detrimental course that would be difficult to reverse in the future.

Endangered Species Act

The Endangered Species Act of 1973 (ESA) protects species that are listed as "endangered" or "threatened." (16 U.S.C. §§ 1531-1544). Section 7 of the ESA directs all agencies to ensure that any action authorized, funded, or carried out by it is not likely "to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species." (The "jeopardy provision"). (16 U.S.C. § 1536(a)(2)). Section 7 requires the NPS to consult with the Fish and Wildlife Service to ensure that an action does not violate the jeopardy provision. (Id.) Section 9 prohibits all persons (private and public) within the jurisdiction of the United States from "taking" a listed species. (16 U.S.C. § 1538(a)). It is important to note that a take does not necessarily require a "dead body." A take arises whenever the listed species is harassed, harmed, pursued, shot, wounded, killed, trapped, captured, or collected. Even an attempt at any of these actions constitutes a "take." (Id.) A Biological Opinion issued under section 7 analyzes the possibility that a proposed action will take a listed species. The FAA and NPS acknowledge on the park planning website that they have begun informal consultation with the Fish and Wildlife Service, but the draft ATMP does not include compliance with the ESA and should not be signed by the National Park Service until it does.

A full assessment and disclosure of potential and probable impacts upon wildlife should be undertaken by NPS, especially given that NPS has a division dedicated to studying and understanding threats to natural sounds- the Natural Sounds and Night Skies Division. In addition to fully assessing and preventing any impacts to threatened and endangered species, NPS should consider and disclose potential impacts of air tour noise upon other species and the ecological functions they provide. At Point Reyes, 28 threatened and endangered species are present and at Golden Gate, 37 threatened and endangered species are present, including the threatened northern spotted owl.

National Historic Preservation Act

In the National Historic Preservation Act (NHPA) (16 U.S.C. §§ 470a et seq.), section 106 is the portion that addresses federal undertakings which include a project, activity, or program either funded, permitted, licensed, or approved by a federal agency including the FAA and NPS. Undertakings may take place either on or off federally controlled property and include new and continuing projects, activities, or programs and any of their elements not previously considered under Section 106. This provision requires the FAA and NPS to take into account the effects of their undertakings on historic properties and to

provide the Advisory Council on Historic Preservation (ACHP) with a reasonable opportunity to comment. In addition, FAA and NPS are required to consult on the Section 106 process with State Historic Preservation Offices (SHPO), Tribal Historic Preservation Offices (THPO), Indian Tribes (to include Alaska Natives) [Tribes], and Native Hawaiian Organizations (NHO).

Historic properties are any prehistoric or historic districts, sites, buildings, structures, or objects that are eligible for or already listed in the National Register of Historic Places. Also included are any artifacts, records, and remains (surface or subsurface) that are related to and located within historic properties and any properties of traditional religious and cultural importance to Tribes or NHOs.

The Section 106 regulations (36 CFR 800) place particular emphasis on consultation with THPOs, Tribes, and NHOs. Federal agencies must consult THPOs, Tribes, and NHOs about undertakings when they may affect historic properties to which a Tribe or NHO attaches religious or cultural significance. This requirement applies regardless of the location of the historic property. The draft air tour plan does not acknowledge compliance with the NHPA and should not be signed by the National Park Service until it does.


The Wilderness Act of 1964

The Wilderness Act of 1964 (16 U.S.C. Â§ 1131) created the National Wilderness Preservation System to protect and preserve land's wilderness character. The NPS Management Policies of 2006 clearly established the responsibilities of park managers to protect and preserve wilderness resources, stating that "to preserve Congress's prerogative to designate wilderness ... plans potentially affecting eligible wilderness resources will propose no actions that could adversely affect the wilderness characteristics and values that make them eligible for consideration for inclusion in the National Wilderness Preservation System." (NPS Management Policies at 2.3.1.10) This draft plan has established routes through wilderness which clearly threatens wilderness resources in that a cornerstone of wilderness is that "the imprint of humans' work [be] substantially unnoticeable." (NPS Management Policies at 6.2.1.1) The noise contributed by air tours is certainly not unnoticeable and causes harm to visitors seeking to experience natural sounds. Above all, the Park Service should not invite avoidable intrusions, like air tours, into wilderness whether it be designated, potential, proposed or recommended given NPS' duty to "ensure that the wilderness character is likewise preserved." (NPS Management Policies at 6.3.1) The draft air tour plan does not acknowledge compliance with the Wilderness Act and should not be signed by the National Park Service until it does.

National Park Service Management Policies of 2006

Congress provided the NPS with the discretion to manage national parks but limited that discretion by the requirements of the Organic Act that park resources and values be left "unimpaired" for future generations. This duty to avoid impairment establishes the primary responsibility of the NPS. "The impairment of park resources and values may not be allowed by the Service unless directly and specifically provided for by legislation or by the proclamation establishing the park." (NPS Management Policies at 1.4.4). The Park Service has an affirmative duty to prevent degradation of park resources and values. "NPS managers must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values." (NPS Management Policies at 1.4.3)

Impairment is an impact that affects a resource or value that is "necessary to fulfill specific purposes" identified in formation of the park or "key to the natural and cultural integrity of the park or to opportunities for enjoyment of the park". (NPS Management Policies at 1.4.5). The "park resources and values" that fall under the impairment standard include scenery, wildlife, natural soundscapes and smell, and all natural process and features. Also not to be impaired is "the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system." (NPS Management Policies at 1.4.6).

The Bay Area National Parks draft air tour plan mentions the prohibition of air tours in relation to sunset and sunrise due to effects on wildlife species and visitors. It states, "Sunrise and sunset are important times of the day for wildlife and visitor use and experience. Biologically important behaviors for many species occur during this time, such as foraging and

communication. Wildlife viewing by Park visitors on the ground is often done during this time of day as well. The day/time restrictions have been included in this ATMP to protect these Park resources." (at page 13). This is an acknowledgement that resources could be impaired by air tours, but there is no further investigation, study or monitoring of wildlife behavior at other times of the day. This omission of information violates the fundamental laws and policies governing NPS units.

Specifically, the NPS set a requirement of "using appropriate management planning, superintendents will identify what levels and types of unnatural sound constitute acceptable impacts on park natural soundscapes. The frequencies, magnitudes, and durations of acceptable levels of unnatural sound will vary throughout a park, being generally greater in developed areas. In and adjacent to parks, the Service will monitor human activities that generate noise that adversely affects park soundscapes, including noise caused by mechanical or electronic devices. The Service will take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values, or that exceeds levels that have been identified through monitoring as being acceptable to or appropriate for visitor uses at the sites being monitored." (NPS Management Policies at 4.9). NPS should be conducting acoustic monitoring beyond the sunrise/sunset time frames to ensure no adverse effects or impairment of park resources and values.

Furthermore, NPS sets an expectation that certain impacts should be avoided and describes its duty as the following: "unacceptable impacts are impacts that, individually or cumulatively, would be inconsistent with a park's purposes or values, or impede the attainment of a park's desired conditions for natural and cultural resources as identified through the park's planning process, or create an unsafe or unhealthy environment for visitors or employees, or diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or unreasonably interfere with park programs or activities, or an appropriate use, or the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park, or NPS concessioner or contractor operations or services." (NPS Management Policies at 8.2). Whether the standard is impairment, adverse effects or unacceptable impacts, NPS is required to protect natural and cultural resources and visitor experiences of those resources ahead of uses and activities that could negatively impact them. For example, the Point Reyes Foundation Document describes these Fundamental Resources and Values that should receive primary consideration in planning processes:

Wilderness. The Phillip Burton Wilderness comprises almost 33,000 acres of land and water, roughly one-third of the lands administered by the Point Reyes National Seashore. It is the only federally designated wilderness in the San Francisco Bay Area and includes one of only two marine wilderness areas in the national park system. The Phillip Burton Wilderness provides access to outstanding opportunities for solitude and inspired recreation adjacent to a large urban area.

