NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-1067

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

MARIN AUDUBON SOCIETY, et al.,
*Petitioners,*

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents.*

_____

**CORRECTED DEFERRED JOINT APPENDIX**


**VOLUME II**

**JA228 through JA341**


**November 2, 2023**

**<u>Glossary</u>**
FAA - Federal Aviation Administration
JA - Joint Appendix
NEPA - National Environmental Policy Act
NPS - National Park Service
ROD - Record of Decision
SF – San Francisco

# Agency Action Documents (cont.) – Vol. II

## TABLE OF CONTENTS

| **Record Citation** | **<u>Document  -  date</u>** | **<u>JA Page</u>** |
|---|---|---|
| AR774 | ROD Appendix F - National Historic Preservation Act Section 106 Compliance Document (part) - 1/17/2023 | JA228 |
| AR827 | ROD Appendix G - NPS Statement of Compliance - 1/17/2023 | JA254 |
| AR859 | ROD Appendix H - Summary of Public Comments and Comment Analysis – 1/17/2023 | JA286 |
| AR875 | ROD Appendix I - Coastal Zone Management Act Compliance document - 1/17/2023 | JA302 |
|  | End  Vol. II | JA341 |

Respectfully submitted,


/s/ Peter T. Jenkins
Peter T. Jenkins
Paula Dinerstein
Public Employees for Environ-
  mental Responsibility
962 Wayne Ave., No. 610
Silver Spring, MD 20910
(202) 265-4189
pjenkins@peer.org
pdinerstein@peer.org

Attorneys for Petitioners

/s/ Justin D. Heminger
Todd Kim
Assistant Attorney General
Robert P. Stockman
Justin D. Heminger
Attorneys
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

Attorneys for Respondents

# APPENDIX F

National Historic Preservation Act: Section 106
Compliance Documentation



**U.S. Department
of Transportation**
**Federal Aviation
Administration**

**United States Department of Transportation**
**FEDERAL AVIATION ADMINISTRATION**
Office of Policy, International Affairs & Environment
Office of Environment and Energy

**NATIONAL PARKS AIR TOUR MANAGEMENT PROGRAM**

August 30, 2022

Re: Section 106 Consultation and Finding of No Adverse Effect under Section 106 of the National Historic Preservation Act for the Development of an Air Tour Management Plan for Four California National Park Service Units

Julianne Polanco
State Historic Preservation Officer
Office of Historic Preservation
Department of Parks and Recreation
1725 23rd Street, Suite 100
Sacramento, CA 95816

Dear Julianne Polanco:

**Introduction**

The Federal Aviation Administration (FAA), in coordination with the National Park Service (NPS), seeks to continue consultation with your office under Section 106 of the National Historic Preservation Act (NHPA) for the development of an Air Tour Management Plan (ATMP) for Golden Gate Recreation Area (Golden Gate), San Francisco Maritime National Historical Park (San Francisco Maritime), Point Reyes National Seashore (Point Reyes), and Muir Woods National Monument (Muir Woods) (collectively, the Parks) At this time, the FAA requests your concurrence with its proposed finding that the undertaking would have no adverse effect on historic properties, in accordance with 36 CFR 800.5(c). On this date, we are also notifying all consulting parties of this proposed finding and providing the documentation below for their review.

In accordance with the requirements of 36 CFR 800.11(e), this letter describes the undertaking, including: changes that have occurred since the draft ATMP was issued to the public; the Area of Potential Effects (APE); a description of steps taken to identify historic properties; a description of affected historic properties in the APE and the characteristics that qualify them for the National Register of Historic Places (NRHP); and an explanation of why the criteria of adverse effect are inapplicable. This letter also describes the Section 106 consultation process and public involvement for this undertaking.

The FAA initiated Section 106 consultation with your office by letter dated March 29, 2021. In a follow-up letter dated October 15, 2021, we described the proposed undertaking in more detail, proposed a preliminary APE, and provided our initial list of historic properties identified within the APE. FAA conducted additional identification efforts and provided a revised list of historic properties in our most

recent correspondence dated March 15, 2022. Similar letters were sent to all consulting parties; Section 106 consultation with tribes is described below. Public involvement for this undertaking was integrated with the National Parks Air Tour Management Act (NPATMA) process. We published a notice of availability of the draft ATMP in the Federal Register on October 15, 2021. The public comment period on the draft ATMP was October 15, 2021, through November 15, 2021. A public meeting was held October 26, 2021.

The FAA and the NPS received several public comments about potential visual effects from commercial air tours. However, none of those commenters expressed specific concerns regarding such visual effects to historic properties. Many comments were submitted about potential noise effects from commercial air tours. Commenters stated that Congress developed the Act (NPATMA) out of concern that noise from air tours could harm national park resources, values, and experiences for visitors. Commenters also noted air tours would violate NPS Director's Order #47 and the 2006 NPS Management Policies § 4.9 which states that the NPS "will preserve, to the greatest extent possible, the natural soundscapes of parks." Another commenter also referenced the 1994 Report to Congress on Effects of Aircraft Overflights on the National Park System which the commenter contends explains the adverse impacts of aircraft overflight noise on Park resources and values.[1] Chapter 4 of that report is dedicated to "Effects on Cultural and Historic Resources, Sacred Sites, and Ceremonies."

The FAA and the NPS received comments from the public related to tribal concerns. One commenter noted there was a lack of tribal consultation in the draft ATMP and no indication which tribes contributed. The commenter noted the draft ATMP should acknowledge the cultural and historical significance of areas in these Parks. The commenter noted that as a result of the insufficient language regarding how this draft ATMP will respect American Indian sacred sites and ceremonial activities, the NPS should conduct additional analysis of these cultural sites and include additional tribal consultation.

The FAA and the NPS received a few public comments about potential effects on historic properties from commercial air tours. Commenters noted the draft ATMP provides no information regarding compliance with Section 106 of the NHPA and lacks necessary consultation with potentially affected Native American tribes and should not be signed by the NPS until consultation is complete. Referring to the Council on Environmental Quality (CEQ) National Environmental Policy Act (NEPA) regulations and the agencies' NEPA policies, NHPA compliance, and other applicable federal statutes, one commenter stated these should be integrated into the NEPA document prepared for the proposed action and failing to do so violates NEPA process requirements.

**Description of the Undertaking**
The FAA and the NPS are developing ATMPs for multiple parks, including an ATMP for Golden Gate, San Francisco Maritime, Point Reyes, and Muir Woods. The ATMPs are being developed in accordance with NPATMA. Each ATMP is unique and therefore, each ATMP is being assessed individually under Section 106.

Commercial air tours have been operating over Golden Gate, San Francisco Maritime, and Point Reyes for over 20 years. Since 2005, these air tours have been conducted pursuant to interim operating authority (IOA) that the FAA was required to grant under NPATMA. IOA does not provide any operating conditions (e.g., routes, altitudes, time of day, etc.) for air tours other than an annual limit on the number of air tours per year; two commercial air tour operators, San Francisco Helicopters, LLC and San

---

[1] https://www.nonoise.org/library/npreport/intro.htm

AR_0000776

Filed: 11/02/2023     Document #2025130     USCA Case #23-1067

Francisco Seaplane Tours, Inc., hold IOA to conduct a combined total of 5,090 commercial air tours over each of the Parks or within ½ mile of their boundaries each year. The ATMP will replace IOA.

The FAA and the NPS have documented the existing conditions for commercial air tour operations over the Parks. The FAA and the NPS consider the existing operations for commercial air tours to be an average of 2017-2019 annual air tours flown, which is 2,548 air tours. The agencies decided to use a three-year average because it reflects the most accurate and reliable air tour conditions based on available operator reporting, and accounts for variations across multiple years, excluding more recent years affected by the COVID 19 pandemic.

Commercial air tours currently are provided by two different operators and are conducted using DHC-2-MKI fixed-wing aircraft and BHT-407-407 and BHT-427-427 helicopters. Under existing conditions, commercial air tours are conducted on the routes shown in **Attachment A**. Commercial air tour operations presently fly between 800 ft. and 2,500 ft. above ground level (AGL)[2] depending on the location over the Parks[3] and are generally flown on four different routes[4], also shown in **Attachment A**, though they are not required to fly on any particular route.

The ATMP would result in commercial air tours being conducted along the routes shown in **Attachment A**. These routes fly over the Parks and ½ mile buffer for approximately 27 miles. The ATMP will require operators to fly the designated routes depicted in **Attachment A**. As noted above, under existing conditions, operators generally adhere to the routes depicted in **Attachment A** but are not obligated to do so.

The undertaking for purposes of Section 106 is implementing the ATMP that applies to all commercial air tours over the Parks and within ½ mile outside the boundary of each Park. A commercial air tour subject to the ATMP is any flight conducted for compensation or hire in a powered aircraft where a purpose of the flight is sightseeing over the Parks, or within ½ mile of its boundary, during which the aircraft flies:

(1) Below 5,000 feet above ground level (except solely for the purposes of takeoff or landing, or necessary for safe operation of an aircraft as determined under the rules and regulations of the FAA requiring the pilot-in-command to take action to ensure the safe operation of the aircraft); or

(2) Less than one mile laterally from any geographic feature within each Park (unless more than ½ mile outside the Park boundary).

Overflights that do not meet the definition of a commercial air tour above are not subject to NPATMA and are thus outside the scope of the ATMP.

The undertaking was previously described in detail in our Section 106 consultation letter dated October 15, 2021. The following elements of the ATMP have remained unchanged since the issuance of the draft

---

[2] Altitude expressed in units above ground level (AGL) is a measurement of the distance between the ground surface and the aircraft, whereas altitude expressed in median sea level (MSL) refers to the altitude of aircraft above sea level, regardless of the terrain below it. Aircraft flying at a constant MSL altitude would simultaneously fly at varying AGL altitudes, and vice versa, assuming uneven terrain is present below the aircraft.

[3] No tours are currently flown over Muir Woods or within ½ mile of its boundary.

[4] The S.F. Helicopter route shown in Attachment A is actually comprised of eight different routes flown by the operator, but are displayed as one route in Attachment A since the individual routes would not be discernable given the scale of the map.

AR_0000777

ATMP to the public, a copy of which is available at:
https://parkplanning.nps.gov/document.cfm?parkID=303&projectID=103175&documentID=115991.

- A maximum of 2,548 commercial air tours are authorized per year. Of these, up to 143 may fly over Point Reyes. No tours over Point Reyes may be flown using helicopters and no tours are authorized over Muir Woods. Due to the location and proximity of Golden Gate and San Francisco Maritime all authorized tours overfly both of these parks;
- All commercial air tours will be required to fly on designated routes, depicted in **Attachment A** and in the ATMP. These routes require a 1,000 ft. lateral avoidance of Alcatraz Island, nesting shorebird colonies, peregrine falcon nests and marine mammal haul out; a ¾ mile lateral offset from Double Point; and a ½ mile lateral offset from Duxbury Reef, as depicted in included maps.
- All commercial air tours will be required to fly at certain minimum altitudes depending on the location type of aircraft and locations overflown. Air tours conducted with helicopters will fly no lower than 1,000 to 1,500 ft. AGL. All air tours will fly no lower than 2,000 ft AGL over land-based wilderness;
- The aircraft types authorized to be used for commercial air tours over Golden Gate and San Francisco Maritime are DHC-2-MKI fixed-wing aircraft and BHT-407-407 and BHT-427-427 helicopters. The aircraft type authorized to be used for tours that also fly over Point Reyes is a DHC-2-MKI fixed-wing aircraft. Any new or replacement aircraft must not exceed the noise level produced by the aircraft being replaced;
- Unless flown using aircraft that qualify for the quiet technology incentive, air tours of Golden Gate and San Francisco Maritime may operate from 9:00 AM until 30 minutes after sunset, as defined by the National Oceanic and Atmospheric Administration (NOAA),[5] and air tours of Point Reyes may operate from 12:00 PM to 5:00 PM. Tours flown using aircraft that qualify for the quiet technology incentive may conduct air tours beginning one hour after sunrise.
- Air tours may operate any day of the year, except that the NPS may establish temporary no-fly periods that apply to commercial air tours for special events or planned Park management. Absent exigent circumstances or emergency operations, the NPS will provide a minimum of 15 days written notice to the operators for any restrictions that temporarily restrict certain areas or certain times of day, or 60 days written notice to the operators for any full-day restrictions in advance of the no-fly period. Events may include tribal ceremonies or other events;
- Operators would submit semi-annual reports to the FAA and the NPS regarding the number of commercial air tours conducted by the operators over the Parks;
- When made available by Park staff, the operators/pilots will take at least one training course per year conducted by NPS staff;
- At the request of either of the agencies, the Park staff, the local FAA Flight Standards District Office (FSDO), and all operators will meet once per year to discuss the implementation of the ATMP and any amendments or other changes to the ATMP.

In order to address comments received from participating tribes and other consulting parties through the Section 106 process and from members of the public submitted through the draft ATMP public

---

[5] Sunrise and sunset data are available from the NOAA Solar Calculator, https://www.esrl.noaa.gov/gmd/grad/solcalc/

review specific to potential noise and visual effects to cultural, as well as biological, resources, the following changes to the undertaking at the Parks have been made:

- A new subsection was added to prohibit aircraft hovering in place.
- Air tours conducted using fixed-wing aircraft will fly no lower than 1,000 to 2,500 feet (ft.) AGL, depending on location (changed from 1,500 to 2,500 ft. AGL in the draft ATMP).
- The minimum altitude for helicopters over Alcatraz Island was changed from 1,000 ft. AGL to 1,500 ft. AGL with a 1,000 ft. lateral avoidance of the Island for protection of nesting waterbirds.
- The minimum altitude for fixed-wing aircraft on the air tour route around Angel Island was changed from 1,500 ft. AGL to 1,000 ft. AGL to align with helicopter operations since 1,000 ft. AGL is protective of park resources.
- The lateral offset required with respect to Core Ranch Area B was changed from 2,000 ft. to 1,000 ft., though aircraft must maintain a minimum altitude of 1,500 ft. AGL. The vertical and lateral avoidance requirements for Core Ranch Area B and other Core Ranch Areas in Point Reyes are intended to limit sound impacts and minimize disturbances to permitted dairy ranch operations and associated residential uses in the Point Reyes Peninsula Dairy Ranches Historic District.
- A new subsection was added that requires operators to report all bird strikes that occur during commercial air tours over the lands and waters covered by the ATMP per FAA Advisory Circular 150/5200-32B, Reporting Wildlife Aircraft Strikes, using OMB approved form No. 2120-0045.
- A new subsection was added in response to questions and comments regarding the transferability of air tour allocations, or the assumption of allocations of commercial air tours by a successor corporation. The added language makes clear that annual allocations of air tour operations are not transferrable between operators, though they may be assumed by a successor purchaser. Conditions are included to ensure that the agencies have sufficient time to review the transaction to avoid an interruption of service and the successor operator must acknowledge and agree to the comply with the ATMP. This language is excerpted below:

  Annual operations under the ATMP are non-transferable. An allocation of annual operations may be assumed by a successor purchaser that acquires an entity holding allocations under the ATMP in its entirety. In such case the prospective purchaser shall notify the FAA and the NPS of its intention to purchase the operator at the earliest possible opportunity to avoid any potential interruption in the authority to conduct commercial air tours under the ATMP. This notification must include a certification that the prospective purchase has read and will comply with the terms and conditions in the ATMP. The FAA will consult with the NPS before issuing new or modified operations specifications or taking other formal steps to memorialize the change in ownership.

- The agencies revised some of the language related to the quiet technology incentive, but not the incentive itself, in order to clarify that applications for the incentive will be analyzed on a case-by-case basis. The revised language is below:

  The ATMP incentivizes the use of quiet technology aircraft by commercial air tour operators. Operators that have converted to quiet technology aircraft, or are considering converting to quiet technology aircraft may request to be allowed to conduct air tours beginning one hour after sunrise, as defined by NOAA, on all days that flights are authorized. Because aviation technology continues to evolve and advance and the FAA updates its noise certification standards periodically, the aircraft eligible for this incentive will be analyzed on a case-by-

case basis at the time of the operator's request to be considered for this incentive.  The NPS will periodically monitor Parks' conditions and coordinate with the FAA to assess the effectiveness of this incentive.  If implementation of this incentive results in unanticipated effects on Parks' resources or visitor experience, further agency action may be required to ensure the protection of Parks' resources and visitor experience;

- Minor edits were made to clearly state in various subsections that the ATMP applies not only to the area within the Park boundaries, but also to areas ½ mile outside the Park boundaries.
- In Section 5.0[6] Compliance, edits were made to make clear that the public may report suspected instances of noncompliance with the ATMP's terms, and that the applicable Flight Standards District Office would respond to written reports of noncompliance, consistent with FAA guidance.
- Clarifying edits were made to Section 8.0 Adaptive Management to make clear that adaptive management actions may occur in response to input received from tribes.
- In Section 9.0 Amendment, the agencies clarified that additional environmental review would be required in order to increase the number of authorized commercial air tours per year above the 2,548 authorized in the ATMP.  The revised language is below:

    Increases to the total number of air tours authorized per year under the ATMP resulting from accommodation of a new entrant application or a request by an existing operator will require an amendment to the ATMP and additional environmental review.  Notice of all amendments to this ATMP will be published in the Federal Register for notice and comment.
- A change was made in the frequency operators will utilize.

    For situational awareness when conducting tours of the Parks, the operators will utilize frequency 124.3 Common Traffic Advisory Frequency and report when they enter and depart a route.  The pilot should identify their company, aircraft, and route to make any other aircraft in the vicinity aware of their position.

**Area of Potential Effects**

The APE for the undertaking was proposed in the Section 106 consultation letter dated October 15, 2021.  The undertaking does not require land acquisition, construction, or ground disturbance.  In establishing the APE, the FAA sought to include areas where any historic property present could be affected by noise from or sight of commercial air tours over the Parks or adjacent tribal lands.  The FAA considered the number and altitude of commercial air tours over historic properties in these areas to further assess the potential for visual effects and any incremental change in noise levels that may result in alteration of the characteristics of historic properties qualifying them as eligible for listing in the NRHP.

The APE for the undertaking comprises the entirety of San Francisco Maritime and Muir Woods, the central and southern portions of Point Reyes, and the northern part of Golden Gate as well as ½ mile outside the boundary of each Park or portion of the Parks, as depicted in **Attachment A** below.  The FAA requested comments from all consulting parties including one federally recognized tribe.  We received no comments from consulting parties regarding the APE.  The changes to the undertaking described above do not have the potential to cause any additional effects to historic properties.  The FAA has determined the delineated APE as initially proposed adequately captures potential effects from the undertaking on historic properties and remains unchanged.

---

[6] Section 5.0 in the draft ATMP is Section 4.0 in the final ATMP.

**Identification of Historic Properties**

In accordance with 36 CFR 800.4, the FAA has made a reasonable and good faith effort to identify historic properties within the APE. Those efforts resulted in identification of 70 historic properties. All historic properties identified within the APE are listed in **Attachment B** and those with available non-restricted location data are shown in the APE map provided in **Attachment A**. The key for the mapped historic properties is also provided in **Attachment B**.

Preliminary identification of historic properties relied upon data submitted by NPS Park staff about known historic properties within the Parks. Section 106 consultation efforts involved outreach to tribes, the California State Historic Preservation Office, Northwest Information Center, operators, and other consulting parties including local governments and neighboring federal land managers. Public comments submitted as part of the draft ATMP public review process also informed identification efforts.

The FAA, in cooperation with the NPS, coordinated with Park staff to identify known historic properties located within the APE. A preliminary list of historic properties was provided to all consulting parties for their review and comment in a letter dated March 15, 2022. The FAA received no comments from consultation parties regarding the identification of historic properties. On January 25, 2022, FAA submitted a non-confidential extended record search request to the Northwest Information Center (NWIC) to collect data from the California Historical Resources Information System (CHRIS) to identify properties not included in the FAA's preliminary list of historic properties. On April 27, 2022, the FAA received data request results from NWIC, including those in **Attachment C**. The FAA also consulted with the Federated Indians of Graton Rancheria regarding the identification of any other previously unidentified historic properties, including traditional cultural properties (TCPs) that may also be located within the APE. The Federated Indians of Graton Rancheria did not identify additional historic properties within the APE.

As the undertaking would not result in physical effects, the identification effort focused on identifying properties where setting and feeling are characteristics contributing to a property's NRHP eligibility, as they are the type of historic properties most sensitive to the effects of aircraft overflights. These may include isolated properties where a cultural landscape is part of the property's significance, rural historic districts, outdoor spaces designed for meditation or contemplation, and certain TCPs. In so doing, the FAA has taken into consideration the views of consulting parties, past planning, research and studies, the magnitude and nature of the undertaking, the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature of historic properties within the APE in accordance with 36 CFR 800.4(b)(1).

**Summary of Section 106 Consultation with Tribes**

The FAA contacted the Federated Indians of Graton Rancheria, a federally recognized tribe, via letter on April 12, 2021, inviting them to participate in Section 106 consultations and requesting their expertise regarding historic properties, including TCPs that may be located within the APE. The Federated Indians of Graton Rancheria is included in the list of consulting parties enclosed as **Attachment D**. On October 15, 2021, the FAA sent the Federated Indians of Graton Rancheria a Section 106 consultation letter describing the proposed undertaking in greater detail in which we proposed an APE and provided the results of our preliminary identification of historic properties.

USCA Case #23-1067   Document #2025130   Filed: 11/02/2023   Page 13 of 118

On December 9, 2021, the FAA sent a follow-up email to the Federated Indians of Graton Rancheria, who did not respond to our prior Section 106 consultation, once again inviting them to participate in Section 106 consultations. On December 21, 2021, the FAA followed up with a phone call and received a response from the Federated Indians of Graton Rancheria expressing interest in participating in the Section 106 consultation process.

In response to a meeting request by the Federated Indians of Graton Rancheria, the agencies held a government-to-government meeting with the Tribe on May 5, 2022. The Federated Indians of Graton Rancheria's concerns included having provisions in the ATMP that would account for any future changes in routes. The FAA informed the Tribe that the ATMP does provide for amendments to the plan, including route changes, however, that type of amendment would require additional environmental review, which would include tribal consultation, before any amendment is adopted. In an e-mail dated August 3, 2022, the Tribal Historic Preservation Officer for the Federated Indians of Graton Rancheria stated that the Tribe was comfortable with proceeding with the ATMP with the understanding that tribal consultation would be initiated if there are future route changes.

### Assessment of Effects

The undertaking could have an effect on a historic property if it alters the characteristics that qualify the property for eligibility for listing or inclusion in the NRHP. The characteristics of the historic properties within the APE that qualify them for inclusion in the NRHP are described in **Attachment B**. Effects are considered adverse if they diminish the integrity of a property's elements that contribute to its significance. The undertaking does not include land acquisition, construction, or ground disturbance and will not result in physical effects to historic properties. The FAA, in coordination with the NPS, focused the assessment of effects on the potential for adverse effects from the introduction of audible or visual elements that could diminish the integrity of the property's significant historic features.

### Assessment of Noise Effects

The undertaking would not alter the characteristics of historic properties within the APE because there would be no measurable change in audible effects from existing conditions. To assess the potential for the introduction of audible elements, including changes in the character of aircraft noise, the FAA and NPS considered whether there would be a change in the annual number, daily frequency, routes or altitudes of commercial air tours, as well as the type of aircraft used to conduct those tours.

The ATMP authorizes the same number of annual flights as the average number of flights from 2017-2019 and maintains routes similar to what is currently flown under existing conditions; therefore, any changes to overall noise impacts associated with commercial air tours over the Parks are expected to be minimal in both character and decibel level. Likewise, the ATMP authorizes the use of the DHC-2-MKI fixed-wing aircraft and BHT-407-407 and BHT-427-427 helicopters. Any new or replacement aircraft must not exceed the noise level produced by the aircraft being replaced.

The ATMP requires the operators to continue to fly on substantially the same routes at the same or increased altitudes than are flown under existing conditions (minimum 1,000 – 1,500 ft. AGL, depending on location over the Golden Gate and San Francisco Maritime for helicopter tours, and minimum 1,000 – 2,500 ft. AGL depending on location over Golden Gate, San Francisco Maritime and Point Reyes for fixed-wing tours). Increases in altitude, where they occur, will reduce maximum noise levels at sites directly below the commercial air tour routes. It should be noted that when the altitude of an aircraft is increased, the total area exposed to the noise from that aircraft may also increase depending on the surrounding terrain. Although the area exposed to noise might increase, this would not meaningfully

AR_0000782

affect the acoustic environment because attenuation of noise from the higher altitude would most likely reduce noise levels depending on terrain and the transient nature of the impacts.

For purposes of assessing noise impacts from commercial air tours on the acoustic environment of the Parks under the National Environmental Policy Act (NEPA), the FAA noise evaluation is based on Yearly[7] Day Night Average Sound Level ($L_{dn}$ or DNL); the cumulative noise energy exposure from aircraft over 24 hours. The DNL analysis indicates that the undertaking would not result in any noise impacts that would be "significant" or "reportable" under FAA's policy for NEPA.[8]

As part of the ATMP noise analysis, the NPS provided supplemental metrics to further assess the impact of commercial air tours in quiet settings. **Attachment E** provides further information about the supplemental noise metrics and presents the noise contours (i.e., graphical illustration depicting noise exposure) from the modeling.

**Attachment E** presents noise contours for the Time Above 35 dBA (the amount of time in minutes that aircraft sound levels are above 35 dBA) and time above 52 dBA. Noise related to commercial air tours is modeled to be greater than 35 dBA for less than 125 minutes a day within the APE and greater than 52 dBA for less than 25 minutes a day within the APE[9]. Many historic properties are clustered in areas where the duration above 35 dBA is less than 100 minutes on days when commercial air tours would occur. The Core Ranch Areas in Point Reyes are in an area where the duration above 35 dBA is between 0 and 10 minutes on days when commercial air tours would occur. Because noise is modeled using conservative assumptions (see **Attachment E**) and implementing the ATMP would result in limiting the number of flights to be consistent with the three-year average of flights flown from 2017-2019 using the similar routes and the same aircraft to fly at higher altitudes, noise impacts are not expected to measurably change under the ATMP. Because the ATMP would result in minimal changes to noise levels on historic properties compared to existing conditions, the undertaking would not diminish the integrity of any historic property's significant historic features.

