SCHEDULED FOR ORAL ARGUMENT JANUARY 19, 2024

No. 23-1067

—————————————————————

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————————————

MARIN AUDUBON SOCIETY, et al.,
*Petitioners,*

v.

U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents.*

—————————————————————————————

**CORRECTED FINAL PETITIONERS' REPLY BRIEF**

Peter T. Jenkins
D.C. Bar No. 477229
Paula Dinerstein
D.C. Bar No. 333971
Public Employees for Environmental
   Responsibility
962 Wayne Ave., No. 610
Silver Spring, MD 20910
202-265-4189
pjenkins@peer.org
pdinerstein@peer.org
Attorneys for Petitioners

**November 27, 2023**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ...................................................................... ii

GLOSSARY ............................................................................................. v

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT ........................................................................................... 3

I.     The Agencies' Invocation of a Categorical Exclusion under NEPA Violated NPATMA. ..................................................................................... 3

   A.   Congress's intent in 49 U.S.C. § 40128(b)(2) was unambiguous and favors Petitioners' arguments ........................................................................ 5

   B.   The Agencies' proposed reading of NPATMA is not persuasive. ............... 7

II.    The Agencies' Invocation of a Categorical Exclusion was Arbitrary and Capricious and Violated NEPA. ........................................................... 12

   A.   The "Approved Action" the Agencies relied on was defective. ............... 13

   B.   The "baseline" for the categorical exclusion was arbitrary and capricious. ……………………………………………………………………17

   C.   Beneficial impacts must be assessed. ...................................................... 22

III.   The Analysis in the Agencies' Categorical Exclusion Process Failed to Fully Address "Extraordinary Circumstances" that Precluded Use of the Exclusion ........................................................................................... 25

IV.    Petitioners Seek Appropriate Relief. ...................................................... 26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Gov't Emps. v. Hoffman*, 543 F.2d 930 (D.C. Cir. 1976)...................19

*Andrus v. Sierra Club*, 442 U.S. 347 (1979)...............................................6

*Birckhead v. FERC*, 925 F.3d 510 (D.C. Cir. 2019).................................24

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................22

*Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Com.*, 449 F.2d 1109 (D.C. Cir. 1971)...................................................4

*Conservation Law Foundation v. FERC*, 216 F.3d 41 (D.C. Cir. 2000).................17

*Davis* v. *Michigan Dept. of Treasury*, 489 U.S. 803 (1989) ......................9

*Defs. of Wildlife v. Zinke*, 856 F.3d 1248 (9th Cir. 2017) ........................13

*Earth Island Inst. v. Muldoon*, 630 F. Supp. 3d 1312 (E.D. Cal. 2022) .......... 15, 16

*Earth Island Inst. v. Muldoon*, No. 22-16483, 2023 U.S. App. LEXIS 24105 (9th Cir. Sep. 12, 2023) ......................................15

*Envt'l Defense Fund v. Marsh*, 651 F.2d 983 (5th Cir. 1981)..................23

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...................19

*Hibbs v. Winn*, 542 U.S. 88 (2004) ......................................8

*In re Pub. Emps. for Envt'l Responsibility*, 957 F3d 267 (D.D.C 2020).. 3, 4, 20, 27

*Lamie v. United States Trustee*, 540 U.S. 526 (2004)................................5

*Magwood v. Patterson*, 561 U.S. 320 (2010)............................................................5

*Pub. Emps. for Envt'l Responsibility v. Nat'l Park Serv.*, 605 F. Supp. 3d 28

   (D.D.C. 2022) ......................................................................5

*Pub. Utils. Comm'n v. FERC*, 900 F.2d 269 (D.C. Cir. 1990)....................................5

*Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2009) ................................................22

*Sauk Prairie Conservation All. v. United States DOI*, 944 F.3d 664 (7th Cir. 2019)

   ..........................................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31 (D.C. Cir. 2015) ..............23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C.

   Cir. 2021) ..........................................................................25

*Town of Superior v. United States Fish & Wildlife Serv.*, Civil Action No. 18-cv-

   1746-MSK, 2021 U.S. Dist. LEXIS 176149 (D. Colo. Sep. 16, 2021)...............15

*United States v. Rodgers*, 461 U.S. 677 (1983) ......................................................9

*Wild Fish Conservancy v. Kempthorne*, 613 F. Supp. 2d 1209 (E.D. Wash. 2009).15

**Statutes**

42 U.S.C. § 4332...........................................................................8

49 U.S.C. § 40128(b)(1)(B) ................................................................10

49 U.S.C. § 40128(b)(2) ................................................. 1, 3, 4, 5, 6, 7, 8, 10, 11, 12

49 U.S.C. § 40128(c) ........................................................................14

49 U.S.C. § 40128(c)(2)(E)..................................................................16

49 U.S.C. § 40128(c)(3)(C) ....................................................................12

5 U.S.C. § 706(2)(A) ...............................................................................12

**Regulations**

40 C.F.R. § 1501.5(c)(2) .........................................................................23

40 C.F.R. § 1508.1(g) ..............................................................................23

40 C.F.R. § 1508.10 ...................................................................................6

40 C.F.R. § 1508.22 ...................................................................................7

40 C.F.R. § 1508.9(b) ..............................................................................23

40 C.F.R. § 1508.18(a) ...............................................................................8

40 C.F.R. § 1508.13 .................................................................................11

# GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **AR** | Administrative Record |
| **ATMP** | Air Tour Management Plan |
| **CEQ** | Council on Environmental Quality |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **FAA** | Federal Aviation Administration |
| **NEPA** | National Environmental Policy Act |
| **NPATMA** | National Parks Air Tours Management Act |
| **NPS** | National Park Service |
| **SF** | San Francisco, California |

