# United States Court of Appeals for the D.C. Circuit

MARIN AUDUBON SOCIETY, ET AL.,

*Petitioners*,

v.

FEDERAL AVIATION ADMINISTRATION, ET AL.,

*Respondents*.

On Petition for Review of an Order by the
Federal Aviation Administration and National Park Service

## PETITION FOR PANEL REHEARING OR REHEARING EN BANC

Peter T. Jenkins
Paula Dinerstein
PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY
962 Wayne Ave., No. 610
Silver Spring, MD 20910

Kirti Datla
Tosh Sagar
EARTHJUSTICE
1001 G St. NW, Ste. 1000
Washington, DC 20001
202.797.5241
kdatla@earthjustice.org

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104

November 27, 2024

*Counsel for Petitioners*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES .......................................................................ii

GLOSSARY .......................................................................................... v

INTRODUCTION AND RULE 35(b) STATEMENT ................................. 1

STATEMENT ........................................................................................ 4

REASONS FOR GRANTING THE PETITION ......................................... 8

    I.    I. The Party-Presentation Principle Is Foundational, And The
            Panel Majority Departed From It Here. ........................................... 8

    II.   II. The Panel Majority's Departures From That Principle Will
           Cause Severe Doctrinal And Practical Disruption. .......................... 14

CONCLUSION..................................................................................... 16

CERTIFICATE OF SERVICE ................................................................ 17

CERTIFICATE OF COMPLIANCE......................................................... 18

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
    988 F.2d 146 (D.C. Cir. 1993) ............................................................. 2, 16

*Astellas Pharma, Inc. v. Sandoz Inc.*,
    117 F.4th 1371 (Fed. Cir. 2024) ................................................................ 8

*Brodsky v. U.S. Nuclear Regulatory Commission*,
    704 F.3d 113 (2d Cir. 2013) ..................................................................... 11

*Carducci v. Regan*,
    714 F.2d 171 (D.C. Cir. 1983) ............................................................. 9, 11

*Colorado v. U.S. Environmental Protection Agency*,
    989 F.3d 874 (10th Cir. 2021) .................................................................. 9

*Debique v. Garland*,
    58 F.4th 676 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2715 (2024) ................. 8

*Department of Transportation v. Public Citizen*,
    541 U.S. 752 (2004) ................................................................................ 10

*Diamond Walnut Growers, Inc. v. NLRB*,
    113 F.3d 1259 (D.C. Cir. 1997) ............................................................ 1, 8

*Eagle-Picher Industries, Inc. v. United States*,
    937 F.2d 625 (D.C. Cir. 1991) .................................................................. 9

*Fath v. Texas Department of Transportation*,
    924 F.3d 132 (5th Cir. 2018) .................................................................. 11

*Elmen Holdings, LLC v. Martin Marietta Materials, Inc.*,
    86 F.4th 667 (5th Cir. 2023) ..................................................................... 9

*Greenlaw v. United States*,
    554 U.S. 237 (2008) .................................................................................. 8

*In re Public Employees for Environmental Responsibility*,
    957 F.3d 267 (D.C. Cir. 2020) .................................................................. 4

ii

*Ivey v. Audrain County,*
    968 F.3d 845 (8th Cir. 2020) ....................................................... 9

*Kamen v. Kemper Financial Services, Inc.,*
    500 U.S. 90 (1991) ..................................................................... 12

*Montejo-Gonzalez v. Garland,*
    119 F.4th 651 (9th Cir. 2024) ..................................................... 9

*National Association of Realtors v. United States,*
    97 F.4th 951 (D.C. Cir. 2024)..................................................... 8

*Northwest Austin Municipal Utility District Number One v. Holder,*
    557 U.S. 193 (2009) ................................................................... 12

*United States v. Akridge,*
    62 F.4th 258 (6th Cir. 2023) ....................................................... 9

*United States v. Campbell,*
    26 F.4th 860 (11th Cir.), *cert. denied*, 143 S. Ct. 95 (2022) ........... 9

*United States v. Cheveres-Morales,*
    83 F.4th 34 (1st Cir. 2023)........................................................... 8

*United States v. Dowdell,*
    70 F.4th 134 (3d Cir. 2023) ......................................................... 9

*United States v. Ford,*
    106 F.4th 607 (7th Cir. 2024) ..................................................... 9

*United States v. International Business Machines Corporation,*
    517 U.S. 843 (1996) ..................................................................... 8

*United States v. Oliver,*
    878 F.3d 120 (4th Cir. 2017) ....................................................... 9

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ...........................................................1, 8, 13

*United States ex rel. Totten v. Bombardier Corp.,*
    380 F.3d 488 (D.C. Cir. 2004).................................................... 12

*U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*,
508 U.S. 439 (1993) .................................................................. 12

STATUTES:

National Environmental Policy Act

42 U.S.C. § 4332(2)................................................................. 14

42 U.S.C. § 4332(2)(C)........................................................... 4

National Parks Air Tour Management Act

49 U.S.C. § 40128(a)(2)(D) ...................................................... 4

49 U.S.C. § 40128(b)............................................................... 4

49 U.S.C. § 40128(b)(1)(A)-(B)................................................ 4

49 U.S.C. § 40128(c) ............................................................... 5

AGENCY DOCUMENTS:

85 Fed. Reg. 43,304 (July 16, 2020) ........................................ 14

87 Fed. Reg. 23,453 (Apr. 20, 2022)............................... 2, 14, 15

Nat'l Park Service, NEPA Handbook (2015), bit.ly/npsnh15 ......... 5

OTHER AUTHORITIES:

Associated Builders & Contractors Newsline, *Federal Court Issues Major Decision Invalidating NEPA Environmental Review Regulations* (Nov. 20, 2024), bit.ly/abcnepa ....................................................2, 15

Madeline Lyskawa, *DC Circ.'s White House NEPA Upheaval Sends Shockwaves*, Law360 (Nov. 15, 2024), bit.ly/l360nepa ................ 2

Rachel Frazin, *Federal Court takes aim at White House's environment authority*, The Hill (Nov. 13, 2024), bit.ly/hillceq.................... 15

# GLOSSARY

CEQ            Council on Environmental Quality

NEPA         National Environmental Policy Act

## INTRODUCTION AND RULE 35(b) STATEMENT

This is an unusual petition, necessitated by an unusual panel decision. "In our adversarial system," federal courts "follow the principle of party presentation," under which they "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 375–376 (2020) (quotation omitted); *see also Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1263 (D.C. Cir. 1997) (en banc) ("[I]t is . . . well-established that we do not consider arguments not presented to us."); *infra* at 8 n.8 (collecting cases). The panel decision departed from that principle. The consequences of its choice to do so will reach far beyond this case, and beyond this Circuit.[1]

*First*, the panel majority became the first court to declare a nearly fifty-year old set of regulations that apply across the federal government "*ultra vires*," Op. at 8, "reaching out to address that issue," as the Chief Judge explained in dissent, though no party raised, briefed, argued, or embraced it, Dissent at 1. Its declaration is dicta, as it was not needed to resolve the claims at issue. Even so, it is demonstrably dangerous. These Council on Environmental Quality regulations implement the National Environmental Policy Act, a statute that applies to *every* federal agency. Agencies have "developed extensive experience implementing"

_____

[1] The government is assessing the panel's decision. *See* Gov't Reply Br. 4 n.1, *Seven Cnty. Infrastructure Coal. v. Eagle County*, No. 23-975 (Nov. 18, 2024).

1

the regulations, "and a large body of agency practice and case law [has] developed based on them."[2] The declaration that they are invalid "leaves so many questions unanswered" about how agencies should proceed and how courts should evaluate their decisions.[3] For that reason, even entities that dislike aspects of the regulations have expressed concern that the declaration risks "varying procedures across different federal agencies" and the "elimination of" procedures that "streamline NEPA reviews."[4] And courts (this one included) and litigants have already been asked to address the effects of the declaration.

*Second,* after agreeing with claims that petitioners had raised, the panel majority crafted a remedy that no party asked or advocated for, one that left petitioners worse off than if they had never brought this case. In doing so, it injected uncertainty into a remedial question that courts face every day: whether to vacate an invalid agency action. This Court ordinarily considers the harms that counsel against vacatur under the familiar framework in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993). The majority

---

[2] 87 Fed. Reg. 23,453, 23,454 (Apr. 20, 2022).

[3] Madeline Lyskawa, *DC Circ.'s White House NEPA Upheaval Sends Shockwaves*, Law360 (Nov. 15, 2024), bit.ly/l360nepa.

[4] Associated Builders & Contractors Newsline, *Federal Court Issues Major Decision Invalidating NEPA Environmental Review Regulations* (Nov. 20, 2024), bit.ly/abcnepa.

instead shunted those considerations into an ill-defined proceeding initiated by a motion to stay the mandate.[5] Panels and district courts in this Circuit will now have to sort out when to resort to this proceeding and define its contours.

The stark effects that the panel decision has had, and will have, call for reinforcing the party-presentation principle here. This case shows why the principle is foundational. Following it here would have allowed these issues to arise in a case because a party raised them, giving motivated parties and the court a chance to fully explore them and yielding an informed decision tailored to the facts at hand and written to avoid doctrinal and practical disarray. Not following it meant that the panel addressed under the least optimal circumstances.

This Court should grant rehearing. Doing so would allow the full Court to carefully consider the proper approach in this case before such a consequential, outlier opinion hardens into the law of this Circuit. At a minimum, if the full Court concludes that considering one or both of these issues is indeed required to resolve the case, then rehearing would provide it with an opportunity to receive directed briefing and hear argument before endorsing a decision with such far-reaching consequences.

---

[5] Consistent with the panel majority's direction, Op. at 28, petitioners anticipate filing a motion to stay the mandate in short order.

## STATEMENT

The National Parks Air Tour Management Act requires the Federal Aviation Administration, in cooperation with the National Park Service, to establish air tour management plans for national parks with "acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations." 49 U.S.C. § 40128(b)(1)(A)-(B); *see also id.* § 40128(a)(2)(D), (b). It sets timelines, but the agencies did not meet them. Congress acted to spur on the protective plans the Act requires, and this Court later ordered mandamus relief to ensure that the agencies would meet Congress's commands. *See In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 269–271, 275–276 (D.C. Cir. 2020) (summarizing history and ordering mandamus relief with an expectation that the agencies would "complete the task within two years").

