**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| Marin Audubon Society, *et al.*, <br><br> *Petitioners*, <br><br> v. <br><br> Federal Aviation Administration, *et al.*, <br><br> *Respondents*. | No. 23-1067 |

**JOINT MOTION TO STAY ISSUANCE OF THE MANDATE**

When vacating the order on review in this case, the Court stated that "[i]f the [respondent] Agencies and Petitioners desire to keep the current Plan" that governs tourist flights over four national park units near San Francisco "in place while the Agencies restart their NEPA review, the parties may move for a stay of our mandate." Op. 28. The plan at issue limits air tours in these units and includes conditions that mitigate some of the tours' environmental effects. Vacating the plan would revive a prior interim system under which nearly twice as many flights were authorized for two park units and even more for the other two park units, without the plan's conditions. It would thus harm the very places (the park units) and people (like petitioners) that the National Parks Air Tour Management Act and the plan were meant to protect. This Court should therefore stay the issuance of its mandate for one year after the disposition of the

petitions for rehearing so that the Agencies can comply with this Court's decision.[1]

## BACKGROUND

The National Parks Air Tour Management Act, enacted in 2000, governs commercial air tours over national park units (and tribal lands within or adjacent to those units). The Act requires the Administrator of the Federal Aviation Administration, in cooperation with the Director of the National Park Service, to establish air tour management plans or voluntary agreements for these areas. 49 U.S.C. § 40128(b)(1)(A), (b)(7).

Any plan must "develop acceptable and effective measures to mitigate or prevent the significant adverse impacts, if any, of" tours "upon the natural and cultural resources, visitor experiences, and tribal lands" in these areas. *Id.* § 40128(b)(1)(B). These plans may include measures such as prohibiting or limiting the number of tours; establishing altitude, route, and time restrictions; and mitigating noise, visual, or other impacts. *See id.* § 40128(b)(3). The

---

[1] The parties have sought rehearing. The issuance of the mandate has been stayed until seven days after the disposition of their petitions.

Petitioners' rehearing petition asked the Court to revise Section IV of the panel opinion to order the remedy of remand without vacatur as the parties requested, and Respondents did not oppose that request. If the full Court grants this rehearing request from Petitioners, that will avoid the need to resolve this motion because the Plan will not be vacated and will remain in place on remand.

Administrator and Director both must sign off on the agencies' National Environmental Policy Act (NEPA) environmental analysis for these plans. *See id.* § 40128(b)(2).

The Management Act addresses the interim period before plans issue. The Administrator "shall grant interim operating authority" to existing operators. *Id.* § 40128(c)(1). The number of flights under this authority is capped based on the number of flights the operator reported that it ran over the prior year or the average number of flights over the previous three years, whichever was higher. *See id.* § 40128(c)(2).

This case concerns a plan that covers four park units near San Francisco that issued last year. Before the plan, operators had been granted interim operating authority "to conduct up to 5,090 flights per year over each of the" four park units, without "restrictions on routes, altitudes, time of day, or . . . for special events." JA148. By contrast, the plan capped tours at 2,548 over the Golden Gate National Recreation Area and San Francisco Maritime National Historical Park, 143 over Point Reyes National Seashore, and none over Muir Woods National Monument. JA148–149. Where flights were allowed, the plan included restrictions such as daily limits, time, altitude, and route modifications, and prohibitions on hovering in place to address the tours' effects on the environment and the public's enjoyment of these areas. JA149–150.

Petitioners challenged the plan, and the panel held that the Agencies did not comply with NEPA when preparing the plan. The Agencies set the "baseline from which to measure environmental impacts of the" plan as the three-year average of tours operating under interim operating authority. JA151. The Agencies then concluded that because the plan authorized a similar number of tours along with mitigation measures, it would "result in no or only minimal environmental impacts." *Id.* The Court held that the Act "makes clear that the provisional grant of interim operating authority should not function as the baseline for environmental analysis." Op. 25. By using that baseline, the Court found that the Agencies had "failed to fully consider the Plan's environmental effects." *Id.*

As to the remedy, the Court held, over a partial dissent by Chief Judge Srinivasan, that the Agencies' error meant that it "must vacate the Plan." *Id.* at 28. The Court then stated that if the parties "desire to keep the current Plan in place while the Agencies restart their NEPA review," they "may move for a stay of [the] mandate." *Id.* It further stated that a stay could "place limits and reporting requirements on" the Agencies. *Id.*

Consistent with the Court's direction, the parties now seek to stay issuance of the mandate.