Marine, Estuarine, and Freshwater Environments. Natural interactions and connections between freshwater, estuarine, and marine systems are indicators of ecosystem health and examples of resilience. Protection of these environments and the interactions between them is important for the ecological health of intertidal invertebrates and fishes, pinnipeds, seabirds, shorebirds, and dune plants, among other species, which are threatened by rising sea levels, changes in nutrient and temperature regimes, oil spills, and other pressures.

Diversity of Habitats and Native Species. In Point Reyes National Seashore the convergence of ecological regions at the continental margin creates a complexity of terrestrial and marine habitats that sustain exceptional and internationally recognized native biodiversity, including a wide range of rare and endemic species.
Opportunities for Inspiration and Recreation. A system of trails, beaches, and waterways in Point Reyes National Seashore provides a wide variety of year-round activities and coastal access just an hour's drive from the San Francisco Bay Area. Activities include whale watching, hiking, kayaking, beach recreation, bird watching, horseback riding, backpacking, and wilderness experiences.

National Environmental Policy Act

This ATMP does not comply with the National Environmental Policy Act (NEPA). The Federal Register notice announcing the ATMP states, "The FAA is issuing this notice pursuant to the National Parks Air Tour Management Act of 2000 (Pub. L. 106-181) and its implementing regulations contained in Title 14, Code of Federal Regulations, Part 136, Subpart B, National Parks Air Tour Management." §136.39 states, "In establishing an air tour management plan under this section, the Administrator and the Director shall each sign the environmental decision document required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) which may include a finding of no significant impact, an environmental

assessment, or an environmental impact statement and the record of decision for the air tour management plan." No decision document is available for public review concurrent with the ATMP. It's important to note the following from the court decision that prompted this planning process: "Management plans must go through notice and comment and comply with the National Environmental Policy Act (NEPA)."https://www.peer.org/wp-content/uploads/2020/05/5_1_20-Court-Decision-Overflights.pdf.

The National Environmental Policy Act (NEPA) requires that agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on - - (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. §§ 4332(C). The NPATMA requires NEPA compliance by means of an EIS or EA for ATMPs. 49 U.S.C. §§ 40128(b)(2). The FAA has neither prepared an EIS or EA concerning this proposed ATMP nor properly claimed a categorical exclusion from NEPA. The FAA is therefore in violation of NEPA and should conduct a full NEPA analysis with a suite of alternatives before moving forward with this ATMP.

We sincerely hope that NPS and the FAA can successfully complete the necessary and appropriate ATMP/NEPA documents that will serve to protect park resources and values as required by the NPS Organic Act of 1916 and fulfill each agency's responsibilities under the National Parks Air Tour Management Act of 2000. Such plans are, in fact, long overdue. However, the NPS approach of presenting the proposed actions (the ATMPs) for public comment in advance of and apart from the required compliance documents is completely unacceptable, sets a harmful procedural precedent for future planning efforts, and is very likely to be counterproductive to the necessary completion of the twenty-three ATMPs by the agreed upon deadline. It is also very likely that the NPS approach of separating the "plan" from the "compliance" will invite further legal challenge, if not by the Petitioners in the existing case, then by other conservation groups who are equally concerned about the process.

Lack of Measurements and science-based assessment

In our previous letter (Appendix A), we called on the FAA and NPS to conduct site-specific analysis at each park that was mandated to prepare an ATMP. We are greatly disappointed with the lack of information provided in the current draft plans. With little to no measurements on the potential impacts of air tour noise on park resources and visitor experiences, the NPS failed to take into account the unique characteristics and resources of each park.

We fear that the new operating authority based on the average of annual overflights between 2017, 2018, and 2019 does not consider the actual carrying capacity for noise of these Bay Area National Parks. Taking the average of these years only formalizes the status quo. No metrics are provided in the draft plan to illustrate whether this average is an appropriate measure and will not derogate park resources. Any reduction of operating authority should center around resource protection and be justified by sound studies and modeling. Overall, there was an alarming lack of measured acoustics and impacts to visitors and park resources in all draft ATMPs, which further illustrates the plans' failures to justify and mitigate air tour impacts on natural resources. No sound studies or sound modeling were cited in any justifications in this plan. Without actual justification and mitigation, air tours should not be permitted. Therefore, we ask for a further reduction in operating authority that is backed by sound studies and modeling or evidence that demonstrates that sound studies and modeling support that the new operating authority is in fact within the park's carrying capacity (NPS Management Policies at 8.2.1).

Lack of Justification for Air Tours

In Golden Gate, San Francisco Maritime, and Point Reyes, we find the NPS and FAA do not provide enough justification to allow air tours. To allow for such few flights with no justification communicates a lack of prioritization of the park's natural and cultural resources. With parks' limited resources in terms of staff and funding that are already dedicated to a variety of important projects and programs, the time and cost of managing an air tour program with virtually no activity that still has the potential to harm park resources is not worth it, particularly with a viable alternative to reroute air tours outside the parks air space. Furthermore, if NPS cannot do more than formalize the status quo at this park, a park where it should be significantly easier to eliminate all flights, we have great concern for future ATMPs and how they will protect park resources.

**Tribal Consultation**

While we appreciate the avoidance of sacred land in the draft ATMPs, we are equally disturbed by the seeming lack of tribal consultation. There is no indication in the plans of how and which tribes contributed and how their voices were factored into the decision-making process. It is vital that this plan acknowledges the cultural and historical significance of many areas in these Bay Area National Parks and that the Park Service actively works with neighboring tribal communities to protect these areas within this plan. As a result of the insufficient language regarding how this plan will respect American Indian sacred sites and ceremonial activities, we urge the NPS to increase the amount of comprehensive analysis of these cultural sites and include more tribal consultation. Without proper investigation into the needs and wants of neighboring tribal communities, this plan will ultimately fail to achieve its intended purpose.

**Conclusion**

After assessment of the draft plan, NPCA found that there was a lack of justification to allow air tours at the expense of protecting the natural soundscape in the park and that the FAA and NPS failed to demonstrate they have applied measurements of the acoustics, carried our sound studies, evaluate impact on park resources, or conduct thorough tribal consultation. There are significant flaws in this planning process indicating that NPS should return to the drawing board, and a full site-specific analysis and disclosure in the context of an appropriate level NEPA-compliant document, including a no air tour alternative, should be developed and released. Without the appropriate justification, we ask that this process be stopped and air tours should be eliminated at these Bay Area National Parks.

Sincerely,
Neal Desai
Senior Program Director, Pacific Region
National Parks Conservation Association

Appendix A: Letter from NPCA to FAA and NPA dated 12/3/2020

| | |
|---|---|
| Correspondence ID: | 136Project:103175Document:115991 |
| Email: | tsteiner@tirn.net |
| Outside Organization: | TURTLE ISLAND RESTORATION NETWORK Unaffiliated Individual(Official Rep.) |
| Received: | Nov,15 2021 17:24:19 |
| Correspondence Type: | Web Form |
| Correspondence: | Thank you for the opportunity to comment. |

The proposed Air Tour Management Plan for the Golden Gate National Recreation Area, Point Reyes National Seashore, Muir Woods National Monument and San Francisco Maritime National Historical Park needs vast improvement.