**Assessment of Visual Effects**

The undertaking would not alter the characteristics of historic properties within the APE because there would be no measurable change in visual effects from existing conditions. The level of commercial air tour activity under the ATMP is expected to improve or remain the same. The ATMP sets the number of commercial air tours consistent with the three-year average from 2017-2019 and implements limits on the number of flights and times of day during which commercial air tours are able to operate. These limits do not currently exist.

Recognizing that some types of historic properties may be affected by visual effects of commercial air tours, the FAA and NPS considered the potential for the introduction of visual elements that could alter the characteristics of a historic property that qualifies it for inclusion in the NRHP. Aircraft are transitory

---

[7] Yearly conditions are represented as the Average Annual Day (AAD)

[8] Under FAA policy, an increase in the Day-Night Average Sound Level (DNL) of 1.5 dBA or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dBA noise exposure level, or that will be exposed at or above the DNL 65 dBA level due to a DNL 1.5 dBA or greater increase, is significant. FAA Order 1050.1F, *Environmental Impacts: Policies and Procedures*, Exhibit 4-1. Noise increases are "reportable" if the DNL increases by 5 dB or more within areas exposed to DNL 45-60 dB, or by 3 dB or more within areas exposed to DNL 60-65 dB. FAA Order 1050.1F, Appendix B, section B-1.4.

[9] See note preceding Figure 1 in the Noise Technical Analysis (Attachment E) regarding minor altitude adjustments not reflected in the noise modeling.

elements in a scene and visual impacts tend to be relatively short. The short duration and low number of flights make it unlikely a historic property would experience a visual effect from the undertaking.

The FAA and NPS also considered the experience of tribal members who may be conducting ceremonies or practices that could involve looking toward the sky. The ATMP includes a provision for the NPS to establish temporary no-fly periods for special events, such as tribal ceremonies or other similar events, with a minimum of 15 days' notice to the operator. This represents an improvement over existing conditions where no such provision exists.

The ATMP limits the annual number of commercial air tours to 2,548 tours on routes that are substantially the same as the existing routes. On days with peak air tour activity (defined as a 90th percentile day), as many as 14 commercial air tours occurred. Therefore, visual effects to historic properties are expected to slightly decrease compared to impacts currently occurring because the number of authorized flights under the ATMP will be the same or less than the average number of flights from 2017-2019. As a result of provisions in the ATMP such as the increase in the minimum altitude of some flights and limits to the time-of-day flights can operate, the undertaking would not introduce visual elements that would alter the characteristics of any historic property that qualifies it for inclusion in the NRHP.

**Finding of No Adverse Effect Criteria**

To support a Finding of No Adverse Effect, an undertaking must not meet any of the criteria set forth in the Advisory Council on Historic Preservation's Section 106 regulations at 36 CFR 800.5(a). This section demonstrates the undertaking does not meet those criteria. The undertaking would not have any physical impact on any property. The undertaking is located in the airspace above historic properties and would not result in any alteration or physical modifications to these resources. The undertaking would not remove any property from its location. The undertaking would not change the character of any property's use or any physical features in any historic property's setting. As discussed above, the undertaking would not introduce any auditory or visual elements that would diminish the integrity of the significant historical features of any historic properties in the APE. The undertaking would not cause any property to be neglected, sold, or transferred.

**Proposed Finding and Request for Review and Concurrence**

FAA and NPS approval of the undertaking would not alter the characteristics of any historic properties located within the APE as there would be minimal change in audible or visual effects from existing conditions. Based on the above analysis, the FAA proposes a finding of no adverse effect on historic properties. As you may be aware, the agencies are preparing this ATMP under court supervision. We request that you review the information and respond whether you concur with the proposed finding within thirty days of receiving this letter.

Should you have any questions regarding any of the above, please contact Judith Walker at 202-267-4185 or Judith.Walker@faa.gov and copy the ATMP team at ATMPTeam@dot.gov.

Page 16 of 118

Filed: 11/02/2023

Document #2025130

USCA Case #23-1067

Sincerely,



Judith Walker
Federal Preservation Officer
Senior Environmental Policy Analyst
Environmental Policy Division (AEE-400)
Federal Aviation Administration

Attachments
    A.   APE Map including proposed Commercial Air Tour Routes
    B.   List of Historic Properties in the APE and Description of Historic Characteristics
    C.   NWIC Data Request Results
    D.   List of Consulting Parties
    E.   Methodology of NEPA Technical Noise Analysis

AR_0000785

Filed: 11/02/2023    Document #2025130    USCA Case #23-1067

**ATTACHMENT A**

**Area of Potential Effects Map**
**Including**
**Proposed Commercial Air Tour Routes**

Filed: 11/02/2023

Document #2025130

USCA Case #23-1067

## Area of Potential Effects with Historic Properties for ATMP at Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historic Park, and Point Reyes National Seashore



AR_0000787

**JA241**

**ATTACHMENT B**

**List of Historic Properties in the APE and Description of Historic Characteristics**

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| Golden Gate National Recreation Area | Fort Funston | District | Eligible | Fort Funston is a former harbor defense instillation that is significant under Criterion A in the area of military history. | 1 |
| Golden Gate National Recreation Area | Muir Beach Archaeological Site | Site | Listed | The Muir Beach Archaeological Site is listed under Criterion D for its potential to yield information. | Not mapped |
| Golden Gate National Recreation Area | Steamship TENNESSEE Remains | Site | Listed | The Steamship TENNESSEE Remains are listed under Criterion A in the areas of commerce, transportation, and invention. | Not mapped |
| Golden Gate National Recreation Area | The Dipsea Trail | Site | Listed | The Dipsea Trail is listed under Criterion A for its association with the Dipsea Race, the oldest cross-country trail race in the U.S. that has influenced the development of other races and in America's interest in physical fitness. | 2 |
| Golden Gate National Recreation Area | Forts Baker, Barry, and Cronkhite | District | Listed | Forts Baker, Barry, and Cronkhite are listed under Criterion A in the area of military history for their association with early coastal defense. | 3 |
| Golden Gate National Recreation Area | Alcatraz | District | Listed | Alcatraz is listed under Criterion A in the areas of military history, social history, and maritime commerce. It is also listed under Criterion C for engineering. | 4 |
| Golden Gate National Recreation Area | Camera Obscura | Object | Listed | The Camera Obscura is listed under Criterion C as a rare example of the camera obscura apparatus in its original location. | 5 |

14

JA242

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| Golden Gate National Recreation Area | Fort Miley Military Reservation | District | Listed | The Fort Miley Military Reservation is listed under Criterion A in the area of military history for its association with the defense of the strategic harbor of San Francisco. | 6 |
| Golden Gate National Recreation Area | Hill 640 Military Reservation | Site | Listed | The Hill 640 Military Reservation is listed under Criterion A for its association with military history. | 7 |
| Golden Gate National Recreation Area | KING PHILIP (ship) and REPORTER (schooner) Shipwreck Site | Site | Listed | The KING PHILIP (ship) and REPORTER (schooner) Shipwreck Site is listed under Criterion A in the areas of commerce and transportation and Criterion C for engineering. | Not mapped |
| Golden Gate National Recreation Area | Point Lobos Archaeological Sites | District | Listed | The Point Lobos Archaeological Sites are listed under Criterion A in the area of science and Criterion D for their potential to yield information. | 8 |
| Golden Gate National Recreation Area | Presidio of San Francisco | District | Listed | The Presidio of San Francisco is the oldest Army instillation operating in the American West and is listed under Criterion A in the areas of military history Hispanic history, and exploration/settlement; Criterion C for architecture; and Criterion D for information potential. | 9 |
| Golden Gate National Recreation Area | Pumping Station No. 2 San Francisco Fire Department Auxiliary Water Supply System | Building | Listed | Pumping Station No. 2 San Francisco Fire Department Auxiliary Water Supply System represents innovative planning and innovative design of an "earthquake-proof" firefighting system. It is listed under Criterion A in the area of | 10 |

15

JA243

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| | | | | community planning and Criterion C for engineering. | |
| Golden Gate National Recreation Area | Six-Inch Rifled Gun No. 9 | Object | Listed | The Six-Inch Rifled Gun No. 9 is a rare surviving two six-inch breechloading rifle that survived the scrapping of coastal defense ordinance following World War II. It is listed under Criterion A in the area of military history. | 11 |
| Golden Gate National Recreation Area | Fort Mason Historic District | District | Listed | The Fort Mason Historic District is listed under Criterion A in the areas of military and transportation. It is also listed under Criterion C for architecture and landscape architecture. | 12 |
| Golden Gate National Recreation Area | San Francisco Port of Embarkation, US Army (NHL) | District | Listed | The San Francisco Port of Embarkation, US Army district is listed under Criterion A in the area of military history | 13 |
| Golden Gate National Recreation Area | Fort Point National Historic Site | Site | Listed | Fort Point National Historic Site is listed under Criterion A in the areas of military and maritime history and Criterion C for architecture. | 14 |
| Muir Woods National Monument | Muir Woods National Monument | District | Listed | Muir Woods National Monument is listed under Criterion A in the area of conservation for its association with the history of the American Conservation Movement and early conservation achievements in the Bay Area. It is also listed under Criterion C for architecture. | 15 |
| Point Reyes National Seashore | Drakes Bay Historic and Archaeological District (NHL) | District | Listed | The Drakes Bay Historic and Archaeological District is listed under Criterion A for its association with Sir Francis Drake's 1579 California landfall | Not mapped |

16

JA244

AR_0000790

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| | | | | and the 1595 shipwreck of the Manila galleon San Agustín within Drakes Bay. It is also listed under Criterion B for its association with Sir Francis Drake and Criterion D for its ability to yield information about these early contacts. | |
| Point Reyes National Seashore | Marconi—RCA Bolinas Transmitting Station | District | Listed | The Marconi-RCA Bolinas Transmitting Station is listed under Criterion A as one of four extant Marconi wireless stations in the continental U.S. from the interwar period. It is also listed under Criterion C for its Art Deco design. | 16 |
| Point Reyes National Seashore | Point Reyes Lifeboat Rescue Station, 1927 | Building, Structure | Listed | The Point Reyes Lifeboat Rescue Station is listed under Criterion A in the areas of commerce, transportation, maritime history, and social history. It is also listed under Criterion C for architecture and engineering. | 17 |
| Point Reyes National Seashore | Point Reyes Naval Radio Compass Station | Building | Listed | The Point Reyes Naval Radio Compass Station is listed under Criterion A for its use as one of three radio compass stations that worked to fix the location of ships in the area. It is also listed under Criterion C for architecture. | 18 |
| Point Reyes National Seashore | Point Reyes Peninsula Dairy Ranches Historic District | District | Listed | The Point Reyes Peninsula Dairy Ranches Historic District is one of the earliest and largest collection of tenant dairy ranches in California and is listed under Criterion A in the areas of agriculture and commerce and Criterion C for architecture. | 19 |
| Point Reyes National Seashore | RCA Point Reyes Receiving Station | Building | Listed | The RCA Point Reyes Receiving Station is listed under Criterion A as a rare example | 20 |

17

AR_0000791

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| | | | | of a shortwave wireless station from the interwar period. It is also listed under Criterion C for its Art Deco design. | |
| Point Reyes National Seashore | Point Reyes Light Station | Building, Structure | Listed | The Point Reyes Light Station is listed under Criterion A in the area of commerce, transportation, and maritime history. It is also listed under Criterion C for architecture and engineering. | 21 |
| Point Reyes National Seashore | Olema Lime Kilns | Structure | Listed | The Olema Lime Kilns is listed under Criterion A in the area of industry representing a Gold Rush-triggered pioneer American effort to establish a lime-producing industry in Marin County. | 22 |
| Point Reyes National Seashore | Olema Valley Dairy Ranches Historic District | District | Listed | The Olema Valley Dairy Ranches Historic District is listed under Criterion A for its association with early dairy ranching and Criterion C for architecture. | 23 |
| Point Reyes National Seashore | Tocaloma Bridge | Structure | Listed | The Tocaloma Bridge is a rare example of a reinforced concrete through arch bridge in California and is listed under Criterion C for engineering. | 24 |
| Point Reyes National Seashore | Sarah Seaver Randall House | Building | Eligible | The Sarah Seaver Randall house is significant under Criterion A for its association with the dairy industry and Criterion C for architecture. | 25 |
| Point Reyes National Seashore | Point Reyes Peninsula Indigenous Archeological District | District | Eligible | The Point Reyes Peninsula Indigenous Archaeological District encompasses the entirety of Point Reyes National Seashore and is significant under Criterion D for its research potential regarding Point Reyes' indigenous history. | Not mapped |

18

JA246

AR_0000792

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| San Francisco Maritime National Historic Park | ALMA (Scow Schooner) (NHL) | Structure | Listed | The ALMA (Scow Schooner) is listed under Criterion A in the areas of commerce and transportation and Criterion C for architecture. | 26 |
| San Francisco Maritime National Historic Park | Aquatic Park Historic District (NHL) | District | Listed | The Aquatic Park Historic District is listed under Criterion A in the areas of art, military, and community planning and development. It is also listed under Criterion C for architecture. | 27 |
| San Francisco Maritime National Historic Park | BALCLUTHA (NHL) | Structure | Listed | The BALCLUTHA is listed under Criterion A in the areas of commerce and transportation. | 28 |
| San Francisco Maritime National Historic Park | C.A. THAYER (NHL) | Structure | Listed | The C.A. THAYER is listed under Criterion A in the areas of commerce and industry. | 29 |
| San Francisco Maritime National Historic Park | EUREKA (NHL) | Site | Listed | The EUREKA is listed under Criterion A in the areas of commerce and transportation and Criterion C for engineering. | 30 |
| San Francisco Maritime National Historic Park | HERCULES (tugboat) (NHL) | Structure | Listed | The HERCULES (tugboat) is listed under Criterion A in the areas of industry, commerce, and transportation and Criterion C for engineering. | 31 |
| San Francisco Maritime National Historic Park | LEWIS ARK (houseboat) | Structure | Listed | The LEWIS ARK (houseboat) is listed under Criterion C as an example of a type of maritime residential architecture. | 32 |
| San Francisco Maritime National Historic Park | Tubbs Cordage Company Office Building | Building | Listed | The Tubbs Cordage Company Office Building is listed under Criterion A in the areas of industry and commerce and Criterion C as an example of Victorian industrial architecture. | 33 |
| San Francisco Maritime National Historic Park | Haslett Warehouse | Building | Listed | The Haslett Warehouse is listed under Criterion A in the area of commerce and | 34 |

JA247

AR_0000793

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| | | | | Criterion C for its association with architect William S. Mooser, Jr. | |
| Marin County | Sausalito Central Business Historic District | District | Eligible | The Sausalito Central Business Historic District is a significant business district with good examples of Italianate commercial and utilitarian commercial architecture that exemplify the city's growth and change since 1868. | 35 |
| Marin County | Building at 200 Pacific Way, Muir Beach | Building | Eligible | The building at 200 Pacific Way is a 1915 residence that is significant under Criterion C for architecture. | 36 |
| San Francisco County | Golden Gate Park | District | Listed | Golden Gate Park is listed under Criterion A for recreation and social history as the first large urban space dedicated for outdoor enjoyment in the west and Criterion C for landscape architecture. | 37 |
| San Francisco County | St. John's Presbyterian Church | Building | Listed | The St. John's Presbyterian Church is listed under Criterion C as an example of Shingle style architecture. | 38 |
| San Francisco County | Sinton House | Building | Listed | The Sinton House is listed under Criterion B for its association with artist Eleanor W. Sinton and Criterion C for its association with architects John A. Porporato and William Wilson Wurster. | 39 |
| San Francisco County | Swedenborgian Church (NHL) | Building | Listed | The Swedenborgian Church is listed under Criterion C as an excellent example of the First Bay Tradition style of architecture. | 40 |
| San Francisco County | Palace of Fine Arts | District | Listed | The Palace of Fine Arts is listed under Criterion A as an exceptional example of conservation and for its association with the changing attitudes toward historic | 41 |

20

JA248

AR_0000794

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| | | | | preservation, architectural design, and urban development in the U.S. | |
| San Francisco County | Pioneer Woolen Mills and D. Ghirardelli Company | District | Listed | The Pioneer Woolen Mills and D. Ghirardelli Company is listed under Criterion A in the areas of commerce, industry, art, and conservation. It is also listed under Criterion C in the areas of architecture and landscape architecture. | 42 |
| San Francisco County | Port of San Francisco Embarcadero Historic District | District | Listed | The Port of San Francisco Embarcadero Historic District is listed under Criterion A in the areas of government, commerce, transportation, and labor; Criterion B: Significant Person for its association with Harry Bridges, a labor leader; and Criterion C in the areas of Architecture and Community Planning and Development. | 43 |
| San Francisco County | Old Seawall | Structure | Eligible | The Old Seawall is individually significant under Criterion A for its association with waterfront development and Criterion C in the area of engineering. It is also contributing to the listed Port of San Francisco Embarcadero Historic District and the listed Central Embarcadero Piers Historic District. | 44 |
| San Francisco County | San Francisco Cable Cars (NHL) | District | Listed | The San Francisco Cable Cars are listed under Criterion A for its association with the transportation history of San Francisco. | 45 |
| San Francisco County | San Francisco Art Institute | Building | Listed | The San Francisco Art Institute is listed under Criterion A for its role in the development of American art and its | 46 |

JA249

AR_0000795

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| | | | | contributions to art education in the United States. | |
| San Francisco County | San Francisco Veterans Affairs Medical Center | District | Listed | The San Francisco Veterans Affairs Medical Center is listed under Criterion A as the location of one of the early standardized VA hospitals. It is also listed under Criterion C as an early example of a federal building designed with seismic-resistant building technologies and for the design of its Mayan Art Deco ornamentation. | 47 |
| San Francisco County | Moss Flats Building | Building | Listed | The Moss Flats Building is listed under Criterion A for its association with the early development of the ocean frontage as a beach and health resort. It is also listed under Criterion C as an excellent example of the Late Gothic Revival style. | 48 |
| San Francisco County | Roos House | Building | Listed | The Roos house is listed under Criterion C as a work of master architect Bernard Maybeck that embodies the distinctive characteristics of Tudor Revival style with Gothic decorative details. | 49 |
| San Francisco County | Julian Waybur House | Building | Listed | The Julian Waybur House is listed under Criterion C as a work of master architect Ernest Coxhead that combines the American Shingle style with experimental uses of European Revival styles. | 50 |
| San Francisco County | Koshland House | Building | Listed | The Koshland House is listed under Criterion A for its association with performing arts in San Francisco and Criterion C as an excellent example of the Classical Revival style. | 51 |

JA250

AR_0000796

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| San Francisco County | Moscone Clubhouse | Building | Eligible | The Moscone Clubhouse is significant under Criterion A for its association with the recreational history of San Francisco. It is also significant under Criterion C for architecture. | 52 |
| San Francisco County | Anchor Building | Building | Eligible | The Anchor Building is significant under Criterion C for architecture. | 53 |
| San Francisco County | Building at 521 Francisco Street, San Francisco | Building | Eligible | The building at 521 Francisco Street is significant under Criterion C for architecture. | 54 |
| San Francisco County | North Beach Place Housing Project | Building | Eligible | The North Beach Place Housing Project building is significant under Criterion C for architecture. | 55 |
| San Francisco County | Building at 547 Francisco Street, San Francisco | Building | Eligible | The building at 547 Francisco Street is significant under Criterion C for architecture. | 56 |
| San Francisco County | Building at 679 Francisco Street, San Francisco | Building | Eligible | The building at 679 Francisco Street is significant under Criterion C for architecture. | 57 |
| San Francisco County | Building at 750 Francisco Street, San Francisco | Building | Eligible | The building at 750 Francisco Street is significant under Criterion C for architecture. | 58 |
| San Francisco County | Building at 1672 Great Highway, San Francisco | Building | Eligible | The building at 1672 Great Highway is significant under Criterion C for architecture. | 59 |
| San Francisco County | Search Light Market | Building | Eligible | The Search Light Market building is significant under Criterion C for architecture. | 60 |
| San Francisco County | Laurel Street Apartments | Building | Eligible | The Laurel Street Apartments are significant under Criterion C for architecture. | 61 |

JA251

AR_0000797

| Park Location (if located inside Park boundary) or County Name | Property Name | Property Type | Eligibility Status | Significant Characteristics | Map Label Number |
|---|---|---|---|---|---|
| San Francisco County | Antica Building | Building | Eligible | The Antica Building is significant under Criterion C for architecture. | 62 |
| San Francisco County | Presidio Golf Club Clubhouse | Building | Eligible | The Presidio Golf Club Clubhouse building is eligible under Criterion A for its association with the military and recreational history of San Francisco and Criterion C for its Craftsman-style architecture. | 63 |
| San Francisco County | Jerome White House | Building | Appears Eligible | The Jerome White House is potentially significant under Criterion C for architecture. | 64 |
| San Francisco County | Building at 1800 Union Street | Building | Eligible | The building at 1800 Union Street is significant under Criterion C for architecture. | 65 |

24

**JA252**

AR_0000798

# APPENDIX G

NPS Statement of Compliance for Golden Gate
National Recreation Area,
San Francisco Maritime National Historical
Park, and Point Reyes National Seashore

APPENDIX G

## NATIONAL PARK SERVICE STATEMENT OF COMPLIANCE

### San Francisco Maritime National Historical Park Air Tour Management Plan

**Compliance with NPS Management Policies Unacceptable Impact and Non-Impairment Standard**

As described in National Park Service (NPS or Service) 2006 Management Policies, § 1.4.4, the National Park Service Organic Act prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (September 2011) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The applicable NPS guidance does not require the preparation of a non-impairment determination where a categorical exclusion (CE) is applied because impacts associated with CEs are generally so minimal, they do not have the potential to impair park resources. Nonetheless, out of an abundance of caution, the NPS has completed a non-impairment analysis for the impacts to San Francisco Maritime National Historical Park (Park) as a result of commercial air tours authorized under the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument and Point Reyes National Seashore and determined that it will not result in impairment of Park resources, or in unacceptable impacts as described in § 1.4.7.1 of the 2006 NPS Management Policies. A separate Statement of Compliance has been completed for Point Reyes National Seashore and Golden Gate National Recreation Area. Impacts to Muir Woods National Monument from commercial air tours are addressed in Golden Gate National Recreation Area Statement of Compliance.

Sections 1.4.5 and 1.4.6 of Management Policies 2006 further explain impairment. Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Section 1.4.5 goes on to state:

> An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

> - necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
> - key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
> - identified in the park's general management plan or other relevant NPS planning documents as being of significance.

Section 1.4.6 of Management Policies 2006 identifies the park resources and values that are subject to the no-impairment standard. These include:

1

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor experience, socioeconomics, public health and safety, environmental justice, land use, Park operations, wilderness, etc., as these do not constitute impacts to Park resources and values subject to the non impairment standard under the Organic Act. *See* Management Policies § 1.4.6.

*Non-Impairment Determination for the San Francisco Maritime National Historical Park ATMP*

The purposes of San Francisco Maritime National Historical Park, along with Park significance statements and a description of the Park's fundamental resources and values, are described in the *Foundation Document Overview for San Francisco Maritime National Historical Park* (Foundation Document), 2017.

> Through preservation and interpretation of historic ships, extensive museum collections, traditional maritime skills, and its San Francisco Bay setting, San Francisco Maritime National Historical Park brings America's maritime legacy to life and promotes the understanding and enjoyment of the nation's West Coast maritime heritage (Foundation Document, page 5).

The Park's significance statements highlight resources that are unlikely to be impacted by commercial air tours. The preservation of historic ships and the maritime history collection will not be impacted by commercial air tours nor will commercial air tours alter the rich legacy of the site and seaport (*See* Foundation Document, page 6). The Park's fundamental resources and values include recreational and scenic opportunities. These resources may be impacted by commercial air tours, although the impacts are within the context of and urban audience (*See* Foundation Document, page 7).

As a basis for evaluating the potential for impairment or unacceptable impacts on Park resources, the NPS relied on the environmental analysis in the Environmental Screening Form (ESF) (Appendix B to the Record of Decision (ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), and the Section 106 documentation for the National

2

Historic Preservation Act (Appendix F to the ROD). The ESF includes analysis of impacts to air quality; biological resources including wildlife, wildlife habitat, and special status species; cultural resources including cultural landscapes, ethnographic resources, prehistoric and historic structures; soundscapes; lightscapes; wilderness; visitor experience; and viewsheds. The ESF considers both the change from current conditions as well the impact from the commercial air tours authorized under the ATMP (*See* ESF, Appendix B to the ROD).

The ATMP would result in limited impacts to the Park's natural and cultural soundscapes. Acoustic conditions in the Park have not been measured but were measured nearby at Golden Gate National Recreation Area in 2007 and 2008. The existing acoustic conditions at the Park have been estimated using data from developed sites at Golden Gate National Recreation Area. Due to the urban setting of the Park, only the existing ambient conditions were considered in the resource impacts analysis. The modeled daytime existing ambient[1] sound level without air tours was 55–60 decibels, which is typical of an urban setting (United States Environmental Protection Agency, Office of Noise Abatement and Control, 1974) in which the Park is located. To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. Noise modeling for the ATMP discloses that noise exceeding 35 decibels, a level at which natural sounds would be masked, would be present up to 125 minutes on a peak day, defined as a 90th percentile day at some locations in the Park (*See* ESF, Appendix B to the ROD). Because the Park is in an urban setting and the existing ambient exceeds 35 decibels, it is likely this noise would be masked by other noise. Modeling demonstrates that noise exceeding 52 decibels, the level at which a visitor may reasonably expect interference with Park interpretive programs, for up to 10 minutes on a peak day. Noise is not expected to exceed 85 decibels at any time. Again, much of this noise may be masked by other noise in the Park. Regardless, noise exceeding 52 decibels for only 10 minutes a day leaves the Park's natural and cultural soundscape largely unimpacted by commercial air tours and available for the enjoyment by present and future generations with limited interruptions. The Park will continue to preserve the historic resources in the Park and offer the public opportunities to learn about those with the existing soundscape.

ATMP impacts to wildlife could occur from noise generated by commercial air tours, although the Park does not have abundant habitat for species other than aquatic species. Commercial air tours do not have a known impact these species. Some birds use the area, but habitat for these species is limited and most bird species that use the Park are accustomed to noise. Therefore, noise will have very limited impacts on birds that maybe in the area. To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. As described above commercial air tours would impact the Park at levels above 35 decibels up to 125 minutes on a peak day. The minimum altitude of 1,000 ft above ground level (AGL) limits noise exposure to wildlife in the Park. Also, the NPS concluded, after discussing the impacts with the

---

[1] Noise metrics referenced in this document are discussed in detail on pages 8–9 and 14–16 of the ESF.