Petitioners Marin Audubon Society et al. herein reply to the Respondents'

Brief (hereinafter "the Response") filed by the U.S. Department of Transportation

et al. (hereinafter "the Agencies").

## SUMMARY OF ARGUMENT

A.     The Agencies' invocation of a categorical exclusion under the

National Environmental Policy Act (NEPA) violated the National Parks Air

Tour Management Act of 2000 (NPATMA). The Agencies' reading of 49 U.S.C. §

40128(b)(2) contravenes Congress's plain language, which neither explicitly nor

implicitly allows for categorical exclusions for new air tour management plans

(ATMP). Further, Congress's intent was clear in NPATMA that "hard look"

environmental analysis under NEPA was vital.

B.     Even assuming, *arguendo,* a categorical exclusion was possible under

NPATMA, the Agencies' invocation of a categorical exclusion here violated NEPA

and was arbitrary and capricious. The particular categorical exclusion the Agencies

relied upon cannot apply because an ATMP does not change or amend the existing

interim operating authority, which was intended as a temporary measure to be

replaced by an ATMP with full environmental review.

The failure of their NEPA categorical exclusion to fit the 2020 San Francisco

(SF) area ATMP is sharply illustrated by the fact that in their previous 2011 attempt

to prepare the needed environmental documents for essentially the same ATMP, the

same Agencies officially declared that they would prepare a full environmental assessment (EA). Then they changed course in 2020 with no explanation.

Additionally, the "baseline" used for their environmental analysis was arbitrary and capricious. It had become far too late for the Agencies to categorically exclude the SF area ATMP, which was never before assessed under NEPA, based on a baseline of their choosing after two decades of delays.

The Response glosses over the fact that even allegedly beneficial impacts must be assessed under NEPA and compared with the impacts of other alternatives that might have different or greater benefits. In claiming net beneficial impacts, the Agencies relied on claims of numerous mitigations of the potentially significant impacts of the ongoing air tour overflights, implicitly admitting that there were significant impacts requiring environmental review. It is NEPA's very process of assessing whether proposed mitigation measures of significant impacts are beneficial, and what might be alternatives, that mandated broader public involvement through the preparation of at least an EA, and possibly an environmental impact statement (EIS), instead of invoking a categorical exclusion that allowed the Agencies to choose mitigation measures in the SF area ATMP without public input.

C.    Even if a categorical exclusion was otherwise permissible, the Agencies' process failed to fully address "extraordinary circumstances" that

precluded the exclusion for the SF area ATMP, such as the fact that the public

comment record plainly showed a high degree of controversiality as to the

Agencies' invocation of a categorical exclusion.

D.    Petitioners' Opening Brief sought appropriate relief. All parties agree

that simply vacating the current SF area ATMP would lead to an unjust result. The

larger national background to this case shows the legal standards for maintaining

jurisdiction are met here, based on the Agencies' prior unreasonable delay in

complying with NPATMA illustrated in the still-ongoing related case, *In re Pub.*

*Emps. for Envt'l Responsibility*, 957 F3d 267 (D.D.C 2020).

# ARGUMENT

## I.    The Agencies' Invocation of a Categorical Exclusion under NEPA Violated NPATMA.

Much of Petitioners' Opening Brief (hereinafter "the Opening") and the

Response is about this language in NPATMA section, 49 U.S.C. § 40128(b)(2), at

the heart of this dispute:

> ENVIRONMENTAL DETERMINATION. In establishing an air tour management plan under this subsection, the Administrator [of FAA] and the Director [of NPS] shall each sign the environmental decision document required by section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) which may include a finding of no significant impact, an environmental assessment, or an environmental impact statement and the record of decision for the air tour management plan.

For several reasons, the Response is incorrect in insisting that a categorical exclusion was allowable for the SF area ATMP under that language. As Petitioners previously demonstrated, their reading of 49 U.S.C. § 40128(b)(2) is supported by the structure and the purpose of NPATMA, which was to ensure that environmental impacts of airplane and helicopter air tours <u>were</u> rigorously assessed via transparent EIS) or  EA processes, which still has not occurred for the SF area ATMP. Opening, at 20-24.

This Court should recall this guidance in a venerable NEPA case, which refers to the same "Section 102" decision-making duties listed in § 40128(b)(2):

> Of course, all of these Section 102 duties are qualified by the phrase "to the fullest extent possible." We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging Agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the Agencies, a standard which must be rigorously enforced by the reviewing courts.