This case stems from a shortcut the agencies took when carrying out the National Environmental Policy Act, which ensures that federal agencies take a hard look at actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In carrying out NEPA to produce an air tour management plan for four national park units in the San Francisco area, the agencies' thinking went like this. The Park Service's NEPA Handbook establishes a so-called "categorical exclusion[]" for "[c]hanges or amendments to an approved action" that would "cause no or only minimal environmental

4

impact."[6]  The Management Act required the FAA Administrator to grant interim operating authority for tours, to be terminated after a plan issues.  *See* 49 U.S.C. § 40128(c).  Tour flights are occurring under that interim authority.  JA148–149 (putting the average at 2,548 tours annually at two of the park units, 143 at another, and 0 at the final park unit).  Because their plan authorized a "very similar" number of tour flights and "include[d] new operating parameters designed to improve resource protections and [the] visitor experience," it would have "no or only minimal environmental impacts."  JA151.  The Park Service NEPA Handbook's categorical exclusion was therefore appropriate, and the agencies did not need to conduct further environmental analysis.  *Id.*

Petitioners challenged the plan as invalid under the Management Act and NEPA.  They argued, as relevant here, that the Management Act prohibited the use of categorical exclusions and required the agencies to prepare an environmental assessment (at a minimum).  *See* Opening Br. 15–24.  They also argued that using the baseline of flights occurring under interim measures to decide that the plan would have "no or only minimal" environmental effects violated both the Act and NEPA.  It meant that the agencies never considered the environmental effects of those flights.  *See id.* at 24–31.  The agencies defended their use

---

[6] Nat'l Park Service, NEPA Handbook § 3.3.A.1 (2015), bit.ly/npsnh15.

of the categorical exemption under the Act and NEPA. *See* Response Br. 27–55. As to remedy, "[a]ll parties agree[d] that" vacatur "would lead to an unjust result"—*more* authorized flights *without* the plan's mitigation measures—and endorsed remand without vacatur. Reply Br. 26; Response Br. 67.

At argument, a member of the panel raised questions about the Council on Environmental Quality's authority to issue regulations to implement NEPA. Counsel for both parties noted that the case did not present the issue, and neither was in a position to discuss the issue. Petitioners' counsel twice offered to submit supplemental briefing if requested. No panel member made that request.

The panel decision was unanimous on one front: The agencies erred in folding flights operating under interim authorization into the baseline for assessing the plan's environmental effects. Op. at 22–25; Dissent at 1.

Two members of the panel reframed the parties' dispute as "center[ing] on whether the Agencies complied with" the CEQ regulations. Op. at 8. Having done so, this majority declined to "address these arguments" because of its view that the regulations "are *ultra vires*." *Id.* It recognized that the parties had not briefed or argued that question. *Id.* at 9. Yet it decided to address it "once and for all" anyway because, in its view, "this issue has remained largely undetected and undecided for so many years." *Id.* at 10, 15.

The panel majority then vacated the plan, which no party requested. Though the parties had explained that vacatur would cause environmental harm, the panel majority did not address those concerns. *See id.* at 28. Instead, it told the parties to seek "a stay of [the] mandate" if they wish "to keep the current Plan in place" as the agencies correct their environmental review. *Id.*

The Chief Judge dissented on both fronts, explaining that "[n]o party . . . ask[ed]" the Court "to take either of those steps" and "in substantially similar circumstances" this Court has *not*. Dissent at 1. The majority "contravene[d] [the] established principle of party presentation" by "reaching out to address" the CEQ regulations when "no party challenge[d]" them. *Id.* (quotation omitted). There was not even a "need to consider" that issue. *Id.* at 3. As the majority's opinion shows, the agencies' use of an improper baseline fully resolved the case. *Id.* at 2–3. And the majority questioned CEQ's authority to issue binding regulations while discussing a CEQ regulation that "does not in fact bind" agencies. *Id.* at 4. As to remedy, the dissent explained that no party had asked for vacatur, and both had agreed it would be unjust. *See id.* at 4–5. On both fronts, the majority's choices did not square with this Court's precedents. *See id.* at 2 ("Time and again, we have refrained from questioning the CEQ's authority . . . because the parties did not."); *id.* at 5 ("When confronted with similar circumstances, our court has repeatedly remanded . . . without vacating.").

## REASONS FOR GRANTING THE PETITION

### I. The Party-Presentation Principle Is Foundational, And The Panel Majority Departed From It Here.

"In our adversary system, in both civil and criminal cases, in the first instance and on appeal, [courts] follow the principle of party presentation." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Courts "rely on the parties to frame the issues" and have "the role of neutral arbiter of matters the parties present." *Id.* Courts also rely on the parties to address the issues and refrain from deciding important questions without briefing or argument. *See, e.g.*, *United States v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 855 (1996) ("It would be inappropriate for us to reexamine in this case, without the benefit of the parties' briefing, whether . . . ."). The Supreme Court has said so. *See Greenlaw*, 554 U.S. at 243; *see also Sineneng-Smith*, 590 U.S. at 376. This Circuit has said so. *See, e.g.*, *Diamond Walnut Growers*, 113 F.3d at 1263; *see also Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024). Every other circuit has said so.[7]

---

[7] *See, e.g.*, *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1377 (Fed. Cir. 2024) ("By rendering its decision on a ground not raised by any party . . . , the district court disregarded the longstanding principle of party presentation."); *United States v. Cheveres-Morales*, 83 F.4th 34, 42 (1st Cir. 2023) ("[C]ourts rely on the parties to frame the issues for decision while the courts assume the role of neutral arbiter of matters the parties present." (quotation omitted)); *Debique v. Garland*, 58 F.4th 676, 684 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2715 (2024) ("Under the party-presentation rule, we normally decide only questions presented by the parties and may play only a modest initiating role in shaping the

The values this principle serves are clear.  Party presentation ensures that courts have "that assistance of counsel which the system assumes."  *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.).  Like other aspects of our system aimed at producing adversity, this ensures that the process used is the one most likely to yield a correct decision.[8]  It also ensures that courts are seen

---

arguments before us." (quotation omitted)); *United States v. Dowdell*, 70 F.4th 134, 145 (3d Cir. 2023) ("That principle ensures that courts decide only those issues argued by interested and motivated litigants."); *United States v. Oliver*, 878 F.3d 120, 126 (4th Cir. 2017) ("[O]ur adversarial system of justice is premised on the well-tested principle that party presentation is the most effective method for reaching the best outcome." (quotation omitted)); *Elmen Holdings, LLC v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 674 (5th Cir. 2023) ("[W]e normally decide only questions presented by the parties." (quotation omitted)); *United States v. Akridge*, 62 F.4th 258, 264 (6th Cir. 2023) ("Article III . . . doesn't permit federal courts to sally forth each day looking for wrongs to right." (quotation omitted)); *United States v. Ford*, 106 F.4th 607, 609 (7th Cir. 2024) ("Given the principle of party presentation, we accept the implied concession . . . , while reserving the subject for decision" where "it has been the subject of adversarial briefing." (citation omitted)); *Ivey v. Audrain County*, 968 F.3d 845, 851 (8th Cir. 2020) ("The principle of party presentation counsels against adopting theories of a plaintiff's case that he does not advance, much less one that he expressly disclaims."); *Montejo-Gonzalez v. Garland*, 119 F.4th 651, 655 n.1 (9th Cir. 2024) ("[T]he dissent's radical transformation of the appropriate analysis for this case . . . violates the well-established party presentation rule." (alteration and quotation omitted)); *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 885 (10th Cir. 2021) ("[C]ourts do not sit as self-directed boards of legal inquiry and research." (quotation omitted)); *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir.), *cert. denied*, 143 S. Ct. 95 (2022) ("[Our] system is designed around the premise that the parties . . . are responsible for advancing the facts and arguments entitling them to relief." (quotation omitted)).

[8] *See, e.g.*, *Eagle-Picher Indus., Inc. v. United States*, 937 F.2d 625, 634 n.9 (D.C. Cir. 1991) ("If a party finds that this section of our opinion suffers as a

as disinterested in the outcome of any given case or issue. *See, e.g.*, *id.* (explaining that when courts "sit as self-directed boards of legal inquiry and research," it risks "altering the character of [the] institution").

It is hard to imagine a better advertisement for the importance of the party-presentation principle than this case.

The panel majority raised the question of CEQ's authority by itself, went on to answer that question by itself, and made a consequential pronouncement in a case where that question made no difference to the outcome.[9] It is the *first* to declare that CEQ lacks authority to issue binding regulations. *Compare e.g.*, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) ("The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations . . . ."). This Court has consistently declined to address this issue when the parties have not and has instead treated the regulations as valid when they were at issue. Dissent at 2 (collecting circuit cases declining to address this issue). Other circuits do the same. *See,*

---

result of a lack of party presentation, we invite it to bring any flaws to our attention.").

[9] The majority's statement (at 8) that "[a]s the parties argue the case, it centers on whether the Agencies complied with [CEQ] regulations" is not correct. Petitioners referred to CEQ's regulations as tools to help understand the meaning of the National Parks Air Tour Management Act. *See, e.g.*, Opening Br. 16 n.6. The agencies responded in kind. *See, e.g.*, Response Br. 29.

*e.g.*, *Fath v. Texas Dep't of Transp.*, 924 F.3d 132, 136 (5th Cir. 2018) ("[A]gencies must comply with regulations by the Council on Environmental Quality."); *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 120 n.3 (2d Cir. 2013) ("The weight of authority, however, holds CEQ regulations binding on federal agencies."). The panel majority's decision to raise the issue on its own and to address it without briefing or argument deprived it of the chance to engage with the full set of arguments on that question.[10] This decision also deprived it of the chance to understand the effects its novel answer would have and to reconsider the appropriateness of giving it in this case or, at a minimum, to cabin those effects. *See Carducci*, 714 F.2d at 177 (explaining that the party presentation principle applies "especially where . . . important questions of far-reaching significance are involved" (quotation omitted)). Indeed, the majority seemed to recognize that its declaration leaves significant open questions in its wake. *See* Op. at 17 (brushing aside interpretive weight of CEQ's regulations); *id.* at 20 (discussing agency regulations that adopt CEQ's).