## REASONS TO STAY ISSUANCE OF THE MANDATE

When this Court vacates an agency action and then considers whether to issue its mandate, it asks whether doing so would have disruptive consequences. *See* Fed. R. App. Proc. 41(b) (stating that a "court may shorten or extend the time [at which the mandate will issue] by order"); *see also* D.C. Cir. R. 41(a)(2).[2] For example, in *Cboe Futures Exchange, LLC v. Securities and Exchange Commission*, this Court vacated an exchange order that governed certain futures contracts but recognized that market participants would need time to wind down transactions that took place under the order. 77 F.4th 971, 982 (D.C. Cir. 2023). It therefore "provide[d] a three-month period during which market participants can wind down their open transactions" before the mandate would issue. *Id.*; *see also Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355, 371 (D.C. Cir. 1989) ("[T]o

---

[2] The Court should not await, or invite, the participation of "intervenors or amici curiae" to resolve this motion. Op. 28. The Federal Rules require interested entities to seek to join a case as early as possible. *See, e.g., Campaign Legal Ctr. v. Fed. Election Comm'n*, 68 F.4th 607, 610 (D.C. Cir. 2023) ("The most important circumstance relating to timeliness is whether a party sought to intervene as soon as it became clear that its interests would no longer be protected by the parties." (alteration and quotation omitted)). Here, any entities with an interest in the plan (for or against) have long been on notice that this litigation could affect the status of the plan. And the parties' merits briefing specifically addressed the remedy question, including raising the considerations that this motion discusses.

avoid disrupting EPA's regulatory program [prohibiting disposal of certain solvents and dioxin], we will withhold issuance of our mandate for 90 days.").

In this case, a stay of issuance of the mandate is warranted to avoid the disruptive harm that would result if the plan is not left in place while the Agencies comply with the Court's decision.

To start, under these circumstances, allowing *no* plan to govern tours over these four national park units would undermine the stated goals of the Management Act. As this Court recognized in its opinion, the Act exists "to 'preserve, protect, and enhance the environment by minimizing, mitigating, or preventing the adverse effects of aircraft overflights' on national parks." Op. 26 (quoting Pub. L. No. 106-181, § 802(2), 114 Stat. 61, 186 (2000)). The parties agree that the plan here includes at least *some* provisions that take steps to achieve the Act's goals, and it is possible that the Agencies' future action will maintain or *increase* the protectiveness of those steps. Under these circumstances, it would undermine the Act to lift the protection those steps provide while the Agencies pursue *full* compliance with the Act.

What is more, issuance of the mandate in this case would—by making the vacatur immediately effective—harm the national park resources and visitor experiences at issue.

The plan limits the number of tours over these areas; without it, operators would be able to run nearly twice as many tours, with all of the attendant "noise, visual, or other impacts." 49 U.S.C. § 40128(b)(3)(B). As the petitioners' have shown, those impacts are already falling on the park units and the people who visit them; a higher number of tours would escalate those impacts. *See, e.g.*, Chariton Decl. ¶ 4, Doc. No. 2027395 (filed Nov. 16, 2023) (explaining that she visits parks for "peace, quiet, observation, and meditation" and tours "cause loud noise and disturb the quiet"); Marin Audubon Society Decl. ¶ 6, Doc. No. 2027395 (filed Nov. 16, 2023) (explaining that tours flush birds out of their habitat and affect "seabird nesting and marine mammals"). Though the Court found that the Agencies did not fully assess the environmental effects of all current tours, the Agencies' environmental analysis confirms that tours can harm these areas. *See, e.g.*, JA61 (noting that raptor species present in the areas "are especially sensitive to low flying aircraft and their associated noise); JA61–62 (explaining that noise from tours can affect wildlife through "altered vocal behavior, breeding relocation, changes in vigilance and foraging behavior, and impacts on individual fitness and the structure of ecological communities"); JA66 ("aircraft noise in national parks can impact human perceptions of aesthetic quality of viewsheds"); *see also* Ex. 1, National Park Service Decl. ¶¶ 4-8 (Jan. 8, 2025).