The Interim Operating Agreement it continues does not properly mitigate for recreational values of the park units and damages most visitor experiences..

Sound pollution reduces visitor experiences, especially for those units that are essential for wildlife and for the people who visit them.

This especially true for these units that are near urban areas and provide an important refuge for people and wildlife.

The proposed ATMP should be more fully analyzed under the provisions of NEPA, The heart of the environmental process is the examination of alternatives. Confirming an existing IOA with a Categorical Exclusion does not allow sufficient examination of the facts that would include acknowledging adverse impacts and mitigating them.

This insufficient ATMP does not protect the outstanding qualities of these four parks that are intended to be preserved within

Filed: 10/16/2023    Page 200 of 232

USCA Case #23-1067    Document #2022013

| Correspondence ID: | 138Project:103175Document:115991 |
| --- | --- |
| Email: | laurachariton@comcast.net |
| Outside Organization: | Watershed Alliance of Marin Unaffiliated Individual(Official Rep.) |
| Received: | Nov,15 2021 17:59:29 |
| Correspondence Type: | Web Form |
| Correspondence: | Watershed Alliance of Marin |

446 Panoramic Hwy.
Mill Valley, CA 94941
November 15, 2021
Park: Golden Gate National Recreation Area
Project: National Park Service Bay Area Air Tour Management Plan (ATMP) ID: 103175
RE: Air Tours Management Plan - Golden Gate National Recreation Area, Point Reyes National Seashore, Muir Woods
National Monument and San Francisco Maritime National Historical Park

To whom it may concern;
Daily, because of our proximity to Muir Woods, we are reminded of how detrimental these air tours of fixed wing aircraft,
helicopters and sea-planes are; buzzing the ridgeline, speeding, diving and flying directly over us, Muir Woods, Point Reyes
and the GGNRA Coast.

The offices of the Watershed Alliance of Marin (501c3) est. 2013 and our home of 30 years are on the ridge of Panoramic
Highway in Mill Valley above Muir Woods. As a past Tule Elk docent, I frequently visit the elk preserve and hike the trails
at Point Reyes National Seashore. Sounds of low flying planes are averse to preserving and protecting wildlife that is already
stressed. On November 12, 2021, a rare bald eagle flew past our offices on its way to the north where salmon spawn. A
neighbor photographed two bald eagles a bit earlier in the day and posted the photo on Next Door. Bald eagle's continuing
recovery is dependent upon less, not more threats to their existence.

Had the planes been in the vicinity, these magnificent once endangered eagles would have been hit or terrified since the
offending planes often fly way too low and within their altitude. We also have endangered Northern Spotted Owls, too, who
are very sensitive to noise, to the point of nest and location abandonment. Large flocks of Band-Tailed Pigeons and Cedar
Waxwings also inhabit this area, as well as rare Osprey and Golden Eagles.

Despite documenting the extremely low flights for 5 years, taking scores of photos of them flying directly over us, and
calling the F.A.A. many, many times to report infractions there has been no enforcement. Given our property is 400 feet long,
estimating that planes are flying lower than 400 feet is obvious. Sometimes, they barely clear the 130-foot eucalyptus trees.

The National Park Service and GGNRA needs to get serious in banning, to the largest extent possible, any increase in flights
or continuing to allow them, and especially at low altitudes. NEPA needs to be invoked and is necessary to protect the public
trust in this instance. The wildlife need to be protected first and foremost. Shoddy tour companies who fail to abide the FAA
and NPS rules and engage in stunt flying over the most hazardous fire areas in the bay area, should not be allowed to fly over
what should be protected parkland. We agree with Amy Meyer:
"The proposed Air Tour Management Plan for the Golden Gate National Recreation Area, Point Reyes National Seashore,
Muir Woods National Monument and San Francisco Maritime National Historical Park is insufficient. It continues an Interim
Operating Agreement without properly examining relevant facts.

These parks were preserved for their outstanding natural, historic, scenic and recreational values. Natural quiet is an essential
element for their wildlife and for the people who visit them. In proximity to an urban region, these parks are each an
outstanding portion of our nation's heritage and also a refuge from urban life.

The proposed ATMP should be more fully analyzed under the provisions of NEPA. The heart of the environmental process is
the examination of alternatives. Confirming an existing IOA with a Categorical Exclusion does not allow sufficient
examination of the facts that would include acknowledging adverse impacts and mitigating them.

This insufficient ATMP does not protect the outstanding qualities of these four parks that are intended to be preserved within our National Park System." Amy Meyer

Sincerely,

Laura Chariton, President, M.A. Riparian Policy and Environmental Restoration

| | |
|---|---|
| Correspondence ID: | 139Project:103175Document:115991 |
| Email: | maria.brown@noaa.gov |
| Outside Organization: | NOAA, Greater Farallones National Marine Sanctuary Unaffiliated Individual(Official Rep.) |
| Received: | Nov,15 2021 18:18:56 |
| Correspondence Type: | Web Form |

Correspondence: Greater Farallones National Marine Sanctuary (GFNMS) has reviewed the Draft National Park Service Bay Area Air Tour Management Plan (ATMP), and submitted a letter via mail. GFNMS manages the waters and submerged lands to the mean high tide, including the tidal waters and submerged lands currently adjacent to and overlapping with two of the four National Parks Service areas listed in the ATMP: Golden Gate National Recreation Area, and Point Reyes National Seashore. These waters and submerged lands also include northern Monterey Bay National Marine Sanctuary off the coast of Marin County, which is also managed by GFNMS. If the interested public or project planners would like a copy of the letter, please contact Karen Reyna at karen.reyna@noaa.gov. Thank you.

| | |
|---|---|
| Correspondence ID: | 140Project:103175Document:115991 |
| Email: | |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,15 2021 23:49:30 |
| Correspondence Type: | Web Form |

Correspondence: I live in the Gate 6 Road Floating Homes Community and have watched the bird population decline over the 18 years I've lived here, especially more recently after the Sea Plane tours based near Richardson Bay Bridge has increased the number of flights. During the Covid shut down, birds returned but as numbers of flights increase, the birds leave the area as soon as they hear the engine roar as the plane takes off. Osprey's which nested on pilings near the channel are long gone,

The helicopter also taking off from the Manzanita area also disturbs the birds. I watch the pilots of both the helicopter and the two sea planesturn and fly low toward the GGNRA, or if I'm hiking, they are directly overhead and extremely noisy even my ears, because I don't hike with my hearing aids. I have clapped my hands to my ears because of the sound and seen other people do the same.

I have graduated with a degree in Biology and went on to get a Masters in Zoology, and have read and am deeply appreciative of the National Parks Conservation Association's comments. I urge you to carefully read their thoroughly research document and heed it. Air Tours only benefit the rich, while disturbing wildlife and humans trying to seek a quiet time in nature.

In closing, I have occasional run into Coyotes while hiking. Twice I have seen them flee from the ridge when there have been overnights that were much to low and very noisy.

Mickey allison

| | |
|---|---|
| Correspondence ID: | 141Project:103175Document:115991 |
| Email: | |
| Outside Organization: | Unaffiliated Individual |
| Received: | Nov,15 2021 23:51:24 |
| Correspondence Type: | Web Form |

AR_0003269

## migratory birds and air tours

Merkle, William W
Tue 1/18/2022 4:44 PM
To: afish@parksconservancy.org <afish@parksconservancy.org>
Cc: Forrestel, Alison <Alison_Forrestel@nps.gov>

Hi Allen,

I am under pressure to finish up language on bird strikes for responses to comments about air tour impacts to migratory birds:

Here is information that I collated:
Think bird strikes would be a national issue – that all the parks need a consistent answer for.
Need to consider both migrating and resident species (MBTA protects a wide range of native (non-game) species).
We are on Pacific Flyway, and Hawk Hill/Golden Gate has a natural concentration for some migrating species.
FAA maintains air strike database.
Seems like bird strikes are a flight safety issue.
Air strikes are most common at take-off and landing—this is true for fixed wing aircraft BUT most helicopter strikes are en route.