AR_0000830

U.S. Fish and Wildlife Service, that the commercial air tours authorized by the ATMP will have no effect on threatened and endangered species in the Park[2] (Section 7 documentation, Appendix E to the ROD). In conclusion, the ATMP will not impair the Park's wildlife or its habitat because the impacts from the commercial air tours do not individually rise above 35 decibels over most of the park for more than 125 minutes on a peak day. As documented through this analysis, and in the ESF, impacts to wildlife, either individually or cumulatively, would occur on an individual level and would not affect wildlife on the population level. These impacts do not impair the functioning of the Park's wildlife within. Consistent with the no adverse effect determination, wildlife, including threatened and endangered species, will persist in the Park without a loss of integrity and visitors will continue to enjoy wildlife and their habitats.

Impacts to the Park's cultural resources would be similar in frequency, amplitude, and duration to those described above for wildlife. The analysis in the ESF evaluated the impacts from commercial air tours on ethnographic resources, cultural landscapes, and historic resources. Many of the historic resources the Park protects are inside historic ships or museum properties and will not be impacted at all by noise from commercial air tours. Acting as lead agency for the purposes of compliance with Section 106 of the National Historic Preservation Act with respect to the ATMP, the FAA concluded, in coordination with the NPS, that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The State Historic Preservation Officer concurred with that determination that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The consultation materials documented that the ATMP would not diminish the Park's cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. Additionally, the determination documented that commercial air tours do not adversely affect those elements of ethnographic resources that make them significant to traditionally associated groups, nor does the ATMP interfere with the use of ethnographic resources by these groups. Finally, the analysis documented that the ATMP does not adversely affect the feeling and setting of historic structures that make those sites and structures eligible for listing on the National Register of Historic Properties (*See* Appendices B and F to the ROD). Since there are no adverse effects on these resources and impacts on these resources are limited, these resources would maintain their integrity and purpose and therefore remain unimpaired for the enjoyment of future generations under the ATMP.

As disclosed in the ESF, the ATMP may have very limited impacts on the Park's viewshed or scenic views. The Park's scenic views are a fundamental resource. As noted in the ESF, aircraft are not typically included in viewshed analyses because they are transitory. They are most noticeable because of the noise associated with them. Because of the Park location within and near urban environments, aircraft of all types are common and expected from most viewing areas. Commercial air tours therefore likely do not detract from viewsheds within the Park. As a result, visitors will continue to be able to enjoy the Park's beautiful views unimpaired.

---

[2] No effect means there will be no consequences to listed species or critical habitat that result from the proposed action.

4

The NPS completed an air quality analysis and determined that the 2,548 commercial air tours authorized under the ATMP contributes a minimal amount of emissions to the local air quality and would not have a regional impact (*See* ESF, Air Quality Technical Analysis, Appendix B to the ROD). Because the amount of emissions is so small the ATMP does not affect the integrity of the Park's air quality, leaving it unimpaired for future enjoyment.

As demonstrated here and in the analysis referenced above, the impacts to these resources, neither individually nor cumulatively, would preclude the NPS from achieving the purpose of the Park or desired conditions for resources; and would not unreasonably interfere with Park programs or activities, another appropriate use, the overall atmosphere of peace and tranquility or the natural soundscape, or NPS concessioner or contractor operations or services. As a result, there will not be impairment of or unacceptable impacts to the Park's natural and cultural resources or visitor experience. Impacts to other resources potentially affected were considered so small and insignificant that they did not warrant a written analysis here.

The ATMP sections on adaptive management and amending the plan will allow park managers to ensure that unanticipated or unacceptable impacts do not occur and the requirement for implementing flight tracking technologies included in the ATMP will better enable the NPS to monitor and enforce the restrictions in the ATMP.

**Compliance with NPS Management Policies Regarding Appropriate Uses**

A separate written appropriate use analysis is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether commercial air tours are an appropriate use over the Park, for this ATMP the NPS has decided to briefly address the issue of appropriate use below.

NPS 2006 Management Policies § 1.5 state:

> An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park."

Section 8.1.2 of Management Policies further explain:

> The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated.

In determining whether a use is appropriate, the NPS evaluates:

- consistency with applicable laws, executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;

5

- total costs to the Service;
- whether the public interest will be served.

Parks may allow uses that are appropriate even if some individuals do not favor that particular use. The National Park Air Tour Management Act (NPATMA) contemplates that commercial air tours may be an acceptable use over National Park System units so long as protections are in place to protect park resources from significant impacts of such tours, if any. Therefore, commercial air tours are authorized by law, though not mandated, and generally may be appropriate where they do not result in significant impacts or cause unacceptable impacts on park resources and values.

*San Francisco Maritime National Historical Park ATMP – consistency with NPS Management Policies for Appropriate Uses*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), the unacceptable impact and non-impairment analysis above, and the language in NPATMA as a basis for finding that the ATMP's authorization of 2,548 commercial air tours over San Francisco Maritime National Historical Park is an appropriate use.

- The ATMP for San Francisco Maritime National Historical Park is consistent with applicable laws, executive orders, regulations, and policies. NPATMA specifically provides that air tours may be allowed over National Park System units where they do not result in significant impacts. Commercial air tours are not prohibited in applicable laws, regulations, or policies.
- The ATMP's authorization of 2,548 commercial air tours over the Park is consistent with the Park's existing management plans. No existing management plans preclude commercial air tours, though the Park may set different management direction in the future. Mitigations, including limiting the number of commercial air tours per year, restricting commercial air tours to the designated route, and setting minimum altitudes, limit impacts to visitor experience and other resources.
- The effects of the 2,548 commercial air tours authorized in the ATMP on Park resources was evaluated in the materials referenced above and unacceptable impact and non-impairment discussion above. The Park is in an urban environment and much of the noise from commercial air tours will be masked by other noise. As noted in the ESF, a recent visitor survey noted that noise was not a problem at the Park. The commercial air tours are short in duration and occur at decibel levels that do not rise to the level of an unacceptable impact nor impair Park resources. The NPS does not interpret § 8.1.1 to require the NPS to contemplate mitigating Park uses to the point that the use no longer has any impact or no longer can occur. Rather, this section requires the NPS to consider whether there are mitigations that can reduce impacts to Park resources and whether the impacts of those uses, after applying mitigations, result in unacceptable impacts or impairment. In this case, the NPS evaluated the impacts of 2,548 commercial air tours and included specific mitigations in the ATMP to minimize impacts to Park resources.

6

The NPS acknowledges that prohibiting commercial air tours entirely would avoid all impacts to Park resources, but the elimination of commercial air tours is not required to avoid unacceptable impacts or impairment of Park resources. The NPS believes the mitigations in the ATMP are sufficient to protect Park resources and that additional mitigations are not required because the impacts associated with the ATMP are not significant and do not result in unacceptable impacts or impairment.

- The cost to the NPS from implementing the ATMP includes yearly compiling of operator reported commercial air tours and aircraft monitoring data which is done in coordination with the Federal Aviation Administration. These activities would occur anyway, because they are required under NPATMA, regardless of whether the Park has an ATMP because commercial air tours are currently authorized under interim operating authority (IOA). This is done by the NPS's Natural Sounds and Night Skies Division which also provides noise monitoring, modeling, and planning support to parks across the country.

- While some visitors may not like commercial air tours, others appreciate the opportunity to view the Park from a commercial air tour. Commercial air tours, as contemplated in NPATMA, serve the public in this way.

Additional commercial air tours and commercial air tours on other routes may not be appropriate. However, the NPS has determined that because the ATMP authorizes 2,548 commercial air tours, and because those commercial air tours are restricted to designated routes, are relatively short in duration, and are at an acceptable altitude, the ATMP is adequately protective of Park resources and the commercial air tours it authorizes are an appropriate use of the Park at this time.

**Compliance with NPS Management Policies for Soundscape Management**

A separate written compliance analysis for Soundscape Management is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether the ATMP complies with NPS soundscape policies and guidance, the NPS has opted to briefly discuss the issue with respect to this ATMP.

Management Policies § 4.9 states, "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks." Section 5.3.1.7 similarly addresses cultural and historic resource sounds.

Section 8.4 specifically addresses overflights, including commercial air tours, which notes

Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the National Park System occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences.

7

Director's Order #47 gives further guidance for the management of natural and cultural soundscapes, requiring the consideration of both the natural and existing ambient levels.

*San Francisco Maritime National Historical Park ATMP – consistency with NPS Management Policies for Soundscape Management.*

Consistent with Management Policies § 8.4, the NPS worked constructively and collaboratively with FAA to develop the ATMP. The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), and the unacceptable impact and non-impairment analysis above as a basis for finding that the ATMP complies with the policies and guidance for management of natural and cultural soundscapes.

Consistent with Management Policies § 4.9, the ATMP eliminates some noise, or moves the Park closer to natural ambient conditions, by limiting commercial air tours to 2,548 per year, which is a reduction from the current authorized number (5,090) under IOA (*See* ATMP, Appendix A to the ROD). In addition, the ATMP limits the operation of commercial air tours to between 9:00 AM until 30 minutes after sunset, establishes designated air tour routes, increases the minimum altitude that commercial air tours may fly over the Park to no lower than 1,000 ft. AGL and includes quiet technology incentives which could further reduce noise. The commercial air tours occur along designated routes, which protects most of these areas from the intermittent, and short duration noise effects of commercial air tours.

Management Policies § 5.3.1.7 prohibits excessive noise and § 1.4.7.1 prohibits actions that unreasonably interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park." Because of the location of the Park which includes substantial noise from other sources outside the Park, a natural soundscape is highly unlikely to ever occur. As noted above, commercial air tour noise should not exceed 52 decibels for more than 10 minutes. Some mitigations have been included to reduce noise compared to current condition. Commercial air tour noise is neither excessive nor does it unreasonably interfere with the peace and tranquility of the Park, or natural or historic or commemorative locations. In conclusion, the ATMP complies with § 8.4, § 4.9, and § 5.3.1.7 of the Management Policies because the NPS has successfully collaborated with the FAA and developed an ATMP that will not result in unacceptable impacts to natural or cultural soundscapes or impairment of Park resources.

8

AR_0000835

**JA262**

**References**

National Park Service. (2000). Director's Order #47: Soundscape Preservation and Noise Management. Available at https://www.nps.gov/subjects/policy/upload/DO_47_12-1-2000.pdf

National Park Service. (2006). Management Policies, 2006. Available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service. (2011). Guidance for Non-Impairment Determinations and the NPS NEPA Process. Available at https://www.nps.gov/subjects/nepa/

National Park Service. (2017). Foundation Document for San Francisco Maritime Historical Park. Available at https://www.nps.gov/safr/getinvolved/upload/SAFR_FD_SP_11_17_508-2.pdff

United States Environmental Protection Agency, Office of Noise Abatement and Control (1974). Information on levels of environmental noise requisite to protect public health and welfare with an adequate margin of safety. NPC Online Library, 550/9-74-004, 1-78. Available at https://www.nrc.gov/docs/ML1224/ML12241A393.pdf

AR_0000836

**JA263**

## APPENDIX G

## NATIONAL PARK SERVICE STATEMENT OF COMPLIANCE

### Point Reyes National Seashore Air Tour Management Plan

**Compliance with NPS Management Policies Unacceptable Impact and Non-Impairment Standard**

As described in National Park Service (NPS or Service) 2006 Management Policies, § 1.4.4, the National Park Service Organic Act prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (September 2011) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The applicable NPS guidance does not require the preparation of a non-impairment determination where a categorical exclusion (CE) is applied because impacts associated with CEs are generally so minimal, they do not have the potential to impair park resources. Nonetheless, out of an abundance of caution, the NPS has completed a non-impairment analysis for the impacts to Point Reyes National Seashore (Park) as a result of commercial air tours authorized under the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore and determined that they will not result in impairment of Park resources, or in unacceptable impacts as described in § 1.4.7.1 of the 2006 NPS Management Policies. A separate Statement of Compliance has been completed for Golden Gate National Recreation Area and San Francisco Maritime National Historic Park. The ATMP does not authorize commercial air tours over Muir Woods National Monument and therefore the NPS has not prepared a separate Statement of Compliance for that park. Impacts to Muir Woods National Monument from commercial air tours are addressed in Golden Gate National Recreation Area Statement of Compliance.

Sections 1.4.5 and 1.4.6 of Management Policies 2006 further explain impairment. Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Section 1.4.5 goes on to state:

> An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is
>
> - necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
> - key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
> - identified in the park's general management plan or other relevant NPS planning documents as being of significance.

1

Section 1.4.6 of Management Policies 2006 identifies the park resources and values that are subject to the no-impairment standard. These include:

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor experience, socioeconomics, public health and safety, environmental justice, land use, Park operations, wilderness, etc., as these do not constitute impacts to Park resources and values subject to the non impairment standard under the Organic Act. *See* Management Policies § 1.4.6.

*Non-Impairment Determination for the Point Reyes National Seashore ATMP*

The purposes of Point Reyes National Seashore, along with Park significance statements and a description of the Park's fundamental resources and values, are described in the *Foundation Document Point Reyes National Seashore* (Foundation Document), 2020.

> Park Purpose: Established for public benefit, recreation, and inspiration, Point Reyes National Seashore preserves a rugged and wild coastal peninsula and surrounding waters, connecting native ecosystems, enduring human history, and interpretive, scientific, and educational opportunities (Foundation Document, page 5).

The Park's significance statements highlight resources that may be impacted by commercial air tours including wilderness character, wildlife, and cultural resources. The scenic coastal landscapes of the Park may also be impacted by commercial air tours (*See* Foundation Document, page 6). Additionally, a number of the Park's fundamental resources and values could be impacted by commercial air tours including the Park's diverse wildlife habitats and opportunities for inspiration (*See* Foundation Document, page 8). The analysis in this statement includes 15,000 acres of the North District of Golden Gate National Recreation Area, including all NPS lands north of Bolinas-Fairfax Road. This area of Golden Gate National Recreation Area is managed by Point Reyes National Seashore.

2

AR_0000838

As a basis for evaluating the potential for impairment or unacceptable impacts on Park resources, the NPS relied on the environmental analysis in the Environmental Screening Form (ESF) (Appendix B to the Record of Decision (ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), and the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD). The ESF includes analysis of impacts to air quality; biological resources including wildlife, wildlife habitat, and special status species; cultural resources including cultural landscapes, ethnographic resources, prehistoric and historic structures; soundscapes; lightscapes; wilderness; visitor experience; and viewsheds. The ESF considers both the change from current conditions as well the impact from the commercial air tours authorized under the ATMP (*See* ESF, Appendix B to the ROD).

The ATMP would result in limited impacts to the Park's natural and cultural soundscapes. Acoustic conditions in the Park were measured in 2009 and 2010 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$)[1] was reported to be 30–40 decibels, while the natural ambient ($L_{nat}$) was reported to be 25–35 decibels. These metrics confirm that the natural acoustic environment at these sites experience disturbances from anthropogenic noise. Buxton, et al. (2017) found that anthropogenic noise in protected areas is closely linked with transportation, development, and other uses. To determine the severity of the effect and potential for impairment from commercial air tours, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. Noise modeling for the ATMP discloses that noise from 143 annual commercial air tours would be present at any location in the Park no more than 10 minutes on a peak day, defined as a 90th percentile day (*See* ESF, Appendix B to the ROD). Most areas of the Park would experience noise above 35 decibels, a level at which natural sounds would be masked, less than 5 minutes on a peak day. The area around the Lighthouse Visitor Center, Point Reyes Lighthouse and Sea Lion Overlook would experience noise up to 35 decibels approximately 10 minutes on a peak day. The maximum noise level is not expected to exceed 52 decibels for more than 5 minutes at any location in the Park on a peak day, the level at which a visitor may reasonably expect interference with Park interpretive programs (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). Approximately half of the Park will never experience noise at or above 52 decibels and noise from air tours will be present less than half of the days of the year. Therefore, the natural and cultural soundscapes of the Park remain unimpaired and without unacceptable impacts under the ATMP since noise impacts are limited to approximately half of the Park and noise in that area only exceeds 52 decibels for 5 minutes on a peak day and commercial air tour noise will not be present every day. Because the noise is short in duration and infrequent with the loudest noise focused near or beneath the designated routes, the Park's natural and cultural soundscape will be largely unimpacted by commercial air tours and available for the enjoyment by present and future generations.

ATMP impacts to wildlife occur from noise generated by commercial air tours. The analysis in the ESF discloses that noise would likely be heard by wildlife near the route (*See* Appendix B to the ROD). Generally, noise from commercial air tours may impact wildlife in a number of ways:

---

[1] Noise metrics referenced in this document are discussed in detail on pages 8–9 and 14–16 of the ESF.

3

altered vocal behavior, breeding relocation, changes in vigilance and foraging behavior, predator avoidance, reproductive success, and impacts on individual fitness and the structure of ecological communities to name a few (Shannon et al., 2016; Kunc et al., 2016; Kunc and Schmidt, 2019). To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. The analysis demonstrates that the 143 commercial air tours would impact the Park at levels above 35 decibels for no more than 10 minutes on a peak day. Most Park wildlife would not experience noise above 35 decibels more than 5 minutes on a peak day. The minimum altitude required along the route includes altitude protections (required 2,500 ft AGL) and setbacks for areas with sensitive wildlife. Therefore, the AGL requirements limit noise exposure to wildlife in the Park, including the Park's threatened and endangered species. The NPS concluded, after discussing the impacts with the U.S. Fish and Wildlife Service, that the commercial air tours authorized by the ATMP will have no effect on threatened and endangered species in the Park[2] (Section 7 documentation, Appendix E to the ROD). In conclusion, the ATMP will not impair the Park's wildlife or its habitat because the impacts from the commercial air tours do not individually rise above 35 decibels for more than 10 minutes on a peak day. As documented through this analysis, and in the ESF, impacts to wildlife, either individually or cumulatively, would occur on an individual level and would not affect wildlife on the population level. These impacts do not impair the functioning of the Park's unique ecosystems and the wildlife within. Consistent with the no adverse effect determination, wildlife, including threatened and endangered species, will persist in the Park without a loss of integrity and visitors will continue to enjoy wildlife and their habitats.

Impacts to the Park's cultural resources would be similar in frequency, amplitude, and duration to those described above for wildlife. The analysis in the ESF evaluated the impacts from commercial air tours on cultural landscapes, ethnographic resources, and historic resources. Because of the number and times commercial air tours occur, and the location of the routes, noise impacts to these resources will be limited. Acting as lead agency for the purposes of compliance with Section 106 of the National Historic Preservation Act with respect to the ATMP, the FAA concluded, in coordination with the NPS, that there would be no adverse effects on historic properties from the 143 commercial air tours authorized under the ATMP. The State Historic Preservation Officer concurred with that determination that there would be no adverse effects on historic properties from the 143 commercial air tours authorized under the ATMP. The consultation materials documented that the ATMP would not diminish the Park's cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. Additionally, the determination documented that commercial air tours do not adversely affect those elements of ethnographic resources that make them significant to traditionally associated groups, nor does the ATMP interfere with the use of ethnographic resources by these groups. Finally, the analysis documented that the ATMP does not adversely affect the feeling and setting of historic structures that make those sites and structures eligible for listing on the National Register of Historic Properties (*See* Appendices B and F to the ROD). Since there are no adverse effects on these resources and impacts on these resources are limited, these resources would

---

[2] No effect means there will be no consequences to listed species or critical habitat that result from the proposed action.

4

maintain their integrity and purpose and therefore remain unimpaired for the enjoyment of future generations under the ATMP.

As disclosed in the ESF, the ATMP may have very limited impacts on the Park's viewshed or scenic views. The Park's scenic views are a fundamental resource. Commercial air tours will be visible from some observation points in the Park. As noted in the ESF, aircraft are not typically included in viewshed analyses because they are transitory. They are most noticeable because of the noise associated with them. As noted above, due to the short duration of the effects as well as the limited area air tours will be present, impacts to the Park's viewshed will be limited. As a result, visitors will continue to be able to enjoy the Park's beautiful views unimpaired.

The NPS completed an air quality analysis and determined that the 143 commercial air tours authorized under the ATMP contributes a minimal amount of emissions to the local air quality and would not have a regional impact (*See* ESF, Air Quality Technical Analysis, Appendix B to the ROD). Because the amount of emissions is so small the ATMP does not affect the integrity of the Park's air quality, leaving it unimpaired for future enjoyment.

As demonstrated here and in the analysis referenced above, the impacts to these resources, neither individually nor cumulatively, would preclude the NPS from achieving the purpose of the Park or desired conditions for resources; and would not unreasonably interfere with Park programs or activities, another appropriate use, the overall atmosphere of peace and tranquility or the natural soundscape, or NPS concessioner or contractor operations or services. As a result, there will not be impairment of or unacceptable impacts to the Park's natural and cultural resources or visitor experience. Impacts to other resources potentially affected were considered so small and insignificant that they did not warrant a written analysis here.

The ATMP sections on adaptive management and amending the plan will allow park managers to ensure that unanticipated or unacceptable impacts do not occur and the requirement for implementing flight tracking technologies included in the ATMP will better enable the NPS to monitor and enforce the restrictions in the ATMP.

**Compliance with NPS Management Policies Regarding Appropriate Uses**

A separate written appropriate use analysis is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether commercial air tours are an appropriate use over the Park, for this ATMP the NPS has decided to briefly address the issue of appropriate use below.

NPS 2006 Management Policies § 1.5 state:

> An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park."

5

Section 8.1.2 of Management Policies further explain:

> The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated.

In determining whether a use is appropriate, the NPS evaluates:

- consistency with applicable laws, executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;
- total costs to the Service;
- whether the public interest will be served.

Parks may allow uses that are appropriate even if some individuals do not favor that particular use. The National Park Air Tour Management Act (NPATMA) contemplates that commercial air tours may be an acceptable use over National Park System units so long as protections are in place to protect park resources from significant impacts of such tours, if any. Therefore, commercial air tours are authorized by law, though not mandated, and generally may be appropriate where they do not result in significant impacts or cause unacceptable impacts on park resources and values.

*Point Reyes National Seashore ATMP – consistency with NPS Management Policies for Appropriate Uses*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), the unacceptable impact and non-impairment analysis above, and the language in NPATMA as a basis for finding that the ATMP's authorization of 143 commercial air tours over Point Reyes National Seashore is an appropriate use.

- The ATMP for Point Reyes National Seashore is consistent with applicable laws, executive orders, regulations, and policies. NPATMA specifically provides that commercial air tours may be allowed over National Park System units where they do not result in significant impacts. Commercial air tours are not prohibited in applicable laws, regulations, or policies.
- The ATMP's authorization of 143 commercial air tours over the Park is consistent with the Park's existing management plans. No existing management plans preclude commercial air tours, though the Park may set different management direction in the future. Mitigations, including limiting the number of commercial air tours per year, restricting commercial air tours to the designated route, and setting minimum altitudes, limit impacts to visitor experience and other resources.

6

- The effects of the 143 commercial air tours authorized in the ATMP on Park resources was evaluated in the materials referenced above and unacceptable impact and non-impairment discussion above. The Park will not experience noise above 35 decibels from commercial air tours for more than 10 minutes on a peak day. Most areas will not experience noise above 35 decibels for more than 5 minutes on a peak day. Commercial air tours will not occur on at least half of the days each year. The commercial air tours are short in duration and occur at decibels levels that do not rise to the level of an unacceptable impact nor impair Park resources. The NPS does not interpret § 8.1.1 to require the NPS to contemplate mitigating Park uses to the point that the use no longer has any impact or no longer can occur. Rather, this section requires the NPS to consider whether there are mitigations that can reduce impacts to Park resources and whether the impacts of those uses, after applying mitigations, result in unacceptable impacts or impairment. In this case, the NPS evaluated the impacts of 143 commercial air tours and included specific mitigations in the ATMP to minimize impacts to Park resources. These mitigations included setbacks for wildlife, restricted hours in which tours may occur, and altitude protections for wildlife and wilderness protection. The NPS acknowledges that prohibiting commercial air tours entirely would avoid all impacts to Park resources, but the elimination of commercial air tours is not required to avoid unacceptable impacts or impairment of Park resources. The NPS believes the mitigations in the ATMP are sufficient to protect Park resources and that additional mitigations are not required because the impacts associated with the ATMP are not significant and do not result in unacceptable impacts or impairment.
- The cost to the NPS from implementing the ATMP includes yearly compiling of operator reported commercial air tours and aircraft monitoring data which is done in coordination with the Federal Aviation Administration. These activities would occur anyway, because they are required under NPATMA, regardless of whether the Park has an ATMP because commercial air tours are currently authorized under interim operating authority (IOA). This is done by the NPS's Natural Sounds and Night Skies Division which also provides noise monitoring, modeling, and planning support to parks across the country.
- While some visitors may not like commercial air tours, others appreciate the opportunity to view the Park from a commercial air tour. Commercial air tours, as contemplated in NPATMA, serve the public in this way.

Additional commercial air tours and commercial air tours on other routes may not be appropriate. However, the NPS has determined that because the ATMP authorizes 143 commercial air tours, and because those commercial air tours are restricted to designated routes, are relatively short in duration, and are at an acceptable altitude, the ATMP is adequately protective of Park resources and the commercial air tours it authorizes are an appropriate use of the Park at this time.

**Compliance with NPS Management Policies for Soundscape Management**

A separate written compliance analysis for Soundscape Management is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider

7

whether the ATMP complies with NPS soundscape policies and guidance, the NPS has opted to briefly discuss the issue with respect to this ATMP.

Management Policies § 4.9 states, "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks." Section 5.3.1.7 similarly addresses cultural and historic resource sounds.

Section 8.4 specifically addresses overflights, including commercial air tours, which notes

> Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

> Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the National Park System occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences.

Director's Order #47 gives further guidance for the management of natural and cultural soundscapes, requiring the consideration of both the natural and existing ambient levels.

*Point Reyes National Seashore ATMP – consistency with NPS Management Policies for Soundscape Management.*

Consistent with Management Policies § 8.4, the NPS worked constructively and collaboratively with FAA to develop the ATMP. The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), and the unacceptable impact and non-impairment analysis above as a basis for finding that the ATMP complies with the policies and guidance for management of natural and cultural soundscapes.