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com.*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). The 20-plus year saga of footdragging by the Agencies in preparing ATMPs with required NEPA analysis has been extensively documented by this Court. *In re Pub. Emps. for Envt'l Responsibility*, 957 F3d 267 (D.D.C 2020). That footdragging should not leave them room here to avoid complying to "the fullest extent possible" for the SF area ATMP, which means preparing an EIS or EA.

Instead, the Agencies examined the SF area ATMP in the relative "black box" of a categorical exclusion. As stated in a recent DC District Court decision, the effect of a categorical exclusion is to "excuse NEPA analysis." *Pub. Emps. for Envt'l Responsibility v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 57 (D.D.C. 2022). A categorical exclusion also evades the maxim: "An agency's primary duty under the NEPA is to 'take a "hard look" at environmental consequences.'" *Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990).

## A. Congress's intent in 49 U.S.C. § 40128(b)(2) was unambiguous and favors Petitioners' arguments.

The Response, at 24, stresses there are three possible NEPA outcomes: an EIS, an EA, or a categorical exclusion. That means Congress deliberately left one of those three items -- consisting of just <u>two</u> <u>words</u> -- off its list of possible outcomes at the end of § 40128(b)(2). The implication that Congress was trying to, perhaps, save space (!), while also adding unnecessary vagueness to the section is implausible. The more plausible reading is that Congress intentionally left categorical exclusion off its list of NEPA outcomes for ATMPs. A basic statutory interpretation rule is that courts should not add language Congress has not inserted. *Lamie v. United States Trustee*, 540 U.S. 526, 537 (2004) (courts should not add an "absent word" to a statute; "there is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted"); *Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We

cannot replace the actual text with speculation as to Congress' intent."). There is little need to speculate about Congress's intent because it is clear from the language: § 40128(b)(2) serves to prevent these two co-lead Agencies from invoking the less-transparent categorical exclusions for ATMPs rather than preparing a full EIS or EA.

The Response, at 29, argues the term "environmental decision documents" in § 40128(b)(2) is slightly different from "environmental documents," and therefore the Council on Environmental Quality's (CEQ) NEPA-implementing regulatory definition of the latter term can be set aside. However, a logical reason explains why this Court should interpret the § 40128(b)(2) term "environmental decision document" enacted in 2000 to mean the same as "environmental document" per the pre-existing definition in the 1978 CEQ regulations (first recalling the Supreme Court's direction: "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979)). That is because the NEPA documents Congress listed at the end of § 40128(b)(2) are basically the same documents the CEQ listed in the 40 C.F.R. § 1508.10 definition:

> "Environmental document" includes the documents specified in §1508.9, (environmental assessment), §1508.11 (environmental impact statement), §1508.13 (finding of no significant impact), and §1508.22 (notice of intent.)

The only item in 40 C.F.R. § 1508.10 that is not also in 49 U.S.C. § 40128(b)(2) is a "notice of intent." However, a "notice of intent" per the definition in 40 C.F.R. § 1508.22 "means a notice that an environmental impact statement will be prepared and considered." It is a mere "notice" rather than a separate environmental compliance <u>decision</u> document. Congress need not have listed "notice of intent" separately in 49 U.S.C. § 40128(b)(2). Doing so would have been redundant because the section already listed "environmental impact statement" as a possible outcome. And that Congress chose to emphasize the subset of NEPA <u>decision</u> outcomes in NPATMA explains why it inserted that word in the middle of the term "environmental decision documents." Again, neither § 40128(b)(2) nor the CEQ definition mentions a "categorical exclusion" as such a document.

**B. The Agencies' proposed reading of NPATMA is not persuasive.**

The Agencies' reading would render the list of possible NEPA outcomes in the last phrase of 49 U.S.C. § 40128(b)(2) unnecessary. If Congress had not intended the phrase "environmental decision documents" to be interpreted as limiting the NPS and FAA, then it could easily have just dispensed altogether with the list in the last phrase. There was no reason to include an incomplete, "illustrative, not exclusive" list of NEPA documents that could be "enlarged" by later interpretation. Response, at 33.

Further, the Agencies' reading violates the canon that language should not be read to be superfluous. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). The reading proposed by Petitioners is the one that gives specific meaning to the limited list of NEPA outcomes in the last phrase of § 40128(b)(2), rather than superfluity as the Agencies' does.

Still further, under the Agencies' reading, the gist of § 40128(b)(2) would have been just a redundant restatement of NEPA's applicability to the Agencies' ATMP approval decisions. However, there was no legislative need to include a provision saying NEPA applied to approving ATMPs. It applied anyway to the actions of both Agencies, as NEPA applies to virtually any "major Federal Action." 42 U.S.C. § 4332; 40 C.F.R. § 1508.18(a). It would have been superfluous for NPATMA to just re-state an open-ended list of the possible NEPA outcomes.