---

[10] *Compare* Op. at 8–22, *with* Fed. Defts.' Supp. Br. & Intvrs-Defts.' Supp. Br., *Iowa v. Council on Env't Quality*, No. 1:24-89 (D.N.D. Nov. 20, 2024), ECF Nos. 119, 122 (raising additional points despite responding to a supplemental briefing order on less than 24-hours' notice); *see also* Order at 2, *Iowa v. Council on Env't Quality*, No. 1:24-89, (D.N.D. Nov. 20, 2024), ECF No. 124 (permitting additional briefing).

Neither case the panel majority relied on (at 9) to explain its departure suffices. In one, a court asked the parties to address whether the statute they were arguing over even "existed" or had been repealed (it had), where that issue was "antecedent to and ultimately dispositive of the" parties' dispute. *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (alteration and quotation omitted). In another, a plaintiff sought relief based on federal common law, and a lower court considered relevant state law though the plaintiff raised it only on reply. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 & n.5 (1991). Neither case approves of raising important questions that the parties have not where doing so is not necessary to resolve the case, much less answering those questions without briefing or argument.

The majority next frames all statutory interpretation issues as separation of powers issues and suggests that courts must address such issues whether raised or not. *See* Op. at 9–10. Even accepting the characterization, it would not justify addressing CEQ's authority, much less doing so without the parties' participation. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009) ("[T]he importance of the question does not justify our rushing to decide it. Quite the contrary: Our usual practice is to avoid the unnecessary resolution of constitutional questions."); *see also United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) (Roberts, J.) (stating that no doctrine

"favor[s] avoiding one question of statutory interpretation" the parties raised "by proposing, and then answering, a different one not posed by the parties").

The panel majority's remedy decision likewise illustrates the value of party presentation. The parties raised and addressed the question of the appropriate remedy; the panel did not raise the issue at argument. It then "order[ed] a remedy that no party desires"—vacatur full stop—that the dissent described as "out of step with [this Circuit's] decisions in like circumstances." Dissent at 4, 5–7 (discussing cases). The majority did not address whether vacatur would cause environmental harm. Instead, it offered a separate proceeding to stay the mandate as a way to consider those effects, one that "perhaps" could include "intervenors or amici." Op. at 28. The contours of and standards for that proceeding are unclear. *See id.* (suggesting that two panel concurrences and a statement respecting the Supreme Court's denial of a stay pending appeal provide guidance). Had the majority given the parties an opportunity to address its views, it might have avoided injecting uncertainty into a remedial question that arises on a near-daily basis.

Though the party presentation principle is "not ironclad," whatever the "circumstances in which a modest initiating role for a court is appropriate," they did not exist here. *Sineneng-Smith*, 590 U.S. at 375–376. Reinforcing the principle here is a simple enough task. Section II of the opinion can be excised, and

Section IV can be revised to provide the remedy that the parties agreed was appropriate and would not leave petitioners worse off.

## II. The Panel Majority's Departures From That Principle Will Cause Severe Doctrinal And Practical Disruption.

The panel majority's decision has already had, and will have, stark consequences that support rehearing to excise the statements that stem from its departures from the party-presentation principle.

Declaring CEQ's regulations implementing NEPA "*ultra vires*" kicks the foundation out from under a statute that agencies across the federal government implement on a daily basis.[11] NEPA applies to "all agencies of the Federal Government," 42 U.S.C. § 4332(2), and the CEQ regulations date back nearly 50 years to 1978. As multiple Administrations have recognized, "agencies developed extensive experience implementing the 1978 regulations, and a large body of agency practice and case law developed based on them." 87 Fed. Reg. at 23,454; 85 Fed. Reg. 43,304, 43,305 (July 16, 2020) ("[A]n extensive body of case law interpreting NEPA and CEQ's implementing regulations drives much of agencies' modern day practice."). The regulations, for example, contain

---

[11] The panel majority's declaration was not needed to resolve the case. *See* Op. at 22–25 (resolving the case without reference to the CEQ regulations); *id.* at 17 (dismissing Supreme Court precedent as "stray remark[s] on an issue the parties neither raised nor discussed in any meaningful way"). That it is dicta has not diminished its effects.

longstanding definitions of key terms and "streamlining procedures" that "make the statute workable."[12]

The panel majority's declaration leaves many questions open, *see supra* at 11, and courts and litigants have already begun asking them. Parties have raised it in cases pending in this Court.[13] Other courts have ordered supplemental briefing in cases pending before them.[14]

Given the scope of the statute and the depth of experience with the regulations, the government has explained that even just altering them risks "uncertainty and confusion" for agencies. 87 Fed. Reg. at 23,463. Casting doubt on their validity in their entirety does much worse. That is why even entities that take issue with some of the regulations have sounded alarm about the decision's "potentially . . . wide-ranging implications for federal permitting actions."[15]

The panel majority's remedy decision risks disruption too. Courts and parties in this Circuit facing similar circumstances will have to reconcile the

---

[12] Rachel Frazin, *Federal Court takes aim at White House's environment authority*, The Hill (Nov. 13, 2024), bit.ly/hillceq.

[13] *See* Letter, *City of Port Isabel v. FERC*, Nos. 23-1174, 23-1221 (D.C. Cir. Nov. 13, 2024); Letter, *Healthy Gulf v. FERC*, No. 23-1226 (D.C. Cir. Nov. 14, 2024).

[14] *See* Minute Order, *Healthy Gulf v. Haaland*, 1:23-cv-604 (D.D.C. Nov. 15, 2024); *supra* at 11 n.10.

[15] Associated Builders & Contractors Newsline, *supra* n.4.

panel decision with the precedents the dissent identified and work to define the stay-the-mandate proceeding that the majority suggested. Because other circuits view this Court's *Allied-Signal* framework as "an instructive test for determining when a court should remand without vacating the agency's action," *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015), the decision also risks exporting confusion to those circuits.

## CONCLUSION

For these reasons, this Court should grant the rehearing petition.

November 25, 2024

Paula N. Dinerstein
Peter T. Jenkins
PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY
962 Wayne Ave., Ste. 610
Silver Spring, MD 20910

Respectfully submitted,

/s/ Kirti Datla

Kirti Datla
Tosh Sagar
EARTHJUSTICE
1001 G Street NW, Suite 1001
Washington, DC 20001
202.797.5241
kdatla@earthjustice.org

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I certify that this petition was electronically filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on November 27, 2024. I certify that this petition was served on counsel for all parties via email and the Court's CM/ECF system.

November 27, 2024                    /s/ Kirti Datla

                                     Kirti Datla
                                     EARTHJUSTICE
                                     1001 G Street NW, Suite 1001
                                     Washington, DC 20001
                                     202.797.5241
                                     kdatla@earthjustice.org
                                     *Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE**

This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,894 words, excluding the parts of the petition exempted by Rule 32(f).

This petition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Office Word for Microsoft 365 in Calisto MT 14-point font.

November 27, 2024

/s/ Kirti Datla

Kirti Datla
EARTHJUSTICE
1001 G Street NW, Suite 1001
Washington, DC 20001
202.797.5241
kdatla@earthjustice.org
*Counsel for Petitioners*

**ADDENDUM**

**TABLE OF CONTENTS**

Rule 35(c) Certificate of Parties and Amici Curiae ......................................... 1

Rule 26.1 Corporate Disclosure Statement ..................................................... 2

Opinion (D.C. Circuit Nov. 12, 2024) ............................................................ 3

# RULE 35(c) CERTIFICATE OF PARTIES AND AMICI CURIAE

This case is a petition for review of agency orders issued by respondents that was filed directly in this Court. The requirement of Circuit Rule 28(a)(1)(A) to list the parties, intervenors, and amici that appeared below does not apply.

**Parties**: Petitioners are Laura Chariton, Marin Audubon Society, Public Employees for Environmental Responsibility, and Watershed Alliance of Marin. Respondents are the U.S. Department of Transportation, Federal Aviation Administration and the U.S. Department of the Interior, National Park Service. There currently are no intervenors or amici.

**Ruling Under Review**: The ruling under review is the unnumbered final order of the respondents issuing a Record of Decision implementing the National Parks Air Tour Management Act that is dated January 10, 2023 and was released on January 17, 2023. It was not published in the Federal Register. A copy was filed with the Petition for Review on March 13, 2023.

**Related Case**: This case has not previously been before this Court or any other court. Some of the petitioners here previously obtained a writ of mandamus from this Court that relates to these agencies' compliance with the National Parks Air Tour Management Act. *In re Public Employees for Environmental Responsibility*, No. 19-1044 (D.C. Cir.).

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Marin Audubon Society is a non-profit, tax-exempt corporation head-quartered in Mill Valley, California. Its purpose is to conserve and restore natural ecosystems in Marin County, focusing on birds, other wildlife, and their habitats, for the benefit of humanity and the Earth's biological diversity. Marin Audubon Society has no parent companies and no publicly owned company has a 10% or greater ownership interest in it.

Watershed Alliance of Marin is a 501(c)(3) nonprofit, tax-exempt corporation headquartered in Mill Valley, California. The Alliance's purposes include protecting the streams, watersheds, and wildlife of Marin County. Watershed Alliance of Marin has no parent companies and no publicly owned company has a 10% or greater ownership interest in it.

Public Employees for Environmental Responsibility is a non-profit, tax-exempt corporation incorporated in the District of Columbia. Its purposes include educating employees of resource management and environmental protection agencies nationwide and the public about environmental ethics and assisting those who speak out on behalf of environmental ethics. It has no parent companies and no publicly owned company has a 10% or greater ownership interest in it.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 19, 2024      Decided November 12, 2024

No. 23-1067

MARIN AUDUBON SOCIETY, ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION, U.S. DEPARTMENT OF
TRANSPORTATION AND NATIONAL PARK SERVICE, U.S.
DEPARTMENT OF THE INTERIOR,
RESPONDENTS

———

On Petition for Review of an Order
of the Federal Aviation Administration

———

*Peter T. Jenkins* argued the cause for petitioners. With him
on the briefs was *Paula Dinerstein*.

*Justin D. Heminger*, Attorney, U.S. Department of Justice,
argued the cause for respondents. With him on the brief were
*Todd Kim*, Assistant Attorney General, and *Robert P. Stockman*,
Attorney.

Before: SRINIVASAN, *Chief Judge*, HENDERSON, *Circuit
Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM with respect to Parts I and III.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH with respect to Parts II and IV.

Concurring opinion filed by *Senior Circuit Judge* RANDOLPH with respect to Part IV.