Without the plan, the risk is not just of more tours but of more *damaging* tours, as the plan's mitigation measures would not be in effect. *See* Ex. 1, National Park Service Decl. ¶¶ 4-5. These measures, for example, require tours to "maintain a 1,000 ft. lateral avoidance of nesting waterbird colonies, peregrine falcon nests and marine mammal haul outs." JA33. They also proscribe routes that reflect "avoidance distances of currently known nesting waterbird colonies, peregrine falcon nests and marine mammal haul outs." *Id.* And they restrict the times of day during which tours can take place. JA38; *see also* JA43 (explaining that "[b]iologically important behaviors for many species occur during this time, such as the dawn chorus for songbirds, foraging, and communication" and that the plan's time restrictions "create quiet periods of the day during which noise from commercial air tours would not impede these critical wildlife behaviors"). Without the plan, the tour operators will not be required to take these protective measures when flying over these areas.

The Agencies are committed to addressing the error that the Court's opinion identified in a timely manner. As the attached declarations explain, the Agencies may need substantial time to respond to the Court's decision. *See* Ex. 1, National Park Service Decl. ¶¶ 9-11; Ex. 2, Federal Aviation Administration Decl. ¶¶ 2-4 (Jan. 10, 2025). If the Agencies comply with the Court's decision by preparing a new or amended air tour management plan, the Agencies will

need to account for the Court's holding that the Agencies chose an incorrect baseline to comply with NEPA. *See* Exs. 1, 2.[3] And if the Agencies conclude it is necessary to prepare an environmental assessment to comply with NEPA, the Agencies estimate that it could take them one year to complete that process and issue a new or amended air tour management plan. *See* Exs. 1, 2. As a member of this Court has noted, a stay of the issuance of the mandate accompanied by time limits can "give the agency an incentive to act in a reasonable time, given the other constraints on its resources." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring). To demonstrate the Agencies' commitment to moving quickly, the parties propose that this Court stay its issuance of the mandate for one year, to coincide with the Agencies' estimate of when they would be able to complete the required actions.

---

[3] Petitioners join this joint motion because they agree that the equities support keeping the current plan in place while the Agencies comply with the panel decision. Petitioners do not disagree with the estimates the Agencies have provided of the time needed to conduct further environmental review under the National Environmental Policy Act in light of the panel decision. Beyond those estimates, the declarations contain some discussion of actions that the Agencies may take after the panel decision. Petitioners disagree with that additional discussion, and they reserve all arguments and rights with respect to future challenges to the Agencies' future actions in light of the panel decision. Because the joint motion to stay the issuance of the mandate is based on an estimate of the time needed to conduct further environmental review, this disagreement is not relevant to the Court's resolution of this joint motion.

# CONCLUSION

For these reasons, this Court should stay the issuance of its mandate for one year after the disposition of the petitions for rehearing so that the Agencies can comply with the Management Act and this Court's decision.

January 10, 2025

/s/ Kirti Datla

Kirti Datla
Tosh Sagar
EARTHJUSTICE
1001 G Street NW, Suite 1001
Washington, DC 20001
202.797.5241
kdatla@earthjustice.org

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104

Paula N. Dinerstein
Peter T. Jenkins
PUBLIC EMPLOYEES FOR ENVIRON-
MENTAL RESPONSIBILITY
962 Wayne Ave., Ste. 610
Silver Spring, MD 20910

*Counsel for Petitioners*

Respectfully submitted,

/s/ Justin D. Heminger

TODD KIM
Assistant Attorney General

JUSTIN D. HEMINGER
JACOB D. ECKER
Attorneys
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I certify that this motion was electronically filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on January 10, 2025.  I certify that this motion was served on counsel for all parties via email and the Court's CM/ECF system.

January 10, 2025

/s/ Justin D. Heminger
JUSTIN D. HEMINGER
*Counsel for Respondents*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d) because it contains 2,169 words.

This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface in Calisto MT 14-point font using Microsoft Office Word for Microsoft 365.