At our last meeting some suggested routing air tours higher in altitude -- think this would be 2000', but the problem with migrating birds is that they can be flying higher in that 2-5000' range and even above. Not sure if you have thoughts on this.

A couple of other ideas:
We could require air tours to report any bird strikes to the FAA bird strike database.  This is kind of saying we don't think this is a big problem, but that we could continue to monitor and develop avoidance measures if there is a recurring problem (and there is a pattern that can be avoided).
We could provide additional information on migration seasonal windows during annual training to air tour operators.
I can check in with USFWS migratory bird office on this and see if they have any advice (they will probably tell me that it is my job to make them avoid birds) -- I owe them a check in to see if they are processing our barred owl permit anyway.

For some reason, no other parks with over flights seem to be dealing with this issue.  I think that it is our highly informed, engaged public.

-Bill

Bill Merkle *(he/him)*
Wildlife Ecologist
Golden Gate National Recreation Area
415-509-2844

AR  0003317

**JA450**

# ATTACHMENT A

# Court Orders and Joint Supplemental Report

AR_0002695

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 19-1044**                              **September Term, 2019**

**Filed On:** May 1, 2020

In re: Public Employees for Environmental
Responsibility and Hawaii Coalition Malama
Pono,

      Petitioners

**BEFORE:**     Henderson, Tatel, and Griffith, Circuit Judges

## O R D E R

Upon consideration of the petition for writ of mandamus, the opposition thereto and supplement to the opposition, the reply and supplement to the reply, and argument by counsel; and in accordance with the opinion issued herein this date, it is

**ORDERED** that the petition be granted.  It is

**FURTHER ORDERED** that the agencies file with the court a proposed schedule, within 120 days of the issuance of this court's opinion, for bringing all twenty-three parks into compliance within two years.  Should the agencies anticipate it will take them longer than two years, they must offer specific concrete reasons in the proposed schedule for why that is so.  The court will retain jurisdiction to approve the plan and monitor the agencies' progress.  After the plan is approved, the agencies are directed to submit updates on their progress every 90 days until their statutory obligations are fulfilled.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:   /s/
Daniel J. Reidy
Deputy Clerk

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 19-1044**                                    **September Term, 2021**

**Filed On:** June 21, 2022

In re: Public Employees for Environmental
Responsibility and Hawaii Coalition Malama
Pono,

      Petitioners

**BEFORE:**     Henderson, Circuit Judge; and Tatel, Senior Circuit Judge

## O R D E R

Upon consideration of petitioners' second motion to enforce order granting petition for mandamus, the opposition thereto, and the reply, it is

**ORDERED** that the motion be granted in part. The Federal Aviation Administration and the National Park Service are directed to file a joint supplemental report by July 21, 2022, in which they: (1) explain why the agencies were unaware that they were behind schedule as of their November 24, 2021 status report; (2) propose firm compliance dates for each park; and (3) provide the legal basis for any anticipated categorical exclusion and the date by which the agencies will make that determination. This supplemental report shall be signed by the Administrator of the Federal Aviation Administration and the Director of the National Parks Service in addition to counsel for the agencies. Petitioners' request for an order limiting air tours at noncompliant parks is denied without prejudice.

### Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY:     /s/
Daniel J. Reidy
Deputy Clerk

No. 19-1044

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY
and HAWAII COALITION MALAMA PONO,
*Petitioners.*

On Petition for Writ of Mandamus

**JOINT SUPPLEMENTAL REPORT OF THE
FEDERAL AVIATION ADMINISTRATION AND
THE NATIONAL PARK SERVICE**

Of Counsel:

MARC A. NICHOLS
*Chief Counsel*
MICHAEL FINEMAN
CATHERINE BASIC
*Attorneys*
Office of the Chief Counsel
Federal Aviation Administration

SARAH KRAKOFF
*Deputy Solicitor for Parks and Wildlife*
SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

TODD KIM
*Assistant Attorney General*
JUSTIN D. HEMINGER
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

The Federal Aviation Administration (FAA) and National Park Service (together, the agencies) submit this joint supplemental report to comply with the Court's June 21, 2022 Order. As directed by the June 21 Order, this report was reviewed and is signed by the Acting Administrator of the FAA and the Director of the National Park Service, as well as counsel for the agencies.

## PRELIMINARY STATEMENT

At the outset, we highlight three points for the Court's consideration.

*First*, the agencies remain committed to meeting their obligations. The agencies have sought in good faith to comply with the Court's May 2020 Mandamus Order and November 2020 order (Approval Order) approving the agencies' August 31, 2020 Proposed Plan and Schedule for Completing the Air Tour Management Plans for Twenty-Three Parks (the Compliance Plan). The agencies have devoted substantial resources to get to the point where they are today. Most recently, the agencies have completed the first two management plans (see attached Exhibits 1, 2). And the agencies will continue to devote substantial resources to this effort. The agencies also will continue to submit quarterly Progress Updates to the Court until this is accomplished. The agencies will submit the next Progress Update on August 31, 2022.

*Second*, the agencies are firmly committed to involving the public in the process of developing air tour management plans at national parks. The agencies

1

AR_0002699

have engaged in public participation in three primary ways: (1) soliciting public input on the plans under the National Parks Air Tour Management Act; (2) consulting under the National Historic Preservation Act; and (3) engaging in tribal consultation. The agencies have sought to provide meaningful opportunities for public participation as they develop plans. But public participation takes time; it is often unpredictable and not entirely within the agencies' control. The agencies received thousands of comments on the draft plans released in the late summer and fall of 2021, and they needed to consider and address those comments. Consultation under the National Historic Preservation Act involves State Historic Preservation Offices and other stakeholders, who may affect the timeframe for completing consultation in ways the agencies cannot control. *See* 36 C.F.R. §§ 800.5, 800.6.

Similarly, engaging in tribal consultation, a priority for the agencies, though valuable and necessary, may extend the timeframe for completing plans. *See* Declaration of Raymond M. Sauvajot, Ph.D. (Second Sauvajot Decl.) ¶¶ 1-83 (attached as Exhibit 3 to Respondents' Opposition to Petitioners' Second Motion to Enforce (May 9, 2022) (Respondents' Second Opposition)); Declaration of Kevin Welsh, Executive Director of the Federal Aviation Administration's Office of Environment and Energy (Second Welsh Decl.) ¶¶ 1-28 (attached as Exhibit 4 to Respondents' Second Opposition).

2

*Finally*, the agencies are equally committed to complying with the National Environmental Policy Act (NEPA). For some parks, that may mean applying a categorical exclusion, while for others that may mean preparing an Environmental Assessment. Where the agencies have applied a categorical exclusion, they have still examined in detail the potential environmental impacts of the management plans. The agencies have attached two examples of the extensive documentation being prepared for all plans for which the agencies are contemplating applying a categorical exclusion. Exhibit 1 is the final Record of Decision for the Air Tour Management Plan for Olympic National Park, with documentation in Appendices B, C, and D. Exhibit 2 is the final Record of Decision for the Air Tour Management Plan for Mount Rainier National Park, with appendices. But when the agencies determine that an Environmental Assessment is needed, that takes even more time and resources to develop. And until the Environmental Assessment is completed, the agencies cannot determine whether there may be significant impacts that would require mitigation to avoid having to prepare an Environmental Impact Statement.