Consistent with Management Policies § 4.9, the ATMP eliminates some noise, or moves the Park closer to natural ambient conditions, by limiting commercial air tours to 143 per year, which is a reduction from the current authorized number (5,090) under IOA (*See* ATMP, Appendix A to the ROD). In addition, the ATMP limits the hours in which commercial air tours may occur (tours may only occur between 12:00 pm and 5:00 pm), restricts commercial air tours to designated routes, requires operators fly a minimum altitude between 1,500 ft. AGL to 2,500 ft. AGL depending on location, and includes quiet technology incentives which could further reduce noise. When developing the ATMP, the NPS considered the commercial air tour routes and evaluated the potential for noise to reach the most sensitive resources in the Park, including cultural and natural resources, and areas where commercial air tours could disrupt educational and interpretive opportunities. None of the visitor centers at the Park would experience noise above 52 decibels for more than 5 minutes a day leaving most educational and interpretative programs at these sites free from interruption from commercial air tours.

8

AR_0000844

**JA271**

Management Policies § 5.3.1.7 prohibits excessive noise and § 1.4.7.1 prohibits actions that unreasonably interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park." Acoustic conditions in the Park were measured in 2009 and 2010 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$) was reported to be 30–40 decibels, while the natural ambient ($L_{nat}$) was reported to be 25–35 decibels. When determining the severity of the impacts, results from the noise modeling for the ATMP were considered against both the natural soundscape and existing soundscape. In this case, there is some evidence of anthropogenic noise, including aircraft noise. As discussed above under the non-impairment discussion, the noise from commercial air tours is limited, both spatially and temporally. Therefore, the noise from commercial air tours is neither excessive nor does it unreasonably interfere with the peace and tranquility of the Park, wilderness character, or natural or historic or commemorative locations. In conclusion, the ATMP complies with § 8.4, § 4.9, and § 5.3.1.7 of the Management Policies because the NPS has successfully collaborated with the FAA and developed an ATMP that will not result in unacceptable impacts to natural or cultural soundscapes or impairment of Park resources.

**Compliance with NPS Management Policies for Wilderness Preservation and Management**

A separate written compliance analysis for Wilderness Preservation and Management is not required under NPS Management Policies. In recognition of comments suggesting that the NPS consider whether the ATMP complies with NPS wilderness policies and guidance, the NPS has elected to briefly discuss the issue with respect to this ATMP.

Management Policies for wilderness preservation and management do not specifically address commercial air tours. However, § 7.3 of Director's Order #41 notes that commercial air tours are inconsistent with preservation of wilderness character and requires the NPS to consider ways to further prevent or minimize impacts of commercial air tours on wilderness character.

The ATMP does not allow commercial air tours to take off or land within wilderness. Therefore, § 4(c) of the Wilderness Act and § 6.4 of Director's Order #41 do not apply and a minimum requirements analysis is not required. While the NPS did not complete a minimum requirements analysis, the NPS did analyze and report on the impacts of commercial air tours on wilderness character and minimized those impacts.

*Point Reyes National Seashore ATMP – consistency with NPS Management Policies for Wilderness Preservation and Management.*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the unacceptable impact and non-impairment analysis above, and soundscape management analysis above as a basis for finding that the ATMP complies with the policies and guidance for Wilderness Preservation and Management.

Point Reyes National Seashore includes the 33,000–acre Phillip Burton Wilderness. The NPS considered the impact of 143 commercial air tours on wilderness character. The ESF

9

AR_0000845

acknowledges noise from aircraft could impact wilderness character although the analysis demonstrates that the impact is limited. The ATMP requires aircraft to fly at least 2,500 ft AGL above Bolinas Ridge and Inverness Ridge and at 1,500 ft AGL over the Point Reyes headlands area in order to limit noise to wilderness. The wilderness at Tomales Point will not experience any noise from commercial air tours. Much of the remainder of the Phillip Burton Wilderness will not experience noise above 52 decibels and where the decibel levels reach that level, it will not exceed 5 minutes. Most of the Phillip Burton Wilderness will not experience noise above 35 decibels more than 5 minutes. Because of the limited number of tours, at least half of the year there will be no noise in wilderness from commercial air tours. In conclusion, as described in detail above and in the ESF, noise from commercial air tours over wilderness will be short and at an amplitude that impacts to wilderness character will be limited. Wilderness character will remain unimpaired under the ATMP since a Park visitor will have the opportunity to hear the sounds of nature and experience the primeval character of the Park's wilderness, and the natural and cultural soundscape will remain largely unmarred by air tour noise the vast majority of time.

Consistent with Director's Order #41, § 7.3, the ATMP includes mitigations which minimize impacts to wilderness character including limiting commercial air tours to 143 per year, requiring aircraft to fly above 1,500 ft. AGL over most of the Park, and between 2,000 ft AGL and 2,500 ft. AGL over certain wilderness portions, and requiring the commercial air tours to stay on designated routes (*See* ATMP, § 5.0, Appendix A to the ROD).

10

**References**

Buxton, R. T., McKenna, M. F., Mennitt, D., Fristrup, K., Crooks, K., Angeloni, L., & Wittemyer, G. (2017). Noise pollution is pervasive in US protected areas. Science, 356 (6337), 531-533.

Kunc, H. P., McLaughlin, K. E., & Schmidt, R. (2016). Aquatic noise pollution: Implications for individuals, populations, and ecosystems. Proceedings of the Royal Society B: Biological Sciences, 283(1836), 20160839. Available at https://doi.org/10.1098/rspb.2016.0839

Kunc, H. P., & Schmidt, R. (2019). The effects of anthropogenic noise on animals: A meta-analysis. Biology Letters, 15(11), 20190649. Available at https://doi.org/10.1098/rsbl.2019.0649

Lee C., & Macdonald, J. (2011). Point Reyes National Seashore baseline ambient sound levels 2009 and 2010. Report No. DOT-VNTSC-FAA-16-20.

National Park Service. (2000). Director's Order #47: Soundscape Preservation and Noise Management. Available at https://www.nps.gov/subjects/policy/upload/DO_47_12-1-2000.pdf

National Park Service. (2006). Management Policies, 2006. Available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service. (2011). Guidance for Non-Impairment Determinations and the NPS NEPA Process. Available at https://www.nps.gov/subjects/nepa/

National Park Service. (2013). Directors Order #41. Wilderness Stewardship. Available at https://www.nps.gov/policy/DOrders/DO_41.pdf

National Park Service. (2020). Foundation Document for Point Reyes National Seashore. Available at https://www.nps.gov/pore/getinvolved/planning_foundation_document.htm

Shannon, G., McKenna, M.F., Angeloni, L.M., Crooks, K.R., Fristrup, K.M., Brown, E., Warner, K.A., Nelson, M.D., White, C., Briggs, G., McFarland, S., & Wittemyer, G. (2015). A synthesis of two decades of research documenting the effects of noise on wildlife. *Biological Reviews*, 91(4) 982-1005. Available at https://doi.org/10.1111/brv.12207

The Wilderness Act, (1964), Public Law 88-577 (16 U.S.C. §§ 1131-1136) 88th Congress, Second Session (As amended).

AR_0000847

JA274

## APPENDIX G

## NATIONAL PARK SERVICE STATEMENT OF COMPLIANCE

### For Golden Gate National Recreation Area

**Compliance with NPS Management Policies Unacceptable Impact and Non-Impairment Standard**

As described in National Park Service (NPS or Service) 2006 Management Policies, § 1.4.4, the National Park Service Organic Act prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (September 2011) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The applicable NPS guidance does not require the preparation of a non-impairment determination where a categorical exclusion (CE) is applied because impacts associated with CEs are generally so minimal, they do not have the potential to impair park resources. Nonetheless, out of an abundance of caution, the NPS has completed a non-impairment analysis for the impacts to Golden Gate National Recreation Area (Park) as a result of commercial air tours authorized under the Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument and Point Reyes National Seashore and determined that it will not result in impairment of Park resources, or in unacceptable impacts as described in § 1.4.7.1 of the 2006 NPS Management Policies. A separate Statement of Compliance has been completed for Point Reyes National Seashore and San Francisco Maritime National Historic Park. The ATMP does not authorize commercial air tours over Muir Woods National Monument (Muir Woods) and therefore the NPS has not prepared a separate Statement of Compliance for that park. However, the effects of commercial air tour noise on Muir Woods as a result of air tours authorized within the ATMP planning area are documented here. As noted, those effects are similar to those for adjacent areas of Golden Gate National Recreation Area (described in detail below), and therefore similarly do not result in unacceptable impacts or impairment of Park resources.

Sections 1.4.5 and 1.4.6 of Management Policies 2006 further explain impairment. Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Section 1.4.5 goes on to state:

> An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is
>
> - necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or

1

- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

Section 1.4.6 of Management Policies 2006 identifies the park resources and values that are subject to the no-impairment standard. These include:

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor experience, socioeconomics, public health and safety, environmental justice, land use, Park operations, wilderness, etc., as these do not constitute impacts to Park resources and values subject to the non impairment standard under the Organic Act. *See* Management Policies § 1.4.6.

*Non-Impairment Determination for the Golden Gate National Recreation Area ATMP*

The purposes of Golden Gate National Recreation Area, along with Park significance statements and a description of the Park's fundamental resources and values, are described in the *Foundation Document Overview for Golden Gate National Recreation Area* (Foundation Document), 2017.

> The purpose of Golden Gate National Recreation Area is to offer national park experiences to all, including a large and diverse urban population, while preserving and interpreting the outstanding natural, historic, scenic, and recreational values of the park lands (Foundation Document, page 8).

The Park's significance statements highlight resources that may be impacted by commercial air tours including Alcatraz Island, outstanding scenic views, and historic values. Many of the fundamental resources and values will not be impacted by commercial air tours. Commercial air tours will not impact Park access and the diversity of settings. Similarly, they do not impact geologic resources, water resources, tides, currents and ocean conditions, but commercial air

2

tours may impact coastal wildlife, threatened and endangered species, and cultural resources at the Park (*See* Foundation Document, page 6-7). The analysis in this statement excludes 15,000 acres of the North District of Golden Gate National Recreation Area, including all NPS lands north of Bolinas-Fairfax Road. This area of Golden Gate National Recreation Area is managed by Point Reyes National Seashore. Thus, analysis for that area is included in the Statement of Compliance for Point Reyes National Seashore .

As a basis for evaluating the potential for impairment or unacceptable impacts on Park resources, the NPS relied on the environmental analysis in the Environmental Screening Form (ESF) (Appendix B to the Record of Decision (ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), and the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD). The ESF includes analysis of impacts to air quality; biological resources including wildlife, wildlife habitat, and special status species; cultural resources including cultural landscapes, ethnographic resources, prehistoric and historic structures; soundscapes; lightscapes; wilderness; visitor experience; and viewsheds. The ESF considers both the change from current conditions as well the impact from the commercial air tours authorized under the ATMP (*See* ESF, Appendix B to the ROD).

The ATMP would result in limited impacts to the Park's natural and cultural soundscapes. Acoustic conditions in the Park were measured in 2007 and 2008 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$)[1] was reported to be 40–55 decibels, while the natural ambient ($L_{nat}$) was reported to be 30–55 db. These metrics confirm that the natural acoustic environment at these sites sometimes experience disturbances from anthropogenic noise. Many Park areas are adjacent to urban environments where urban noise is common. To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. Noise modeling for the ATMP discloses noise exceeding 35 decibels, a level that would mask natural sounds, would not exceed 125 minutes on a peak day, defined as a 90th percentile day. However, this would only occur in a small area of the park and, as with all air tour noise, it would be intermittent throughout the day (*See* ESF, Appendix B to the ROD).

The Tennessee, Gerbode, and Rodeo Valley areas would experience noise above 35 decibels for about an hour on a peak day but would only exceed 52 decibels, the level at which a visitor may reasonably expect interference with park interpretive programs, approximately 10 minutes on a peak day. Most of this area would experience noise above 52 decibels for 5 minutes on a peak day (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). These lands are predominately natural areas within the Park (National Park Service, 2014). The short duration of noise in these areas is consistent with the uses of these lands.

Some isolated areas in San Mateo County will experience noise above 35 decibels for less than 5 minutes on a peak day but most of the areas south of Fort Funston will not experience noise

---

[1] Noise metrics referenced in this document are discussed in detail on pages 8–9 and 14–16 of the ESF.

3

above 35 decibels from commercial air tours over the Park. No areas south of Fort Funston will experience noise that exceed 52 decibels (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD).

The lands within San Francisco City and County will experience the most noise from commercial air tours. Some of these areas will experience noise above 35 decibels for just over two hours on a peak day (125 minutes). This includes areas near the Presidio, Fort Mason, Fort Point, and Lands End. Some areas will experience noise above 52 decibels for up to 25 minutes on a peak day (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). These Park areas are not natural areas and are in or adjacent to urban environments where noise is common. Human caused sound was audible 84% during daytime hours (7 am – 7 pm) at a nearby acoustic sampling location and sound levels were above 52 decibels 75 – 95% of daytime hours (Lee & MacDonald, 2011). Existing noise from sources other than commercial air tours, such as road traffic, is likely to mask some noise from air tours in these locations. The ESF Noise Technical Analysis indicates similar decibel levels for Alcatraz. The ATMP was revised to include a setback around Alcatraz to provide protections for seabirds. Therefore, the anticipated decibel levels at Alcatraz are expected to be less than depicted in Figures 1, 2 and 4 (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD).

In summary, most of the impacted areas will experience noise at or above 35 decibels less than 20 minutes on a peak day. The maximum noise level is not expected to exceed 52 decibels for more than 25 minutes at any location in the Park on a peak day (ESF, Figures 1. and 2. Noise Technical Analysis, Appendix B to the ROD). Park lands within San Francisco City and County will experience the most noise. Because noise is limited in the more natural areas and noise within the more urban environments is limited to 25 minutes above 52 decibels, and much of the Park will not experience noise from commercial air tours, the natural and cultural soundscapes of the Park remain unimpaired and without unacceptable impacts under the ATMP. The Park's natural and cultural soundscape will be largely unimpacted by commercial air tours and available for the enjoyment by present and future generations with limited interruptions.

ATMP impacts to wildlife occur from noise generated by commercial air tours. The analysis in the ESF discloses that noise would likely be heard by wildlife near the route (*See* Appendix B to the ROD). Generally, noise from commercial air tours may impact wildlife in a number of ways: altered vocal behavior, breeding relocation, changes in vigilance and foraging behavior, predator avoidance, reproductive success, and impacts on individual fitness and the structure of ecological communities to name a few (Shannon et al., 2016; Kunc et al., 2016; Kunc and Schmidt, 2019). To determine the severity of the effect and potential for impairment, the NPS considered not just the presence of noise and potential for disturbance, but also the duration, frequency, and amplitude of noise. As described above commercial air tours would impact most of the Park at levels above 35 decibels for less than 20 minutes on a peak day. The minimum altitude of 1,000 ft above ground level (AGL) limits noise exposure to wildlife in the Park, including the Park's threatened and endangered species. The ATMP includes a 1,500 ft. AGL requirement near Alcatraz for the purpose of limiting noise impacts on seabirds that use the island for roosting. The ATMP also includes a 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine

4

falcon nests and marine mammal haul outs. The NPS concluded, after discussing the impacts with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, that the commercial air tours authorized by the ATMP will have no effect on threatened and endangered species in the Park[2] (Section 7 documentation, Appendix E to the ROD). In conclusion, the ATMP will not impair the Park's wildlife or its habitat because the impacts from the commercial air tours do not individually rise above 35 decibels over most of the Park for more than 20 minutes on a peak day and not exceed 125 minutes at any location. As documented through this analysis, and in the ESF, impacts to wildlife, either individually or cumulatively, would occur on an individual level and would not affect wildlife on the population level. These impacts do not impair the functioning of the Park's unique ecosystems and the wildlife within. Consistent with the no adverse effect determination, wildlife, including threatened and endangered species, will persist in the Park without a loss of integrity and visitors will continue to enjoy wildlife and their habitats.

Impacts to the Park's cultural resources would be similar in frequency, amplitude, and duration to those described above for wildlife. The analysis in the ESF evaluated the impacts from commercial air tours on cultural landscapes, ethnographic resources, and historic resources. Because of the number and times commercial air tours occur, and the location of the routes, noise impacts to these resources will be limited. Acting as lead agency for the purposes of compliance with Section 106 of the National Historic Preservation Act with respect to the ATMP, the FAA concluded, in coordination with the NPS, that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The State Historic Preservation Officer concurred with that determination that there would be no adverse effects on historic properties from the 2,548 commercial air tours authorized under the ATMP. The consultation materials documented that the ATMP would not diminish the Park's cultural landscape's integrity of location, design, setting, materials, workmanship, feeling, or association. Additionally, the determination documented that commercial air tours do not adversely affect those elements of ethnographic resources that make them significant to traditionally associated groups, nor does the ATMP interfere with the use of ethnographic resources by these groups. Finally, the analysis documented that the ATMP does not adversely affect the feeling and setting of historic structures that make those sites and structures eligible for listing on the National Register of Historic Properties (*See* Appendices B and F to the ROD). Since there are no adverse effects on these resources and impacts on these resources are limited, these resources would maintain their integrity and purpose and therefore remain unimpaired for the enjoyment of future generations under the ATMP.

As disclosed in the ESF, the ATMP may have very limited impacts on the Park's viewshed or scenic views. The Park's scenic views are a fundamental resource. As noted in the ESF, aircraft are not typically included in viewshed analyses because they are transitory. They are most noticeable because of the noise associated with them. Because of the Park location within and near urban environments, aircraft of all variations are likely commonly seen and expected from most viewing areas. Commercial air tours therefore likely do not detract from viewsheds within

---

[2] No effect means there will be no consequences to listed species or critical habitat that result from the proposed action.

5

the Park. As a result, visitors will continue to be able to enjoy the Park's beautiful views unimpaired.

The NPS completed an air quality analysis and determined that the 2,548 commercial air tours authorized under the ATMP contributes a minimal amount of emissions to the local air quality and would not have a regional impact (*See* ESF, Air Quality Technical Analysis, Appendix B to the ROD). Because the amount of emissions is so small the ATMP does not affect the integrity of the Park's air quality, leaving it unimpaired for future enjoyment.

As demonstrated here and in the analysis referenced above, the impacts to these resources, neither individually nor cumulatively, would preclude the NPS from achieving the purpose of the Park or desired conditions for resources; and would not unreasonably interfere with Park programs or activities, another appropriate use, the overall atmosphere of peace and tranquility or the natural soundscape, or NPS concessioner or contractor operations or services. As a result, there will not be impairment of or unacceptable impacts to the Park's natural and cultural resources or visitor experience. Impacts to other resources potentially affected were considered so small and insignificant that they did not warrant a written analysis here.

The ATMP sections on adaptive management and amending the plan will allow park managers to ensure that unanticipated or unacceptable impacts do not occur and the requirement for implementing flight tracking technologies included in the ATMP will better enable the NPS to monitor and enforce the restrictions in the ATMP.

*Non-Impairment Determination for the Muir Woods National Monument*

As noted above, the ATMP does not authorize commercial air tours over Muir Woods. However, some noise from commercial air tours within the ATMP planning area will affect Muir Woods. The NPS normally does not prepare non-impairment determinations for actions outside a NPS unit boundary. However, here, out of an abundance of caution, we briefly discuss the ATMP's impact on Muir Woods since establishing the ATMP is an NPS action. The impact of commercial air tours on Muir Woods would be similar to the impacts of commercial air tours on Golden Gate National Recreation Area's adjacent natural areas. Lands within Muir Woods would experience noise above 35 decibels for up to 20 minutes on a peak day. Noise would exceed 52 decibels, the level at which a visitor may reasonably expect interference with park interpretive programs, no more than 5 minutes on a peak day. The analysis above for wildlife, cultural resources, air quality, viewsheds, etc. discusses the impacts of air tour noise and would apply similarly to Muir Woods where the noise is similar in frequency, intensity and duration. Noise from commercial air tours will not result in unacceptable impacts or impairment of any resources at Muir Woods because noise will be of relatively low intensity and infrequent throughout the day.

**Compliance with NPS Management Policies Regarding Appropriate Uses**

A separate written appropriate use analysis is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether commercial air

6

tours are an appropriate use over the Park, for this ATMP the NPS has decided to briefly address the issue of appropriate use below.

NPS 2006 Management Policies § 1.5 state:

> An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park."

Section 8.1.2 of Management Policies further explain:

> The fact that a park use may have an impact does not necessarily mean it will be unacceptable or impair park resources or values for the enjoyment of future generations. Impacts may affect park resources or values and still be within the limits of the discretionary authority conferred by the Organic Act. In these situations, the Service will ensure that the impacts are unavoidable and cannot be further mitigated.

In determining whether a use is appropriate, the NPS evaluates:

- consistency with applicable laws, executive orders, regulations, and policies;
- consistency with existing plans for public use and resource management;
- actual and potential effects on park resources and values;
- total costs to the Service;
- whether the public interest will be served.

Parks may allow uses that are appropriate even if some individuals do not favor that particular use. The National Park Air Tour Management Act (NPATMA) contemplates that commercial air tours may be an acceptable use over National Park System units so long as protections are in place to protect park resources from significant impacts of such tours, if any. Therefore, commercial air tours are authorized by law, though not mandated, and generally may be appropriate where they do not result in significant impacts or cause unacceptable impacts on park resources and values.

*Golden Gate National Recreation Area ATMP – consistency with NPS Management Policies for Appropriate Uses*

The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), the unacceptable impact and non-impairment analysis above, and the language in NPATMA as a basis for finding that the ATMP's authorization of 2,548 commercial air tours over Golden Gate National Recreation Area is an appropriate use.

- The ATMP for Golden Gate National Recreation Area is consistent with applicable laws, executive orders, regulations, and policies. NPATMA specifically provides that air tours may be allowed over National Park System units where they do not result in significant

7

impacts. Commercial air tours are not prohibited in applicable laws, regulations, or policies.

- The ATMP's authorization of 2,548 commercial air tours over the Park is consistent with the Park's existing management plans. No existing management plans preclude commercial air tours, though the Park may set different management direction in the future. Mitigations, including limiting the number of commercial air tours per year, restricting commercial air tours to the designated route, and setting minimum altitudes, limit impacts to visitor experience and other resources.

- The effects of the 2,548 commercial air tours authorized in the ATMP on Park resources was evaluated in the materials referenced above and unacceptable impact and non-impairment discussion above. Most areas of the Park will not experience noise at or above 35 decibels from air tours for more than 20 minutes a day. Areas with the most noise will not experience noise that interrupts speech more than 25 minutes a day. The areas most affected by noise are in or near urban environments where commercial air tour noise may be masked by other noise. The commercial air tours are short in duration and occur at decibel levels that do not rise to the level of an unacceptable impact nor impair Park resources. The NPS does not interpret § 8.1.1 to require the NPS to contemplate mitigating Park uses to the point that the use no longer has any impact or no longer can occur. Rather, this section requires the NPS to consider whether there are mitigations that can reduce impacts to Park resources and whether the impacts of those uses, after applying mitigations, result in unacceptable impacts or impairment. In this case, the NPS evaluated the impacts of 2,548 commercial air tours and included specific mitigations in the ATMP to minimize impacts to Park resources. The NPS acknowledges that prohibiting commercial air tours entirely would avoid all impacts to Park resources, but the elimination of commercial air tours is not required to avoid unacceptable impacts or impairment of Park resources. The NPS believes the mitigations in the ATMP are sufficient to protect Park resources and that additional mitigations are not required because the impacts associated with the ATMP are not significant and do not result in unacceptable impacts or impairment.

- The cost to the NPS from implementing the ATMP includes yearly compiling of operator reported commercial air tours and aircraft monitoring data which is done in coordination with the Federal Aviation Administration. These activities would occur anyway, because they are required under NPATMA, regardless of whether the Park has an ATMP because commercial air tours are currently authorized under interim operating authority (IOA). This is done by the NPS's Natural Sounds and Night Skies Division which also provides noise monitoring, modeling, and planning support to parks across the country.

- While some visitors may not like commercial air tours, others appreciate the opportunity to view the Park from a commercial air tour. Commercial air tours, as contemplated in NPATMA, serve the public in this way.

Additional commercial air tours and commercial air tours on other routes may not be appropriate. However, the NPS has determined that because the ATMP authorizes 2,548 commercial air tours over the Park, and because those commercial air tours are restricted to

8

designated routes, are relatively short in duration, and are at an acceptable altitude, and no air tours are authorized over, or within ½ mile of Muir Woods, the ATMP is adequately protective of Park resources, and the resources of the adjacent Muir Woods, and the commercial air tours authorized by the ATMP are an appropriate use of the Park at this time.

**Compliance with NPS Management Policies for Soundscape Management**

A separate written compliance analysis for Soundscape Management is not required under NPS 2006 Management Policies. In recognition of comments suggesting that the NPS consider whether the ATMP complies with NPS soundscape policies and guidance, the NPS has opted to briefly discuss the issue with respect to this ATMP.

Management Policies § 4.9 states, "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks." Section 5.3.1.7 similarly addresses cultural and historic resource sounds.

Section 8.4 specifically addresses overflights, including commercial air tours, which notes

> Although there are many legitimate aviation uses, overflights can adversely affect park resources and values and interfere with visitor enjoyment. The Service will take all necessary steps to avoid or mitigate unacceptable impacts from aircraft overflights.

> Because the nation's airspace is managed by the Federal Aviation Administration (FAA), the Service will work constructively and cooperatively with the Federal Aviation Administration and national defense and other agencies to ensure that authorized aviation activities affecting units of the National Park System occur in a safe manner and do not cause unacceptable impacts on park resources and values and visitor experiences.

Director's Order #47 gives further guidance for the management of natural and cultural soundscapes, requiring the consideration of both the natural and existing ambient levels.

*Golden Gate National Recreation Area ATMP – consistency with NPS Management Policies for Soundscape Management.*

Consistent with Management Policies § 8.4, the NPS worked constructively and collaboratively with FAA to develop the ATMP. The NPS relied on the mitigations in the ATMP (Appendix A to the ROD), the analysis in the ESF (Appendix B to the ROD), the Section 7 documentation for the Endangered Species Act (Appendix E to the ROD), the Section 106 documentation for the National Historic Preservation Act (Appendix F to the ROD), and the unacceptable impact and non-impairment analysis above as a basis for finding that the ATMP complies with the policies and guidance for management of natural and cultural soundscapes.