The Agencies then argue the point of the section was just to clarify that both FAA and NPS should <u>sign</u> the final ATMP decision documents. Response at 28, 41-42. First, it should be noted that a statutory section can (as here) serve more than one purpose. The Response's simply labeling § 40128(b)(2) as the "Signature Provision" does not limit it to that purpose. If its sole purpose was for the Agency heads to both sign the resulting documents, then 49 U.S.C. § 40128(b)(2) would

have just said that -- and not gone on to list the required documents specifically as it does. The legislative history about the signature element in § 40128(b)(2) the Response cites, at 39-43, in no way indicates that "environmental decision documents" should include "categorical exclusion" notwithstanding the glaring omission of the term from the list Congress provided.

As Petitioners previously argued, canons of interpretation are unneeded when the meaning is clear. Opening, at 16-17. Nevertheless, the Response, at 31-34, goes on at length interpreting the word "may" as granting largely unlimited discretion. However, in doing so it ignores the lesson from the Supreme Court that interpreting "may" must be done within the context of the structure and purpose of the statute, which can "defeat" the notion of unlimited discretion. *United States v. Rodgers*, 461 U.S. 677, 706 (1983); Opening, at 19-20. It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). That is where the Agencies' reading of "may include" fails; but the cases they cite generally acknowledge that statutory context is critical. A fundamental purpose of NPATMA was to ensure the environmental impacts of National Park overflights were fully addressed, which

they had never been before its passage in 2000.[1] In view of that, it is unreasonable for the Agencies to argue that "may include" means any other comparable element can be considered as added to the list at the end of § 40128(b)(2), even if that element does not advance the purpose of NPATMA. "May" is a modal verb about granting permission, in this case to select among the listed environmental decision documents, but it does not signify unlimited permission.[2]

Another rebuttal of the reading of § 40128(b)(2) proffered by the Agencies stems from the point they make about the various combinations of EAs, FONSIs, and EISs that may be involved in the NEPA process, depending on the circumstances. They say (Response at 36): "the listed documents are not disjunctive, mutually exclusive types of NEPA review." Petitioners agree. That fact underscored the need for the drafter(s) of that section to use the phrase "may include" to cover the various document combinations that might be used by the Agencies to reach the final NEPA determination.

---

[1] The Response, at 40, argues the central purpose of NPATMA was to create ATMPs, not to ensure NEPA compliance. However, as the discussion here and in the Opening makes clear, the Act's purpose to require Plans that "mitigate or prevent … adverse impacts," 49 U.S.C. § 40128(b)(1)(B), was to be realized through establishing ATMPs after NEPA impact analysis.

[2] The Response did not distinguish the analogy regarding the defined set of Supreme Court Justices and the "may include" phrase proposed in the Opening, at 20. This suggests they lacked an argument as to how that analogy does not fit here.

"May" makes sense in § 40128(b)(2) because of the inclusion of a "finding of no significant impact" (FONSI) in the list of three decision documents (to which the Response also points, at 36-37). Per its definition in 40 C.F.R. § 1508.13, a FONSI is not a standalone document. Rather, it is the agency's decision, based on an initial EA, that preparation of a full EIS is unnecessary. In short, a FONSI is always accompanied by an EA. In other circumstances, a preliminary EA could be prepared and then be followed by a full EIS for the same action. That is when there is no FONSI, rather the EA showed that significant impacts <u>are</u> likely. Thus the possible results under the statute are an EA with a FONSI, an EA followed by an EIS, or an EIS.

Thus, using the word "may" with "or" in the document list at the end of 49 U.S.C. § 40128(b)(2) made grammatical sense to denote that the environmental decision document may include any of the listed documents but no others. Contrary to the Response arguments, at 31-32, the drafter(s) could not have rationally used "shall include" there with "or" instead of "may include" because the meaning then would have been mutually exclusive/disjunct, that is, <u>only</u> one of those three decisions could be chosen for an ATMP. Using "shall include" or "only" would have conflicted with standard NEPA terminology.

None of the examples of "shall" and "may" in other NPATMA sections the Response cites, at 32, are the same as this situation in which the universe of

potential outcomes was first delimited as in § 40128(b)(2). Additionally, a careful

reading of other sections of NPATMA does reveal examples where Congress used

"may" in contexts in which agency discretion was also constrained. For example,

49 U.S.C. § 40128(c)(3)(C) "ATMP limitation," starts: "The Administrator may

grant interim operating authority under subparagraph (A) of this paragraph only if

[certain conditions were met]." Again, "may" does not mean open-ended

discretion. Further, the Response arguments, at 35-36, about the wording of other

statutes that directed agencies to prepare only an EIS or EA are unconvincing. The

different statutes reinforce that Congress has used various wording approaches to

achieve that end. The wording of § 40128(b)(2) was another variation for requiring

an EA, with a FONSI, and/or an EIS, in this case complicated (in a manner that

made addition of "only" impractical) by the added two-agency signature

requirement for both the NEPA decision and the ATMP Record of Decision.

## II.    The Agencies' Invocation of a Categorical Exclusion was Arbitrary and Capricious and Violated NEPA.

The parties agree that invocation of a categorical exclusion is reviewed

under the Administrative Procedure Act (APA) standard of "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A). Opening, at 14; Response, at 44. Petitioners have already shown above

that the categorical exclusion was "not in accordance with" NPATMA.