Dissenting opinion filed by *Chief Judge* SRINIVASAN with respect to Parts II and IV.

## I.

The Federal Aviation Administration is an agency within the Department of Transportation.  The National Park Service is an agency within the Department of the Interior.  The National Parks Air Tour Management Act of 2000 requires these two agencies to work together in developing plans regulating tour flights over national parks throughout the United States.  *See* Pub. L. No. 106-181, §§ 801–809, 114 Stat. 61, 185–94 (2000) (codified as amended at 49 U.S.C. § 40128 and note).

To that end, the Agencies issued an Air Tour Management Plan governing tourist flights over four national parks near San Francisco, California: the Golden Gate National Recreation Area, Muir Woods National Monument, San Francisco Maritime National Historical Park, and Point Reyes National Seashore.  The Agencies determined that there was no need to prepare an environmental analysis under the National Environmental Policy Act because their Plan, as compared to what existed, would cause minimal additional or no environmental impact.

A group of organizations and one area resident brought this direct review action to set aside the Agencies' Plan.

A.

The National Parks Act requires commercial air operators to obtain approval from the FAA before conducting tourist flights over a national park. 49 U.S.C. § 40128(a)(1)–(2). The FAA may not approve an operator's application without first, "in cooperation with" the Park Service, developing an Air Tour Management Plan for the park. *See id.* § 40128(a)(2)(D).

"The objective of any [Plan] shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." *Id.* § 40128(b)(1)(B). Such a Plan can prohibit air tours altogether or it may impose lesser limitations, including particular "routes, maximum or minimum altitudes, time-of-day restrictions," "maximum number of flights per unit of time," and "mitigation of noise, visual, or other impacts." *Id.* § 40128(b)(3)(B). In formulating their plan, the Agencies must comply with the National Environmental Policy Act, *id.* § 40128(b)(2), and their Plan must go through notice and comment procedures, *id.* § 40128(b)(4)(B).

The Parks Act specifies that the FAA "shall make every effort to act on any [commercial air tour operator's] application . . . and issue a decision on the application not later than 24 months after it is received or amended." *Id.* § 40128(a)(2)(E). Recognizing that the process could take substantial time, Congress directed the FAA to enable existing air tour operators to apply for "interim operating authority." *Id.* § 40128(c)(1). Interim operating authority enables operators already conducting air tours to continue doing so while the Agencies develop

a Plan. Interim operating authority terminates 180 days after a Plan is put in place. *Id.* § 40128(c)(2)(E).

The Parks Act also allows the Agencies to enter into voluntary agreements with tour operators in lieu of establishing a Plan. *Id*. § 40128(b)(7). A voluntary agreement need not undergo formal notice and comment procedures and is not subject to NEPA. *See id*. § 40128(b)(7)(C).

B.

NEPA requires federal agencies to prepare "a detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "'NEPA itself does not mandate particular results' in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 US. 752, 756–57 (2004) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989)).

The detailed environmental impact statement must analyze the "environmental impact of the proposed action," any unavoidable "adverse environmental effects" of the action, and potential alternatives to the action. 42 U.S.C. § 4332(2)(C) (1970) (amended June 3, 2023).

According to regulations issued by the Council on Environmental Quality—about which more later—if the proposed action "[i]s not likely to have significant [environmental] effects or the significance of the effects is unknown," then the agency can prepare an environmental assessment. 40 C.F.R. § 1501.3(a)(2) (2020); *see generally* 42

U.S.C. § 4342. An environmental assessment under CEQ's detailed regulations is a more concise document through which the agency either (i) determines that the action will have significant environmental impacts of a kind requiring an environmental impact statement or (ii) makes a finding of no significant impact, in which case no environmental impact statement is needed. 40 C.F.R. § 1501.5 (2020); *see also id.* § 1501.6 (2020).

CEQ regulations also state that the agency may forgo preparing an environmental impact statement or an environmental assessment if the proposed action is "categorically excluded" from NEPA's usual requirements because it "[n]ormally does not have significant effects" on the environment. *Id.* § 1501.3(a)(1) (2020).

## C.

Congress, as noted, directed these Agencies to "make every effort" to complete a Plan within twenty-four months of an air tour operator's application. 49 U.S.C. § 40128(a)(2)(e). The Agencies, though, became mired in "infighting" and "squabbles." *In re Pub. Emps. for Env't Resp.* (*In re PEER*), 957 F.3d 267, 270 (D.C. Cir. 2020). As of 2020, "applications [had] been pending at twenty-five parks for nearly two decades," but the Agencies had "fulfilled their statutory mandate at only two," albeit even in those instances by reaching voluntary agreements with air tour operators rather than by establishing Plans. *Id.* at 269–71.

Because of the Agencies' inaction, our court granted a petition for a writ of mandamus to compel the Agencies to bring all twenty-three parks with pending applications—including the four parks at issue in this case—into compliance with the Act. *Id.* at 275. Our court also retained jurisdiction to monitor the Agencies' progress. *Id.* at 275–76.

In 2011, the Agencies announced their intent to develop a Plan and prepare an environmental assessment for the Bay Area Parks. Notice of Intent to Prepare an Environmental Assessment, 76 Fed. Reg. 45,312 (July 28, 2011). No environmental assessment was ever completed, however.

That is because the Agencies halted the process for developing Plans and environmental assessments/environmental impact statements at ten parks—including the Bay Area Parks—after Congress amended the Parks Act in 2012. Termination of Previously Initiated Processes for the Development of Air Tour Management Plans and Environmental Assessments/Environmental Impact Statements for Various National Park Units, 85 Fed. Reg. 55,060, 55,060 (Sept. 3, 2020). The Agencies then formally "terminat[ed]" those processes in September 2020. *Id.* The initial pause was "due to a focus on other program priorities," namely "the development of Voluntary Agreements" with tour operators because those agreements "do not require compliance with NEPA." *Id.* The Agencies then terminated the paused processes because, "[g]iven the length of time since [they] were initiated and actively worked, termination" would "allow the agencies to start anew with the development of [Plans] and associated environmental documents at these and other parks." *Id.*

Upon restarting the Plan process, the Agencies decided to prepare a single Plan for all four Bay Area Parks. They did so because of the "close proximity of the parks, including shared borders," and "the fact that the same operators conducted tours over" three of the parks, with some routes "overfl[ying] multiple parks." U.S. Dep't of Transp., Fed. Aviation Admin. & U.S. Dep't of the Interior, Nat'l Park Serv., *Record of Decision: Air Tour Management Plan for Golden Gate National Recreational Area, Muir Woods National Monument, San Francisco Maritime*

*National Historical Park, and Point Reyes National Seashore* 4 (Jan. 10, 2023) (Record of Decision).

For purposes of their NEPA analysis, the Agencies used existing air tours to determine the environmental baseline against which they would assess the Plan's environmental impact. At the time, two companies possessed interim operating authority to conduct flights over the Bay Area Parks. On paper, those operators together had authority to conduct 5,090 tours per year over the four Parks. Fewer flights were actually flown, however, and the Agencies decided to use the average annual number of actual flights to identify the baseline existing condition. The Agencies calculated that the operators conducted an annual average of 2,548 tours over Golden Gate and San Francisco Maritime from 2017 to 2019, and that 143 of those tours also flew over or close to Point Reyes. The Agencies treated that average volume as the existing environmental condition of the Bay Area Parks.

The final Bay Area Parks Plan authorizes maintaining that "existing condition," albeit "with measures designed to mitigate impacts [of the flights] on the Parks' resources and visitor experience." *Id*. at 7. Thus, the Plan authorizes 2,548 tours over Golden Gate and San Francisco Maritime, 143 of which may also fly over Point Reyes, but with certain limitations. For example, the Plan specifies the kinds of aircraft operators can use, imposes daily flight caps, and alters existing routes and schedules to avoid disturbing wildlife and impinging on visitors' aesthetic experiences.

The Agencies concluded that they did not need to prepare an environmental assessment or environmental impact statement for "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." *Id*. at 8. The Agencies determined that the "impacts

[of the Plan] will be *beneficial* compared to current conditions." *Id.* (emphasis added). That was because the Plan would maintain the existing number of flights, currently flying under interim operating authority, but would reduce their environmental impacts through the prescribed mitigation measures. *Id.*

In light of that conclusion, the Agencies finalized the Bay Area Parks Plan without completing any environmental assessment or environmental impact statement. Record of Decision, *supra*, at 9, 20–21; Record of Decision, *supra*, app. C (Categorical Exclusion Documentation Form) at 13–17.

The Record of Decision for the Plan was a final order of the FAA, which we have jurisdiction to review. 49 U.S.C. § 46110(a); *id.* § 40128(b)(5).

## II.

As the parties argue the case, it centers on whether the Agencies complied with regulations of the Council on Environmental Quality, an entity within the Executive Office of the President. We will not address these arguments. The CEQ regulations, which purport to govern how all federal agencies must comply with the National Environmental Policy Act, are *ultra vires*.

CEQ traces its rulemaking authority not to legislation but to an Executive Order of the President. But "an executive order is not 'law' within the meaning of the Constitution." *California v. EPA*, 72 F.4th 308, 318 (2023). The Supreme Court, in one of its most significant separation of powers decisions, ruled that the Constitution does not permit the President to seize for himself the "law-making power of Congress" by issuing an order that, "like a statute, authorizes a government official to

promulgate . . . rules and regulations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952). The Court reiterated and emphasized this point in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1970): "The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by government departments and agencies must be rooted in a grant of such power by the Congress and subject to the limitations which that body imposes." *Id.* at 302.[1]

Yet both sides in this case took for granted CEQ's authority to issue binding NEPA regulations. Although questions about this were raised at oral argument, no party sought leave to file a post-argument brief. That is understandable. Petitioners claimed that the Agencies violated CEQ regulations; the Agencies denied the charge and defended by invoking CEQ regulations.

Despite the parties' acquiescence in CEQ's regulatory authority, we "retain[] the independent power to identify and apply the proper construction of governing law," and that is especially true when "the proper construction is that a law does not govern because it is not in force" or is not legally binding. *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (first excerpt quoting *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 99 (1991)). Here, CEQ's authority to issue regulations on the basis of an Executive Order raises what is essentially a "separation of powers" issue. *Mexichem Fluor,*

---

[1] *See, e.g.*, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[N]o matter how 'important, conspicuous, and controversial' the issue, and regardless of how likely the public is to hold the Executive Branch politically accountable, . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress.").