January 10, 2025

/s/ Justin D. Heminger
JUSTIN D. HEMINGER
*Counsel for Respondents*

# Exhibit 1

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| MARIN AUDUBON SOCIETY, et al., | ) | |
| Petitioners | ) | |
| | ) | |
| v. | ) | Case No. 23-1067 |
| | ) | |
| FEDERAL AVIATION ADMINISTRATION, | ) | |
| U.S. DEPARTMENT OF TRANSPORTATION | ) | |
| And NATIONAL PARK SERVICE, U.S | ) | |
| DEPARTMENT OF THE INTERIOR, | ) | |
| Respondents | ) | |
| _____ | ) | |

## DECLARATION OF RAYOND M. SAUVAJOT, PH.D.

I, Raymond M. Sauvajot, PH.D., declare as follows:

1.      I am the Associate Director for National Resource Stewardship and Science for the National Park Service (NPS). I have been in this position for ten years. Prior to that time, I served as Deputy Associate Director for Natural Resource Stewardship and Science, Natural Resource Program Chief for the NPS Pacific West Region, and Chief of Planning, Science, and Resource Management for Santa Monica Mountains National Recreation Area.  All told, I have worked for the NPS for 31 years.

2.      I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.     As Associate Director, I oversee natural resource management and science programs for the NPS, including national programs in biology, air and water resources, geology, natural sounds and night skies, environmental quality and compliance, ecological inventory and monitoring, climate change response, and science communication. The Natural Sounds and Night Skies Division is a Washington support program within the Natural Resource Stewardship and Science directorate. The NPS National Overflights Program, which has primary responsibility for implementing the National Parks Air Tour Management Act (NPATMA), is within the Natural Sounds and Night Skies Division.

4.     The routes included in the air tour management plan (ATMP) for the parks included modifications from the air tour routes flown by the operators under existing conditions. These modifications were identified by a NPS interdisciplinary team of subject matter experts.  This team modified the operators' existing routes, as provided by the operators, so that the tours would not fly over sensitive areas, including historic districts, or interfere with the Parks' interpretive programs, and other measures designed to minimize or prevent impacts to park resources. If the ATMP were vacated and interim operating authority reinstated, operators could resume flying their previous routes without the mitigations to protect the Parks' resources and visitor experience included in the ATMP because interim operating authority only specifies the annual number of air tours allowed and does not

include any operating conditions such as designated routes, minimum altitudes, or time of day restrictions. The operators could also choose to fly different routes than those they previously reported to the agencies, resulting in impacts to the Parks' resources that were not analyzed by the NPS or addressed in the ATMP.

5.     The ATMP includes minimum altitudes and lateral avoidances for helicopter and seaplane tours. They were developed based on technical advice provided by the U.S. Fish and Wildlife Service and the National Marine Fisheries Service and are consistent with recommended protections for marine mammal haul outs, peregrine falcons, nesting shore birds, and other noise sensitive species.   If the ATMP were vacated, and interim operating authority reinstated, these sensitive resources would lose the protections from noise and visual impacts provided by the ATMP.

6.     The ATMP authorizes 2,548 air tours over Golden Gate and San Francisco Maritime each year; up to 1,280 of which may be flown using helicopters and 1,268 of which may be flown using seaplanes. If the ATMP were vacated and interim operating authority reinstated; up to 2,900 helicopter tours could occur and up to 2,190 seaplane tours could occur over these two parks. Under the ATMP, noise modeling demonstrates that noise exceeding 52 decibels, the level at which a visitor may reasonably expect interference with Park interpretive programs, for up to 10 minutes on a peak day. If the ATMP were

vacated, increased tours could occur, up to the level authorized by interim operating authority, which would increase noise and visual impacts beyond those disclosed in the NPS's Categorical Exclusion Documentation Form.

7.     The ATMP authorizes only 143 commercial air tours over Point Reyes National Seashore, with no helicopter tours allowed. The ATMP also includes daily limits on the number of seaplane tours that may be conducted over Point Reyes.  On most days, the seaplane operator is limited to a maximum of a single air tour per day, though on five days a year the seaplane operator could conduct up to two flights per day over Point Reyes. If the ATMP were vacated, and interim operating authority reinstated, the helicopter operator could fly up to 2,900 tours per year and the seaplane operator could fly up to 2,190 tours each year over Point Reyes with no daily caps. While the seaplane route authorized in the ATMP does cross segments of the Phillip Burton Wilderness it spends only limited time over the wilderness, leaving the vast majority of the park's wilderness unimpacted by air tours year-round. If the ATMP were vacated, increased air tours could occur increasing noise and visual impacts on wilderness character and on the park's other sensitive resources, including marine mammals and shorebirds.