In sum, the agencies are working diligently under the Compliance Plan to bring all eligible parks into compliance with the Air Tour Management Act. To that end, the agencies submit this supplemental report.

3

**JOINT SUPPLEMENTAL STATUS REPORT**

## I.    The Accuracy of the Agencies' November 2021 Progress Update

In the June 21 Order, the Court directed the agencies to "explain why the agencies were unaware that they were behind schedule as of their November 24, 2021 status report." The agencies understand the Court's concern to be whether the agencies' November 2021 Progress Update was accurate. The agencies have accurately reported on their activities and progress in all of the progress updates submitted to the Court, including the November 2021 Progress Update.

The Compliance Plan provided that during the first quarter of the second year (September 1, 2021 through November 31, 2021) the agencies would: "Release ATMP/NEPA documents for public comment, as appropriate"; "Conduct public meetings"; and "Continue resolution of Tribal and other agency consultations, as necessary." In the August 2021 Progress Update, the agencies reported that they had released four air tour management plans for public review ahead of schedule. In their November 2021 Progress Update, the agencies reported that an additional eight management plans covering eleven parks had been released for public review and that public meetings had been conducted. November 2021 Progress Update at 3. In sum, the agencies reported that a total of twelve draft

4

management plans, covering fifteen parks, had been completed on or ahead of the schedule in the agencies' Compliance Plan.[1]

But in their November 2021 Progress Update, the agencies also acknowledged the nine parks that had fallen behind the schedule in the Compliance Plan (that is, because no draft management plans had been released for public comment and no public meetings had yet been conducted). The agencies explained that "unique challenges and complications" had caused eight of those nine parks to fall behind the other parks. November 2021 Progress Update at 7-8.

When the November 2021 Progress Update was filed, the agencies also reported that their goal remained to complete air tour management plans or voluntary agreements for all parks included in the Compliance Plan by August 31, 2022. November 2021 Progress Update at 6. And the agencies noted that when it became "clear that compliance with [the Air Tour Management Act] for any of the parks covered by the Court approved plan and schedule will take longer than August 31, 2022, the agencies will provide the Court with a clear and specific

---

[1] The agencies are preparing a single air tour management plan for Golden Gate National Recreation Area, Point Reyes National Seashore, Muir Woods National Monument, and San Francisco Maritime National Historical Park. Muir Woods National Monument was not one of the 23 parks included in the Court-approved Compliance Plan and was exempt because no tours had been conducted over it for several years. But the Park Service withdrew its exemption, and the agencies included it in the combined air tour management plan for the San Francisco Bay Area parks.

5

explanation for the need for additional time." *Id.* at 7. At that time, though the agencies acknowledged that they were behind schedule as to specific tasks in the Compliance Plan for nine parks, they were still working to meet the Compliance Plan's two-year timeline. Moreover, at the time, the agencies did not have sufficient information to predict how much additional time, if any, they might need and for which parks. In particular, the agencies still had significant work to do in considering public input on the draft management plans. But the agencies promised to provide such information to the Court when they were able to provide clear and specific reasons why compliance would take longer for individual parks.

This information was provided in the next Progress Update, filed in February 2022. The agencies informed the Court that "it has become clear that the agencies will not be able to bring 8 of the 23 covered parks into compliance" with the Act by August 31, 2022 and, as promised, provided clear and specific reasons why bringing these parks into compliance would take additional time. February 28, 2022 Progress Update at 7. In the interim between the November 2021 and February 2022 Progress Updates, the voluminous public comments on the twelve draft plans that had been released for public review in the fall of 2021 were reviewed, summarized, and compiled into reports for the agencies' consideration. The agencies then expended extensive efforts to review, consider, and address the public comments on each plan and to identify whether and how the plans needed to

6

be modified as a result of those comments. An example report summarizing public comments on a single plan is included as Appendix G to Exhibit 1.

In their February 2022 Progress Update, the agencies explained the reasons for anticipated delays in completing plans or agreements for the parks identified in the November Progress Update, along with estimated timelines for bringing the parks into compliance with the Act. These timelines were informed by the extensive comments received on the draft plans already released and the time and effort needed to address them. The agencies also reported that, at that point, the schedule was currently holding to bring the 15 parks for which draft plans had already been released for public review into compliance by August 31, 2022, but that the completion of two plans covering five parks (Bandelier National Monument and the four San Francisco Bay Area parks) could be delayed past August 31, 2022 due to unanticipated complications. February 2022 Progress Update at 5-6. The agencies also informed the Court that it was clear they would not be able to bring 8 parks into compliance with the Air Tour Management Act by August 31, 2022. And the agencies provided specific reasons for the delay and estimated timelines for completing those efforts. *Id.* at 7-13.

The agencies updated their explanation and timeline again in their May 2022 Progress Update, identifying additional parks that had fallen behind schedule due to unanticipated circumstances and identifying dates by which the agencies

7

anticipated completing plans or agreements for all parks that the agencies believed, based on information available at that time, could not be completed by August 31, 2022. May 2022 Progress Update at 5-6. The agencies also reported that one park (Everglades National Park) achieved compliance with the Act because the only air tour operator for that park no longer had authority to conduct commercial air tours of the park. *Id*. at 4-5.

Since the agencies' May 2022 Progress Update, the agencies have continued to encounter new obstacles and delays that have set back the schedule for completing plans or agreements at additional parks. Completion of these air tour management plans was delayed due to factors explained in the agencies' most recent progress updates and in the agencies' response to Petitioners' Second Motion to Enforce, as well as delays in completing consultation in compliance with the National Historic Preservation Act.

The agencies have acted consistent with the Compliance Plan since it was approved by the Court in November 2020. The Compliance Plan provides that if it appears that park-specific "circumstances may result in a delay in completion of the ATMP process at an individual park, the agencies will identify the specific and concrete reasons for such delay in the quarterly reports required by the Order at the earliest possible time." Compliance Plan at 1. In the Compliance Plan, the agencies predicted some of the factors that might delay compliance, and those factors have

8

in fact caused delays in completing plans or agreements. Compliance Plan at 1-2 & Exhibit B at 10-13. Other delays have resulted from factors or circumstances that the agencies did not anticipate when they filed the Compliance Plan. But the agencies accurately reported the factors that have caused some parks to fall behind schedule in their November 2021, February 2022, and May 2022 Progress Updates, as well as in their responses to Petitioners' two motions to enforce, which responses were accompanied by voluminous declarations in support.

## II.    Proposed Firm Compliance Dates for Each Park

In the June 21 Order, the Court directed the agencies to propose firm compliance dates for each park. In the chart below, the agencies have submitted proposed dates for bringing each park included in the Compliance Plan into compliance with the Act. We highlight three points about the proposed timeline.

*First*, the agencies have completed two management plans and associated Records of Decision (see attached Exhibits 1, 2), and they are on track to complete another eight management plans for ten parks by the end of January 2023. The timeframe for completion of these management plans depends on whether issues are raised or objections are made by State Historic Preservation Offices or other consulting parties so that the agencies can complete necessary compliance with the National Historic Preservation Act. The chart below identifies proposed deadlines for those eight management plans that account for that uncertainty.

AR_0002707

**JA463**

*Second*, where the agencies cannot complete air tour management plans or voluntary agreements by August 31, 2022, the primary reason is that the agencies need to conduct additional required consultation and environmental or other analysis. This includes preparing environmental assessments for up to nine parks— the very NEPA documents that Petitioners contend the agencies must prepare. On the one hand, Petitioners seek to rush the agencies to the finish line to complete all of the air tour management plans within two years. On the other hand, Petitioners complain that the agencies are not doing sufficient NEPA review.