Consistent with Management Policies § 4.9, the ATMP eliminates some noise, or moves the Park closer to natural ambient conditions, by limiting commercial air tours to 2,548 per year, which is a reduction from the current authorized number (5,090) under IOA (*See* ATMP, Appendix A to the ROD). In addition, the ATMP limits the operation of commercial air tours to between 9:00 AM until 30 minutes after sunset, establishes designated air tour routes, establishes the minimum altitude that commercial air tours may fly over the Park to no lower than 1,000 ft. AGL for the

9

entirety of all commercial air tour routes, and includes quiet technology incentives which could further reduce noise. When developing the ATMP, the NPS considered the commercial air tour routes and evaluated the potential for noise to reach the most sensitive resources in the Park, including cultural and natural resources, and areas where commercial air tours could disrupt educational opportunities. The commercial air tours occur along designated routes, which protects most of these areas from the intermittent, and short duration noise effects of commercial air tours.

Management Policies § 5.3.1.7 prohibits excessive noise and § 1.4.7.1 prohibits actions that unreasonably interfere with "the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park." Acoustic conditions in the Park were measured in 2007 and 2008 (Lee & MacDonald, 2011). At locations nearest existing air tour routes, the existing ambient sound level ($L_{50}$) was reported to be 40–55 decibels, while the natural ambient ($L_{nat}$) was reported to be 30–55 decibels. These metrics confirm that the natural acoustic environment at these sites sometimes experience disturbances from anthropogenic noise. When determining the severity of the impacts, results from the noise modeling for the ATMP were considered against both the natural soundscape and existing soundscape. As discussed above under the non-impairment discussion, the noise from commercial air tours is limited, both spatially and temporally. Therefore, the noise from commercial air tours is neither excessive nor does it unreasonably interfere with the peace and tranquility of the Park, or natural or historic or commemorative locations. In conclusion, the ATMP complies with § 8.4, § 4.9, and § 5.3.1.7 of the Management Policies because the NPS has successfully collaborated with the FAA and developed an ATMP that will not result in unacceptable impacts to natural or cultural soundscapes or impairment of park resources at Golden Gate National Recreation Area or Muir Woods National Monument.

10

**References**

Kunc, H. P., McLaughlin, K. E., & Schmidt, R. (2016). Aquatic noise pollution: Implications for individuals, populations, and ecosystems. Proceedings of the Royal Society B: Biological Sciences, 283(1836), 20160839. Available at https://doi.org/10.1098/rspb.2016.0839

Kunc, H. P., & Schmidt, R. (2019). The effects of anthropogenic noise on animals: A meta-analysis. Biology Letters, 15(11), 20190649. Available at https://doi.org/10.1098/rsbl.2019.0649

Lee, C., & MacDonald, J. (2011). Golden Gate National Recreation Area: Acoustical Monitoring 2007/2008.

National Park Service. (2000). Director's Order #47: Soundscape Preservation and Noise Management. Available at https://www.nps.gov/subjects/policy/upload/DO_47_12-1-2000.pdf

National Park Service. (2006). Management Policies, 2006. Available at https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

National Park Service. (2011). Guidance for Non-Impairment Determinations and the NPS NEPA Process. Available at https://www.nps.gov/subjects/nepa/

National Park Service. (2014). Golden Gate National Recreation Area General Management Plan. Available at https://parkplanning.nps.gov/projectHome.cfm?parkID=303&projectID=15075

National Park Service. (2015). Foundation Document for Golden Gate National Park. Available at https://www.nps.gov/goga/learn/management/upload/GOGA_OV_2017.pdf

Shannon, G., McKenna, M.F., Angeloni, L.M., Crooks, K.R., Fristrup, K.M., Brown, E., Warner, K.A., Nelson, M.D., White, C., Briggs, G., McFarland, S., & Wittemyer, G. (2015). A synthesis of two decades of research documenting the effects of noise on wildlife. *Biological Reviews*, 91(4) 982-1005. Available at https://doi.org/10.1111/brv.12207

11

# APPENDIX H

Summary of Public Comments and Comment
Analysis on the Draft Air Tour Management
Plan for Golden Gate National Recreation Area,
Muir Woods National Monument,
San Francisco Maritime National Historical
Park, and Point Reyes National Seashore

US Department of Transportation
Federal Aviation Administration

US Department of the Interior
National Park Service




# Golden Gate National Recreation Area
# Muir Woods National Monument
# San Francisco Maritime National Historical Park
# Point Reyes National Seashore

## Summary of Public Comments and Comment Analysis of the Draft Air Tour Management Plan

**August 2022**

# CONTENTS

INTRODUCTION ............................................................................................................................. 1

COMMENT ANALYSIS METHODOLOGY ................................................................................ 1

CONTENT ANALYSIS TABLES ................................................................................................ 2

SUMMARY OF COMMENTS ...................................................................................................... 3

    ADV100 Adverse Impacts: Soundscape Impacts ................................................................... 3

    ADV200 Adverse Impacts: Wildlife/Biological Impacts ...................................................... 4

    ADV300 Adverse Impacts: Endangered Species Impacts ..................................................... 5

    ADV400 Adverse Impacts: Wilderness Character Impacts ................................................... 5

    ADV500 Adverse Impacts: Cultural Resource Impacts ........................................................ 5

    ADV510 Adverse Impacts: Visual Impacts .......................................................................... 6

    ADV520 Adverse Impacts: Equity ........................................................................................ 6

    ADV530 Adverse Impacts: Climate Change, Greenhouse Gasses, and Air Quality ............. 6

    ADV600 Adverse Impacts: Other .......................................................................................... 6

    ELE100 ATMP Elements: Annual Number of Air Tours ...................................................... 6

    ELE200 ATMP Elements: Routes and Altitudes ................................................................... 6

    ELE300 ATMP Elements: Aircraft Type ............................................................................... 8

    ELE400 ATMP Elements: Day/Time ..................................................................................... 8

    ELE500 ATMP Elements: Other ........................................................................................... 8

    FAV100 Benefits of Air Tours ............................................................................................. 10

    PRO100 Process Comments: Impact Analysis .................................................................... 10

    PRO200 Process comments: Public Review ........................................................................ 11

    PRO300 Process Comments: Alternatives Considered ........................................................ 11

    PRO400 Process Comments: Other ...................................................................................... 11

    PRO500 Process Comments: NEPA ..................................................................................... 11

    TRIBE Tribal Concerns ....................................................................................................... 12

    NS100 Non-Substantive Comment: Support Air Tours ....................................................... 12

    NS150 Non-Substantive Comment: Other ........................................................................... 12

    NS200 Non-Substantive Comment: Oppose Air Tours Continuing ..................................... 13

    NS300 Non-Substantive Comment: Oppose Air Tours Introduction ................................... 13

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175

AR_0000861

**JA288**

## INTRODUCTION

An Air Tour Management Plan (ATMP) would provide the terms and conditions for commercial air tours conducted over Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (Parks) pursuant to the National Parks Air Tour Management Act (Act) of 2000. The Act requires that the Federal Aviation Administration (FAA) in cooperation with the National Park Service (NPS) (collectively, the agencies) establish an ATMP or voluntary agreement for each National Park System unit for which one or more applications to conduct commercial air tours has been submitted, unless that unit is exempt from this requirement because 50 or fewer commercial air tour operations are conducted over the park on an annual basis, 49 U.S.C. § 40128(a)(5). On March 4, 2021, NPS notified FAA that an ATMP was necessary to protect Muir Woods National Monument resources and values and withdrew the exemption for the park.

The objective of establishing an ATMP for the Parks is to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tours on natural and cultural resources, visitor experiences and tribal lands.

A notification of the public review period for the draft ATMP was announced in the Federal Register, and the draft ATMP was provided for public review and comment from October 15 through November 15, 2021. In addition, the agencies held a virtual public meeting for the Parks' draft ATMP on October 26, 2021. The draft ATMP was published on the NPS Planning, Environment, and Public Comment (PEPC) website.

Any comments entered into PEPC by members of the general public, as well as any written comments mailed or emailed to the NPS, were considered and included in the overall project record. This *Public Comment Summary Report* provides a summary of the substantive comments submitted during the public comment period.

## COMMENT ANALYSIS METHODOLOGY

Comment analysis is a process used to compile and correlate similar comments into a usable format for the agencies' decision-makers and the program team. Comment analysis assists the agencies in organizing, clarifying, and addressing information and aids in identifying the topics and issues to be evaluated and considered throughout the ATMP planning process.

The process includes five main components:
- developing a coding structure
- employing a comment database for comment management
- reviewing and coding of comments
- interpreting and analyzing the comments to identify issues and themes
- preparing a comment summary.

A coding structure was developed to help sort comments into logical groups by topic and issue. The coding structure was designed to capture the content of the comments rather than to restrict or exclude any ideas.

The NPS PEPC database was used to manage the public comments received. The database stores the full text of all correspondence and allows each comment to be coded by topic and category. All comments

were read and analyzed, including those of a technical nature, opinions, suggestions, and comments of a personal or philosophical nature. Under each code, all comments were grouped by similar themes, and those groups were summarized with concern statements.

## CONTENT ANALYSIS TABLES

In total, 149 correspondences were received providing 355 comments. The term "correspondence," as used in this report, refers to each submission offered by a commenter. The term "comment," as used in this report, refers to an individual issue and/or concern raised by a commenter that the agency coded by topic and category. A single commenter may have raised multiple comments within a correspondence. Similarly, multiple commenters raised many of the same comments. Of the correspondences received, two were identified as form letters, to which there were a combined total of 70 signatories. The form letter with the majority of the signatories expressed opposition to the ATMP and requested the National Park Service and Federal Aviation Administration consider the National Park Overflight Advisory Group (NPOAG) guidance in preparation of the ATMP. This letter also expressed concern about the economic impact to helicopter air tour companies and stated that the limited number of air tours per year would constrain the park experience for the physically disabled. The additional form letter opposed air tours due to their impact on the solace and peace within the Parks.

The following table was produced by the NPS PEPC database and provides information about the numbers and types of comments received, organized by code, including form letters.

| Code | Description | Comments | Percentage |
|---|---|---|---|
| ADV100 | Adverse Impacts: Soundscape impacts | 52 | 14.6% |
| ADV200 | Adverse Impacts: Wildlife/biological impacts | 37 | 10.4% |
| ADV300 | Adverse Impacts: Endangered species impacts | 7 | 2% |
| ADV400 | Adverse Impacts: Wilderness character impacts | 3 | 0.8% |
| ADV500 | Adverse Impacts: Cultural resource impacts | 2 | 0.6% |
| ADV510 | Adverse impacts: Visual impacts | 2 | 0.6% |
| ADV520 | Adverse Impacts: Equity | 12 | 3.4% |
| ADV530 | Adverse Impacts: Climate change / greenhouse gases / air quality | 22 | 6.2% |
| ADV600 | Adverse Impacts: Other | 8 | 2% |
| ELE100 | ATMP Elements: Annual number of air tours | 15 | 4% |
| ELE200 | ATMP Elements: Routes and altitudes | 25 | 7% |
| ELE300 | ATMP Elements: Aircraft type | 2 | 0.6% |
| ELE400 | ATMP Elements: Day/time | 2 | 0.6% |
| ELE500 | ATMP Elements: Other | 38 | 10.7% |
| FAV100 | Benefits of air tours | 0 | 0% |
| NS100 | Non-substantive comment: Support air tours | 3 | 0.8% |
| NS150 | Non-substantive comment: Other | 0 | 0% |
| NS200 | Non-substantive comment: Oppose air tours continuing | 14 | 4% |
| NS300 | Non-substantive comment: Oppose air tours introduction | 30 | 8.5% |
| PRO100 | Process Comments: Impact analysis | 20 | 5.6% |
| PRO200 | Process Comments: Public review | 3 | 0.8% |
| PRO300 | Process Comments: Alternatives considered | 20 | 5.6% |
| PRO400 | Process Comments: Other | 4 | 1% |
| PRO500 | Process Comments: NEPA | 33 | 9.3% |
| TRIBE | Tribal concerns | 1 | 0.3% |

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore        PEPC ID: 103175

AR_0000863

**JA290**

## SUMMARY OF COMMENTS

The following text summarizes the comments received during the comment period and is organized by code. The summarized text is formatted into concern statements to identify the thematic issues or concerns represented by comments within the code. The focus on coding comments is on those comments with substantive content. Substantive comments raise, debate, or question a point of fact, or analysis of the impacts associated with the ATMP, or elements of the ATMP. Comments that merely support or oppose the ATMP are not considered substantive.

<u>ADV100 Adverse Impacts: Soundscape Impacts</u>

1. Commenters noted concern that air tours would impact soundscapes and the solitude and natural sounds in the Parks. One commenter asked if a schedule would be published in advance of air tours in order to plan visits to avoid noise from air tours. Other commenters noted concern about the cumulative effect of air tours and traffic from other visitors. One commenter noted that the NPS should be conducting acoustic monitoring beyond the sunrise and sunset time frames in accordance with NPS management policies, to ensure no adverse impacts occur to soundscapes and other park resources.
2. One commenter requested that the record of decision (ROD) list all noise and visitor experience studies at Muir Woods and compare park acoustic conditions with all visitor noise intrusions including air tours.
3. Commenters stated that Congress developed the Act out of concern that noise from air tours could harm national park resources, values, and experiences for visitors. Commenters also noted air tours would violate Director's Order #47 and NPS Management Policy, Chapter 4.9 which states that the NPS will preserve, to the greatest extent possible, the natural soundscapes of parks. One commenter requested air tours be prohibited with exceptions for emergencies, and at Parks whose interpretation includes aviation; for example, air shows at Crissy Field in the Golden Gate National Recreation Area.
4. One commenter referenced that the NPS Natural Sounds Program has a strong reputation for its technical capability to collect acoustic data in the field and to prepare credible scientific analysis of noise impacts. The commenter referenced https://www.nps.gov/subjects/sound/acousticmonitoring_reports.htm.
5. One commenter stated that the objective of an ATMP would be to improve resource conditions by reducing the ambient level of air tour noise, especially in areas managed as wilderness. The commenter provided the following references: https://www.science.org/doi/full/10.1126/science.aah4783; A synthesis of two decades of research documenting the effects of noise on wildlife; Graeme Shannon et al; 26 June 2015. https://onlinelibrary.wiley.com/doi/10.1111/brv.12207; https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_91-36D.pdf.
6. One commenter referenced the adverse impacts of aircraft overflight noise on park resources and values contained in the 1994 Report to Congress on Effects of Aircraft Overflights on the National Park System (https://www.nonoise.org/library/npreport/intro.htm#TABLE OF CONTENTS).
7. One commenter stated that Parks should consistently be considered as noise sensitive areas as described in FAA Advisory Circular (AC) No. 91-36D and that the voluntary compliance

4

recommendations under the AC should be a requirement for ATMPs. The commenter also referenced FAA Order 1050.1F.

8. Commenters noted concern regarding noise from air tours that fly over residential areas. One commenter representing a community of 60 residential units on Richardson Bay stated that the community is located where tours embark and noise from the existing air tours causes negative impacts to their community.

ADV200 Adverse Impacts: Wildlife/Biological Impacts

1. Commenters noted that while the draft ATMP mentions the prohibition of air tours two hours after sunrise and two hours before sunset due to effects on wildlife species and visitors, there is no further investigation, study or monitoring of wildlife behavior at other times of the day. The commenter stated that this omission of information violates the fundamental laws and policies governing NPS units.

2. One commenter noted that the flight paths will exclude the central and northern portions of the recently established Ranchland zone and the northern portion of the Phillip Burton Wilderness Area, and that while the flight paths will avoid harbor seal haul outs at Duxbury Reef, Double Point, and Drakes Estero Marine Wilderness area, there are other sites within the Seashore and other species that may be adversely affected by the overflight noise, including elephant seal colonies located in Drake Bay. The commenter also noted that the seashore is located along the Pacific flyway and other important migratory routes for numerous marine mammals and that due to potential impacts should be analyzed and provided to the public for review.

3. One commenter asked how pilots will know where nesting bird colonies, falcon nests, or marine mammal haul outs are located. The commenter suggested the ATMP include provisions to identify sensitive habitat sites so pilots clearly understand where these sensitive locations are.

4. One commenter noted that birds cross the Golden Gate channel during spring and fall migration and that the draft ATMP does not consider the potential impacts to raptors and other birds that cross the channel between Marin and San Francisco Counties. The commenter noted that according to BirdNote (birdnote.org), birds usually fly relatively low, under 500 ft., yet during migration, birds fly at higher altitudes with many species flying at 2,000 to 5,000 ft. or higher, using prevailing winds to assist them. The commenter requested that routes over the channel and elsewhere throughout the Parks be at sufficient altitudes to avoid any chance of impacting migrating birds.

5. Many commenters expressed general concern about the impacts of air tour noise on wildlife. Commenters noted the protection of intertidal invertebrates and fishes, pinnipeds, seabirds, shorebirds, and dune plants, among other species is important given other impacts and threats to these species.

6. One commenter noted their direct observation of a decline in the bird population near Richardson Bay Bridge and referenced air tours as the cause. The commenter also noted that planes taking off from Manzanita are disturbing birds.

7. One commentor provided the following references related to wildlife disturbances from aircrafts: Airborne Hunting Act (November 18, 1971, as amended 1972): Department of the Interior, US Fish and Wildlife Service United States, Title 16, Chapter 9, Section 742j-1, National Marine Sanctuaries Act (October 23, 1972, as amended 2000): Office of National Marine Sanctuaries, Title 16, Chapter 32, § 1436; Regulations of Greater Farallones National Marine Sanctuary, National Oceanic and Atmospheric Administration (NOAA), Office of National Marine Sanctuaries, 15 CFR Subpart H 922.82; and Regulations of the Monterey Bay National Marine

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore        PEPC ID: 103175

AR_0000865
JA292

Sanctuary National Oceanic and Atmospheric Administration (NOAA), 15 CFR Subpart M § 922.132, § 922.84(5).

8.  One commenter that recommended a 2,000 ft. above ground level (AGL) requirement over sanctuaries provided justification related to the thirty-six (36) marine mammals observed at the Greater Farallones National Marine Sanctuary (GFNMS), noting that many of these mammals occur in large concentrations and rely on the habitats for breeding, pupping, hauling out, feeding, and resting during migration. The commenter noted that circling or multiple passes can be more disturbing to whales than a single pass and that seals and sea lions can be frightened into the water causing stress and juvenile mortality if there is a stampede. The commenter also noted aircraft disturbances to seabird colonies have not changed significantly in monitored locations since monitoring began in 2005 and provided the following reference: Bednar et al. 2020. This commenter suggested a minimum 2,000 ft. AGL above areas within the national marine sanctuaries as a recovery method for seabirds.

## ADV300 Adverse Impacts: Endangered Species Impacts

1.  Commenters noted the Parks are host to threatened and endangered species including: northern spotted owl, snowy plover, coho salmon, California red-legged frog, steelhead trout, San Francisco garter snake, southern sea otter, Guadalupe fur seal, sei whale, blue whale, fin whale, marbled murrelet, California least tern, San Bruno elfin butterfly, mission blue butterfly, bay checkerspot butterfly and others.

2.  Commenters requested an assessment and disclosure of potential and probable impacts to wildlife, referencing the Endangered Species Act of 1973 (ESA). The commenters also noted that the agencies have initiated informal consultation with the United States Fish and Wildlife Service (USFWS) and that the draft ATMP should not be approved until consultation is complete.

## ADV400 Adverse Impacts: Wilderness Character Impacts

1.  Commenters noted that commercial air tours negatively affect wilderness character and the draft ATMP does not acknowledge compliance with the Wilderness Act. One commenter noted that the Phillip Burton Wilderness provides access to opportunities for solitude and inspired recreation adjacent to a large urban area. Commenters referenced various sources: U.S. C. 1131-1136, sec. 3c; 1964; https://www.science.org/doi/full/10.1126/science.aah4783; https://doi.org/10.5849/jof.14-135, A Framework to Assess the Effects of Commercial Air Tour Noise on Wilderness; Landres et al. 2008, (p. 7- 8); Watson et al. 2015; Barber et al. 2010; NPS 2006; Marin et al. 2011; Miller 2008, Lynch et al. 2011; Mace et al. 2013, Rapoza et al. 2014; https://www.nps.gov/pore/learn/management/wildernessact.htm.

## ADV500 Adverse Impacts: Cultural Resource Impacts

1.  Commenters noted the draft ATMP provides no information regarding compliance with Section 106 of the National Historic Preservation Act (NHPA) and lacks necessary consultation with potentially affected Native American tribes and should not be signed by the NPS until consultation is complete. Referring to the Council on Environmental Quality (CEQ) National Environmental Policy Act (NEPA) regulations and the agencies' NEPA policies, NHPA compliance, and other applicable federal statutes, one commenter stated these should be integrated into the NEPA document prepared for the proposed action, and failing to do so violates NEPA process requirements.

AR_0000866

6

ADV510 Adverse Impacts: Visual Impacts

1. Several commenters noted general concern that air tours would cause visual disruption.

ADV520 Adverse Impacts: Equity

1. Commenters noted equity considerations, stating the cost of the tours is prohibitive.

ADV530 Adverse Impacts: Climate Change, Greenhouse Gasses, and Air Quality

1. Commenters noted that air tours adversely affect air quality and climate change. One commenter noted that the draft ATMP does not include an analysis of greenhouse gas emissions. Commenters noted air pollutants absorb more incoming energy than what is radiated back to space, causing Earth's atmosphere to warm according to National Geographic 2021.

ADV600 Adverse Impacts: Other

1. One commenter noted that limiting flights over the Parks discriminates against those who might not have the time, resources, or physical ability to see the park any other way including the elderly, young, handicapped, and others.
2. One commenter noted that the NPS did not coordinate with air tour operators or consider the economic impacts that would result from restricting air tours.
3. One commenter stated that the NPS is required to protect natural and cultural resources and visitor experiences of those resources ahead of uses and activities that could negatively impact them, and as an example pointed to the Point Reyes Foundation Document which describes fundamental resources and values that should receive primary consideration in planning processes. One commenter stated that the ATMP should focus on restoring and protecting natural sounds, a resource the NPS is mandated to protect.

ELE100 ATMP Elements: Annual Number of Air Tours

1. Commenters noted a reduction in total air tours is the only way to reduce impacts, suggesting the total number of flights should be eliminated or limited to one per day.
2. One commenter noted that the annual number of flights reduces the total number of flights available to an air tour operator by 50% and the economic impact has not been evaluated. The commenter noted the restrictions also limit growth opportunities and the ability to invest in technology that could reduce noise.
3. One commenter noted the draft ATMP does not consider fluctuations in the market when deciding the total number of annual air tours.

ELE200 ATMP Elements: Routes and Altitudes

1. One commenter noted there was no consideration of different routes and that sensitive areas such as Point Reyes Headlands have shoreline cliffs as high as 600 ft. and a plane flying lateral to these cliffs at 1,500 ft. AGL would have impacts comparable to a flight at 900 ft. AGL. The commenter also noted the fluctuating altitude of 1,500 ft. to 2,000 ft. is a safety concern and should be maintained at 2,000 ft. The commenter referenced the Organic Act and the NPS responsibilities to conserve resources and values. The commenter also noted that flights over the Phillip Burton Wilderness are unnecessary because views of the ridgeline can be provided by crossing south of Stinson Beach to avoid both the Wilderness area and Bolinas Lagoon. The

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175

AR_0000867
JA294

commenter also noted the route that flies over the Point Reyes National Seashore Ranch dairy complex should be modified to avoid impacts to the dairies.

2. One commenter suggested air tour routes be adjusted 1-mile south of Tam Valley in order to avoid flying over homes.

3. One commenter noted that one air tour operator currently advertises a tour that includes a flight over Muir Woods National Monument.  The commenter noted that Flight Aware tracking data (https://flightaware.com) also identifies that flights have occurred over Muir Woods National Monument during the past year.

4. One commenter suggested that in order to allow passengers on both sides of the aircraft to see the same or similar views during a tour, the pilot could turn around and safely fly back on the same route.  Based on this justification, the commenter requested the route at Point Reyes stay over the ocean and not over land in order to reduce impacts.

5. Commenters suggested various minimum altitudes including: 1/2 mile offshore at 2,000 ft.; 2,500 ft.; and 5,000 ft.

6. One commenter offered revisions to the routes in order to avoid all sensitive habitat at the point thereby reducing impacts to harbor seals and nesting seabirds and reduce noise impacts to the Phillip Burton Wilderness Area.  The commenter's suggested revisions include: removing segment 6 to 7 to avoid crossing the point and to keep the flight path offshore; reroute segment 6 directly south to rejoin segment 8; remove segment 5 and re-direct segment 3 and 4 at Bolinas Ridge to go directly south to pick up at segment 10 on the southeast edge of the route.

7. Referencing the Federal Aviation Regulation (FAR) Part 91.119, one commenter noted that the route maps provided in the draft ATMP indicate that helicopters will frequently fly over much of the Presidio and that because Hawk Hill is 923 ft. tall and the Golden Gate Bridge towers are 746 ft. tall (and the Salesforce Tower is 1,070 ft. tall), helicopters flying at 1,000 ft. would be close to park visitors on the ground.  The commenter requested the draft ATMP require air tours to fly higher than the 1,000 ft. minimum required over urban areas.

8. One commenter noted that the requirement for aircraft to fly above 1,500 ft. over certain areas would require entry into Class B airspace and that it's unreasonable for air tour operators to request Class B clearances several times a day for a 3-5 minute transition.

9. One commenter noted the higher altitude requirement for fixed-wing aircrafts in the draft ATMP provides helicopter operators with a competitive advantage.  The commenter noted that seaplanes, especially the DHC-2, are designed to safely land in any water conditions; seaplanes are safer than helicopters in the case of an in-flight emergency at any altitude; and should not be treated differently than helicopters in terms of allowed altitudes.  The commenter also noted that helicopters are slower and FAA does not require different altitudes for seaplanes and helicopters.  The commenter also noted the Jet Ranger (407) actually flies faster than the DHC-2 in cruise and that seaplanes are allowed to fly at altitudes below 500 ft.  The commenter stated that there are no FARs that designate different altitudes for seaplanes and helicopters in terms of providing separation and the same regulations apply to all aircraft when flying visual flight rules (VFR) in the Bay Area as these aircraft are required to provide visual separation from each other under current FAR.