However, assuming, *arguendo,* that such a categorical exclusion was theoretically possible under NPATMA, nevertheless its invocation for the SF area ATMP was "not in accordance with" NEPA and was arbitrary and capricious under the APA standard:

> [I]f the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017).

## A. The "Approved Action" the Agencies relied on was defective.

The Agencies employed the NPS's categorical exclusion for "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." JA 008 (citing NEPA Handbook, Categorical Exclusion 3.3 A1, found in JA 435-472, at 464); Response, at 11-12, 44-45. Importantly, the categorical exclusion invoked is under "A. Actions Related to General Administration" and every other action listed under that heading is negligible in nature, such as "2. Minor boundary changes," whereas approving the SF area ATMP was not. Here, the Agencies labeled the "approved action" as Congress's enactment of Interim Operating Authority in 2000 for air tour operators under 49 U.S.C. § 40128(b), which Authority then was announced specifically by the FAA's Federal Register notice in 2005. JA 473-475.

13

However, the Response fails to mention this nearby cautionary language in the NEPA Handbook under the heading 3.4 "Process for Categorical Exclusions Requiring Documentation": "[t]he proposed action . . . should **easily fit** into the category of actions described by the CE [categorical exclusion]."  JA 470 (emphasis added). Here, approval of the SF area ATMP did not "easily fit" into the categorical exclusion category of changes or amendments to approved actions under the heading "General Administration"– in fact it did not fit that category at all.

The Response points to no support for the proposition that the air tour numbers the Agencies chose from 2017-2019, or the other restrictions they put on flight routes, etc., equated to "changes or amendments" to the, by then, antiquated Interim Operating Authority under which tours were allowed to operate pending establishment of an ATMP. In essence, they "grandfathered in" the pre-existing flight numbers contrary to NPATMA, which was enacted in order to fully assess and mitigate the impacts of the pre-existing overflights. Interim Operating Authority was created under a different provision, 49 U.S.C. § 40128(c), than that for the far more comprehensive ATMPs, § 40128(b), requiring different content and for a different purpose, and thus an ATMP approval is not by its terms a change or amendment to Interim Operating Authority.

These quotes directly from the SF area ATMP Record of Decision itself are on point: "IOA [Interim Operating Authority] is not property . . . . Nor was IOA intended to last indefinitely. It was intended by Congress to be a stopgap measure to preserve the status quo until an ATMP for the Parks could be established." JA 023. Further, it was not "agency action," and the authorized flight numbers were not previously assessed under NEPA.

In contrast, for the cases the Response cites, at 47, and others that approved the use of the same NPS categorical exclusion language as used here, each involved ongoing agency actions or plans that were being amended or revised and would continue in force as amended. *Earth Island Inst. v. Muldoon*, 630 F. Supp. 3d 1312, 1331 (E.D. Cal. 2022); *aff'd, Earth Island Inst. v. Muldoon*, No. 22-16483, 2023 U.S. App. LEXIS 24105 (9th Cir. Sep. 12, 2023) (National Park Fire Management Plan); *Sauk Prairie Conservation All. v. United States DOI*, 944 F.3d 664 (7th Cir. 2019) ("Program of Utilization" approved by NPS when it transferred land to a state park); *Town of Superior v. United States Fish & Wildlife Serv.*, Civil Action No. 18-cv-1746-MSK, 2021 U.S. Dist. LEXIS 176149 (D. Colo. Sep. 16, 2021) (Comprehensive Conservation Plan for a National Wildlife Refuge); *Wild Fish Conservancy v. Kempthorne*, 613 F. Supp. 2d 1209 (E.D. Wash. 2009), *rev'd on other grounds*, 628 F.3d 513 (9th Cir. 2010) (Operation and Maintenance plan for an Interior Department fish hatchery).

A key factor in the District Court decision underlying the lead case cited by the Agencies, *Earth Island Inst.*, was that the prior NPS "approved action" there <u>had</u> received full NEPA compliance, which did not occur here.

> The "approved plan" that the Projects purport to "change or amend" is the Park's 2004 Fire Management Plan ("2004 FMP") . . . . The 2004 FMP included an EIS that analyzed alternatives for carrying out fire management plans in Yosemite and the effects each would have in different areas of the park.

630 F. Supp. 3rd at 1320. Comparing the effect of the minor new changes to the FMP, the Court relied for support on the prior EIS:

> The FMP's EIS further indicates that the impact of conventional and mechanical tree removal and skidding on fishers and the Frog is "minor" and "negligible."

*Id.* at 1334.

Those cases contrast to Interim Operating Authority under § 40128(c), which would not continue in force for the San Francisco area. It was temporary authorization that Congress directed to be <u>replaced</u> by the ATMP, and it terminated 180 days after establishment of the ATMP for the Park unit involved. 49 U.S.C. § 40128(c)(2)(E).