*Inc. v. EPA*, 866 F.3d 451, 453 (D.C. Cir. 2017) (Kavanaugh, J.). "To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III . . . ." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986); *see also Freytag v. Commissioner*, 501 U.S. 868, 878–89 (1991); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 232 (1995); *Bahlul v. United States*, 840 F.3d 757, 760 n.1 (D.C. Cir. 2016) (en banc) (Kavanaugh, J., concurring).

There are good reasons, indeed there are compelling reasons, for us to determine the validity of the CEQ regulations once and for all. Over many years, our court has expressed serious concerns about whether CEQ's regulations had any "binding effect" because it was "far from clear" that CEQ had any "regulatory authority under [NEPA]." *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 n.5 (D.C. Cir. 2006) (quoting *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006); *City of Alexandria v. Slater*, 198 F.3d 862, 866 n.3 (D.C. Cir. 1999)); *see also Grand Canyon Tr. v. FAA*, 290 F.3d 339, 341 n.* (D.C. Cir. 2002); *Food & Water Watch v. U.S. Dep't of Agric.*, 1 F.4th 1112, 1118 (D.C. Cir. 2021) (Randolph, J., concurring). It is time for our court's long-standing misgivings to be put to the test: "where there is so much smoke, there must be a fair amount of fire, and we would do well to analyze the causes." Henry J. Friendly, *A Look at the Federal Administrative Agencies*, 60 Colum. L. Rev. 429, 432 (1960).

A.

The National Environmental Policy Act of 1969 required each federal agency to issue a "detailed statement" addressing the environmental impact of any proposed "major Federal

action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). All federal agencies were required to develop procedures implementing NEPA. *Id.* § 4332(2)(B). NEPA also created a "Council on Environmental Quality" within the Executive Office of the President, to be run by three Commissioners appointed by the President and confirmed by the Senate. *Id.* § 4342. CEQ's job was to "review and appraise" agencies' compliance with NEPA; to "make recommendations to the President with respect thereto"; and to "develop and recommend to the President national policies to foster and promote the improvement of environmental quality." *Id.* § 4344(3)–(4).

In 1970, President Nixon issued an Executive Order instructing CEQ to "[i]ssue guidelines to Federal agencies for the preparation of" the "detailed statements" NEPA required. Exec. Order No. 11514, § 3(h), 35 Fed. Reg. 4247, 4248 (Mar. 7, 1970). In response, CEQ published a "memorandum" containing "guidelines" for federal agencies considering environmental impact statements. 36 Fed. Reg. 7724, 7724 (Apr. 23, 1971).

At the time, several courts concluded that CEQ's role was "merely advisory" because it lacked any "authority to prescribe regulations governing compliance with NEPA." *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 424 (5th Cir. 1973) (citing *Greene Cnty. Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412, 421 (2d Cir. 1972)). These courts and others therefore viewed CEQ's guidelines as non-binding suggestions to assist agencies in developing their own NEPA procedures. *See Aertsen v. Landrieu*, 637 F.2d 12, 17 (1st Cir. 1980); *Nat'l Helium Corp. v. Morton*, 455 F.2d 650, 656 (10th Cir. 1971).

CEQ held a quite different view. It considered its guidelines to be mandatory, "non-discretionary standards for

agency decision-making." 43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978). These divergent views were at the center of *Sierra Club v. Morton*, 514 F.2d 856 (D.C. Cir. 1975). Our court sided with CEQ, treating its NEPA guidelines as the equivalent of legally binding rules, entitled to "great respect" and "heightened" "deference," and rejected the Department of the Interior's environmental impact "statement" (a "statement" consisting of many thick volumes) because it failed to comply with those guidelines. *Id.* at 873 & n. 24.

When the case reached the Supreme Court, the Solicitor General—in a quasi-confession of error—advised the Court that CEQ's guidelines were not mandatory and "do not bind agencies of the Executive branch." Brief for the Petitioners at 31 n.24, *Kleppe v. Sierra Club*, 427 U.S. 390 (1976) (Nos. 75-552 & 75-561). As a result, the Supreme Court's *Kleppe v. Sierra Club* opinion, which reversed the D.C. Circuit, made no mention of CEQ or its guidelines.

In 1977, President Carter took office and issued Executive Order 11991, 42 Fed. Reg. 26,967 (May 25, 1977), apparently in response to the Solicitor General's position in the *Kleppe* Supreme Court case. President Carter's Executive Order was meant to empower CEQ to issue "regulations," rather than "guidelines," "to Federal agencies for the implementation of the procedural provisions of [NEPA]." *Id.* His Executive Order required all federal agencies to "comply with the regulations issued by [CEQ]" unless doing so would violate federal law. *Id.* at 26,968. President Carter imposed these duties "[b]y virtue of" his authority as President and "in furtherance of the purpose and policy" of NEPA and several other environmental laws. *Id.* at 26,967. In so doing, he embarked on "the most ambitious presidential foray into the nation's environmental protection effort: the transformation of the CEQ from an advisory entity into a regulatory agency." Scott C. Whitney, *The Role of the*

*President's Council on Environmental Quality in the 1990's and Beyond*, 6 J. Env't L. & Litig. 81, 84 (1991).

In compliance with President Carter's Executive Order, CEQ issued what amounted to a massive new body of law "binding on all Federal agencies," the federal courts, and the non-federal litigants in NEPA cases and setting forth "uniform standards applicable throughout the Federal government." 43 Fed. Reg. 55,978–79 (Nov. 29, 1978). In its initial foray, CEQ issued ninety-two NEPA mandatory regulations, many with numerous subparts containing extensive detailed and intricate explanations and directives. CEQ's 1978 regulations replaced "some seventy different sets of agency regulations," leaving the other Executive and independent agencies with only the residual authority to "issue implementing procedures" for applying CEQ's mandates. *Id.* As authority for its regulations, CEQ invoked Executive Order 11991 and "the President's Constitutional and statutory authority." *Id.*

Those original CEQ regulations erected a framework that largely remains in effect to this day. The regulations described the "detailed statement" NEPA requires for proposed agency action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.11 (1978). An agency must begin by determining whether the proposed action would have a significant environmental effect, and then document its findings in a concise statement CEQ called an "environmental assessment." *Id.* §§ 1501.3–.4, 1508.9. If the agency finds that the action's environmental effect would be significant, it must prepare an "environmental impact statement." *Id.* If it does not so find, the agency must issue a "finding of no significant impact" documenting its conclusion. *See id.* § 1508.13.

CEQ also permitted agencies to comply with NEPA in one

other way: by invoking what CEQ—coining a phrase—called a "categorical exclusion." *See id.* §§ 1501.4, 1508.4. Under the regulations, an agency may identify categories of actions that have no significant environmental effects. *Id.* If a proposed action fits into one of those categories, the agency can invoke the categorical exclusion and avoid preparing an environmental assessment or an environmental impact statement. *Id.*[2]

In January 2023, the Park Service and the FAA issued a plan to manage commercial air tours over several national parks in and around San Francisco. In explaining their environmental analysis, they repeatedly relied on CEQ's NEPA regulations. *See* J.A. 8–9, J.A. 20–21, 24–25, 58, 151, 159–63. They asserted that they had complied with NEPA by applying the Park Service's categorical exclusion for "[c]hanges or amendments to an approved action when such changes would cause no or only minimal environmental impacts." J.A. 8–9.

## B.

Federal agencies, whether executive agencies like the FAA and the Park Service or independent agencies like the Nuclear Regulatory Commission and the Federal Energy Regulatory

---

[2] The National Parks Act contains one provision incorporating five CEQ regulations dealing mainly with the coordination between agencies in making NEPA determinations. 49 U.S.C. § 40128(b)(4)(c). Those regulations are not at issue, and CEQ has revised them since passage of the National Parks Act in 2020 and 2024. Noticeably absent even from the National Parks Act's incorporation is CEQ's regulation dealing with "categorical exclusion," which is at issue in this case.

Commission,[3] are creatures of statute and as such "literally ha[ve] no power to act" except to the extent Congress authorized them. *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). For CEQ's regulations to be legally binding on agencies, courts, and the public, "it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Chrysler*, 441 U.S. at 304. Then-Judge Kavanaugh put it this way: "The separation of powers and statutory interpretation issue that arises again and again in this Court is whether an executive or independent agency has statutory authority from Congress to issue a particular regulation." *Mexichem*, 866 F.3d at 453.

The "separation of powers and statutory interpretation issue" that CEQ's regulations present is thus unremarkable. What is quite remarkable is that this issue has remained largely undetected and undecided for so many years in so many cases.

One apparent reason for the oversight is that CEQ publishes its "regulations" in the Code of Federal Regulations, as if that were a credential. The temptation for litigants and courts is to treat publication in the C.F.R. as equal to publication in the United States Code. Trouble is that publication in the C.F.R. is no measure of an agency's authority to issue rules that appear there, as Professor Merrill has explained. Thomas W. Merrill, *Judge Williams on Administrative Law*, 16 N.Y.U. J. L. & Liberty 98, 100–02 (2022) (discussing *Health Ins. Ass'n v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994)). The provisions of

---

[3] The Federal Energy Regulatory Commission is a five-member "independent regulatory commission" within the Department of Energy. 42 U.S.C. § 7171(a). Both it and the Nuclear Regulatory Commission are considered independent agencies pursuant to 44 U.S.C. § 3502(5).

NEPA provide no support for CEQ's authority to issue binding regulations. No statutory language states or suggests that Congress empowered CEQ to issue rules binding on other agencies—that is, to act as a regulatory agency rather than as an advisory agency.[4] NEPA contains nothing close to the sort of clear language Congress typically uses to confer rulemaking authority. *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 471–76 (2002).