8.     The ATMP does not allow any tours over Muir Woods. Though Muir Woods was exempt from the requirement to prepare an ATMP or voluntary agreement, the NPS withdrew that exemption on March 4, 2021, in order to protect

the park's resources and values and visitor experience and to preserve the park's primeval character and ecological integrity of its old-growth redwood forest. The park's natural soundscape is a highly valued part of the visitor experience. If the ATMP were vacated, and interim operating authority reinstated, air tours over the park could occur up to the level authorized by interim operating authority (5,090 air tours per year). Any air tours over the Muir Woods would increase noise and visual impacts beyond those disclosed in the NPS's Categorical Exclusion Documentation Form.

9.     On remand, the Agencies will need to determine how to comply with the National Parks Air Tour Management Act, which allows the Agencies either to prepare an air tour management plan or to enter into a voluntary agreement with all operators over a park.

10.     If the agencies choose to prepare a new or amended air tour management plan, the Agencies will need to determine how to comply with the Court's decision, which held that the Agencies chose an incorrect baseline to comply with the National Environmental Policy Act (NEPA). If the Agencies decide to prepare a new or amended air tour management plan and conclude that it is necessary to prepare an environmental assessment under NEPA, it could take 12 months to complete that process and to issue a new or amended air tour management plan.

11.     Alternatively, the Agencies may choose to comply with the Court's decision and NPATMA by entering into a voluntary agreement with the air tour operators. A voluntary agreement must address management issues necessary to protect park resources and visitor experiences and may include the same sorts of measures that can be included in a plan. Before entering into a voluntary agreement, the Agencies must provide an opportunity for public review of the draft agreement and must consult with any Indian tribe whose tribal lands are, or may be, flown over; after that public review and consultation, the voluntary agreement may be implemented without further administrative or environmental process. A voluntary agreement becomes effective when both the NPS and the FAA enter into it with the air tour operators. If the Agencies choose to comply with the Court's decision by entering into a voluntary agreement, this process will likely take less time than completing a plan, though the Agencies are not in a position at this time to estimate the length of time such process would take.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 8, 2025.

RAYMOND
SAUVAJOT

Digitally signed by
RAYMOND SAUVAJOT
Date: 2025.01.08 17:32:42
-05'00'

Raymond M. Sauvajot, Ph.D.,
Associate Director for National Resource
Stewardship and Science,
National Park Service

# Exhibit 2

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| MARIN AUDUBON SOCIETY, et al., | ) | |
| Petitioners | ) | |
| | ) | |
| v. | ) | Case No. 23-1067 |
| | ) | |
| FEDERAL AVIATION ADMINISTRATION, | ) | |
| U.S. DEPARTMENT OF TRANSPORTATION | ) | |
| And NATIONAL PARK SERVICE, U.S | ) | |
| DEPARTMENT OF THE INTERIOR, | ) | |
| Respondents | ) | |
| _____ | ) | |

## DECLARATION OF JULIE MARKS

1.     I, Julie Marks, am the Executive Director of the Office of Environment and Energy at the Federal Aviation Administration. In this capacity, I am responsible for providing support to the Air Tour Management Plan effort.

2.     The National Parks Air Tour Management Act allows the Agencies either to prepare an air tour management plan or to enter into a voluntary agreement with all operators over a park.

3.     On remand, if the Agencies choose to prepare a new or amended air tour management plan, the Agencies will need to determine how to comply with the Court's holding that they chose an incorrect baseline for compliance with the National Environmental Policy Act (NEPA). If the Agencies decide to prepare a new or amended air tour management plan and conclude that it is necessary to

prepare an Environmental Assessment under NEPA, it could take 12 months to complete that process.

4.     Alternatively, the Agencies may choose to comply with the Court's decision and NPATMA by negotiating and entering into a voluntary agreement with the air tour operators. Before entering into a voluntary agreement, the Agencies must provide an opportunity for public review of the draft agreement and must consult with any Indian tribe whose tribal lands are, or may be, flown over. After that public review and consultation, the voluntary agreement may be implemented without further administrative or environmental process. If the Agencies choose to comply with the Court's decision by entering into a voluntary agreement, the process will likely take less time than completing a plan although the Agencies are not in a position at this time to estimate the length of time such a process would take.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2025

JULIE ANN
MARKS

Digitally signed by JULIE ANN
MARKS
Date: 2025.01.10 12:25:33
-05'00'

Julie Marks
Executive Director
Office of Environment and Energy
Federal Aviation Administration