The agencies are seeking to bring all parks included in the Compliance Plan into compliance with the Act as expeditiously as possible, while also complying with NEPA and other applicable laws. As to some of those laws, the agencies do not have ultimate control over the timing of compliance. For example, where tribal interests or concerns have been expressed, the agencies have sought to engage in government-to-government tribal consultation. Though necessary to inform their planning efforts, the scheduling, timing, and resolution of such consultation is not entirely within the agencies' control. A good example of this is the snowstorm in April 2022 that forced the agencies to reschedule their first in-person tribal consultation meeting regarding the plans for Badlands National Park and Mount Rushmore National Memorial. *See* Second Welsh Decl. ¶¶ 18-19. Due to the difficulties in scheduling a meeting with agency decision-makers and tribal leaders,

10

the agencies were forced to delay this meeting for a month, which has contributed to a delay in completing the scoping newsletters for these parks.

Similarly, as noted above, compliance with the National Historic Preservation Act requires the agencies to engage in a consultation process with State Historic Preservation Offices and other interested parties, including tribes. If the State Historic Preservation Office or another consulting party does not concur with the agencies' proposed finding of no adverse effects, then the agencies must conduct an additional process. *See* 36 C.F.R. part 800.5(c). For example, the agencies could have completed the management plan for Great Smoky Mountains National Park by August 31, 2022, but the Tennessee State Historic Preservation Officer objected to the FAA's proposed finding of no adverse effect, delaying completion of National Historic Preservation Act consultation and completion of the plan for that park.

The Second Declaration of Raymond Sauvajot and the Second Declaration of Kevin Welsh, attached to the Respondents' Opposition to the Petitioners' Second Motion to Enforce, both supplied detailed explanations of park-specific challenges that have delayed the completion of plans or agreements for certain parks and identified anticipated completion dates for most of those parks. Second Sauvajot Decl. ¶¶ 15-81; Second Welsh Decl. ¶¶ 14-28. The parks discussed are primarily those for which the agencies now anticipate preparing an environmental

11

assessment. *See id.* The agencies' May 2022 Progress Update was consistent with the dates reported in the Second Sauvajot Declaration, except the Progress Update noted that the plan for Bryce Canyon National Park had been delayed due to aviation safety concerns raised during the public comment process. These safety concerns have required additional consultation with the FAA's Flight Standards District Office. May 2022 Progress Update at 6. And the agencies set an anticipated completion date for Bandelier National Monument, while noting that completion of the plan for that park could be further delayed due to the Cerro Pelado Fire on Park Service and tribal lands. *Id.* at 6-7.

The chart below identifies proposed completion dates that differ from the anticipated completion dates previously reported. However, it identifies a proposed completion date for each of those parks that accounts for uncertainty regarding the completion of the consultation process under the National Historic Preservation Act which, as noted above, is not entirely within the agencies' control.

The chart also identifies several parks for which the agencies plan to prepare an environmental assessment to comply with NEPA. The proposed completion dates for these parks differ from the anticipated completion dates included in the May 2022 Progress Update for several reasons:

- For some parks, including Bandelier National Monument, Canyon De Chelly National Monument, Glen Canyon National Recreation Area, and Rainbow Bridge National Monument, the proposed completion dates account for tribal interest and the need to conduct tribal consultation.

12

- For Lake Mead National Recreation Area, the extended timeframe is primarily due to the complex airspace and the need to engage operators to understand the current condition of air tours.

- For Badlands National Park, Mount Rushmore National Park, Hawaii Volcanoes National Park, and Haleakala National Park, the proposed completion date takes into consideration the extensive work already completed or in progress in furtherance of plans for these parks.

- The timeframe for bringing the National Parks of the New York Harbor into compliance is extended because the agencies have not yet entered into a voluntary agreement with operators and may have to prepare an air tour management plan and environmental assessment instead.

For all of these parks, the proposed completion dates account for additional time that may be necessary to complete compliance with the National Historic Preservation Act.

*Third*, although the agencies are submitting their best predictions of how long it will take to bring each park into compliance, these are only predictions. And it is difficult to predict with precision the completion of a process that necessarily includes the participation of stakeholders not before the Court. Developing an air tour management plan is a lengthy and complex process rife with challenges, many of them unexpected. The agencies now have more experience to lean on in estimating how long it will take to develop a draft plan, release it for public review and comment, address comments received, and complete compliance with other applicable laws. But despite their best efforts, the agencies may still be unable to bring some parks into compliance by the deadlines

AR_0002711

proposed in the chart below. This is particularly so when the issues involve legal obligations under NEPA and other applicable laws, such as the National Historic Preservation Act, that may arise as a result of engaging in robust consultation with tribes, the State Historic Preservation Offices, and other stakeholders. For instance, if the agencies conclude that they need to prepare an environmental assessment at a park where they previously anticipated applying a categorical exclusion, the agencies would need additional time to complete the NEPA process.

### III.    The Legal Basis for Anticipated Categorical Exclusions and the Date by which the Agencies Will Make that Determination

In the June 21 Order, the Court also directed the agencies to provide the legal basis for any anticipated categorical exclusion and the date by which the agencies will make that determination. In the chart below, the agencies have identified the level of NEPA review they anticipate for each potential air tour management plan at this time (voluntary agreements do not require NEPA compliance under the Air Tour Management Act). But until the agencies complete their environmental analysis and make a final decision on a management plan, the agencies maintain discretion to find that a different level of NEPA review applies.

For some management plans, the agencies have already decided to prepare an environmental assessment to comply with NEPA. For others, the Park Service anticipates applying a documented categorical exclusion memorialized in the Department of the Interior's Departmental Manual Part 516 § 12.5.A(1),

14

reproduced in the Park Service's NEPA Handbook as categorical exclusion 3.3.A.1.[2] This categorical exclusion applies to "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." Interior Departmental Manual, Part 516, § 12.5.A(1).

Here, the "approved action" is the interim operating authority that the FAA granted air tour operators as required by the Air Tour Management Act. *See* 49 U.S.C. § 40128(c). The Act required operators that wished to conduct commercial air tours over national parks to apply to the FAA for authority to conduct such tours. *Id.* § 40128(c)(1). By expressly requiring the FAA to grant interim operating authority to existing operators, the Act provided for existing commercial air tour operations occurring at the time the law was enacted to continue until an air tour management plan for the park was implemented. *Id.*; *see also id.* § 40128(c)(2)(E) (specifying that interim operating authority "shall terminate 180 days after the date on which an air tour management plan is established for the park or tribal lands"). The interim operating authority allowed operators to conduct, on an annual basis, "the greater of (i) the number of flights used by the operator to provide the commercial air tour operations within the 12-month period prior to the date of the enactment of the act, or (ii) the average number of flights per 12-month period

---

[2] The relevant chapter of the Departmental Manual is available at https://www.doi.gov/sites/doi.gov/files/elips/documents/516-dm-12.pdf.

15

used by the operator to provide such operations within the 36-month period prior to such date of enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period." 49 U.S.C. § 40128(c)(2)(A)(i-ii).

The FAA granted the required interim operating authority for commercial air tours over all National Park System units for which operators applied. *See* Notice of Interim Operating Authority Granted to Commercial Air Tour Operators Over National Parks and Tribal Lands Within or Abutting National Parks, 70 Fed. Reg. 36,456 (June 23, 2005). The interim operating authority does not provide any operating conditions (for example, route, altitudes, time of day, etc.) for commercial air tours other than an annual limit. The issuance of the interim operating authority was a non-discretionary action directed by Congress. *See* 49 U.S.C. § 40128(c).