10. One commenter asked why the draft ATMP includes lateral avoidance of 2,000 ft. for dairy ranches and only 1,000 ft. for nesting birds and marine mammals.  The commenter requested the lateral avoidance should provide consistent and adequate protection from disturbance to natural resources and to visitor experience, citing studies that support a 1,000 ft. buffer prevents flushing,

AR_0000868

8

with greater distance to prevent all forms of disturbance. The commenter requested a 2,000 ft. lateral avoidance requirement to prevent disturbance to sensitive habitat areas noting it would provide more consistent protection of resources and visitor experience.

11. One commenter suggested the ATMP cite concerns related to disturbing marine wildlife in the sanctuary as justification for commercial tours to maintain 2,000 ft. AGL above sanctuaries and 1,000 ft. lateral avoidance of Stormy Stack and Point Resistance. This commenter suggested ATMP flight paths be plotted on NOAA nautical charts as well as Google Earth to ensure latitudes/longitudes and NOAA Regulated Overflight Zones (NROZs) are shared with air tour operators. This commenter also suggested the NPS and FAA ensure pilots adhere to the San Francisco VFR Sectional chart that recommends 2,000 ft. AGL as best management practices in additional to the required 1,000 ft AGL in NROZs.

ELE300 ATMP Elements: Aircraft Type

1. Several commenters recommended that Section 3.8 of each draft ATMP include a definition or reference to FAA guidance defining quiet technology aircraft as described in FAA Advisory Circular AC-93-2. See https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC-93-2.pdf.

ELE400 ATMP Elements: Day/Time

1. One commenter requested air tours be restricted to the hours of 12:00 PM to 5:00 PM, noting the best opportunities for most wildlife viewing and organized wildlife viewing trips occur between 7:00 AM and 12:00 PM, specifically during the months when migration occurs for hawks.

ELE500 ATMP Elements: Other

1. Commenters noted the draft ATMP does not include any details on overlapping jurisdictional authorities from the State of California, tribes, USFWS, the NROZs, FAA airspace restrictions; and the National Marine Sanctuaries, noting this prevents public understanding of the potential negative impacts of the draft ATMP. The commenters referenced the flight path over Mount Tamalpais State Park as an example that also travels over California State Marine Protected Areas; the Greater Farallones National Marine Sanctuary; public recreational beaches including Bolinas, Drakes, and Stinson Beaches; and the communities of Bolinas, and Stinson Beach. One commenter requested a release of a draft ATMP with comments, letters, and reports by other jurisdictions and agencies to inform the planning process. Another commenter recommended that Stormy Stack and Point Resistance are included in the ATMP maps to ensure that the routes maintain at least 1,000 ft. lateral avoidance at both locations.

2. One commenter referencing FAA Order 2150.3, asked why the quarterly reporting requirement is now every 6 months and if the reports and flight monitoring data will be fully available to public for review without a Freedom of Information Act (FOIA) request. The commenter also asked who would be responsible for identifying and reporting violations and requested contact information be easily available online for citizens to report violations. The commenter noted that most citizens are not familiar with the process to contact Oakland Flight Standards District Offices (FSDO) and that staffing considerations should be addressed if the NPS would be responsible for reporting violations. The commenter also noted real-time monitoring should be established during the first year of the ATMP to address ongoing issues with current air tour operators.

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175

AR_0000869
JA296

9

3.  One commenter asked who would pay for the cost of the environmental analysis in the draft ATMP and noted it should fall to the air tour operators. Another commenter asked if air tour operators are required to pay an entrance fee.

4.  One commenter stated that one of the primary findings from the Government Accountability Office (GAO) was that the FAA and the NPS lack a mechanism to verify the number of air tours conducted over national parks, both historically and under interim operating authority. The commenter asked why the GAO's recommendation that a monitoring program be implemented as an integral part of any ATMP was not included in the draft ATMP.

5.  One commenter stated that the adaptive management section of the draft ATMP is vague and asked if there would be a pre-defined and systematic adaptive management program with indicators, desired future conditions, periodic review time frames, or other metrics that would trigger an NPS review to determine if changes are needed to the ATMP, as is commonly done with many adaptive management programs, and if so, what are those indicators or metrics. Other commenters had recommendations for adaptive management including: 1) that it not be authorized in the event it would increase the number of air tours, decrease minimum altitude or other mitigation requirements, or otherwise increase noise emission or other negative impacts on the natural habitat and visitor experience; 2) that any proposed modifications under adaptive management be fully noticed to the public for advance comment; 3) that adaptive management be adequately described in an appropriate level NEPA document; 4) that NPS have volunteers monitor aircraft flight patterns and noise, and that implementation of this draft ATMP should include an adaptive management process with operators, agency staff, scientists, and citizens; and 5) the NPS and the FAA should monitor new technology that may further reduce the noise from aircraft and its ability to meet Parks' needs, and as a part of adaptive management, NPS should require the most current noise reducing equipment and practices for permitting use by a specific type of aircraft.

6.  One commenter noted that Section 6 of the draft ATMP, regarding New Entrants, seems to leave open the possibility of additional flights above the annual cap stated in Section 3.1 of the draft ATMP if or when new entrants are involved. To address this concern, the commenter requested that Section 6 of the draft ATMP be clarified to say that while the allotment of annual flights may be redistributed from existing operator(s) to accommodate new entrants, the cap on the total number of annual flights will remain the same as stated in Section 3.1 of the plan.

7.  One commenter suggested that staff at the park where the air tours would take place provide the training referenced in Section 3.7(A) of the draft ATMP.

8.  In addition to ensuring that the Parks provide annual pilot training, commenters recommended that NPS require air tour operators to provide air tour passengers with an educational brochure or rack card (e.g., jointly prepared by the FAA and NPS) that informs the public they will be flying over a noise sensitive area, which may include wildlife habitat, wilderness areas and cultural sites; and that special restrictions (such as AGL requirements) are in effect to minimize the adverse impacts of aircraft noise on the environment below.

9.  One commenter recommended that the ATMP planning and compliance process be managed directly by a NEPA project manager at the NPS Environmental Quality Division (EQD).

10. One commenter stated that administration of the ATMP should not put a financial burden on the NPS and should provide for adequate funding to cover all NPS administrative expenses.

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175

AR_0000870
JA297

10

11. One commenter suggested that the draft ATMP should include the precautionary principle, in which lack of full scientific certainty shall not be used as a reason for postponing cost-effective measures to prevent environmental degradation.
12. One commenter noted the draft ATMP does not consider the potential for designating some days of the week as no-fly days which could enhance and ensure a better quality visitor experience. Another commenter suggested flights be restricted to once a day on the weekends.
13. One commenter noted that air tours have safely used 124.3 (Golden Gate Traffic) as a CTAF to deconflict and successfully manage collision avoidance for decades. The commenter stated that utilizing a different frequency from other low-level Bay Area air traffic creates a safety concern and suggested a common frequency should be used.
14. One commenter requested the draft ATMP include a provision that prohibits hovering in place.
15. One commenter recommended the review and inclusion of the following reference in lines 274-276 (Section 4.0 Justification for Measures Taken) of the ATMP for justification for the 1,000 ft. altitude requirements: Fuller, A. R., G.J. McChesney, and R.T. Golightly. 2018. Aircraft disturbance to Common Murres (*Uria aalge*) at a breeding colony in central California, USA. Waterbirds 41:257-267. This commenter also referred to data compiled by GFNMS that included low overflight incident reporting data from 2005-2007 which indicated disturbance to seabirds.

FAV100 Benefits of Air Tours

1. No comments were submitted that noted benefits of air tours.

PRO100 Process Comments: Impact Analysis

1. One commenter requested that all planning documents explain why, through 2017, Muir Woods National Monument air tours were reported in the hundreds every year during peak quarters and then the reporting went down to zero air tours. The commenter also requested information regarding how reports were audited for Muir Woods asking what error occurred to disclose there were no air tours and from which air tour company is the information based on. The commenter also asked how the reported numbers were analyzed by the agencies and what written correspondences and meetings established the correct figure of zero.
2. One commenter noted that the draft ATMP includes a high-level environmental summary of the seashore, but fails to include analysis on negative impacts from noise disturbances to species or impacts to recreational and visitor experiences for public review. The commenter stated that the draft ATMP fails to explore impacts from additional overflight tours that may be allowed in the future that could expand air traffic and change flight paths. The commenter asked if the public will be able to participate in the adaptive management changes that would take place in the future.
3. Commenters noted there was a lack of analysis and justification to allow air tours and that the agencies failed to demonstrate they have applied measurements of the acoustics, carried out sound studies, evaluated impacts on park resources, or conducted thorough tribal consultation.
4. One commenter noted that the draft ATMP does not include metrics to illustrate whether the three year average is an appropriate measure to determine the number of flights as it does not consider the actual carrying capacity for noise at these Parks. The commenter also noted that any reduction in the number of air tours should center on resource protection and be justified by sound studies and modeling, referencing NPS Management Policies at 8.2.1.

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175

AR_0000871
JA298

5. One commenter noted an existing flight track traverses residential neighborhoods in Tamalpais Valley and nearby neighborhoods in Southern Marin. The commenter asked if the impact on residential neighborhoods and safety concerns were considered in the development of the draft ATMP and if not, why. Another commenter noted 40 CFR Section 1508.8 and the requirement to address indirect effects outside the ½-mile ATMP boundary as they pertain to impacts to residences.

6. One commenter asked if a visitor poll was conducted at the Parks, similar to the poll done early in the ATMP process for Hawai'i Volcanoes National Park. The commenter asked if a poll was conducted, what were the results, or if not, why a poll was not conducted.

7. One commenter noted the draft ATMP should include a valid baseline and incorporate considerations from the U.S. Circuit Court of Appeals in the case of United States Air Tour Association v. FAA, 298F.3d997, which states that ATMPs must also consider impacts from non-tour aircraft.

8. Commenters stated that NPS should prepare an appropriate use analysis in accordance with NPS Management Policies 2006, Sections 1.5 and 8.1.2, which serves as the basis for determining whether air tours should be allowed or prohibited.

PRO200 Process comments: Public Review

1. One commenter noted that in public meetings, the agencies stated the NEPA pathway as a categorical exclusion (CE) that could be reconsidered based on public comment, placing the burden squarely on the public to identify potential impacts absent site specific analysis and scientific data as well as information from tribal and USFWS consultation.

2. One commenter noted that based on the level of public interest in the draft ATMP, the initial analysis, which is not fully publicly available, should be transparent to assist with better understanding if there is potential for adverse impacts to recreational, scenic, wilderness, and cultural resources.

PRO300 Process Comments: Alternatives Considered

1. Commenters noted that the agencies did not consider or evaluate reasonable alternatives and that the decision was predetermined. Commenters suggested a range alternatives including a no air tour alternative; decrease air tours over time; drone footage alternative; reduction of air tours through attrition; phased reduction by 10% every 3 years; and a phased reduction by 40% every 4 years.

PRO400 Process Comments: Other

1. One commenter noted the agencies ignored The National Parks Overflight Advisory Group (NPOAG), a rulemaking committee put in place by Congress to provide advice, information, and recommendations to the agencies in the implementation of the National Parks Air Tour Management Act of 2000. The commenter noted that excluding NPOAG in the ATMP process is negligent and violates the NPOAG Order.

PRO500 Process Comments: NEPA

1. Commenters noted that the NPS issued proposed actions under the draft ATMPs for public comment without disclosing the environmental impacts of that action as required under NEPA and related FAA and NPS NEPA policies. One commenter referred to 40 CFR 1501.2(b)(2)

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175

AR_0000872
JA299

noting Federal agencies are required to disclose impacts. Commenters also referenced https://www.law.cornell.edu/cfr/text/40/1501.2; requirements in FAA's NEPA policies in Order 1050.1F at https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf and, NPS NEPA policies in its NEPA Handbook 2015, Section 1.4.A (https://www.nps.gov/subjects/nepa/upload/NPS_NEPAHandbook_Final_508.pdf)

2. Several commenters noted that an environmental impact statement (EIS) should be completed in accordance with Public Law 106-181. Commenters noted the use of a categorical exclusion does not allow sufficient analysis of impacts and mitigation measures. Another commenter noted that the draft ATMP does not comply with NEPA, that no decision document is available for public review concurrent with the draft ATMP, and pointed out the following from the court decision that prompted this ATMP planning process: Management plans must go through notice and comment and comply with NEPA (https://www.peer.org/wp-content/uploads/2020/05/5_1_20-Court-Decision-Overflights.pdf).

3. Commenters noted various shortcomings in the NEPA process including: A) the agencies have issued a proposed action for public comment without disclosing potential impacts or providing any environmental impact analysis regarding that proposed action; B) the agencies have failed to conduct public scoping or otherwise consider reasonable alternatives to the proposed action; C) the NPS has not made the case that its proposed action will effectively mitigate the adverse impacts of ongoing air tours at the Parks that have been operating virtually unregulated over the past 20 years; D) the agencies stated intention is to finalize the action (i.e., the ATMP) before actually issuing a NEPA analysis which violates NEPA procedural requirements; and E) the agencies have improperly identified NPS categorical exclusion 3.3 A1 as the preliminary NEPA pathway for this draft ATMP since NPS has not conducted a NEPA review and never formally approved national park air tours in the first place.

4. One commenter cited CEQ regulation 40 CFR 1502.25 noting the draft ATMP process should be integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), the NHPA (16 U.S.C. 470 et seq.), the ESA (16 U.S.C. 1531 et seq.), and other environmental review laws and executive orders.

TRIBE Tribal Concerns

1. One commenter noted there was a lack of tribal consultation in the draft ATMP and no indication which tribes contributed. The commenter noted the draft ATMP should acknowledge the cultural and historical significance of areas in these Parks. The commenter noted that as a result of the insufficient language regarding how this draft ATMP will respect American Indian sacred sites and ceremonial activities, the NPS should conduct additional analysis of these cultural sites and include additional tribal consultation.

NS100 Non-Substantive Comment: Support Air Tours

1. One commenter noted that air tours do not require visitor services and are less of a detriment to ground based visitors.

NS150 Non-Substantive Comment: Other

1. Commenters expressed opposition to air tours continuing at the Parks and cited to concerns about wildlife impacts, cultural resource impacts, climate change, and impacts to visitor experience.

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore        PEPC ID: 103175

AR_0000873
JA300

NS200 Non-Substantive Comment: Oppose Air Tours Continuing

1.  No commenters expressed non-substantive opposition to the continuation of air tours.

NS300 Non-Substantive Comment: Oppose Air Tours Introduction

1.  Many commenters opposed the introduction of air tours where the stated concerns included impacts to cultural resources, wilderness, and noise impacts.  Commenters referenced a 2002 NPS publication "Wild Soundscapes in the National Parks: An Educational Program Guide to Listening and Recording."

Comment Summary and Analysis Report
Golden Gate National Recreation Area, Muir Woods National Monument,
San Francisco Maritime National Historical Park, and Point Reyes National Seashore          PEPC ID: 103175


AR_0000874
JA301

# APPENDIX I

Coastal Zone Management Act: Compliance
Documentation



**United States Department of the Interior**
NATIONAL PARK SERVICE



**United States Department of Transportation**
FEDERAL AVIATION ADMINISTRATION

## NATIONAL PARKS AIR TOUR MANAGEMENT PROGRAM

August 15, 2022

Larry Goldzband
Executive Director
San Francisco Bay Conservation and Development Commission
375 Beale St., Suite 510
San Francisco, CA 94105

**RE: Consistency Determination for Air Tour Management Plan for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore**

Dear Mr. Goldzband:

The Federal Aviation Administration (FAA), in cooperation with the National Park Service (NPS) (collectively, the agencies), is developing an Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (the Parks). The agencies are preparing documentation for the ATMP in accordance with the National Parks Air Tour Management Act (NPATMA) and other applicable laws.

In accordance with Section 307c(1) of the Federal Coastal Zone Management Act of 1972, as amended, the NPS has evaluated the proposed project and determined that it is consistent to the maximum extent practicable with the California Coastal Management Program. This request is submitted in compliance with 15 CFR Section 930.34 et seq. of the National Oceanic and Atmospheric Administration (NOAA) Federal Consistency Regulations (15 CFR 930). We respectively request that the San Francisco Bay Conservation and Development Commission concur with our consistency determination.

<u>Project Description</u>
The ATMP would provide the terms and conditions for commercial air tours conducted over the Parks pursuant to NPATMA. The ATMP would apply to commercial air tours flying below 5,000 feet (ft.) above ground level (AGL) over the Parks, within 1/2-mile outside the Parks' boundaries, and over tribal lands within or abutting the Parks (Figure 1). The objective of the ATMP is to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tours on natural and cultural resources, visitor experiences, and tribal lands.

*Figure 1. Map of area subject to the proposed ATMP for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore.*

When Congress passed NPATMA in 2000, the law required operators who wished to conduct commercial air tours over national parks to apply to the FAA for authority to conduct such tours. NPATMA provided for existing commercial air tour operations occurring at the time the law was enacted to continue until an ATMP for the Parks was implemented by expressly requiring the FAA to grant interim operating authority (IOA) to existing operators, authorizing them to conduct, on an annual basis, "the greater of (i) the number of flights used by the operator to provide the commercial air tour operations within the 12-month period prior to the date of the enactment of the act, or (ii) the average number of flights per 12-month period used by the operator to provide such operations within the 36-month period prior to such date of enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period." Under NPATMA, the FAA granted IOA for commercial air tours over the Parks.

Currently, two commercial air tour operators hold IOA to conduct a combined total of 5,090 commercial air tours over Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore each year. IOA does not provide any operating conditions (e.g., routes, altitudes, time of day, etc.) for commercial air tours other than an annual limit.

Under the ATMP, the IOA would be terminated and 2,548 commercial air tours per year would be authorized, which consists of 2,405 commercial air tours for routes that go over Golden Gate National

Recreation Area and San Francisco Maritime National Historical Park, and 143 commercial air tours for a route that goes over Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore. The total number of commercial air tours authorized under the ATMP would be consistent with the existing commercial air tours reported over the Parks. It is based on the 3-year average of the total commercial air tours reported in 2017, 2018 and 2019. The annual flight limits in this ATMP are intended to protect visitor experience, wildlife, and wilderness areas throughout the Parks by limiting the number of potential disturbances caused by commercial air tours.

Commercial air tours over Point Reyes would only be conducted using fixed-wing aircraft; no helicopter air tours would be authorized. No commercial air tours would be authorized over, or within a ½ mile of the boundary of, Muir Woods.

Commercial air tours authorized under this ATMP would be conducted on the routes and altitudes in Figures 2 through 5 in Attachment A. Due to the location and proximity of Golden Gate National Recreation Area and San Francisco Maritime National Historical Park (the two parks share a boundary), an air tour route authorized by this ATMP passes over both parks. The only authorized commercial air tour route that would pass over Point Reyes National Seashore would also pass over Golden Gate National Recreation Area and San Francisco Maritime National Historical Park.

Under the proposed ATMP, commercial air tours conducted with fixed-wing aircraft would fly no lower than 1,000 to 2,500 ft. AGL, depending on the location. The ATMP would establish a minimum altitude of 1,500 ft. AGL or higher for fixed-wing aircraft over Golden Gate National Recreation Area, depending on location over the park, except that 1,000 ft. AGL would be permitted within the ATMP boundary around Angel Island State Park (see Figures 2 and 4), where existing operations fly as low as 1,000 ft AGL depending on location. The ATMP would establish a minimum altitude of 1,500 ft. AGL or higher for fixed-wing aircraft over Point Reyes National Seashore (see Figures 2 and 5).

Commercial air tours conducted with helicopters would fly no lower than 1,000 to 1,500 ft. AGL, depending on location. The ATMP would establish a minimum altitude of 1,000 ft AGL for helicopters over Golden Gate National Recreation Area, except for certain areas of the park in Marin County and around Alcatraz Island where the ATMP would establish a minimum altitude of 1,500 ft. AGL (see Figure 3), where existing operations fly as low as 1,000 ft. AGL in those areas of Marin County.

All commercial tours would fly no lower than 2,000 ft. AGL over land-based wilderness, maintain at least 1,000 ft. lateral avoidance of Alcatraz Island and 1,500 ft. AGL, and 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine falcon nests or marine mammal haul outs. Hovering aircraft in place would be prohibited.

Commercial air tours would operate from 9:00 AM until 30 minutes after sunset, as defined by the NOAA,[1] for tours of Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, and from 12:00 PM to 5:00 PM for tours of Point Reyes National Seashore. The proposed ATMP also includes incentives for the use of Quiet Technology (QT). Operators that have converted to QT aircraft, or are considering converting to QT aircraft, may request to be allowed to conduct commercial air tours beginning one hour after sunrise on all days that flights are authorized.

### Consistency with Provisions of the California Coastal Act

### Article 2, Public Access
Ground-based access to coastal zones within each park would not be affected by the ATMP and recreational opportunities would continue to be provided for all people consistent with public safety needs

---

[1] Sunrise and sunset data are available from the NOAA Solar Calculator, https://www.esrl.noaa.gov/gmd/grad/solcalc/

and the need to protect public rights, rights of private property owners, and natural resource areas from overuse. The proposed ATMP limits the annual number of commercial air tours over the Parks, designates specific routes and altitudes, and limits the time of day in which flights may occur in order to protect on the ground visitor experience at the Parks. Additionally, the ATMP would allow the NPS to establish temporary no-fly periods that apply to commercial air tours for special events or planned park management when necessary.

## Article 3, Recreation

Commercial air tours offer a recreational experience for those who wish to view the Parks' coastal features from a different vantage point. The ATMP would limit the number of commercial air tours per year, designate specific routes and altitudes, and limit the time of day in which flights may occur in order to protect on-the-ground visitor experience and recreation while providing an additional recreational opportunity. While some temporary noise disturbances may occur, these intrusions would be limited in frequency and duration by the ATMP. For instance, on days when commercial air tours would occur over Golden Gate National Recreation Area, noise levels above 52 dBA will occur for less than 20 minutes a day in several small areas directly beneath and adjacent to the routes.[2] At Point Reyes, noise levels above 52 dBA are anticipated to occur for less than five minutes a day. Noise impacts would be limited in frequency and duration by the ATMP due to the restrictions to the number of flights per year, routes and altitudes, and time of day flights may occur. Therefore, water-oriented activities and ocean front land suitable for recreation are not anticipated to be impaired by the ATMP.

The ATMP would not result in ground disturbing activities. Therefore, ocean front property for recreation and development, private lands, aquaculture facilities, upland areas necessary to support coastal recreation, and boating activities and facilities would not be altered by the ATMP.

## Article 4, Marine Environment

The agencies are working in coordination with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to establish parameters within the ATMP to protect coastal areas utilized by marine mammals, migratory birds, and other birds of conservation concern.

The proposed ATMP designates routes, establishes minimum altitudes, establishes time of day restrictions, and limits the number of commercial air tours conducted per year[3]. These measures incorporated into the ATMP would serve to avoid and minimize possible effects to marine wildlife, including listed species and their critical habitat. All commercial tours would fly no lower than 2,000 ft. AGL over land-based wilderness and maintain at least 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine falcon nests, or marine mammal haul outs. Within the Point Reyes park boundary are two no-take state marine reserves, three special closure areas, and three state marine conservation areas. Marine boundaries are shared with the Greater Farallones National Marine Sanctuary, and Cordell Bank National Marine Sanctuary is situated further offshore. NOAA regulations for minimum altitudes within the Greater Farallones National Marine Sanctuary assume that failure to comply with these regulations

---

[2] After completing noise modeling for the proposed action, a minor altitude adjustment was made for which the impacts are not represented in the technical noise analysis. The helicopter route altitude was raised from 1,000 ft. to 1,500 ft. AGL near Alcatraz (commercial air tours directly over Alcatraz are prohibited) to reduce noise impacts on nesting seabirds. Compared to current conditions, this altitude adjustment may result in a short increase in noise in two locations along the route due to the flight dynamics of helicopters when changing altitudes. The noise increases are expected to last for only a few minutes of the tour and would occur when the helicopter ascends to 1,500 ft. AGL and then descends back to 1,000 ft. AGL both of which occur before and after the flight passes near sensitive bird habitat at Alcatraz. The NPS has determined that the overall effect of this change would be beneficial for nesting seabirds and other park resources, including visitor experience.

[3] The proposed ATMP also limits Point Reyes National Seashore to 1 tour per day up to 143 days per year, or 1 tour per day with up to 5 flex days that allow 2 tours per day not to exceed 143 tours per year.

AR_0000879

disturbs marine mammals.[4] The minimum altitudes prescribed in the proposed ATMP exceed the NOAA altitude requirements of 1,000 ft. AGL or above and therefore safeguard marine mammals protected under the Marine Mammal Protection Act regulated by the NOAA.

The ATMP would not result in any ground disturbing activities. Therefore, water quality, marine resources, oil and hazardous spills, diking, filling and dredging, commercial fishing, shoreline altering construction, and water supply would not be altered or of concern. Additionally, the ATMP would not involve other activities with the potential to impact aquatic or terrestrial habitat. Therefore, reptiles, amphibians, fishes, insects, or crustacean species would not be impacted by commercial air tours authorized by the ATMP.

### Article 5, Land Resources
The ATMP would not result in ground disturbing activities. Therefore, agricultural land and soil productivity would not be altered by the ATMP.

### Article 6, Development
The ATMP would not result in any ground disturbing activities or new development in the area of consideration. Therefore, this article does not apply to the proposed ATMP.

### Article 7, Industrial Development
The ATMP would not result in any ground disturbing activities or new development in the area of consideration. Therefore, this article does not apply to the proposed ATMP.

---

[4] 15 CFR § 922.82(a)(11)

**Determination**

The agencies have evaluated the proposed ATMP and have found it to be fully consistent with the California Coastal Act of 1976 as amended.

Thank you for your assistance and collaboration on this federal consistency determination. We look forward to working with you as you complete this review. If you have questions or need more information, please contact Keith Lusk, keith.lusk@faa.gov, or Michelle Carter, michelle_carter@nps.gov, who are helping coordinate overall consistency determination on the ATMP for the Parks on behalf of the agencies.

Completing this ATMP is part of a nationwide effort to comply with a court order to finalize ATMPs for 23 parks as soon as possible. The NPS and FAA are working to complete this ATMP by October 31, 2022. The agencies recognize the Commission has a substantial workload and appreciate any effort you can put toward prioritizing your review in light of this critical deadline. If possible, the agencies would appreciate a response by August 26, 2022.