In sum, the approved final SF area ATMP did not by its terms "change or amend" the 2005 Interim Operating Authority for the San Francisco area -- it completely supplanted that "stopgap" Authority. Instead of respecting the "easily fit" language in the NEPA Handbook, *supra*, the NPS shoehorned the concept of

"changes or amendments to an approved action" into its chosen categorical

exclusion in a way that was not in accordance with NPATMA or NEPA.

**B. The "baseline" for the categorical exclusion was arbitrary and capricious.**

Choosing the roughly estimated pre-existing air tour flight numbers from

2017-2019 as their analytical baseline when they classified the effects of their

proposed ATMP as categorically excluded was a major error by the Agencies in

which they "relied on factors Congress did not intend it to consider." Opening, at

24-31.[3] As explained above, Congress' intent was to replace the existing Interim

Operating Authority with ATMPs that mitigated harms following full

environmental analysis. Congress certainly did not intend "grandfathering" of the

pre-existing flights.[4]

---

[3] The Response, at 47, asserts the Opening was so conclusory about the non-applicability of the categorical exclusion as to "constitute forfeiture." Given the seven pages of argument on that very topic discussing the improper selection of the "approved action" baseline and how the Agencies' impacts determinations necessary to invoke the exclusion were arbitrary and capricious in several ways, the suggestion that Petitioners forfeited the argument is bizarre. Opening, at 24-31.

[4] The non-NEPA, non-NPATMA case the Agencies cite, *Conservation Law Foundation v. FERC*, 216 F.3d 41 (D.C. Cir. 2000), is distinguishable. Response, at 53-54. There, a baseline of existing conditions was allowed for relicensing of a hydroelectric dam because the directive in the Federal Power Act was to compare the impacts on fish and wildlife with and without imposing license conditions to protect them. Here the statutory directive is to analyze and mitigate the impacts of existing flights, so they cannot be the baseline.

The failure of the categorical exclusion language invoked to "easily fit" the 2020 SF area ATMP is sharply illustrated by the fact that in the previous multi-year attempt to prepare the needed environmental documents for essentially the same ATMP, the same Agencies declared in the Federal Register in 2011 that they would prepare a full EA (not invoke a categorical exclusion). *See* Opening, at 25-26. They did not arbitrarily choose Interim Operating Authority baseline flight numbers back then, even though it was only six years after those had been announced by the FAA. Nowhere does the Response actually explain why they reversed their prior decision such that the SF area ATMP could somehow "easily fit" the categorical exclusion language per the NEPA Handbook, notwithstanding the fact that the cumulative effects of the Bay Area overflights likely had increased in significance from 2011 up until the years of 2017-2019 that the Agencies used to re-define the baseline. Opening, at 28.

The Agencies weakly try to justify their NEPA course reversal from EA to categorical exclusion in 2020 by merely saying it was a "new process." Response at 48-49. But it was the same basic factual and regulatory setting under NPATMA both before and after the 2011 EA process that they failed to timely complete. Inconsistent unexplained actions when applying the same statute in the same regulatory setting are the essence of arbitrary and capricious. *Am. Fed'n of Gov't*

*Emps. v. Hoffman*, 543 F.2d 930, 946 (D.C. Cir. 1976) ("Inconsistent agency action without adequate explanation would, of course, be cause for reversal.").

The Response, at 48, points to *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), as supporting that the Agencies need not have explained their inconsistent NEPA actions. But a full reading of that opinion does not help them. The Supreme Court stated: "And of course the agency must show that there are good reasons for the new policy . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* The Agencies have not explained that at all nor does the Administrative Record.

In response to Petitioners' arguments (Opening, at 29-30) about the numbers of air tour overflights for the Badlands National Park ATMP, which had a full EA, being much fewer than the number of overflights in the SF area ATMP, which had no EA, the Response, at 50-51, dismisses the comparison (emphasis added):[5]

> Environmental Groups point to the lower number of existing air tours at Badlands (1,425) to suggest that the Agencies should have prepared an EA for the Bay Area Parks. Br. 29-30 & n.17. But **number of air**

---

[5] The Response, at 49-50, raises meritless procedural concerns about Petitioners' comparison of the SF area ATMP's categorical exclusion to the Badlands National Park's EA. They argue, "the issue is forfeit," claiming the comparison was not raised during the public comment period back in 2021. But the Badlands EA did not exist then, thus Petitioners could not cite it. Further, the Badlands flight numbers Petitioners cited were judicially noticeable public NPS records on its website.

> **tours is an empty statistic** because in the final Plan for the Parks, the Agencies are allowing no air tours at Muir Woods, only 143 plane tours per year at Point Reyes, and 2,548 tours per year at Golden Gate and San Francisco Maritime—two Parks with settings unlike Badlands. AR033

It is nonsensical for the Response to claim the "number of air tours is an empty statistic" since the baseline the Agencies used for applying their categorical exclusion rested solely on pre-existing numbers of air tours as of 2019. JA 151. If that statistic was empty for comparing overflights between two sets of National Parks, then it also was empty as the baseline for determining the crucial categorical exclusion starting point for the Agencies' analysis for the SF area ATMP. In any event, the obviously much greater number of total overflights, affected people, affected wildlife species (marine and terrestrial), affected Park units, and other factors in the Bay Area compared to the Badlands in a remote part of South Dakota provided strong indications that the SF area ATMP should have been assessed in at least an EA as well.