No statute confers rulemaking authority on CEQ. President Carter's Executive Order cited section 309 of the Clean Air Act. 42 Fed. Reg. 26,967 (May 25, 1977). Under this provision, the Administrator of the Environmental Protection Agency reviews the environmental impact of other federal agencies' proposed actions. 42 U.S.C. § 7609(a). If the EPA Administrator finds that the proposed action is "unsatisfactory" from an environmental-quality standpoint, he must "publish his determination" and refer the matter to CEQ. *Id.* § 7609(b). That provision is consistent with CEQ's advisory role; it says nothing about CEQ's rulemaking authority. The Executive Order also cites the Environmental Quality Improvement Act of 1970, which established an Office of Environmental Quality headed

---

[4] The legal status of the Council of Economic Advisors, another entity in the Executive Office of the President, provides an example and a contrast. As our court observed, the duties Congress assigned to the Council of Economic Advisors "are, for all practical purposes, identical" to the duties Congress assigned to CEQ. *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1041–42 (D.C. Cir. 1985) (citing 15 U.S.C. § 1023(c)). Unlike CEQ, no Executive Orders "expanded" the powers of the Council of Economic Advisors and it has remained exactly where Congress initially put it: in "the realm of entities the sole function of which is to advise and assist the President." *Id.*

by the chairman of CEQ. 42 U.S.C. § 4372(a). Even as the director of that Office, however, CEQ's chairman only has the authority to "assist[]" other federal agencies. *Id.* § 4372(d)(2), (5), (6). The Chairman may "promulgate regulations" but only related to a fund used to finance the Office's projects and research studies.[5] *Id.* § 4375.

The Supreme Court's pronouncements in this area cannot rescue CEQ's regulations. The Court once wrote that CEQ's regulations under NEPA are "entitled to substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979). But that *Chevron*-like statement did not result from an examination of CEQ's authority to issue judicially enforceable regulations and cannot be credited in light of the Supreme Court's ruling in *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244 (2024). In another case, the Supreme Court stated that CEQ was "established by NEPA with authority to issue regulations interpreting it." *Pub. Citizen*, 541 U.S. at 757. The statement appeared without any accompanying legal analysis. We must obey "carefully considered language of the Supreme Court, even if technically dictum." *Winslow v. FERC*, 587 F.3d 1133, 1135 (D.C. Cir. 2009) (quoting *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006)). But we are not bound by every stray remark on an issue the parties neither raised nor discussed in any meaningful way. *See Webster v. Fall*, 266 U.S. 507, 511 (1925); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821) (Marshall, C.J.).

---

[5] Also worth mentioning is the "housekeeping statute," 5 U.S.C. § 301, which empowers "the head of an Executive department" to "prescribe regulations for" the governance of his department and its operations. This is "simply a grant of authority to the agency to regulate its own affairs" and internal functions. *Chrysler*, 441 U.S. at 309.

The CEQ regulations are by no means a mere delegation of the President's authority under the Take Care Clause.  *See* U.S. Const. art. II, § 3; 3 U.S.C. § 301; *see also* Whitney, *supra*, at 91.  Executive Orders focused solely on the internal management of the Executive Branch create no private rights and are not judicially reviewable.  *California v. EPA*, 72 F.4th at 318.  NEPA, by contrast, "imposes statutory obligations that agencies must execute consistent with the requirements of the APA," and affect private parties who may seek judicial review of agencies' compliance.  *Id.* (citing *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).[6] If all federal agencies are bound by the CEQ regulations and must follow them in carrying out their obligations under NEPA, and if the regulations are enforceable by courts, then those regulations cannot be justified solely as an exercise in a President's oversight of his Administration.

Besides, upholding the CEQ regulations on the theory that these amount to Presidential oversight would raise additional problems.  The regulations "replace[d]" the rules of some seventy federal agencies, 43 Fed. Reg. at 55,978, and limited the agencies' role to supplementing CEQ's work with "implementing procedures," 40 C.F.R. § 1507.3(a) (1978).  Once the CEQ rules went into effect, they served as binding regulations across the whole of government.  And yet Supreme Court decisions hold that the Take Care Clause cannot be used to bypass agencies' limited status as "creatures of statute,"

---

[6] *See Pub. Citizen*, 541 U.S. at 768 ("The informational role of an [environmental impact statement] is to give the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provide a springboard for public comment in the agency decisionmaking process itself.").

"possess[ing] only the authority that Congress has provided them." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). To repeat, the Constitution does not permit the President to seize for himself the "law-making power of Congress" by issuing an order that, "like a statute, authorizes a government official to promulgate . . . rules and regulations." *Youngstown*, 343 U.S. at 588 (1952); *see also* Whitney, *supra*, at 92–94.[7]

---

[7] *See NLRB v. Noel Canning*, 573 U.S. 513, 571–72 (2014) (Scalia, J., joined by Roberts, C.J., Thomas & Alito, J.J., concurring in the judgment):

> "[W]hen questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch 'to say what the law is.' *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). This Court does not defer to the other branches resolution of such controversies; as Justice KENNEDY has previously written, our role is in no way "lessened" because it might be said that "the two political branches are adjusting their own powers between themselves." *Clinton* [*v. City of New York*, 524 U.S. 417, 449 (1998)] (concurring opinion). Since the separation of powers exists for the protection of individual liberty, its vitality "does not depend" on "whether 'the encroached-upon branch approves the encroachment.' " *Free Enterprise Fund*, 561 U.S. 477, 497 2010)(quoting *New York v. United States*, 505 U.S. 144, 182 (1992)); *see also Freytag v. Commissioner*, 501 U.S. 868, 879–880 (1991); *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–277 (1991). Rather, policing the "enduring structure" of constitutional government

CEQ therefore had no lawful authority to promulgate these regulations. One wrinkle remains. Many agencies, including the parent departments of the agencies here (the Department of the Interior, for the Park Service, and the Department of Transportation, for the FAA), have issued their own NEPA regulations. If an agency adopts CEQ's rules or incorporates them by reference into its NEPA regulations, would that be a permissible exercise of its own rulemaking authority?[8] The question is a good one, but it does not describe this case.

CEQ's regulations, as mentioned, instruct agencies to "confine themselves" to issuing only "implementing procedures" that "comply with [CEQ's] regulations." 40 C.F.R. § 1507.3(a)–(b) (1978). The implementing procedures "shall not paraphrase" CEQ's rules. *Id.* So the CEQ regulations represent the framework for all agencies' compliance with NEPA, leaving the agencies to fill in certain details specific to their programs.

As a result, the Agencies here have neither adopted the content of the CEQ regulations nor incorporated those rules by reference. Instead, they obeyed CEQ's command and accepted the CEQ regulations as a stand-alone body of law that they must

---

when the political branches fail to do so is "one of the most vital functions of this Court." *Public Citizen v. Department of Justice*, 491 U.S. 440, 468 (1989) (KENNEDY, J., concurring in judgment)."

[8] This court has explained in other contexts that an agency cannot outsource authority over the content of its regulations to an entity that itself lacks rulemaking authority. See *Ass'n of Am. R.R.s. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670–71 (D.C. Cir. 2013), *vacated & remanded on other grounds*, 575 U.S. 43 (2015); *NRDC v. EPA*, 464 F.3d 1, 8–9 (D.C. Cir. 2006).

obey and the courts must enforce.  The Department of the Interior's NEPA rules, for example, are meant to be used "for compliance with" the CEQ regulations.  43 C.F.R. § 46.10(a)(2).  Interior's regulations "supplement, and [are] to be used in conjunction with, the CEQ regulations."  *Id.* § 46.20(a).  And although the Department of the Interior once stated that it was "incorporat[ing]" certain CEQ guidance documents, it never said the same of the regulations.  73 Fed. Reg. 61,292, 61,292, 61,298 (Oct. 15, 2008).  The Department of Transportation's rules are similar: they are "not a substitute for" the CEQ regulations; do not "repeat or paraphrase the language of those regulations"; and merely "supplement[] the CEQ regulations by applying them to DOT programs."  Dep't of Transp., Order 5610.1C, at 2 (July 30, 1985).

The Agencies' NEPA analysis in this case reflected that reality.  They repeatedly invoked the CEQ regulations, not their own rules, as the source of the overarching regulatory framework they applied.  *See* J.A. 8–9, 20–21, 24–25, 58, 151, 159–63.  Their own NEPA regulations came up only to deal with certain agency-specific aspects of the analysis.  *See* J.A. 9, 20, 161, 169–73, 192, 194, 204–05, 220.

Even if Interior and Transportation had incorporated CEQ's regulations as their own, they would have been able to do so only for the original 1978 version of the CEQ's rules.  Interior's current rules went into effect in 2007; Transportation's in 1985.  The CEQ regulations were revised twice before 2023, when the Agencies formulated the Plan.  *See* 87 Fed. Reg. 23,453 (May 20, 2022); 85 Fed. Reg. 43,304 (July 16, 2020).  *See Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 291 (4th Cir. 2022).  The Agencies could not have adopted a body of rules that did not exist at the time.  Even if that were possible, nothing in the

agencies' rules evinced an intent to automatically incorporate every new iteration of the CEQ regulations.[9]

## III.

### A.

Petitioners, without invoking CEQ regulations, argue that the Agencies relied on an improper baseline for their environmental analysis by using the existing level of flights under interim operating authority as the baseline for assessing the environmental effects of the Plan.  We agree and hold that it was arbitrary and capricious for the Agencies to treat interim operating authority as the status quo for their NEPA analysis. We reject or decline to reach the rest of Petitioners' arguments.

When conducting an environmental analysis of a proposed action under NEPA, an agency compares the action's projected environmental effects to the existing condition of the environment.  Through that comparison, the agency can ascertain the magnitude of the proposed action's environmental impacts.  The agency's choice of the baseline for comparison matters a great deal. If the baseline is artificially high, the agency might erroneously conclude that even highly disruptive actions will have minimal incremental environmental effects. In that event, the agency might avoid conducting a more comprehensive environmental analysis required by NEPA.

In preparing the Bay Area Parks Plan, the Agencies treated the existing air tours in the Parks as the status quo for purposes

---

[9] It is worth considering whether, under the Administrative Procedure Act, each agency would be required to hold a separate notice and comment rulemaking proceeding before incorporating by reference any CEQ regulatory amendments.

of conducting their NEPA analysis. Those tours were conducted under interim operating authority. With the thousands of air tours conducted pursuant to interim operating authority serving as the baseline for comparison, the Agencies concluded that the Plan would have "no or minimal" environmental impacts. Record of Decision, *supra*, at 8–9. But by treating interim operating authority as the baseline, the Agencies enshrined the status quo without evaluating the environmental impacts of the existing flights. That outcome stands at odds with the Agencies' duties under the Act and NEPA.