For Glacier National Park, the Park Service also considers a 1999 Record of Decision for the park's General Management Plan to be an approved action for the purposes of the categorical exclusion.

To document their compliance with NEPA, the agencies are using the Park Service's categorical exclusion documentation form and environmental screening form to demonstrate that there are no or minimal impacts from these air tour management plans or, alternatively, that the impacts of the plans are beneficial

16

compared to the current condition. For each plan where the agencies anticipate applying the categorical exclusion, the Park Service will first consider whether the extraordinary circumstances in 43 C.F.R. § 46.215 exist. The Park Service will apply the categorical exclusion only if no extraordinary circumstances exist and if the plan will not result in significant environmental impacts.

The FAA is performing its own extraordinary circumstances analysis and an analysis under section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). If the FAA finds that no extraordinary circumstances apply, it is planning to adopt the Park Service's categorical exclusion determination pursuant to 40 C.F.R. § 1506.3(d), which allows an agency to adopt another agency's determination that a categorical exclusion applies. Thus, a categorical exclusion will only be applied to a plan if, after the plan is finalized, the Park Service has determined that it will have no or minimal impacts (or that impacts will be beneficial), and both agencies have determined that no extraordinary circumstances preclude the application of a categorical exclusion.

Prior to implementing an air tour management plan, the agencies intend to document that decision in a record of decision as contemplated by the Air Tour Management Act. 49 U.S.C. § 40128(b)(2). The appendices to the record of decision will include the agencies' documentation regarding their compliance with NEPA. As examples, the Record of Decision for the Air Tour Management Plan

AR_0002715

JA471

for Olympic National Park, and its appendices, are attached as part of Exhibit 1 to this Report. The Environmental Screening Form, Categorical Exclusion Documentation Form, and FAA Categorical Exclusion Determination Adoption documents are attached to the Record of Decision as Appendices B, C, and D. The same documents are attached to the Record of Decision for the Air Tour Management Plan for Mount Rainier National Park at Exhibit 2.

The Court also directed the agencies to provide the date by which they will determine whether to apply a categorical exclusion to each plan. Unfortunately, the agencies cannot make a final determination on the level of NEPA review for an air tour management plan until the conclusion of the agencies' decision-making process. That is, before the Park Service applies a categorical exclusion, it must first conduct (1) consultation under Section 106 of the National Historic Preservation Act, (2) government to government tribal consultation (if any), (3) compliance with Section 7 of the Endangered Species Act, and (4) consideration of public comments on the draft air tour management plan. Once the Park Service has information from each of these processes, it will be able to determine whether the categorical exclusion applies to the air tour management plan, and the FAA will be able to decide whether it can adopt the categorical exclusion determination.

In the chart below, the agencies have identified the proposed completion date for the air tour management plan as the same date they expect to determine

18

conclusively the applicability of the categorical exclusion, with the exception of
Canyon De Chelly National Monument where the agencies have included a date by
which they will determine whether to prepare an environmental assessment. In
compliance with the June 21 Order, the agencies have identified the level of NEPA
review they currently contemplate for the plan being prepared for each park.

The parks are listed in descending chronological order according to the
anticipated date by which the agencies will be able to complete a plan or
agreement for the park. Where multiple parks are anticipated to be included in a
single plan, those parks are grouped together.

### ANTICIPATED NEPA PATHWAY AND
### PROPOSED FIRM COMPLIANCE DATES

| | Park | Anticipated NEPA Pathway | Date for determining application of Categorical Exclusion | Proposed Date for Completion |
|---|---|---|---|---|
| 1. | **Everglades National Park** | n/a | n/a | As explained in the May 2022 Progress Update the Act no longer requires a plan or agreement for this park. |
| 2. | **Olympic National Park** | Categorical Exclusion | Completed | Completed July 20, 2022 |
| 3. | **Mount Rainier National Park** | Categorical Exclusion | Completed | Completed July 20, 2022 |

19

| | Park | Anticipated NEPA Pathway | Date for determining application of Categorical Exclusion | Proposed Date for Completion |
|---|---|---|---|---|
| 4. | **Death Valley National Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 5. | **Glacier National Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 6. | **Great Smoky Mountains National Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 7. | **Arches National Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 8. | **Canyonlands National Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 9. | **Natural Bridges National Monument** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 10. | **Bryce Canyon National Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |
| 11.-13. | **Golden Gate National Recreation Area/Point Reyes National Seashore/San Francisco Maritime National Historical Park** | Categorical Exclusion | Jan. 31, 2023 | Jan. 31, 2023 |

20

| | Park | Anticipated NEPA Pathway | Date for determining application of Categorical Exclusion | Proposed Date for Completion |
|---|---|---|---|---|
| 14. | **National Parks of the New York Harbor** | Voluntary Agreement or Environmental Assessment | n/a | Aug. 31, 2023* |
| 15. | **Badlands National Park** | Environmental Assessment | n/a | Dec. 31, 2023 |
| 16. | **Mount Rushmore National Memorial** | Environmental Assessment | n/a | Dec. 31, 2023 |
| 17. | **Hawaii Volcanoes National Park** | Environmental Assessment | n/a | Dec. 31, 2023 |
| 18. | **Haleakala National Park** | Environmental Assessment | n/a | Dec. 31, 2023 |
| 19. | **Bandelier National Monument** | Environmental Assessment | n/a | March 31, 2024 |
| 20. | **Lake Mead National Recreation Area** | Environmental Assessment | n/a | Aug. 31, 2024 |
| 21.-22. | **Glen Canyon National Recreation Area/Rainbow Bridge National Monument** | Environmental Assessment | n/a | Aug. 31, 2024 |

AR_0002719

**JA475**

|     | Park | Anticipated NEPA Pathway | Date for determining application of Categorical Exclusion | Proposed Date for Completion |
| --- | --- | --- | --- | --- |
| 23. | **Canyon de Chelly National Monument** | Environmental Assessment or Categorical Exclusion | Dec. 31, 2023 | Dec. 31, 2024 |

\* This proposed completion date assumes that the agencies are not able to complete a voluntary agreement in the near term and are then required to do an environmental assessment.

22

## CONCLUSION

As directed by the Court in the June 21 Order, this report is signed by the Acting Administrator of the FAA and the Director of the National Park Service, as well as counsel for the agencies. The Acting Administrator and the Director affirm that both agencies remain committed to complying with the Court's Orders and to working diligently to bring all eligible parks into compliance with the Air Tour Management Act.