Sincerely,

*Tamara A. Swann*
_____
Tamara A. Swann
Regional Administrator (Acting)
Western Pacific Region
Federal Aviation Administration

CAREY FEIERABEND
Digitally signed by CAREY FEIERABEND
Date: 2022.08.15 21:20:20 -07'00'
_____
Carey Feieraband
Acting Superintendent
Golden Gate National Recreation Area
National Park Service

*Paul DePrey*
Digitally signed by PAUL DEPREY
Date: 2022.08.16 09:03:13 -07'00'
_____
Paul DePrey
Superintendent
San Francisco Maritime National Historical Park
National Park Service

CC
- Mr. Cassidy Teufel, Federal Consistency Coordinator, California Coastal Commission (Cassidy.Teufel@coastal.ca.gov)
- Alison Forrestel, Chief of Natural Resources and Science, Golden Gate National Recreation Area
- Bert Ho, Division Lead for Cultural Resources and Museum Management, San Francisco Maritime National Historical Park
- Brannon Ketcham, Management Assistant, Point Reyes National Seashore

Attachments
- Attachment A – Route Maps

AR_0000881

**Attachment A – Route Maps**



*Figure 2. Proposed commercial air tour routes at Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore.*



*Figure 3. Proposed commercial air tour routes for helicopters at Golden Gate National Recreation Area and San Francisco Maritime National Historical Park*



*Figure 4. Proposed commercial air tour routes for fixed-wing aircraft at Golden Gate National Recreation Area and San Francisco Maritime National Historical Park.*



*Figure 5. Proposed commercial air tour routes at Point Reyes National Seashore.*

AR_0000885

**JA312**



**United States Department of the Interior
NATIONAL PARK SERVICE**



**United States Department of Transportation
FEDERAL AVIATION ADMINISTRATION**

## NATIONAL PARKS AIR TOUR MANAGEMENT PROGRAM

August 15, 2022

John Ainsworth
Executive Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105

**RE: Consistency Determination for Air Tour Management Plan for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore**

Dear Mr. Ainsworth:

The Federal Aviation Administration (FAA), in cooperation with the National Park Service (NPS) (collectively, the agencies), is developing an Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (the Parks). The agencies are preparing documentation for the ATMP in accordance with the National Parks Air Tour Management Act (NPATMA) and other applicable laws.

In accordance with Section 307c(1) of the Federal Coastal Zone Management Act of 1972, as amended, the NPS has evaluated the proposed project and determined that it is consistent to the maximum extent practicable with the California Coastal Management Program. This request is submitted in compliance with 15 CFR Section 930.34 et seq. of the National Oceanic and Atmospheric Administration (NOAA) Federal Consistency Regulations (15 CFR 930). We respectively request that the California Coastal Commission concur with our consistency determination.

**Project Description**
The ATMP would provide the terms and conditions for commercial air tours conducted over the Parks pursuant to NPATMA. The ATMP would apply to commercial air tours flying below 5,000 feet (ft.) above ground level (AGL) over the Parks, within 1/2-mile outside the Parks' boundaries, and over tribal lands within or abutting the Parks (Figure 1). The objective of the ATMP is to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tours on natural and cultural resources, visitor experiences, and tribal lands.



*Figure 1. Map of area subject to the proposed ATMP for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore.*

When Congress passed NPATMA in 2000, the law required operators who wished to conduct commercial air tours over national parks to apply to the FAA for authority to conduct such tours. NPATMA provided for existing commercial air tour operations occurring at the time the law was enacted to continue until an ATMP for the Parks was implemented by expressly requiring the FAA to grant interim operating authority (IOA) to existing operators, authorizing them to conduct, on an annual basis, "the greater of (i) the number of flights used by the operator to provide the commercial air tour operations within the 12-month period prior to the date of the enactment of the act, or (ii) the average number of flights per 12-month period used by the operator to provide such operations within the 36-month period prior to such date of enactment, and, for seasonal operations, the number of flights so used during the season or seasons covered by that 12-month period." Under NPATMA, the FAA granted IOA for commercial air tours over the Parks.

Currently, two commercial air tour operators hold IOA to conduct a combined total of 5,090 commercial air tours over Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, Muir Woods National Monument, and Point Reyes National Seashore each year. IOA does not provide any operating conditions (e.g., routes, altitudes, time of day, etc.) for commercial air tours other than an annual limit.

Under the ATMP, the IOA would be terminated and 2,548 commercial air tours per year would be authorized, which consists of 2,405 commercial air tours for routes that go over Golden Gate National

Recreation Area and San Francisco Maritime National Historical Park, and 143 commercial air tours for a route that goes over Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore. The total number of commercial air tours authorized under the ATMP would be consistent with the existing commercial air tours reported over the Parks. It is based on the 3-year average of the total commercial air tours reported in 2017, 2018 and 2019. The annual flight limits in this ATMP are intended to protect visitor experience, wildlife, and wilderness areas throughout the Parks by limiting the number of potential disturbances caused by commercial air tours.

Commercial air tours over Point Reyes would only be conducted using fixed-wing aircraft; no helicopter air tours would be authorized. No commercial air tours would be authorized over, or within a ½ mile of the boundary of, Muir Woods.

Commercial air tours authorized under this ATMP would be conducted on the routes and altitudes in Figures 2 through 5 in Attachment A. Due to the location and proximity of Golden Gate National Recreation Area and San Francisco Maritime National Historical Park (the two parks share a boundary), an air tour route authorized by this ATMP passes over both parks. The only authorized commercial air tour route that would pass over Point Reyes National Seashore would also pass over Golden Gate National Recreation Area and San Francisco Maritime National Historical Park.

Under the proposed ATMP, commercial air tours conducted with fixed-wing aircraft would fly no lower than 1,000 to 2,500 ft. AGL, depending on the location. The ATMP would establish a minimum altitude of 1,500 ft. AGL or higher for fixed-wing aircraft over Golden Gate National Recreation Area, depending on location over the park, except that 1,000 ft. AGL would be permitted within the ATMP boundary around Angel Island State Park (see Figures 2 and 4), where existing operations fly as low as 1,000 ft AGL depending on location. The ATMP would establish a minimum altitude of 1,500 ft. AGL or higher for fixed-wing aircraft over Point Reyes National Seashore (see Figures 2 and 5).

Commercial air tours conducted with helicopters would fly no lower than 1,000 to 1,500 ft. AGL, depending on location. The ATMP would establish a minimum altitude of 1,000 ft AGL for helicopters over Golden Gate National Recreation Area, except for certain areas of the park in Marin County and around Alcatraz Island where the ATMP would establish a minimum altitude of 1,500 ft. AGL (see Figure 3), where existing operations fly as low as 1,000 ft. AGL in those areas of Marin County.

All commercial tours would fly no lower than 2,000 ft. AGL over land-based wilderness, maintain at least 1,000 ft. lateral avoidance of Alcatraz Island and 1,500 ft. AGL, and 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine falcon nests or marine mammal haul outs. Hovering aircraft in place would be prohibited.

Commercial air tours would operate from 9:00 AM until 30 minutes after sunset, as defined by the NOAA,[1] for tours of Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, and from 12:00 PM to 5:00 PM for tours of Point Reyes National Seashore. The proposed ATMP also includes incentives for the use of Quiet Technology (QT). Operators that have converted to QT aircraft, or are considering converting to QT aircraft, may request to be allowed to conduct commercial air tours beginning one hour after sunrise on all days that flights are authorized.

### Consistency with Provisions of the California Coastal Act

### Article 2, Public Access
Ground-based access to coastal zones within each park would not be affected by the ATMP and recreational opportunities would continue to be provided for all people consistent with public safety needs

---

[1] Sunrise and sunset data are available from the NOAA Solar Calculator, https://www.esrl.noaa.gov/gmd/grad/solcalc/

and the need to protect public rights, rights of private property owners, and natural resource areas from overuse. The proposed ATMP limits the annual number of commercial air tours over the Parks, designates specific routes and altitudes, and limits the time of day in which flights may occur in order to protect on the ground visitor experience at the Parks. Additionally, the ATMP would allow the NPS to establish temporary no-fly periods that apply to commercial air tours for special events or planned park management when necessary.

## Article 3, Recreation

Commercial air tours offer a recreational experience for those who wish to view the Parks' coastal features from a different vantage point. The ATMP would limit the number of commercial air tours per year, designate specific routes and altitudes, and limit the time of day in which flights may occur in order to protect on-the-ground visitor experience and recreation while providing an additional recreational opportunity. While some temporary noise disturbances may occur, these intrusions would be limited in frequency and duration by the ATMP. For instance, on days when commercial air tours would occur over Golden Gate National Recreation Area, noise levels above 52 dBA will occur for less than 20 minutes a day in several small areas directly beneath and adjacent to the routes.[2] At Point Reyes, noise levels above 52 dBA are anticipated to occur for less than five minutes a day. Noise impacts would be limited in frequency and duration by the ATMP due to the restrictions to the number of flights per year, routes and altitudes, and time of day flights may occur. Therefore, water-oriented activities and ocean front land suitable for recreation are not anticipated to be impaired by the ATMP.

The ATMP would not result in ground disturbing activities. Therefore, ocean front property for recreation and development, private lands, aquaculture facilities, upland areas necessary to support coastal recreation, and boating activities and facilities would not be altered by the ATMP.

## Article 4, Marine Environment

The agencies are working in coordination with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to establish parameters within the ATMP to protect coastal areas utilized by marine mammals, migratory birds, and other birds of conservation concern.

The proposed ATMP designates routes, establishes minimum altitudes, establishes time of day restrictions, and limits the number of commercial air tours conducted per year[3]. These measures incorporated into the ATMP would serve to avoid and minimize possible effects to marine wildlife, including listed species and their critical habitat. All commercial tours would fly no lower than 2,000 ft. AGL over land-based wilderness and maintain at least 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine falcon nests, or marine mammal haul outs. Within the Point Reyes park boundary are two no-take state marine reserves, three special closure areas, and three state marine conservation areas. Marine boundaries are shared with the Greater Farallones National Marine Sanctuary, and Cordell Bank National Marine Sanctuary is situated further offshore. NOAA regulations for minimum altitudes within the Greater Farallones National Marine Sanctuary assume that failure to comply with these regulations

---

[2] After completing noise modeling for the proposed action, a minor altitude adjustment was made for which the impacts are not represented in the technical noise analysis. The helicopter route altitude was raised from 1,000 ft. to 1,500 ft. AGL near Alcatraz (commercial air tours directly over Alcatraz are prohibited) to reduce noise impacts on nesting seabirds. Compared to current conditions, this altitude adjustment may result in a short increase in noise in two locations along the route due to the flight dynamics of helicopters when changing altitudes. The noise increases are expected to last for only a few minutes of the tour and would occur when the helicopter ascends to 1,500 ft. AGL and then descends back to 1,000 ft. AGL both of which occur before and after the flight passes most sensitive bird habitat at Alcatraz. The NPS has determined that the overall effect of this change would be beneficial for nesting seabirds and other park resources, including visitor experience.

[3] The proposed ATMP also limits Point Reyes National Seashore to 1 tour per day up to 143 days per year, or 1 tour per day with up to 5 flex days that allow 2 tours per day not to exceed 143 tours per year.

disturbs marine mammals.[4] The minimum altitudes prescribed in the proposed ATMP exceed the NOAA altitude requirements of 1,000 ft. AGL or above and therefore safeguard marine mammals protected under the Marine Mammal Protection Act regulated by the NOAA.

The ATMP would not result in any ground disturbing activities. Therefore, water quality, marine resources, oil and hazardous spills, diking, filling and dredging, commercial fishing, shoreline altering construction, and water supply would not be altered or of concern. Additionally, the ATMP would not involve other activities with the potential to impact aquatic or terrestrial habitat. Therefore, reptiles, amphibians, fishes, insects, or crustacean species would not be impacted by commercial air tours authorized by the ATMP.

### Article 5, Land Resources
The ATMP would not result in ground disturbing activities. Therefore, agricultural land and soil productivity would not be altered by the ATMP.

### Article 6, Development
The ATMP would not result in any ground disturbing activities or new development in the area of consideration. Therefore, this article does not apply to the proposed ATMP.

### Article 7, Industrial Development
The ATMP would not result in any ground disturbing activities or new development in the area of consideration. Therefore, this article does not apply to the proposed ATMP.

---

[4] 15 CFR § 922.82(a)(11)

**Determination**

The agencies have evaluated the proposed ATMP and have found it to be fully consistent with the California Coastal Act of 1976 as amended.

Thank you for your assistance and collaboration on this federal consistency determination. We look forward to working with you as you complete this review. If you have questions or need more information, please contact Keith Lusk, keith.lusk@faa.gov, or Michelle Carter, michelle_carter@nps.gov, who are helping coordinate overall consistency determination on the ATMP for the Parks on behalf of the agencies.

Completing this ATMP is part of a nationwide effort to comply with a court order to finalize ATMPs for 23 parks as soon as possible. The NPS and FAA are working to complete this ATMP by October 31, 2022. The agencies recognize the Commission has a substantial workload and appreciate any effort you can put toward prioritizing your review in light of this critical deadline. If possible, the agencies would appreciate a response by August 26, 2022.

Sincerely,

*Tamara A. Swann*
_____
Tamara A. Swann
Regional Administrator (Acting)
Western Pacific Region
Federal Aviation Administration

CAREY FEIERABEND
Digitally signed by CAREY FEIERABEND
Date: 2022.08.15 21:20:59 -07'00'
_____
Carey Feieraband
Acting Superintendent
Golden Gate National Recreation Area
National Park Service

CRAIG KENKEL
Digitally signed by CRAIG KENKEL
Date: 2022.08.16 08:53:29 -07'00'
_____
Craig Kenkel
Superintendent
Point Reyes National Seashore
National Park Service

CC
- Mr. Cassidy Teufel, Federal Consistency Coordinator, California Coastal Commission (Cassidy.Teufel@coastal.ca.gov)
- Alison Forrestel, Chief of Natural Resources and Science, Golden Gate National Recreation Area
- Bert Ho, Division Lead for Cultural Resources and Museum Management, San Francisco Maritime National Historical Park
- Brannon Ketcham, Management Assistant, Point Reyes National Seashore

Attachments
- Attachment A – Route Maps

**Attachment A – Route Maps**



*Figure 2. Proposed commercial air tour routes at Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore.*



*Figure 3. Proposed commercial air tour routes for helicopters at Golden Gate National Recreation Area and San Francisco Maritime National Historical Park*



*Figure 4. Proposed commercial air tour routes for fixed-wing aircraft at Golden Gate National Recreation Area and San Francisco Maritime National Historical Park.*



*Figure 5. Proposed commercial air tour routes at Point Reyes National Seashore.*

AR_0000895

**JA322**

DocuSign Envelope ID: 7740B82E-D72C-41B3-AF52-1BE3BF0E272E

# San Francisco Bay Conservation and Development Commission

375 Beale Street, Suite 510, San Francisco, California 94105 tel 415 352 3600 fax 888 348 5190

State of California | Gavin Newsom – Governor | info@bcdc.ca.gov | www.bcdc.ca.gov

August 30, 2022

Federal Aviation Administration, Western Pacific Region
777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245
ATTN: Tamara A. Swann, Acting Regional Administrator

Golden Gate National Recreation Area, National Park Service
Building 201, Fort Mason
San Francisco , CA 94123
ATTN: Carey Feierabend, Acting Superintendent

San Francisco Maritime National Historical Park, National Park Service
2 Marina Boulevard,
Building E, 2nd Floor
San Francisco , CA 94123
ATTN: Paul DePrey, Superintendent
Via email: <Paul_DePrey@nps.gov>

**SUBJECT: National Parks Air Tour Management Program (BCDC Permit Application No. C2022.007.00)**

Dear Ms. Swann, Ms. Feierabend, and Mr. DePrey:

Thank you for your request for Commission concurrence with the federal consistency
determination received in this office on August 16, 2022 on behalf of the National Park Service
(NPS), in cooperation with the Federal Aviation Administration (FAA), to develop an Air Tour
Management Plan (ATMP) for Golden Gate National Recreation Area, Muir Woods National
Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore
(the Parks).

As you are aware, a portion of the proposed project is located in the San Francisco Bay and has
the potential to affect the Commission's San Francisco Bay Coastal Zone. As such, the project is
being evaluated for consistency with the federal Coastal Zone Management Act (CZMA), as
amended, and the Commission's federally approved Coastal Management Program for San
Francisco Bay, which includes the McAteer-Petris Act, the Suisun Marsh Preservation Act, the
Commission's *San Francisco Bay Plan* (Bay Plan), and the Suisun Marsh Protection Plan (SMPP).
Most relevant for this project are the McAteer-Petris Act and the Bay Plan.



DocuSign Envelope ID: 7740B82E-D72C-41B3-AF52-1BE3BF0E272E

The Commission staff intends to work with the NPS and its representatives to expeditiously evaluate the Proposed Project for consistency with the applicable laws and policies, but it is our understanding the project has yet to be fully evaluated for consistency under the above-mentioned laws and policies incorporated into the Commission's Coastal Management Program. We are requesting that NPS provide an evaluation of the consistency of the Proposed Project with the McAteer-Petris Act and relevant Bay Plan policies, and the itemized information listed below as part of this request for concurrence, as described in 15 CFR§ 930.34 (a)(2). This section of the CZMA encourages federal agencies to "coordinate and consult with State agencies through use of existing procedures in order to avoid waste, duplication of effort, and to reduce Federal and State agency administrative burdens." Having this information has afforded the Commission the advice of agencies with more specific expertise in certain subject areas and has allowed the Commission and other agencies to agree upon and coordinate appropriate conditions and mitigation requirements, if necessary. If NPS is agreeable to this request, the 60-day review period would not start until this consultation and the information requested below is provided to the Commission staff. Please inform us in writing (letter or email) at your earliest convenience if NPS agrees with this request.

Our initial review of NPS's request for consistency determination review found that the following information is needed to file the consistency determination complete, consistent with 15 CFR §930.39(a). As a result, pursuant to the requirements of 15 CFR 930.41, the Commission's 60-day consistency determination review period has not commenced. Therefore, please provide the following information:

1. **Total Project and Site Information**

   From reviewing your materials, it appears that that the Proposed Project would develop an ATMP that would provide the terms and conditions for commercial air tours conducted over the Parks, within 1/2-mile outside the Parks' boundaries, and over tribal lands within or abutting the Parks, and authorizes the following activities:

   a. 2,548 commercial air tours per year, consisting of 2,405 commercial air tours for routes that go over Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, and 143 commercial air tours for a route that goes over Golden Gate National Recreation Area, San Francisco Maritime National Historical Park, and Point Reyes National Seashore;

   b. No commercial air tours would be authorized over, or within a ½ mile of the boundary of, Muir Woods;

   c. Flight Elevations

      (1) Commercial air tours conducted with fixed-wing aircraft would fly no lower than 1,000 to 2,500 ft. above ground level (AGL), depending on the location:

DocuSign Envelope ID: 7740B82E-D72C-41B3-AF52-1BE3BF0E272E

Ms. Tamara A. Swann, Ms. Carey Feierabend, and Mr. Paul DePrey          Page 3
BCDC Permit Application No. C2022.007.00                              August 30, 2022

    (a)  A minimum altitude of 1,500 ft. AGL or higher for fixed-wing aircraft over Golden Gate National Recreation Area, except for around Angel Island State Park where 1,000 ft. would be permitted; and,

    (b)  A minimum altitude of 1,500 ft. AGL or higher for fixed-wing aircraft over Point Reyes National Seashore.

(2)  Commercial air tours conducted with helicopters would fly no lower than 1,000 to 1,500 ft. AGL, depending on location:

    (a)  A minimum altitude of 1,000 ft AGL over Golden Gate National Recreation Area, except for certain areas of the park in Marin County and around Alcatraz Island with a minimum altitude of 1,500 ft.

(3)  All commercial tours would fly no lower than 2,000 ft. AGL over land-based wilderness, maintain at least 1,000 ft. lateral avoidance of Alcatraz Island and 1,500 ft. AGL, and 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine falcon nests or marine mammal haul outs.

(4)  Hovering aircraft in place would be prohibited.

d.  Commercial air tours would operate from 9:00 AM until 30 minutes after sunset for Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, and from 12:00 PM to 5:00 PM for tours of Point Reyes National Seashore Operators that use Quiet Technology aircraft, or are considering converting to QT aircraft, may potentially conduct commercial air tours beginning one hour after sunrise.

Please indicate whether the proposed ATMP has been described in full or correct the project description if necessary.

## 2. Consistency with the McAteer-Petris Act and San Francisco Bay Plan

As noted above, the Commission's approved Coastal Management Program includes the McAteer-Petris Act and the San Francisco Bay Plan. Please provide an assessment of the Proposed Project's consistency with our laws and policies, and any additional data and information necessary to support the consistency determination. More specifically, please provide a description of the consistency with the Bay Plan Policies on Fish, Other Aquatic Organisms and Wildlife; Tidal Marshes and Tidal Flats; Water Quality; Environmental Justice and Social Equity; Recreation; Public Access; Airports; and any other relevant policies.

## 3. Environmental Minimization Measures and Species Impacts

The Parks and the Bay contain a wide variety of wildlife species and sensitive habitat, including nesting waterbird colonies, peregrine falcon nests, and marine mammal haul outs, and many other native species and their habitats. Please provide copies of any consultations NPS has undertaken with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to avoid

USCA Case #23-1067     Document #2025130       Filed: 11/02/2023     Page 103 of 118

DocuSign Envelope ID: 7740B82E-D72C-41B3-AF52-1BE3BF0E272E

possible adverse species and wildlife habitat impacts for listed species, or indicate whether such consultations are not necessary for the Proposed Project. Please further confirm that the ATMP would not result in any ground disturbing activities or any construction of associated ground infrastructure.

### 4. Environmental Documentation

Please indicate whether NPS or the FAA plans to conduct an analysis of the Proposed Project under the National Environmental Policy Act (NEPA). If so, or if this has already occurred, please provide a copy of the environmental documentation as part of the data and information provided to support the consistency determination. If no environmental analysis will be conducted for the Proposed Project under the National Environmental Policy Act, please provide an explanation which justifies this decision.

### 5. Public Access and Recreation

Please confirm that the proposed ATMP will have no impacts to public access or recreation within or adjacent to the Parks, including physical and visual access at public areas, vista points, along the shoreline, and areas along the flight routes. If there will be impacts to public access and recreation from the Proposed Project, please provide an analysis of the impacts and any minimization measures that will be used to minimize or mitigate the impacts.

### 6. Airport Use and Airplane Operations

We note that many of the routes for the commercial tours begin at the Seaplane Adventures-Seaplane and Heliport Base (formerly called Commodore Center) located at 242 Redwood Highway, Mill Valley in Marin County. It is not clear whether all flights authorized under this ATMP leave out of this airport alone or also come from other airports. Please provide additional information on where the airplanes will be coming from. Please also provide information on whether the ATMP allows for any increases in the frequency of flights from Seaplane Adventures or other airports around the Bay Area. Additionally, please see enclosed the recent letter from the Richardson Bay Environmental Protection Association that was submitted to the Commission on July 12, 2022 and that discusses concerns regarding potential lead contamination alleged to be the result of the fuel source used by these airplanes and the intensity or number of flights leaving from the Seaplane Adventures airport. Please provide any information responsive to the legitimacy of these concerns and an evaluation of consistency with any Bay Plan policies relevant to this issue.

### 7. Interested Parties

It is necessary to have a complete list of interested parties prior to filing the consistency determination. Please provide a list of adjacent property owners and other parties known to be interested in your project, wherever possible, please include email addresses as all correspondence related to Commission meetings and permits is currently being sent electronically.

DocuSign Envelope ID: 7740B82E-D72C-41B3-AF52-1BE3BF0E272E

Ms. Tamara A. Swann, Ms. Carey Feierabend, and Mr. Paul DePrey                                   Page 5
BCDC Permit Application No. C2022.007.00                                              August 30, 2022

If you have any questions, please do not hesitate to contact me at 415-352-3665 or
sam.fielding@bcdc.ca.gov.

Sincerely,

*Sam Fielding*

SAM FIELDING
Coastal Program Analyst

SF/gg

Encl.: Letter from the Richardson Bay Environmental Protection Association

cc: Cassidy Teufel, California Coastal Commission, <Cassidy.Teufel@coastal.ca.gov>
    Alison Forrestel, Golden Gate National Recreation Area, <alison_forrestel@nps.gov>
    Bert Ho, Francisco Maritime National Historical Park, <Bert_Ho@nps.gov>
    Brannon Ketcham, Point Reyes National Seashore, <Brannon_Ketcham@nps.gov>





**United States Department of the Interior**
**NATIONAL PARK SERVICE**

**United States Department of Transportation**
**FEDERAL AVIATION ADMINISTRATION**

### NATIONAL PARKS AIR TOUR MANAGEMENT PROGRAM

September 29, 2022

Sam Fielding
Coastal Program Analyst
San Francisco Bay Conservation and Development Commission
375 Beale Street, Suite 510
San Francisco, CA 94105

Dear Mr. Fielding,

Thank you for your August 30, 2022 letter responding to the National Park Service (NPS) and Federal Aviation Administration's (FAA) (together, the agencies) request for concurrence from the San Francisco Bay Conservation and Development Commission (Commission) on the Federal consistency determination on the proposed Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (together, the Parks). We understand that the Commission received the agencies' consistency determination on August 16, 2022. We respectfully renew our request that the Commission concur with our consistency determination, the content of which is incorporated herein by reference.

As an initial matter, some of the information requested exceeds that required by 36 CFR § 930.39(a). We have provided the information required by 36 CFR § 930.39(a) and have attempted to provide the additional information requested to the extent practicable in order to aid your review and to provide additional context for the ATMP. However, we have had to balance our desire to be responsive to the Commission's request for additional information with the fact that this planning process is proceeding under the supervision of the U.S. Court of Appeals for the D.C. Circuit, with a completion deadline of January 31, 2023. *See* Attachment A. Further, the detail provided is commensurate with the expected effects from implementation of the ATMP on resources under the Commission's jurisdiction, all of which are beneficial when measured from the current condition. Under the circumstances, we consider the information submitted herewith, together with the information we previously submitted, to fulfill our obligations and to start the 60-day period for the Commission's review of the agencies' determination.

We understand that the agencies' preparation of a single ATMP that will regulate commercial air tours over four National Park System units, including areas within the jurisdiction of the Commission as well as areas within the jurisdiction of the California Coastal Commission, may have caused some confusion regarding the potential for impacts on areas within the Commission's jurisdiction. The agencies decided to prepare a single ATMP covering the four parks as a matter of administrative efficiency. In our response to your request, we have focused on the area within the Commission's jurisdiction.