Further, the baseline chosen here improperly reflects the Agencies' unreasonable delay in creating ATMPs. It must be recalled that they previously engaged in nationwide delays lasting for nearly 20 years that grossly violated NPATMA. It is worth reviewing key points in *In re Pub. Emps. for Envt'l Responsibility*, 957 F3d 267, 274 (D.C. Cir. 2020) (in pertinent part, citations omitted). All of these findings apply to the SF area ATMP as well:

The Act directs the agencies to "make every effort" to rule on applications within two years, 49 U.S.C. § 40128(a)(2)(E), but after nineteen, the agencies have little to show for their labors. …. we have found far shorter delays than nineteen years to be "nothing less than egregious." . . . even the lack of a hard deadline "does not give government officials carte blanche to ignore their legal obligations.". . . . park visitors are among the Act's intended beneficiaries and the ones most harmed by the agencies' listless pace. Granting relief will aid these visitors by reducing the disruptive impacts of air tours . . . the agencies' failure to regulate air tours harms visitor welfare to some extent by exposing visitors to unmitigated noise pollution.

Thus, instead of assessing the affected environment in preparing the required SF area ATMP within a reasonable number of years after NPATMA's adoption or after the Federal Register notice of the specific Interim Operating Authority in 2005, the Agencies' "egregious" delay meant they instead assessed a baseline of average overflights from 2017-2019. By then a whole slew of conditions – including the cumulative noise impacts this Court pointed to above - had changed in the Bay Area. The Response ignores those delays. The reality flowing from the findings in this Court's decision above is that it became far too late for the Agencies to categorically exclude based on a baseline of their choosing. This is particularly so because it is undisputed that no prior government decision that previously allowed overflights in the Bay Area region was ever subject to any NEPA compliance. *See* Opening, at 27.

At 44-47, the Response cites cases where categorical exclusions have been upheld. However, the use of comparable exclusions by other agencies also have

been overturned. *See e.g.*, *Reed v. Salazar*, 744 F. Supp. 2d 98, 118 (D.D.C. 2009); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 23 (D.D.C. 2009). Each outcome depends on the NEPA posture and the facts; here, they do not favor the Agencies' position.

### C. Beneficial impacts must be assessed.

Even assuming, *arguendo*, that the "approved action" and the 2017-2019 baseline chosen by the Agencies could somehow survive legal muster, again the text of the NPS categorical exclusion invoked says: "such changes would cause no or only minimal environmental impacts." However, the Agencies' justification of "no or only minimal impacts" is contradicted by their own repeated claims of <u>beneficial</u> impacts. Response at 46 ("In fact, the Park Service found the Plan would benefit the Parks' resources and values when compared to current conditions. JA 151, JA 020-21.") and at 59 ("The Park Service found these mitigation measures would benefit the visitor experience at Point Reyes and avoid significant impacts. JA 087-090"). This reliance on mitigation of harmful effects to claim a net benefit is stressed in the final Record of Decision in which "mitigate" or "mitigation" is found a total of 19 times, on almost every page. JA 001-026.

A claim of overall beneficial effects because of mitigation does not justify a "no or only minimal impacts" determination or excuse a formal NEPA effects

analysis. Under the 2020 CEQ implementing regulations, even beneficial effects

should have been assessed:

> 40 C.F.R. § 1508.1(g) Effects. . . . Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

The need to assess claimed significant beneficial effects was articulated clearly in

*Envt'l Defense Fund v. Marsh*, 651 F.2d 983, 993 (5th Cir. 1981):

> The proper question is not the intent behind the actions, but the significance of the environmental impacts. And even if the Corps was correct in deciding that the new land use will be beneficial in impact, a beneficial impact must nevertheless be discussed in an EIS, so long as it is significant. NEPA is concerned with all significant environmental effects, not merely adverse ones.

Thus, the Agencies' admission that some mitigations here aimed to "avoid

significant impacts," Response at 59, meant they needed to be examined in at least

an EA and possibly an EIS. The Agencies' use there of "significant impacts"

proved too much.

Due to the Agencies' improper invocation of a categorical exclusion, there

has been no discussion of what is the "heart of NEPA," the consideration of

alternatives, including alternative mitigations, for the SF area ATMP. *See e.g.*,

*Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015). EAs,

as well as EISs, must include discussion of the environmental impacts of both the

proposed action and alternatives. 40 C.F.R. §§ 1501.5(c)(2), 1508.9(b); *see*

*Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (per curiam) ("an Environmental Assessment must briefly discuss reasonable alternatives to the proposed action and compare the respective environmental impacts of each."). By failing to publicly discuss any alternatives, the Agencies were able to choose the mitigation measures, and thereby their claimed beneficial effects, within a black box. Mitigation measures that could have provided more benefit to the environment and visitor experience were neither identified nor explored.