Under the Act, "[t]he objective of any air tour management plan shall be to develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of commercial air tour operations upon the natural and cultural resources, visitor experiences, and tribal lands." 49 U.S.C. § 40128(b)(1)(B). The Act thereby confers a duty upon the Agencies to develop "acceptable and effective" Plans that "mitigate or prevent" significant environmental harms. The Agencies cannot sidestep those obligations by tilting the scales in a way that obscures the true environmental effects of a Plan.

That, though, is effectively what the Agencies have done here. The Agencies "decided to implement the existing condition"—that is, existing tours conducted under interim operating authority—in the Plan "because the impacts associated with the existing condition, together with reasonable mitigation measures included in the Plan, would not result in significant adverse impacts of commercial air tour operations upon the natural and cultural resources of any of the Parks or visitor experience in any of the Parks." Record of Decision, *supra*, at 14. But the "the impacts associated with the existing condition" along with the "mitigation measures" in the Plan would "not result in significant adverse impacts" only because they were compared to the existing condition itself. It was

unreasonable for the Agencies to avoid fully treating the environmental effects of the Bay Area Parks Plan on the ground that those effects would minimally alter a status quo that itself has never been adequately assessed. *See id.* at 21 ("The agencies acknowledge that no previous NEPA analysis of [interim operating authority] occurred. ").

The Agencies insist that Congress set interim operating authority as the status quo and that their choice of interim operating authority as the baseline thus was reasonable. True, Congress provided for granting interim operating authority as a means of smoothing the transition between the pre- and post-Air Tour Management Act worlds. But Congress did not intend for the Agencies to treat the level of pre-Act air tours as a legal status quo against which to compare all potential Plans. Under such an approach, the Agencies could grandfather in all pre-Act air tours without *ever* conducting a NEPA analysis. Congress, though, enacted the Act to "preserve, protect, and enhance the environment by minimizing, mitigating, or preventing the adverse effects of aircraft overflights" on national parks. Pub. L. No. 106-181, § 802(2), 114 Stat. at 186.

To achieve those objectives, Congress constructed a detailed scheme by which any operator of national-park air tours would be required to obtain approval from the Agencies, and the Agencies would likewise be required to develop detailed plans governing commercial air tour operations. *See* 49 U.S.C. § 40128(b). While that process plays itself out, existing operators can continue conducting flights pursuant to interim operating authority, but that authority can be revoked at any time for cause and it automatically expires six months after establishment of a Plan. *Id.* § 40128(c)(2)(D)–(E). Interim operating authority thus was always meant to be *interim*—that is, temporary. Indeed, the Agencies themselves describe interim operating authority as a "stopgap measure." Record of Decision,

*supra*, at 23. But by treating interim operating authority as the baseline for assessment of a Plan, the Agencies effectively transform a stopgap into a permanent part of a Plan that never undergoes NEPA analysis.

This case is unlike *Conservation Law Foundation v. FERC*, 216 F.3d 41 (D.C. Cir. 2000), on which the Agencies rely. There, we upheld the Federal Energy Regulatory Commission's decision to use the existing conditions of an operating dam as the baseline for analyzing the environmental effects of relicensing the dam. But we noted that the relevant statute "says nothing about whether the baseline for the Commission's comparative inquiry should be today or sometime other than today." *Id.* at 46. By contrast, the Parks Act makes clear that the provisional grant of interim operating authority should not function as the baseline for environmental analysis. In addition, we noted in *Conservation Law Foundation* that, regardless of the Commission's choice of baseline, it had "fully examined" the environmental effects of its proposed action and the alternative options. *Id.* Here, however, the Agencies failed to fully consider the Plan's environmental effects because they treated the effects of the existing flights as a starting point.

For these reasons, we hold that the Agencies acted arbitrarily by using the air tours conducted under interim operating authority as the baseline for evaluating the Bay Area Parks Plan's environmental effects. Because we hold that the Agencies measured environmental impacts against an improper baseline, we need not consider Petitioners' argument that the Agencies erred by excluding 2015–2016 flight data from that baseline. Nor need we address their contention that interim operating authority does not qualify as an "approved action" for purposes of the approved-action categorical exclusion.

B.

Petitioners argue that the Agencies' decision not to prepare an environmental assessment or environmental impact statement was arbitrary for two additional reasons: (i) the Agencies had previously decided to prepare an environmental assessment for the Bay Area Parks and abandoned that plan, and (ii) the Agencies have prepared—or are planning to prepare—environmental assessments for other, allegedly similar national parks. We reject both arguments.

First, it was not arbitrary for the Agencies to reverse course and decline to prepare an environmental assessment for the Bay Area Parks. In 2011, the Agencies published a notice in the Federal Register stating their intent to prepare an environmental assessment for the Parks. *See* 76 Fed. Reg. at 45,312. The Agencies "paused" that process upon amendment of the Act in 2012 and later "formally terminated" the process in 2020. Record of Decision, *supra*, at 2–3. When an agency reverses course, it must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis omitted). Here, the Agencies acknowledged their change of course and provided a reasonable explanation for it: to initiate fresh environmental review processes better suited to current circumstances. *See* 85 Fed. Reg. at 55,060; *accord* Record of Decision, *supra*, at 4.

Second, it was not arbitrary for the Agencies to decline to prepare an environmental assessment for the Bay Area Parks even though they prepared or are planning to prepare environmental assessments for purportedly similar national parks. Petitioners' argument boils down to a simplistic comparison between the number of air tours conducted in the Bay Area Parks and the number of air tours conducted

elsewhere. But the Agencies must consider a slew of factors in addition to the absolute number of air tours. Those factors include air tour routes, the altitudes for those tours, restrictions for particular events, noise consequences, and visual impacts. *See* 49 U.S.C. § 40128(b)(3)(B). And the Agencies must consider the effects upon the "natural and cultural resources" and "visitor experiences" of the relevant park. *Id.* § 40128(b)(1)(B). The Agencies are therefore tasked with conducting a highly park-specific inquiry involving far more than simply counting the number of air tours. We extend agencies considerable discretion to weigh an open-ended set of factors, *see Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002), especially when the agency must make a "predictive judgment regarding a matter within its sphere of expertise," *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999). In that light, we decline to second-guess the Agencies' decision not to prepare an environmental assessment for the Bay Area Parks solely because they prepared environmental assessments for other parks.

## IV.

We come then to the question of remedy. Pursuant to section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2), a reviewing court "shall . . . hold unlawful and set aside" agency action that violates the APA. Our precedents have authorized remand without vacatur but "only if an agency's error is 'curable.'" *Bridgeport Hosp. v. Becerra*, No. 22-5249, --- F.4th ----, 2024 WL 3504407, at *7 (D.C. Cir. July 23, 2024) (quoting *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016)). As discussed in Part III above, the Agencies' actions were *ultra vires* when they determined that their Plan would have no environmental impact as compared with the existing tour flights permitted on an interim basis. The Agencies will now need to take a completely different tack to complete their

NEPA review. Because the Agencies have not shown "at least a serious possibility" that they will be able to reach the same outcome on remand, we must vacate the Plan. *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)).

If the Agencies and Petitioners desire to keep the current Plan in place while the Agencies restart their NEPA review, the parties may move for a stay of our mandate. *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1375 (D.C. Cir. 2004) (Randolph, J., concurring); *accord Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (statement of Kavanaugh, J.). This approach has several practical advantages. It allows the court to hear from both sides, and perhaps from intervenors or amici curiae, gather information about the consequences of granting or denying relief, and decide the question in accordance with our well-established standards for issuing a stay. *See NRDC v. EPA*, 489 F.3d 1250, 1263–64 (D.C. Cir. 2007) (Randolph, J., concurring).

A stay can also place limits and reporting requirements on an agency, thus giving "the agency an incentive to act in a reasonable time." *Id.* at 1264 (Randolph, J., concurring). One might expect that the Agencies will move "promptly" on remand. But an expectation is not an obligation. This court has already had to issue a writ of mandamus to force the Agencies' hands. *See In re PEER*, 957 F.3d at 269. Petitioners should not be saddled with having to clear the bar of mandamus relief if the Agencies take too long. The Agencies acted without authority; they should bear the burden of justifying a stay of the mandate.

\* \* \*

The petition for review is granted, the FAA's order is vacated, and the case is remanded to the FAA.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring with respect to Part IV:

As I have maintained, the Administrative Procedure Act requires courts to vacate agency action determined to be unlawful. *See Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (opinion of Randolph, J.); *NRDC v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007) (Randolph, J., concurring); *Comcast Corp. v. FCC*, 579 F.3d 1, 10 (D.C. Cir. 2009) (Randolph, J., concurring). Section 706(2) provides that a reviewing court "shall . . . hold unlawful and set aside" agency action that violates the APA. 5 U.S.C. § 706(2). "Shall" in § 706 conveys a "command," as it does in ordinary usage. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265 (2024). And to "set aside" is to vacate, as confirmed by the text, the structure, and the history of the APA, and the longstanding practices of this court and the Supreme Court—all of which Justice Kavanaugh proved conclusively in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 144 S. Ct. 2440, 2462–64 (2024) (Kavanaugh, J., concurring).

Section 706(2)'s text thus admits of only one meaning: a court must—not may—vacate agency action that is arbitrary or capricious or otherwise unlawful. A long line of this court's precedents reinforce that conclusion. *See Comcast*, 579 F.3d at 10–11 & n.2 (Randolph, J., concurring) (collecting cases); *Checkosky*, 23 F.3d at 491–93 & n.35 (opinion of Randolph, J.) (same). It is true that there are decisions of this court ordering remand without vacatur. *E.g. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). But not one of those decisions even attempted to explain how "shall" and "set aside" in § 706(2) could possibly mean "disregard" and "keep in place" unlawful agency action. *See Webster v. Fall*, 266 U.S. 507, 511 (1925).

31

Internal deliberations of the Supreme Court in *Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988), unearthed with the release of the Thurgood Marshall papers, support this view. *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 351--52 (2003). Justice Kennedy's draft opinion had initially stated that a reviewing court could remand an illegal rule without vacating it. *Id.* Justice Kennedy deleted that portion of his draft after Justice Scalia circulated a memorandum with which several other justices agreed. *Id.* Justice Scalia's memorandum first quoted § 706(2) with particular emphasis on the word "shall" preceding "set aside," and then said this:

> I think it would be buying grief to suggest that a court may exercise its equitable discretion to disregard [§ 706(2)] by leaving a regulation "not in accordance with law" in effect, or by allowing a revised rule to be formulated and then applied as though it had been issued earlier. For one thing, since not all proceedings calling a rule into question are equitable proceedings – for example, a civil penalty suit brought by the agency for violation of the invalid rule – such a principle would create considerable potential for inconsistent application. (The ordinary statutory provision for direct court-of-appeals review of rulemaking does not, I think, establish an equitable proceeding . . . .) Even apart from this problem, however, I am sure it is not wise for us to invite agencies to seek exercise of 'equitable discretion' to let invalid rules stand.