Respectfully submitted,

/s/ *Justin D. Heminger*

Of Counsel:

MARC A. NICHOLS
*Chief Counsel*
MICHAEL FINEMAN
CATHERINE BASIC
*Attorneys*
Office of the Chief Counsel
Federal Aviation Administration

SARAH KRAKOFF
*Deputy Solicitor for Parks and Wildlife*
SARA PORSIA
*Attorney*
Office of the Solicitor
U.S. Department of the Interior

July 21, 2022
DJ 90-13-1-15766

TODD KIM
*Assistant Attorney General*
JUSTIN D. HEMINGER
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice

/s/ *Billy Nolen*

BILLY NOLEN
Acting Administrator of the
Federal Aviation Administration

/s/ *Chuck F. Sams III*

CHARLES F. SAMS III
Director of the National Park Service

23

## CERTIFICATE OF COMPLIANCE

1.     This document is not a brief or motion and therefore is not subject to the type-volume limits of Federal Rules of Appellate Procedure 27(d)(1)(E)(2) and 32(a)(7)(B). Excluding the cover, signature block, and certificate this document contains 4,782 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

*Counsel for the Federal Aviation Administration and the National Park Service*

24

AR_0002722
**JA478**

*I live and work on the traditional and ancestral land of the Huimen Coast Miwok.*

---

**From:** Bill Schneider <bill@varsitypix.com>
**Sent:** Wednesday, November 30, 2022 11:52 AM
**To:** Kenkel, Craig A <Craig_Kenkel@nps.gov>
**Cc:** Strickfaden, Charles J <Charles_Strickfaden@nps.gov>; Sauvajot, Raymond M <Ray_Sauvajot@nps.gov>; Director@nps.gov <Director@nps.gov>; Monroe, Mia <Mia_Monroe@nps.gov>; Lusk, Keith (FAA) <keith.lusk@faa.gov>; pdinerstein@peer.org <pdinerstein@peer.org>; jruch@peer.org <jruch@peer.org>; Mike Murray <m13murray@gmail.com>; ndesai@npca.org <ndesai@npca.org>
**Subject:** [EXTERNAL] Illegal Helicopter Sightseeing Flights over Bay Area NPS Properties

> This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.

Superintendent Kenkel,

Since our last email on 11/22 Specialized Helicopters, Inc. dba Specialized Aviation, and Helico Sonoma Inc. and/or the owners of N442BN (Parker Helicopters LLC), N644VB (TC Choppers, LLC) and N557SM (National Rotorcraft, LLC) have flown an additional 19 illegal helicopter sightseeing tours over Bay Area National Park properties.

These flights as well as the previous 44 or more illegal helicopter sightseeing flights by these operators are clear violations *49 USC 40128; Overflights of national parks.* According to *70 FR 36456 - Notice of Interim Operating Authority Granted to Commercial Air Tour Operators Over National Parks and Tribal Lands Within or Abutting National Parks,* neither of these helicopter owners or operators have IOA permits to operate over the NPS properties. Also, neither are listed as the current helicopter sightseeing air tour operator in the draft ATMP for the Bay Area NPS properties. The current holder of the IOA is San Francisco Helicopters, and according to the FAA's Notice of Final Opinion on the Transferability of Interim Operating Authority Under the National Parks Air Tour Management Act in 2007, the FAA ruled, "it is the opinion of the FAA that IOA is not transferable." (Federal Register / Vol. 72, No. 29 / Tuesday, February 13, 2007 / Notices)

49 USC 40128 specifies in part that, "Before commencing commercial air tour operations over a national park or tribal lands, a commercial air tour operator shall apply to the Administrator for authority to conduct the operations over the park or tribal lands." And that, "Before granting an application under this paragraph, the Administrator, in cooperation with the Director, shall develop an air tour management plan in accordance with subsection (b) and implement such plan."

It is our understanding that neither of these requirements have been satisfied.

Since September, the FAA has been notified multiple times by multiple parties of these illegal helicopter sightseeing flights over Bay Area National Park properties and yet apparently they have taken no action to stop these illegal flights. If the FAA is unwilling/incapable of enforcing blatant violations of federal law such as those being committed by Specialized Aviation and Helico Sonoma, how can the public expect them to investigate helicopter and fixed-wing aircraft sightseeing flight violations under the limited/inadequate monitoring and enforcement procedures proposed in the draft ATMP? The Oakland FAA FSDO's apparent inaction in the current situation is telling.

If and when Specialized Aviation and or Helico Sonoma apply for operating authority to fly sightseeing flights over the Bay Area NPS properties their flagrant and cynical disregard for federal law, the NPS, park visitors and the public should not be forgotten.

Theses 19 illegal helicopter sightseeing flights by Specialized Aviation and Helico Sonoma overflew multiple Bay Area NPS properties this past week.

The following FlightAware links show maps of the actual flight paths of these illegal helicopter sightseeing tours. Click on the Replay button at the bottom of each map to see an animation of the flight path.

https://flightaware.com/live/flight/N442BN/history/20221122/0026Z/KHWD/KHWD - 11/21 Ft. Point

https://flightaware.com/live/flight/N442BN/history/20221122/0153Z/KHWD/KHWD - 11/21 Alcatraz, Presidio, Crissy Field

https://flightaware.com/live/flight/N442BN/history/20221222/2231Z/KHWD/KHWD - 11/22 Alcatraz, Ft. Baker, Marin Headlands, Presidio, Ft. Mason

https://flightaware.com/live/flight/N442BN/history/20221123/1931Z/KHWD/KHWD -11/23 Alcatraz, Ft. Baker, Marin Headlands, Presidio, Crissy Field, Ft. Mason

https://flightaware.com/live/flight/N442BN/history/20221123/2055Z/KHWD/KHWD - 11/23 Alcatraz, Marin Headlands,

https://flightaware.com/live/flight/N442BN/history/20221123/2352Z/KHWD/KHWD - 11/23 Alcatraz, Ft. Baker, Marin Headlands, Presidio, Crissy Field, Ft. Mason

https://flightaware.com/live/flight/N442BN/history/20221124/2139Z/KHWD/KHWD -11/24 Alcatraz, Marin Headlands, Ft. Mason

https://flightaware.com/live/flight/N442BN/history/20221124/2252Z/KHWD/KHWD - 11/24 Alcatraz, Marin Headlands, Ft. Mason,

https://flightaware.com/live/flight/N442BN/history/20221125/0034Z/KHWD/KHWD - 11/24 Alcatraz, Ft. Baker, Marin Headlands

https://flightaware.com/live/flight/N442BN/history/20221125/1930Z/KHWD/KHWD - 11/25 Alcatraz, Marin Headlands, Presidio, Ft. Mason

https://flightaware.com/live/flight/N442BN/history/20221125/2242Z/KHWD/KHWD - 11/25 Alcatraz, Marin Headlands, Ft. Mason

https://flightaware.com/live/flight/N442BN/history/20221126/0108Z/KHWD/KHWD - 11/25 Alcatraz

https://flightaware.com/live/flight/N442BN/history/20221126/2213Z/KHWD/KHWD - 11/26 Alcatraz, Ft. Baker, Marin Headlands, Presidio

https://flightaware.com/live/flight/N442BN/history/20221127/0041Z/KHWD/KHWD - 11/26 Alcatraz, Ft. Baker, Marin Headlands, Presidio, Crissy Field

https://flightaware.com/live/flight/N442BN/history/20221128/2149Z/KHWD/KHWD - 11/28 Alcatraz, Ft. Baker, Marin Headlands, Presidio, Crissy Field, Ft. Mason

https://flightaware.com/live/flight/N644VB/history/20221129/2337Z/KHWD/KHWD - 11/29 Alcatraz, Presidio

https://flightaware.com/live/flight/N644VB/history/20221130/0048Z/KHWD/KHWD - 11/29 Alcatraz

https://flightaware.com/live/flight/N557SM/history/20221126/1944Z/KJMC/KJMC - 11/26 Ft. Baker, Marin Headlands, Presidio, Crissy Field, Marin Headlands, Ft. Baker

https://flightaware.com/live/flight/N557SM/history/20221126/2035Z/KJMC/KJMC - 11/26 GGNRA, Marin Headlands, Ft. Point, Crissy Field, Presidio, Ft. Baker

Thank you.

Bill Schneider
Secretary
Richardson Bay Environmental Protection Association

Email Disclaimer: https://www.marincounty.org/main/disclaimers
Email Disclaimer: https://www.marincounty.org/main/disclaimers