**1. Total Project and Site Information**:

The total project and site information included in our consistency determination accurately describes the area included in the ATMP. The description included in your August 30, 2022, letter is generally accurate, though it excludes some information as described below. We are also providing additional information and context to further the Commission's understanding of the project and its impacts.

Commercial air tours have been operating over Golden Gate National Recreation Area (Golden Gate) and San Francisco Maritime National Historical Park (San Francisco Maritime) well before the National Parks Air Tour Management Act (NPATMA) was enacted in 2000. Prior to NPATMA, air tour operators were subject only to FAA's general safety regulations, which applied to the operators of various types of aircraft, including those used to conduct commercial air tour operations whether or not the tours flew over national parks. At that time there were no limits on the number of air tours that could be conducted per year and no designated routes or altitudes for flights.

As previously explained, NPATMA required the FAA to grant interim operating authority (IOA) to existing commercial air tour operators that applied for it. 49 U.S.C. § 40128(c)(1). Specifically, the FAA was required to grant IOA that authorized the greater of the number of commercial air tour flights over the Parks during the 12-month period prior to the enactment of NPATMA, or the average number of commercial air tour flights within the 36-month period prior to the enactment of NPATMA. *Id.* § 40128(c)(2). Since 2005, commercial air tours over Golden Gate and San Francisco Maritime have been conducted pursuant to IOA issued by the FAA in accordance with NPATMA. *See* 70 Fed. Reg. 36,456 (June 23, 2005).

Currently, two commercial air tour operators (San Francisco Helicopters, LLC and San Francisco Seaplane Tours, LLC) hold IOA to conduct a combined total of 5,090 commercial air tours over Golden Gate and San Francisco Maritime. San Francisco Helicopters, LLC holds IOA for 2,900 commercial air tours each year and San Francisco Seaplane Tours, LLC holds IOA for 2,190 commercial air tours each year over each of the Parks. IOA does not itself include any operating parameters (e.g., routes, altitudes, time of day, etc.) for commercial air tours other than an upper limit of the total number of air tours operators may conduct each year. The maps included in the agencies' consistency determination display existing routes as reported by the operators, with modifications made by the agencies to protect Park resources, however the operators are not currently required to follow any designated routes and may change their routes at any time without notice to the agencies. Commercial air tours are conducted at altitudes ranging between

2

1,000 feet (ft.) and 2,500 ft. above ground level (AGL)[1] depending on location over the Parks, though under IOA there is no minimum altitude required.[2] And though there are no restrictions as to when air tours may occur, tours of Golden Gate and San Francisco Maritime are typically conducted between the hours of 9:00 AM and 6:00 PM and occur year-round. San Francisco Seaplane Tours also offers a sunset tour. Your August 30, 2022, letter does not reflect that IOA will be terminated on the effective date of the ATMP, after which time the commercial air tour operators would be required to comply with the terms of the ATMP. The agencies believe this is an important aspect of the project, because the ATMP includes multiple measures designed to protect the Parks' resources.

Put differently, the ATMP would allow the agencies to regulate the commercial air tours that are already occurring, with modifications that protect the Parks' resources and resources of concern to the Commission. The ATMP would authorize the existing number of commercial air tours per year (2,548) not the 5,090 currently authorized under IOA. It designates routes that are based on operator reported routes but which the agencies have modified for the protection of park resources, and that include lateral offsets to protect wildlife. As described in our consistency determination, the ATMP would require aircraft to fly at minimum altitudes set for the protection of park resources, where there are currently no minimum altitudes required. Nearly all of the minimum altitudes required by the ATMP are above altitudes currently flown.

Your August 30, 2022, letter does not include a reference to the designated routes, which are another key feature of the ATMP that we would like to explain better as part of this response. As noted above, under IOA there are no designated routes and the operators could change their routes at any time. The maps included in our consistency determination identify the particular route modifications that would be made by the ATMP to protect wildlife including nesting seabird colonies, peregrine falcon nests, and marine mammal haul outs. The required altitudes are also depicted on the maps included with our consistency determination. Versions of these maps with more site-specific details are attached as Attachment H.

The ATMP includes a reporting requirement in the unlikely event of a bird strike resulting from commercial air tours over the Parks, which will allow the agencies to monitor and respond to potential impacts to raptors, migratory birds, or other avian species. If unanticipated impacts to the parks' natural resources are observed, the ATMP provides that adaptive management measures could be taken to avoid such impacts, as long as the impacts of the adaptive management measures are within the impacts already analyzed by the agencies. Unanticipated impacts to the parks' resources could also be addressed through a plan amendment which would require further environmental compliance. Under current conditions, there is no requirement for operators to report bird strikes.

The ATMP also includes provisions requiring that operators install flight following technology that, coupled with the ATMP's reporting requirements, will enable the agencies to monitor and enforce compliance with the ATMP's terms.

---

[1] Altitude expressed in AGL units is a measurement of the distance between the ground surface and the aircraft.
[2] While IOA does not prescribe a minimum altitude, operators are required to comply with general FAA minimum altitude regulations at 14 CFR § 91.119.

AR_0000903
**JA330**

It is also important to note the limits of the agencies' regulatory jurisdiction under NPATMA and its implementing regulations. An ATMP may only regulate commercial air tours over a National Park System unit or outside that park but within 1/2 mile of its boundary during which the aircraft flies below 5,000 ft. AGL. Air tours outside of this area are not subject to regulation under NPATMA and are therefore not regulated under the ATMP. The maps included in our consistency determination, and in Attachment H, depict the area that is within the scope of the ATMP and the area outside the scope of the ATMP.

## 2. Consistency with the McAteer-Petris Act and San Francisco Bay Plan:

In your letter, you requested an assessment of how the ATMP is consistent with the Commission's approved Coastal Management Program. The agencies believe that the implementation of an ATMP for the Parks consistent with the McAteer-Petris Act and the policies set forth in the San Francisco Bay Plan. Implementation of the ATMP would provide protections for the Parks' resources not in place under current conditions. The ATMP does not involve development, placing fill, extracting materials, or making any substantial change in the use of any water, land, or structure within the area of the Commission's jurisdiction. Further, it will not take or damage private property for public use or make any changes to public access. The agencies have analyzed the applicable policies from the sections of the Bay Plan identified in your letter and provide the following analyses.

### Water Quality, Tidal Marshes and Tidal Flats

The ATMP would allow the agencies to regulate the commercial air tours that are already occurring. It would require aircraft to abide by the time-of-day restrictions, fly at minimum altitudes, and fly on designated routes set for the protection of the Parks' resources noted above and in our consistency determination, where there are currently no such requirements. The ATMP does not involve any ground disturbance or other activities that could affect tidal marshes or tidal flats. No aircraft will take off or land within the rea regulated by the ATMP. Therefore, implementation of the ATMP will have no impact on tidal marshes and tidal flats, or water quality.

### Fish, Other Aquatic Organisms and Wildlife

The ATMP does not involve ground-disturbing activities or other activities with the potential to impact aquatic or terrestrial habitat. Thus, reptiles, amphibians, fishes, insects, and flowering plant species will not be impacted by the commercial air tours authorized by the ATMP. The ATMP sets the minimum altitudes at 1,000 to 1,500 ft. AGL, depending on location for commercial air tours using helicopters and fixed-wing aircraft. Aircraft are required to maintain a minimum altitude of 1,500 ft. AGL, and a 1,000 ft. lateral avoidance of marine mammal haul outs, which is more protective than the minimum altitude of 1,000 ft. AGL required by NOAA for overflights of the Greater Farallones National Marine Sanctuary. The ATMP's provisions, including the 1,000 ft. lateral set off from Alcatraz Island and the 1,500 ft. AGL minimum altitude required near Alcatraz Island are protective of nesting shorebirds and other avian species. The requirement to report bird strikes, detailed above, also will allow the agencies to assess the effectiveness of these protections, and to modify them in the event that unanticipated adverse impacts are observed. Thus, the agencies determined that the ATMP will result in

4

beneficial impacts to marine mammals and birds compared to current conditions. Attachment B is the agencies' Section 7 Endangered Species Act No Effect Determination and Evaluation of Other Species of Concern, which includes the additional analysis. Thus, the ATMP is consistent with the Bay Plan because it would not affect reptiles, amphibians, fish, insects, or plant species, and includes measures that will improve protections for marine mammals and birds compared to current conditions.

<u>Environmental Justice and Social Equity</u>

The agencies examined U.S. Census data for the census blocks surrounding Golden Gate and San Francisco Maritime to determine the presence of minority or low-income populations immediately outside these parks or within ½ mile of their boundaries. Based on this review, minority populations were identified in San Francisco County. However, the commercial air tours authorized by the ATMP will not have a disproportionate impact on low-income or minority populations, since the noise associated with commercial air tours will occur in areas directly beneath and adjacent to the routes over the Park and will not be concentrated over low-income or minority populations. As noted above, under current conditions (IOA), there are no designated routes and the operators could change their routes at any time. The two commercial operators also hold IOA to conduct a combined total of 5,090 commercial air tours each year over both Golden Gate and San Francisco Maritime. The ATMP will not authorize any on-the-ground activities. It will limit the number of commercial air tours that the operators are authorized to conduct over the parks each year to existing conditions, or the three-year average of tours conducted on an annual basis from 2017-2019 (2,548 tours per year) and implement measures such as minimum altitudes and time of day restrictions that are not currently in place.

The agencies conducted public outreach regarding the ATMP. NPATMA requires that the agencies publish notification of the availability of a draft ATMP in the Federal Register for public comment and to hold at least one public meeting for each draft ATMP. The FAA published a notice of availability of the draft ATMP for the Parks on October 15, 2021. Public Meeting/Notice of Availability for Proposed Air Tour Management Plan at Golden Gate National Recreation Area; Muir Woods National Monument; San Francisco Maritime National Historical Park; and Point Reyes National Seashore, 86 Fed. Reg. 57, 471 (Oct. 15, 2021). Golden Gate notified their stakeholder list via email that the draft ATMP was available for public comment and shared a news release regarding the draft ATMP on its website and in a Twitter post. The agencies held the public meeting for the ATMP for the Parks on October 26, 2021 and accepted public comments on this ATMP between October 15 and November 14, 2021. In addition, the attached letter to the California State Historic Preservation Officer finding no adverse effect as a result of the ATMP discusses the consultation process conducted by the agencies, with the FAA acting as lead agency, in compliance with Section 106 of the National Historic Preservation Act. *See* Attachment C.

In sum, the ATMP represents an overall improvement to current conditions. Thus, it is consistent with the Bay Plan with respect to environmental justice and social equity.

For more information on how the ATMP is consistent with the Commission's policies on Public Access, Recreation and Airports, see items number 5 and 6 below.

5

For all of the reasons set forth in this section, and in the following sections, the agencies have determined the ATMP is consistent with the San Francisco Bay Plan. Additional analysis of potential environmental impacts is presented in the draft Environmental Screening Forms included in Attachments D and E.

**3.   Environmental Minimization Measures and Species Impacts:**

The FAA and the NPS are aware that Golden Gate, San Francisco Maritime, and the San Francisco Bay contain a wide variety of wildlife species and sensitive habitats, including nesting waterbird colonies, peregrine falcon nests, marine mammal haul outs, and many other native species and their habitats. To ensure the ATMP included conditions that would protect these species, the agencies engaged with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) to obtain technical assistance regarding the operating conditions proposed to be included in the ATMP. The agencies presented the draft ATMP outlining the designated routes, minimum altitudes, time of day restrictions, and the limit of the number of air tours conducted to FWS and NMFS. The agencies also discussed available mitigation measures with FWS and NMFS and explained how the ATMP's mitigation measures would avoid and minimize possible effects on listed species and critical habitats. During this discussion, FWS and NMFS expressed no concern with the agencies' No Effect determination. *See* Draft Section 7 Endangered Species Act No Effect Determination and Evaluation of Other Species of Concern, Attachment B. Additional information may be found in the draft Environmental Screening Forms included in Attachments D and E and described in more detail below.

The agencies confirm that the ATMP would not result in any ground disturbing activities or any construction of associated ground infrastructure.

**4.   Environmental Documentation:**

The NPS anticipates applying a documented categorical exclusion to comply with the National Environmental Policy Act. Attachment F is an unsigned draft Categorical Exclusion Documentation Form for the ATMP. The categorical exclusion that the NPS anticipates applying is set forth in the Department of the Interior's Departmental Manual Part 516 § 12.5.A(1) and included in the NPS's NEPA Handbook as categorical exclusion 3.3.A.1.2 This categorical exclusion applies to "[c]hanges or amendments to an   approved action when such changes would cause no or only minimal environmental impacts." Interior Departmental Manual, Part 516, § 12.5.A(1). Here, the "approved action" is the IOA issued by the FAA consistent with NPATMA, which was a non-discretionary authorization directed by Congress. NPS plans to use the NPS environmental screening forms to document that there are no or minimal impacts from the ATMP. The NPS plans to separately analyze the impacts of the ATMP on each of the four parks and document the impacts in an environmental screening form for each park. The NPS further will evaluate the extraordinary circumstances in 43 CFR § 46.215. The analysis conducted thus far demonstrates that no extraordinary circumstances apply and the ATMP will not result in significant impacts. Additional analysis can be found in the draft Environmental Screening Forms for Golden Gate and San Francisco Maritime, Attachments D and E. The FAA is performing its own extraordinary circumstances analysis, including under Section 4(f) of the

6

Department of Transportation Act, codified at 49 U.S.C. § 303(c), and intends to adopt the NPS's categorical exclusion determination pursuant to 40 CFR § 1506.3(d).

## 5. Public Access and Recreation:

The ATMP will have no impacts to public access within or adjacent to the Parks, including physical and visual access at public areas, vista points, along the shoreline, and areas along the flight routes.

The ATMP will have no impacts to recreation within or adjacent to the Parks, including in public areas, vista points, along the shoreline, and areas along the flight routes. Commercial air tours do offer a recreational experience for those who wish to view the coastal features of Golden Gate and San Francisco Maritime from a different vantage point. Because the number of tours authorized by the ATMP is consistent with the average number of flights from 2017-2019, there are no or minimal changes anticipated to the number of tours offered per year compared to current conditions.

As for impacts to visitors on the ground, it is important to note that the ATMP will allow the agencies to regulate the commercial air tours that are currently permitted under IOA, set an upper limit on the number of tours allowed per year, designate routes and altitudes, and include time of day restrictions identified above. The limitations included in the ATMP are protective of on-the-ground visitor use, experience, and recreational resources while providing an additional recreational opportunity through commercial air tours. While some temporary noise disturbances may occur, these intrusions would be limited in frequency and duration by the ATMP and will be an improvement compared to current conditions. For instance, on days when commercial air tours would occur over Golden Gate noise levels above 52 dBA will occur for less than 20 minutes a day in several small areas directly beneath and adjacent to the routes. *See* Draft Environmental Screening Forms, Attachments D and E. For these reasons the agencies have determined the ATMP is consistent with the San Francisco Bay Plan policies on recreation and public access.

## 6. Airport Use and Airplane Operations:

The agencies believe that your letter requests information relating to seaplane base use, airport use and airplane operations that is not required by 36 CFR § 930.39(a). However, the agencies have attempted to respond to the extent practicable in order to further inform your review. As explained above and in the agencies' consistency determination, the area that may be regulated by the ATMP is limited by law to the airspace above the area within the boundaries of the Parks and the area outside the Parks' boundaries that is within ½ mile of the boundary of one or more of the Parks. It is also limited to aircraft conducting commercial air tours that are flying under 5,000 ft. AGL.

The Commission's August 30, 2022, letter requests information regarding the Seaplane Adventures Seaplane and Heliport Base located at 242 Redwood Highway, Mill Valley in Marin County. The seaplane base is more than ½ mile outside the boundaries of all of the Parks and thus air tour operations in its vicinity are not regulated or regulable by the ATMP. The agencies'

AR_0000907

understanding is that flights by the air tour operators that originate from this base are authorized by a use permit issued by Marin County. Further, the Marin County permit is not limited to commercial air tour operations regulable under NPATMA. Flights that do not meet the definition of a commercial air tour are not regulated by NPATMA, this would include general aviation flights and flights outside of the area regulable under the ATMP.

The Commission's August 30, 2022, letter also requested information regarding any other airports where commercial air tours may originate. Based on reporting data the operators submitted to the agencies, San Francisco Helicopters also conducts tours that originate out of San Francisco International Airport, as well as Commodore Seaplane Base and Heliport. It is important to note that the ATMP would not authorize operators to originate commercial air tours at the seaplane base or any airport—its scope is limited to overflights over the Parks and the area ½ mile outside their boundaries.

The ATMP does not allow for any increases in the number of commercial air tours, regardless as to what location they may originate from. As noted above, the ATMP would authorize a total of 2,548 commercial air tours per year over Golden Gate and San Francisco Maritime—not the 5,090 currently authorized under IOA. Any increase in the number of commercial air tours conducted per year from the 2,548 authorized by the ATMP would require an amendment to the ATMP and additional environmental compliance. In addition to the authorization provided by the ATMP to conduct commercial air tours in the area regulated by the ATMP, operators would need to have appropriate permissions to operate from the facilities from which the flights originate or at which they land. As the ATMP does not authorize any ground disturbing activities, or even the use of any specific airport or base, it is thus consistent with the Bay Plan. Although the frequency of air tours over San Francisco Maritime and Golden Gate is not limited by the ATMP because the ATMP authorized the average number of flights that occurred annually during the three-year period from 2017 to 2019, the frequency of flights over these parks is unlikely to increase, given the annual limits in the ATMP.

The agencies reviewed the Richardson Bay Environmental Protection Association's letter requesting that the Commission conduct an environmental review of the Seaplane Adventures Seaplane and Heliport Base for lead and other toxic substances. The agencies do not have records responsive to this request to share with the Commission that could inform this review. The FAA, however, would like to provide information on two integrated initiatives focused on safely transitioning aircraft away from leaded fuel: The Piston Aviation Fuels Initiative (PAFI) https://www.faa.gov/about/initiatives/avgas/, and the FAA-industry partnership to Eliminate Aviation Gasoline Lead Emissions (EAGLE) https://www.faa.gov/unleaded. PAFI provides the testing and evaluation of unleaded aviation gasoline (avgas) candidates and determines if they are qualified as a replacement for leaded avgas. The EAGLE initiative focuses on transitioning the entire industry sector to a lead-free fuel, including fuel production, distribution, and infrastructure. In addition, FAA collaborates and coordinates with the Environmental Protection Agency on lead reduction opportunities from the use of leaded aviation gasoline while these fuel replacement programs are in development. This collaborative work will include responding to National Academy of Sciences recommendations regarding options for reducing lead emissions from these aircraft. *See* https://www.nap.edu/catalog/26050/options-for-reducing-lead-emissions-from-piston-engine-aircraft.

8

**7. Interested Parties:**

In your letter you request a "complete list of interested parties" consisting of a "list of adjacent property owners and other parties known to be interested" in the ATMP. This information is not required by 36 CFR § 930.39(a) and we are not able to provide such information regarding private persons as doing so would compromise our ability to protect such information from public disclosure. In addition, since the action is to implement an ATMP authorizing commercial air tours, there are no adjacent property owners. However, in an effort to aid your review, please see Attachment G. Further, the Section 106 consultation process included engagement with the State Historic Preservation Officer, the Federated Indians of Graton Rancheria, current operators, relevant government entities, and other consulting parties as detailed in Attachment C. Contact information for the consulting parties is included in Attachment G.

TAMARA A SWANN
Digitally signed by TAMARA A SWANN
Date: 2022.09.29 11:40:06 -07'00'

CAREY FEIERABEND
Digitally signed by CAREY FEIERABEND
Date: 2022.09.29 14:08:32 -07'00'

Tamara A. Swann
Regional Administrator (Acting)
Western Pacific Region
Federal Aviation Administration

Carey Feieraband
Acting Superintendent
Golden Gate National Recreation Area
National Park Service

Paul DePrey
Digitally signed by PAUL DEPREY
Date: 2022.09.29 14:40:51 -07'00'

Paul DePrey
Superintendent
San Francisco Maritime National Historical Park
National Park Service

9

AR_0000909

**JA336**

**<u>Attachments</u>**

| | |
|---|---|
| A. | D.C. Circuit Court of Appeals orders and filings |
| B. | Draft No Effect Determination Memorandum |
| C. | Finding of Adverse Effect Letter to the California State Historic Preservation Officer |
| D. | Draft Environmental Screening Form for San Francisco Maritime National Historical Park |
| E. | Draft Environmental Screening Form for Golden Gate National Recreation Area |
| F. | Draft Categorical Exclusion Documentation Form |
| G. | Stakeholder lists (organizations only) |
| H. | Maps |

AR_0000910

**JA337**

DocuSign Envelope ID: B2301E3A-FAA2-4B4B-BF2E-539D5A92A7CF

## San Francisco Bay Conservation and Development Commission

375 Beale Street, Suite 510, San Francisco, California 94105 tel 415 352 3600 fax 888 348 5190

State of California | Gavin Newsom – Governor | info@bcdc.ca.gov | www.bcdc.ca.gov

October 13, 2022

*Transmitted Via Electronic Mail*

Federal Aviation Administration, Western Pacific Region
777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245
ATTN: Tamara A. Swann, Acting Regional Administrator

Golden Gate National Recreation Area, National Park Service
Building 201, Fort Mason
San Francisco , CA 94123
ATTN: Carey Feierabend, Acting Superintendent

San Francisco Maritime National Historical Park, National Park Service
2 Marina Boulevard,
Building E, 2nd Floor
San Francisco , CA 94123
ATTN: Paul DePrey, Superintendent
Via email: <Paul_DePrey@nps.gov>

**SUBJECT: National Parks Air Tour Management Program (BCDC Permit Application No. C2022.004.00)**

Dear Ms. Swann, Ms. Feierabend, and Mr. DePrey:

Thank you for your request for Commission concurrence with the federal consistency determination received in this office on August 16, 2022 and with supplemental information provided on September 29, 2022, on behalf of the National Park Service (NPS), in cooperation with the Federal Aviation Administration (FAA), to develop an Air Tour Management Plan (ATMP) for Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore (the Parks).

As a portion of the proposed project is located in the San Francisco Bay and has the potential to affect the Commission's San Francisco Bay Coastal Zone, the project is being evaluated for consistency with the federal Coastal Zone Management Act (CZMA), as amended, and the Commission's federally approved Coastal Management Program for San Francisco Bay, which includes the McAteer-Petris Act, the Suisun Marsh Preservation Act, the Commission's *San Francisco Bay Plan* (Bay Plan), and the Suisun Marsh Protection Plan (SMPP).

DocuSign Envelope ID: B2301E3A-FAA2-4B4B-BF2E-539D5A92A7CF

Ms. Swann, Ms. Feierabend, and Mr. DePrey                                    Page 2
National Parks Air Tour Management Project                              October 13, 2022
BCDC Permit Application No. C2022.004.00

Based on BCDC staff review of your submittal, we have determined that the submittal contains comprehensive information sufficient to support NPS and the FAA's statement of consistency as required per 15 CFR section 930.39(a) for purposes of initiating BCDC's 60-day consistency determination review period per 15 CFR section 930.41(a). Pursuant to 15 CFR section 930.41(b), BCDC invokes its one-time right to a 15-day extension to the 60-day review period, considered to have begun at the receipt of supplemental information provided September 29, 2022, to allow BCDC staff more time to conduct a thorough analysis of the proposed activities for consistency with BCDC's enforceable state policies under its certified Coastal Management Program (CMP). Therefore, BCDC will complete its consistency review by December 13, 2022. Please let us know who best to contact if any questions arise as we are conducting the consistency review.

If you have any questions, please do not hesitate to contact me at 415-352-3665 or sam.fielding@bcdc.ca.gov.

Sincerely,

*Sam Fielding*
—2AA0DD5043E4453...

SAM FIELDING
Coastal Program Analyst

SF/ra

cc: Holly Wyer, California Coastal Commission, <holly.wyer@coastal.ca.gov>
    Alison Forrestel, Golden Gate National Recreation Area, <alison_forrestel@nps.gov>
    Bert Ho, San Francisco Maritime National Historical Park, <Bert_Ho@nps.gov>
    Brannon Ketcham, Point Reyes National Seashore, <Brannon_Ketcham@nps.gov>

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                                    GAVIN NEWSOM, *Governor*

**CALIFORNIA COASTAL COMMISSION**
ENERGY, OCEAN RESOURCES AND FEDERAL CONSISTENCY
455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400

November 21, 2022

Tamara A. Swann
Regional Administrator (Acting)
Western Pacific Region
Federal Aviation Administration
Via email: Tamara.A.Swann@faa.gov

Craig Kenkel
Acting Superintendent
Golden Gate National Recreation Area
National Park Service
Via email: Craig_Kenkel@nps.gov

Anne Altman
Acting Superintendent
Point Reyes National Seashore
National  Park Service
Via email: Anne_Altman@nps.gov

Re: Consistency Determination CD-0005-22, (Air Tour Management Plan)

Dear Administrator Swann, Acting Superintendent Kenkel and Acting Superintendent Altman,

On November 17, 2022, the California Coastal Commission concurred with the above-referenced consistency determination submitted by the Federal Aviation Administration and National Park Service for adopting and implementing an Air Tour Management Plan for Golden Gate National Recreation Area and Point Reyes National Seashore. The Commission found the proposed activities to be consistent with the California Coastal Management Program.

If you have questions, please feel free to contact Holly Wyer at holly.wyer@coastal.ca.gov.

Sincerely,

Cassidy Teufel
Manager
Energy, Ocean Resources, and Federal Consistency Division

CC

Eric Elmore, Federal Aviation Administration (eric.elmore@faa.gov)

Michelle Carter, National Park Service (michelle_carter@nps.gov)

Vicki Ward, National Park Service (vicki_ward@nps.gov)

Barbara Repeta, National Park Service (barbara_repeta@nps.gov)

Alison Forrestel, Golden Gate National Recreation Area (alison_forrestel@nps.gov)

Brannon Ketcham, Point Reyes National Seashore (brannon_ketcham@nps.gov)

David Kaiser, National Oceanic and Atmospheric Administration (david.kaiser@noaa.gov)

Kerry Kehoe, National Oceanic and Atmospheric Administration (kerry.kehoe@noaa.gov)

AR_0000914

JA341