In sum, contrary to the gist of the Response, the categorical exclusion concept is not a catch-all for a mitigated action that the Agencies internally decide is more "beneficial" than the situation that already exists on the ground or, in this case, in the air. A concrete example may be clearer than air flight numbers. As a hypothetical, if one were to assume that Congress approved and directed the FAA's replacing of a large, old, never-before-NEPA-assessed, airport, which Congress had approved decades earlier, with a smaller, modern airport with plenty of environmental mitigations, there would be no doubt under NEPA that the effects of the new airport would still first need to be analyzed in an EA or EIS, notwithstanding their overall beneficial nature compared to the prior "approved action." A new airport, even with multiple mitigations, could not possibly fit under the NPS's "no or minimal environmental impacts" categorical exclusion language

the Agencies invoked here. JA 464. That language plainly was intended for only

minor actions.

It is NEPA's very process of assessing whether proposed mitigation

measures of significant impacts are beneficial, and what might be alternatives, that

mandated broader agency and public involvement. That was denied here via the

Agencies' invocation of a categorical exclusion, which they presented to other

agencies and the public as a *fait accompli.* JA 024-025.

### III. The Analysis in the Agencies' Categorical Exclusion Process Failed to Fully Address "Extraordinary Circumstances" that Precluded Use of the Exclusion.

To show that "extraordinary circumstances" precluded the categorical

exclusion, Petitioners make these additional rebuttals beyond their Opening, at 31-

37.[6] At 61-63, the Response discounts the "highly controversial" extraordinary

circumstance that precluded a categorical exclusion. However, the case cited helps

Petitioners rather than the Agencies. *Standing Rock Sioux Tribe v. U.S. Army Corps*

*of Engineers*, 985 F.3d 1032, 1042 (D.C. Cir. 2021). There, the Court recognized it

is not just the controversiality about harmful effects, but fundamental disputes as to

---

[6] As pointed to in the Response, at 60, Petitioners concede they slightly
exaggerated when asserting the NPS "formally nominated" the Golden Gate
National Recreation Area and Point Reyes National Seashore for the World
Heritage List. Opening, at 32. While the title to the Federal Register notice begins
"U.S. Nominations to the World Heritage List," the text reveals those units were
designated for "potential" nomination. This does not change the fact that the NPS
singled them out as likely suitable for international recognition.

the very "size, [and] nature" of the agency action that can render a proposed action "highly controversial." The public comments here, including from commenters with high levels of expertise, such as the National Parks Conservation Association, thoroughly criticized how the Agencies characterized the size and the nature of their action by using the baseline of "grandfathered in" flight numbers. Opening, at 34-35. The NPS's own Summary of Public Comments acknowledged they were largely about how the Agencies framed the NEPA context to invoke a categorical exclusion using a flawed baseline. JA 300. Indeed, the Record of Decision admitted as much: "Commenters in general noted concerns that an environmental analysis was not released for public review and comment and either advocated for the consideration of various alternatives or criticized that consideration and analysis of alternatives was required under NEPA." JA 024. The comments were not just asking to "ban air tours," as the Response misstates, at 62. The detailed criticisms indicated "something more" beyond just controversy about the effects of the overflights, as called for in *Standing Rock Sioux Tribe*.

## IV.    Petitioners Seek Appropriate Relief.

All parties agree that simply vacating the current SF area ATMP would lead to an unjust result. Opening, at 37, Response, at 67. Beyond that, Petitioners stand on their Opening arguments. However, they were particularly surprised to read the Agencies disputing that this Court should maintain oversight of their

NPATMA/NEPA compliance. Response, at 70. All the larger national background

to this case shows the legal standards for maintaining jurisdiction are met here,

based on the Agencies' prior "unreasonable delay" in compliance, just as the Court

continues to do in *In re Pub. Emps. for Envt'l Responsibility.* Opening, at 39-40.

There is no reason to return to the "bad old days" of assuming the FAA and NPS

will comply when it has taken them more than 20 years and a Writ of Mandamus to

get this far, yet they still are out of compliance for the SF area ATMP.[7]

Respectfully submitted,

/s/ Peter T. Jenkins
Peter T. Jenkins
D.C. Bar No. 477229
Paula Dinerstein
D.C. Bar No. 333971
Public Employees for Environmental
Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202.265.4189
pjenkins@peer.org
pdinerstein@peer.org

Attorneys for Petitioners

---

[7] Petitioners note, as they did in their Opening at i-ii and 5, that in *In re Pub. Emps. for Envt'l Responsibility,* the Court's Order of July 7, 2023, document # 2006865, denied Petitioners' Third Motion to Enforce without prejudice while pointing to the expected determination of the NPATMA/NEPA compliance issues in the present case.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit, typeface requirements and type-style requirements of the Federal Rules of Appellate Procedure and D.C. Circuit Rules.

1.  This document complies with the type-volume limitation of Fed.R.App.P 32(a)(7)(B). It contains 6,500 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman, 14 point.


/s/ Peter T. Jenkins
Peter T. Jenkins

Attorney for Petitioners