*Id.* Thus, § 706(2) forecloses judicial discretion, equitable or otherwise. *See Miller v. French,* 530 U.S. 327, 340–341 (2000).

SRINIVASAN, *Chief Judge*, dissenting with respect to Parts II and IV:

I join Part III of the court's opinion, in which we reject the Agencies' use of the existing level of flights under interim operating authority as the baseline for measuring the environmental effects of their Air Travel Management Plan. Respectfully, though, I am unable to join Parts II and IV of the court's opinion, in which my colleagues, respectively: (i) consider whether the CEQ has authority to issue binding NEPA regulations and conclude it does not; and (ii) determine that the Agencies' challenged action must be vacated even though the effect of vacatur is to put the prevailing party (petitioners) in a worse position. No party in this case asks us take either of those steps. And in substantially similar circumstances, our court has consistently refrained from unnecessarily deciding the CEQ regulations' validity or unnecessarily vacating agency action. I would follow the same course here.

1. In Part II of the court's opinion, my colleagues determine that the CEQ lacks authority to issue binding regulations implementing NEPA. There is no cause to reach that issue in this case.

First and foremost, no party challenges the CEQ's regulations. In nonetheless reaching out to address the issue, the court contravenes "our established 'principle of party presentation.'" *Keepseagle v. Perdue*, 856 F.3d 1039, 1055 (D.C. Cir. 2017). That principle embodies the idea "that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1210 (D.C. Cir. 1986). After all, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375,

386 (2003) (Scalia, J., concurring in part and concurring in judgment). And when no party raises an issue, we of course lack the benefit of the parties' presentation of briefing and argument on it.

Of particular salience, we have specifically and steadfastly adhered to the party presentation principle in declining to address the exact issue my colleagues venture out to decide today. Time and again, we have refrained from questioning the CEQ's authority to adopt binding NEPA regulations because the parties did not raise the challenge. *See, e.g.*, *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 n.5 (D.C. Cir. 2006) ("The DOE accepts [the CEQ regulations] as binding, as do we for purposes of this appeal."); *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 341 n.* (D.C. Cir. 2002) ("Neither party challenges the regulatory authority of the CEQ, and hence we have no occasion to question the binding effect of the regulations on the FAA."); *City of Alexandria v. Slater*, 198 F.3d 862, 866 n.3 (D.C. Cir. 1999) ("Because the Administration does not challenge the Council's regulatory authority, we treat the Council's regulations as binding on the agency.").

There is all the more reason to abide by the party presentation principle in this case because we are already ruling in favor of the petitioners on another ground they *did* raise: that the Agencies' choice to use the existing level of flights as the baseline was improper. The relevant CEQ regulation enables the Agencies to rely on a "categorical exclusion" from NEPA's otherwise-applicable requirement to prepare a formal environmental analysis. *See* 40 C.F.R. §§ 1501.3(a)(1), 1501.4 (2020); Maj. Op. 12, *supra*. Petitioners do not challenge the validity of the categorical-exclusion regulation, but instead argue (among other things) that the Agencies' reliance on the regulation was improper because it rested on an improper baseline. The court today agrees with petitioners on that score.

And because we hold that the Agencies' reliance on the categorical-exclusion regulation was improper, there is no need to consider whether the regulation is valid—even aside from the fact that no one is challenging the regulation's lawfulness in the first place.

My colleagues ground their decision to assess the CEQ's authority to issue binding regulations on the idea that the question implicates the separation of powers. *See* Maj. Op. 8, *supra*. But that of course was no less true in the repeated occasions in which we declined to address precisely the same issue because no party raised the challenge. Even if the parties could not "by consent cure" the issue if it were squarely presented, *id.* (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850 (1986)), my colleagues do not suggest that the court is somehow obligated to address the issue even though no party has presented it. Rather, as our consistent line of decisions declining to address the validity of the CEQ regulations confirms, the normal rule that we do not take up a challenge unless a party raises it is fully applicable here.

Even assuming the party presentation principle could give way in certain circumstances involving a separation-of-powers issue, this case would not be a prime candidate for that kind of exception. My colleagues reference *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017), in support of their invocation of separation-of-powers principles as a reason to address the CEQ regulations' validity. Maj. Op. 8, 13, *supra*. Unlike in this case, the party in *Mexichem* raised the issue the court decided—whether EPA had authority to issue a rule restricting the manufacture of products containing a regulated chemical. 866 F.3d at 456. The restrictive effect of the challenged rule fell directly on a regulated private party, a context in which we are generally sensitive to the "bedrock separation of powers principle[]" of assuring the agency's

authority to impose the regulatory burden. *Id.*; *cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) ("The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.") (quoting *Bowsher v. Synar*, 478 U.S. 714, 730 (1986)).

Here, by contrast, the CEQ's relevant regulation operates directly on the Agencies, not on a regulated private party: the regulation enables the Agencies to forgo preparing a formal environmental analysis if a categorical exclusion is available. And by doing so, the regulation enables the Agencies to circumscribe their regulatory ambit, not expand it. What is more, to the extent my colleagues believe the party presentation principle should give way even if the party bound by a CEQ regulation is an agency rather than a regulated party, the regulation in question here does not in fact bind an agency. Instead, the regulation enables an agency to rely on a categorical exclusion without requiring the agency to do so. *See* 40 C.F.R. § 1501.4 (2020). Whatever interest there may be in determining the CEQ's authority to issue binding NEPA regulations, that interest is diminished in a case that does not involve a regulation that in fact binds.

For all of those reasons, I would adhere to our consistent practice of declining to address the validity of the CEQ regulations when no party asks us to do so.

2. My colleagues not only address an issue that no party raises, but they also order a remedy that no party desires. That action, too, is out of step with our decisions in like circumstances.

Petitioners, the prevailing parties in this case, understandably do not want a vacatur of the Agencies' Air Travel Management Plan. That remedy would leave

petitioners worse off than the status quo. A vacatur of the Agencies' Plan would reinstate the pre-Plan regime—that is, the level of flights permitted under the interim operating authority but without the mitigating environmental measures instituted by the Plan. Vacatur, then, "would at least temporarily defeat . . . the enhanced protection of the environmental values" at stake. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188 (D.C. Cir. 2017) (alteration in original) (quoting *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam)).

Largely for that reason, "[n]o party to this litigation asks that the court vacate [the Plan]." *Env't Def. Fund v. Adm'r, U.S. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990). Petitioners, while successfully challenging the Plan, submit that vacatur would be "unjust" because it would only increase air tours' environmental effects on the Bay Area Parks. Pet. Reply Br. 26. The Agencies, for their part, agree. While they defend the Plan, they allow that if petitioners' challenge succeeds, then "vacating the Plan while the Agencies conducted more environmental analysis would cause disruptive consequences." Agencies' Br. 67. And because "the adverse consequences would fall on the very places and people that the Plan protects," the Agencies explain, "the Court should exercise its equitable discretion by leaving the Plan in place while the Agencies conduct more NEPA analysis." *Id.* at 68.

When confronted with similar circumstances, our court has repeatedly remanded to an agency without vacating a flawed but environmentally protective agency action. *See, e.g., Ctr. for Biological Diversity*, 861 F.3d at 188–89; *North Carolina*, 550 F.3d at 1178; *Env't Def. Fund*, 898 F.2d at 190; *Sierra Club v. EPA*, 167 F.3d 658, 664 (D.C. Cir. 1999); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000); *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (per

curiam); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019 (per curiam). I see no reason to do otherwise here.

My colleagues express uncertainty about whether the Agencies would ultimately be able to achieve the same result as the successfully-challenged Plan. Maj. Op. 24, *supra*. The question, though, is what happens while the Agencies undertake that analysis. And in that regard, there is no cause here for putting the prevailing party in a worse position than the status quo while the proceedings before the Agencies move forward. To the contrary, "[w]e have [] frequently remanded without vacating when a rule's defects are *curable* and where vacatur would at least temporarily defeat . . . the enhanced protection of the environmental values covered by the [rule]." *U.S. Sugar Corp.*, 844 F.3d at 270 (emphasis added) (quotation marks and citation omitted). The defect here—the Agencies' use of an improper baseline—is at least "curable." *Id.*

In *North Carolina v. EPA*, for instance, we determined that the Clean Air Interstate Rule (CAIR) was "fundamentally flawed" and that "[n]o amount of tinkering with the rule or revising of the explanations will transform CAIR, as written, into an acceptable rule." 531 F.3d 896, 929–30 (D.C. Cir. 2008). But we remanded without vacatur, explaining that, "notwithstanding the relative flaws of CAIR, allowing CAIR to remain in effect until it is replaced by a rule consistent with our opinion would at least temporarily preserve the environmental values covered by CAIR." 550 F.3d at 1178. We described that "method of disposition [as] consistent with the court's precedents." *Id.*

Along the same lines, in *Sierra Club v. EPA*, we rejected EPA's methodology in a rule as "hopelessly irrational." 167 F.3d at 664. But we remanded without vacatur because Sierra

Club "expressly requested that we leave the current regulations in place during any remand, rather than eliminate any federal control at all." *Id.* We found it adequate that "[i]t is possible that EPA may be able to explain" its approach. *Id.*; *see, e.g., Nat'l Lime Ass'n*, 233 F.3d at 635 ("In view of [the petitioner's] request that we not vacate the EPA's regulations, because to do so would at least temporarily defeat [its] purpose, the enhanced protection of the environment, we will leave the current [] regulations in place during remand.") (internal quotation marks and citation omitted); *Env't Def. Fund*, 898 F.2d at 190 (remanding without vacatur because "[n]o party to this litigation asks that the court vacate the EPA's regulations, and to do so would at least temporarily defeat petitioner's purpose, the enhanced protection of the environmental values covered by the [regulations]"). I would apply the same approach—and reach the same conclusion—in this case.